# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF VIRGINIA
### ALEXANDRIA DIVISION

01 COMMUNIQUE LABORATORY, INC.,

        Plaintiff

v.

LOGMEIN, INC. and DELL, INC.,

        Defendants.

Civil Action No. 1:10-cv-01007-CMH-TRJ

Judge Claude M. Hilton

Magistrate Judge Thomas Rawles Jones, Jr.

## PLAINTIFF'S MEMORANDUM IN SUPPORT OF ITS MOTION FOR A PRELIMINARY INJUNCTION <u>AGAINST LOGMEIN, INC.</u>

**TABLE OF CONTENTS**

PAGE

TABLE OF AUTHORITIES ........................................................................................ i

TABLE OF EXHIBITS ............................................................................................. iii

I.     INTRODUCTION ..............................................................................................1

II.    BACKGROUND ...............................................................................................2

     A.    History Of The Invention ...................................................................2

     B.    01's Suit Against Citrix And Citrix's Request For Reexamination Of The '479 Patent ..........................................................................5

     C.    The Present Action Against LogMeIn ...............................................7

III.   ARGUMENT .....................................................................................................8

     A.    01 Is Likely To Succeed On The Merits ...........................................9

          1.    LogMeIn's Products Likely Infringe The '479 Patent ..............10

          2.    01 Is Likely to Succeed on the Issue of Validity .....................17

     B.    01 Will Continue To Suffer Irreparable Harm If LogMeIn Is Permitted To Continue Infringing ...................................................18

     C.    The Balance of Hardships Is Overwhelmingly In 01's Favor .............21

     D.    No Critical Public Interest Weighs Against Granting A Preliminary Injunction ..................................................................22

     E.    The Importance Of The Issuance Of A Preliminary Injunction Was Confirmed By The Federal Circuit's Decision In In Re Seagate .........23

IV.   CONCLUSION ...............................................................................................24

# TABLE OF AUTHORITIES

**Page**

**Cases**

*Abbott Labs. v. Sandoz, Inc.*, 544 F.3d 1341 (Fed. Cir. 2008) ...................................................8, 22

*Amazon.com, Inc. v. Barnesandnoble.com, Inc.*, 239 F.3d 1343 (Fed. Cir. 2001).......................1, 8

*Bio-Technology Gen. Corp. v. Genentech, Inc.*, 80 F.3d 1553 (Fed. Cir. 1996)...........................19

*Boehringer Ingelheim Vetmedia, Inc. v. Schering-Plough Corp.*, 106 F.Supp.2d
    696 (D. N.J. 2000) ......................................................................................................23

*eBay, Inc. v. MercExchange, LLC*, 547 U.S. 388 (2006) .............................................................8

*EyeTicket Corp. v. Unisys Corp.*, 155 F.Supp.2d 527 (E.D. Va. 2001) .................................17, 20

*Hybritech, Inc. v. Abbott Labs.*, 849 F.2d 1446 (Fed. Cir. 1988)...............................................8

*i4i Ltd. P'ship v. Microsoft Corp.*, 598 F.3d 831 (Fed. Cir. 2010)..........................................19, 21

*ICU Medical, Inc. v. RyMed Techs, Inc.* 673 F.Supp.2d 228 (D. Del. 2009)................................10

*In re Seagate Tech., LLC*, 497 F.3d 1360 (Fed. Cir. 2007) ..........................................................23

*Liquid Dynamics Corp. v. Vaughan Co.*, 449 F.3d 1209 (Fed. Cir. 2006)...................................23

*Markman v. Westview Instruments, Inc.*, 52 F.3d 967 (Fed. Cir. 1995).......................................10

*Nutrition 21 v. United States*, 930 F.2d 867 (Fed. Cir. 1991) ......................................................9

*Oakley, Inc. v. Sunglass Hut Int'l*, 316 F.3d 1331 (Fed. Cir. 2003) .........................................1, 18

*Odetics, Inc. v. Storage Tech. Corp.*, 14 F.Supp.2d 785 (E.D.Va. 1998)....................................22

*Payless Shoesource, Inc. v. Reebok Int'l Ltd.*, 998 F.2d 985 (Fed. Cir. 1993)...........................23

*Pfizer, Inc. v. Teva Pharms. USA, Inc.*, 429 F.3d 1364 (Fed. Cir. 2005) ....................................23

*Polymer Techs., Inc. v. Bridwell*, 103 F.3d 970 (Fed. Cir. 1996)................................................19

*PPG Indus., Inc. v. Guardian Indus. Corp.*, 75 F.3d 1558 (Fed. Cir. 1996) ...............................17

*Purdue Pharma L.P. v. Boehringer Ingelheim GmbH*, 237 F.3d 1359 (Fed. Cir.
    2001)...............................................................................................10, 11, 19

*Reebok Int'l. v. J. Baker, Inc.*, 32 F.3d 1552 (Fed. Cir. 1994)......................................................1

**TABLE OF AUTHORITIES**
(continued)

PAGE

*Sanofi-Synthelabo v. Apotex, Inc.*, 470 F.3d 1368 (Fed. Cir. 2006) ........................................19, 23

*Smith Int'l v. Hughes Tool Co.*, 718 F.2d 1573 (Fed. Cir. 1983) ..................................................18

*Standard Havens Prods., Inc. v. Gencor Indus., Inc.*, 897 F.2d 511 (Fed. Cir. 1990)........................................................................................................21

*TiVo Inc. v. EchoStar Commc'n Corp.*, 446 F.Supp.2d 664 (E.D. Tex, 2006) ...........................20

*Vehicular Techs. Corp. v. Titan Wheel Int'l,* 141 F.3d 1084 (Fed. Cir. 1998) ................................1

*Windsurfing Int'l v. AMF,* Inc., 782 F.2d 995 (Fed. Cir. 1986)....................................................22

**Rules and Statutes**

35 U.S.C. § 271..........................................................................................................................7, 17

35 U.S.C. § 283.....................................................................................................................1, 8, 17

Fed. R. Civ. P. 65.............................................................................................................................1

MPEP § 2673.02...............................................................................................................................2

