PUBLIC VERSION

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**Alexandria Division**

| | |
|---|---|
| 01 COMMUNIQUE LABORATORY, INC., | ) |
| Plaintiff, | ) |
| | ) |
| vs. | )     Civil Action No. 1:10-cv-01007-CMH-TRJ |
| | ) |
| LOGMEIN, INC., | ) |
| | ) |
| Defendant. | ) |

**DEFENDANT LOGMEIN, INC.'S MEMORANDUM IN SUPPORT OF ITS**
***DAUBERT* MOTION TO EXCLUDE THE TESTIMONY OF ROBERT BRLAS**

# TABLE OF CONTENTS

I.     INTRODUCTION ................................................................................................ 1

II.    LEGAL STANDARDS ....................................................................................... 4

    A.    Rule 702:  Expert Testimony Must Be Reliable. ..................................... 4

    B.    Federal Circuit:  Expert Opinion on Reasonable Royalty Damages Requires
        Sound Economic and Factual Predicates .................................................. 5

III.   FACTUAL BACKGROUND ............................................................................... 6

    A.    The '479 Patent ........................................................................................ 6

    B.    01's Claims Against LogMeIn .................................................................. 7

    C.    Mr. Brlas's Damages Opinion ................................................................. 8

        1.    Mr. Brlas's Reliance on *RoyaltySource* License Abstracts and Purchase
            Transactions .................................................................................. 9

        2.    Mr. Brlas's "Lost Profits" Theory for LogMeIn Free ............................... 10

        3.    Mr. Brlas's Total Royalty ........................................................................... 11

IV.    THE COURT SHOULD EXCLUDE MR. BRLAS'S TESTIMONY ............................ 11

    A.    Mr. Brlas Improperly Used Non-Comparable *RoyaltySource* License Data and
        Purchase Transactions To Arrive at His 18%-20% Royalty Rate ....................... 11

        1.    The *RoyaltySource* License Abstracts ..................................................... 12

        2.    The Purchase Transactions ......................................................................... 18

        3.    Mr. Brlas Disregarded Relevant Agreements ............................................ 22

        4.    Since Mr. Brlas's Baseline Royalty Rate Is Flawed and Unreliable,  His
            Opinions Regarding Royalties For All of Accused Products Are
            Unreliable and Should Excluded ................................................................ 23

    B.    Mr. Brlas Improperly Relied On A "Lost Profits" Theory For LogMeIn Free
        Products, Without Demonstrating That Methodology Applies In This Case. ...... 24

    C.    Mr. Brlas Improperly Relied on LogMeIn's Total Accused Revenues To
        Calculate His Proposed Royalty ............................................................... 26

    D.    Mr. Brlas's Proposed Royalty Would Have Been Expected to Leave, And Would
        Have Left, LogMeIn With Huge Operating *Losses* And, Thus, Is Not a
        "Reasonable Royalty" ............................................................................... 28

V.     CONCLUSION ................................................................................................... 30

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Apple Inc. v. Samsung Elecs. Co.*,
No. 11-CV-01846-LHK, 2012 WL 2571332 (N.D. Cal. June 30, 2012) ................................28

*AVM Tech. LLC v. Intel Corp.*,
Civ. No. 10-610-RGA, 2013 WL 126233 (D. Del. Jan. 4, 2013)............................................13

*Axcess Int'l, Inc. v. Savi Techs., Inc.*,
No. 3:10-cv-1033-F, slip op. (N.D. Tex. Jan. 25, 2013) (Walker Decl., Ex. 6) .....................25

*Cornell Univ. v. Hewlett–Packard Co.*,
609 F. Supp. 2d 279 (N.D.N.Y. 2009) ......................................................................................5

*DataQuill Ltd. v. High Tech Comp. Corp.*,
No. 08cv543-IEG, 2012 WL 1284381 (S.D. Cal. Apr. 16, 2012) ................................... passim

*Daubert v. Merrell Dow Pharms., Inc.*,
509 U.S. 579 (1993)..........................................................................................................1, 4, 5

*ePlus, Inc. v. Lawson Software, Inc.*,
764 F. Supp. 2d 807 (E.D. Va. 2011) (Payne, J.), *aff'd in relevant part* 700 F.3d 509
(Fed. Cir. 2012).....................................................................................................2, 6, 22, 25

*Gen. Elec. Co. v. Joiner*,
522 U.S. 136 (1997)..................................................................................................................5

*Georgia-Pacific Corp. v. U.S. Plywood Corp.*,
318 F. Supp. 1116 (S.D.N.Y. 1970).............................................................................. passim

*Grain Processing Corp. v. Am. Maize-Prods. Co.*,
185 F.3d 1341 (Fed. Cir. 1999)................................................................................................6

*Hanson v. Alpine Valley Ski Area, Inc.*,
718 F.2d 1075 (Fed. Cir. 1983)..............................................................................................29

*Hughes Tool Co. v. Dresser Indus., Inc.*,
816 F.2d 1549 (Fed. Cir. 1987)..............................................................................................29

*In re Novatel Wireless Secs. Litig.*,
846 F. Supp. 2d 1104 (S.D. Cal. 2012) ..................................................................................28

*In re Paoli R.R. Yard PCB Litig.*,
35 F.3d 717 (3d Cir. 1994).......................................................................................................5

*IP Innovation LLC v. Red Hat, Inc.*,
  705 F. Supp. 2d 687 (E.D. Tex. 2010) ...................................................................6

*King Instruments Corp. v. Perego*,
  65 F.3d 941 (Fed. Cir. 1995)................................................................................26

*LaserDynamics, Inc. v. Quanta Computer, Inc.*,
  694 F.3d 51 (Fed. Cir. 2012)....................................................................... passim

*LaserDynamics, Inc. v. Quanta Computer, Inc.*,
  No. 2:06-CV-348-TJW-CE, 2011 WL 7563818 (E.D. Tex. Jan. 7, 2011) ............................21

*LG Display Co., Ltd. v. AU Optronics Corp.*,
  722 F. Supp. 2d 466 (D. Del. 2010)......................................................................29

*Lindemann Maschinenfabrik GmbH v. Am. Hoist & Derrick Co.*,
  895 F.2d 1403 (Fed. Cir. 1990)........................................................................4, 29

*Ltd. v. Hewlett-Packard Co.*,
  No. 6:08-cv-00273, 2010 WL 3911372 (E.D. Tex. Apr. 16, 2010) ..........................................6

*Lucent Techs., Inc. v. Gateway, Inc.*,
  580 F.3d 1301 (Fed. Cir. 2009)..................................................................... passim

*Md. Cas. Co. v. Therm-O-Disc, Inc.*,
  137 F.3d 780 (4th Cir. 1998) ................................................................................4

*Micro Chemical, Inc. v. Lextron, Inc.*,
  161 F. Supp. 2d 1187 (D. Colo. 2001), *overruled on other grounds* 318 F.3d 1119
  (Fed. Cir. 2003)..................................................................................................29

*Mobil Oil Corp. v. Amoco Chem. Corp.*,
  915 F. Supp. 1333 (D. Del. 1994).........................................................................29

*ResQNet.com, Inc. v. Lansa, Inc.*,
  594 F.3d 860 (Fed. Cir. 2010)....................................................................... passim

*State Indus., Inc. v. Mor–Flo Indus., Inc.*,
  883 F.2d 1573 (Fed. Cir. 1989).............................................................................29

*Trans-World Mfg. Corp. v. Al Nyman & Sons, Inc.*,
  750 F.2d 1552 (Fed. Cir. 1984).............................................................................29

*Trell v. Marlee Elec. Corp.*,
  912 F.2d 1443 (Fed. Cir. 1990).................................................................13, 14, 19

*Uniloc USA, Inc. v. Microsoft Corp.*,
  632 F.3d 1292 (Fed. Cir. 2011)..................................................................... passim

*Westvaco Corp. v. Int'l Paper Co.*,
   Civ. No. 3:90CV00601, 1991 WL 290676 (E.D. Va. Nov. 27, 1991) (Spencer, J.) ..............29

*Wordtech Sys., Inc. v. Integrated Networks Solutions, Inc.*,
   609 F.3d 1308 (Fed. Cir. 2010)...........................................................................................20

**STATUTES**

35 U.S.C. § 284..............................................................................................................................5

**OTHER AUTHORITIES**

5 Chisum, *Patents* § 20.07[2][d][i] ..............................................................................................29

Fed. R. Evid. 702(b)-(d).............................................................................................................4, 6

## I.     INTRODUCTION

Plaintiff 01 Communique ("01") plans to call Robert M. Brlas, a proposed damages expert, to tell the jury that 01 is entitled to "reasonable royalty" damages of approximately ██████████████████ for LogMeIn's alleged infringement of the '479 patent.  Mr. Brlas's proposed royalty is facially unreasonable and unsupportable, and LogMeIn respectfully submits that this Court should exercise its "gatekeeper" function to prevent this baseless number from being presented to the jury in this case: the proposed royalty is █████████████ LogMeIn's total operating profits on **both** accused and non-accused products **throughout its entire existence as a company**, and is █████████████ than LogMeIn's total operating profits on the accused products.

