UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA
ALEXANDRIA DIVISION

_____

01 COMMUNIQUE LABORATORY,        )
INC.,                            )
                                 )  Docket No. 1:10-cv-1007
          Plaintiff,             )  Alexandria, Virginia
                                 )
          v.                     )  March 18, 2013
                                 )
LOGMEIN, INC.,                   )  Volume I
                                 )  (a.m. session)
          Defendant.             )
_____

TRANSCRIPT OF TRIAL

BEFORE THE HONORABLE CLAUDE M. HILTON

UNITED STATES DISTRICT JUDGE

AND A JURY

<u>APPEARANCES</u>:

  For the Plaintiff:     John P. Corrado, Esq.
                         Marc A. Antonetti, Esq.
                         Thomas H. Shunk, Esq.
                         Katherine Lea McKnight, Esq.
                         William T. DeVinney, Esq.
                         Loura Alaverdi, Esq.
                         A. Neal Seth, Esq.

  For the Defendant:     Wayne L. Stoner, Esq.
                         Charles B. Molster, III, Esq.
                         Vinita Ferrera, Esq.
                         Rachel Gurvich, Esq.

  Court Reporter:        Tracy L. Westfall, RPR, CMRS, CCR
Proceedings reported by machine shorthand, transcript produced
by computer-aided transcription.

1                           I N D E X

2                    Direct    Cross   Redirect   Recross

3    FOR THE PLAINTIFF:

4    A. Cheung            53        --        --          --

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                       P R O C E E D I N G S

2              MR. CORRADO:  Good morning, Your Honor.  Jack Corrado

3    for 01.  With me today is Bill DeVinney, Marc Antonetti, Loura

4    Alaverdi, Neal Seth, and Kate McKnight.  Tom Shunk will also be

5    here, be one of the presenters.

6              Thank you, Your Honor.

7              MR. MOLSTER:  Good morning, Your Honor.  Charles

8    Molster from Winston & Strawn on behalf of the defendant,

9    LogMeIn.

10             Also at counsel table is Wayne Stoner from WilmerHale

11   and Vinita Ferrera, also from WilmerHale.

12             MR. STONER:  Good morning, Your Honor.

13             MR. MOLSTER:  Thank you very much for coming out a

14   little bit earlier, Your Honor.  We had a couple of matters that

15   relate to opening statement and the patent video that we wanted

16   to raise with the Court so -- in an effort to try to avoid

17   objections during opening statement.

18             THE COURT:  All right.

19             MR. MOLSTER:  First of all, we do have an agreement --

20   we haven't agreed to settle the case, Your Honor, apologize for

21   that -- but we do have an agreement to play the patent tape from

22   the Federal Judicial Conference for the jury, if it's agreeable

23   to the Court.  I think it lasts about 18 minutes, and we think

24   it gives them some great background on what patents are, what

25   the PTO is.  And -- and we have an agreement on that.

1          THE COURT:  Is that necessary?  People know what a

2     patent is.  You-all are talking about patents.  They know the

3     office is over here.  People know what a patent is.

4          MR. MOLSTER:  I think, Your Honor, respectfully, some

5     of these jurors are from -- not from Alexandria.  Some of them

6     are from further counties.  And I think that there are people

7     who -- and based on what -- the trials that we've done around

8     the country on both sides, the patent tape is very helpful

9     because some of these jurors aren't familiar with the patent

10    process.

11         THE COURT:  Do you agree with that, Mr. Corrado?

12         MR. CORRADO:  Yes, Your Honor.  We don't object to it.

13    It -- I think it can be helpful in some matters, but I agree

14    with the Court that I think it's not necessary.

15         THE COURT:  I'll let you do it, but I'm going to take

16    18 minutes off somewhere else because I think it's a waste of

17    time.  If you-all agree to it, that's fine.  Everybody knows

18    what a patent is.  There's no problem understanding it,

19    particularly after you-all talk about it, and you'll just repeat

20    what's in that video.  You'll be repeating opening statements

21    and about half the testimony of the witnesses, but I'll let you

22    play it.

23         MR. MOLSTER:  Thank you, Your Honor.

24         The second issue relates to 01's opening statement.  We

25    don't want to object during 01's statement.  We don't know what

1   01 plans to say about this issue of the redesign, which was the

2   subject of some motions in limine that have been deferred to

3   trial, but we just want to remind that what 01 said to the Court

4   was that Mr. Shunk said that he would not argue that redesign

5   and evidence of infringement in opening statement.  He said we

6   do argue that the switch they made to continue -- continues to

7   infringe.  And so, obviously, we're going to have to tell the

8   jury that there is an old and new architecture and that we claim

9   they both infringe.  So long as that's okay, maybe we don't have

10  a dispute here.

11          As long as that's all they do, is say that the

12  redesign, the second version, infringes, that's fine.  But we

13  believe it's improper for them to argue that it shows -- it

14  demonstrates infringement under 407 or that it's evidence of

15  willfulness in the opening statement.

16          In their opposition to the motion in limine, they said

17  in accord with Federal Rule of Evidence 407, 01 does not intend

18  to argue that the redesign by LogMeIn of LogMeIn's products

19  shows that the original design infringed '479.

20          So if they -- if they stick to that in opening

21  statement, we're fine.  We don't -- and that's why we've just

22  raised it, because we don't want to have to object during

23  opening statement.

24          MR. CORRADO:  Your Honor, I think Mr. Shunk is going to

25  comply with what he presented to the Court.  I don't expect that

1    there's going to be any reference in that way to the redesign in

2    opening statement that it shows evidence of infringement.

3             THE COURT:  I'm sorry?

4             MR. CORRADO:  I -- I am confident that Mr. Shunk will

5    comply with what he has told the Court, and that is --

6             THE COURT:  So you don't disagree with what Mr. Molster

7    said?  So we have no issue.

8             MR. CORRADO:  Doesn't seem to be an issue, Your Honor.

9             MR. MOLSTER:  All in favor of no issues, Your Honor.

10            Now, they -- with respect to our opening statement,

11   there are a number of objections to documents that we would like

12   to use in our opening statements -- in our opening statement.

13            If I may, Your Honor, I have a copy of the actual

14   exhibits.  Some of the exhibits relate to -- some there are no

15   objections, some there are objections as to admissibility.  If I

16   could hand this to Marshal Williams and have him pass it up to

17   the Court.

18            I think the -- there's two ways we can go on this.

19   Either we get rulings now as to admissibility to cure their

20   objections or we're allowed to play them in the opening

21   statement.  And if we can't get them into evidence, that's our

22   problem at the end of the day.  We'll do whatever the Court's

23   pleasure is.  But these are exhibits that we think are highly

24   relevant, they are very relevant to issues in the case.

25            The whole point of the opening statement is a roadmap

1  to show what the evidence is going to show, and this is what the

2  evidence is going to show.  It's the actual evidence.

3          THE COURT:  You can tell them what the evidence will

4  show and not use exhibits.  Why do you need to use any exhibits

5  in the opening statement?

6          MR. MOLSTER:  Because we'd like -- Your Honor, we'd

7  like for the jury to be able to see exactly what these documents

8  are and what -- the opening statement includes a number of

9  admissions that 01 has made, which we think are highly relevant

10 to the case, and we --

11         THE COURT:  I'm not going to permit you to do that.

12 All you'll be able to do is hold it up at the podium and tell

13 them what it says.  So why even use it?

14         MR. MOLSTER:  Well, we'd like to put them on the

15 screen, Your Honor, so the jury can see them.

16         THE COURT:  I'm not going to permit that.  I told you

17 we're not going to put all these documents up on the screen.  I

18 told you you can use this equipment when there's diagrams that

19 are important.  Only because it's a patent case are the screens

20 here and only because there may be something technical involved.

21         Now, the exhibits that are going to come in at trial

22 have nothing to do with technical information that you need to

23 tell the jury in opening statement.

24         MR. MOLSTER:  There are several of our exhibits that

25 we'd like to show on the screen that are patents and diagrams

1    for the patents, and they don't -- and 01 does not object to us

2    using those.  And we'd like to use --

3              THE COURT:  If they're diagrams to the patents, you can

4    show those.

5              MR. MOLSTER:  Very well, Your Honor.  If we could have

6    a moment.

7              Also, we wanted to show our patent.  There was an

8    objection to showing our patent to the jury, Your Honor.  We

9    think that our patent was put in issue by one of their experts.

10   It was in our motion in limine.  We think the fact that we have

11   patents is highly relevant.  There's some *Georgia-Pacific*

12   factors so we think we should be able to show that as well.

13             THE COURT:  You can show it.  You can't make an

14   argument in the opening statement.

15             MR. MOLSTER:  Very well, Your Honor.

16             THE COURT:  I mean, if you're simply telling them this

17   is what we're going to show our patent to be --

18             MR. MOLSTER:  Right.

19             THE COURT:  -- that will be permissible.

20             MR. MOLSTER:  Very well.

21             MR. CORRADO:  Take a minute on this, if I may.

22             THE COURT:  All right.

23             MR. CORRADO:  We certainly agree with the ruling, Your

24   Honor, about publications involving some of this for the jury.

25   It's a great waste of time and it goes into -- not going to

1   argue that again, but it goes into issues that are subject to

2   the Court's deferral of the motions in limine and objections.

3        The patent, their patent, being displayed to the jury

4   is prone to create tremendous jury confusion.  The concept that

5   a defendant has a patent which may cover -- or the defendant may

6   claim covers his own product is irrelevant to whether or not the

7   defendant is infringing the plaintiff's patent.

8        And once you do that, once you suggest to the jury,

9   hey, look we've got a patent ourselves, the jury is now -- and

10  there's great case law on this -- is confused about whether or

11  not, well, if you're practicing your own patent, that's a

12  defense to infringement of our patent.

13       And for that reason, we strongly object to the

14  display -- and, again, they can talk about it in opening, they

15  can advert to it.  But to display something like that to the

16  jury in opening is at the get-go going to confuse the jury about

17  what patent we're talking about, what the claims are.  The jury

18  simply, frankly, doesn't understand the relevance of a

19  defendant's patent.

20       Frankly, there is no relevance of the defendant's

21  patent, and so we would strongly object to the display of that.

22  Again, he can advert to it, he can talk about it, but -- but to

23  show it to the jury is going to create in the jury's mind a

24  great confusion about what's going on here.

25       THE COURT:  I think if you are going to show any of

1   them, you can show both.

2         MR. CORRADO:  I would remind the Court it is subject to

3   an outstanding motion in limine to exclude reference to their

4   patent.  And that's sort of the general problem here, displaying

5   it in opening -- displaying to the jury at opening matters that

6   are subject to pending motions in limine.  The Court deferred

7   these questions until -- right -- absolutely rightly there was a

8   context developed for knowing whether or not it was appropriate

9   for this evidence to go before the jury, deferred it until we

10  got that context in trial.

11        And so to allow this now is essentially an end run

12  around that motion in limine.  It essentially resolves it

13  because the jury will be able to see it up on the screen.  And,

14  again, for that reason, I think it's perfectly fine to talk

15  about it.  We're not showing our patent in opening, by the way.

16  All we're showing in opening is diagrams of the -- of the

17  important figure in our patent and their architecture, just

18  two -- two boards.

19        So the use of -- I would suggest the display of the

20  patent in opening is a problem, will tend to confuse the jury

21  and it's subject to a pending motion in limine.

22        MR. MOLSTER:  With respect to our patent, Your Honor,

23  absolutely relevant.  It's a *Georgia-Pacific* factor.  I think

24  that's, as you say, if it sells for the goose, it sells for the

25  gander.

1              THE COURT:  I believe the ruling's correct.  There can

2   be no argument about this.  But if you have a patent, I believe

3   you can show that.  If we're showing the other -- if we're

4   showing other diagrams of patents, we'll show it all or we'll

5   show none.  I believe it will be correct.

6              MR. MOLSTER:  Your Honor, we'd also like to be able to

7   show some of the important claim terms at -- straight out of the

8   patent.

9              Would that be agreeable so the jury can see what the

10  claim terms are?

11             THE COURT:  That's going to be a waste of time in

12  opening statement.

13             MR. MOLSTER:  We'd also like to show --

14             THE COURT:  Maybe you ought to -- how long do you-all

15  intend --

16             MR. MOLSTER:  45 minutes.

17             THE COURT:  Oh, my word.  No.  I'm just simply not

18  going to permit that now.  You can get up in five minutes and

19  tell them what the issues are in this case and then put on your

20  evidence.  I'm not going to allow a lawyer to stand up in

21  opening statement and try to tell every piece of evidence that's

22  going to come in.  It's an absolute waste of time.  I know you'd

23  like to tell -- everybody likes to tell these juries five, six,

24  seven different times the same thing over and over again.

25             Why don't I give you-all 15 minutes a side?  If you

1    want to waste it with showing these diagrams, go ahead.  But in

2    15 minutes you can summarize any case with any issues that could

3    ever come along, tell the jury what the issues are, and then

4    call your witnesses and put the evidence on, talk about the

5    claims with your witnesses.

6         MR. MOLSTER:  Can I respectfully request 30?

7         THE COURT:  15 is more than enough.

8         MR. MOLSTER:  Very well.

9         THE COURT:  I can tell the jury what this case is about

10   in five minutes.

11        MR. MOLSTER:  Understood, Your Honor.

12        THE COURT:  Maybe even less.  But I'm going to tell

13   them what it's about before you-all even start.

14        MR. MOLSTER:  Understood.

15        THE COURT:  All right.

16        MR. MOLSTER:  Thank you.  I wanted to -- there was a

17   ruling by Judge Jones on Friday with respect to a motion about

18   confidentiality information.  He indicated that 01 could not

19   talk about our commercially, very highly critical competitive

20   information regarding product-by-product financial information.

21   I don't expect they're going to try to do it in the opening

22   statement, but I just wanted to give the Court a heads-up that

23   that was a ruling that occurred on Friday.

24        THE COURT:  I saw his ruling.  I'm sure they're not.

25        MR. MOLSTER:  Thank you.  Here's the last point.  We

1    have tried to reach an agreement with 01 that we see trial

2    exhibits the night before -- sometime before they are handed to

3    a witness at trial.