## TABLE OF EXHIBITS

| EXHIBIT | DESCRIPTION |
| --- | --- |
| A | U.S. Patent No. 6,928,479, System Computer Product and Method for Providing a Private Communication Portal |
| B | July 6, 2010, *Inter Partes* Reexamination Communication, Right of Appeal Notice |
| C | Declaration of Andrew Cheung in Support of Plaintiff's Motion for a Preliminary Injunction Against LogMeIn, Inc. and Exhibits Thereto |

| Cheung Decl. Exhibit | Description |
| --- | --- |
| 1 | June 20, 2000 Press Release, "01 Communique Files a Patent for Its Private Communication Portal Technology" |
| 2 | August 30, 2000 Press Release, "01 Communique to Unveil Wireless Unified Communication Solution at Upcoming Press Conference" |
| 3 | November 13, 2000 Press Release "01 Communique Announces 'I'm InTouch' Personal Unified Communications Center" |
| 4 | November 12, 2002 Declaration of Andrew Cheung |
| 5 | Transaction History for "System Computer Product and Method for Providing a Private Communication Portal" |
| 6 | USPTO Performance and Accountability Report Fiscal Year 2000, Table 4, "Patent Pendency and Cycle Time Statistics: 2000" |
| 7 | Customer Inter@ction Solutions, Production of the Year 2001 Award |
| 8 | VAR Business Innovator, Tech Innovator of the Year 2006 Award |
| 9 | February 20, 2002 Press Release, "01 Communique and Hitachi Business Solution Co., Ltd. Launch Wireless Remote Access Service in Japan" |
| 10 | October 26, 2005 Press Release, "01 Communique Files Patent Application for its Remote PC Wake-Up Technology" |

| EXHIBIT | DESCRIPTION |
| --- | --- |
| D | March 13, 2007, Memorandum and Order, Northern District of Ohio, Case No. 1:06-cv-0253, ECF 73 |
| E | August 28, 2007, Memorandum and Order, Northern District of Ohio, Case No. |

1:06-cv-0253, ECF 127

F        Declaration of Tejinder Dhillon in Support of Plaintiff's Motion for a Preliminary
Injunction Against LogMeIn, Inc. and Exhibits Thereto

| Dhillon Decl. Exhibit | Description |
|---|---|
| 1 | LogMeIn Security: An In-Depth Look |
| 2 | LogMeIn Free User Guide |
| 3 | LogMeIn Pro$^2$ User Guide |
| 4 | LogMeIn Ignition User Guide |
| 5 | www.logmein.com, Search Knowledge Base, "Does LogMeIn work with dynamic IP address?" |
| 6 | U.S. Patent No. 7,558,862, "Method and Apparatus for Remotely Controlling a Computer with Peer-to-Peer Command and Data Transfer" |
| 7 | Selected definitions from Newton's Telecom Dictionary, The Official Dictionary of Telecommunications, Networking and the Internet, 17th Updated and Expanded Edition, by Harry Newton |
| 8 | Screen shots of Wireshark Protocol Analyzer |

Pursuant to 35 U.S.C. § 283 and Fed. R. Civ. P. 65, Plaintiff 01 Communique, Inc. ("01")

respectfully submits this memorandum in support of its motion for a preliminary injunction to

enjoin Defendant LogMeIn, Inc. ("LogMeIn") from continuing to infringe United States Patent

No. 6,928,479 ("the '479 Patent").[1]  Ex. A, U.S. Patent No. 6,928,479.  01 asks that the Court

preliminarily enjoin LogMeIn from making, using, selling, offering for sale, and importing

LogMeIn's LogMeIn Free, LogMeIn Pro[2] and LogMeIn Ignition products.

## I.   INTRODUCTION

The decision to grant 01's requested preliminary injunction is based upon this Court's

assessment of four factors:  (1) the likelihood of patentee's success on the merits; (2) irreparable

harm if the injunction is not granted; (3) the balance of hardships between the parties; and (4) the

public interest.  *Oakley, Inc. v. Sunglass Hut Int'l*, 316 F.3d 1331, 1338-39 (Fed. Cir. 2003)

(citing *Amazon.com, Inc. v. Barnesandnoble.com, Inc.*, 239 F.3d 1343, 1350 (Fed. Cir. 2001)).

The first two factors, i.e., likelihood of success and irreparable harm, must be affirmatively

demonstrated by 01.  *Amazon.com*, 239 F.3d at 1350 (citing *Vehicular Techs. Corp. v. Titan*

*Wheel Int'l*, 141 F.3d 1084, 1088 (Fed. Cir. 1998); *Reebok Int'l v. J. Baker, Inc.*, 32 F.3d 1552,

1555 (Fed. Cir. 1994)).

This case is uniquely compelling because of the overwhelming evidence that supports

those first two factors.  Here, the patent-in-suit has already been construed in another litigation—

a construction that is very favorable to 01 and is the predicate for finding that LogMeIn infringes

the '479 Patent.  In addition, the patent-in-suit has been subjected to *inter partes* re-examination

by Citrix Systems, Inc. and Citrix Online, LLC ("Citrix"), a leading supplier of the infringing

---

[1] Dell has represented through counsel that the accused Dell service has been discontinued.
Thus, 01 is not moving for a preliminary injunction against Dell at this time.  01 reserves the
right to so move if the representation of Dell's counsel proves to be incorrect or if Dell
reintroduces the accused service.

services.  On July 6, 2010, the U.S. Patent & Trademark Office ("USPTO") issued a Right of

Appeal Notice that confirmed the validity of the asserted claims.[2]  Ex. B, July 6, 2010, USPTO

Right of Appeal Notice.  Furthermore, the effects of price erosion and loss of market share in this

competitive field of technology have continued to result in the significant loss of market

opportunities that cannot be adequately compensated.

As detailed herein, this case presents distinctive facts that strongly support the granting of

01's motion for preliminary injunction.

## II.   BACKGROUND

### A.   History Of The Invention

01 was formed in 1992 for the purpose of developing and marketing software that

permitted a person to send a fax from his computer.  Ex. C, Declaration of Andrew Cheung

(hereinafter, "Cheung Decl.") ¶ 2.  The software was developed by 01's founder and CEO,

Andrew Cheung, who was an experienced software programmer.  *Id.* ¶¶ 1 and 2.  Mr. Cheung

later developed a unified messaging product, called "COMMUNICATE!" which provided users

with the ability to create, receive, and access facsimile messages, e-mail, and voice mail,

including access by phone.  *Id.* ¶ 2.  Since its release in August of 1996, over 5,000,000 copies of

the COMMUNICATE! software have been sold worldwide.  *Id.*

As the COMMUNICATE! product was being finalized in mid-1996, Mr. Cheung began

to investigate a new problem that he saw developing in the Internet communication field:  more

and more individuals did part of their work using a home computer, and also had a laptop with

them when travelling.  *Id.* ¶ 3.  Those people would likely want to be able to access work-related

information on their home computer while travelling.  *Id.*  However, unlike typical business