In a series of recent cases,[1] the Federal Circuit repeatedly emphasized that trial courts should exercise their "gatekeeping" function to exclude unreliable damages opinions from trial as inadmissible altogether—and not merely have them subjected to cross-examination about their "weight."  A patentee should not be allowed to present the jury with large, unreliable damages figures, since doing so would improperly "skew the damages horizon for the jury" and "taint[] the jury's damages calculation."  *See Uniloc*, 632 F.3d at 1318, 1320-21 (ordering new damages trial where trial court permitted expert to present jury with unreliable royalty rate and royalty base); *see also LaserDynamics*, 694 F.3d at 79-81 (same where expert's royalty opinion was speculative and unsupported).  Here, Mr. Brlas's damages opinion is grounded in four fundamental flaws that render it unreliable and speculative, and thus inadmissible under the Supreme Court's *Daubert* standard and controlling Federal Circuit precedent.

---

[1] *Lucent Techs., Inc. v. Gateway, Inc.*, 580 F.3d 1301, 1324-32 (Fed. Cir. 2009); *ResQNet.com, Inc. v. Lansa, Inc.*, 594 F.3d 860, 869-73 (Fed. Cir. 2010); *Uniloc USA, Inc. v. Microsoft Corp.*, 632 F.3d 1292, 1311-18 (Fed. Cir. 2011); *LaserDynamics, Inc. v. Quanta Computer, Inc.*, 694 F.3d 51, 79-81 (Fed. Cir. 2012).

**First**, Mr. Brlas improperly relied on "non-comparable" licenses and purchase transactions to arrive at an inflated royalty rate. The Federal Circuit repeatedly has rejected damages opinions that base the proposed royalty rate on non-comparable transactions not tied to the hypothetical license that the parties would have negotiated. *See Lucent*, 580 F.3d at 1324-32; *ResQNet*, 594 F.3d at 869-73; *Uniloc*, 632 F.3d 1292, 1311-18; *LaserDynamics*, 694 F.3d at 79-81 (expert's royalty opinion should have been excluded because it relied on non-comparable licenses and licensing survey). Here, Mr. Brlas's damages opinion is plainly based on non-comparable licenses and purchase transactions. Indeed, most of the licenses upon which Mr. Brlas relied are *software* licenses that *do not appear to involve any patent rights at all*, and the purchase transactions involved *purchases* of entire companies, not *patent licenses*. Relying on these dissimilar agreements, Mr. Brlas completely disregarded *actual* licenses to the '479 patent, as well as LogMeIn's *actual* licenses to six other remote-access patents—which call for payments far lower than the royalty he has proposed here. Mr. Brlas's royalty opinions are unreliable and should be excluded.

**Second**, Mr. Brlas relied on a "lost profits" theory to arrive at a proposed "royalty" totaling ████████ for LogMeIn's Free product (a product that LogMeIn gives away to customers for free), but he identified no basis whatsoever to conclude that 01 would have made, or would have expected to make, such high profits selling its own products. In fact, Mr. Brlas admitted that he is not aware of any evidence indicating that users of LogMeIn's free product, were they not able to use that free product, would have switched to 01's paid products:

> Q   Are you aware of any evidence that would lead you to conclude that users of LogMeIn's free product, were they not able to use that product or that product were to go away for some reason, would switch to 01's paid product?
>
> A   I haven't seen any evidence one way or the other on that.

(Declaration of Nathan L. Walker ("Walker Decl."), Ex. 4 ("Brlas Dep."), at 217:9-15.)  Mr. Brlas's "lost profits" royalty opinion is based not on sound economic and factual predicates but on his mere say so.  It is pure speculation—and utterly unreliable and intended to skew damages—and should be excluded from trial.

*Third*, Mr. Brlas improperly relied on LogMeIn's ***total revenues from the accused products*** for his analysis, even though the Entire Market Value Rule prohibits this methodology, and he made no attempt to apportion the percentage of revenues allegedly attributable to the '479 patent.  A damages expert may use the defendant's total revenues from sales of the accused products to calculate reasonable royalty damages ***only*** if the "Entire Market Value Rule" is satisfied.  Under that rule, a defendant may recover damages based on the value of an entire product containing several features ***only*** if "the feature patented constitutes ***the*** basis for customer demand."  *Lucent*, 580 F.3d at 1336 (emphasis added).  The Federal Circuit has emphasized that ***this test can only be met by showing that the patented feature alone*** causes customers to purchase the accused products.  *LaserDynamics*, 694 F.3d at 68 ("It is not enough to merely show that the [patented feature] is viewed as valuable, important, or even essential . . .. [P]roof that consumers would not want a laptop computer without [its many] features is not tantamount to proof that any one of those features alone drives the market for laptop computers.").  Here, contrary to this binding authority, Mr. Brlas relied on LogMeIn's total revenues from sales of the accused paid products as the royalty base against which he applied his flawed royalty rate, without satisfying the Entire Market Value Rule or ***apportioning*** the accused revenues between those allegedly attributable to the '479 patent and those attributable to the dozens of other features that drive sales.  Mr. Brlas's royalty is thus inflated, speculative, unreliable, and should be excluded.

*Fourth*, Mr. Brlas's proposed royalty vastly exceeds LogMeIn's expected operating profits, and is unreasonable and unreliable on that basis alone.  His royalty is ████████ ████ LogMeIn's total operating profits for both accused products and non-accused products, and is ██████████ than LogMeIn's total operating profits on the accused products.  Mr. Brlas does not claim, nor provide any basis to conclude, that LogMeIn would have been profitable under his oppressive royalty.  Mr. Brlas thus has proposed a royalty to which no reasonable licensor would agree.  *Lindemann Maschinenfabrik GmbH v. Am. Hoist & Derrick Co.*, 895 F.2d 1403, 1408 (Fed. Cir. 1990) (holding that expert's opinion that defendant "would agree to pay a royalty in excess of what it expected to make in profit" was "absurd").  Mr. Brlas's proposed royalty is facially unreasonable and unreliable, and should be excluded.

Put simply, Mr. Brlas's damages opinion is exactly the type of unreliable, unsupported and speculative expert testimony that *Daubert* is designed to prevent the jury from hearing.  *See Uniloc*, 632 F.3d at 1318, 1320 (expert's use of unreliable royalty rate and base "taints the jury's damages calculation" and "skew[s] the damages horizon for the jury").  LogMeIn respectfully submits that this Court should preclude Mr. Brlas from offering his damages opinions at trial.

## II.     LEGAL STANDARDS

### A.     Rule 702:  Expert Testimony Must Be Reliable.

01 bears the burden of establishing that its expert's testimony is admissible by a preponderance of the evidence.  *See Md. Cas. Co. v. Therm-O-Disc, Inc.*, 137 F.3d 780, 783 (4th Cir. 1998).  Under Federal Rule of Evidence 702, an expert witnesses may offer opinion testimony only if:  (i) "the testimony is based on sufficient facts or data;" (ii) "the testimony is the product of reliable principles and methods;" and (iii) "the expert has reliably applied the principles and methods to the facts of the case."  Fed. R. Evid. 702(b)-(d); *see also Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 597 (1993).  Courts are charged with the

"gatekeeping" function of excluding expert testimony that is irrelevant or does not result from the application of reliable methodologies or theories to the facts of the case. *Daubert*, 509 U.S. at 589-92. "*[A]ny* step that renders the [expert's] analysis unreliable under the *Daubert factors renders the expert's testimony inadmissible*." *In re Paoli R.R. Yard PCB Litig.*, 35 F.3d 717, 745 (3d Cir. 1994) (emphasis in original).