4           01 is not agreeable to that.  It's a process we used in

5    every other case.  So what that means is that unless we do

6    something, the exhibit is going to be shown to the witness and

7    we're supposed to either object in front of the jury or, I

8    guess, have a sidebar with you.  We don't think that's the most

9    efficient way to try the case.  We think that's going to slow

10   the case down.

11          Therefore, we would urge that there be some process

12   where before the witness takes the stand, we have worked -- we

13   have identified what objections, if any, there are to those

14   exhibits and -- and have you rule on them, to the extent there

15   are any objections, before the witness takes the stand so it

16   doesn't slow down the trial.

17          THE COURT:  Well, there's a requirement for the list of

18   exhibits to be filed, wasn't there?

19          MR. MOLSTER:  But there's still objections.  They

20   haven't been ruled on.  And so we -- you know, we're just trying

21   to come up with a process so that that's done in an orderly

22   fashion, not in front of the jury and not at sidebars, so it

23   doesn't slow down the trial.

24          THE COURT:  We haven't got that many objections,

25   surely.  These jurors are used to objections.  I tell them to

1    ignore those.

2            MR. MOLSTER:  There are many objections right now.

3            THE COURT:  That's no problem.

4            MR. MOLSTER:  Very well.

5            THE COURT:  We'll take care of that as we go along.

6            MR. CORRADO:  One last thing, if we may.  The ruling on

7    patents, there is a patent in this case that is irrelevant, the

8    Accolade patent, that I believe that -- that they intended to

9    show in opening.  I understand that your ruling precludes them

10   from showing other people's patents in opening.

11           There is also an issue about whether or not they can

12   refer to inequitable conduct issues in opening.  And we'd like

13   to just take a minute of the Court's time to talk about that

14   issue.  It's a very important issue, as far as we're concerned,

15   about sort of infecting the jurors' minds with issues that there

16   has been a fraud on the PTO.  And if I could ask my partner,

17   Marc Antonetti, just to address that briefly.

18           THE COURT:  All right.

19           MR. ANTONETTI:  Thank you, Your Honor.

20           With respect to the inequitable conduct issue, as you

21   know, that is an issue for the Court to decide and not for the

22   jury to decide.  And we gathered from the many exhibits that

23   they intended to put on that they do intend to argue -- or at

24   least to, in their opening statement, bring out a number of

25   issues related to inequitable conduct.  Those are not for the

1   jury to decide.  And we had a motion in limine that addressed a

2   wide range of things, many of which they've suggested go to

3   inequitable conduct.

4         I would prefer not to have us object during their

5   opening on that point, but if they're going to raise issues

6   related to inequitable conduct that are solely for the Court to

7   decide, we would like that not to occur.  I don't know what

8   they're going to do with their opening at this point in time,

9   but we did see throughout there were a number of issues on

10  inequitable conduct, and our motion in limine does cover many of

11  those items.  I don't know what they'll address though.  So we

12  would request that the Court preclude evidence related to

13  inequitable conduct during the opening statements.

14        MR. STONER:  Your Honor, you've already decided this

15  issue.  They filed a motion to bifurcate inequitable conduct out

16  of the case -- out of the jury trial.  Your Honor denied it.  So

17  it's part of this one trial, and so we need to address the issue

18  during this trial.  We intend to do so.

19        THE COURT:  Well, you wouldn't have to address it in

20  opening statement.  I don't need to be -- I know that the issue

21  is there.  You don't need to apprise me of it.

22        MR. STONER:  Very good.

23        THE COURT:  So if we can keep that out of opening

24  statement.

25        MR. ANTONETTI:  Thank you, Your Honor.

1          THE COURT:  I shouldn't mention it either as an issue

2    in the case.

3          MR. ANTONETTI:  I'm sorry?

4          THE COURT:  And I shouldn't mention that's an issue in

5    the case either.

6          MR. STONER:  You know, we will examine the witnesses on

7    the issue, obviously, because it's part of this trial.

8          THE COURT:  Right.

9          MR. ANTONETTI:  Your Honor, in that regard, I would

10   suggest simply that that not occur unless it's done outside the

11   presence of the jury, whether it's on Friday or while they're

12   deliberating.  One of their cases that they cited in resisting

13   our motion to bifurcate had a good solution to it.  And that was

14   the *Inventio v. Otis Elevator* case in which the court there did

15   not bifurcate the case, but did have the evidence of inequitable

16   conduct heard outside the presence of the jury during different

17   opportunities to present itself during the case.  So we would

18   suggest that that would be a good way to address that question.

19          THE COURT:  Well, I don't know that that's necessary.

20   It just deals with the evidence of what was available, what

21   information was available at the time.  I don't see how that

22   bothers the jury in making their determination that there's

23   infringement or not.

24          MR. ANTONETTI:  Certain evidence that they may look to

25   introduce, for example, related to the Ontario Securities

1    Commission.  And Mr. Cheung will be testifying later on this

2    morning.  I anticipate they may want to ask him questions about

3    that.  That would move in limine to preclude them asking because

4    it's not something that should be considered in the first

5    instance.  The point it relates to, which they represented it

6    relates to, is the inequitable conduct issue.

7             So if that were to be raised, I think it will be highly

8    prejudicial to the jury.  But if the Court wishes to defer

9    ruling on that, doing it --

10            THE COURT:  What does the Canadian Securities

11   Commission have to do with inequitable conduct?

12            MR. ANTONETTI:  Well, we would say it has nothing to do

13   with it, Your Honor.

14            THE COURT:  What are they saying?

15            MR. ANTONETTI:  Their -- their position would be that

16   it shows that either, A, Mr. Cheung is not truthful or, B, that

17   it's prior conduct being used to prove consistent behavior here

18   in the present time.

19            Those two issues relate only to inequitable conduct,

20   but is not a criminal conviction and it has no bearing on the

21   case.  We would say it should not come in at all.  But if the

22   Court were going to hear that evidence, we believe it should not

23   be done in the presence the jury.

24            THE COURT:  What relevance would that have?

25            MR. STONER:  Your Honor, Mr. Cheung was -- agreed

1    to that he violated the Canadian insider trading laws.  I can

2    short-circuit this.  We will not examine Mr. Cheung about that

3    subject, but we do intend to examine him about issues that

4    overlap with the validity issue in the case as well as the

5    inequitable conduct issue.  It was prior art that invalidates,

6    he would tell, from the patent office, and that seems relevant.

7         THE COURT:  Well, I don't think that hurts to come out

8    in front the jury.

9         MR. CORRADO:  Your Honor, there are some issues to take

10   up before witnesses.  For example, there are -- that the process

11   of reading these deposition designations, which will be the

12   second, I think, witness that we call today, we'll be reading

13   depositions.  We can defer that at any point to -- but we would

14   like to have some quick ruling on that before we actually do

15   that reading because I think it will be confusing otherwise.  We

16   can do it after the jury's empaneled or I can do it right now.

17        May I just address it, tell what the problem is?

18        THE COURT:  All right.

19        MR. CORRADO:  Your Honor, we have -- we've designated

20   certain -- as always we do, we designated certain portions of

21   the deposition exhibits of the defendant to be read into

22   evidence.  And we have an absolute right to do that under

23   Rule 32.  We can read in -- planning to read in the deposition

24   of the chief technical officer and the fellow who was the

25   architect of the infringing system.  We have certain -- certain

1   deposition excerpts, which we plan to read into evidence.  And

2   we have to right to do that, an absolute right to do that for

3   any purpose.

4        They have the right under Rule 106 to add in things

5   that would be -- that if left out would be unfair.  Well, Your

6   Honor, here is our designations.  Here is their designations.

7   And what they're doing is essentially using that as a green

8   light to get all of their affirmative -- a lot of their

9   affirmative evidence into the case in our case-in-chief, and it

10  creates a whole lot of confusion for the jury if the -- if --

11  and there are self-serving things.  For example, the LogMeIn

12  lawyer's asking the LogMeIn witness in a deposition, is

13  everything you said truthful, and questions in the deposition

14  that go to issues that are completely unrelated to the

15  functionality, for example, of the 01 system and so on.

16       Forcing us to read their counter-designations in a --

17  forcing us to read not only our designations but their -- all of

18  their counter-designations would be essentially to put us in a

19  position of sponsoring testimony that we don't -- we shouldn't

20  sponsor.

21       So I would respectfully suggest that we should be

22  allowed to read our designations.  If as we're reading it, they

23  say -- and for 32 years in this court, this is the way I've

24  always done it -- you're reading a deposition and they say, you

25  ought to read the sentence before that.  Well, fine, we'll read

1    the sentence before it.  Or you ought to read the question after

2    it, that's fine.

3          But to put in wholesale a whole package of their

4    affirmative evidence is just improper.  So I would just suggest

5    that we should be allowed to read our evidence -- our

6    designations in.  They can put theirs in.  Their witness is

7    going to be here apparently.  They can put theirs in when their

8    witness is here.  Failing that, I would very strongly ask that

9    we don't have to read their questions.

10          THE COURT:  Didn't I already indicate that when it goes

11   beyond the testimony of your witness, that they would have to

12   put it in in their case?

13          MR. CORRADO:  Your Honor, I believe -- I believe you

14   did say that.  And that's -- there's some question about what

15   exactly the ruling was.  But -- but if that was the intent of

16   the Court, that is fine with us.

17          THE COURT:  I'm sure there is.  And there's some

18   question of how I'm even going to rule on this until I hear it

19   because I'm not going to go through all these depositions

20   beforehand and make rulings on them.  What you ought to be able

21   to do is to read your designated portion of the deposition and

22   they ought to be able to put in or read behind you that part

23   that is relevant to what you put in.  When they go beyond that,

24   then it ought to stop and it ought to come as their part of the

25   case.

 1          MR. CORRADO:  Absolutely --

 2          THE COURT:  But I can't do that until I hear it come

 3  in, as far as I know.  I don't know how to do it.

 4          MR. CORRADO:  Absolutely right.  But the solution to

 5  that whole problem is letting us read ours in first without

 6  having to also read their counter.  So with that ruling, I think

 7  we're absolutely fine on this.  We'll read ours in.  After we're

 8  done, they can ask -- they can have someone take the --

 9          THE COURT:  That's right.  If they go beyond where you

10  ought to go, you can object to it.

11          MR. CORRADO:  Exactly, Your Honor.  Thank you, Your

12  Honor.

13          THE COURT:  All right.

14          MS. FERRERA:  Your Honor, may I address that issue

15  briefly?

16          THE COURT:  Sure.

17          MS. FERRERA:  Your Honor, as I understand what they're

18  suggesting, is that they would read all of their designations

19  for -- I apologize for my voice, Your Honor -- for this

20  particular witness and then we would come back in and fill in

21  the holes that we believe have been left.  And that seems to be

22  very confusing to the jury to have -- hear once and then hear

23  our counter-designations out of context from the original

24  designations.

25          What we would propose -- and, frankly, Your Honor, we

1    proposed this to 01 over the weekend -- is that we try to --

2    before coming and presenting this testimony to Your Honor is to

3    go through and match up, you know, which designations they want

4    to present and which counter-designations we think are fairly

5    relevant and responsive to the testimony that they're

6    designating and just read it all at once so the jury gets an

7    understandable presentation of the testimony.  And we think

8    that's what the Rule permits.

9         And, Your Honor, we're not trying to designate stuff

10   that's completely irrelevant to 01's designations.

11        THE COURT:  You want him to read the entire -- read

12   your portion of the deposition as well as his?

13        MS. FERRERA:  Your Honor, whether they read it or

14   whether we get up immediately after the section is read and then

15   we read the part that we think is relevant to put into context,

16   I leave that up to you, what you think would be more

17   appropriate.  But I think they have to be read together, rather

18   than all 01's designations and then separately our

19   counter-designations.

20        THE COURT:  All right.  Well, I don't have any problem

21   with that.  But at the point that this goes beyond the area that

22   you have designated, when you start getting a few sentences away

23   from what they had, then you've got some problems, it seems to

24   me.

25        MS. FERRERA:  Well, your Honor, to be fair, their --

1    they may have asked one question about something, you know, how

2    does the LogMeIn product work and then two pages later ask the

3    follow-up question we think puts the other one in context.  I

4    think that's --

5              THE COURT:  No, you can't rearrange it like that.

6              MS. FERRERA:  Thank you, Your Honor.

7              THE COURT:  If he's reading a deposition and he stops

8    at the end of the sentence and there's a sentence afterwards

9    that you think is relevant, that should be read at the time,

10   that can be read, but you can't hop around and try to make an

11   argument out of the order in which these things are done in the

12   deposition.  You're going to have to do them in order.  And if

13   there's something you want to expand on that he reads, you may

14   get up and read that.

15             MR. CORRADO:  Thank you, Your Honor.

16             THE COURT:  Or ask him to read it and he may do it.

17   But when you start going a few pages further on regardless of

18   the subject matter, no.

19             MS. FERRERA:  Thank you, Your Honor.

20             THE COURT:  Is there anything else?

21             MR. CORRADO:  That's all we have, Your Honor.

22             MR. MOLSTER:  Thank you, Your Honor.

23             THE COURT:  I've got a list of a lot of lawyers.  I

24   don't know who all wants to be introduced.  What do we have?  We

25   have Mr. Seth Neal -- or I'm sorry -- Neal Seth.  I'm sorry.

1   I've got it backwards.

2           MR. CORRADO:  Mr. Seth will be our -- will be our

3   presenter at trial.

4           THE COURT:  All right.  And John Corrado and Katherine

5   McKnight.  Who else?  Marc --

6           MR. CORRADO:  Mr. Antonetti.

7           THE COURT:  Marc Antonetti.

8           MR. CORRADO:  Mr. Shunk -- I don't know if he's here.

9   Tom Shunk will be the lead lawyer at trial.  He's in the

10  hallway.

11          THE COURT:  All right.  And --

12          MR. CORRADO:  Those are trial presenters.  We also have

13  Loura Alaverdi, who is here.

14          MS. ALAVERDI:  Good morning, Your Honor.

15          THE COURT:  All right.

16          MR. CORRADO:  And Bill DeVinney, who is here, but they

17  will not be presenting.