---

[2] "A Right of Appeal Notice (RAN) is a final office action which presents. . . a final decision
favorable to patentability as to the claims. . . ." MPEP § 2673.02 (emphasis added.)

computer network installations, most "home" users of the Internet are assigned a transitory

address (a "dynamic IP address") by their Internet service provider, which changes on a regular

basis, to permit them to use the Internet. *Id.* The constantly-changing dynamic IP address, along

with commonplace security "firewalls" and Network Address Translation ("NAT") devices make

it difficult for users to contact their home computers while on the road. *Id.* Mr. Cheung's

realization was critical, because, as he suspected at the time, the desire of business people to be

able to access important information located on their home computer while travelling

skyrocketed in subsequent years. *Id.* In addition, small businesses lacking a large computer

network system began to seek out the ability for their employees to access their work computers

while travelling. *Id.*

By the fall of 1997, Mr. Cheung had developed a solution to this problem—software on a

home computer that repeatedly sends its current "location" to a server computer that maintains a

fixed address. *Id.* ¶ 4. On the road, a user can access the server at its fixed address and learn the

current location of the home computer so that a communication session can be established from

the remote computer to the home computer. *Id.* Mr. Cheung discussed this solution with co-

inventor Pedro Nascimento and they proceeded to develop a product marketed commercially

today by 01 under the name "I'm InTouch." *Id.* I'm InTouch is sold as a service where a user

can download the necessary software for free, and then pay 01 a regularly recurring fee to

maintain the server computer that creates communication sessions with a home computer while

the user is away from home. *Id.*

Prior to developing the I'm InTouch product, it had been Mr. Cheung and Mr.

Nascimento's hope that they could find an existing solution that could be licensed and included

in the next release of the COMMUNICATE! product to provide the new remote-access

capability. *Id.* ¶ 5.  They discovered, however, that there were no such products.  *Id.*  Realizing that their solution was not only new but also had applications far beyond being a feature of the COMMUNICATE! product, they began writing source code for a prototype of the technology that became the I'm InTouch product.  *Id.*

In the summer of 2000, after filing a patent application, 01 issued a press release announcing the I'm InTouch product and service.  *Id.* ¶ 6.  The service was first publicly demonstrated at a press conference in Toronto on September 13, 2000.  *Id.*  That press conference was attended by over 300 industry analysts, investors, and corporate technology participants, including representatives from companies such as Research in Motion that makes BlackBerry smart phones.  *Id.*  A second demonstration at the industry's biggest trade show—the Comdex show in Las Vegas—followed in November of 2000.  *Id.*

Two years after filing the patent application that led to the '479 Patent, 01 filed a request with the USPTO to expedite the examination of the patent application, which had not yet undergone any substantive examination.  *Id.* ¶ 7.  Notwithstanding this request to expedite the prosecution, the '479 Patent took longer-than expected to issue, in part due to the USPTO's losing the patent application file.  *Id.*  Thus, despite the request for expedited examination and the USPTO's reported average pendency of 25.9 months for a patent application to move from filing to issue in 2000, the application that led to the '479 Patent took over 61 months to grant.  *Id.*

The technology covered by the '479 Patent garnered considerable praise in the marketplace and won numerous awards.  *Id.* ¶ 8.  01's I'm InTouch service embodies an invention of the '479 Patent and is used by thousands of customers for remote computer access.  *Id.*  Hitachi Business Solutions in Japan has partnered with 01, using the technology of the '479

Patent as the technology underlying Hitachi's DoMobile product. *Id.* Hitachi is the exclusive licensee of the technology in Japan and is now a joint owner of the corresponding patent application in Japan. *Id.*

01 continues to operate the I'm InTouch service, and to develop new features for the service. *Id.* ¶ 9. For example, in October 2005, 01 filed a patent application for its "remote wake up" technology, U.S. Application No. 11/260,433, which allows a user to remotely turn on a personal computer so that the user does not need to leave the computer running in order to use the I'm InTouch service. *Id.* I'm InTouch is one of the only remote access services to offer this energy saving feature. *Id.*

**B.     01's Suit Against Citrix And Citrix's Request For Reexamination Of The '479 Patent**

On February 1, 2006, 01 filed a patent infringement suit against Citrix in the Northern District of Ohio, Case No. 1:06-cv-0253 ("the Citrix Suit"), which was assigned to the Honorable Ann Aldrich.

On December 7, 2007, Citrix filed a request for *inter partes* reexamination of the '479 Patent and, a month later, Citrix requested the court to stay the Citrix Suit based on its representation that the *inter partes* reexamination it requested would invalidate 01's patent, making further litigation proceedings unnecessary. Three weeks before the scheduled trial date, Judge Aldrich granted Citrix's request to stay the litigation.

After a two and a half year stay of litigation the USPTO <u>confirmed</u> the patentability of <u>all 30 of the contested claims</u> in a Right of Appeal Notice, issued on July 6, 2010. Ex. B. While Citrix has appealed its loss to the Board of Patent Appeals and Interferences, it is limited by the record below.[3] During the stay, the presiding Judge in the Citrix case, Judge Aldrich, passed

---

[3] On September 7, 2010, Citrix filed a petition to reopen prosecution of the *inter partes*

away, and on September 10, 2010, the case was reassigned to Judge Sara Lioi of the Northern

District of Ohio. While 01 expects that the stay will be lifted, it currently remains in place, and

no schedule for the completion of that case has been set.[4]

During the infringement action against Citrix, and following a full briefing on the claim

constructions Judge Aldrich conducted a claim construction hearing on November 2, 2006. The

claim construction hearing was followed by an additional round of briefing at the request of

Citrix. This briefing and oral argument resulted in a claim construction order issued on March

13, 2007, in which Judge Aldrich ruled in 01's favor on all pertinent claim terms. Ex. D,

Memorandum and Order [ECF 73].

Thereafter, Citrix filed a Request for Reconsideration of the claim construction ruling

thereby triggering a third round of briefing. After this third full round of briefing on the claim

constructions, however, the Court again rejected Citrix's asserted constructions and provided a

detailed explanation for the propriety of the claim constructions proposed by 01, and adopted by

the Court, are proper. Ex. E, Memorandum and Order [ECF 127]. While that ruling is not

binding on this Court, 01 suggests that the prior claim construction ruling is highly persuasive to

the patent infringement issues in this case.[5]

---

reexamination and to submit additional evidence. The USPTO dismissed this petition on
September 30, 2010.

[4] Because additional discovery will need to be taken in the Citrix Suit to address additional
accused services, and because there is no longer any institutional knowledge of the Citrix Suit
with the Ohio Court, it is not yet known what schedule will be put in place for the completion of
that case.