Nothing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert. *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997). The expert's testimony is unreliable and should be excluded where "there is simply too great an analytical gap between the data and the opinion proffered." *Id.*

**B.     Federal Circuit:  Expert Opinion on Reasonable Royalty Damages Requires Sound Economic and Factual Predicates**

In a suit for patent infringement, a successful plaintiff is entitled to "damages adequate to compensate for the infringement, but in no event less than a reasonable royalty." 35 U.S.C. § 284. A common approach for determining a "reasonable royalty" is the hypothetical negotiation, which attempts to ascertain the royalty upon which the parties would have agreed had they successfully negotiated a license agreement just before infringement began. *See Lucent*, 580 F.3d at 1324 (citing *Georgia-Pacific Corp. v. U.S. Plywood Corp.*, 318 F. Supp. 1116, 1120 (S.D.N.Y. 1970)). Calculation of a reasonable royalty often involves determination of two separate and distinct amounts:  (1) the royalty base, or the revenue pool implicated by the infringement, and (2) the royalty rate, or the percentage of that pool "adequate to compensate" the plaintiff for the infringement. *See Cornell Univ. v. Hewlett–Packard Co.*, 609 F. Supp. 2d 279, 286 (N.D.N.Y. 2009) (Chief Judge Rader, sitting by designation).

The Federal Circuit "requires sound economic proof of the nature of the market and likely outcomes with infringement factored out of the economic picture" in all damages calculations. *Grain Processing Corp. v. Am. Maize-Prods. Co.*, 185 F.3d 1341, 1350 (Fed. Cir. 1999). Where sound economic and factual predicates are absent from a reasonable royalty analysis, Rule 702 ***requires*** the court to exclude that unreliable proffered evidence. *See Uniloc*, 632 F.3d at 1315 (holding that patentee "must 'sufficiently [tie the expert testimony on damages] to the facts of the case'" or such testimony is inadmissible); *ePlus, Inc. v. Lawson Software, Inc.*, 764 F. Supp. 2d 807, 813-16 (E.D. Va. 2011) (Payne, J.) (excluding expert's royalty analysis that was based on *ipse dixit* rather than "sound economic precepts that are explained so that a jury could understand why it is reasonable to award such a royalty rate"), *aff'd in relevant part* 700 F.3d 509 (Fed. Cir. 2012); *IP Innovation LLC v. Red Hat, Inc.*, 705 F. Supp. 2d 687, 691 (E.D. Tex. 2010) (Chief Judge Rader, sitting by designation) (excluding expert's testimony concerning reasonable royalty where expert report failed to demonstrate that the alleged agreements on which he relied were comparable to the patents-in-suit); *Fenner Invs., Ltd. v. Hewlett-Packard Co.*, No. 6:08-cv-00273, 2010 WL 3911372, at \*2 (E.D. Tex. Apr. 16, 2010) (same).

## III.  FACTUAL BACKGROUND

### A.  The '479 Patent

U.S. Patent No. 6,928,479  ("'479 patent") issued on August 9, 2005. The '479 patent purports to claim a particular system for allowing a remote computer to access a host computer. No technical expert has opined in this case that the '479 patent is "fundamental" or otherwise "essential" to remote-access products or remote-collaboration products.



(*See* Walker Decl., Ex. 5 ("Stringer Dep."), at 86:11-20; 87:9-16.)  No expert has opined in this case that the claimed invention of the '479 patent is *the* basis for consumer demand for any products, or *alone* causes customers to purchase any products.

01 has a remote access product called "I'm InTouch" that embodies the '479 patent. (Walker Decl., Ex. 1 ("Brlas Rpt."), at 5).  01 first made its "I'm InTouch" product available to consumers in 2001.  Neither 01 nor its "I'm InTouch" product has ever had any meaningful portion of the remote access market.  (*Id*.)

(Stringer Dep., at 213:15-214:24; Brlas Rpt. at 9.)

## B.      01's Claims Against LogMeIn

LogMeIn is a leading supplier of remote access products and remote collaboration products.[2]  In this case, 01 alleges that the following LogMeIn products infringe the '479 patent: (i) LogMeIn Pro; (ii) LogMeIn Pro 2; (iii) LogMeIn Free, (iii) IT Reach, (iv) LogMeIn Ignition

---

[2] Remote-access products allow users to access their home computers (and other internet-enabled devices) via a remote computer.  Remote-collaboration services are used by business users and consumers to conduct online meetings and share documents, images, and desktop space with other users to enable fast and secure online collaboration.

(collectively, the "accused remote-access products"); (v) join.me Pro; and (vi) join.me Free

(collectively, the "accused remote-collaboration products").  LogMeIn Free is a limited-feature

version of LogMeIn Pro that LogMeIn supplies to users free of charge.  Similarly, join.me is a

limited-feature version of join.me Pro that LogMeIn supplies to users free of charge.  LogMeIn

released its first product, LogMeIn Pro, in 2004.  LogMeIn sells many products and services that

are not accused of infringing the '479 patent, including LogMeIn Rescue, LogMeIn Backup,

LogMeIn Central, and Hamachi.

### C.     Mr. Brlas's Damages Opinion

01 has submitted three expert reports on damages from Robert Brlas, an accountant and a

professional expert witness.  (Brlas Rpt., Walker Decl., Ex. 2 ("Brlas Supp. Rpt."), Walker Decl.,

Ex. 3 ("Brlas Second Supp. Rpt.").)  In his reports, Mr. Brlas has opined that LogMeIn should

pay ████████████████████ in purported reasonable royalty damages as a result of its

alleged infringement of the '479 patent.  (Brlas Second Supp. Rpt. at 35.)  Specifically, Mr. Brlas

has opined that LogMeIn, in a "hypothetical negotiation" , would have agreed to pay to 01 a

royalty of between 18% and 20% of LogMeIn's revenues from the sales of its accused remote

access and remote collaboration products, ***PLUS*** a flat fee of $2.50 for each and every user to

whom LogMeIn has given away the LogMeIn Free product ***without charge***, ***PLUS*** a flat fee of

$2.50 for each "unique user" of the free version of the join.me product that LogMeIn has given

away to users ***without charge***.  These amounts add up to a total payment of approximately

████████████████████ in past royalties supposedly due to 01—far exceeding any

actual profits ever earned by LogMeIn, and assessing LogMeIn huge fees on free products that

LogMeIn gives away to users without charge.  (Brlas Rpt. at 39-40; Brlas Second Supp. Rpt. at

35 and Ex. 3.)

Mr. Brlas concludes LogMeIn would have agreed to these amounts during two hypothetical negotiations—one that would have occurred before the first alleged infringement by the accused remote-access products in the third quarter of 2005 (when the '479 patent issued), and a second that would cover the accused remote-collaboration products and would have occurred in the summer of 2009. (*See* Brlas Rept. at 11; Second Suppl. Brlas Report at 9).[3]

### 1.   Mr. Brlas's Reliance on *RoyaltySource* License Abstracts and Purchase Transactions

To arrive at a baseline "range of reasonable royalty rates the Parties would have developed as they approached the hypothetical negotiations," Mr. Brlas relied on three factors:

(1)   Publicly available data (specifically, license "abstracts") concerning thirteen licenses that Mr. Brlas identified through *RoyaltySource*, a third-party license database service (*see* Brlas Rpt. at 19-20, 26). None of these abstracts involved the '479 patent. Further, Mr. Brlas provided no evidence or analysis to establish that the abstracted licenses are "comparable" to the hypothetical ***non-exclusive*** license ***for the '479 patent*** that the parties would have negotiated for in this case.

(2)   Two transactions that involved the purchase of entire companies (or the assets thereof)—namely, (i) the Applied Networking Inc. transaction, ███████████████ (the "Applied Networking Transaction"); and (ii) a transaction in which third-party Citrix acquired Expertcity and ███████████ (the "Expertcity Transaction"). (Brlas Rpt. at 20-22, 26.) From these two purchase transactions, Mr. Brlas calculated "implied royalty rates" of 39% and 20%, respectively. (*Id.*) Mr. Brlas failed to demonstrate that either of the two purchase transactions involved a *license* to any patent. The two purchase transactions involved the *purchase* of entire companies that held *multiple* patents and/or patent applications (and other assets). Mr. Brlas made no effort whatsoever to account for the differences between the value provided by a purchase and the value provided by a non-exclusive license, nor did he try to determine whether any of the multiple patents and/or patent applications involved were comparable to 01's asserted patent.

---

[3] Mr. Brlas provided no explanation whatsoever as to why a second hypothetical negotiation would occur "sometime in the summer of 2009," when the accused remote-collaboration products did not launch until ***more than a year later***, in October 2010. There is no valid basis for his assumption, given that the hypothetical negotiation is presumed to occur on the eve of the first alleged infringement, and this is yet another reason to exclude his testimony at trial. *See Georgia-Pacific*, 318 F. Supp. at 1120, 1123.

(3)      LogMeIn's "incremental profit margin," which Mr. Brlas calculated to be ▮▮▮▮ (*Id.* at 22-25.)