18          THE COURT:  All right.  So everybody but Christine

19  Moser?

20          MR. CORRADO:  Christine Moser is also here.  She will

21  not be presenting during trial.

22          THE COURT:  Then I'm going to -- I'll just introduce

23  those people that are going to be active in the trial --

24          MR. CORRADO:  Okay.

25          THE COURT:  -- or be here at counsel table during the

1    trial.

2           MR. MOLSTER:  Yes, sir.  So for us that would be Wayne

3    Stoner, Vinita Ferrara, and myself.  Just a small little ragtag

4    team, Your Honor.

5           THE COURT:  The three of you?

6           MR. MOLSTER:  Yes, sir.

7           THE COURT:  All right.  Who else is at table that I

8    might to -- I'll introduce them.

9           MR. MOLSTER:  Rachel is also an attorney.

10           THE COURT:  All right.

11           MR. MOLSTER:  And we were -- also have our corporate

12    representative at the table.

13           THE COURT:  All right.  Well, I'll not -- I'll not

14    represent --

15           MR. CORRADO:  Thank you, Your Honor.

16           THE COURT:  -- introduce them.

17           All right.  Is the jury --

18           Oh, okay.  Well, we have to take a brief recess and get

19    the jury up here.

20       (Recess taken at 10:06 a.m.)

21       * * *

22       (Jury voir dire is conducted, and the opening statements

23    commence as follows at 10:45 a.m.)

24       * * *

25           THE COURT:  There's a request for a rule on witnesses?

1           MR. MOLSTER:  We don't have one, Your Honor.

2           MR. SHUNK:  We don't ask for that, Your Honor.

3           THE COURT:  All right.

4           All right.  Members of the jury, now that you've been

5    sworn, I'll give you a few preliminary instructions which I hope

6    will guide you in your participation in this trial.

7           It's going to be your duty to find from the evidence

8    what the facts are.  You and you alone are the judges of the

9    facts.  You will then have to apply those facts to the law as

10   the Court will give it to you.  You must follow that law whether

11   you agree with it or not.

12          Now, the evidence form which you'll find the facts will

13   consist of the testimony of witnesses, documents received into

14   the record as exhibits, any facts that the lawyers may stipulate

15   to, or any facts that the Court may instruct you to find.

16          Certain things are not evidence and must not be

17   considered by you.  Statements, arguments, and questions by

18   lawyers are not evidence.  Objections to questions are not

19   evidence.

20          The lawyers have an obligation to their clients to make

21   an objection when they believe that evidence is being offered

22   which is improper under the Rules of Evidence.  You should not

23   be influenced by the objection or by the Court's ruling on it.

24   If the objection is sustained, ignore the question.  If the

25   objection is overruled, treat the answer like any other.

1      If you're instructed that some item of evidence is

2  received for a limited purpose only, you must follow that

3  instruction.   Testimony that has been excluded or that the Court

4  has told you to disregard is not evidence and must not be

5  considered.

6      And anything you've seen or heard outside the courtroom

7  is not evidence in this case.   You're to decide this case solely

8  on the evidence presented here in the courtroom.

9      Now, just a few words as to your conduct as jurors.   I

10  would instruct you that during the trial you're not to discuss

11  this case with anyone, nor permit anyone to discuss it with you.

12  Until you retire to the jury room at the end of the case to

13  deliberate on your verdict, you simply should not talk about the

14  case.   Don't read or listen to anything touching the case in any

15  way.   If anyone should try to talk to you about it, bring it to

16  the Court's attention promptly.

17      Don't try to do any research or investigation about the

18  case on your own.   Finally, don't form any opinion until all of

19  the evidence is in.   Keep an open mind until you begin your

20  deliberations at the end of the case.

21      I would prefer that you-all not take notes, but listen

22  to the evidence as it comes in and rely on your collective

23  recollection when you begin your deliberations.

24      The trial is going to begin.   The lawyers will make an

25  opening statement.   You will then hear the testimony of

1    witnesses.  When all the evidence is in, the lawyers will make

2    their closing arguments, I will instruct you on the law, and

3    you'll retire to deliberate on your verdict.

4          Now, we'll take a recess in the middle of the morning

5    and the middle of the afternoon and try to recess for lunch

6    around 1 o'clock, and we'll probably go into the neighborhood of

7    5:00, 5:30 in the afternoon, depending on where we are with the

8    witness, although that's got to be 5:00 today because I've got

9    to go to the funeral home after that.  So we'll go to 5:00 this

10   afternoon.

11         All right.  Gentlemen.

12         MR. STONER:  Your Honor, we were going to play the

13   video about the patent system, if you recall.

14         THE COURT:  Is that part of your 15 minutes?

15         MR. STONER:  No.

16         THE COURT:  I think you'd better forego that.  I think

17   you better do your 15 minutes.

18         MR. STONER:  Very well, Your Honor.

19         THE COURT:  All right.

20         MR. SHUNK:  May it please the Court.

21         My name is Tom Shunk, and I represent a company called

22   01 Communique Laboratory, Inc.  Now, that's a long name so I'm

23   just going to shorten it up to 01 from time to time.

24         The company gets its name from the 0s and a 1 -- and

25   the 1s that a -- that a computer uses to think.  And that's

1   because the company was founded by and is managed by a computer

2   programmer named Andrew Cheung.   That's Mr. Cheung sitting over

3   there in the back row.

4         In 1997, ladies and gentlemen, Andrew Cheung invented

5   some really useful technology that for the first time allowed

6   everyday people, not just people with a technology background,

7   but everyday people, to connect their business computer to a

8   remote computer, like a computer at home or a laptop that they

9   might have, and to do that inexpensively, securely, and easily.

10        The technology is today called remote access services,

11  remote access services, and tens of millions of people use that

12  technology.

13        Now, Andrew's company, 01, was the first company to

14  sell that kind of remote access technology.   The company brought

15  out its remote access service called I'm InTouch, I'm InTouch,

16  in 2000.   In the early days, I'm InTouch won some industry

17  awards because it was so useful and so novel.

18        01 was able to partner with a large Japanese company,

19  Hitachi, in order to bring the technology to Japan.   The remote

20  access service invention that Andrew made was so useful and so

21  novel, ladies and gentlemen, that in 2005 the United States

22  government awarded Andrew a patent on that technology.

23        It's patent 6,928,479.   I'm just going to call it the

24  '479 patent from now on.

25        In the early days, ladies and gentlemen, the future

1    looked bright for Andrew, for 01, and for the I'm InTouch

2    service.   01 and the I'm InTouch service had a real chance for

3    success.

4         We're here today, however, because the defendant in

5    this case, almost four years later, decided to bring out its own

6    remote access service technology using Andrew's invention.

7    Worse yet, they decided that they would just give Andrew's

8    invention away in order to try to get customers to buy other

9    products that the company was offering.

10        So, ladies and gentlemen, even though today tens of

11   millions of people use Andrew's invention, neither Andrew nor 01

12   has been able to see the benefit from that invention.   01 just

13   couldn't compete with a competitor who was using its technology

14   and giving it away for free.   And that is how LogMeIn, the

15   defendant, denied 01 its chance for success.

16        What LogMeIn did, ladies and gentlemen, is called

17   patent infringement.   And 01 is here to ask you to award it

18   reasonable damages for LogMeIn's patent infringement.

19        You'll hear that Andrew Cheung actually began designing

20   software code when he was a child.   He went to school and he

21   majored in computer science.   He actually started a company in

22   college, selling parts that were imported, and then later put

23   those parts together and made computers and sold those in the

24   Toronto area.

25        In 1992, after he left college he started his company,

01 Communique Laboratory, Inc., what I call 01.  They brought

out their first product, 01/Fax that turned the computer into a

fax machine.  They then brought out another product called

Communicate! with an exclamation point.  Communicate! is a

software product that combines fax, e-mail, voice messaging,

text-to-speech conversion, and paging all in one computer.  It

was a really successful product.  It sold five million copies

and was distributed throughout the United States by Comp USA,

Office Depot, companies like that.

          Fast forward now to 1997, five years into the company's

life.  Andrew was presenting the Communicate! product at a show

in Germany, and he was approached by the Swedish cell phone

company, Ericsson, about the Communicate! product, talking about

doing some additional stuff with it.  That got Andrew thinking,

ladies and gentlemen, about the problems that there might be for

one computer to remotely connect to another computer.

          Now, that may seem, oh, that -- that should be easy to

do, right?  That should be simple to do.  But that's because

today, our cell phones probably are more powerful than the

desktop computers were back then.  It's only because people like

Andrew have brought inventions into the market since the

nineties that we have the kind of Internet technology and world

that we do today, because back in 1997, if you wanted to connect

one computer to another easily and cheaply, you had to have some

real Internet technology know-how.

1           Andrew decided that he needed to bring out a product

2    that didn't require knowledge of a lot of special computer

3    technology to get it to work.  It should just work out of the

4    box.  And so, ladies and gentlemen, in September, or

5    thereabouts, of 1997, Andrew came up with the idea that later

6    became the '479 patent.

7           As he was thinking about these problems that there

8    might be, he realized that there were three fundamental problems

9    he had to deal with; firewalls, dynamic IP addresses, and

10   routers.  Now, those may sound like meaningless terms to you

11   now, but we will bring experts in who will talk about dynamic IP

12   addresses, firewalls, and routers, and you'll understand that by

13   the time the case is through.

14          Those three main obstacles were what were making it

15   difficult for people to easily and inexpensively and securely

16   connect one computer to another.  Andrew will explain that in

17   1997, he thought long and hard about those three problems.

18          And by the fall of '97, he came up with his solution,

19   the solution he calls a gateway server or a locator server.  He

20   uses those words interchangeably.  And the idea, ladies and

21   gentlemen, was to put a computer that was owned by Andrew's

22   company in the middle between, for example, a person's business

23   computer and the remote computer, say, a laptop that the

24   individual wanted to use to see what was on the business

25   computer.

 1              So there would be a locator server or a gateway server

 2     standing in between the two computers.  That gateway server

 3     would use information that it obtained from the business

 4     computer about its then current location in order to create a

 5     communication, like a big pipe between the business computer and

 6     the home computer or the business computer and the laptop.

 7              You'll hear the word ping, ladies and gentlemen,

 8     P-I-N-G.  And that's part of the invention.  The idea that

 9     Andrew had was to have the business computer, the one with the

10     information that the user wanted to get to while they were on

11     the road, send a repeated communication to the locator server.

12     It didn't say anything.  It was just sort of, Hello, I'm here.

13     This is my current location.

14              But the locator server would use that information that

15     it obtained so that when the laptop computer wanted to make the

16     connection, the locator server could do the connecting, make the

17     connection, set up the communication session.

18              Well, that was the invention.  And it also allowed

19     Andrew's company to market the remote access service in a new

20     way.  Rather than selling shrink-wrapped software that you would

21     have to put on your computer and then configure, Andrew decided

22     to market instead a service.  So you didn't pay for the

23     software.  You simply paid in order to get access to that

24     locator server that stood in the middle between the laptop and

25     the business computer.

1        Today, ladies and gentlemen, 01's main competitors,

2   LogMeIn and another company called Citrix, that you'll hear

3   about as we do this case, use Andrew's technology and they also

4   use Andrew's business model, because people really liked the

5   idea of using a service rather than paying for the software.

6        After he got the prototype working, Andrew turned the

7   technology over to his coworkers, Pedro Nascimento and Steven

8   Meyer, to start refining the details.  After filing for their

9   patent, 01 demonstrated the product at major conventions in

10  Toronto and in Las Vegas.

11       But the timing here is important.  First 01 brought out

12  its service in 2000.  Then the company called Expertcity, and

13  later called Citrix, brought out its remote access service

14  called GoToMyPC, which imitated the I'm InTouch service in 2001.

15  And then several years after that, LogMeIn brought out its

16  service that imitated both.  The timing is clear.  In 2000, when

17  I'm InTouch was brought out, no other business was offering a

18  remote access service to the public like Andrew's.  No one.

19       That brings us to the defendant, LogMeIn.  LogMeIn was

20  begun as a company by a Hungarian software designer named

21  Marton Anka.  In 1998, a year after Andrew had already come up

22  with his idea, Mr. Anka developed a product called Remotely

23  Anywhere that was also supposed to do remote connections, but --

24  and this is a big exception -- Remotely Anywhere, number one,

25  did not use a locator server; two, it was not a remote access

1   service like I'm InTouch; three, it wasn't easy for people to

2   understand and use.  And, as a result of those three things, it

3   did not solve the three problems; firewalls, dynamic IP

4   addresses, and routers that I mentioned earlier.

5       You needed to pretty much be an IT professional in

6   order to make Remotely Anywhere handle any of those

7   difficulties.  Andrew's invention, of course, made it possible

8   for everyday people to use remote access services.

9       How are we going to prove that LogMeIn's service uses

10  Andrew Cheung's invention?  Well, it's not the case, and we

11  don't claim and we're not going to prove to you that Mr. Anka

12  copied word by word the software code from 01.  We're not going

13  to argue that.  We don't have to.  The fact is that Andrew's

14  patent doesn't have examples of computer code in it.  It teaches

15  the invention in simple English.  And so once you hear about or

16  see the invention, if you're a software programmer, you can

17  write the code.  So, instead, what we've done is we've obtained

18  technical manuals from LogMeIn.  We've obtained their computer

19  source code, of course, as well.  And we've actually done

20  experimentation to see how exactly the LogMeIn service works.

21      We're going to bring in a technical expert named

22  Dr. Andrew Grimshaw.  He's a computer professor at the

23  University of Virginia.  He's studied these technical manuals

24  and source codes very thoroughly, and he'll explain to you he is

25  convinced that the LogMeIn software infringes claim 24 of the

1    '479 patent.

2          Now, when I say claim 24, what do I mean?  You'll see

3    that when -- when you have an opportunity to look at the patent

4    when you deliberate and you have the documents with you.  The

5    claims are the numbered paragraphs at the end of the patent.  We

6    need prove that the LogMeIn device or the LogMeIn service

7    infringes only one of those claims in order to show that there

8    is patent infringement in this case.  And Dr. Grimshaw is going

9    to take claim 24 and walk through it word by word and show you

10   why every word of that claim can be found in the LogMeIn

11   service.  In order to keep the case streamlined, we're only

12   going to talk with you in this case about claim 24.