[5] In its October 15, 2010, motion to transfer, LogMeIn argues that judicial efficiency will be
served by transferring this case to Ohio. Because there is no institutional knowledge of the
Citrix Suit remaining with the Ohio Court, 01 presumes that LogMeIn's position is that judicial
efficiency will be obtained from LogMeIn being bound by the claim construction ruling of the
Ohio Court as well as being bound by the preclusive effect on validity of the *inter partes*
reexamination.

01 is a small company and, due to limited resources, it was initially only able to pursue Citrix which, at the time, was the largest infringer in the market. Ex. C, ¶ 11. Further compounding 01's inability to fund actions against other infringers, news of the litigation stay in the Citrix Suit sent 01's stock plummeting, where it languished for more than two years. *Id.* The USPTO's final decision confirming the validity of all the claims at issue, however, has caused the stock price to increase sharply, which in turn has led to an infusion of additional outside capital. *Id.*

With 01's financial position greatly improved, it moved forward with its plans to open a U.S. business office in Arlington, Virginia to team with resellers for 01's software and services and to find licensees to provide white-label versions of 01's products and services. *Id.* ¶ 12. 01's Direct of Business Development is resident in the Arlington Office. 01 does not plan to license its competitors who offer services and products that directly compete with 01's I'm InTouch. *Id.* 01 is also now in a financial position such that it can afford to enforce its patent against other infringers including LogMeIn and Dell, Inc. ("Dell") (collectively, "Defendants"). *Id.*

### C.   The Present Action Against LogMeIn

For 01 to fully integrate its remote access products into the U.S. market, it is imperative that 01 use its newly acquired financial resources to enforce its patents. 01 filed the present patent infringement suit against LogMeIn and Dell on September 8, 2010. In its complaint, 01 seeks damages and preliminary and permanent injunctions for Defendants' willful infringement of the '479 Patent.

As discussed below, LogMeIn is a direct competitor of 01, providing infringing software and/or services that compete with 01's I'm InTouch remote access service. Moreover, LogMeIn markets its products as remote access services that operate in the same manner as the inventions

of 01's patent claims.  By making, using, offering for sale, and selling the infringing services—

LogMeIn's LogMeIn Free, LogMeIn Pro[2], LogMeIn Ignition ("the Accused Services")—

LogMeIn infringes the '479 Patent in violation of 35 U.S.C. § 271.

LogMeIn competes for the same customers as 01, and each sale of the Accused Services

decreases 01's ability to establish market share, costing 01 valuable market opportunities

because its products fail to gain sufficient traction in the marketplace.  By offering the Accused

Services at heavily discounted prices—such as LogMeIn Free which as the name implies, has no

cost—LogMeIn erodes 01's ability to price fairly and compete within the market place.  As a

result, infringement by LogMeIn cannot be adequately remedied with money damages.  Unless

LogMeIn is preliminarily enjoined from continuing to make, use, sell, and offer to sell the

Accused Services, 01 will continue to be irreparably harmed by LogMeIn's infringement of 01's

patent.

## III.   ARGUMENT

The four factors normally considered by a court in considering a motion for preliminary

injunction apply with equal force to patent infringement cases, enumerated recently in this

fashion by the Federal Circuit:

> (1) likelihood of success on the merits of the underlying litigation, (2) whether
> irreparable harm is likely if the injunction is not granted, (3) the balance of
> hardships as between the litigants, and (4) factors of the public interest.

*Abbott Labs. v. Sandoz, Inc.*, 544 F.3d 1341, 1344 (Fed. Cir. 2008); see also, *Amazon.com, Inc. v.*

*Barnesandnoble.com, Inc.*, 239 F.3d 1343, 1350 (Fed. Cir. 2001).  "These factors, taken

individually, are not dispositive; rather, the district court must weigh and measure each factor

against the other factors and against the form and magnitude of the relief requested." *Hybritech,*

*Inc. v. Abbott Labs.*, 849 F.2d 1446, 1451 (Fed. Cir. 1988).  The importance of considering and

balancing these four factors was reinforced by the Supreme Court's decision in *eBay, Inc. v. MercExchange, LLC*, 547 U.S. 388 (2006).

01 will show in this Brief that there is substantial likelihood that it will succeed in demonstrating that the accused LogMeIn products infringe at least one claim of the '479 Patent. As to the validity of the claims, 01 need not establish – for purposes of seeking the requested injunction – the validity of the '479 Patent beyond question. As the Federal Circuit recently explained:

> In determining, for preliminary injunction purposes, the likelihood that patent invalidity would be established at trial, the district court evaluates the factual and legal arguments in light of the presumptions and burdens that will inhere at trial, *viz.*, that "[a] patent shall be presumed valid. . . . The burden of establishing invalidity of a patent or any claim thereof shall rest on the party asserting such invalidity." 35 U.S.C. 282. This burden "exists at every stage of the litigation.".

*Abbott Labs.*, at 1346 (citations omitted).

01 is required at this phase of the case to present a clear case supporting the validity of the patent in suit. *See Nutrition 21 v. United States*, 930 F.2d 867, 871 (Fed. Cir. 1991). Prior Federal Circuit decisions have found a "clear case" to be made, for example, by showing that the patent in suit had successfully withstood previous validity challenges in other proceedings. *Amazon.com*, at 1359. In this case, of course, 01 will be able to demonstrate that a thorough review of the best prior art that could be mustered by defendant Citrix in the Ohio Action resulted in a finding that the claims of the '479 Patent are valid by the U.S. Patent and Trademark Office ("PTO").

Though 01 must make a "clear case," the '479 Patent must be presumed to be valid absent evidence to the contrary by this Court, and defendant LogMeIn must be considered to have the burden of proof on issues of validity at the preliminary injunction phase, just as at trial. *Abbott Labs.*, at 1346.

### A.     01 Is Likely To Succeed On The Merits

A patentee establishes likelihood of success on the merits by showing that it will likely succeed in proving infringement of at least one claim of the patent-in-suit and in proving that the likely infringed claim will survive the validity challenges presented by the accused infringer. *Purdue Pharma L.P. v. Boehringer Ingelheim GmbH*, 237 F.3d 1359, 1363 (Fed. Cir. 2001).

### 1.     LogMeIn's Products Likely Infringe The '479 Patent

An infringement analysis entails two steps: (1) determining the meaning and scope of the patent claims asserted to be infringed; and (2) comparing the properly construed claims to the device accused of infringing. *Id.* at 1363-64 (citing *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 976 (Fed. Cir. 1995) (en banc)).