*Id.* at 16-25.

Mr. Brlas concluded that "the value of the '479 Patent technology is between 15% and 25% of the revenues generated on the Accused Products sold by LogMeIn." (Brlas Rpt. at 26.) Mr. Brlas thereafter purported to adjust these royalty rates, in unspecified amounts, for each of the *Georgia-Pacific* factors, to arrive at a royalty rate for the accused LogMeIn paid products of 18% to 20% of revenues. (*Id.* at 29-39.) Mr. Brlas thereafter applied his 18%-20% royalty rates to LogMeIn's total revenues on accused paid products to arrive at a total royalty on those paid products of approximately ▮▮▮▮. (Brlas Second Supp. Rpt. at Ex. 3.) In addition, Mr. Brlas applied his 18%-20% royalty rates to arrive at a total royalty for the accused "LogMeIn Free" and "join.me free" products of approximately ▮▮▮▮. (Brlas Rpt. at 25, 39-40; Brlas Second Supp. Rpt. at 18-19; 34-35.)

## 2.      Mr. Brlas's "Lost Profits" Theory for LogMeIn Free

According to Mr. Brlas, a reasonable royalty for the LogMeIn Free product is approximately ▮▮▮▮. (*See* Brlas Second Supp. Rpt. at Ex. 3.) Mr. Brlas claims that the proper measure of the reasonable royalty for the LogMeIn Free product is the ***"value that would otherwise be lost by 01***; either through its own sales or from generating royalties from other potential licensees," as result of licensing LogMeIn to supply its LogMeIn Free product to customers. (Brlas Rpt. at 25) (emphasis added). To determine a royalty under this "lost profits" theory, Mr. Brlas purported to calculate the average "monetary value" (profit) that 01 obtains from each of its own free trial users who use its I'm InTouch product in a free trial. (*Id.*) Next, Mr. Brlas multiplied (i) the value that each 01 free trial user allegedly provides to 01 (▮▮▮▮ per free trial) by (ii) the royalty rates that he calculated for LogMeIn's accused paid

products (*18%-20%*), to arrive at a range of ████████ per Free user.  (Brlas Supp. Rpt. at

Ex. 9.)   And based on that range, Mr. Brlas concluded that 01 and LogMeIn would have agreed

to a royalty rate of $2.50 per LogMeIn Free user.  (*Id.*)  Applying this fee of $2.50 to each

LogMeIn Free user, Mr. Brlas calculated a total royalty on the accused LogMeIn Free product of

approximately ████████.  (Brlas Rpt. at 39-40; Brlas Second Supp. Rpt. at Ex. 3.)

### 3.    Mr. Brlas's Total Royalty

Applying the rates described above, Mr. Brlas has opined that a reasonable royalty would

be approximately ████████████.  His proposed royalty is ████████████

LogMeIn's actual operating profits of the entire company in the calculated damages period (2005

and 2012), which totaled only about ████████, including ***both accused and non-accused***

***products***.  (*See* Declaration of Edward Herdiech,("Herdiech Decl."), at ¶ 6.)  His royalty is ████

████████ than LogMeIn's actual operating profits on all of its accused products in the

claimed damages period.  (*Id.* at ¶ 7.)  Mr. Brlas has not claimed, nor has he provided any basis

to conclude, that LogMeIn would have expected to make any operating profit whatsoever under

his proposed royalty.

## IV.    THE COURT SHOULD EXCLUDE MR. BRLAS'S TESTIMONY

### A.    Mr. Brlas Improperly Used Non-Comparable *RoyaltySource* License Data and Purchase Transactions To Arrive at His 18%-20% Royalty Rate

Mr. Brlas's use of the *RoyaltySource* license "abstracts" and the two purchase agreements

(the Applied Networking Transaction and the Expertcity Transaction) to arrive at his royalty rate

for the accused paid products is fatally flawed because they are not comparable to the non-

exclusive license for a single patent that LogMeIn and 01 would have negotiated.

The Federal Circuit has made clear that a damages expert may rely on prior licenses to

calculate reasonable royalty damages ***only*** after establishing that the prior licenses are

comparable, in terms of both technology and economics, to the hypothetical license the parties

would have negotiated for the asserted patent. *Lucent*, 580 F.3d at 1332 (vacating damages

award where expert royalty opinion based on non-comparable licenses); *LaserDynamics*, 694

F.3d at 79-81 (excluding same).  There must be a "basis in fact to associate the royalty rates used

in prior licenses to the particular hypothetical negotiation at issue in the case."  *Uniloc*, 632 F.3d

at 1317.  In order to establish that a prior agreement is sufficiently comparable, the expert must:

(i) demonstrate "how similar or dissimilar the patented technology" covered by the prior licenses

is to the patent-in-suit, *Lucent*, 580 F.3d at 1331; and (ii) "account[] for the technological and

economic differences" between the prior licenses and the hypothetical license to the patent-in-

suit, *ResQNet*, 594 F.3d at 873.  Mr. Brlas has completely failed to meet this standard—he has

presented no analysis whatsoever demonstrating the comparability of the *RoyaltySource* license

"abstracts" or the two purchase transaction to the non-exclusive license for a single patent, and

thus his opinions must be excluded.

### 1.    The *RoyaltySource* License Abstracts

Mr. Brlas did not obtain the full agreements of any of the purported licenses that are

supposedly summarized in the *RoyaltySource* abstracts; instead, he merely relied on the

publically available abstracts obtained from *RoyaltySource*.  (*See* Brlas Dep. at 162:2-6; Brlas

Rpt. at 19-20, 26; Brlas Supp. Rpt. at Ex. 7.)  The abstracts cited by Mr. Brlas are not

comparable to the hypothetical license at issue in this suit for at least four reasons.

*First*, each of the abstracts relied upon by Mr. Brlas indicates that the underlying

"license" was in fact very different than the case at hand because it either:  (i) apparently did not

grant any patent rights at all, since the abstract does not even mention patent rights at all; or

(ii) granted rights under ***multiple patents***; ***none*** of the cited abstracts reflects a license to single

patent, as the hypothetical license between LogMeIn and 01 would have been in this case.  (Brlas

Rpt. at 11-12 (hypothetical license would be non-exclusive license for '479 patent); *id.* at 19-20

and Ex. 4; Brlas Supp. Rpt. at Ex. 7.). Clearly, a license that granted *no patents rights* at all is

not "comparable" to the hypothetical license that LogMeIn and 01 would have negotiated for

regarding the '479 patent. *See DataQuill Ltd. v. High Tech Comp. Corp.*, No. 08cv543-IEG,

2012 WL 1284381, at *7-8 (S.D. Cal. Apr. 16, 2012) (holding that prior agreement was "not

even a patent license" and thus was not comparable to hypothetical license for the asserted

patent). Likewise, a license to *multiple patents* is substantially different from a license to a

*single* patent. *See Lucent*, 580 F.3d at 1328 (license to portfolio of patents is "vastly different"

than a license to a single patent); *AVM Tech. LLC v. Intel Corp.*, Civ. No. 10-610-RGA, 2013

WL 126233 at *3 (D. Del. Jan. 4, 2013) ("patentee may not argue that prior licenses granting

rights to entire portfolios of patents are comparable to a license that the parties would have

negotiated for a single asserted patent"). Because Mr. Brlas accounted for none these

differences in his report, and instead simply ignored them, his testimony is unreliable,

speculative and inadmissible.

      *Second*, most of the abstracted licenses relied upon by Mr. Brlas—including all of the

"licenses" that have a royalty rate within Mr. Brlas's baseline range (15%-25% of revenues)—

included *significant non-patent benefits*, such as providing the licensee with a *commercial*

*software product* or other proprietary technology. (Brlas Rpt. at 19-20 and Ex. 4; Brlas Supp.

Rpt. at Ex. 7.) Mr. Brlas's failure to account for these significant technological and economic

differences also renders his opinion unreliable, speculative, and inadmissible. *See ResQNet*, 594

F.3d at 870, 873 (holding that trial court erred by considering software re-bundling licenses

without factual findings that accounted for technological and economic differences between

those licenses and the patent-in-suit; vacating damages award); *accord Trell v. Marlee Elec.*

*Corp.*, 912 F.2d 1443, 1446-48 (Fed. Cir. 1990) (vacating reasonable royalty award based on a prior agreement that "conveyed rights more broad in scope than those covered by [the patent-in-suit]").