13         Now, you'll hear from the LogMeIn witnesses that they

14   have been successful with their product and 01 has not, 01 is a

15   failure.  Well, of course, 01 is a failure, ladies and

16   gentlemen, in their minds because they stole 01's invention and

17   gave it away for free.  But they have a fancy name for this.

18   They call it their freemium model, freemium with an f.

19         In a nutshell, ladies and gentlemen, the freemium

20   model, you'll hear, is to give Andrew's technology away for

21   free, technology that his company spent $25 million to develop

22   and commercialize.  They give it away for free in order to get

23   customers to upgrade to a premium version of their product; and

24   then, secondly, to develop a large base of users to encourage

25   investors to put cash in their company and drive the stock price

1    up; and, three -- and this is the most insidious of the three --

2    use the free giveaway as a way to put all their competitors out

3    of business.

4         This ruthless approach seems to have worked.  When

5    users found out they could get Andrew's invention for free, they

6    flocked in droves to the LogMeIn product.  And LogMeIn has

7    expanded their product line to include services like IT Reach,

8    LogMeIn Pro, Ignition, Join.me Free and Join.me Pro.  And all of

9    these names, all of these products you will hear still use

10   Andrew's invention, and they all infringe.

11        The evidence is going to be that the free giveaway gave

12   LogMeIn 15 million users, and it's given LogMeIn a market value

13   of $500 million and more than $200 million of cash on hand.

14   LogMeIn witnesses will say that the freemium model was a big

15   risk and so they should be entitled to a big reward for the

16   risk.  But LogMeIn was not taking a risk with its -- with its

17   own technology.  It was taking a risk with Andrew's technology.

18        So when LogMeIn decided to roll the dice by giving away

19   LogMeIn for free to see what it would get them, keep in mind

20   that they were rolling the dice with Andrew's money.

21        One thing is going to be clear from the evidence and

22   testimony, ladies and gentlemen.  LogMeIn's money and their

23   value is all due to Andrew's invention.  LogMeIn's own documents

24   show that the free service drives the success of all of their

25   other products, and the free service wouldn't work if it didn't

1    have Andrew's invention.

2           Now, you might ask yourself, if this invention happened

3    in 1997, why are we here today?  And the answer is very simple.

4    First of all, it took the patent office, which spends a lot of

5    time reviewing, analyzing, and finalizing its decisions, five

6    years to prove of Andrew's patent.

7           So Andrew didn't have a patent to enforce until 2005.

8    Shortly after 2005, Andrew's small company looked around at the

9    various imitators of his product and he chose the one that was

10   at that time the biggest, Citrix, and he sued them in Ohio.

11          As soon as Andrew sued Citrix, Citrix went back to the

12   United States Patent Office and asked them to look again at

13   Andrew's patent in what's called a reexamination proceeding.

14          That reexamination proceeding took until 2010 to

15   finalize at the level of the patent office.  Andrew's patent was

16   found to be valid by the United States Patent Office.  Citrix

17   has filed an appeal, but today the '479 patent stands as valid

18   as it was on the day that it issued.

19          However, the combination of a lengthy time prosecuting

20   the patent, the time spent fighting Citrix, the time spent at

21   the reexamination before the patent office meant that 01 was not

22   in a position to bring this suit until the year 2010.

23          Now, ladies and gentlemen, the laws of this country

24   require that if someone infringes a patent, they must pay at

25   least a reasonable royalty for that infringement.  And so we're

1  going to bring in an expert named Robert Brlas.  He's an

2  accountant.  He specializes in valuing patents.  He's done a lot

3  of analysis of the financial records in this case, and he's

4  going to explain to you that he has placed a value on all of the

5  uses of the LogMeIn products that embody Andrew's invention.

6         Even the ones that are free, of course, are still

7  infringements and a value has to be placed on them.  Even

8  LogMeIn places a great deal of value on its free products.

9  You'll hear testimony that they think their -- their free users,

10 even though the user is free, is actually worth 5 or $6 a user

11 to them.  And when you multiply that by the millions of users,

12 you can see that that's a lot of value.

13        Mr. Brlas will tell you from his research that a

14 reasonable royalty in this case is $110 million.  And, ladies

15 and gentlemen, when we get done presenting the evidence, the

16 expert testimony to you in this case, that is the number that we

17 are going to ask you to return in favor of -- in favor of 01,

18 $110,000,000, because for a groundbreaking, market-creating

19 service, like the one that Andrew created, that is indeed a fair

20 and reasonable royalty.

21        If LogMeIn had wanted to gamble on -- with its -- on

22 its freemium business model with its own product, Remotely

23 Anywhere, that's one thing.  They gambled with Andrew's money.

24 And so it shouldn't matter whether that gamble worked out or

25 not.  They should pay for the infringement.

1          Now, of course --

2          THE COURT:  Counsel, it's time to finish up.

3          MR. SHUNK:  I will, Your Honor.

4          Defendants, they all have a story.  They say they don't

5   infringe.  And if they do infringe, maybe the patent is invalid.

6   And maybe if the patent isn't invalid, well, maybe there's some

7   other defenses.  LogMeIn is no different, and I will let their

8   lawyers tell you about those defenses.  But let me say just two

9   things about it.

10         First, when they argue -- their argument about

11  infringement has to do with the fact that they have -- they cut

12  the software up into little pieces and spread it out all over a

13  lot of computers around the world.  You'll see, however, ladies

14  and gentlemen, that Andrew expected that people would try to do

15  that and his patent explicitly covers what they do.

16         When they talk about invalidity, they'll show you lots

17  of old patents claiming that somebody else invented Andrew's

18  invention.  But each time you see one of those patents, ladies

19  and gentlemen, just ask yourself, does it solve those three

20  problems that Andrew solved; firewalls, dynamic IP addresses,

21  and routers.  And the answer is going to be no.  Andrew's patent

22  is valid.

23         My time is up, as His Honor has pointed out to me.  I

24  look forward to the opportunity of introducing you to Andrew

25  Cheung, Robert Brlas, Andrew Grimshaw, all of the other

```
 1    witnesses that you're going to hear, and proving to you that
 2    LogMeIn's remote access and collaborative work services products
 3    infringe claim 24 of the '479 patent.  After the evidence is
 4    done, I get an opportunity to speak to you again, and I will
 5    tell -- I will explain to you in detail at that time how we have
 6    answered every challenge that has been brought against this
 7    case.
 8              I thank you very much for giving me your full attention
 9    and -- and your willingness to serve on this jury.
10              And, Your Honor, if I may, I want to incorporate by
11    reference the complaint in this matter for the record into my
12    opening statement.  Thank you very much, Your Honor.
13              MR. STONER:  May I proceed, Your Honor?
14              THE COURT:  Yes, Your Honor.
15              MR. STONER:  Thank you.
16              Good morning, members of the jury.  Thank you for
17    hearing our case today.  We know that it is a burden for you to
18    sit here and listen to this, and we appreciate your time and
19    attention.
20              Again, my name is Wayne Stoner, and along with my
21    colleagues, Vinita Ferrera and Charles Molster, we represent the
22    company that's being sued, LogMeIn.  It's the defendant in this
23    case.  LogMeIn is a software company based out of Woburn,
24    Massachusetts, an old industrial town outside of Boston that has
25    facilities all over the world and all over this country,
```

1    including near here in Ashburn.

2         LogMeIn is, as you heard, a software company.  What you

3    did not hear was LogMeIn is a software company that employs over

4    550 people.  It provides a service that 45 million people use to

5    access their computers around the world.  It's a software

6    company that spent over $100 million of its own in ten years

7    independently developing its technology without copying anyone,

8    without infringing anyone's patents, and it has a patent -- it

9    has patents of its own.  And if I could, I would like to put one

10   of those on the screen so you can see it.  This is Defendant's

11   Exhibit 170 -- 274.  This is a patent issued to LogMeIn on its

12   technology.  It was issued to Mr. Anka, who is one of the

13   inventors of LogMeIn's technology.  You will hear more about

14   that in this trial.

15        One other thing you didn't hear from Mr. Shunk is that

16   LogMeIn introduced its product, grew as a company for six years,

17   and 01 Communique knew all about that.  But for five years,

18   six years, they didn't say a word.  They didn't sue.  They

19   didn't send a letter to us saying we have a patent.  We think

20   you're infringing.  They didn't call up LogMeIn and say, you

21   know, we have a patent that you should be concerned about.  No

22   lawsuit, no letter, no phone call, no e-mail, nothing for six

23   years.  You would think if someone was being ruthless and

24   stealing your technology, you would have done something.  They

25   did nothing.

1          As you were listening to Mr. Shunk, I expect you were

2     wondering, what is the other side of the story?  If everything

3     is as he says it is, why are we even here?  This is my chance to

4     tell you the other side of the story, what the evidence you will

5     hear and see in this case will be.  You see, trial is like a

6     puzzle.  Each witness you hear, each document you see is a piece

7     of that puzzle.  And it's not until the end of the trial, as His

8     Honor said, that all of the pieces will be in place and you will

9     see the complete story and the true story.  I break this case

10    down into four chapters like a book, and I want to talk about

11    each one of those briefly.  It's only an overview and everything

12    I tell you will be shown to you as evidence in this trial.

13         The first chapter is a story of people, some of whom

14    are not in this courtroom but who invented things long ago.

15    Listening to Mr. Shunk, you might have thought that 01

16    Communique invented remote access or invented remote access

17    using a computer with a dynamic IP address or accessing a

18    computer across a so-called firewall.  None of that is true.

19    Even their own expert witnesses admit that's not true.

20         And I'll show you one example of invention made before

21    01 that covers exactly what they did.  And this is the Crichton

22    patent.  I'll put it on the screen, Defendant's Exhibit 28.

23    This is a patent that issued to Mr. Crichton of IBM.  He filed

24    the patent in 1997.  And if we could look at the diagram of his

25    system, which is Fig. 10 of the patent, you can see he has two

computers.  He's providing remote access from one computer to

another.  He's doing so using the Internet and a server in the

middle, and he's doing it across a firewall.

You see, you cannot patent what other people have

already invented.  And, if you do, your patent is invalid.  So

that's the first chapter.  01 Communique did not invent remote

access or remote access to cross a firewall or remote access to

a computer using a dynamic IP address.  Other people had already

invented that.  So what did 01 Communique do?  01 is a Canadian

company that did put out a remote access product called I'm

InTouch that you heard about.  It did not do very well.  01

filed for a patent on it anyway, but it didn't work well and

people didn't buy it and it wasn't popular.  And this was years

before LogMeIn was even in the market.

They put out their product in 2001.  We didn't come on

the market until 2004.  And even by then, their product failed,

basically.  People didn't like it.  They didn't buy it.  And

it's not just my saying so.  You will see this, that they

describe to the public, to their own shareholders, securities

filings required under the Canadian laws.  This is what they

say.  They were not effective in gaining market share because of

the all new merits, or lack thereof, of their product.

01 Communique lost money every year since they introduced their

patented product.  It has nothing to do with LogMeIn.  It has to

do with the fact that their product -- people don't like it.

1    They don't buy it.

2          01 Communique realized this, and there's a reason why

3    it didn't work well.  In today's world, to have a remote access

4    service that can service millions of people, you can't just have

5    a locator server the way Mr. Cheung invented.  You need to have

6    a very sophisticated multiple-server platform with multiple

7    computers and multiple kinds of software performing different

8    functions in different languages that can scale up to allow this

9    to happen.  That's the way LogMeIn's system works.

10   01 Communique's system, patented system, would not work that

11   way.  And we know this not just because of my say-so or some

12   expert witness, but a few years after 01 filed its patent, it

13   was asking for some money from the Canadian government to work

14   on their products more, and they said we have a problem with

15   multiple servers.  We're not even sure our system will function

16   that way.  You will see that in this trial.

17         And the consequence of this is 01 Communique lost out

18   to other people, eventually LogMeIn too.  You will see in this

19   case people reported to -- to 01 that we're losing -- we're

20   losing customers.  Someone went to LogMeIn.  It's faster,

21   easier, better to use.  So that's chapter 2.  01 had a remote

22   access product, didn't work very well, people didn't buy it,

23   which brings us to chapter 3, LogMeIn.

24         LogMeIn also wanted to develop a remote access system.

25   Its founders, one of whom is in the courtroom today -- and I'll

1   introduce him -- Michael Simon.  He's a software engineer.  He's

2   one of the founders.  He's the president today of this company

3   that grew from nothing.  Started in the department with his --

4   with his partner, Marton Anka, whom you'll also hear testimony,

5   grew from a company in an apartment, today having 550 employees,

6   over $100 million in revenue, provided a service that people

7   have used over two billion times.

8          This wasn't done by copying anyone.  Mr. Simon and

9   Mr. Anka had worked on remote access systems in the 1990s, long

10  before Mr. Cheung, and they developed a product that has been

11  very successful.  I saw during the voir dire that the Judge

12  asked some questions.  You know, a number of you have used other

13  companies' products, Citrix products, other companies' remote

14  access products.  But LogMeIn has come in.  They've come in and

15  in ten years they've become the second biggest player, and it's

16  because their technology works well.

17         Here is a diagram, Defendant's Exhibit 1 on the screen,

18  of the LogMeIn system.  This is very high level.  You will hear

19  a lot more explanation in the trial about this.  LogMeIn has

20  three different kinds of servers with different software

21  performing different functions in different places.  There are

22  gateway servers, there are database servers, there are web

23  servers.  And, as you see, a number of these are in Ashburn.

24         These all work together to provide a service that a lot

25  of people use.  And, in fact, it works so well, LogMeIn could

1   afford to give away the basic service for free.  This was --

2   this is a business model.  A lot of companies do it today in the

3   computer business, as I'm sure you know.  But LogMeIn said, you

4   know, the only way we're going to get people to see how good our

5   technology is is give it to them for free.  And they'll see it

6   and hopefully they'll come back and they'll buy our premium

7   products.  And that's what they did.