Regarding the first step of the infringement analysis, the claims must be construed in order to define the metes and bounds of the patent. *Markman*, 52 F.3d at 1000. Here, 01 has already succeeded in proving the meaning and scope of the disputed claim terms following 10 briefs and a full day hearing on these issues in the Citrix Suit. Although the Markman ruling of another district court is not binding on this Court, this Court should find that the ruling of the Northern District of Ohio is persuasive and informative. *ICU Medical, Inc. v. RyMed Techs, Inc.*, 673 F.Supp.2d 228, 232 (D. Del. 2009) (adopting the constructions of previous district courts where "several of the disputed terms have been considered or construed by other courts in prior proceedings"). Here, the Court should find that the favorable Markman ruling in the Citrix Suit weighs in favor of 01 establishing a likelihood of success.[6]

---

[6] LogMeIn's likely argument that the Ohio Court's claim construction should be revisited due to the inter partes reexamination proceeding is unavailing because 01 did not make any statements in the prosecution of that reexamination that are inconsistent with the Ohio Court's claim construction.

As discussed below, 01 is likely to prove that LogMeIn's products infringe when the accused products are compared to the properly construed claims. At trial, 01 is likely to prove by a preponderance of the evidence that LogMeIn infringes at least claims 1, 3, 4, 5, 20, 21, 22, 23, 24, 25, 26, 27, 28, 29, 30, 43, 44, 45, 46 of the '479 Patent. For a preliminary injunction, however, it is sufficient for a patentee to demonstrate likelihood of success with respect to a single claim. *See Purdue*, 237 F.3d at 1363. Accordingly, the detailed analyses below is focused on the likely infringement of claim 1.

Claim 1 is an independent claim covering a system for providing remote access to a personal computer.

The preamble of claim 1 states:

**A system for providing access to a personal computer having a location on the Internet defined by a dynamic IP address from a remote computer,**

The previous claim construction order issued by the Ohio court ("*Citrix Order*") determined that the following terms have the following meanings:

| Personal Computer | The computer which is being accessed remotely. This computer is a general-purpose computer designed primarily for use by an individual user. |
|---|---|
| Remote Computer | The computer that is being used to access the personal computer. |

The LogMeIn Services are provided by a system that provides remote access over the Internet to a personal computer that has a dynamic IP address. Ex. F, Declaration of Tejinder Dhillon (hereinafter "Dhillon Decl."), ¶ 5. A diagram on page 5 of the LogMeIn Security White Paper, available on the LogMeIn website, depicts the LogMeIn system architecture as including: the LogMeIn Host, the Client Browser, and the LogMeIn gateway server. *Id.* On the LogMeIn website (www.logmein.com), LogMeIn Free, LogMeIn Pro[2], and LogMeIn Ignition are all marketed as providing remote access for computers with dynamic IP addresses. *Id.*

As discussed below, LogMeIn also satisfies each element in the body of claim 1:

*the system comprising: (a) a personal computer linked to the Internet, its location on the Internet being defined by either (i) a dynamic public IP address (publicly addressable), or (ii) a dynamic LAN IP address (publicly un-addressable),*

The *Citrix Order* determined that the claim terms relevant to this claim element have the

following meanings:

| Personal Computer | The computer which is being accessed remotely. This computer is a general-purpose computer designed primarily for use by an individual user. |
|---|---|

As described on the LogMeIn website, the LogMeIn Services support dynamic IP

addresses. *Id.* ¶ 6. The diagram on page 5 of the LogMeIn Security White Paper also includes

blocks labeled "firewall" and the paper further describes how the system works behind firewalls

and network address translation ("NAT") devices. *Id.* The LogMeIn user guides also state that

"LogMeIn works when the host is behind a firewall." *Id.* The LogMeIn Security White Paper also

points to U.S. Patent 7,558,862 ("the '862 Patent") for further details on its NAT traversal protocol.

*Id.* The '862 Patent states, " [t]he NAT router 128 provides address translation that allows the

network 102 to use private network addresses (called unregistered or non-routable addresses)

without interfering with normal Internet addresses (called registered or routable addresses)." *Id.* A

"firewall," which is most commonly used on a local area network ("LAN"), makes a computer's IP

address publicly unaddressable. *Id.* NAT devices translate IP addresses on the Internet to IP

addresses inside a LAN. *Id.*

*the personal computer being further linked to a data communication facility, the data communication facility being adapted to create and send a communication that includes a then current dynamic public IP address (publicly addressable) or dynamic LAN IP address (publicly un-addressable) of the personal computer;*

The *Citrix Order* determined that the claim terms relevant to this claim element have the

following meanings:

12

| Data Communication Facility | Computer software associated with the personal computer. |
|---|---|
| The claimed data communication facility being "adapted to create and send a communication that includes a then current dynamic public IP address (publicly addressable) or dynamic LAN IP address (publicly un-addressable) of the personal computer" | The claimed data communication facility has the ability to create and send a communication that includes the current dynamic IP address of the personal computer.  This dynamic IP address may be publicly addressable or unaddressable. |

As described in LogMeIn Free and Pro[2] user guides, each host computer a user wants to access must be running a LogMeIn host software. *Id.* ¶ 7. As described in those documents, the "host software safely and securely 'opens the door' to a computer for a qualified remote user." *Id.* As described in the LogMeIn Ignition user guide, in order to use LogMeIn Ignition, a host computer must be running LogMeIn Free or Pro[2] software. *Id.* As described in LogMeIn Security White Paper, the LogMeIn host computer software (i.e. a data communication facility) "maintains a constant SSL-secured connection with one of the LogMeIn gateway servers." *Id.* As further described, this connection is initiated by the host. *Id.* When the communication initiating the connection is sent by the host, it must contain the then current "Internet Address" of the host computer, which as stated above could be a dynamic public Internet Address (publicly addressable) or dynamic LAN Internet Address (publicly unaddressable). *Id.*

   ***(b) a locator server computer linked to the Internet, its location on the Internet being defined by a static IP address, and including a location facility for locating the personal computer; and***

   The *Citrix Order* determined that the claim terms relevant to this claim element have the following meanings:

| Personal Computer | The computer which is being accessed remotely.  This computer is a general-purpose computer designed primarily for use by an individual user. |
|---|---|
| Locator Server Computer | A computer with unrestricted access to an interconnected network of computers, such as the Internet. |

| Location Facility | Computer software associated with the locator server. |
|---|---|

The LogMeIn Security White Paper depicts an architecture that includes the LogMeIn gateway. *Id.* ¶ 8. Using a protocol analyzer, the LogMeIn gateway was found to have the static IP address 69.25.20.193. *Id.* According to the LogMeIn Security White Paper, the LogMeIn gateway forwards the data to the host once the client computer is authenticated. *Id.* Implicit in this is that the LogMeIn gateway has software for locating the host computer. *Id.*