*Third*, Mr. Brlas failed to account for the ***technological differences between the patents involved*** in the abstracted licenses (to the extent the abstracts involved any patents or licenses at all) and '479 patent.  None of the abstracts involve the '479 patent, and Mr. Brlas provided  no basis to conclude that any patents involved in the abstracts are comparable to the '479 patent. None of 01's technical experts provided any opinion on the technological comparability of the abstracted licenses to the '479 patent.  01's failure to demonstrate the technological comparability of the abstracted "licenses" in and of itself precludes reliance on the purported "licenses" to calculate reasonable royalty damages.  *See, e.g.*, *DataQuill*, , 2012 WL 1284381 at *5 (excluding expert testimony where patentee failed to provide "any technical expert testimony explaining the technology contained in the [licensed products] such that a basis could be formed for comparing them to [the accused product]").  *See e.g.*, *ResQNet*, 594 F.3d at 873 (vacating damages where no evidence "accounted for the technological and economic differences between those licenses and the [asserted] patent").

*Fourth*, many of the abstracted "licenses" relied upon by Mr. Brlas granted ***exclusive*** rights, even though the hypothetical license in this case would provide only a ***non-exclusive*** license to the '479 patent—as Mr. Brlas admits in his report (Brlas Rpt. at 11-12).  It is undisputable that a company would pay more for exclusive rights than it would pay for non-exclusive rights, and thus again Mr. Brlas methodology is unreliable, speculative, and inadmissible.  *See Trell*, 912 F.2d at 1446-48 (vacating reasonable royalty award based on a prior

agreement that was an "exclusive license" and "conveyed rights more broad in scope than those covered by [the patent-in-suit]").

As detailed above, the license "abstracts" are not comparable to the non-exclusive license for a single patent that would have been the subject of the negotiation in this case.  A prime example of the lack of comparability is the summary of the agreement between Innovative Tech. Systems and Intergraph Corp.:

**_Licensed Property:_**

The Company has exclusive OEM distribution rights with respect to the Span(TM) software. Span software under the IFM software tools for Facilities Management brand - an industry leading software solution for the effective planning and management of an organization's facilities. SpanoFM brand solutions include SpanoFM software, the leading enterprise-wide Facilities Automation software. Also under the SpanoFM brand is the remote data collection systems product line, which includes Inspection Manager, FireProof and TourWatch.  These systems automate field data collection and management systems for operations, maintenance, security and fire safety applications. The Company believes that its integrated product line meets the needs of a wide range of users in the Facilities Automation marketplace -1995.

**_Compensation Detail_**:

Royalty:  Intergraph will pay a 30% royalty on all sales of IFM products . . .

(Brlas Supp. Rpt. at Ex. 7.)  The foregoing summary does *not* indicate that any *patents* were licensed or, if so, how many patents were licensed.  Further, the summary affirmatively demonstrates that the underlying agreement provided significant non-patent benefits consisting of "OEM distribution rights" with respect to "Span(TM) software."  Moreover, the summary does *not* demonstrate that the underlying agreement involved the remote-access system claimed in the '479 patent, or even any "comparable" remote-access technology.  Further, the summary demonstrates that the rights provided—OEM distribution rights—were "exclusive" rights, not non-exclusive.

Mr. Brlas's reliance on the summary above is precisely the type of evidence that the Federal Circuit has cautioned trial courts to be vigilant against admitting by exercising their gatekeeping function.  *See LaserDynamics*, 694 F.3d at 79-81 (damages award vacated and new trial ordered because expert's royalty opinion relied on non-comparable licensing data); *ResQNet*, 592 F.3d at 870, 873 (expert's royalty rate opinion should have been excluded, where expert failed to demonstrate that royalty rate was based on comparable agreements or otherwise tied to particular facts of the case).  Likewise, the other abstracts upon which Mr. Brlas relied are similarly not comparable to the hypothetical license at issue in this case.

Summarized below are some of key differences between the non-exclusive hypothetical license for a single patent in the case at bar and the *RoyaltySource* abstracts:

| Licensor | Differences |
| --- | --- |
| Innovative Tech. Systems Inc. | ▪ Software license<br>▪ No indication of a license for any patent(s), or if so how many<br>▪ Software supplied by licensor<br>▪ Exclusive rights<br>▪ No evidence whatsoever that the technology relates to remote-access services, as Mr. Brlas used that term in his own report[4]<br>▪ Date:  1995, ten years before the hypothetical negotiation |
| Global Enterprise Technology Solutions, LLC | ▪ Software license<br>▪ No indication of a license for any patent(s), or if so how many<br>▪ Software supplied by licensor<br>▪ Exclusive rights<br>▪ No evidence that the technology relates to remote-access services |
| Stellent, Inc. | ▪ Software license<br>▪ No indication of a license for any patent(s), or if so how many<br>▪ Software supplied by licensor<br>▪ Exclusive rights<br>▪ No evidence that the technology relates to remote-access services |

---

[4] *See* Brlas Rpt. at 7 ("Remote access services software is a screen-sharing technology that enables one [personal computer] to stream its desktop to a remote [personal computer] via an Internet connection.")

| Licensor | Differences |
|---|---|
| Advanced Management Environment | <ul><li>Software license</li><li>No indication of a license for any patent(s), or if so how many</li><li>Software supplied by licensor</li></ul> |
| Network-1 Security Solutions, Inc. | <ul><li>Product supplied by licensor (as indicated by fact that royalty is based on licensor's list price)</li><li>Multiple "patents" related to "communication switching modules"</li><li>No evidence whatsoever that the technology relates to remote access services</li><li>Non-patent rights, including "trademarks"</li></ul> |
| Multi Soft Inc. | <ul><li>Software license</li><li>No indication of a license for any patent(s), or if so how many</li><li>Exclusive rights</li><li>Software supplied by licensor</li><li>Date:  1993, twelve years before the hypothetical negotiation</li></ul> |
| Orchestral Corp. (amendment to license) | <ul><li>Software distribution agreement</li><li>No indication of a license for any patent(s), or if so how many</li><li>Exclusive rights</li><li>No evidence whatsoever that the technology relates to remote access services</li></ul> |
| Orchestral Corp. (3-30-1999 license) | <ul><li>Software distribution agreement</li><li>No indication of a license for any patent(s), or if so how many</li><li>Exclusive rights</li><li>No evidence whatsoever that the technology relates to remote access services</li></ul> |
| Alpha Virtual Inc. | <ul><li>Software license</li><li>Software supplied by the licensor</li><li>Exclusive rights</li><li>Multiple "patents" and other intellectual property, including "trademarks, service marks, tradenames, and copyrights"</li></ul> |
| Microsoft | <ul><li>Software license</li><li>License provided access to "communication protocols"</li><li>No indication of a license for any patent(s), or if so how many</li><li>License signed under "threat of new multimillion-dollar fines"</li><li>No evidence that the technology relates to remote access services</li></ul> |
| Mobility Electronics, Inc. | <ul><li>ASIC chips developed by licensor</li><li>Multiple "patents"</li><li>Non-patent technology, including software, trade secrets, IP blocks, designs, and specifications</li><li>No evidence that the technology relates to remote access services</li></ul> |
| Robert E. Pfister and William D. Kight | <ul><li>Patent application assignment</li><li>No indication of a license for any patent(s), or if so how many</li><li>Royalty a percentage of net profit, not revenues</li><li>Date:  1993, twelve years before the hypothetical negotiation</li><li>No evidence that the technology relates to remote access services</li></ul> |
| Science Applications International Corp. | <ul><li>Multiple "patents"</li><li>Payment was for full "assignment of patents," not a mere license</li><li>Exclusive rights</li></ul> |

(*See* Brlas Rpt., Ex. 4 (identifying 13 abstracts on which Mr. Brlas relied); Supp. Rpt., Ex. 7.)[5]



(Brlas Dep. Tr. at 165:12-18.)

Because the "abstracts" are not comparable to the non-exclusive license for a single patent that would have been the subject of the hypothetical license in this case (as Mr. Brlas himself admits), and because Mr. Brlas has not even attempted to show that they are comparable, those purported "licenses" provide no basis for determining a reasonable royalty, and Mr. Brlas's reliance upon them renders his royalty opinion unreliable, speculative and inadmissible at the trial of this case.[6]

### 2.    The Purchase Transactions

Nor are the two purchase agreements upon which Mr. Brlas relies—the Applied Networking Transaction and the Expertcity Transaction—comparable to the non-exclusive license for a single patent at issue in this case, for at least four reasons:

*First*, the two purchase transactions involved the ***purchase of entire companies, including patents and/or patent applications and other assets***—not simply a ***non-exclusive license*** to a single patent.  Again, as Mr. Brlas admits (Brlas Rep. at 11-12), a reasonable royalty analysis ***must*** consider the value that the parties would have negotiated for a ***non-exclusive***

---

[5] For convenience, these 13 abstracts are attached to the Walker Declaration at Exhibit 14.