8          Now, 45 million people have now signed up to use

9   LogMeIn, all kinds of people; individuals, businesses, military,

10  government agencies, teachers.  It has grown from nothing into a

11  successful company.  Does it infringe 01's patent?  No, it

12  doesn't.  And there's three kinds of evidence you will hear in

13  this trial showing why and how we do not infringe.  One is

14  technical differences.  I'll show it to you later, but 01

15  Communique's claim 24, it's a long list of technical

16  requirements.  Every single one of those needs to be in our

17  system to be there for their -- the infringement.  Even if one

18  is missing, there's no infringement.

19         We're missing many of them.  And I'll -- you'll hear

20  that in detail.  You'll hear it from LogMeIn's engineers.

21  You'll also hear it from a professor of software engineering, an

22  independent expert witness at the University of Maryland,

23  Dr. Samrat Bhattacharjee, who has looked at the system and

24  concluded that there's no infringement.

25         You see, 01 Communique, because it did not invent

1    remote access, told the patent office that its system had very

2    specific narrow requirements for how it could work.  They had to

3    have a special location facility requirement that performs

4    multiple functions.  We don't do it.  You will see those

5    representations that they made to the patent office before this

6    lawsuit started, before they started this lawsuit.  And you'll

7    see how we don't do it that way.  That's the first kind of

8    evidence you will hear.

9           But the second reason -- second body of evidence you

10   will hear of why LogMeIn does not infringe is 01 Communique's

11   own actions.  As I said, LogMeIn came into the market in 2004.

12   2004.  01 Communique saw us right away.  They saw us as a

13   potential competitor.  They even said internally we want to get

14   rid of LogMeIn.  We don't like this competition.  Next month

15   their patent comes out and they think maybe LogMeIn infringes.

16   So let's look at it.  So they downloaded our product off the

17   Internet.  They had their patent, they had our product.  They

18   asked the lawyers to consider --

19           MR. SHUNK:  Objection, Your Honor.

20           THE COURT:  Objection overruled.

21           MR. STONER:  They considered whether we infringed.  And

22   then what did they do?  Nothing for five years.  Five years

23   after the patent issued they didn't say they had any problem

24   with us at all.  And there's a reason for that.  They knew we

25   didn't infringe.  See, 01 Communique is a publicly traded

company.  Its officers, such as Mr. Cheung, have a duty to their

company to protect it from any unfair competition, if there is

any, and he wanted to get rid of LogMeIn.  LogMeIn was a

competitor, going to take business away from them.  That's

competition.

But if there's unfair competition, he had a duty to do

something about it, and he didn't.  In fact, he testified he

didn't even consider LogMeIn, after suing LogMeIn, after doing

his investigation, whether we infringed.  Didn't even consider

it.  And today he's testified he doesn't even know whether we

infringe or not.  He's an inventor.  He's a software engineer.

He's been looking at our product for nine years.  He doesn't

know whether we infringe or not.  So that's the second body of

evidence you will hear.

The third one is LogMeIn's actions.  See, LogMeIn

didn't want to use 01's technology.  It doesn't work very well.

They didn't want to copy it, and you will see proof of that.

There was no copying, as Mr. Shunk said.  In fact, after our

product was on the market -- LogMeIn introduced this product

without even knowing about 01.  01 is a small company.  Didn't

even know about it.  Introduced its product in -- with

independent research and development.  And then after LogMeIn

introduced its own product, it learned about 01.  It said, well,

here's a competitor.  We ought to see what they're doing.

So Mr. Anka, the software engineer, downloaded their

product, looked at it long before this lawsuit started, before

he had ever heard from 01.  What did he conclude?  He says it

doesn't work well.  It works very poorly, presents badly.  He

thought this must be stolen anyway.  That was his conclusion at

the time.  So that's chapter 3.  LogMeIn independently developed

its own product that does not infringe, which brings us to the

final chapter.  Why are we here?

        The simple explanation is 01 Communique changed its

business strategy.  They went from a company trying to make and

sell a product that people would like to buy, which they failed

to do.  Instead, they decided to sue people.  01 Communique

filed this lawsuit.  They put out a press release to the world

announcing why they were doing it.  And they said, quoting

Mr. Cheung, we want to participate in the growth and success of

the remote access market by leveraging our patent.  So instead

of trying to sell a product that people like and want to use,

they want to sue people who have been successful.  That's their

business model, suing people.

        And, in fact, Mr. Cheung testified under oath in one of

the proceedings in this case in his lawsuit against Citrix, he

was asked, did you ever consider suing anyone else besides

Citrix, you know, even after looking at LogMeIn, he said

nothing -- he said nothing about LogMeIn -- no.  But then he

states, well, did you even think about it?  And he said, yeah,

you dream about suing everybody in the world.  That was his

1    testimony.  That is what he said.  He dreams about suing

2    everybody in the world.  That's why we're here.

3         So now they come in here asking you to take

4    $110 million from LogMeIn and give it to them.  They couldn't

5    earn it in the marketplace.  They couldn't earn it by selling

6    products.  They never made any money themselves using the

7    patented technology, but now they want you to take $110 million

8    from LogMeIn.  That's more than six times the profits LogMeIn

9    has made for its entire company, for its entire history, and

10   give it all to them.

11        So 01 could not earn in the marketplace the products

12   and technology that people want, and now they want to get it in

13   corporate by suing people.  No one ever paid a dime to 01 for a

14   right to use this technology outside of a lawsuit, and they

15   shouldn't get any now.

16        At the end of this trial, I'm going to ask you to

17   find -- and I believe you will find -- LogMeIn does not infringe

18   the '479 patent.  This technology is different.  I'll also ask

19   you to find that the 01 patent is invalid.  A patent is what

20   other people invented.  They patented things that they didn't

21   know how to make work.  So this patent shouldn't even exist to

22   allow 01 to go sue people on it.

23        I'll ask you to find that 01 Communique laid in wait

24   six years watching LogMeIn grow, knowing we didn't infringe,

25   just waiting until we get successful so they can sue us and try

1   to shake us down for money.  I'll ask you to find that 01

2   Communique is not entitled to take any money from this lawsuit.

3   You will send the parties back to the marketplace to compete

4   there and not in this courtroom.  Thank you.

5        THE COURT:  All right.  Why don't we take a brief

6   recess.

7       (Recess taken at 11:29 a.m.)

8       * * *

9        NOTE:  The second half of the morning portion of the

10  case on March 18, 2013 begins in the presence of the jury as

11  follows:

12  JURY IN

13       THE COURT:  All right.

14       MR. SHUNK:  Your Honor, as our first witness, the

15  plaintiff calls Andrew Cheung, the president of 01 Communique.

16        NOTE:  The witness is sworn.

17       MR. SHUNK:  Your Honor, for the convenience of the

18  Court and the efficiency of it, we have prepared a binder of

19  only the exhibits that this witness will look at.

20       I wonder if it would be okay if we would give one to

21  Mr. Cheung, one to the Court, and one to opposing counsel, if

22  they wish one.

23       THE COURT:  All right.

24       MR. SHUNK:  Thank you.  I would ask the Marshal to hand

25  them up.

1              ANDREW CHEUNG, called by counsel for the Plaintiff,

2    first being duly sworn, testifies and states:

3          DIRECT EXAMINATION

4    BY MR. SHUNK:

5    Q.   Tell the jury your full name, Mr. Cheung.

6    A.   My name is Andrew Cheung.

7    Q.   What's your job?

8    A.   My job is the CEO and president of 01 Communique Laboratory,

9    Incorporated.

10   Q.   Is that the plaintiff in this case?

11   A.   Yes.

12   Q.   Where is 01 located?

13   A.   01 has its headquarters in Toronto, Canada, and we also have

14   a branch office in Arlington, Virginia.

15   Q.   What does 01 do?

16   A.   01 operate a remote access service called I'm InTouch and

17   some other related services.

18   Q.   When did 01 begin as a company?

19   A.   01 was founded in 1992.

20   Q.   Who began the company?

21   A.   I did.

22   Q.   Now, 01 Communique Laboratory, where did that name come

23   from?

24   A.   Actually 0 and 1 was coming from the computer language, like

25   computer, they communicate, they think in 0 and 1.  That's the

 1   digital communication, basically.

 2   Q.  Mr. Cheung, you have a binder of exhibits in front of you.

 3   Would you turn to Plaintiff's Exhibit 1 to begin with.

 4        Do you recognize Plaintiff's Exhibit 1?

 5   A.  Yes, I do.

 6   Q.  What is it?

 7   A.  This is the copy of the '479 patent.

 8   Q.  Are you one of the inventors that is named?

 9   A.  I am.

10        MR. SHUNK:  Your Honor, Plaintiff moves the admission

11   of Plaintiff's Exhibit 1.

12        MR. STONER:  No objection.

13        THE COURT:  It is admitted.

14   BY MR. SHUNK: (Continuing)

15   Q.  Mr. Cheung, is it okay if we call this the '479 patent

16   between the two of us?

17   A.  No problem.

18   Q.  Would you read off the full number for the jury so that they

19   have got that on the record.

20   A.  The patent number is 6,928,479.

21   Q.  What company or person today owns the '479 patent?

22   A.  My company, 01 Communique Laboratory, Inc., owns that

23   patent.

24   Q.  How did you come to own the patent?

25   A.  Me, in addition to another two inventors, Pedro Nascimento

1    and Steven Meyer, assigned the owners to the company in the year

2    2000, when we filed the patent.

3    Q.   You mentioned two other inventors.   Let me ask you about

4    them individually.

5         Who is Pedro Nascimento?

6    A.   Pedro Nascimento is our VP of product development.

7    Q.   What about Steven Meyer?

8    A.   Steven Meyer was our chief technology officer.

9    Q.   Does Steven Meyer work for the company anymore?

10   A.   No, not today.   He was no longer working for 01 since 2002.

11   Q.   What about Pedro Nascimento, is he still with your company?

12   A.   Yes, Pedro is still with 01 today.

13   Q.   Do you know where Pedro lives?

14   A.   Pedro lives in Toronto, Canada.

15   Q.   Let's take just a second to learn a little bit more about

16   01, the company.

17        Where is its headquarters?

18   A.   01's headquarters in Toronto, Canada.   To be precise, it is

19   a suburb of Toronto called Mississauga.

20   Q.   Does 01 have offices anywhere else?

21   A.   We have a branch office here in Arlington, Virginia.

22   Q.   Do you have any employees that work at that branch office?

23   A.   Yes.

24   Q.   Who?

25   A.   We have a lady called Ginger Jones work in that office.

1   Q.   Anyone else?

2   A.   Not at this point.

3   Q.   Mr. Cheung, let's now learn a little bit about you and your

4   background.

5        Where do you live?

6   A.   I split my time about 50/50 between Toronto, Canada, my

7   home, and an apartment here in Arlington, Virginia.

8   Q.   Did you go to college?

9   A.   Yes, I went to college.  I graduated 1987 at the University

10  of West Ontario with a honor degree in computer science.  And

11  honor degree in Canada at that time is kind of like a Pre-Master

12  degree that you only need to spend one year to pursue your

13  Master degree.

14  Q.   Maybe I should have started a little earlier.  Where were

15  you born, Mr. Cheung?

16  A.   I born in Hong Kong.

17  Q.   When did you come to Canada?

18  A.   When I was 17.

19  Q.   And are you a Canadian citizen now?

20  A.   I am a Canadian citizen.

21  Q.   Now, in that span of time that you have been alive, when was

22  it that you began working with computers?

23  A.   Oh, that was a long time.  I actually started working

24  computer when I was a kid.  Since computer came out, I always

25  ask my dad can I have one.  And when I got my first computer,

1  the Apple II, as you can tell is a long time, I started teaching

2  myself in programming from that time.

3  Q.  What kind of programs did you write, just generally?

4  A.  Yeah, at that time those programs would be obviously not as

5  sophisticated as the software today.  It would be something

6  like -- I remember I did a very rudimentary game like people

7  playing ping-pong with each other.

8      And I also had written a -- kind of an inventory software,

9  keeping track of my music collection.  Like you can, you can

10  search music against type, album, the artist, and things like

11  that, and it would return -- now tape number and album number

12  and the track number, those things.

13  Q.  Well, when did you start running a business that was related

14  to computers?

15  A.  That was when I was still in college in London, Ontario, at

16  the university.  I started a company buying and selling computer

17  parts to local computer stores in London, Ontario, which is

18  where I went to college.  And then later on, after I graduated,

19  I moved the company out to Toronto and continued expanding into

20  manufacturing computer as a whole and then resell them across

21  Canada.

22  Q.  Whatever happened to that company?

23  A.  I sold the company in 1992.

24  Q.  1992.  What did you do at that point after you had sold your

25  first company?

1   A.  After I sold the company, I started 01 Communique.

2   Q.  What was the initial business of 01 Communique?

3   A.  The initial business of 01 Communique was a product called

4   01/Fax, which turned your computer into a fax machine to receive

5   fax and send fax so you don't need to buy a fax machine.

6   Remember, at that time, fax machine cost like 1,000 to 2,000

7   apiece.

8   Q.  Well, let's take a look at Plaintiff's Exhibit 4.

9       And I would ask, Your Honor, to mark the -- Marshal to

10  provide that to Mr. Cheung.  It is a physical exhibit.

11      Mr. Cheung might be able to pick it out of the box faster.

12  A.  Yes.

13  Q.  Would you hold that up so the jury can see it, Mr. Cheung?

14      What is Plaintiff's Exhibit 4?

15  A.  This is the actual box of the 01/Fax product we had in

16  1994 -- 1993, actually.

17  Q.  And what was in the box?

18  A.  In the box --

19  Q.  Or I should say what is in the box because it is still there

20  today?

21  A.  In the box is our software, the 01/Fax software.  Now this

22  is real historic.  It has floppies, those three-and-a-half inch

23  floppies that my daughter never seen before.  And it has floppy

24  containing the 01/Fax software.

25  Q.  Was this product successful, Mr. Cheung?

1  A.  I would say it is very successful, although it was

2  short-lived and we didn't sell very many copies because it was a

3  very important milestone to the next product, the Communicate!