> *(c) a remote computer linked to the Internet, the remote computer including a communication facility, the communication facility being operable to create a request for communication with the personal computer, and send the request for communication to the locator server computer;*

The *Citrix Order* determined that the claim terms relevant to this claim element have the following meanings:

| Personal Computer | The computer which is being accessed remotely. This computer is a general-purpose computer designed primarily for use by an individual user. |
|---|---|
| Remote Computer | The computer that is being used to access the personal computer. |
| Communication Facility | Computer software associated with the remote computer. |
| Locator Server Computer | A computer with unrestricted access to an interconnected network of computers, such as the Internet. |

The LogMeIn Free and LogMeIn Pro[2] user guides provide a step-by-step process for connecting to a host computer from a client computer. *Id.* ¶ 9 In this process, the user is instructed to navigate their browser to www.logmein.com and thus, the client computer is linked to the Internet. *Id.* The subsequent steps identify how to select a computer to be accessed. *Id.* Then, LogMeIn is designed to enable a remote computer with a web browser and Internet access to create and send a web request to the Gateway to communicate with a personal computer. *Id.*

> *wherein the data communication facility includes data corresponding to the static IP address of the locator server computer, thereby enabling the data communication facility to*

*create and send on an intermittent basis one or more communications to the locator server computer that include the then current dynamic public IP address or dynamic LAN IP address of the personal computer; and*

The *Citrix Order* determined that the claim terms relevant to this claim element have the following meanings:

| Personal Computer | The computer which is being accessed remotely. This computer is a general-purpose computer designed primarily for use by an individual user. |
| --- | --- |
| An Intermittent Basis | From time to time, including periodically. |
| Data Communication Facility | Computer software associated with the personal computer. |
| Locator Server Computer | A computer with unrestricted access to an interconnected network of computers, such as the Internet. |

As described in the LogMeIn Security White Paper, the LogMeIn host computer software (i.e. a data communication facility) "maintains a constant SSL-secured connection with one of the LogMeIn gateway servers. *Id.* ¶ 10. This link is initiated by the host ..." *Id.* In order to initiate the SSL-secured connection, the host computer must have data corresponding to the static IP address of the LogMeIn gateway server and must send one or more communications to a LogMeIn gateway server. Because the host maintains a constant SSL-secured connection with one of the LogMeIn gateway servers, it must also send one or more communications on an intermittent basis to keep that connection alive. *Id.* Where the host computer has a dynamic public IP address or a dynamic LAN IP address, all communications sent by the host computer would include the then current dynamic public or LAN IP address. *Id.*

*wherein the locator server computer is operable to act as an intermediary between the personal computer and the remote computer by creating one or more communication sessions there between, said one or more communication sessions being created by the location facility, in response to receipt of the request for communication with the personal computer from the remote computer, by determining the then current location of the personal computer and creating a communication channel between the remote computer and the personal computer, the location facility being operable to create such communication channel whether the personal computer is linked to the Internet directly (with a publicly addressable) dynamic IP*

*address or indirectly via an Internet gateway/proxy (with a publicly un-addressable dynamic LAN IP address).*

The *Citrix Order* determined that the claim terms relevant to this claim element have the following meanings:

| Personal Computer | The computer which is being accessed remotely. This computer is a general-purpose computer designed primarily for use by an individual user. |
|---|---|
| Remote Computer | The computer that is being used to access the personal computer. |
| The claimed one or more communication sessions "being created by the location facility, in response to receipt of the request for communication with the personal computer from the remote computer" | The location facility creates one or more communication sessions between the personal computer and the remote computer in response to receiving a request from the remote computer. |
| Locator Server Computer | A computer with unrestricted access to an interconnected network of computers, such as the Internet. |
| The claimed one or more communication session being created by the location facility "by determining the then current location of the personal computer" | The one or more communication sessions are created by the location facility by determining a current address or communication session for communicating with the personal computer. |
| Location Facility | Computer software associated with the locator server. |

As described above, the client computer requests a communication with a host computer. *Id.* ¶ 11. In response to this request, an SSL-secured connection between the client computer and the host computer is created by the LogMeIn gateway server and the LogMeIn gateway server mediates the traffic between the two computers. *Id.* Because the LogMeIn services work for host computers having publicly addressable dynamic IP addresses and publicly unaddressable dynamic LAN IP addresses, the LogMeIn gateway server can create the SSL-secured communication channel whether the host computer is linked to the Internet with a publicly addressable dynamic IP address or publicly unaddressable dynamic LAN IP address. *Id.*

As described in the LogMeIn Security White Paper, the LogMeIn Services contain an additional feature in which, after creating the SSL-secured communication channel between the host computer and the client computer, the LogMeIn gateway server will "attempt to set up a direct connection." *Id.* ¶ 13. The inclusion of this feature does not avoid infringement of the '479 Patent by the Accused Services. The LogMeIn Security White Paper cites the '862 Patent for further detail of this feature. *Id.* The '862 Patent states, in the summary of the invention, "[i]n accordance with the principle of the invention, a remote access section is established with the assistance of a gateway, but after the session is established, data passes directly between the client computer and the host computer." *Id.* The SSL-secured channel is always established first, before an attempt is made to create a direct connection. *Id.* Thus, the Accused Services always utilize the invention of claim 1 of the '479 Patent before creating direct connections for some users.

The results of a technical analysis of LogMeIn Pro[2] confirm that the Accused Services operated as described in the documentation made available on LogMeIn's website. *Id.* ¶ 12. Thus, the LogMeIn Products practice all elements of claim 1 and therefore infringe at least claim 1.

## 2.   01 Is Likely to Succeed on the Issue of Validity

LogMeIn bears the burden of proving by clear and convincing evidence the invalidity or unenforceability of the patent, and even at the preliminary injunction stage, a challenger's evidence of invalidity must be "sufficiently persuasive that it is likely to overcome the presumption of patent validity." *EyeTicket Corp. v. Unisys Corp.*, 155 F.Supp.2d 527, 542 (E.D. Va. 2001) (Morgan, Jr., J.) (quoting *PPG Indus., Inc. v. Guardian Indus. Corp.*, 75 F.3d 1558, 1566 (Fed. Cir. 1996)). Moreover, in the present *inter partes* reexamination of the '479 Patent,

17

where a presumption of validity does not attach, the USPTO has confirmed the patentability of the pertinent claims. *See* Ex. B.