[6] ████████████████████████████████████████████████████████████████████
█████████████████████████████████████████████████████████████████████████
█████████████████████████████████████     *See infra* at IV(A)(3).

*license* to the '479 patent.  But the two purchase transactions relied upon by Mr. Brlas were acquisitions—not licenses.  It is undisputable that a company would pay far more to obtain complete *ownership* of a patent than it would pay for a non-exclusive license, since ownership provides much broader rights than a bare license, including the right to license (or exclude) third parties.  Mr. Brlas's complete failure to show any similarity, or discount the payments made under the two purchase transactions to account for this economic difference, renders his opinion completely unreliable, speculative and inadmissible.  *See Trell*, 912 F.2d at 1446-48 (vacating reasonable royalty award based on a prior agreement that was an "exclusive license" and "conveyed rights more broad in scope than those covered by [the patent-in-suit]"); *DataQuill*, 2012 WL 1284381, at *7-8 (holding that agreement that was "not even a patent license" was not comparable to hypothetical license for the asserted patent).

*Second*, Mr. Brlas never accounted for the fact that the two purchase transactions provided rights to *multiple patents and/or patent applications (and potentially other intellectual property intellectual property, such as trademarks)—not* simply *a non-exclusive license to a single patent* such is at issue here.  The Federal Circuit has recognized that licenses to multiple patents are "vastly different" than a license to a single patent.  *Lucent*, 580 F.3d at 1328; *Trell*, 912 F.2d at 1446-48 (vacating reasonable royalty award based on a prior agreement that was exclusive and "encompassed the right to other inventions").

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████.  (Brlas Rpt. at 20-22.)  But Mr. Brlas never accounted for the fact that a company would pay more for the rights to multiple patents and/or patent applications (and potentially other technologies) than it would for a bare non-exclusive license to merely a single

patent.  (Brlas Rpt. at 20-22 and Exs. 5, 6a and 6b; Brlas Dep. Tr. at 166:18-167:7; 170:25-171:6



This further renders Mr. Brlas's damages calculation

unreliable, speculative and inadmissible.  *See, e.g., Lucent*, 580 F.3d at 1328 (affirming grant of

new trial where patentee attempted to use a license to an "entire patent portfolio" to establish a

reasonable royalty for a single patent); *DataQuill*, 2012 WL 1284381, at *9 (excluding evidence

of prior license agreement "much larger in scope than the license that would have been reached

at the hypothetical negotiation"); *Wordtech Sys., Inc. v. Integrated Networks Solutions, Inc.*, 609

F.3d 1308, 1320, 1322 (Fed. Cir. 2010) (vacating damages award where the prior licenses

provided "no basis for comparison with [the defendant's] infringing sales" and did not

"describe[] how the parties calculated each lump sum, the licensees' intended products, or how

many products each licensee expected to produce").

    ***Third***, Mr. Brlas failed to compare the ***differences between the technology*** of the two

purchase transactions and the '479 patent.  It is undisputed that the purchase transactions did not

involve the '479 patent.  And Mr. Brlas failed to provide any basis whatsoever to conclude that

the patents and technologies involved were comparable to the '479 patent.[7]

(Brlas Dep. Tr. at

171:25-172:5; 173:13-17.)  Moreover, none of 01's technical experts have provided any opinions

---

[7] In his discussion of *Georgia-Pacific* factor 2—"[t]he rates paid by LogMeIn for the use of other patents comparable to the '479 Patent"—Mr. Brlas did ***not*** identify the LogMeIn – Applied Networking Transaction as a transaction involving comparable patents.  (*See* Brlas Rpt at 31.)

on the technological comparability of the two purchase transactions and the '479 patent.  Again,

01's failure to demonstrate the technological comparability of the two purchase transactions to

the '479 patent precludes any reliance on those agreements to calculate reasonable royalty

damages.  *See, e.g., DataQuill*, 2012 WL 1284381, at *5 (excluding expert testimony where

patentee failed to provide "any technical expert testimony explaining the technology contained in

the [licensed products] such that a basis could be formed for comparing them to [the accused

product]").[8]  *See e.g., ResQNet*, 594 F.3d at 873 (vacating damages where no evidence

"accounted for the technological and economic differences between those licenses and the

[asserted] patent").

    ***Fourth***, the two purchase agreements are radically different from the hypothetical license

assumed by Mr. Brlas because the payment structure of, and the amounts paid under, the

purchase agreements are different from the royalty structure and amounts that Mr. Brlas has

proposed here.  ███████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████   (Brlas Rpt. at 20-22.)  In contrast, Mr. Brlas has proposed a

hypothetical license with a ***running-royalty structure***, and claims a total royalty of

---

[8] ██████████████████████████████████████████████████████████████
██████████████████████████████████████████████████████████████
████████████████████████████████   (Brlas Rpt. at 20.)  However, Mr. Brlas
did not provide any basis to conclude that the technology involved in that transaction was
comparable to the '479 patent.  The general statement quoted by Mr. Brlas does nothing to
establish technological comparability for purposes of determining a reasonable royalty.
*LaserDynamics*, 694 F.3d at 79 ("When relying on licenses to prove a reasonable royalty,
alleging a loose or vague comparability between different technologies or licenses does not
suffice."); *LaserDynamics, Inc. v. Quanta Computer, Inc.*, No. 2:06-CV-348-TJW-CE, 2011 WL
7563818 at *3 (E.D. Tex. Jan. 7, 2011) ("It is not sufficient to state that both patents cover
optical disk drive technology. Rather, the plaintiff must establish the functionality enabled by the
patent-in-suit as well as the functionality purportedly covered by the licensed patent and compare
their economic importance").

approximately ███████████████████—more than ███████ (and ████ ███████████ ████ than) the amount paid under the Applied Technology transaction, and more than ████████ (and ████████████ than) the amount paid under the Expertcity transaction.  Although Mr. Brlas purported to derive "implied royalty rates" from the purchase agreements, Mr. Brlas's conversion methodology is speculative and not tied to the facts of this case, and there is no evidence whatsoever that the lump-sum payments under the purchase agreements were intended to constitute, or included, payment based on any running royalty rate.  *ePlus*, 764 F. Supp. 2d at 814 ("It also is settled that lump sum settlement agreements have minimal, if any, probative value in establishing a reasonable running royalty.  Even when a lump sum royalty agreement can be extrapolated to suggest a reasonable running royalty, the methodology must itself be sound and not speculative and not far removed from the facts of the case." (citations omitted).), *aff'd in relevant part* 700 F.3d 509, 522-23 (Fed. Cir. 2012).

Mr. Brlas's complete failure to demonstrate that the two purchase transactions and the *RoyaltySource* license abstracts are comparable to the non-exclusive license for a single patent—which is the issue in this case—dooms his baseline royalty rate (15%-25%) and renders unreliable, speculative and inadmissible all of his opinions based on that flawed royalty rate.[9]

### 3.     Mr. Brlas Disregarded Relevant Agreements

In arriving at his 18%-20% royalty rate, Mr. Brlas disregarded an *actual* license to the '479 patent, as well as numerous *actual* licenses under which LogMeIn has obtained patent licenses covering its remote access and remote collaboration products that are accused of infringement in this case.  ████████████████████████████

---

[9] Although Mr. Brlas claimed in his reports that his baseline royalty rate is also supported by LogMeIn's alleged "incremental profit margin" (*see* Brlas Rpt. at 23-25, 26), that claim is inadmissible *ipse dixit*.  Mr. Brlas provided no explanation whatsoever as to why the alleged "incremental profit margin" (████) supports his baseline rate (15%-25%).



(Walker Decl., Exs. 7-12,)

Mr. Brlas asserted that these actual licenses are not relevant because they arose out of litigation.  (Brlas Rpt. at 18-19, 31.)  The Federal Circuit, however, has made clear that licenses that arise out of litigation can be the "most reliable" licenses in the reasonable royalty analysis, as is the case here where they are not used to show how much people have been willing to pay (which may be just nuisance money to get rid of a lawsuit), but rather to show how much 01 and other patentees have been actually willing to *accept* for their patent rights.  *See ResQNet*, 594 F.3d at 872.