4  product where we sold more than 5 million copies across the

5  United States.

6  Q.  Who wrote the 01/Fax software?

7  A.  It was majority written by me, myself, and some other

8  software engineer that I hired at that time.

9  Q.  Well, now, tell the jury how Communicate! developed out of

10  01/Fax.

11  A.  Communicate! was a combination of fax -- obviously fax is

12  one part of it.  So, we using this fundamental code combining

13  with other additional code we did so that we integrate fax,

14  e-mail, voicemail, text-to-speech, paging, all into one piece.

15  So that you can use your computer to receive your voicemail and

16  self-detect whether it is a voice, a person calling, or it is a

17  fax machine calling.  And it will switch accordingly, so you

18  don't need two phone lines for different things.

19      And so you don't need to buy different -- different of those

20  software.  And one, like we call all-in-one communication

21  central unit.

22          MR. SHUNK:  Your Honor, with regard to Plaintiff's

23  Exhibit 4, we have a photograph of the box.  And I would move

24  the photograph into evidence in order to not have the bulky box

25  itself be in evidence.

1          MR. STONER:  I don't see the relevance, Your Honor.

2     But if they want to put it in, no objection.

3          THE COURT:  All right.  It is admitted.

4     BY MR. SHUNK: (Continuing)

5     Q.   I would ask, then, that you have the box of physical

6     exhibits.  Could you find physical Exhibit 6 and 12.

7     A.   Can I put this box down?

8     Q.   Yes, please.

9     A.   Yes, 6 and 12, right.

10    Q.   Hold those up, Mr. Cheung, so the jury can see them.

11    A.   This is Exhibit 6, and this is Exhibit 12.

12    Q.   What are these?

13    A.   These are two different versions of the -- the Communicate!

14    product I just mentioned.  The all-in-one communication product,

15    we sold more than 5 million copies around -- across United

16    States.

17         And one earlier version, the blue box, and the later

18    version, the green box -- the purple box that we had Internet

19    phone built in for this later version.

20    Q.   Okay.  Now, is that something -- what's the technical word

21    for Internet phone?  Is there a technical phrase for that?

22    A.   Yes.  Actually, Internet phone at that time was allowing a

23    person to call another person on the computer over the Internet.

24    And fast-forward 15 years today, we call them VoIP, Voiceover

25    IP, but that was the -- the predecessor name was Internet phone

1   at that time.

2   Q.  You mentioned just a second ago in your answer IP.  What is

3   that?

4   A.  IP is -- the short answer is Internet protocol, and it is

5   the fundamental language that the Internet talk, like computer

6   talk to each other over the Internet.

7         MR. SHUNK:  Your Honor, just as we did with Plaintiff's

8   Exhibit 4, we have photos to introduce into evidence for

9   convenience of 6 and 12.  And we would move the admission of

10  Plaintiff's Exhibit 6 and 12 at this time.

11        MR. STONER:  Your Honor, again, this has nothing to do

12  with these patents, so it is irrelevant.  But if they want to

13  put it in, no objection.

14        THE COURT:  Admitted.

15  BY MR. SHUNK: (Continuing)

16  Q.  Now, was -- can you -- you told us how many copies you sold

17  of Communicate!

18      Was it financially successful to your company, the selling

19  of Communicate!?

20  A.  Yes, it was financially successful.

21  Q.  And what was your distribution method for Communicate!?

22  A.  We distribute through mainly two channels.  Our first

23  channel was the -- the retail chain store like CompUSA, Office

24  Depot, OfficeMax, Circuit City, et cetera, et cetera.

25      And then the other channel is what we call the modem

1    bundling channel.  My daughter never see, again, a modem.  But a

2    modem at that time was a piece of equipment that we use in the

3    computer to talk to another computer.  And those -- like the

4    word -- name modem at that time, for example, Hayes modem, who

5    invent modem, they bundle our software, the Communicate!

6    software with their product.

7        So, if you happened so long ago that you have used a Hayes

8    modem before, chances are you have used our product because it

9    was bundled in those modems.

10   Q.   Mr. Cheung, I would like you to turn back now to Plaintiff's

11   Exhibit 1 in your book.  And if you haven't already, you could

12   put 6 and 12 back in the box.

13       By the way, Mr. Cheung, is there a copy of Plaintiff's

14   Exhibit 1 in the box as well?  I wonder if you might hold that

15   copy up for the jury.

16   A.   Yes.

17   Q.   Mr. Cheung, I would like to direct your attention now to

18   Plaintiff's Exhibit 1, the '479 patent.

19       First of all, would you just tell the jury what the title of

20   the patent is.

21   A.   The title of the patent is called System Computer Product

22   and Method for Providing a Private Communication Portal.

23   Q.   What does that phrase "private communication portal" mean?

24   A.   Maybe the best way to explain that is like the word

25   "portal."  Portal is a technical word, simply in plain English

1    it means something that facilitates communication from one

2    computer to another.  Or you can fast-forward to today, we call

3    it remote access.

4    Q.  Why didn't you call it remote access in the title?

5    A.  It is -- the technical term "portal" is what I used, but it

6    means the same thing in the software programmer's world.

7    Q.  We've heard a lot both in opening -- in the two openings and

8    now from you about remote access.  Would you give the jury an

9    example of remote access so we can get to understand this a

10   little better.

11   A.  Absolutely.  Remote access is -- let me give you an example.

12   Like say you have a computer in your office where you keep all

13   the important documents.  And you are traveling now with your

14   laptop with you, or you are in a hotel business center using one

15   of their computer, and you need to access to one of these

16   important document.

17       You can then log in back into a computer and as if you are

18   using the computer back at the office, although it may be

19   thousands miles away.  After using it, you close it, nothing

20   left in that remote computer, say the business hotel, business

21   center, and it becomes very safe.

22       In this way, imagine that your document has never left your

23   office computer.  It always stay there even though you can

24   access to it.

25   Q.  Let's think back to the late '90s before your invention,

1  Mr. Cheung.

2      Were there products or services out there before you that

3  permitted some kind of remote access?

4  A.   Yeah, absolutely.  Remote access wasn't new.  Remote access

5  has been there long time before the invention.  Only that all

6  those older software, they all share more or less the same

7  problem, making them, I would say, practically unusable in the

8  age of the Internet.

9  Q.   Well, let's take a step back.  I want to come back to those

10  problems, but let me ask you first how you got involved in

11  designing remote access software.

12  A.   When I was -- I would say early 1997 we were exhibiting in

13  the largest computer trade show in Hanover -- well, actually

14  largest computer trade show in Europe in Hanover, Germany.  We

15  were exhibiting Communicate!, at that time we were actually

16  selling Communicate! at that time.  And a large cell phone

17  manufacturer from Sweden called Ericcson approach my show booth

18  and discussing they want to put some kind of the Communicate!

19  features into a cell phone, something related to that.

20      And that triggers me starting to think about all these

21  problems we might have when you are remotely accessing a

22  computer remotely.

23  Q.   You know, I forgot to ask you, Mr. Cheung, you have written

24  computer code.  I think you testified about this 01/Fax product.

25      Who wrote the accounting software for your company?

1  A.  Oh, I did, although I am not an accountant.

2  Q.  Okay.  Going back to the problems that you just mentioned in

3  your testimony.  As you thought about this idea, what were the

4  problems that you realized that were out there?

5  A.  Mainly the problem of accessing a computer, especially in

6  the 1997 time frame, was in mainly three areas.  First of all,

7  the firewall, and then the dynamic IP addresses, and then the

8  routers.

9  Q.  Let's take those things and learn something about them now

10  through your testimony, if we can.

11      What was the first one you mentioned?  Firewall, right, I

12  think?

13  A.  Yes, firewall.

14  Q.  Tell the jury what a firewall is.

15  A.  Firewall is basically something that prevent unauthorized

16  access to a computer.  Its main purpose was to protect a

17  computer against hackers around the world.

18      You can imagine that it is being like you have your home,

19  you have your main door, your front door.  A firewall is kind of

20  like the key, the lock in your front door.  So, preventing

21  unauthorized access to your home.

22      So, it does the same thing for the computer.

23  Q.  Firewall sounds like a big door.  Is it a physical thing?

24  A.  Firewall can be a physical box, or it can be a software

25  configured in the computer, or it can be anything.  But

1  basically it is something that would just prevent unauthorized

2  access to a PC accessing from outside.

3  Q.  Why were firewalls a problem for remote access?

4  A.  Firewall is a great equipment for hacker prevention, but

5  because of the feature that it has, it is also creating a very

6  big problem for remote access.

7     Imagine that you are traveling into somewhere, and in the

8  hotel business center you are trying to use one of the computers

9  to access your home computer or your office computer.  And the

10 firewall there, obviously, doesn't know the computer in the

11 hotel business center because it could be used by anyone.  All

12 right.

13    So, likely that your firewall would reject that connection,

14 and that is making remote access just impossible with this.

15 Q.  You mentioned, and I hate to even start down this road,

16 dynamic IP addresses.  What is a dynamic IP address?

17 A.  That is a good question.  Actually, maybe I should start

18 explaining about what is an address first in computer.

19 Q.  Okay.

20 A.  Similarly, I use the same analogy, like your home.  You have

21 a physical address at your home, so that your friend can come

22 visit you and the mail can deliver to you.

23    So, similarly, a computer talks to each other, especially

24 over the Internet, using an address, a computer address.  And on

25 the Internet world, this is called the IP.  As I explained

1  earlier, this is called Internet protocol address.

2      Now, why is it a problem?  Is because Internet address are

3  limited to a certain number of address, but there are many more

4  computers, more than the number of addresses available who wants

5  to connect to the Internet.  Therefore, the Internet providers

6  who connects computer to the Internet are only assigning IP

7  address to a computer when it needs it.

8      When the computer disconnect from the Internet, what happens

9  is that the same address will go back to the pool, and then the

10 Internet service provider would reassign that same address to

11 another user when another one wants to connect to the Internet.

12     So, that's basically how they call it dynamic, because the

13 computer owner does not have control on the -- what IP address

14 it has at what time.

15 Q.  Well, again, why would that, why did you see that as a

16 problem for remote access?

17 A.  That would be a big problem because if you imagine, again

18 using my analogy, your home has an address, but if the Post

19 Office change your address like every month or so, chances are

20 you will miss a lot of mail.

21     So, it is the same thing that if the Internet service

22 provider change your IP address, which they do, they just change

23 it without letting you know, and you won't know which IP address

24 you want to use when you are on the road trying to access your

25 computer at that time.

1      So, it is similar problem as a mail address.

2  Q.  Mr. Cheung, in your testimony I have heard you refer to

3  connecting to a business computer sometimes, and sometimes you

4  say connecting to a home computer.  Is there any difference in

5  terms of remote access in terms of the problems to connect to

6  one or the other?

7  A.  Fundamentally there is no difference because your home

8  computer or your office computer is a computer on the Internet.

9  So, whether you have a home computer that you want to remotely

10  access, or you have an office computer that you want to remotely

11  access, or they access each other, it doesn't matter, it is a

12  remote access.

13  Q.  I have also heard you refer both to using a laptop to do the

14  accessing and then you also, I think, talked about computers at

15  a hotel.  Is there any difference in the problem of remote

16  access in terms of which one of those?

17  A.  No, there is no difference.  When you are traveling with a

18  laptop or when you are just picking a computer from a friend's

19  house, put it this way, or borrow a computer at the business

20  center of the hotel, it is the same thing, you are using a

21  computer on the Internet somewhere to access your office

22  computer or your home computer at another location.

23  Q.  Now, are you familiar with a technical word in the computer

24  software business "host," the word "host"?

25  A.  Yes, I am.

1    Q.   What is a host?

2    A.   Well, a host computer is really something that like you are

3    accessing.   Technically you can call it a host, or you can call

4    your office computer, or you can call it is your home computer,

5    as long as something that you are accessing, that's in general

6    technically we call a host.

7    Q.   And have you heard the term "client" used in the context of

8    software?

9    A.   Yes.   Client is basically the one that accessing the host.

10   For example, using what we just discussing, the laptop computer

11   or the hotel business center computer, that is what technically

12   called the client, is the one that is accessing the host

13   computer.

14   Q.   The third thing you mentioned is router.   What's a router?

15   A.   A router in simple term is a piece of equipment that allows

16   multiple computers to share one single Internet connection

17   point.

18   Q.   Can you give the jury a common example of a router that they

19   might be familiar with?

20   A.   Yes.   In today's point of view, I think the Wi-Fi router

21   that many people at home that you can share that Internet

22   connection so that my son, my daughter can connect to the

23   Internet at the same time, is a very typical example of a

24   router.

25   Q.   Well, why did you think routers would be a problem back in

1   1997 for remote access?

2   A.   First of all, in around the 1997 time frame and later on,

3   there were more and more people using routers.   And as I said, a

4   router allow you to share one single Internet connection point.

5        That's exactly where the problem come from because it is one

6   single point of connection, but then behind the router you have

7   so many computers.   From remotely, how do you know what is the

8   address of the computer that you want to contact?   There is no

9   address that you can do it.

10       Router works because from one computer connecting through

11  that router when you are sending out a request to a destination,

12  like when you are doing a Google, you are accessing the Google

13  server.   All right.   When Google server replies back to you, the

14  router sees and knows which computer, like your son's computer

15  or your daughter's computer, which computer send out that

16  request, it know where to deliver back the reply to.

17       All right.   But then if it is not initiated from inside, you

18  are from outside, there is no mechanism that you can reach the

19  inside computer, there is no particular address.

20  Q.   Well, so -- but don't the computers that are in the -- in

21  the home, don't they have to have addresses, too, in order to

22  talk with each other in the home?

23  A.   Yeah, they have an internal address.   But the external

24  address, there is only one external address, and only the router

25  know which internal address it is.

1        And people from outside, when you are trying to access the

2    computer, you don't know what internal address the router knows,

3    like your son's computer or your daughter's computer, behind

4    that router.

5    Q.   Okay.  So, you identified these three problems.  Did you in

6    1997 look around at what other remote access products or

7    services there might be to see if they solved these problems?