The Federal Circuit has held that "recognizing the presumption of validity and the fact that the [patent-in-suit] has already been subjected to reexamination, [the patentee] has at this point in the case shown that it is reasonably likely to withstand such a validity challenge." *Oakley*, 316 F.3d at 1342. *See also Smith Int'l. v. Hughes Tool Co.*, 718 F.2d 1573, 1577-78 (Fed. Cir. 1983) (finding that likelihood of success on validity is shown where the patent claims were upheld in a previous adjudication). Here, 01 has already successfully defended all asserted claims in reexamination of the '479 Patent in view of the *several hundred prior art references* were presented during the *inter partes reexamination* initiated by Citrix (11 of which were discussed in detail by the USPTO). In this case, LogMeIn proving invalidity of the '479 Patent is very unlikely.

Moreover, to succeed on this prong of the preliminary injunction analysis, "the challenger's evidence must raise a 'substantial question' of invalidity." *Id.* This court has held that "[a]lthough the party seeking a preliminary injunction bears the burden of proving likelihood of success on the merits, meeting that burden is less strenuous on the issue of patent validity because the challenger retains the burden of production and persuasion on that issue." *Id.* Accordingly, unless LogMeIn presents evidence challenging the validity of the patent, likelihood of success on the issue of validity is presumed. *Id.* As such, 01 satisfies its burden in showing that it will likely succeed on validity unless LogMeIn raises a substantial question of invalidity sufficiently persuasive to overcome the presumption of validity. *See id.*

**B.      01 Will Continue To Suffer Irreparable Harm If LogMeIn Is Permitted To Continue Infringing**

The Federal Circuit has held that "because the principal value of a patent is its statutory right to exclude, the nature of the patent grant weighs *against* holding that monetary damages will always suffice to make the patentee whole." *Hybritech*, 849 F.2d at 1456 (emphasis added). 01 has a right under the patent laws to prevent others from infringing the '479 Patent by making, using or selling the patented invention. 35 U.S.C. §§ 271, 283. Congress has authorized district courts to grant preliminary injunctive relief in patent cases "in accordance with the principles of equity to prevent the violation of any right secured by patent, on such terms as the court deems reasonable." *Id.* at § 283.

The Federal Circuit has also held that the likelihood of price erosion and loss of market position is evidence of irreparable harm. *Purdue*, 237 F.3d at 1368. Loss of revenue, goodwill, and research and development support also constitute irreparable harm. *Bio-Technology Gen. Corp. v. Genentech, Inc.*, 80 F.3d 1553, 1566 (Fed. Cir. 1996); *Sanofi-Synthelabo v. Apotex, Inc.*, 470 F.3d 1368, 1382 (Fed. Cir. 2006). The loss of market opportunities that cannot be quantified or adequately compensated particularly demonstrates irreparable harm. *Polymer Techs., Inc. v. Bridwell*, 103 F.3d 970, 976 (Fed. Cir. 1996) (supporting the notion that market opportunities for a single entity in the marketplace are much better than if the marketplace is populated by several entities.).

These are precisely the benefits that 01 loses if LogMeIn is allowed to remain in the market and continue selling their products. LogMeIn provides an enormous volume of the infringing services for free, and thus 01 has and will continue to lose customers and goodwill because it cannot afford to give I'm InTouch away for free. *See i4i Ltd. P'ship v. Microsoft Corp.*, 598 F.3d 831, 861-62 (Fed. Cir. 2010) (finding that the district court properly considered

strong circumstantial evidence that Microsoft's infringement rendered i4i's product obsolete for much of the custom XML market, causing i4i to lose market share and change its business strategy to survive).

Loss of revenue at the hands of LogMeIn also prevents 01 from developing other projects. Ex. C ¶ 13. In fields where there is a high retention rate of customers ("sticky customers"), irreparable harm is all the more felt by the patentee. *TiVo Inc. v. EchoStar Commc'n Corp.*, 446 F.Supp.2d 664, 670 (E.D. Tex. 2006). Once customers within the remote computer access industry establish a computer system and remote access capability, the consumer is loathe to change to a different system. Ex. C ¶ 13. As such, 01 will be irreparably harmed if LogMeIn's is permitted to remain in the market during the pendency of this case. *Id.*

01 is entitled to a preliminary injunction to prevent the irreparable harm that would continue to occur because of LogMeIn's infringing activity. 01 continues to lose revenue, market position, and opportunities to LogMeIn who is 01's direct competitor. *Id.* 01's right in the '479 Patent not only ensures the exclusivity of sales but also the opportunity "to establish a reputation for expertise and advanced products" in a particular field, the loss of which constitutes irreparable harm. *EyeTicket*, 155 F.Supp.2d at 548. 01 is a small company that hopes to establish not only market exclusivity but also a "reputation for expertise" in a growing niche market where 01 currently struggles to compete against much larger corporations, such as Citrix and Defendant LogMeIn. *Id.* Although the relative sizes of the companies alone does not establish irreparable harm, "the fact that [01's] sole line of business is this market and technology renders it more vulnerable. This vulnerability bears on the issue of the irreparability of the harm." *Id.* at 549. As this Court held in *EyeTicket*, the value of such a technological lead

over rivals cannot be overstated and is extremely difficult to quantify and fully compensate in the form of damages. *Id.* at 548-49.

The market effects of customer loss, loss of revenue, loss of opportunities and lead-time, together with the loss of market share and pricing structure can never be fully compensated financially. LogMeIn is currently marketing and selling its Accused Services, which unjustly preventings 01 from establishing its exclusive market. A preliminary injunction is appropriate at this stage to prevent LogMeIn from causing further non-compensable market losses to 01.

### C.    The Balance of Hardships Is Overwhelmingly In 01's Favor

Given the substantial irreparable harm that 01 continues to face, an injunction is warranted. The relative sizes of the companies can be a factor in balancing the hardships of granting an injunction. The balance of hardships tips in favor of granting an injunction where the patentee's business is built "almost exclusively" on products and services which implement the patent-in-suit while the accused product is merely one of many products sold by the accused infringer. *i4i*, 598 F.3d at 862. Here, 01's business is "almost exclusively" comprised of I'm InTouch and related products, that implement the patent-in-suit and improvements thereof. Cheung Decl. at ¶ 13; *see Standard Havens Prods., Inc. v. Gencor Indus., Inc.*, 897 F.2d 511, 516 (Fed. Cir. 1990) ("The balance of harms clearly tips in [Movant's] favor. [Defendant's] harm is speculative and in any event cannot threaten its viability. On the other hand, a substantial amount of relevant record evidence indicates that [Movant] reasonably expected harm would be both catastrophic and irreparable. Without a stay, [Movant] may well cease to exist."). Such is the case here, and 01 is particularly vulnerable while, in contrast, LogMeIn offers several other products and services, e.g., LogMeIn Hamachi[2], LogMeIn Backup, LogMeIn Rescue, LogMeIn Central, LogMeIn IT Reach and Remotely Anywhere—not accused of infringing the '479 Patent—that would otherwise sustain its existence.