### 4.    Since Mr. Brlas's Baseline Royalty Rate Is Flawed and Unreliable, His Opinions Regarding Royalties For All of Accused Products Are Unreliable and Should Excluded

It is of no moment that Mr. Brlas used his 15%-25% royalty rate merely as a *starting point* to which he applied the *Georgia-Pacific* factors to bring the rate to 18%-20%.  As the Federal Circuit has held, "[b]eginning from a fundamentally flawed premise and adjusting it based on legitimate considerations specific to the facts of the case nevertheless results in a fundamentally flawed conclusion."  *Uniloc*, 632 F.3d at 1317.  "This is reflected in *Lucent Technologies*, in which unrelated licenses were considered under *Georgia-Pacific* factor 1, but

[the Federal Circuit] held that the entire royalty calculation was unsupported by substantial evidence." *Id.*

Here, Mr. Brlas's baseline rate (15%-25%) is based on "non-comparable" licenses and purchase transactions and is thus fundamentally flawed, unreliable, speculative and inadmissible. Mr. Brlas used his flawed baseline rate to arrive at an unreliable 18%-20% rate, which he then used to calculate his proposed royalties for all accused products. (Brlas Rpt. at 26, 39-40; Brlas Second Supp. Rpt. at 18-19; 34-35.) Accordingly, Mr. Brlas's opinions regarding royalties for all of accused products are unreliable and speculative, and should be excluded.

### B. Mr. Brlas Improperly Relied On A "Lost Profits" Theory For LogMeIn Free Products, Without Demonstrating That Methodology Applies In This Case.

In his reports, Mr. Brlas made clear that his royalty calculation for the accused "LogMeIn Free" products rests on the theory that 01 would expect to "lose" value (*i.e.*, profits from product sales) as a result of licensing LogMeIn to supply its LogMeIn Free product, and that 01 would seek—and the parties would agree to—a reasonable royalty to compensate 01 for its expected loss. (*See* Brlas Rpt. at 25, 39; Brlas Supp. Rpt. at 13-14) ("The purpose of the calculation in question is to derive the value taken from 01 by LogMeIn without payment . . . 01 would most certainly consider, as an important factor during the hypothetical negotiation of a reasonable royalty, the value that it was losing from the presence of LogMeIn's products in the marketplace, and would demand a royalty that would cover such a loss.") (emphasis in original).

But, to calculate 01's expected lost profits, and thus a royalty, Mr. Brlas calculated the value (profits) that each *01* free trial allegedly provides to *01*—$███████ per free trial, and then speculated that this value should be multiplied by the unreliable royalty rates that he calculated for *LogMeIn's* accused paid products—namely, *18%-20%*. (Brlas Supp. Rpt. at Ex. 9).

Mr. Brlas, however, provided no explanation whatsoever as to why LogMeIn and 01, *in negotiating a reasonable royalty based on value (sales) that 01 would expect to lose*, would have agreed on a royalty in the amount of ***18%-20%*** of the value that each 01 free trial allegedly provides ***to 01***.  Mr. Brlas did not claim—nor does he provide any basis for concluding—that 01 ever had or expected to have, 18% to 20% of the remote access market, even before LogMeIn entered the market.  (Brlas Rpt. at 5 ("01 has had limited success with acquiring any meaningful portion of its target market").  Nor did Mr. Brlas provide any other basis for concluding that the parties, in negotiating a reasonably royalty based on 01's anticipated lost profits, would have agreed to the 18%-20% rate used by Mr. Brlas.  ████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████████

██  ████████████████████████████████████

(Brlas Dep. at 217:9-15) (emphasis added.)

Mr. Brlas's conclusion—that a reasonable royalty based on a "lost profits" theory is 18%-20% of the value that each 01 free trial provides to 01—is based on unreliable and inadmissible *ipse dixit,* not on sound economic or factual predicates.  Mr. Brlas has not shown that 01 reasonably would have expected to make sales to 18%-20% of LogMeIn's Free users.  Mr. Brlas's royalty opinion based on his 18-20% rate is thus unreliable, completely speculative, and it should be excluded.  *ePlus*, 764 F. Supp. 2d at 815-16 (excluding expert's opinions based on *ipse dixit* rather than "sound economic precepts that are explained so that a jury could understand why it is reasonable to award such a royalty as that called for" by the expert's conclusions); *Axcess Int'l, Inc. v. Savi Techs., Inc.*, No. 3:10-cv-1033-F, slip op. at 14-15 (N.D. Tex. Jan. 25,

2013) (Walker Decl., Ex. 6) (holding that "reasonably royalty" opinion based on lost profits theory must be supported by evidence that patentee would have made the asserted lost profits absent infringement); *accord King Instruments Corp. v. Perego*, 65 F.3d 941, 952 (Fed. Cir. 1995) ("The patent owner bears the burden to present evidence sufficient to show a reasonable probability that it would have made the asserted profits absent infringement.")

### C.     Mr. Brlas Improperly Relied on LogMeIn's Total Accused Revenues To Calculate His Proposed Royalty

The Federal Circuit has made clear that a damages expert may use the defendant's total revenues from sales of the accused products to calculate reasonable royalty damages ***only*** if the "Entire Market Value Rule" is satisfied.  Under that rule, a defendant may recover damages based on the value of an entire product containing several features only if "the feature patented constitutes ***the*** basis for customer demand."  *Lucent*, 580 F.3d at 1336 (emphasis added) (internal quotations and citations omitted).  Recently, in *LaserDynamics,* the Federal Circuit emphasized that ***this test can only be met by showing that the patented feature alone*** causes customers to purchase the accused products.  694 F.3d at 68 ("It is not enough to merely show that the [patented feature] is viewed as valuable, important, or even essential …. [P]roof that consumers would not want a laptop without [its many] features is not tantamount to proof that any one of those features alone drives the market for laptop computers.").  If the patentee cannot satisfy the Entire Market Value Rule, then the "patentee . . . must ***in every case*** give evidence tending to separate or apportion the defendant's profits and the patentee's damages between the patented features and the unpatented features."  *Uniloc*, 632 F.3d at 1318 (emphasis added) (internal quotations and citations omitted).

Contrary to this binding authority, Mr. Brlas relied on LogMeIn's total revenues from the sales of the accused products as the royalty base against which he applied his 18%-20% royalty

rate, without even attempting to satisfy the Entire Market Value Rule or engaging in any form of apportionment whatsoever.  (Brlas Rpt. 39-40; Brlas Second Supp. Rpt. at 34-35.)  Mr. Brlas made no attempt to show that the system claimed in the '479 patent is "*the basis for customer demand*" that causes customers to purchase the accused products, as required by the Entire Market Value Rule.  *Id.*  Nor did Mr. Brlas make any attempt to show *that the patented feature alone* causes customers to purchase the accused products.  Nor did Mr. Brlas make any attempt whatsoever to *apportion* the accused revenues between those attributable to the '479 patent and those attributable to the dozens of other features that drive sales.  *Id.*

Although Mr. Brlas has claimed that it is his "understanding" that the '479 patent is the "core functionality of LogMeIn's remote access products" and that "all revenue and incremental profits from the Accused Products are a direct result of using the '479 Patent, without which LogMeIn would not have any Remote Access Service business" (*see* Brlas Rpt. at 23), those claims are both factually unsupported and legally insufficient.  It is Mr. Brlas's burden to identify a factual basis for this point, not simply rely on an "understanding."  The Federal Circuit has made clear that the Entire Market Value Rule is not satisfied merely by showing that the patented feature "is viewed as valuable, important, or even essential" to the accused product, or by showing that the accused product without the patented feature "would be commercially unviable."  *LaserDynamics*, 694 F.3d at 68.  Instead, in order to satisfy the Entire Market Value Rule, the patentee must show that the patented feature *alone* is "what motivates customers to buy [the accused product] in the first place."  *Id.*  Mr. Brlas again simply ignored his burden and has not even made an attempt to provide any evidence whatsoever that the feature claimed in the '479 patent is what motivates customers to buy LogMeIn's accused products.

Having failed to satisfy the Entire Market Value Rule, Mr. Brlas claims that his use of LogMeIn's total accused revenues is excusable because he adjusted his royalty rate downward to 18%-20% to account for LogMeIn's contributions to the accused products.  (*See* Brlas Supp. Rpt. at 17.)  This approach is not acceptable, and requires exclusion of the opinions—in *LaserDynamics*, the Federal Circuit made it crystal clear that "the requirement to prove that the patented feature drives demand for the entire product may not be avoided by the use of a very small royalty rate."  *LaserDynamics*, 694 F.3d at 67; *see also Uniloc*, 632 F.3d at 1320 ("The Supreme Court and this court's precedents do not allow consideration of the entire market value of accused products for minor patent improvements simply by asserting a low enough royalty rate.")