8    A.   Yes, I did look around very thoroughly.

9    Q.   What did you find out?

10   A.   Hopefully I wanted to find something that already existed so

11   that I could license them and integrate them with my

12   Communicate! product at that time to provide remote access to my

13   Communicate! product.

14   Q.   Let me stop you right there.  So, were you -- as you were

15   thinking about this, were you looking to invent something and

16   file a patent at that time when you started thinking about this?

17   A.   No, I wasn't.

18   Q.   I see.  So, how did this relate to what you were doing at

19   the Hanover show?

20   A.   Yeah, at the Hanover show, as I mentioned, the Ericcson

21   visit to my booth triggered me starting to think about these

22   remote access problem.  And from that point I started to think,

23   well, with routers, dynamic IP addresses, firewall, you just

24   cannot do remote access effectively and securely.

25        And then as I said, now, I started to look around, hopefully

1   that I can find something already existed so that very quickly I

2   could integrate them, license them to my Communicate! product to

3   provide remote access feature.

4   Q.  I see.  So, how was remote access going to improve the

5   Communicate! product, what was that going to add to it?

6   A.  Imagine that Communicate!, if you remember, it was capable,

7   it was an integration of fax, voice mail, e-mail, paging,

8   text-to-speech into one central inbox.  Right.  So you have all

9   these things all coming to your computer from all different

10  sources.

11      The very next question, very next logical question is, how

12  do you remotely access all these messages in your office or your

13  home computer?  And that's how it triggered into the remote

14  access area related to the Communicate! product.

15      So, with remote access capability built into Communicate!,

16  we would allow that very important feature to work, especially

17  at the age of the Internet.  Remember in 1997, the Internet is

18  beginning to become very strong.

19  Q.  Right.  Okay.  Now, so you looked around at the other

20  possible solutions out there.  What did you find lacking in

21  those solutions?  What were they missing?

22  A.  Well, unfortunately, I couldn't find anything during those

23  thorough search.

24  Q.  Well, are you saying that there was nothing that would

25  remotely access through a firewall?

1  A.  Not really.  What I said was there was nothing that could do

2  it in the way that very efficiently and safely solving all those

3  three problems I just mentioned; the firewall, the dynamic IP

4  addresses, and routers.  I couldn't find any solution that I --

5  that could do this job.

6      The most you can do was like, for example, you poke a hole

7  in your firewall.  Poke a hole technically means opening a port

8  on the firewall to allow someone to come in.  But as you can

9  tell from this description, it is very technical way to do that,

10  and not many laypeople know how to do this.

11      Even though they know how to do that, they probably are

12  unwilling to do it because poking a hole means you are

13  increasing your vulnerability to hackers around the world.

14  Nobody want to do that.  So, they were not very good solutions.

15  Q.  Okay.  Well, what did you do then?

16  A.  As a result, I decided that I had to roll up my sleeve and

17  create the remote access solution by myself.

18      And eventually I came up with the idea about that -- earlier

19  we called it locator server or gateway server technology.

20  Q.  Well, can you give the jury just a basic explanation of what

21  the insight you had was?  How were you going to solve these

22  problems?

23  A.  In a very quick description of it is like we have the

24  gateway or the locator server as the middleman.  Not part of

25  your office computer and not part of the remote, like the laptop

1  computer or the hotel business center computer.  And the

2  middleman would create a communication channel and session

3  between your office computer and your remote computer using the

4  information initiated from a ping, which we explained a little

5  earlier, the short message from the office computer to the

6  locator server.

7  Q.  Well, when you say we explained a little earlier, that was

8  me talking, and I don't know anything about this stuff, so I

9  want to hear it from you.  What is a -- first of all, ping is

10  p-i-n-g, is that right?

11  A.  Yes, it is p-i-n-g.

12  Q.  Okay.  So, tell the jury what a -- first of all, let me ask

13  you this.  Is this we word "ping" used in the computer industry?

14  Is that a technical term?

15  A.  Yeah, to the world of computer programmers, they all know

16  what a ping is.  Like, ping is kind of like -- in English, it is

17  like, hi, you know, here I am.  That's a ping, in computer

18  world.

19  Q.  How would one computer send a ping to another computer?

20  A.  You just initiate a very short message, or we call it

21  packet, you know, in the computer world, a very short packet to

22  the destination, this is what I called the, hi, here I am, I am

23  alive.  Yeah.

24  Q.  So, in the best layman's terms that you can, tell the jury

25  how you envisioned that your -- the middleman, the server would

1    work in your invention.

2    A.   In an easy description, like the office computer you have

3    that you are remotely accessing, or you call it host, right,

4    that office computer would generate those pings to the locator

5    server, to the gateway server, in a continuous or we called it

6    regular basis about its location on the Internet.

7         And then this continued for could be days, months, or

8    whatever.  So, at the time when you are traveling and you want

9    to remotely access your laptop computer or your -- the business

10   center at the hotel computer, is giving, contacting the locator

11   server and giving a request for communication saying, hey, I

12   want to communicate, I want to talk to this office computer.

13        Then the locator server at that time, because it has all

14   those pings, you know, continuously generated from the office

15   computer, would use this information to find the location, the

16   current then location of your office computer.  And then it

17   would join them together by creating a channel and a session for

18   the personal computer and remote computer, like your laptop.

19   Q.   Mr. Cheung, when do you estimate that you had this big

20   insight?

21   A.   I would say it is no later than September of 1997.

22   Q.   Well, have you looked through your records to try to put a

23   date on that event?

24   A.   Yes, I did.

25   Q.   What records did you look through?

1    A.   The record I looked through would be the invoices that I

2    generated over the years to my company.

3    Q.   Why would you be generating invoices to your company if

4    you're the president?

5    A.   That's exactly because of that reason, my main job is the

6    CEO of 01, not an engineer.  So, it happened that my background

7    is a software engineer.  So, I am using my late night, holiday,

8    vacation time, and all my spare time to do what I call a

9    sideline for the company as an engineer.

10       So, as a sideline I am building the company as a -- using

11   the invoice detailing or describing about what I did during the

12   building period.

13   Q.   Take a look, Mr. Cheung, in the book of exhibits at

14   Plaintiff's Exhibit 7, please.

15   A.   Yes, I am there.

16   Q.   What is Plaintiff's Exhibit 7?

17   A.   Those are the invoices that I generated, given to the

18   company during the years.

19   Q.   Do any of these invoices reflect reference to the invention

20   we have been talking about?

21   A.   Let me just quickly look through.

22       Yes, the reference number, 47889, it has an invoice dated

23   September 1997.  Yes, this invoice describe about the invention

24   I had in 1997.

25           MR. SHUNK:  Your Honor, plaintiff moves the admission

1   of Plaintiff's Exhibit 7.

2          MR. STONER:  No objection.

3          THE COURT:  They are admitted.

4   BY MR. SHUNK: (Continuing)

5   Q.  Mr. Cheung, I would like to, I would like to walk through

6   some of the language in this particular invoice to help the jury

7   understand what it is you were looking at when you decided that

8   the invention was no later than September of 1997.  First of

9   all, could you read for the jury your paragraph numbered 1.

10  A.  Yes.  Paragraph number 1 says:  Continue research on

11  existing Internet phone protocol and connection technologies.

12  (a) is:  Investigation continued on Microsoft ILS server,

13  formerly called ULS.

14  Q.  Okay, let me stop you there.  So, why were you -- what was

15  the work you were doing investigating the Microsoft ILS server

16  about in relation to your invention?

17  A.  As I mentioned earlier, we were looking around to see if

18  there was any existing solution or existing technology that we

19  could license to integrate with the Communicate! product.

20      So, this is part of those investigaton that I have done.

21  Q.  So, as you were looking around, did this Microsoft ILS

22  server, did it allow remote access?

23  A.  It allows remote access.

24  Q.  Let's read now the next sentence after that.

25  A.  Yes, it says:  It was proven that ILS server simply stores

1  the IP address of the user and password -- and passed it to the

2  requesting party.

3  Q.  Keep going.

4  A.  It would not make the connection and, as well, would not

5  work if the IP address is behind a router, proxy, or a closed

6  firewall.

7  Q.  Okay, let me ask you about that now.  Were you describing

8  some of the deficiencies of the Microsoft product?

9  A.  Yes, it was.

10  Q.  When you say it wouldn't work behind a closed firewall --

11  closed, c-l-o-s-e-d firewall, what did that mean?

12  A.   It means, usually a firewall is closed because you don't

13  want your firewall to open, like a lock.  So, when your firewall

14  is closed, as I describe firewall technology before, you do not

15  allow people to get through the firewall to the PC.  So, when it

16  is closed, it would just reject everything coming from outside.

17  Q.  You also just read that it would not work if the IP address

18  is behind a router.  Would you explain that to the jury.

19  A.   Yes, this is exactly what I said before about how router

20  works.  You have an IP address behind a router.  Means that IP

21  address is unknown to the outside world, it is unaddressable to

22  the outside world.

23      If anyone wanted to contact you, because there is a router,

24  there is an internal IP address, you cannot talk to the computer

25  at all.  There is just no vehicle for you to talk to this

1    computer if your router is closed or your firewall is closed.

2    Q.  By the way, I think I forgot to ask you, what is the

3    specific date of the invoice that we're talking about?

4    A.  We are talking about September of 1997.

5    Q.  What's the next sentence in your notes of the work you were

6    doing?

7    A.  The next sentence says:  It would not make the connection

8    and, as well, would not work if the IP address is behind a

9    router, proxy, or closed firewall.

10        And it says then:  Other ILS service provider was studied,

11   [the four/11.com] with the same result.

12   Q.  So, what was four/11.com?

13   A.  Four/11.com is a server operating by the company four11 and

14   providing an IOS service for the public at that time.

15   Q.  Going on to subparagraph (c) -- and this is the last

16   paragraph we are going to look at -- would you read the first

17   sentence of those notes.

18   A.  1(c) says:  With the failing results, a conclusion --

19   Q.  Excuse me.  What was that word?

20   A.  With the failing results.

21   Q.  Failing result.  Okay.

22   A.  Yeah, failing.  With the failing results, a conclusion that

23   a new technological concept might be the solution.  This concept

24   involves having the host initiate communication and continue

25   communicating with the central server in order for the central

1  server to create communication sessions between the host and the

2  client.  In other words, it does not require the central server

3  to initiate communication with the host.

4  Q.  What was that a description of, what you just read?

5  A.  That description basically describe what I said a little

6  earlier about the technology, whereby it is not the -- the

7  outside world communicating with the -- your computer.  It was

8  that your office computer initiate the outbound communication

9  with the server using this short ping information continuously

10  on a regular basis about your then current location.

11      And then at the time when you want to remotely connect,

12  remotely access this office computer, your laptop computer, or

13  the computer at the hotel business center would contact the

14  locator server and say, hi, I want to communicate with this

15  office computer.

16      Then the office computer know where is the office computer

17  and they can join them together, forming a communication session

18  and channel.

19  Q.  Okay.  And maybe I wasn't clear with my question.  Were you

20  describing some other product that you had seen there?  What

21  were you describing?

22  A.  I was -- here I was describing our -- the concept we had at

23  that time.

24  Q.  The invention?

25  A.  The invention we had at that time that solved those problems

1   that -- that after all these studied, thorough studying to the

2   market, nobody had any existing solution or technology at that

3   time.

4   Q.  So, starting in September, did you begin working on this

5   server technology that you had developed or come up with?

6   A.  Yes, I did.

7   Q.  What did you do?  What kinds of things did you do to work on

8   the project?

9   A.  I would continue -- there are many things I did.  I

10  continued to -- to research into, is there any other things that

11  have -- or a later version that could solve this problem.

12  Couldn't find anything.

13      At the same time, I also starting to dig into the prototype

14  of creating something that would -- would be enough so that I

15  can take it to my engineering team and let them continue with

16  the commercial product development.

17  Q.  Would you say that you started working full-time on this new

18  invention?

19  A.  I cannot, because I have a full-time job as the CEO of 01

20  Communique.  So, I can only work on my part-time, my late night,

21  my holiday, vacation to -- to continue this development on my

22  own.

23  Q.  Did you miss any birthdays as a result of working on this?

24  A.  I am sure I missed some, yeah.

25  Q.  Over time, Mr. Cheung, how much money do you estimate that

1    01 has put into developing and commercializing that invention?

2    A.   Over $25 million.

3    Q.   Well, once you had worked out the details of the idea --

4    and, by the way -- well, no.  Let me ask you that.

5         Once you had worked out the details of your idea, did you

6    put down the details down in writing?

7    A.   Yes, I did.

8    Q.   Take a look, if you would, at Plaintiff's Exhibit 8.

9         Do you recognize Plaintiff's Exhibit 8?

10   A.   Yes, I do.

11   Q.   What is it?

12   A.   This is one of those documents -- I sometimes call them

13   white paper, that I put down the -- some details of the

14   invention into paper.

15   Q.   What's the date of Plaintiff's Exhibit 8?

16   A.   August 18th of 1999.

17   Q.   Were you able to find any earlier documents that set out the

18   details of your invention than this?

19   A.   I cannot find anything earlier than -- than that or the

20   invoice.  The September invoice 1997 was the earliest I can -- I

21   can find.

22        MR. SHUNK:  Your Honor, plaintiff moves the admission

23   of Plaintiff's Exhibit 8.

24        MR. STONER:  No objection.

25        THE COURT:  It is admitted.

1    BY MR. SHUNK: (Continuing)

2    Q.   Explain to the jury why from September of 1997 to August of

3    1999 there is no other paper that breaks down the details of

4    your invention.

5    A.   It actually took me that -- that kind of a time to find time

6    to starting writing down the concept.   Mainly the reason was

7    that I had decided around mid-1999 that we would pursue it for a

8    patent application process.

9        So, it is important that I was starting to write down and

10   putting some different pieces of the concept together in one

11   single paper.

12   Q.   I would like you to take a look in particular at one little

13   point in Plaintiff's Exhibit 8.   On the first page, Mr. Cheung,

14   do you see the paragraph that begins:   This technology involves

15   three technical components?

16   A.   Yes, I saw that.

17   Q.   Would you read what those three technical components are to

18   the jury.

19   A.   The three components are as follows.   Number one, Internet

20   client [a remote computer]; number two, a gateway server

21   [gateway]; and, number three, PC [a host computer].