21

Moreover, the hardship to LogMeIn in granting the injunction is merely the monetary injury ordinarily expected when an injunction is imposed and does not constitute a hardship which could outweigh 01's interests in preventing irreparable harm. A preliminary injunction is warranted when LogMeIn cannot establish a hardship that is *not* caused by LogMeIn's own conduct in introducing an infringing product into the market. *Odetics, Inc. v. Storage Tech. Corp.*, 14 F.Supp.2d 785, 797 (E.D.Va. 1998) (Ellis, J.) ("[O]ne who elects to build a business on a product found to infringe cannot be heard to complain if an injunction against continuing infringement destroys the business so elected." (quoting *Windsurfing Int'l v. AMF, Inc.*, 782 F.2d 995, 1003 n.12 (Fed. Cir. 1986))). Here, any potential harm to LogMeIn is self-inflicted. As such, the balance of hardships weighs overwhelmingly in 01's favor, which stands to irreparably lose its value of the product, revenue, potential customers, and market position.

**D.    No Critical Public Interest Weighs Against Granting A Preliminary Injunction**

The patent laws strike a necessary balance between promoting progress and promoting competition in the marketplace. Congress has determined that it is within the public interest to award a right of exclusivity to encourage inventors to risk the costs of research, time and development. *Abbott Labs. v. Sandoz, Inc.*, 544 F.3d 1341, 1362-63 (Fed. Cir. 2008) (upholding lower court's grant of preliminary injunction of infringement of patent noting that the public is best served by enforcing patents that are likely valid and infringed). As such, it is within the public interest to prevent LogMeIn's infringement of 01's patents. Given that there is a strong likelihood of success on the issues of infringement and validity, the public interest weighs strongly in favor of enjoining LogMeIn's infringing acts.

Unless LogMeIn can demonstrate that "there exists some critical public interest that would be injured by the grant of preliminary relief," immediate injunctive relief is warranted.

*Hybritech*, 849 F.2d at 1458.  Here, there is no significant public interest, let alone a critical one, adverse to protecting 01's patent rights because LogMeIn has merely succeeded in breaking into the market with a competing and infringing product.

A preliminary injunction would not deprive the public of any benefit because 01 has the ability to meet the market's need if LogMeIn is enjoined. Ex. C ¶ 14. *Boehringer Ingelheim Vetmedia, Inc. v. Schering-Plough Corp.*, 106 F.Supp.2d 696, 707 (D. N.J. 2000) (granting preliminary injunction and rejecting infringer's public interest arguments where patentee had the capacity to meet the expected increased demand that result from the injunction and no disruption of service.).

With respect to LogMeIn's free product, the availability of a cheaper source of infringing products does not qualify as a public interest that favors denying an injunction and overriding the public interest in enforcing patents. *Payless Shoesource, Inc. v. Reebok Int'l Ltd.*, 998 F.2d 985, 991 (Fed. Cir. 1993) ("[s]elling a lower priced product does not justify infringing a patent."); *Pfizer, Inc. v. Teva Pharms. USA, Inc.*, 429 F.3d 1364, 1382 (Fed. Cir. 2005); *Sanofi-Symthelab*, 470 F.3d at 1383-84 (Fed. Cir. 2006).

Accordingly, like the other three factors, the public interest favors the grant of a preliminary injunction.

### E.    The Importance Of The Issuance Of A Preliminary Injunction Was Confirmed By The Federal Circuit's Decision In *In Re Seagate*

35 U.S.C. § 284 provides that in a patent infringement action, "the court may increase the damages up to three times the amount found or assessed."  Generally, an award of enhanced damages pursuant to § 284 is premised on a finding of willful infringement by the defendant. *Liquid Dynamics Corp. v. Vaughan Co.*, 449 F.3d 1209, 1225 (Fed. Cir. 2006).  In *In re Seagate*, the Federal Circuit explained that, as a general proposition, "a willfulness claim asserted must

23

necessary be grounded exclusively in the accused infringer's pre-filing conduct." *In re Seagate Tech., LLC*, 497 F.3d 1360, 1374 (Fed. Cir. 2007)  However, "when an accused infringer's post filing conduct is reckless, a patentee can move for a preliminary injunction, which generally provides an adequate remedy for combating post-filing willful infringement." *Id.* (citation omitted).  The Federal Circuit then cautioned that "[a] patentee who does not attempt to stop an accused infringer's activities [by seeking a preliminary injunction] should not be allowed to accrue enhanced damages based solely on the infringer's post-filing conduct." *Id.*

Issuance of  preliminary injunction, then, is the only way that a remedy can be provided to 01 for LogMeIn's recklessness in its refusal to acknowledge that the *Citrix Order* and the detailed reconsideration of the '479 Patent's validity by the PTO provide it with no defenses to 01's charges of infringement.

## IV.    CONCLUSION

01 has made a compelling showing that all of the requisite factors favor issuance of a

preliminary injunction against LogMeIn from further infringing the '479 Patent.  Accordingly,

01 respectfully asks the Court to enter such an injunction.

Respectfully Submitted,

Date:   October 18, 2010                         By:   _____

BAKER & HOSTETLER LLP

A. Neal Seth (VSB 47394)
Adam J. Smith (VSB 74215)

William C. Bergmann (pro hac vice)
Katherine L. McKnight (pro hac vice)

Washington Square, Suite 1100
1050 Connecticut Avenue, N.W.
Washington, D.C.  20036-5304
(202) 861-1500
(202) 861-1783 (facsimile)
nseth@bakerlaw.com
ajsmith@bakerlaw.com

*Attorneys for Plaintiff,*
*01 Communique Laboratory, Inc.*

## CERTIFICATE OF SERVICE

The undersigned here certifies that a copy of the foregoing Plaintiff's Memorandum In

Support Of Its Motion For A Preliminary Injunction Against LogMeIn, Inc. was filed

electronically on this 18th day of October, 2010 using the CM/ECF system, and a copy has been

served by hand upon counsel for LogMeIn:

> **Philip R. Seybold**
> **Wilmer Cutler Pickering Hale and Dorr LLP**
> **1875 Pennsylvania Avenue NW**
> **Washington, DC 20006**