Accordingly, because Mr. Brlas's reasonable royalty calculation improperly relies on LogMeIn's total accused revenues, contrary to binding damages authority, it is unreliable and his testimony should be excluded from trial.  *See, e.g., Uniloc*, 632 F.3d at 1318-20 (affirming district court's grant of a new trial on damages where patentee improperly relied on the entire market value rule, noting that use of entire market value of accused products "skew[ed] the damages horizon for the jury"); *see Apple Inc. v. Samsung Elecs. Co.*, No. 11-CV-01846-LHK, 2012 WL 2571332, at *6 (N.D. Cal. June 30, 2012) (excluding damages expert testimony regarding apportionment of profits because it was "contrary to the law"); *In re Novatel Wireless Secs. Litig.*, 846 F. Supp. 2d 1104, 1108-09 (S.D. Cal. 2012) (excluding expert opinion that was "incompatible" with correct legal standard).

**D.    Mr. Brlas's Proposed Royalty Would Have Been Expected to Leave, And Would Have Left, LogMeIn With Huge Operating *Losses* And, Thus, Is Not a "Reasonable Royalty"**

A reasonable royalty based on a hypothetical negotiation is "the amount that 'a person, desiring to manufacture [, use, or] sell a patented article, as a business proposition, would be

willing to pay as a royalty and yet be able to make [, use, or] sell the patented article, in the

market, *at a reasonable profit.*'" *Trans-World Mfg. Corp. v. Al Nyman & Sons, Inc.*, 750 F.2d

1552, 1568 (Fed. Cir. 1984) (alterations in original; citations omitted; emphasis added).

Although there is no rule that reasonable royalty damages can be no higher than the infringer's

actual profits, *see State Indus., Inc. v. Mor–Flo Indus., Inc.*, 883 F.2d 1573, 1580 (Fed. Cir.

1989), a reasonable royalty based on a hypothetical negotiation—as Mr. Brlas has purported to

calculate here—generally is one that would have been expected to leave the infringer with some

profit.  *See Georgia–Pacific*, 318 F. Supp. at 1121–22; *Hughes Tool Co. v. Dresser Indus., Inc.*,

816 F.2d 1549, 1558 (Fed. Cir. 1987).  After all, no reasonable person would enter into a license

in which they had agreed to pay more than their expected profit, since doing so would cause

them to go out of business.  *See Hanson v. Alpine Valley Ski Area, Inc.*, 718 F.2d 1075, 1081

(Fed. Cir. 1983) ("[T]hat a reasonable royalty would leave an infringer with a reasonable profit .

. . is implicit. . . .") (internal quotations and citations omitted); *Lindemann*, 895 F.2d at 1408

(holding that expert's opinion that defendant "would agree to pay a royalty in excess of what it

expected to make in profit" was "absurd."); *Westvaco Corp. v. Int'l Paper Co.*, Civ. No.

3:90CV00601, 1991 WL 290676 at * 12 (E.D. Va. Nov. 27, 1991) (Spencer, J.) (reasonable

royalty "must . . . leave the infringer with a reasonable profit").[10]  "Evidence of the infringer's

actual profits generally is admissible as probative of his anticipated profits."  *Trans-World*, 750

F.2d at 1568; *see also* 5 Chisum, *Patents* § 20.07[2][d][i].

---

[10] *See also Mobil Oil Corp. v. Amoco Chem. Corp.*, 915 F. Supp. 1333, 1365–66 (D. Del. 1994)
(patentee's proposed rate was not reasonable because it exceeded entire profit made on accused
products); *LG Display Co., Ltd. v. AU Optronics Corp.*, 722 F. Supp. 2d 466, 472 (D. Del. 2010)
(reasonable royalty should leave the infringer a reasonable profit); *Micro Chemical, Inc. v.
Lextron, Inc.*, 161 F. Supp. 2d 1187, 1209 (D. Colo. 2001) ("a reasonable royalty is one that
leaves the infringer with some profit. . . After all, no reasonable person would enter into a license
in which they had agreed to pay more than their expected profit.") (citations omitted), *overruled
on other grounds* 318 F.3d 1119 (Fed. Cir. 2003).

Here, Mr. Brlas himself conceded at the outset that a "reasonable royalty" is one that would have resulted from a hypothetical negotiation and would have been expected to leave the licensee (LogMeIn) with a ***reasonable profit***.  (Brlas Rpt. at 11) (citing *Georgia-Pacific*, 318 F. Supp at 1120 (emphasis added)); *see also* Brlas Rpt. at 29, 39-40 (referring to hypothetical negotiation).  Despite the foregoing, Mr. Brlas arrived at a proposed total royalty—approximately ████████████████████ in total—that would consume ***all*** of LogMeIn's expected operating profit and result in significant expected ***losses*** for LogMeIn, not only on the accused products, but for the company as a whole.  Mr. Brlas's proposed total royalty is ████ ████████ LogMeIn's total operating profits of the entire company in the calculated damages period (2005 and 2012), which totaled approximately ██████.  (Herdiech Decl. at ¶ 6.).  And Mr. Brlas's proposed royalty is ██████████████ than LogMeIn's total operating profits on the products that 01 has accused of infringement.  (Herdiech Decl. at ¶ 7.).  Mr. Brlas has not claimed, or provided any basis to conclude, that LogMeIn or any reasonable licensee would have expected to make an operating profit under his proposed royalty, or would have agreed to a royalty which would leave it with huge losses.  Mr. Brlas's proposed royalty is thus not reasonable and should be excluded from the trial of this case.

## V.    CONCLUSION

Because Mr. Brlas's damages opinion is unreliable, unsupported, completely speculative, and based on insufficient facts, LogMeIn respectfully submits that this Court should preclude Mr. Brlas from offering his damages opinions at trial.

PUBLIC VERSION

Dated:  February 22, 2013              Respectfully submitted,


/S/ _____
Charles B. Molster, III
(VSB No. 23613)
Attorney for Defendant LogMeIn, Inc.
WINSTON & STRAWN LLP
1700 K Street NW
Washington, D.C. 20006
Tel : (202) 282-5988
Fax : (202) 282-5100
Email: cmolster@winston.com

Wayne L. Stoner (admitted *pro hac vice*)
Vinita Ferrera (admitted *pro hac vice*)
Rachel Gurvich (admitted *pro hac vice*)
Silena Paik (admitted *pro hac vice*)
Alexandra Amrhein (admitted *pro hac vice*)
Leslie Pearlson (admitted *pro hac vice*)
WILMER CUTLER PICKERING HALE AND
DORR LLP
60 State Street
Boston, MA 02109
Tel.:  (617) 526-6000
Fax:  (617) 526-5000
Email: Wayne.Stoner@wilmerhale.com
Email: Vinita.Ferrera@wilmerhale.com
Email: Rachel.Gurvich@wilmerhale.com
Email: Silena.Paik@wilmerhale.com
Email: Alexandra.Amrhein@wilmerhale.com
Email: Leslie.Pearlson@wilmerhale.com

Nathan Walker (admitted *pro hac vice*)
Arthur W. Coviello (admitted *pro hac vice*)
950 Page Mill Road
Palo Alto, CA 94304
Tel.:  (650) 858-6000
Fax:  (650) 858-6100
Email: Nathan.Walker@wilmerhale.com
Email: Arthur.Coviello@wilmerhale.com

PUBLIC VERSION

Philip R. Seybold
(VSB No. 73596)
1875 Pennsylvania Avenue NW
Washington, DC 20006
Tel.:  (202) 663-6000
Fax:  (202) 663-6363
Email: randy.seybold@wilmerhale.com

*Attorneys for Defendant LogMeIn, Inc.*

## CERTIFICATE OF SERVICE

I hereby certify that on this February 22, 2013, the foregoing document was served electronically upon the following counsel of record:

A. Neal Seth
John P. Corrado
Katherine Lea McKnight
BAKER & HOSTETLER LLP
1050 Connecticut Ave. NW, Suite 1100
Washington, DC 20036
Tel.: (202) 861-1500
Email: nseth@bakerlaw.com
Email: ajsmith@bakerlaw.com
Email: jcorrado@bakerlaw.com
Email: kmcknightbakerlaw.com

*Attorneys for Plaintiff 01*
*Communique Laboratory, Inc.*

_____/S/_____

Charles B. Molster, III
(VSB No. 23613)
Attorney for Defendant LogMeIn, Inc.
WINSTON & STRAWN LLP
1700 K Street NW
Washington, D.C. 20006
Tel : (202) 282-5988
Fax : (202) 282-5100
Email: cmolster@winston.com