22   Q.   PC stands for what in this phrase?

23   A.   In this phrase PC is the normal short form that people use

24   for a personal computer.   It's just another name of personal

25   computer.

1   Q.   Take a look at Exhibits 9 and 10, if you would.

2   A.   Yes, I have it here.

3   Q.   What are Exhibits 9 and 10?

4   A.   Exhibits 9 and 10 are some revision of that August 18, 1999

5   paper with some refinement and modification.

6   Q.   Do these also describe aspects of your invention?

7   A.   Yes.

8           MR. SHUNK:  Your Honor, I move the admission of

9   Plaintiff's Exhibits 9 and 10.

10          MR. STONER:  No objection.

11          THE COURT:  They're admitted.

12  BY MR. SHUNK: (Continuing)

13  Q.   Now, between the time that you first had the idea for the --

14  for the server that you have described and the ping and so

15  forth, and the time that you filed your patent application, were

16  there any periods where you just gave up working on the project

17  or, you know, put it on the back burner, something like that?

18  A.   No, I continue work on that.

19  Q.   When did you finally have a version that you were satisfied

20  with commercially?

21  A.   I would say is September of 2000.

22  Q.   What did you decide to call the new product?

23  A.   At that time finally we called the computer -- we called the

24  product I'm InTouch, I apostrophe m, InTouch.

25  Q.   Is the InTouch squeezed together?  It is all one word?

1   A.   Yes, it's in one word.

2   Q.   Where did the name come from?

3   A.   We ran a name contest within 01, and someone won that name

4   contest.

5   Q.   Do you remember who won?

6   A.   No.  Not me.  I remember that it's not me.

7   Q.   Do you remember what they won, even more importantly?

8   A.   I don't even remember.

9   Q.   Okay.  Well, take a look at Plaintiff's Exhibits 13 and 14.

10  And that would -- those would be both of them in the box, I

11  believe.

12  A.   This is 13.

13  Q.   Yeah, hold up 13 first.

14  A.   Yeah.

15  Q.   Yeah.  What is 13?

16  A.   13 was a retail box of the -- of the I'm InTouch product.

17  We had it available in retail stores.

18  Q.   Well, why -- why were you -- why were you selling it in a

19  box like that?

20  A.   I think it's good to mention about that because, remember,

21  this was introduced in 2000, the year 2000.  Today, you know

22  13 years later, we are -- we're very used to downloading

23  software.  But 13 years ago, it was just a -- a kind of early

24  adapter doing that.  So, a lot of people still buying software

25  in a box over the shelf.

1        So, we offer it as an option like this.

2    Q.   Okay.  Well, was it -- what was the price for that box, do

3    you remember?

4    A.   It contained a first year subscription, first year usage of

5    99, $99.  Like $100 to be like a round number.

6    Q.   So, about $99 and --

7    A.   $99 a year, right.

8    Q.   Okay.  So when people bought the box were they buying the

9    thing in the box or were they buying the service?

10   A.   They were buying the service.  They are buying a one-year

11   subscription of the service.

12   Q.   Okay.  Now, at that time when you brought out I'm InTouch,

13   was it possible for someone to simply download the software

14   without buying the box?

15   A.   Yes, they can.

16   Q.   Did they have to pay for the software that they downloaded?

17   A.   They do not need to pay for the software they download.

18   Q.   What did they have to pay for?

19   A.   They pay for the either monthly subscription or annual

20   subscription for using the system, using the service.

21   Q.   Let me ask you now about the service itself.  What does --

22   what does the service consist of from your company's standpoint?

23       In other words, what physical assets does your company have

24   that become part of this service?

25   A.   What we have is a server.  We maintain that locator server,

1  which is totally not -- not within the personal computer or the

2  remote computer.  And it would -- it would connect the personal

3  computer and the remote computers together.

4      So, our company managed that locator server, and we -- we

5  allow end users to sign up for using this service either by a

6  monthly subscription or an annual subscription of what I just

7  described about.

8  Q.  I see.  So, your company had the server.  Did your company

9  sell the remote or the host computer?

10  A.  We do not sell the host computer.

11  Q.  Okay.  So, let me get this straight now.  Someone who wants

12  to use I'm InTouch would either buy the box or they would

13  download it, I guess.  On what computer would they put that

14  software?

15  A.  Well, they would put that software onto the personal

16  computer, like -- or you can call it the host.  It is actually

17  the computer that you would be remotely accessing, such as the

18  office computer or your home computer.

19  Q.  Now, what about -- so that's the -- that's the software

20  that's on the host computer.  Now, let's say that the user

21  moves, you know, or is traveling and they have their laptop with

22  them.

23      Would they also have to download some software onto the

24  laptop?

25  A.  They do not need to do anything.  On the laptop computer --

1    or I have always referred to the computer at the -- computer at

2    the business center of the hotel, all they need to have is a

3    browser, is an Internet browser there to begin with.

4    Q.   What is Exhibit 14?  Would you hold that up, please.

5    A.   Yeah, Exhibit 14 was a brochure that we had for the I'm

6    InTouch service.

7    Q.   Okay.  And, roughly, what's the vintage, the date on that

8    brochure?

9    A.   I would say it's around 2000 when we -- when we first

10   launched the product at the -- either the conference that --

11   that we had in Toronto, September of 2000, or the November

12   COMDEX trade show in Las Vegas.

13          MR. SHUNK:  Your Honor, I move the admission of

14   Plaintiff's Exhibits 13 and 14.  And, once again, for 13 we have

15   a photo to go into the record in place of the actual box.

16          MR. STONER:  No objection.

17          THE COURT:  They are admitted.

18   BY MR. SHUNK: (Continuing)

19   Q.   You can put those two things back in the box, Mr. Cheung, if

20   you would, please.

21       Now, I would like to ask you some questions about the

22   pricing for your service.  First of all, in the early days,

23   right after you brought it out in 2000, did someone who wanted

24   to try your product back then have to immediately pay money to

25   do that?

1   A.   No, they don't need to.   We have a 30 days free trial.   And

2   at the end of the 30 days, you -- the user can either subscribe

3   to the service by, as I mentioned before, monthly subscription

4   or annual subscription.   Or if they decide to subscribe any time

5   during the 30-day trial period, they can subscribe to it any

6   time.

7   Q.   Was there any difference between the -- the service that was

8   during the trial period versus the service that a user got if

9   they paid the subscription price?

10  A.   No, there is no difference.   Work exactly the same.

11  Q.   Now, the software that gets downloaded, that you have shown

12  us in the box, does that software sit on the locator server?

13  A.   No, the software sits -- as I said before, it would sit in

14  the personal computer or the host computer, you know, the one

15  that you are remotely accessing.

16  Q.   Who wrote the code for the software that lives on the server

17  computer, the locator?

18  A.   On the locator, those codes were developed by 01, my

19  company.

20  Q.   Okay.   Let's walk through, if we can, Mr. Cheung, what

21  happens when a customer actually uses the I'm InTouch service.

22       Did you personally prepare a short video showing the use of

23  the product?

24  A.   Yes, I did.

25  Q.   And what did you do to prepare that video sample?

1    A.  I was using a small program to capture the screen happening

2    on the remote computer.  Like you mentioned your laptop

3    computer, I always use the hotel business center computer where

4    you are accessing from.

5        So, I was taking a video recording of the screen happening

6    on that remote computer.

7    Q.  Now, what -- so, you are the person who actually did the

8    video recording?

9    A.  Yes.

10   Q.  Is that correct?

11   A.  Right.

12   Q.  And you are also the person who actually did the remote

13   accessing?

14   A.  Yes.

15   Q.  Now, once you did the video recording, did you take a look

16   at the video that you had recorded to determine whether you

17   believed it was true and accurate about showing how your product

18   works?

19   A.  Yes.

20   Q.  And was it?

21   A.  It was accurate.

22   Q.  Okay.  Now, is that video recording Plaintiff's Exhibit 19?

23   And I know that --

24   A.  Yeah.  This --

25   Q.  Right.  There is nothing in the book, but you remember

1    giving me that to put -- so that I could put a plaintiff's

2    sticker on it?

3    A.  Yes.  Yes.

4          MR. SHUNK:  Your Honor, with the Court's permission, we

5    would like to show -- this is about a two-minute video.

6          THE COURT:  All right.

7          MR. SHUNK:  And it shows --

8    BY MR. SHUNK:  (Continuing)

9    Q.  Before we start it, though, Mr. Cheung, I would like you to,

10   as they say in the movies, set up the clip for us.

11       What had you done before the clip begins so that the jury

12   understands where they are jumping in.

13   A.  Right.  I would give some background about the preview

14   maybe.

15   Q.  Okay.

16   A.  Because I have to access a computer.  So, I had already

17   downloaded the software and installed that on the personal

18   computer where I am accessing.  So, that was what I did before

19   this video, making the personal computer remotely accessible.

20   Q.  So, you had downloaded that on the computer.  Where

21   physically was that computer when you did the video?

22   A.  That physical computer was remotely, was actually in

23   Toronto, Canada when I did that video here in my Arlington,

24   Virginia office.

25   Q.  And I was about to ask you, where were you when you were

1  doing -- when you were trying to remotely access the Toronto

2  computer?

3  A.  I was at my Arlington, Virginia office.

4  Q.  Okay.  Now, I know the jury -- because I have seen the video

5  too.  I know the jury is going to see you open a book on the

6  video.

7      Where is the -- where was the electronic file for that book

8  located as you were opening it?

9  A.  That book -- we call it a pdf file -- was physically located

10  in the personal computer about 1,000 miles away in Toronto.

11  Q.  Okay.  And so, now I would ask our technical assistant to

12  run the video, if you would.

13      Explain what is going on.

14  A.  Yes.  Here it is the remote computer where you are, again,

15  using the browser.  You just open up an Internet browser and

16  visit the locator server called I'mInTouch.com.

17      And here it is asking you to log in, of course, to the

18  account.  So, I would type the login ID of my account.  And, of

19  course, you need a password to authentic to log in.

20      After that, I would then pick and choose a computer I want

21  to remotely access, which is the one, as I mentioned before, in

22  Toronto that I am remotely accessing.

23      So, once I click, what it would do is it would create --

24  like what I am doing here, it would create a communication

25  channel and session.

1      And after that, it would, again, obviously for securities

2  reason, it would prompt you to enter a secondary password.

3      And once that secondary password is successfully

4  authenticated, it would present the screen of the computer in

5  Toronto.

6      So that you would see in a few seconds here that the

7  computer from 1,000 miles away is actually appearing in this

8  remote computer and you are using the computer as if you were

9  physically there.

10     For example --

11 Q.  So, that's the desktop of the Toronto computer?

12 A.  Of the Toronto computer.  You can open a pdf, like a book,

13 on that computer and then view it, scroll, doing editing,

14 anything you like, as if you are sitting in that 1,000 miles

15 away computer in Toronto.

16     When you are done, you simply -- you can close it and

17 disconnect from it, as I mentioned before.

18     Now, nothing has been moved to this remote computer.  So, it

19 is very safe this way for remote access.  Because I bet you

20 reading a lot of news, you know, in the paper, that a lot of

21 computers with confidential information were inadvertently lost

22 during travel.

23     So, this type of remote access would never have this problem

24 and is working through firewall, router, dynamic IP addresses.

25 Q.  Okay.  Well now, for example, if I wanted to look at a book

1   that I might store online, how is that different, you know,

2   looking at a book that I might have using G drive or Dropbox or

3   something like that?

4   A.  Well, that is a different thing because now with the remote

5   access, you are -- you are actually accessing your computer at

6   your office or your home.  Right.  You don't need to move it

7   onto someone else's server so that you can look at another

8   server.

9       So, think of it as a securities point of view.  It's more

10  secure, because if -- say using your example of Dropbox, you

11  have to move a file that you want to access when you are

12  traveling into the Dropbox first, and then when you are

13  traveling you are accessing that Dropbox.

14      And that Dropbox is managed by some other location, and

15  people may be able to hack in and -- that's a different thing.

16  You know, I'm not getting into another discussion.

17      But to answer your question clearly, it is -- you are

18  accessing another place, you know, rather than your own

19  computer.

20  Q.  Is your method of accessing remotely more or less secure

21  than some of these other methods we have heard about?

22  A.  Do you mean these methods like a third-party server and

23  things like that?

24  Q.  Yes.

25  A.  Yeah, in my opinion it is more secure because you are

1   accessing your own computer.

2   Q.  Now, Mr. Cheung, when did you record the video that we just

3   saw?

4   A.  Very recently, to prepare for this trial.

5   Q.  Has the I'm InTouch service functioned substantially

6   differently from what we saw at any time in its history?

7   A.  If your question is about whether it is -- the technology

8   that we use was the same, yeah, we're using the same technology

9   since day one.  But, of course, in software development, you --

10  it is a nonstop process, that you always have to refine your

11  product, you know, with different efficiency, additional

12  features, and things like that.

13  Q.  Take a look at Plaintiff's Exhibit 20, Mr. Cheung, if you

14  would.

15  A.  Yes, I have it here.

16  Q.  What is Plaintiff's Exhibit 20?

17  A.  This is some -- I will say a snapshot of some important

18  moment of the video I've just shown and demonstrated.

19           MR. SHUNK:  Your Honor, in view of the difficulty of

20  watching a video back in the jury room, we would like to move

21  the admission of Plaintiff's Exhibit 20, the snapshots of the

22  video, rather than attempting to move the video itself into

23  evidence at this time.

24           THE COURT:  Any objection?

25           MR. STONER:  No objection.

1        THE COURT:   Admitted.   All right, counsel, I think it

2   is time that we recess for lunch, and we will recess now until

3   2:15.

4

5

6

7

8

9

10

11

12

13                           CERTIFICATION

14

15        I certify, this 18th day of March 2013, that the

16   foregoing is a correct transcript from the record of proceedings

17   in the above-entitled matter to the best of my ability.

18

19

20                     /s/

21        _____

22                Norman B. Linnell, RPR, CM, FCRR

23                     /s/
         _____

24              Tracy Westfall, RPR, CMRS, CCR

25