```
                    UNITED STATES DISTRICT COURT
                    EASTERN DISTRICT OF VIRGINIA
                        ALEXANDRIA DIVISION
   _____

   01 COMMUNIQUE LABORATORY,      )
   INC.,                          )
                                  ) Docket No. 1:10-cv-1007
            Plaintiff,            ) Alexandria, Virginia
                                  )
            v.                    ) March 18, 2013
                                  )
   LOGMEIN, INC.,                 ) Volume I
                                  ) (p.m. session)
            Defendant.            )
   _____
```

TRANSCRIPT OF TRIAL

BEFORE THE HONORABLE CLAUDE M. HILTON

UNITED STATES DISTRICT JUDGE

AND A JURY

APPEARANCES:

```
   For the Plaintiff:      John P. Corrado, Esq.
                           Marc A. Antonetti, Esq.
                           Thomas H. Shunk, Esq.
                           Katherine Lea McKnight, Esq.
                           William T. DeVinney, Esq.
                           Loura Alaverdi, Esq.
                           A. Neal Seth, Esq.

   For the Defendant:      Wayne L. Stoner, Esq.
                           Charles B. Molster, III, Esq.
                           Vinita Ferrera, Esq.
                           Rachel Gurvich, Esq.

   Court Reporter:       Tracy L. Westfall, RPR, CMRS, CCR
   Proceedings reported by machine shorthand, transcript produced
   by computer-aided transcription.
```

1                          I N D E X

2                  Direct    Cross   Redirect   Recross

3    FOR THE PLAINTIFF:

4    A. Cheung          103       131      --          --

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                          P R O C E E D I N G S

2              MR. STONER:  Thank you, Your Honor.  Very briefly, our

3       concern is that 01 Communique, Mr. Shunk in his opening

4       statement, violated the representation 01 made to this court in

5       a prior hearing about what they would not do in this trial.

6              On the March 1st hearing on the motions in limine, 01

7       represented to the Court, quote, we will not argue that the

8       reexamination has any probative value to validity, unquote.

9       Mr. Shunk did just that today, saying that Andrew's patent was

10      found to be valid by the United States Patent Office in the

11      reexamination.

12             We request a curative instruction to the jury in the

13      nature of exactly what they represented to Your Honor, which is

14      that the reexamination does not have any probative value to the

15      validity of this patent.

16             THE COURT:  What do you want to say?

17             MR. SHUNK:  Your Honor, if I may, I chose my words very

18      carefully on this in order to stay within Your Honor's -- within

19      my representation and what I understood Your Honor to

20      understand.  I said that there was a reexamination.  I explained

21      that the reexamination at the patent office level had terminated

22      in 01's favor.  I immediately mentioned that there was an appeal

23      by Citrix.  And then I said the words, Today the '479 patent

24      stands as valid as it was on the day that it issued, which is

25      exactly true.

1          I did not suggest, I don't believe, Your Honor, that

2    there was any additional probative value from the reexamination.

3    But I think that to tell the jury there was a reexamination,

4    they're going to sit and wonder, well, gosh, how did it turn

5    out.  And I think they're entitled to know how it turned out

6    without arguing that it has any legal importance to their

7    decision here.

8          THE COURT:  I think that's correct.  I think that went

9    more to the timing of why they filed suit and why they didn't.

10   There's an issue here of how long they waited to file the suit,

11   and you made that in your opening statement.  And then I -- my

12   recollection of the argument is is that's what that went to as

13   opposed to the validity of the patent.

14         That never occurred to me, that it did go to the

15   validity, what I heard him say, and I thought all of it went to

16   the question of timing of when was the suit filed and when was

17   it not filed.  But anyhow, I'll deny your motion for a curative

18   instruction at this point anyway.

19         MR. STONER:  Your Honor, I mean, we understand that's

20   their excuse for delay, and that's fair game in this trial.

21   It's not true, but we'll deal that.  But what Mr. Cheung said,

22   he did not quote, was, quote --

23         I'm sorry.  Andrew's patent was found to be valid by

24   the United States Patent office.  That's exactly contrary to

25   what they represented to this Court they would not do.

 1            THE COURT:  Well, that's -- I don't know that that --

 2    there's no question the patent office found it valid.  I mean, I

 3    don't see how that goes to the validity at all.  We know the

 4    patent office found it valid the first time and then when they

 5    reexamined it they found it valid.  Didn't they?

 6            MR. SHUNK:  Yes, sir.

 7            MR. STONER:  The issue is not what happened in the

 8    original prosecution.  It's in the reexamination.  And they said

 9    they would not suggest that reexamination was probative to

10    validity.  They did just that.  That's our issue, Your Honor.

11    It's suggesting to the jury that because there's reexamination

12    and it's ongoing in some sense, that the patent office has

13    confirmed validity.  And there's much law.  That was the subject

14    of the motion in limine, saying that's improper, and they agreed

15    that was improper, but then they --

16            THE COURT:  They agreed they wouldn't argue it.  So in

17    the first place, we can't have argument in an opening statement.

18    The only thing he did was tell them that it was valid.  The

19    patent office said it was valid.  It would be inaccurate to say

20    anything else.  And I still -- my recollection of what he said

21    at the time was all in the context of the timing as to when they

22    filed suit on the patent.

23            I just don't think the objection is well taken.  If

24    they do start to argue it, it could be something else, but I

25    take it that they have not argued it, which you have to tell --

1    if you talk about the reexamination, you have to tell them it

2    was approved.

3              MR. STONER:  Well, we don't.  I mean, they represented

4    they wouldn't.  And --

5              THE COURT:  Well, they do because you're raising the

6    issue of the timeliness of file.  So they have to.  They would

7    be remiss if they didn't, wouldn't they?

8              MR. STONER:  I don't think so, Your Honor, but I

9    understand your ruling.

10             THE COURT:  Yes, you do.  You don't want to admit it.

11   All right.

12             MR. STONER:  I --

13             THE COURT:  That's all right.  I don't mind if you

14   disagree with me.

15             MR. STONER:  That's okay.  We understand your ruling,

16   Your Honor.  Thank you.

17             THE COURT:  All right.  Bring in the jury.

18      (The jury enters at 2:24 p.m.)

19             THE COURT:  Thank you.  You can have a seat.  These

20   people are just standing for you.  Get them to sit down.  Let's

21   move along with this witness.  This witness has been on the

22   stand for quite a while now.  Let's move along with this.

23             MR. SHUNK:  Yes, Your Honor.

24

25

1                           DIRECT EXAMINATION

2   BY MR. SHUNK:

3   Q.  Mr. Cheung, I'd like to move right into the patent now, the

4   patent itself.

5       Did you review the draft patent application before it was

6   filed?

7   A.  Yes, I did.

8   Q.  And did you review amendments of the application and so

9   forth as it was being processed through the patent office?

10  A.  Yes.

11  Q.  I'd like you to take Exhibit 1, the '479 patent, and look in

12  particular at figure 1 that appears on the third page of the

13  exhibit.

14          MR. SHUNK:  And, Your Honor, I would ask that the

15  marshal show the jury our foam board demonstrative at this

16  point.  It is the diagram Fig. 1 from the patent.

17          THE COURT:  All right.

18  BY MR. SHUNK:

19  Q.  Mr. Cheung, does the board that the jury sees fairly and

20  accurately reproduce the Fig. 1 drawing that you're looking at

21  in the patent?

22  A.  Yes, it does.

23          MR. SHUNK:  If I could ask the marshal to flip over the

24  first page, which is the same drawing with some color added to

25  it, in order to speed up the examination process.

BY MR. SHUNK:

Q.  Is there any color, Mr. Cheung, in the Fig. 1 drawing in the

patent itself?

A.  In the original drawing there were no color.

Q.  Okay.  So that's been added for purposes of this

examination.

    Tell the jury -- well, first of all, what is this a drawing

of?

A.  This is the -- the drawing representing the schematic of the

invention.

Q.  Okay.  Does it depict anywhere the host computer?

A.  Yes, it does.  Let me use that pointer again.

    The host computer, once again, was -- recapping a little

bit, was the personal computer that you would be remotely

accessing.  That blue box here is the -- the personal computer.

Q.  Let me ask you a couple of questions about this schematic

now so we understand what we're looking at.

    There's a number 14 pointing to some sort of an empty box.

Do you see that?

A.  Yes.

Q.  Tell the jury what that is.

A.  This is actually representing the personal computer.

Q.  Okay.

A.  Yeah.

Q.  Now, you see there is a line that comes down from that and a

1   box that says communication facility.

2   A.   Yes.   This box.

3   Q.   What is a communication facility?

4   A.   The communication facilities is the software that reside in

5   the personal computer that allow you to talk to somewhere over

6   on the Internet, such as the -- the green box.

7   Q.   Okay.   And there's a box under that that says means for

8   communication of location.   What does -- what is that?

9   A.   Yeah, this is -- as the English word says, is the way of

10  communicating the location.

11  Q.   So why did you use the word facility rather than the word

12  software that you just used in your -- in your description?

13  A.   Basically, software and facilities are just two different

14  words.   Means the same thing in the world of software

15  developers.

16  Q.   So the -- the two rectangular boxes with words on them, are

17  they supposed to be separate devices from the host computer or

18  are they the same thing as the host computer?

19  A.   They are software inside the -- the host or the personal

20  computer.

21  Q.   Now, there's a box that says name.   What is that?

22  A.   Like identifier, for example.   Identifying the personal

23  computer.

24  Q.   Okay.   Now, the yellow box, what is that?

25  A.   This yellow box represents the remote computer.   In my

1  testimony, I have been referring to your laptop computer or the

2  computer at the hotel business center where you will be

3  accessing your office or home computer remotely.

4  Q.  The green box, sir, what is that?

5  A.  The green box represents the locator server, which is the

6  middleman in my example, the one that connects creating

7  communication session and creating communication channel between

8  the office computer, the personal computer, and the remote

9  computer in this way.

10 Q.  I see in the green area a box that says location facility.

11 What is that?

12 A.  This is the software that resides inside the locator server

13 that basically the engine driving that locator -- the location

14 server to work.

15 Q.  Now, there's kind of a -- I don't mean any insult by this,

16 Mr. Cheung, but there's kind of a badly drawn circle in the

17 middle of the diagram.  What is that supposed to be, number 16?

18 A.  This thing?

19 Q.  Yes.

20 A.  This was drawn as representation of the Internet.  And now

21 fast-forward 15 years, people call it the cloud.  So it actually

22 looks like a cloud.

23 Q.  Okay.  Now, what are the lines that go back and forth

24 between the three boxes?

25 A.  Those lines represent the -- the communication -- the

1  communication channel.  So it represents that the location

2  server or the gateway server and whatever you call it is

3  creating that communication between the personal computer and

4  the remote computer in such a way.

5  Q.  Just to take this back to the video we saw right before

6  lunch, the -- the -- I recollect that that was done by you in

7  Arlington accessing your computer in Toronto.

8       Which box would represent the computer in Toronto?

9  A.  This blue box, personal computer, represents the computer in

10 Toronto where I was remotely accessing.

11 Q.  What about -- which box would represent the computer in

12 Arlington that you were actually typing on the keyboard of?

13 A.  The yellow box represents the remote computer or laptop that

14 I was remotely accessing from in my Arlington office.

15 Q.  Now, did the communication between the remote and the host

16 that we saw in the video, did it go through the I'm InTouch

17 locator server?

18 A.  As it represents here, it does.  It goes through in this

19 manner, pass through the locator server into the office computer

20 and back and forth.

21 Q.  And where physically is the locator server for the I'm

22 InTouch product?

23 A.  The locator server is physically in Toronto in the -- our

24 data center, which is an official data center run by Allstream

25 AT&T in Toronto.  And it is, you know, those kind of public data

1    center that hosts server like that, not our premises.

2    Q.   Now, one other question about this drawing, sir, and that is

3    I remember your testimony about a ping.

4        Can you show where that would happen in this diagram?

5    A.   Yeah.   The ping would happen from the personal computer, the

6    blue box, generated to the green locator server in a regular

7    basis doing this periodically or intermittently.

8    Q.   Now, how many computers are shown in this patent Fig. 1 in

9    the -- in the green box for the locator server?

10   A.   Well, actually, this is an interesting question because this

11   is a schematic of the system, not a photograph of the system.

12       Of course, when you are describing, you draw a box here, the

13   same thing that if you wanted to describe a factory, you -- I

14   would assume you wouldn't draw all those assembly workers in the

15   factory.   So there's a box here, but then all the software

16   developer will understand at the time of the invention that the

17   location box, the locator server, can be one or more than one

18   computer box, and the software in it, the location facilities,

19   can be subdivided into different pieces, some in one box, some

20   in other box, but they all work together to perform the job.

21   Q.   Now, what you just said in your description, did you

22   actually say that in your patent?

23   A.   Very clearly.   I envisioned that it could be an issue so I

24   specifically said that very clearly in the patent application.

25   Q.   I would like for you to look for that language in Exhibit 1,

1    please.   And while you're doing that --

2            MR. SHUNK:   Your Honor, thank you for letting us show

3    this to the jury.   We're done with it, if the marshal wishes to

4    take it down.

5    BY MR. SHUNK:

6    Q.   Have you been able to the find in the patent where you talk

7    about multiple computers for the locator server?

8    A.   Yes.   Absolutely.   First of all, it is in column 5 of the

9    patent description, line 23 to 24.   It says very clearly word by

10   word server computer 12 may comprise one or more computer as is

11   well known.

12   Q.   And was that a quote from the patent?

13   A.   It was actually word by word from the patent description.

14   Q.   Is there anywhere else you want to refer --

15   A.   And the other place is column number 2, line 39 to line 46.

16   There it says, also by portal, quote/quote, what is generally

17   understood is a means for facilitating communication from

18   point A to point B.   More than one interconnected computer or

19   process may cooperate to provide a single portal.   For example,

20   a first computer or process comprising the portal may provide

21   means for locating B at least once.   Thereafter, communication

22   between A and B may be facilitated through a second computer or

23   process independent of the first computer or process.

24   Q.   Have you heard of the phrase distributed software used in

25   the computer software industry?

1    A.   Yes, sir, I do.

2    Q.   What does it mean?

3    A.   In English terms, all I can explain in everyday language is

4    that it's like load balancing.  Load balancing is to, like the

5    word says, handle heavy loads.  There are many ways that you can

6    configure load balancing.  One example is like you can have one

7    physical computer containing all the locator facility, the

8    software necessary to run it, and then you have multiple box

9    same way, but they're all together to share the load.

10        Another way to configure would be that you kind of subdivide

11   it, the locator server software, into different pieces, some of

12   which is located in one computer, some in another, some in

13   another, but they all work together to perform the same job.

14   You can view it as like -- use that analogy again -- like a

15   factory.

16        You can handle a different load by having assembly -- each

17   assembly worker assembling the product from start to finish, but

18   then you can have multiple -- many assembly worker doing the

19   same thing at the same time producing many products, or you can

20   do it in the way that each assembly worker is doing a particular

21   part and then they all work together to produce many products,

22   those similar.

23   Q.   Now, in the parts of your patent that you read, I didn't

24   hear the word distributed.  Is there any difference between what

25   you read from the patent and what you just described now as

1   distributed?

2   A.  It's basically describing distributed.  What I read about in

3   the column -- column 5, line 23 to line 24, as well as column 2,

4   line 39 to 46, was describing exactly what I said.

5   Q.  Now, how is the locator server within the I'm InTouch

6   service, your service, how is that configured?

7   A.  In our service we configuring, more or less, that second

8   way, as I mentioned, using that analogy like a factory was like

9   different assembly worker doing different things, but they're

10  all collectively working together.  We have one server handling

11  the web access, the other server handling database, keeping

12  track of all the subscribers, the users, the location, and

13  another server called the gateway or connection server basically

14  connect them together.  They, all of them, working together

15  collectively to perform that location server job.

16  Q.  How long has 01 been doing the configuration that way with

17  its I'm InTouch service?

18  A.  I would say pretty much since day one.

19  Q.  Okay.  So 2000, 2001?

20  A.  Yes.

21  Q.  Was that unusual to do things that way back in 2000, to

22  distribute software like that?

23  A.  No.  It's not unusual.  Like load balancing is well known at

24  that time.  And I will say software engineer at the time would

25  very well know about how you can -- you can expand one server

1  computer into multiple boxes in order to handle the additional

2  loads.

3  Q.  Have you ever charged users to download the I'm InTouch

4  software?

5  A.  Never.

6  Q.  What did you charge for the service in 2000?

7  A.  We charged $10, 9.95, $9.95 per month or $99 a year.

8  Q.  What do you charge today?

9  A.  We charge the same.  We haven't changed our price since day

10  one.

11  Q.  Now, before lunch -- I want to clear something up.  Before

12  lunch I asked you whether the user had to download anything on

13  the remote computer, the laptop, the hotel computer, to use your

14  service.  And I believe you answered no.

15      Does anything -- regardless of what the user has to do, does

16  anything get downloaded onto that laptop while the user is using

17  it?

18  A.  Before the connection was started something would get

19  downloaded, but it is not something that the user has to

20  download first before that happen.  When they want to do remote

21  access, all they need to find is a computer, laptop computer,

22  whatsoever, with a browser there.

23  Q.  Okay.  What happens to that, whatever it is that gets

24  downloaded onto the laptop computer, once the session is over?

25  A.  It would be erased.

1   Q.  Would the user even see that the -- the application was

2   being downloaded?

3   A.  The user won't see that.  It is transparent.

4   Q.  Is there a particular name for that kind of transitory

5   application?

6   A.  There's no name for that.  We call it a viewer something,

7   yeah.

8   Q.  Now, I've been asking you about the pricing for the product.

9   Is there a name for that kind of business model where you don't

10  charge for the software, but you do charge for the service?

11  A.  Oh, actually, in recent years people has been labeling that

12  as S-A-A-S, or what people call SaaS.  It is software as a

13  service is what's being labeled in recent years.

14  Q.  Now, you didn't invent software as a service, did you?

15  A.  Oh, absolutely not.  Yeah.

16  Q.  Okay.  So were any other companies offering a remote access

17  service as software as a service in 2000 that you know of?

18  A.  No, not that I'm aware of.

19  Q.  How successful has the software as a service business model

20  been in the remote access services field?

21  A.  In the early years, just like any new technology, was the --

22  what we call the infant stage of those kind of service or

23  product.  It was not successful -- or I shouldn't say not

24  successful.  It wasn't very popular.  And -- but in recent years

25  it has been developing into a very major offering by many

1    different software offering on the planet.

2    Q.   Are you familiar with another remote access service today

3    that's called GoToMyPC?

4    A.   Yes, I am.

5    Q.   Who provides that service?

6    A.   That service today is provided by a company called Citrix.

7    Q.   When it first came out, do you know who provided the

8    service?

9    A.   Yes.   It was -- it was originally provided by a company

10   called Expertcity until they were acquired by Citrix in 2004.

11   Q.   Which of those services, I'm InTouch or GoToMyPC, was

12   offered first to the public commercially?

13   A.   I'm InTouch was offering first.

14   Q.   When exactly did 01 introduce the I'm InTouch service?

15   A.   We first publicly display the -- or announced the product in

16   a press conference September of 2000 in Toronto.   And then a few

17   months after that, we announced the product are commercially

18   available at a computer trade show, the largest computer trade

19   show in the United States called COMDEX November 2000.

20   Q.   Were there any other competitors when 01 released the I'm

21   InTouch service in November of 2000 in remote access services?

22   A.   No.

23   Q.   You said that -- well, you've been talking about GoToMyPC.

24   When you first saw GoToMyPC, did you look into it?

25   A.   I looked into GoToMyPC -- I should say first saw it within a

1    few months' timeframe when I -- when it came to my attention.

2    Q.   Did you do any analysis of the GoToMyPC product?

3    A.   Yes, I did.

4    Q.   What did you do to analyze that service?

5    A.   I cannot remember details, but I can remember some very

6    fundamental points.  I looked at basically two things.  I looked

7    at literature, white paper from the website, things like that,

8    to see how it works.  And then I also had downloaded and used

9    the application putting like a protocol analyzer to monitor

10   traffic traveling back and forth between the personal computer

11   and the GoToMyPC locator server as well as between the remote

12   computer and the GoToMyPC locator server and monitor those

13   traffic.

14   Q.   What did you see when you looked at all that information?

15   A.   I saw that the personal computer was generating pings to the

16   GoToMyPC locator server pretty much the same way the I'm InTouch

17   service did.

18   Q.   What did you do about that?

19   A.   We -- at that time we really cannot do anything because our

20   patent application was still in the hands of the patent office.

21   Q.   Well -- so when was that, roughly?

22   A.   That was roughly 2002.

23   Q.   And to refresh our recollection, when was it that the patent

24   issued?

25   A.   It was issued in August of 2005.

A. Cheung - Direct                                          116

1   Q.  Okay.  Well, you didn't have the patent out yet.  You saw

2   what Citrix was doing.  Did you do anything to try to speed up

3   the patent office?

4   A.  We did two things.  First of all, what we did was file a

5   request to the patent office asking them to expedite in light of

6   a potential infringer, and the second thing was we asked for an

7   update of the patent application process.  And from this update

8   request, we learned that the patent office actually had lost our

9   application file.

10  Q.  What -- what did you do to fix that problem?

11  A.  We asked them to recreate the application file and they did.

12  So the application kind of continued to proceed after that.

13  Q.  I'd like to get a specific date on this.  So could you look

14  at Plaintiff's Exhibit 1 and tell the jury the exact day on

15  which the patent issued.

16  A.  Yeah.  The patent was issued -- let me look at it exactly --

17  was issued on August 9th of 2005.

18  Q.  After the patent issued, did you provide notice to the

19  public about the patent?

20  A.  Yes.  Absolutely.  What we did was we marked our product

21  using this patent on like the box, the website, and things like

22  that.

23  Q.  Okay.  And would a person who logged onto the I'm InTouch

24  website, would they see the patent number?

25  A.  Yes, they would see the patent number.

1  Q.  What about a person signing up for the I'm InTouch service,

2  would they see the patent number?

3  A.  Yes, they would see the patent number.

4  Q.  Has 01 marked substantially all of the services it provides

5  with the '479 patent number since the time the patent issued?

6  A.  Yes, we did.

7  Q.  Once it issued, Andrew, did 01 take any action regarding

8  Citrix and the GoToMyPC service that we just talked about?

9  A.  Once it issued, we went ahead and launched a patent

10 infringement legal action against Citrix.

11 Q.  Where was that suit filed?

12 A.  That was filed in Ohio.

13 Q.  I know you're not a lawyer, Andrew, but can you tell the

14 jury what you understand to be the status of that lawsuit

15 against Citrix?

16 A.  Yeah.  My understanding of the status was that it was put on

17 hold by the -- the Ohio judge.

18 Q.  What's your understanding of why the Ohio judge put the suit

19 on hold?

20 A.  Because soon after we filed the lawsuit against Citrix,

21 Citrix challenged my patent to the patent office.  So the Ohio

22 judge decided to put this lawsuit on hold pending the decision

23 from the reexamination process.

24 Q.  Do you remember when Citrix's challenge to your patent was

25 filed at the patent office?

1  A.  This one I remember vividly.  It was December the 7th of

2  2007.

3  Q.  How do you know that?

4  A.  Because I found out the next day, on December 8th, which is

5  my birthday.

6  Q.  Well, what do you understand to be the word or the correct

7  name for the kind of challenge that Citrix has done?

8  A.  It is called interparty reexamination.

9  Q.  Did you participate yourself in the reexamination?

10 A.  As the CEO of the company, I review paper before they file.

11 But since I'm not a patent attorney, I do not involve in the

12 actual reexamination process.  Our patent attorney handles that

13 for us.

14 Q.  Okay.  What was the nature of the challenge to your patent,

15 generally?  Not a detailed legal or technical, but just

16 generally what was the challenge?

17 A.  In general, the challenge was that the Citrix provided to

18 the patent office a total of 12 different prior art references,

19 saying that they would likely predate our invention and would

20 invalidate the patent.

21 Q.  Did there come a day when you learned what the result, at

22 least at the level of the patent office, was on this

23 reexamination?

24 A.  It was in -- not until around -- I would say July 7th --

25 that's the exact date -- July 7th of 2010, that the patent

1    office validated all the claims of the patent and denied

2    Citrix's petition.

3    Q.   Has Citrix appealed?

4    A.   Yes, Citrix appealed that decision.

5    Q.   Would you please take a look at Plaintiff's Exhibit 34.

6         What is that, Mr. Cheung?

7    A.   That is the right of appeal notice.  This is the -- the

8    notice we received from the patent office confirming the -- the

9    validity of my patent.

10   Q.   Now, how long then did the reexamination process take to

11   reach this point anyway?

12   A.   It actually took -- took two-and-a-half years of scrutiny.

13   Q.   So the notice came out on what day again?

14   A.   July of 2010.

15   Q.   Okay.  And when did you file this lawsuit here against

16   LogMeIn?

17   A.   September 2010.

18   Q.   About two months later?

19   A.   About two months later.

20   Q.   What was it -- was there any connection between the July

21   action in the patent office and your decision to file the

22   lawsuit here against Citrix -- against LogMeIn?

23   A.   Yeah.  It was actually very important because, as you can

24   tell, we are a small company.  So after the Citrix case was put

25   on hold by the -- by the Ohio judge pending reexamination, we

1    just had a hard time raising any additional financing to pretty

2    much anything for the company, so yet alone any additional

3    lawsuit.  And we are also a small company without enough

4    resources to sue two potential infringers at the same time.

5        So like a long story short, we just have no ability like

6    legally and practically to launch any lawsuit until after the

7    patent office had confirmed the validity of my patent and denied

8    Citrix's petition.  This is because -- it was very obvious that

9    any additional lawsuit because of the reexamination would

10   automatically be put on hold as well after that on hold date by

11   the Ohio judge.

12   Q.  Well, when did you become aware of LogMeIn?

13   A.  We became aware of LogMeIn sometimes in 2004.

14   Q.  What did you do once you learned about LogMeIn to

15   investigate the LogMeIn service?

16   A.  I did more or less similar things.  I remember it was in

17   2005 sometimes.

18   Q.  Tell the jury briefly what you did.

19   A.  Briefly, what I did was similar to what I did to the

20   GoToMyPC product back in 2002, putting a protocol analyzer,

21   analyzing the -- the personal computer, communicating with the

22   LogMeIn locator server, and also monitoring the traffic between

23   the remote computer talking to the LogMeIn locator server and

24   understanding what's transferred back and forth.  And then at

25   the end, I found more or less the same thing as what I found in

1    the GoToMyPC analysis, whereby the personal computer was

2    initiating pings to the LogMeIn locator server, pretty much the

3    same way as the I'm InTouch product.

4            MR. SHUNK:  Your Honor, I see that -- I would like the

5    witness to look at Plaintiff's Exhibit 42 next, but I see that

6    I, in error, omitted it from my binder.  I wonder if the marshal

7    could hand the witness Plaintiff's Exhibit 42.

8            THE MARSHAL:  Which binder?

9            MR. CORRADO:  What binder is it?

10           MR. SHUNK:  I don't know.

11   BY MR. SHUNK:

12   Q.  I don't want to slow things down.  While they're looking for

13   that, Mr. Cheung, I'll move on to something else.

14   A.  Yes.

15   Q.  I'll come back to it.  I'd like you to turn to your -- we

16   found it.  Okay.  So that's in binder -- binder number 1, sir.

17           Exhibit 42.

18   A.  I think this is only up to 32.

19   Q.  I don't know.

20           MR. SHUNK:  But perhaps the marshal can hand this copy

21   to the witness.  I apologize, Your Honor.

22           THE WITNESS:  Thank you very much.  Yes.  I have the 42

23   here.

24   BY MR. SHUNK:

25   Q.  What is 42?

1  A.  42 was a table we generate from the access record of

2  our signup database about who has signed up our product, who has

3  downloaded our product for trial or for anything, accessing.

4  Yeah.

5  Q.  And what did you specifically look for in that database

6  that's reflected on 42?

7  A.  In that database we were looking for some key words like

8  Marton Anka, 3AM Lab, or anything with an e-mail ended with .hu.

9  Q.  Why were you looking for 3AM Labs?

10  A.  Because 3AM Lab was the original company name of LogMeIn

11  before they changed names to LogMeIn.

12  Q.  Why were you looking for registered users with a .hu e-mail

13  address?

14  A.  Because, as you know, e-mail addresses of like .com are most

15  likely in North America, but anything was .hu would be from

16  Hungary.

17  Q.  Now, if an individual is listed on this list, what would

18  they have been able to see about the I'm InTouch service when

19  they downloaded the software to use it?

20  A.  Yeah.  They will see the service.

21  Q.  What does the -- well, let me ask you generally.

22      What does this record, 42, show about access to the I'm

23  InTouch service by Mr. Anka, if anything?

24  A.  Well, it shows that the earliest date shown was April 21st

25  of 2004, and it also shows many other, but that is the earliest

1   date shown that someone by that name had access to our server

2   downloading something.

3   Q.   Now, does this printout reflect the business records that

4   you keep in the ordinary course of business?

5   A.   Yes, it does.

6          MR. SHUNK:   I move the admission of Exhibit 4 --

7   Plaintiff's Exhibit 42.

8          MR. STONER:   No objection.

9          THE COURT:   It's admitted.

10  BY MR. SHUNK:

11  Q.   What effect on 01's business did you believe LogMeIn was

12  having in 2005?

13  A.   Simply put, the way that LogMeIn was giving away our product

14  for free without permission was like cutting our legs out from

15  under our company.   We spent years and over $25 million

16  developing, inventing, patenting, and commercializing I'm

17  InTouch, and the fact that they just giving away for free

18  without permission, how can we ever make money to grow the

19  company or even survive?

20  Q.   Well, in 2005 then when your patent came out, why did you

21  wait until 2010 to sue LogMeIn?

22  A.   As I briefly mentioned before, first of all, our patent

23  wasn't granted until August 9th of 2005.   And practically

24  speaking, we were a small company without enough resources to

25  sue two potential infringers at the same time.   And by that

 1   time, 2005-2006, Citrix was a much bigger problem than LogMeIn

 2   at that time.  So that's -- we were suing the bigger competitor.

 3        And making things worse, as you know, the Citrix case was

 4   put on hold by the Ohio judge pending reexamination.

 5   Q.  Okay.  And you've -- since you've already gone through that,

 6   I'll stop you there and move on to the next thing because we

 7   heard that testimony.

 8   A.  Right.  Exactly.

 9   Q.  Now, let me ask you about Hitachi.  Does your company have a

10   business relationship with Hitachi that relates to your

11   invention?

12   A.  Yes, we do.

13   Q.  Tell the jury about that.

14   A.  Hitachi first came to 01 at the COMDEX trade show --

15   remember talking about the largest computer trade show in United

16   States -- in Las Vegas November 2000.  There we publicly

17   announced the commercial availability of I'm InTouch.  And

18   Hitachi came to our booth, saw that product, and was intrigued

19   by it.  And since then we have been negotiating an agreement

20   whereby Hitachi was interested in providing a remote access

21   service product in Japan.

22   Q.  What do they call your technology when it's offered in

23   Japan?

24   A.  They rename it to something else.  We call it a private

25   labeling.  We provide a product.  But the private branding as

1    Hitachi Do Mobile.

2    Q.  Do Mobile?

3    A.  Do Mobile.

4    Q.  Please take a look at Exhibits 21 and 22.  And those should

5    be in the exhibit binder.

6    A.  The original one?  Yes, I have it here.

7    Q.  What are they?

8    A.  They are the agreement we had signed with Hitachi.

9              MR. SHUNK:  Your Honor, I move the admission of

10   Exhibits 21 and 22 for the Plaintiff.

11             MR. STONER:  Object, Your Honor, irrelevant.  It's not

12   tied to this patent at all.

13             MR. SHUNK:  Your Honor, it's tied to the technology.

14             THE COURT:  What relevance would that have?

15             MR. SHUNK:  I'm sorry?

16             THE COURT:  What relevance do they have?  I understand

17   they're somewhat tied.  But what relevance does it have?  He's

18   raised that objection.

19             MR. SHUNK:  Your Honor, we believe that the value that

20   Hitachi is willing to pay for the technology is a factor to be

21   considered in computing a reasonable royalty for the licensing

22   of the I'm InTouch product -- I'm sorry -- for licensing of the

23   '479 patent.

24             MR. STONER:  Hitachi is not a licensee, Your Honor.

25             THE COURT:  Objection sustained.

1   BY MR. SHUNK:

2   Q.  Mr. Cheung, would you look at Plaintiff's Exhibit 18?

3   A.  Yes.

4   Q.  What is Exhibit 18?

5   A.  Exhibit 18 is some snapshot of a video taken by Hitachi

6   during the COMDEX trade show.

7   Q.  Does it accurately reflect your marketing of the I'm InTouch

8   service in 2000?

9   A.  Yes, it does.

10          MR. SHUNK:  Your Honor, I move admission of Plaintiff's

11  Exhibit 18.

12          MR. STONER:  Object, Your Honor.  Your Honor already

13  excluded this last Friday.  This is their video of the trade

14  show.

15          MR. SHUNK:  Your Honor, we're not -- we don't plan to

16  show the video, but we just want to offer these photographs to

17  demonstrate that in fact it was a real product in 2000.

18          THE COURT:  Well, he's testified to that.

19          MR. SHUNK:  He has.

20          THE COURT:  Objection sustained.  I don't see what the

21  photographs have to add to it.  We're not scrutinizing what went

22  on.  The fact it went on, he's testified to it.

23  BY MR. SHUNK:

24  Q.  Have you received any help from the Canadian government for

25  the development and commercialization of the '479 patent

1  invention?

2  A.  Yes.

3  Q.  Tell the jury what sort of help you've received.

4  A.  In Canada there is a program called SRED program.  It stands

5  for Scientific Research and Experimental Development program,

6  whereby you get a certain percentage of your commercial

7  development project costs as a tax credit.

8  Q.  Take a look at Plaintiff's Exhibit 120.

9  A.  Yes.  I have it here.

10  Q.  What is it?

11  A.  This is the report we generate each year to -- in order to

12  qualify for the SRED investment tax credit.

13  Q.  What's the date of the report?

14  A.  The date of report was written in November 2000, and it was

15  about the fiscal year ended November 31, 2000.

16  Q.  Does this report show when your company first began seeking

17  tax credits for the work it was doing to commercialize I'm

18  InTouch?

19  A.  Yes, it does.

20       MR. SHUNK:  Your Honor, I move admission of Plaintiff's

21  Exhibit 120.

22       MR. STONER:  No objection.

23       THE COURT:  It's admitted.

24  BY MR. SHUNK:

25  Q.  Where do you discuss the I'm InTouch service in the

1  document?

2  A.   We discuss about the I'm InTouch project in page -- let me

3  turn to that -- 11705.   The project code name is iServer.

4  Q.   Is that an internal code name?

5  A.   It was an internal code name.

6  Q.   Generally -- without reading it, generally, what are you

7  describing in that section?

8  A.   In that section we're talking about the -- the challenge or

9  the expected challenge that we will face when we were doing the

10 commercial product development on the iServer project.

11 Q.   You discuss challenges.   Did you have a functioning product

12 at that time?

13 A.   Yes.

14 Q.   Well, why were you talking about challenges still?

15 A.   As you know, SRED documents describe the commercial project

16 development.   And commercial product, as you can tell, continues

17 to face challenge to how you can improve, further improve over

18 the year.   We're still facing challenge today.

19      And one thing I think worth mentioning is that there is a

20 difference between scientific invention and commercial product

21 development, just like there are many years between a concept

22 car and a actual production available product.

23 Q.   Has the I'm InTouch service won any awards over the years?

24 A.   Yes.

25 Q.   Give the jury an example.

1  A.  We won -- for example, in 2001 we won the TMC Product of the

2  Year award.

3  Q.  Take a look in the box, would you, for Plaintiff's

4  Exhibit 24.  What is it?

5  A.  This is the actual plaque we receive representing that award

6  from TMC, Product of the Year.

7          MR. SHUNK:  Your Honor, we would move admission of

8  Plaintiff's Exhibit 24 in the form of a photograph of the

9  plaque.

10         MR. STONER:  No objection.

11         THE COURT:  It's admitted.

12 BY MR. SHUNK:

13 Q.  Give the jury one more example.

14 A.  Another example was in 2006, we won the award from

15 VARBusiness magazine -- which was a tech --

16     VAR, V-A-R, yeah, VARBusiness magazine.  It is called a Tech

17 Innovation award for the category of Best Business Tool.

18 Q.  Would you look for and hold up Plaintiff's Exhibit 25?

19     What is that?

20 A.  That was the actual plaque we receive winning that

21 VARBusiness magazine award of tech innovation in the category of

22 best business tool.

23 Q.  Andrew --

24         MR. SHUNK:  I'm sorry.  Before I ask that question,

25 Your Honor, we move the -- again, the admission of Plaintiff's

1    Exhibit 25 in the form of a photograph of that plaque.

2              MR. STONER:  No objection.

3              THE COURT:  It's admitted.

4    BY MR. SKUNK:

5    Q.  Now, Andrew, if LogMeIn had come to you in 2005 and said

6    we'd like to license your technology so we can make a competing

7    product in the United States and pay you a royalty, what would

8    you have wanted to receive as a royalty?

9              MR. STONER:  Objection, Your Honor.  This is a

10   speculative, hypothetical question.

11             THE COURT:  It is speculative, isn't it?

12             MR. SHUNK:  Your Honor, the question of the

13   hypothetical reasonable royalty negotiation between the two

14   parties is an important part of the *Georgia-Pacific* factors for

15   the --

16             THE COURT:  I'm sure you'll have somebody testify about

17   that.

18             MR. SHUNK:  We will, but --

19             THE COURT:  Objection sustained.

20   BY MR. SKUNK:

21   Q.  Andrew, I just have two more questions.  This is the first

22   of those two.

23       Did you -- did you hear Mr. Stoner mention in his opening

24   statement that there was evidence, he believed, that you had

25   stolen some aspects of the computer code for I'm InTouch?

1    A.  I heard that.

2    Q.  Is there any truth to that?

3    A.  Absolutely not.

4          MR. SHUNK:  Thank you very much, Your Honor.  That

5    concludes our direct examination.

6          THE COURT:  All right.  Cross-examine.

7          MR. STONER:  May I proceed, Your Honor?

8          We also have binders of exhibits for the witness to use

9    during the examination which we can share with Your Honor and

10   opposing counsel --

11         THE COURT:  All right.

12         MR. STONER:  -- if the marshal would kindly pass up.

13         Also, copies of Mr. Cheung's transcripts of his

14   depositions.

15                      CROSS-EXAMINATION

16   BY MR. STONER:

17   Q.  Mr. Cheung, let's first give the jury some context.  You

18   don't claim to have invented remote access to a computer, do

19   you?

20   A.  No.

21   Q.  Other people had invented that concept before you, correct?

22   A.  I don't know if the invention or not, but it is a product

23   that -- like remote access has been there, as I testified, long

24   time ago.

25   Q.  You know that you cannot patent what other people have

1    already invented, right?

2    A.  Yes.

3    Q.  You know that if you do patent what other people have

4    invented, your patent is invalid, right?

5    A.  Yes.

6    Q.  Now, you don't also claim to have invented remote access to

7    a computer across a firewall, do you?

8    A.  We claim about remote accessing the specific way described

9    in my patent.

10   Q.  But before you, there were other people who already invented

11   systems for accessing computers across a firewall, right?

12   A.  There are other ways of doing the same.  If there are such a

13   thing, yeah, they exist.

14   Q.  Let me show you one example of that.  It's in your binder.

15   It's Defendant's Exhibit 28.  If you could, please --

16   A.  We cannot find it.  Which book?  There are many books here.

17   Q.  The three-ringed binder.

18   A.  There is -- there is no three-ringed binder.

19   Q.  Defendant's Exhibit --

20   A.  I'm sorry.  Which number are you talking about?

21   Q.  Defendant's Exhibit 28.

22   A.  Yes.

23   Q.  Do you have that before you?

24   A.  I -- I have it here.

25   Q.  It's a patent to Mr. Crichton of IBM, correct?

1    A.   Yes.

2    Q.   You've seen it before, correct?

3    A.   I have seen it before.

4    Q.   It was filed in March 1997, correct?

5    A.   Yes.

6    Q.   That was before you did your work, right?

7    A.   Yes.

8    Q.   So this is work someone else invented before you, correct?

9    A.   Yes.

10   Q.   Now, if you could turn to Fig. 10 of that patent.   Do you

11   have that before you?

12   A.   Yes, I see it here.

13   Q.   It shows a remote access system, doesn't it?

14   A.   It shows some kind of system they describe.

15            MR. STONER:   Your Honor, I offer exhibit -- Defendant's

16   Exhibit 28.

17            MR. SHUNK:   No objection.

18            THE COURT:   It's admitted.

19            MR. STONER:   And, Your Honor, with your permission I'd

20   like to show the jury the diagram in Fig. 10 of this patent and

21   so I -- as I examine Mr. Cheung, they can follow along.

22            THE COURT:   They can see it when they retire to

23   deliberate on their verdict.   You ask him the question you want

24   to ask him.

25            MR. STONER:   Sure.

1  BY MR. STONER:

2  Q.  Fig. 10 of Mr. Crichton's patent shows two computers,

3  correct?

4  A.  Yeah.

5  Q.  It shows a server in between the two, correct?

6  A.  It show three boxes.

7  Q.  And it's called a SOCKS server, correct?

8  A.  It's called SOCKS server, yes.

9  Q.  It's connected to the Internet.  It says Internet, right?

10  A.  Yes.

11  Q.  And there's a firewall protecting each of the computers,

12  correct?

13  A.  Yes.

14  Q.  It shows remote access communication between those two

15  computers across the firewalls, right?

16  A.  Yes.

17  Q.  Now, Mr. Cheung, I think you told the jury that prior art

18  remote access systems were useless for the Internet.  Did you

19  say that?

20  A.  Can you repeat what exact -- useless?  I don't think I used

21  that word.

22  Q.  My recollection, and tell me if I'm wrong, was you told the

23  jury that prior art remote access systems were useless for the

24  Internet.  Did you say that?

25  A.  I didn't say that.

A. Cheung - Cross                                        135

1    Q.  It's not true, is it?

2    A.  I did not say that.

3    Q.  Well, it's not true, is it?

4    A.  I did not say useless.

5    Q.  It's not true the prior art systems were useless for the

6    Internet?

7    A.  It's not true that I said that.  That's my answer.

8    Q.  Well, it's also not true that prior art systems were useless

9    for the Internet, is it?

10   A.  I'm sorry.  I don't understand your question.

11   Q.  All right.  Now, March of 1997, when Mr. Crichton filed his

12   patent application, was actually years before you did your work,

13   right?

14   A.  Can I take a look again at the date?  Yeah, it was a few

15   months before I -- before I had my document.

16   Q.  Well, Mr. Cheung, you told the jury in your direct

17   examination over and over again that you thought of your

18   invention in your patent in September 1997, correct?

19   A.  Yes.

20   Q.  That's not true, is it?

21   A.  That's true.

22   Q.  Well, Mr. Cheung, you remember you told the jury that you

23   submitted materials to the patent office trying to get your

24   patent speeded up so you could sue people?  Do you remember

25   that?

1   A.   Yes.

2   Q.   One of those materials you submitted to the patent office

3   was a detailed sworn declaration about when you made your

4   invention, right?

5   A.   Yes.

6   Q.   Let's take a look at that, Defendant's Exhibit 177, in your

7   binder.

8   A.   Yes, I have it here.

9   Q.   Do you have it before you?

10  A.   Yes.

11  Q.   It is the Declaration of Andrew Cheung, correct?

12  A.   Yes.

13  Q.   That's you, correct?

14  A.   That's me.

15  Q.   You submitted this to the patent office in November 2002,

16  correct?

17  A.   Yes.

18  Q.   That was 11 years ago, right?

19  A.   Approximately.

20  Q.   You would agree you remember things better closer in time to

21  when they happened than ten years later, right?

22  A.   That's not necessarily true.

23  Q.   Well, let's look at what you told the patent office.

24  Declaration of Andrew Cheung.  I, Andrew Cheung, the president

25  of 01 Communique Laboratory, Inc.

1          Do you see that?  That's where you begin.

2   A.   Yes, I see that.

3   Q.   And you go on to say you duly swear, depose, and say.

4          Do you see that?

5   A.   Yes.

6   Q.   And then you say, quote, the invention described in U.S.

7   Application No. 09/595,533 (the "Application").

8          You see that?

9   A.   Yes, I see that.

10  Q.   That's the application that led to the '479 patent here,

11  right?

12  A.   Right.

13  Q.   And you go on to say, was conceived of in November 15, 1999.

14         Do you see that?

15  A.   I see that.

16  Q.   You wrote that November 15, 1999, letter in there, right?

17  A.   Yes.

18  Q.   So it was actually not 1997 but 1999 when you conceived your

19  invention, right?

20  A.   It was 1997.

21  Q.   So you didn't tell the truth to the patent office?

22  A.   I told the truth to the patent office.

23  Q.   You told the patent office it was conceived November 15,

24  1999, right?

25  A.   I told the patent office what I believe at that time.

1   Q.  Right.  Now, you had lawyers help you file this declaration,

2   right?

3   A.  Yes.

4   Q.  You were trying to get the patent office to hurry up and

5   issue your patent, right?

6   A.  Yes.

7   Q.  You wanted to be very truthful at that time, right?

8   A.  I always being truthful to the patent office.

9   Q.  You were truthful when you say your -- your invention was

10  conceived November 15, 1999, correct?

11  A.  That's what's -- what I believe at that time.

12  Q.  And that was more than two years after Mr. Crichton filed

13  his patent application, right?

14  A.  That day was.

15  Q.  Let me show you another piece of prior art.  Defendant's

16  Exhibit 27 --

17          MR. STONER:  I'm sorry, Your Honor.  I offer

18  Defendant's Exhibit 177.

19          MR. SHUNK:  No objection.

20          THE COURT:  It's admitted.

21  BY MR. STONER:

22  Q.  Show you Defendant's Exhibit 27.

23  A.  27?  I'm sorry.  Which book are you referring to?  These are

24  200-something.

25  Q.  Defendant's Exhibit 27.

1    A.   Yeah, I got like -- this is 200-something.  I don't see

2    anything.  Would it be in these books?

3    Q.   Sorry.

4         MR. STONER:  I'm sorry, Your Honor.

5         THE WITNESS:  Thank you very much.  Did you say 27?

6    BY MR. STONER:

7    Q.   Yes.

8    A.   Yes, I have it here.

9    Q.   It's a patent with the numbers '888 that issued to

10   Mr. Hickman and Mr. Gough, correct?

11   A.   Yes.

12   Q.   You've seen it before, correct?

13   A.   I've seen it before.

14   Q.   Concerns a remote access system, correct?

15   A.   Yes.

16        MR. STONER:  Your Honor, I would offer Defendant's

17   Exhibit 27.

18        MR. SHUNK:  No objection.

19        THE COURT:  It's admitted.

20   BY MR. STONER:

21   Q.   The '888 patent was filed February 1997, correct?

22   A.   Yes.

23   Q.   Before you did your work, no matter how you count that,

24   right?

25   A.   Yeah, that was a few months before the September 1997.

1  Q.  And maybe you can read the first sentence of the abstract of

2  this '888 patent, describing what its invention was.

3  A.  I think you're taking things out of context, but I don't

4  mind reading it.  The present invention permits virtually the

5  entire functionality of a computer system to be made accessible

6  over a network, such as the Internet or intranet.

7  Q.  The first sentence of Mr. Hickman's '888 patent says, quote,

8  the present invention permits virtually the entire functionality

9  of a computer system to be made accessible over a network such

10  as the Internet or intranet, unquote, correct?

11  A.  That's what it says in the first sentence.

12  Q.  That says what you claim is your invention, right?

13  A.  I would not agree.

14  Q.  Does your invention, your patent, permit virtually the

15  entire functionality of a computer system to be made accessible

16  over a network such as the Internet or an intranet?

17  A.  We didn't say that in the patent.  If you want me to repeat

18  what the patent is, I wouldn't mind.

19  Q.  So that does not describe your invention, correct?

20  A.  That one sentence does not describe.

21  Q.  And so if someone does what's in that sentence, they're

22  doing something different from your patent, right?

23  A.  I don't know how to answer that question.  You're taking out

24  of context.  I cannot under -- understand your question.  I'm

25  sorry.

1   Q.   Mr. Cheung, let's turn to Fig. 1 of the '888 patent.

2        Fig. 1 shows a remote access system, correct?

3   A.   Fig. 1 shows two computer and an Internet in between.

4   Q.   The two computers, Fig. 1 of the '888 patent shows a host

5   computer, correct?

6   A.   Yes.

7   Q.   It shows a client computer, correct?

8   A.   Yes.

9   Q.   And it shows a -- the Internet in between the two, correct?

10  A.   Yes.

11  Q.   Cloud?

12  A.   Yes.

13  Q.   Looks just like your figure in your drawing, doesn't it?

14  A.   I won't say it looks similar.  It's the Internet.

15  Q.   And it has servers in The Cloud connecting the host and

16  client computers, correct?

17  A.   I couldn't say correct because it wasn't -- it wasn't shown

18  like that, but it has some server there.  Doesn't show that it

19  was connecting them.

20  Q.   There's a box called web server, correct?

21  A.   Yes.

22  Q.   Box called web page, correct?

23  A.   Yes.

24  Q.   Shows arrows showing communication between the host and

25  client computers, correct?

1   A.   Yes.

2   Q.   All of this was done before you did your work, right?

3   A.   Yes.

4   Q.   Let's talk now about the work you did.  The I'm InTouch

5   product that you developed was introduced commercially in 2001,

6   correct?

7   A.   Commercially it was -- it was announced available at COMDEX

8   show November of 2000.

9   Q.   And you filed for a patent on that product, did you not?

10  A.   We filed patent for the technology using that product, not

11  the product.

12  Q.   The I'm InTouch product is covered by your '479 patent,

13  correct?

14  A.   The -- I think the other way around.  The patent covers that

15  product.

16  Q.   And I'm sure you wish it were otherwise, Mr. Cheung, but the

17  I'm InTouch product did not do very well in the market, did it?

18  A.   The I'm InTouch product -- if -- if you -- your question is

19  whether we were not doing very well because we have a product

20  out there called LogMeIn giving away for free, yes, the answer

21  is correct.

22  Q.   When you introduced the I'm InTouch product in March 2001

23  commercially, LogMeIn was not in the market, was it?

24  A.   They were not in the market, yes.

25  Q.   They weren't in the market in 2002 either, were they?

1   A.   Yes.

2   Q.   They weren't in the market in 2003 either, were they?

3   A.   Yes.

4   Q.   And they weren't in the market the first third of 2004, were

5   they?

6   A.   Yes.

7   Q.   During that entire time, your I'm InTouch product did not do

8   very well, right?

9   A.   At that time it was another competitor called Citrix.   I

10  think we talk about that also, and also because during that time

11  it was the infant stage of the market.

12  Q.   Mr. Cheung, I'd like you to turn back to a document written

13  before this lawsuit, to Defendant's Exhibit 47.

14  A.   47 is in the same binder?   Yep, I see 47 here.   Okay.

15  Q.   Do you have that before you?

16  A.   Yes, I do.

17  Q.   This document, Defendant's Exhibit 47, is called an annual

18  information form, correct?

19  A.   Yes.

20  Q.   This an official publication that your company has to put

21  out to the public and your shareholders under Canadian

22  securities laws, correct?

23  A.   Yes.

24  Q.   And you as CEO, of course, review these to make sure they're

25  completely truthful and accurate, correct?

1   A.   Yes.

2   Q.   Defendant's Exhibit 47 is dated February 11, 2005, correct?

3   A.   Yes.

4   Q.   And in this document you're reporting to your shareholders

5   and to the world about your business, right?

6   A.   Yes.

7   Q.   And you're trying to tell them the truth, right?

8   A.   Yes.

9   Q.   Let's turn to page -- page 6 of Defendant's Exhibit 47.   You

10  have that?

11  A.   Yes.

12  Q.   And there's a section of the document called Lack of

13  Revenue, Profitability, Liquidity and Capital Resources.

14       Do you see that?

15  A.   Yes.

16  Q.   In this paragraph you talk about your I'm InTouch product,

17  right?

18  A.   Yes.

19  Q.   And you say, quote, the future of the company is heavily

20  dependent on its ability to build revenue from its remote access

21  service I'm InTouch.   The service -- service was first made

22  commercially available in March 2001, but was not effective in

23  capturing market share, unquote, correct?

24  A.   Yes.

25  Q.   Did I read that correctly?

1   A.   I think word by word you read that correctly.

2   Q.   Okay.

3           MR. STONER:   I'd offer Defendant's Exhibit 47.

4           MR. SHUNK:   No objection.

5           THE COURT:   It's admitted.

6   BY MR. STONER:

7   Q.   Now, I want to examine this statement that you and your

8   company made back in 2005 in Defendant's Exhibit 47.

9       You said you made your I'm InTouch service commercially

10  available in March 2001, correct?

11  A.   Yes, that's what it says here.

12  Q.   And as of February 2005, almost four years later, the

13  product was not effective in capturing market share, correct?

14  A.   Yeah.   If your question is about whether we are not

15  capturing market as effective as we like to be, the answer is

16  yes.

17  Q.   Now, market share is a business concept that talks about all

18  the people out there who might want remote access service, how

19  many pick yours, right?

20  A.   Yes.

21  Q.   And capturing market share is persuading people to buy your

22  product as opposed to someone else's, right?

23  A.   I think market share is about how -- like how many percent

24  you have in that market.   It's not to persuade people buying

25  your product.   It's kind of the other way around.

1    Q.  Well, people have a choice whose products to buy, right?

2    A.  Yes.

3    Q.  Competition, right?

4    A.  Yes.

5    Q.  And some people choose to buy your product, right?

6    A.  Yes.

7    Q.  And some people choose to buy other products, right?

8    A.  Yes.

9    Q.  They have a choice?

10   A.  Yes.

11   Q.  And your product was not effective in capturing market

12   share?

13   A.  As I say, we were not capturing market share as well as we'd

14   like to be.

15   Q.  Even before LogMeIn was in the market, right?

16   A.  Yes.

17   Q.  And your company has lost money every year since you've

18   introduced your patented I'm InTouch product; isn't that true?

19   A.  If your question, again, was because we have people out

20   there using our technology without permission, first of all by

21   Citrix, then by LogMeIn giving away for free, your -- my answer

22   is absolutely, yes.

23   Q.  And all of this time before you filed this lawsuit, you

24   never sent a letter to LogMeIn saying they infringed, correct?

25   A.  I think I testify, again, we cannot do that until the fall

1   of 2010.

2   Q.  You didn't send a letter, correct?

3   A.  No.

4   Q.  You're a big enough company you can afford a postage stamp,

5   right?

6   A.  We can certainly afford a postage stamp, but we cannot

7   afford the consequence of doing that.

8   Q.  Do you ever pick up the phone and call Mr. Simon here and

9   say, you know, we have a patent that we're concerned that you're

10  violating?  Did you ever do that?

11  A.  No, we didn't do that because it may trigger very well like

12  a lawsuit that we cannot afford to fight.

13  Q.  Did LogMeIn ever threaten to sue you?

14  A.  No.

15  Q.  Did LogMeIn ever say if you told them about a patent, they

16  were going to sue you?

17  A.  They will understand that such an action would cause a

18  lawsuit.

19  Q.  Well, Mr. Cheung --

20  A.  We don't even have a patent at certain point in time.

21  Q.  Before you had a patent, did you call up Mr. Simon and say,

22  you know, we have a patent that's coming out, we think you're

23  going to violate it?

24  A.  We don't have the patent.  We cannot do anything.

25  Q.  You didn't try, did you?

 1   A.   How can we without a patent?

 2   Q.   Now, Mr. Cheung, the I'm InTouch product has never been

 3   effective in capturing market share even today, correct?

 4   A.   Yes.

 5   Q.   Back in 2001, you decided to focus your business on your

 6   patented product I'm InTouch, right?

 7   A.   By 2001, we don't have the patent so I -- I think I

 8   cannot -- I cannot answer that question.  There was some logical

 9   error there.  Sorry.

10   Q.   Back in 2001 you decided to focus your business --

11   A.   Yes.

12   Q.   -- your business --

13   A.   Uh-huh.

14   Q.   -- on I'm InTouch, right?

15   A.   That's correct.

16   Q.   I'm InTouch became the main product of your company, right?

17   A.   Correct.

18   Q.   And it hasn't been successful, right?

19   A.   As I said, again, it has not been as successful as we want

20   it to be.

21   Q.   And there's a reason for that, right?

22   A.   There is a reason.

23   Q.   It has nothing to do with anyone else other than yourself,

24   correct?

25   A.   I disagree.

1   Q.  Well, Mr. Cheung, in today's world, as a software engineer

2   you know that being able to serve millions of people with a

3   computer service requires you to use multiple servers and

4   computers with multiple kinds of software, right?

5   A.  That's what we call distributive processing, as I testified

6   before, load balancing.

7   Q.  Yeah.  That's the way LogMeIn's system works, right?

8   A.  Well, the system has no balancing.  You know, any system

9   serving more than a few hundred people would need load

10  balancing.

11         MR. STONER:  Your Honor, I think I forgot to offer

12  Defendant's Exhibit 47.

13         MR. SHUNK:  No objection.

14         THE COURT:  It's admitted.

15         MR. STONER:  Thank you.

16  BY MR. STONER:

17  Q.  Well, Mr. Cheung, you talked to the jury about one of the

18  submissions you made to the Canadian government about your I'm

19  InTouch product asking for money, correct?

20  A.  I shouldn't say asking for money.  It was -- let me describe

21  again.  It was something that you describe, a commercial product

22  development, and portion of the investment spent in commercial

23  development you can get back as a credit to -- as a tax credit.

24  Q.  So you made submissions to the Canadian government asking

25  for a tax credit, right?

1   A.   Yes.

2   Q.   You described the work you were doing on your I'm InTouch

3   product, right?

4   A.   Yes.

5   Q.   To patent the product that's covered by your '479 patent,

6   right?

7   A.   Yes.

8   Q.   Let me show you one of those documents that Mr. Shunk did

9   not show you.   It's Defendant's Exhibit 173.

10  A.   173.   I think it is not in this book.   Which book would

11  it -- this book only goes up to -- oh, yeah.   17 -- is it 173?

12  Q.   Yes.

13  A.   Yes.   Right here.

14  Q.   Do you have that before you?

15  A.   Yes.

16  Q.   This is one of the technical submissions that 01 Communique

17  Laboratory made to the Canadian government, correct?

18  A.   Yes.

19  Q.   And this one is dated June 30, 2004, correct?

20  A.   Yes.

21  Q.   Which is about four years after you filed your patent

22  application, right?

23  A.   Yes.

24  Q.   In this you describe work on the iServer or I'm InTouch

25  product, correct?

1   A.   Let me turn to the -- which page are you referring to?  It's

2   not a -- not a short document.

3   Q.   It would be page 25.

4   A.   Yes.  Yes, I found it here.

5   Q.   Do you have that before you?

6   A.   Yes.

7   Q.   Page 25 of Defendant's Exhibit 173 concerning project code

8   iServer, correct?

9   A.   Yes.

10  Q.   That was the code name for I'm InTouch, correct?

11  A.   Yes.

12  Q.   And in this document you describe some problems you're

13  having with the iServer project, right?

14  A.   Yes.

15  Q.   You were the chief engineer on this project, right?

16  A.   Yes.

17  Q.   And the problem you describe on page 25 is, quote, server

18  farming, unquote.  Correct?

19  A.   Yes.

20  Q.   Server farming is using multiple servers, platforming,

21  right?

22  A.   Server farming is about what I called before, load

23  balancing.

24  Q.   Part of the distributed architecture?

25  A.   Yes.

1    Q.  All right.  And in the first paragraph you say here, quote,

2    with the completion of many different phases of the iServer

3    project, we are beginning to encounter a related problem,

4    multiple servers platform.

5        Do you see that?

6    A.  Yes.

7    Q.  And let's go down the page to part 2-C where you talk about

8    the technological uncertainties, correct?

9    A.  Yes.

10   Q.  It says, quote, first of all, the biggest uncertainty is

11   that we are not sure at all whether the farming can work without

12   affecting the efficiency of data delivery throughput, unquote.

13   Correct?

14   A.  Yes.

15   Q.  I read that correctly?

16   A.  Yes.

17   Q.  That was true at the time in 2004, correct?

18   A.  Yes.

19   Q.  Even though you had filed your patent application four years

20   earlier, correct?

21   A.  We always face problem in the commercial product development

22   as to which way work better, which way work more efficient, so,

23   yeah.  As I said, even until today we're still facing problems.

24   Q.  And the problem here is you weren't even sure your

25   architecture could function with multiple servers, right?

1    A.   In terms of efficiency, yes.

2    Q.   Well, the last sentence in that paragraph says, quote, now,

3    if the locator registration servers and locator portal servers

4    are located in different machines, we're not sure how the

5    architecture can still function, unquote.  Correct?

6    A.   As I said, what it meant, taking the whole context together,

7    was that --

8    Q.   Mr. Cheung --

9    A.   -- we have a problem -- we have a problem about an

10   efficiency in terms of a commercial project development.

11   Q.   Mr. Cheung, did I read the document correctly?

12   A.   Yes, you're reading the words word by word.

13   Q.   I read it correctly, right?

14   A.   You didn't read the whole thing, but you read one or two

15   sentence.   Yeah.

16   Q.   You told the Canadian government in 2004 that if you put

17   your locator registration servers and the locator portal servers

18   are located in different machines, we are not sure how the

19   architecture can still function, unquote.  Correct?

20   A.   Yes.

21   Q.   You told the truth, right?

22   A.   Yes.

23   Q.   Now, you also got feedback from your customers on your

24   patented technology, correct?

25   A.   Yes.

1              MR. STONER:  Let me back up.  I'm sorry, Your Honor.

2      I'd offer Defendant's Exhibit 173.

3              MR. SHUNK:  No objection.

4              THE COURT:  It's admitted.

5      BY MR. STONER:

6      Q.  By the way, you never told the patent office about

7      Defendant's Exhibit 173, did you?

8      A.  Which is the -- oh, the one that you showed me?

9      Q.  Yes.

10     A.  No.

11     Q.  It talks about whether your server architecture could work

12     with multiple servers, correct?

13     A.  Yes.

14     Q.  And you say you're have -- you're not sure whether it will

15     function, correct?

16     A.  As I said in the document paper here, we were talking about

17     how a commercial project development would, you know, be better

18     this way or that way in the efficiency's point of view.

19     Q.  You never told the patent office about this document, did

20     you?

21     A.  No.

22     Q.  The next page of the document you actually say you built a

23     prototype trying to work this way and it crashed, right?

24     A.  Yes.

25     Q.  Did you tell the patent office that?

1    A.   No.

2    Q.   Let's talk about LogMeIn.   LogMeIn introduced its product in

3    April 2004, right?

4    A.   It's around the timeline.   That's good.

5    Q.   And when you were talking about that record of downloads of

6    I'm InTouch showing Mr. Anka downloaded your product, that was

7    after LogMeIn already had a product on the market, right?

8    A.   I think it was around that time.   It's around maybe a little

9    earlier, but it's around those months.

10   Q.   LogMeIn already had a product on the market before they ever

11   looked at yours, right?

12   A.   I don't know whether I can -- I qualify to answer that

13   question.

14   Q.   Right.   You looked at LogMeIn's product too, right?

15   A.   Yes.

16   Q.   And you put your protocol analyzer on it and all of that,

17   right?

18   A.   Yes.

19   Q.   Now, when LogMeIn introduced its product, you learned about

20   it right away, right?

21   A.   Yeah, within a few months.

22   Q.   You learned of LogMeIn by May 2004, the next month at least,

23   right?

24   A.   Around that time.

25   Q.   Right after they introduced the product, right?

1   A.   As I said, within a few months.

2   Q.   Now, this was before you had a patent, right?

3   A.   Yes.

4   Q.   LogMeIn introduced its product before 01 Communique had the

5   '479 patent, right?

6   A.   Yes.

7   Q.   Years before, right?

8   A.   Yes, one year about.

9   Q.   One year.  Now, when you saw LogMeIn's product, you saw it

10  was a competitor, right?

11  A.   Yes.

12  Q.   They had a remote access product on the market, right?

13  A.   Yes.

14  Q.   They were offering it for free, right?

15  A.   Yes.

16  Q.   Or offering a version of it for free, right?

17  A.   Yes.

18  Q.   And you saw that as a competitive threat?

19  A.   Yes.

20  Q.   And, in fact, you reported that to your company officially,

21  didn't you?

22  A.   Yes.

23  Q.   Let's take a look, just so this is documented, in

24  Defendant's Exhibit 167.

25  A.   Yes, I have it here.

1    Q.  Defendant's Exhibit 167 are some minutes to the board of

2    directors of your company, 01 Communique Laboratory, correct?

3    A.  Yes.

4    Q.  Dated December 13, 2004, right?

5    A.  Yes.

6    Q.  And the board of directors are the people who run your

7    company, right?

8    A.  Yes.

9    Q.  You're one of them, right?

10   A.  I'm one of them.

11   Q.  And you're describing what happened at a meeting in

12   December 2004 and documenting it for history, right?

13   A.  Yes.

14   Q.  The meeting was at the Mississaugua Golf and Country Club,

15   right?

16   A.  Yes.

17   Q.  That's where you held your board meetings?

18   A.  Yes.

19   Q.  And you talked about LogMeIn, right?

20   A.  Yes.

21   Q.  Let's turn to page -- they're not numbered.  It's the third

22   page of Defendant's Exhibit 167.

23   A.  Yes, I have it here.

24   Q.  There's a report from CEO, correct?

25   A.  Yes.

1   Q.   That's you, right?

2   A.   Correct.

3   Q.   And it says, Mr. Andrew Cheung reported that a new

4   competitor called LogMeIn had been caressively offering a free

5   remote control service, unquote.

6        Do you see that?

7   A.   Yes.

8   Q.   That's true, right?

9   A.   True.

10             MR. STONER:   I'd offer Defendant's Exhibit 167.

11             MR. SHUNK:   No objection.

12  BY MR. STONER:

13  Q.   So -- by the way, you don't have a problem with companies

14  giving away products for free, do you?

15  A.   Well, if your question is do I have a problem people giving

16  away their product for free, I never have those kind of problem.

17  But I -- but I do have problem with people giving away my

18  technology for free without permission.

19  Q.   You don't have a problem with the concept of people giving

20  away products for free, right?

21  A.   I say it again.   I don't have problem with, again, the

22  concept people give away their product or technology for free,

23  but I do have a big problem if they are giving away our product

24  and my technologies for free.

25  Q.   You don't know whether LogMeIn infringes or not, do you,

1    sir?

2    A.   I'm not a patent attorney so I cannot draw a legal

3    conclusion.   What I know was infringement was the -- is a legal

4    conclusion.   I'm not capable to draw that legal conclusion.   But

5    if you ask me do I believe LogMeIn infringe, I certainly

6    believe.

7    Q.   Mr. Cheung, you're a software engineer, right?

8    A.   Yes.

9    Q.   You're the inventor or named as an inventor on this '479

10   patent, right?

11   A.   Yes.

12   Q.   You've been looking at LogMeIn for years, right?

13   A.   Yes.

14   Q.   You analyze their products, right?

15   A.   Yes.

16   Q.   And you testified under oath in this lawsuit before this

17   trial you didn't know whether LogMeIn infringed or not, right?

18   A.   As I said, I am not a patent attorney so I do not know -- I

19   cannot draw to that legal conclusion.   I know that infringement

20   is a legal conclusion.   I have no capacity drawing to that

21   conclusion.   If you ask me do I believe, then --

22   Q.   I didn't ask --

23   A.   -- that's why I'm saying --

24   Q.   You don't know whether LogMeIn infringes or not, do you?

25   A.   I do not know if they infringe or not.

1   Q.  All right.  Now --

2           THE COURT:  Counsel, it's time for us to take a brief

3   recess.

4           MR. STONER:  Sure.

5       (Recess taken at 3:47 p.m.)

6           NOTE:  After the afternoon recess, the case on March

7   18, 2013 continues in the presence of the jury as follows:

8   JURY IN

9           THE COURT:  All right.

10          MR. STONER:  Thank you, Your Honor.  First I wanted to

11  make sure that Defendant's Exhibit 173 was in evidence.  It was

12  offered and there was no objection.  I just wanted the record to

13  be clear.

14          THE COURT:  It is admitted.

15          MR. STONER:  Thank you.

16  BY MR. STONER: (Continuing)

17  Q.  Mr. Cheung, I just wanted to go back briefly to one point.

18      You told the jury, I believe twice, that you spent over

19  $25 million making the invention of the '479 patent?

20  A.  I think what I said was we spent over $25 million

21  developing, inventing, patenting, and commercializing I'm

22  InTouch.

23  Q.  So, it wasn't all making the invention, right?

24  A.  No.

25  Q.  In fact, you don't know how much money you spent, if any,

 1  before you made your invention, do you?

 2  A.  We didn't do that calculation.

 3  Q.  And you don't remember, do you?

 4  A.  I -- yeah, we have not done that calculation.

 5  Q.  And you don't know how much money you and your co-inventors

 6  spent on it either, do you?

 7  A.  No.

 8  Q.  And there is nothing that could refresh your memory, is

 9  there?

10  A.  At this point sitting here, no.

11  Q.  Now, let's talk about -- go back to LogMeIn and your

12  dealings with LogMeIn.

13      So, as of 2004, LogMeIn is in the market and you know about

14  them, correct?

15  A.  Yes.

16  Q.  You see they're a competitor, right?

17  A.  Yes.

18  Q.  You think that they may be taking away your business, right?

19  A.  Yes.

20  Q.  Now, you believe in competition, don't you, Mr. Cheung?

21  A.  Yes.

22  Q.  As long as it's fair competition, right?

23  A.  Yes.

24  Q.  You don't like unfair competition, right?

25  A.  Correct.

1  Q.  Patent infringement is a form of unfair competition, isn't

2  it?

3  A.  Yes.

4  Q.  Patent infringement, if there is any infringement, is unfair

5  competition, right?

6  A.  Yes.

7  Q.  So, let's move on to 2005.  LogMeIn is still in the market,

8  correct?

9  A.  Yes.

10 Q.  Still a competitor, correct?

11 A.  Yes.

12 Q.  Threatening your business, right?

13 A.  What's your question, I'm sorry?

14 Q.  LogMeIn in 2005 is threatening your business, right?

15 A.  Yes.

16 Q.  They're taking business away from you, probably, right?

17 A.  Yes.

18 Q.  And, in fact, you wanted to get rid of LogMeIn in 2005,

19 didn't you?

20 A.  If your question is about whether we want to stop them from

21 offering the free version, using our technology and giving it

22 away for free, absolutely, yes.

23 Q.  Well, isn't it true in July of 2005 you wrote an e-mail

24 saying you wanted to get rid of LogMeIn, using those words?

25 A.  Can you show me those lines?

1   Q.   Yes.   Look at Defendant's Exhibit 168 in your binders,

2   please.

3   A.   Yes.   I have it here.

4   Q.   The bottom part is an e-mail that you wrote to Mark Reed,

5   correct?

6   A.   Yes.

7   Q.   And you wrote it on July 21, 2005, correct?

8   A.   Yes.

9   Q.   And if you go down the page, you're talking about Citrix,

10  correct?

11  A.   Yes.

12  Q.   And you say:   They want to get rid of LogMeIn and MyWebEx as

13  much as we do.   Correct?

14  A.   Yes.

15  Q.   So, as of July 21, 2005, you wanted to get rid of LogMeIn,

16  right?

17  A.   Again, what I meant over there was we want to stop them

18  offering any free version, which is our technology.

19  Q.   You didn't say anything about your technology, did you?

20  A.   That's what I meant.

21  Q.   Well, let's see.   The very next month, August 2005, your

22  patent issues, right?

23  A.   Yes.

24  Q.   So, a month after you -- just a few weeks after you say you

25  want to get rid of LogMeIn, your patent issues, right?

1  A.   Yes.

2  Q.   But you can only get rid of a competitor using a patent if

3  they infringe; isn't that right?

4  A.   Yes.

5  Q.   So, if they don't infringe, you can't get rid of them using

6  the patent, right?

7  A.   Correct.

8  Q.   Now, you thought LogMeIn might be infringing, didn't you?

9  A.   If you're asking me do I believe they infringed, yes, I

10  believe they infringed.

11  Q.   Well, back in 2005, when your patent issued, you thought

12  LogMeIn might infringe, right?

13  A.   I believe there is a chance that they would infringe.

14  Q.   So, you investigated that question right away, didn't you?

15  A.   Yes.

16  Q.   You had your patent, correct?

17  A.   Yes.

18  Q.   You got a copy of LogMeIn's product and downloaded it,

19  right?

20  A.   Yes.

21  Q.   You hooked up your protocol analyzer to it, right?

22  A.   Yes.

23  Q.   Analyzed it and studied whether it infringed, right?

24  A.   I shouldn't say so because I am not a patent attorney.   I

25  can only compare some technical merits between the two product,

1   and I saw a lot of similarities.

2   Q.  You got lawyers to help you do this analysis, didn't you?

3          MR. SHUNK:  Objection, privileged.

4          THE COURT:  He is not asking for anything that was

5   said.  Objection overruled.

6   A.  Sorry, what was your question?

7   BY MR. STONER: (Continuing)

8   Q.  You got lawyers to help you do the analysis of whether

9   LogMeIn infringed, didn't you?

10  A.  In that analysis, no, I don't.  I didn't.

11  Q.  Well, Mr. Cheung, do you remember giving a deposition in

12  this case?

13  A.  Yes.

14  Q.  And just so it's clear to everyone, what we're talking about

15  is before this trial there was a proceeding called a deposition,

16  right?

17  A.  Yes.

18  Q.  Where I asked you questions and you gave answers just like

19  we're doing here today, right?

20  A.  Yes.

21  Q.  And before you gave those answers, you swore an oath to tell

22  the truth, correct?

23  A.  Yes.

24  Q.  Just like you have done today, right?

25  A.  Yes.

1   Q.   And you did tell the truth, right?

2   A.   Yes.

3   Q.   And after the deposition you had a chance to review it, to

4   see if it was correct, and make any changes, right?

5   A.   Yes.

6   Q.   Let's take a look at page 151 of your deposition from

7   January 26, 2011.

8            MR. SHUNK:  Do I have a copy, counsel?

9   A.   I don't have 151 here.

10           MS. GURVICH:  It's the one on top of the stack.

11  A.   It's a very thick document.  What page are you referring to?

12  BY MR. STONER: (Continuing)

13  Q.   Turn to page 151.

14           MR. SHUNK:  Pardon me, Your Honor, would counsel again

15  tell me the date of this?

16  Q.   January 26, 2011.

17       Do you have that before you, Mr. Cheung?

18  A.   Yes.

19  Q.   And at this proceeding under oath, I asked you the following

20  question:  Okay.  Let me ask you this.  In investigating whether

21  LogMeIn infringed, did 01 Communique engage lawyers to help in

22  that analysis?

23       Can you read the answer for the jury?

24  A.   Yes.  It says:  You know, in the official analysis, yes, we

25  would.

1    Q.   It was truthful testimony, correct?

2    A.   Absolutely.

3              MR. STONER:   Your Honor, I would offer Defendant's

4    Exhibit 168.

5              MR. SHUNK:   No objection to that.

6              THE COURT:   It is admitted.

7    BY MR. STONER: (Continuing)

8    Q.   And after you did your analysis and your investigation, you

9    concluded LogMeIn did not infringe, didn't you?

10   A.   No.

11   Q.   Well, Mr. Cheung, would you turn back a few pages in your

12   deposition of sworn testimony, page 148.

13   A.   Yes, I have it here.

14   Q.   I asked you this question at your deposition.   Question:

15   Isn't it true, Mr. Cheung, that in 2005 and 2006 you and your

16   counsel studied the LogMeIn product and concluded it did not

17   infringe your patent?

18       Do you see that?

19   A.   Yes.

20   Q.   Can you read the jury your answer.

21   A.   It said:   As I said, I don't recall.   I don't recall this.

22   Yes or no, I don't know how to answer that.

23             MR. SHUNK:   Objection, Your Honor, this is not

24   impeachment.

25   A.   Once again, I was not a patent attorney.   I cannot arrive at

 1   any conclusion.

 2            THE COURT:  What's your objection?

 3            MR. SHUNK:  The objection is that what he is reading is

 4   not impeachment of the prior statement of the witness.

 5            THE COURT:  Well, that's for the jury to decide.

 6   Objection overruled.

 7   BY MR. STONER: (Continuing)

 8   Q.  Well, let's look at what you did do or did not do back in

 9   2005 after your patent issued and you investigated LogMeIn's

10   product.

11        You did not sue LogMeIn, correct?

12   A.  Yes.

13   Q.  And as we talked before, you didn't send a letter, e-mail,

14   or anything for five years, right?

15   A.  Yes.

16   Q.  You talked about the re-examination as the reason for delay

17   in suing, right?

18   A.  It was one of the reasons.

19   Q.  Well, the re-examination didn't start until the end of 2007,

20   right?

21   A.  Yes.

22   Q.  So there is no re-examination in 2005, right?

23   A.  No.

24   Q.  Correct?

25   A.  Correct.

A. Cheung - Cross                                                    169

1   Q.   There is no re-examination in 2006, correct?

2   A.   Correct.

3   Q.   There is no re-examination in most of 2007, right?

4   A.   Correct.

5   Q.   And during those three years, you never even considered

6   suing LogMeIn, did you?

7   A.   During those three years, we have no ability to sue LogMeIn.

8   Q.   Well, during those three years, Mr. Cheung, you never even

9   considered suing LogMeIn, did you?

10  A.   As I said before, we have no ability to sue LogMeIn during

11  those three years.

12  Q.   Mr. Cheung, you gave another deposition in your lawsuit

13  against Citrix.  You have the transcript in front of you, and I

14  would like you to look that.

15  A.   Okay.  Can you direct me to which page?

16  Q.   April 6, 2007, pages --

17  A.   Is it this book?  Which book are you referring to?

18            THE COURT:  Look at the date on the front of it.

19            MS. GURVICH:  It's that one, sir.

20  A.   April 6, 2007, is that what you said?

21  BY MR. STONER:  (Continuing)

22  Q.   Correct.  Pages 88 through 89.

23  A.   Can you direct me to the page you are referring to?

24  Q.   Page 88.  Do you have that before you?

25  A.   88, right?

1  Q.  Correct.

2  A.  Yes, I have it here.

3  Q.  All right.  Let's -- for context, April 6, 2007, was

4  two-and-a-half years after your patent issued, right?

5  A.  Yes.

6  Q.  And three years or more after LogMeIn had been on the

7  market, correct?

8  A.  Yes.

9  Q.  And there was no re-exam going on at the time, correct?

10  A.  Yes.

11  Q.  You were asked the question, question:  Has 01 ever

12  anticipated bringing any other lawsuits with respect to the '479

13  patent?  Your answer was:  No, not that I aware of.

14      Correct?

15  A.  Are you referring to the bottom?  Let me read that.

16  Q.  Do you see the next page?

17  A.  Yes.  Yes.  I see that.

18  Q.  Question:  So the only company that 01 has ever considered

19  suing over the '479 patent is Citrix and Citrix Online, is that

20  correct?

21  A.  Yeah, at that time, yes.

22  Q.  And your answer was, answer:  Yes, at this point, yes, it

23  is.

24      Correct?

25  A.  Yes.

1    Q.  So, as of April 2007 you had never even considered suing

2    LogMeIn, right?

3    A.  I don't know how to qualify that.  You know, we haven't sued

4    LogMeIn at that time, that's correct.

5    Q.  You never even considered doing it, right?

6    A.  I don't know if I have considered or not, but certainly we

7    have not sued LogMeIn at that time.

8    Q.  Well, let's -- just to be clear then, I am being perfectly

9    fair here, let's go down the page.  And you were asked:  Did 01

10   ever give thought to suing other companies other than Citrix?

11        And do you see your answer?  You say --

12   A.  Is it the same page?

13   Q.  Same page, line 11, page 89.

14   A.  Yeah.  Okay.

15   Q.  Did 01 ever give thought to suing other companies?

16   A.  Yes, yes.  I see it here, yep.

17   Q.  Your answer was:  Well, I think we qualify a little bit

18   better, that we -- we went to the steps, you know, analyzing and

19   then believe and go ahead and pursue a lawsuit, that's the only

20   one.

21        Do you see that?

22   A.  Yes.

23   Q.  And then you say:  You dream about suing everybody in the

24   world.  We always dream, but never.

25        Do you see that?

1   A.   Yeah, exactly.  What I meant was you dream about suing

2   people infringing your solution and -- yeah.

3   Q.   You dream about suing everybody in the world, don't you?

4   A.   Well, word by word taking out of context, I don't know how

5   to comment on that.  But, yes, for infringers, I would say yes.

6   Q.   Well, Mr. Cheung, the reason you didn't sue LogMeIn or even

7   send them a letter is because they didn't infringe, right?

8   A.   Incorrect.

9   Q.   Well, LogMeIn certainly never said they infringed, right?

10  A.   I don't know if -- I think they won't say that.

11  Q.   So -- well, let me back up.  You are an officer of a

12  publicly traded corporation, right?

13  A.   Yes.

14  Q.   You have fiduciary duties to your company to protect it from

15  unfair competition, don't you?

16  A.   Absolutely.

17  Q.   You have a duty to stop competitors who are infringing your

18  patent, right?

19  A.   Absolutely.

20  Q.   And so, not only would you have done it if LogMeIn was

21  infringing it, you had a duty to do it, right?

22  A.   I have a duty to protect the -- what we call the shareholder

23  value.

24  Q.   And that includes protecting your company from unfair

25  competition, right?

1   A.   If we can afford to do so.

2   Q.   These are duties you have under Canadian law, right?

3   A.   Yes.

4   Q.   You are a Canadian citizen, correct?

5   A.   Absolutely.

6   Q.   Are you a citizen of any other place?

7   A.   Hong Kong.

8   Q.   Do you have duties under United States law as well?

9   A.   Sorry, what was the question again?

10  Q.   Do you have fiduciary duties under United States law?

11  A.   I don't know.

12  Q.   Well, if there is a company out there who is infringing your

13  patents, you have a duty to try to stop it, don't you?

14  A.   If we can afford to, we would do it.

15  Q.   But you never reported to your shareholders that LogMeIn

16  infringed, did you?

17  A.   No.

18  Q.   You did tell your shareholders about LogMeIn, right?

19  A.   Yes.

20  Q.   Said they were a competitor, right?

21  A.   Yes.

22  Q.   You never said they infringed, right?

23  A.   I cannot say so because I am not a patent attorney.  As I

24  said, I cannot draw that legal conclusion.

25  Q.   You never said that they were hurting you in any way, did

 1  you?

 2  A.  No.  We are saying -- we are reporting about -- I don't

 3  remember the wording, yeah, but I don't remember saying that

 4  they infringed.

 5  Q.  You never said they stole your technology, did you?

 6  A.  Never used that word.

 7  Q.  Never said they were ruthless in offering a free service?

 8  A.  Never used those words.

 9  Q.  Now, there are many different ways to do remote access

10  without infringing the '479 patent, aren't there?

11  A.  As I testified earlier, there were a lot of older solutions.

12  Q.  And there are solutions today that don't infringe the '479,

13  right?

14  A.  There are some solutions that don't infringe.

15  Q.  Your patent has very specific requirements about what needs

16  to be in a system before it infringes, isn't it true?

17  A.  Yes.

18          MR. STONER:  And, Your Honor, I would ask to show

19  claim 24 to the jury, Exhibit 1 previously in evidence, if it's

20  okay with Your Honor.

21          MR. SHUNK:  Objection --

22          THE COURT:  I am not going to pass things around to the

23  jury now.  They can see them when they retire to deliberate.

24          MR. STONER:  Okay.  Thank you.

25  BY MR. STONER: (Continuing)

1   Q.  Well, just so we are clear, so when the jury looks at this,

2   your claim 24 is pretty long, right?

3   A.  Yes.

4   Q.  It has many requirements in it, right?

5   A.  Yes.

6   Q.  And every single one of those requirements has to be used

7   before it infringes, right?

8   A.  As I am not a patent attorney, I don't know.  I cannot

9   answer that question.

10  Q.  Well, one of the things your patent claim requires is

11  something called a location facility, right?

12  A.  Yes.

13  Q.  And without a location facility, there is no infringement,

14  right?

15  A.  Again, you ask me to draw some legal conclusion.  I don't

16  think I have the capacity to do so.

17  Q.  You and your company told the patent office in the

18  re-examination that for something to be a location facility, it

19  had to perform multiple specific functions, didn't you?

20  A.  I was not directly involved in the re-examination process,

21  so I don't know how to answer that question.

22  Q.  I thought you told Mr. Cheung and the jury earlier this

23  morning that you were involved in the re-examination process and

24  reviewing every document that was submitted?

25  A.  Yes.  Absolutely.  But I am not a patent attorney, so I only

1    review, but in the capacity of technical point of view, not in

2    the attorney point of view.  I don't know the patent process.

3    Q.  One of the documents that you and your company submitted to

4    the patent office in the re-examination is Defendant's

5    Exhibit 126 in your binder.  Could you please look at that.

6    A.  Can I ask you a question?  There are many binders here.  Can

7    I put away these things for now?

8    Q.  You can put them aside, yes.

9    A.  Which one -- I am sorry.  What was the number?

10   Q.  The three-ringed binder at 126.

11   A.  126?  Yes.  I have it here.

12   Q.  Now, this is a sworn declaration of an expert witness for 01

13   that you reviewed and your company submitted to the Patent

14   Office, correct?

15   A.  Yes.

16   Q.  And in this declaration you are talking about the meaning of

17   words in your patent, right?

18          MR. SHUNK:  Objection, Your Honor.  He said you, but

19   it's Dr. Ganger's declaration.  I think it is unclear.

20          THE COURT:  Well, that would be correct.

21          MR. STONER:  I will correct it, Your Honor.

22   BY MR. STONER: (Continuing)

23   Q.  In this declaration, your expert witness is telling the

24   Patent Office on your behalf what certain terms in your patent

25   mean, correct?

1   A.   I shouldn't say it's on my behalf.   I am not a patent

2   attorney.   He is expressing his opinion.

3   Q.   He is expressing his opinion.   You reviewed it before he

4   submitted it, correct?

5   A.   I reviewed it.

6   Q.   And you approved it as true, correct?

7   A.   I approved it.

8   Q.   Now, let's take a look at some of the things Dr. Ganger told

9   the Patent Office.

10  A.   Which page are you referring to?

11  Q.   Let's turn first to page 2.

12  A.   Yes.   I have it here.

13  Q.   And in paragraph 6 -- do you see that?

14  A.   Yes.

15  Q.   And it's a bit long, and I apologize for having to read

16  this.   But it is talking about what the location facility in

17  your patent means, right?

18  A.   I have no reason to disagree.

19  Q.   It says:   Location facility must create the communication

20  channel.   Do you see that?

21  A.   Yes.

22  Q.   And if we just read the last sentence of paragraph 6, it

23  says, quote:   One of ordinary skill in the art would not view

24  this language, and particularly its repeated use of forms of

25  "create" to be satisfied by an alleged location facility that is

1    simply used by some other component that creates the

2    communication channel.  Rather, one of ordinary skill in the art

3    would understand it to require that the location facility itself

4    create the communication channel, unquote.

5         Do you see that?

6    A.   I see that.

7    Q.   So, the location facility is what in your system locates the

8    personal computer, right?

9    A.   And creates the communication channel.

10   Q.   It does both, right?

11   A.   Yes.

12   Q.   It must do both, right?

13   A.   Yes.

14   Q.   And if something doesn't do both, it's not a location

15   facility, right?

16   A.   Yes.

17   Q.   If we could turn now to paragraph 8 of Defendant's

18   Exhibit 126.

19   A.   Paragraph 8, yes.

20   Q.   And in this document submitted to the Patent Office in this

21   paragraph, Dr. Ganger says, quote:  One of ordinary skill in the

22   art would also not view these "create" requirements to be

23   satisfied if the location facility only enables or facilitates

24   some other component that creates the communication channel.

25        Do you see that?

1   A.   Yes.

2   Q.   He goes on to say:   These words, "uses," "enables,"

3   "facilitates," would have different meanings to one of ordinary

4   skill in the art than "create."   Assisting some other component

5   that creates the communication channel is not the same as

6   creating the communication channel.   The '479 patent claims

7   require the location facility to do the latter, correct?

8   A.   Yes.

9   Q.   That's correct with your understanding of your invention,

10  correct?

11  A.   I understand the technicality of it, yes.

12  Q.   It is a technical distinction, isn't it?

13  A.   Yes.

14  Q.   The difference between a component doing something itself

15  versus a component assisting or helping some other component do

16  it, right?

17  A.   Depends how you say components.   I think component has to be

18  well defined here.

19  Q.   Well --

20  A.   You are talking about components -- of components of

21  components.   That is a different story from a component of

22  another aspect in the patent such as the personal computer or

23  the remote computer.   It is a big difference there.

24  Q.   There is no mention of personal computer or remote computer

25  in paragraph 8, is there?

1    A.   But in the context, this is how -- this is what it is.

2    Q.   Mr. Cheung, paragraph 8, there is no mention of personal

3    computer or a remote computer?

4    A.   But it mentions about the components.

5    Q.   Could you please answer my question.  In paragraph 8 there

6    is no mention of a personal computer or a remote computer, is

7    there?

8    A.   No.

9    Q.   All right.  And it is a technical distinction your expert is

10   making to the Patent Office, right?

11   A.   Yes.

12   Q.   There is a technical distinction in trying to show that

13   something is different from your invention, right?

14   A.   Yes.

15   Q.   And you agreed with it, right?

16   A.   Technicality, I agree.

17   Q.   And the Patent Office accepted it, right?

18   A.   Yes.

19        MR. STONER:  I would offer Defendant's Exhibit 126,

20   Your Honor.

21        MR. SHUNK:  No objection, Your Honor.

22        THE COURT:  It is admitted.

23   BY MR. STONER: (Continuing)

24   Q.   So, Mr. Cheung, you don't know whether LogMeIn infringes,

25   but you are still here suing today, right?

1  A.  Yes.

2  Q.  When you issued this lawsuit, you explained why -- I'm

3  sorry.

4      When you started this lawsuit, your company started this

5  lawsuit, you told people why you were suing, didn't you?

6  A.  Yes.

7  Q.  You put out a press release, correct?

8  A.  Yes.

9  Q.  Let's look at Defendant's Exhibit 157.

10  A.  Yes.

11  Q.  This is a press release that your company issued on

12  September 9, 2010, correct?

13  A.  Yes.

14  Q.  It's the day you sued LogMeIn, right?

15  A.  Yes.

16  Q.  And you announced to the world, quote:  01 Communique files

17  a patent infringement lawsuit against LogMeIn Inc., and Dell

18  Inc., correct?

19  A.  Yes.

20  Q.  And you explained why, right?

21  A.  Yes.

22  Q.  And you say -- you are quoted in this press release, aren't

23  you?

24  A.  Yes.

25  Q.  You say, quote:  Our plan is to participate in the growth of

1    the remote access communication industry by leveraging our

2    patents, quote, said Mr. Andrew Cheung.

3         Correct?

4    A.   Yes.

5    Q.   That's your plan, right?

6    A.   Yes.

7              MR. STONER:   I would offer Defendant's Exhibit 157.

8              MR. SHUNK:   No objection.

9              THE COURT:   It is admitted.

10   BY MR. STONER: (Continuing)

11   Q.   Now, when you issued this press release, this is the first

12   time you had ever told anyone that LogMeIn infringed, right?

13   A.   This is the first time that we told people that we are suing

14   LogMeIn because we believe they infringe.   We didn't say that

15   they infringe.   I cannot, again, draw that conclusion.   That's a

16   legal conclusion.

17   Q.   Well, whatever kind of conclusion it is, before September 9,

18   2010, when you filed this lawsuit, you had never told anyone

19   that LogMeIn infringed your patent, correct?

20   A.   Correct.

21   Q.   But one thing happened in the five years from the time your

22   patent issued until you filed this lawsuit, and that was LogMeIn

23   became more successful, right?

24   A.   Yes.

25   Q.   During those five years, your I'm InTouch product was not

1  doing very well in the market, right?

2  A.  Again, if your question was about them very successfully

3  giving away our technology for free over those few years, yes, I

4  agree.

5  Q.  You don't know if LogMeIn is using your technology, do you?

6  A.  Again, if you are asking me do I believe they were using our

7  technology, yes, I strongly believe.

8  Q.  You never told them that, did you?

9  A.  No.

10  Q.  But LogMeIn was becoming more successful, right?

11  A.  Again, if your question was were they successfully giving

12  away our technology for free, generating 15 million users, my

13  answer to you is yes.

14  Q.  Mr. Cheung, you and 01 certainly did not help LogMeIn

15  develop its remote access products, did you?

16  A.  Again, if your question was helping means they are using our

17  technology, our hard-earned technology, yes, it is a big help.

18  Q.  Mr. Cheung, let's go back to your sworn testimony before

19  this trial, page 243, of your deposition dated February 10,

20  2011?

21  A.  I am sorry, you --

22  Q.  Sure.

23       MR. SHUNK:  What page, counsel?

24  A.  February 10?

25  Q.  243.

1   A.   Which page should I turn to?

2   Q.   243.

3   A.   Two --

4   Q.   243.

5   A.   Thank you.

6   Q.   Do you have that page before you?

7   A.   Yes.

8   Q.   This is your sworn testimony before trial, correct?

9   A.   Yes.

10  Q.   You were asked the question:  Sure.  Did you -- I will begin

11  at the beginning, beginning on line 3.

12      Question:  Did you or anyone else at 01 Communique do

13  anything to develop or help develop the LogMeIn remote access

14  products?

15      And your answer first was:  I'm sorry.  What's your question

16  again?

17      Question:  Sure.  Did you or to your knowledge anyone else

18  at 01 Communique do anything to develop or help develop the

19  LogMeIn remote access products?

20      Your answer:  Do we help LogMeIn develop their product?

21      Question:  Correct.

22      Your answer was:  I'm not sure.  I don't think so.

23      Do you see that?

24  A.   Yes.

25  Q.   Truthful testimony, sir?

1   A.  It's absolutely truthful because, again, if your question

2   was about whether they were using our technology without

3   permission, that's a help.

4       But do we develop their code?  No.  So, it can be a

5   yes-or-no answer.  It depends how your question meant.

6   Q.  You didn't help LogMeIn develop its technology, did you?

7   A.  We didn't help them doing the code.

8   Q.  You didn't help them do the architecture?

9   A.  Well, if your question again was are they using our

10  architecture in the '479 patent, the answer is yes.

11  Q.  Mr. Cheung, did you or any of your software engineers ever

12  do one thing for LogMeIn?

13  A.  If your question, again, was about -- it's a help to,

14  indirect help, was that they were using our disclosed

15  technology, yes, we did help, big time.

16  Q.  February 2011 you said you don't think so, right?

17  A.  I said I am not sure.  I don't think so because the

18  different way you are answering -- questioning would have a

19  different answer.

20  Q.  After you gave this testimony, you got a copy of the

21  transcript to look at, right?

22  A.  Yes.

23  Q.  You could review it.  And if you thought there was something

24  incorrect, you could change it, right?

25  A.  Yeah, if I look at it, yes.

1   Q.   And did you look at this?

2   A.   I don't remember looking at this.

3   Q.   But you never changed it, that's for sure?

4   A.   I don't think I looked at it.

5   Q.   That was your choice?

6   A.   It's my choice.

7   Q.   Now, suing people is now part of your business, right?

8   A.   It has become -- we are doing it as part of the business

9   like right now, of course.

10  Q.   And, in fact, you are not even trying that hard anymore to

11  sell your products, are you?

12  A.   We are still trying very hard to sell as much as we can.

13  Q.   Didn't you tell your shareholders last year that you were

14  limiting your market activities to focus on suing people?

15  A.   As I said, I try as much as I can financially capable.

16  Q.   Did you say to your shareholders last year you were limiting

17  your marketing activities to focus on suing people?

18  A.   Yes.

19  Q.   You also sold part of your patent to another company for

20  them to sue people?

21  A.   Sold patent?  No.

22  Q.   Licensed it?

23  A.   No.  My understanding --

24  Q.   You sold to Wi-LAN, didn't you?

25  A.   We have a business relationship with Wi-LAN.

1  Q.  You gave them the right to sue people under your patent,

2  right?

3  A.  No.

4  Q.  You give them the right to license people under your patent?

5  A.  We have a business relationship whereby Wi-LAN was providing

6  financial resources to 01 related to a number of potential

7  infringers.

8  Q.  And Wi-LAN paid you no money for that, right?

9  A.  Yeah, Wi-LAN provided financial resources related to a few

10  potential infringers.

11  Q.  You get a cut of the money if they collect anything, right?

12  A.  Sorry, can you repeat your question again?

13  Q.  Sure.  You get a cut of the money if Wi-LAN collects

14  anything, right?

15  A.  I think more correct is Wi-LAN get a cut of the money 01

16  receive.

17  Q.  They get 85 percent, right?

18  A.  85 percent?  No.

19  Q.  You told the jury that you have an office in Arlington,

20  Virginia, right?

21  A.  Yes.

22  Q.  You opened that office just a few weeks before you sued

23  LogMeIn, right?

24  A.  Yes.

25  Q.  You wanted to tell -- be able to tell people in the lawsuit

1   that you have a Virginia office, right?

2   A.  That's the truth.

3   Q.  Well, the only I'm InTouch product you sold out of that

4   office for five months after you opened it was to your lawyers

5   here, right?

6   A.  Yes.

7   Q.  Mr. Cheung, you are also trying to benefit personally from

8   your company's suing strategy, aren't you?

9   A.  I assume so.  I hope, at least.

10  Q.  You granted yourself hundreds of thousands of dollars in

11  stock options, haven't you?

12  A.  Over what period of time?

13  Q.  Well, let's take in 2011.  Do you have that in mind?

14  A.  Yes.  Yeah.  What's your question again?

15  Q.  2011 is the year after you brought this lawsuit, right?

16  A.  Yes.

17  Q.  And in that year, your company lost $3.2 million, right?

18  A.  Yes.

19  Q.  They lost money, right?

20  A.  Yes.

21  Q.  And in that year, you still gave yourself $471,600 in stock

22  options, right?

23  A.  You shouldn't say dollars.  Those are stock options.  Stock

24  option is part of compensation.

25  Q.  It is true in 2011 you granted yourself $471,600 worth of

1    stock options, right?

2    A.   Those are stock options that allow you to purchase stock at

3    a certain fixed price, and it wasn't dollar.

4    Q.   2011 you also gave your chief financial officer,

5    Mr. Stringer, $425,800 in stock options, correct?

6    A.   Again, those are options that would allow Mr. Stringer to

7    exercise purchasing stock at a certain fixed price.  It wasn't

8    cash compensation.

9         MR. STONER:  So the jury can see what actually

10   happened, I'd like to offer Defendant's Exhibit 268, which is

11   01's financial statements, and Defendant's Exhibit 223, which

12   talks about stock option grants.

13        MR. SHUNK:  One moment, Your Honor.  I am searching for

14   those exhibits.

15        We have no objection.

16        THE COURT:  They are admitted.

17   BY MR. STONER: (Continuing)

18   Q.   You doubled your salary in 2011 too, correct?

19   A.   Yes.

20   Q.   Even though your company lost over $3 million, right?

21   A.   Yes.

22   Q.   So, now you are coming in here and asking for $110 million

23   from LogMeIn, right?

24   A.   Yes.

25   Q.   You want the jury to take $100 million from LogMeIn and give

1   it to you?

2   A.  Incorrect.  It is given to the company, not me personally.

3   Q.  You will benefit, right?

4   A.  Sorry?

5   Q.  You will benefit, right?

6   A.  I hope so, as I said.  Not necessarily.

7   Q.  You never earned a dime from your patented technology, did

8   you?

9   A.  We had some revenues.  I think you cannot say that we didn't

10  earn a dime.  I think it is a little bit rude saying that,

11  Mr. Stoner.

12  Q.  You never -- I am sorry if I am rude.  But you never made a

13  profit on it, right?

14  A.  That's correct.

15  Q.  You lost money on it year after year, right?

16  A.  We lost money.

17  Q.  And no one has ever paid you for using the patented

18  technology either, have they?

19  A.  Of course they cannot pay us because there is a free version

20  out there.

21  Q.  Well, as we talked about before, Hitachi is not a licensee

22  of yours, is it?

23  A.  Hitachi is a licensee.

24  Q.  Well, we are going to have to look at the Wi-LAN licensing

25  agreement to see where you represented the contrary.  Can you

 1   look at Defendant's Exhibit 175?

 2   A.   Yes.

 3   Q.   This is the Wi-LAN licensing agreement, correct?

 4   A.   Yes.

 5   Q.   You signed it in 2011, correct?

 6   A.   Yes.

 7   Q.   And on page 2 you make representations and warranties,

 8   correct?

 9   A.   Representation, warranties, yes.

10   Q.   And section 2.1.1 talks about patents, right?

11   A.   Are you talking 2.1.1?  Yes.

12   Q.   It says:  Owner is the sole owner in law and in equity of

13   the patents, and has not granted to anyone any release, license,

14   or other interest in the patents, with the exception of a

15   release granted to Dell Inc. and a license granted to

16   SingleClick Systems.

17        Correct?

18   A.   Yes.

19   Q.   No mention of Hitachi, right?

20   A.   Well, my understanding was that anyone using our technology

21   is a licensee.

22   Q.   Mr. Cheung, you made this representation to Wi-LAN, your

23   partner, right?

24   A.   As I said, as far as I know -- correct me if I am wrong --

25   anyone using our product covered by the -- the patent is a

1   licensee.

2   Q.   You mentioned Hitachi in your representations and warranties

3   to Wi-LAN?

4   A.   No.

5   Q.   And you told the truth to your partner, Wi-LAN?

6   A.   As far as I know, it is the truth.

7   Q.   This release granted to Dell, how much did Dell pay?

8   A.   Dell paid -- I don't remember the exact amount, but it was

9   immaterial.

10  Q.   Immaterial, meaning very small, correct?

11  A.   Very small.

12  Q.   They were getting out of the business anyway, right?

13  A.   I don't know about their business model, but they agreed to

14  stop using -- offering their product as a result.

15  Q.   And this license to SingleClick, you haven't got any money

16  from that either, have you?

17  A.   No, we haven't.

18          MR. STONER:  I would offer Defendant's Exhibit 175.

19          MR. SHUNK:  Your Honor, I would object to that.

20  The document itself is irrelevant because its from -- it's from

21  2011 after this lawsuit began.  Counsel has been able to elicit

22  whatever he believes is relevant from the document, but the

23  document itself shouldn't go into evidence.

24          MR. STONER:  Your Honor, it has relevance beyond what I

25  did.  This is an agreement dealing in the patent-in-suit -- a

1   license to the patent-in-suit.  It's relevant to the worth of

2   the patent under the Georgia-Pacific factors.

3            MR. SHUNK:  Your Honor, I don't think it has any more

4   relevance than the Hitachi licenses that you excluded earlier.

5            THE COURT:  Objection sustained.

6            MR. STONER:  Okay.

7   BY MR. STONER: (Continuing)

8   Q.  Now, LogMeIn certainly never hurt your company by

9   $110 million, did it?

10  A.  LogMeIn hurt our company for probably more than that.

11  Q.  Well, in the five years since your patent issues until you

12  sued, LogMeIn was not even hurting 01 enough to warrant telling

13  them you had a patent, correct?

14  A.  I do not agree.

15  Q.  Take a look at your deposition, Mr. Cheung.

16  A.  Yes.  Which one are you referring to?

17  Q.  January 26, 2011.

18  A.  What page do you want me to refer to?

19  Q.  Page 179.  Do you have that before you?

20  A.  Yes, I have it here.

21  Q.  Question:  Am I correct in the five years until you sued

22  LogMeIn in 2010, you thought they were not hurting your business

23  enough to take the risk of notifying them you had a patent?

24       Your answer was:  I don't know how to answer you.  That

25  question is a combination of different things.  I think -- was

 1   it worthwhile?  I -- I think again, you know, if -- if doing

 2   something would result in something that we cannot afford at

 3   that time whether it is bandwidth or resources, or, you know,

 4   whatsoever, no, it's not worthwhile.

 5        Do you see that?

 6   A.  Yes, I see that.

 7   Q.  Did I read it correctly?

 8   A.  You read it correctly.

 9   Q.  It is truthful testimony?

10   A.  Yes.

11   Q.  You certainly never told your shareholders LogMeIn was

12   hurting your company, did you?

13   A.  Correct.

14   Q.  And you don't know if LogMeIn took any sales away from you

15   or not, do you?

16   A.  I should say I know they took sales away.

17   Q.  Well, Mr. Cheung, do you still have your deposition there?

18   A.  The same deposition you are referring to?

19   Q.  Yes.

20   A.  Yes.

21   Q.  Page 193.

22   A.  Yes, I have it here.

23   Q.  This is your sworn truthful testimony as of January 2011,

24   correct?

25   A.  Absolutely.

1  Q.  After you brought this lawsuit, correct?

2  A.  Absolutely.

3  Q.  Question:  Let me ask you to -- well, let me ask it this

4  way.  Has LogMeIn taken sales away from 01 Communique?

5       Your answer was:  Has LogMeIn taken sales away from 01?

6  Maybe.  I don't know how to -- to exactly answer that question.

7  Maybe, maybe not.

8       Correct?

9  A.  Yes.

10  Q.  I read it correctly?

11  A.  You read it correctly.

12  Q.  And your answer was:  Correct.

13       Right?

14  A.  Yeah, at that time I believe, yep.

15  Q.  Other companies came into the remote access market after

16  LogMeIn, correct?

17  A.  You mean after LogMeIn?

18  Q.  Yes.

19  A.  Yep.

20  Q.  Like TeamViewer, you've heard of them?

21  A.  I have heard of them.

22  Q.  They are a company who came into the remote access product

23  market after LogMeIn, correct?

24  A.  Correct.

25  Q.  And they are doing just fine, aren't they?

1   A.   I don't know how well they do.

2   Q.   Mr. Cheung, one final subject.  You did not tell the Patent

3   Office about the prior art '888 patent, did you?

4   A.   Yes.

5   Q.   It's correct you did not?

6   A.   I did not.

7   Q.   Now, let's look at it again.  It is Defendant's Exhibit 27.

8   A.   87?  I think 87 is in another book.  Yeah, it's not here.

9   Q.   It may be down in that binder.

10  A.   Thank you very much.

11  Q.   Oh, it is Exhibit 87.  I'm sorry.

12       27.  It's Defendant's Exhibit 27.

13  A.   Oh, 27.  Yep, right here.  Yes, I have it here.

14  Q.   Do you have it here?  And this is the patent that in

15  Fig. 1 shows a host and a client and the Internet in between the

16  two with Web server in between the two, correct?

17  A.   Yes.

18  Q.   It's the patent that talks about how it creates virtually

19  the entire functionality of a computer system to be made

20  accessible over a network such as the Internet or an intranet,

21  correct?

22  A.   It talks about a certain way of doing that, yes.

23  Q.   And it's work that was done before you did anything on your

24  '479 patent, correct?

25  A.   Yeah, it was a few months before the September '97.

1  Q.  You knew all about this patent, but you didn't tell the

2  Patent Office, right?

3  A.  Yes.

4  Q.  You know that in the patent -- when you deal with the Patent

5  Office, you have a duty of candor, correct?

6  A.  Yes.

7  Q.  You have a duty to tell the Patent Office the truth,

8  correct?

9  A.  Yes.

10  Q.  You have a duty to tell them all the material information

11  you know about, correct?

12  A.  I should say that I should have the duty -- my understanding

13  was I have the duty to tell them about any relevant prior arts

14  that I think I would want the Patent Office to know about.

15  Q.  You signed an oath when you filed the patent application

16  saying that, correct?

17  A.  Yes.

18  Q.  Let's look at Defendant's Exhibit 308.

19  A.  Yes, I have it here.

20  Q.  And this is a declaration, power of attorney, and petition,

21  correct?

22  A.  Yes.

23  Q.  You signed it, correct?

24  A.  Yes.

25  Q.  You signed it knowing that willful false statements may

A. Cheung - Cross                                                    198

1    jeopardize the validity of the application and any patent issued

2    thereon, correct?

3    A.   Yes.

4    Q.   And one of the things you say in this declaration was:   We

5    acknowledge the duty to disclose information which is material

6    to the examination of this application in accordance with Title

7    37, Code of Federal Regulations, section 1.56, correct?

8    A.   Yes.

9    Q.   You knew you had this duty to the Patent Office, correct?

10   A.   Absolutely.

11   Q.   Now, let's talk about how you learned about the '888 patent,

12   okay?

13   A.   Sorry, what was your question?

14   Q.   Sure.  The owner of the '888 patent sued your company for

15   infringing it, correct?

16   A.   Yes.

17   Q.   The company is called Accolade, correct?

18   A.   Yes.

19   Q.   They sued -- they sued 01 Communique saying your I'm InTouch

20   product infringed the '888 patent, right?

21   A.   That's what they alleged.

22   Q.   The I'm InTouch product is your product covered by the '479

23   patent here, correct?

24   A.   Yes.

25   Q.   It was in the re-examination, correct?

1   A.   Yes.

2   Q.   And Accolade sued and said your patented technology

3   infringes the '888 patent, right?

4   A.   Incorrect.  They said our product, I'm InTouch -- they

5   alleged the I'm InTouch product infringed, not the technology of

6   the -- our patent.

7   Q.   Well, let's look exactly what was said.  And turn to

8   Defendant's Exhibit 160, please.

9   A.   Yes.

10          MR. STONER:  Your Honor, I would offer Defendant's

11  Exhibit 308, the oath.

12          MR. SHUNK:  Oh, no objection to the oath.

13          THE COURT:  It is admitted.

14  BY MR. STONER: (Continuing)

15  Q.   Defendant's Exhibit 160, do you have that before you,

16  Mr. Cheung?

17  A.   Yes, I do.

18  Q.   It is a complaint for patent infringement, right?

19  A.   Yes.

20  Q.   It was filed in a federal court like this one, right?

21  A.   Yes.

22  Q.   And it was filed by Accolade Systems against 01 Communique

23  and other companies, right?

24  A.   Yes.

25  Q.   And on the second page, paragraph 13, Accolade says that:

1    Certain products and/or services or technologies that infringe

2    at least one claim of the '888 patent, including but not limited

3    to those products known as I'm InTouch, correct?

4    A.   Yes, correct.

5    Q.   That's what they alleged, correct?

6    A.   Yes.

7    Q.   So, they are telling you they think that your I'm InTouch

8    technology infringes their '888 patent, right?

9    A.   My understanding was that they are telling -- they are

10   alleging that the I'm InTouch product was infringing.

11   Q.   And the I'm InTouch product uses the technology of your '479

12   patent, right?

13   A.   Yes.

14   Q.   Now, this lawsuit was filed in January 2007, right?

15   A.   Yes.

16   Q.   That's before the re-examination, right?

17   A.   Yes.

18   Q.   But this lawsuit is still going on when the re-examination

19   starts, right?

20   A.   Yes.

21   Q.   So, just to get the sequence down here, you are sued for

22   infringing the '888 patent, correct?

23   A.   Yes.

24   Q.   Then the re-examination of the '479 patent is started,

25   right?

1    A.   Yes.

2    Q.   And that -- and the lawsuit from Accolade in the '888 patent

3    is still going on, right?

4    A.   I don't remember the exact time sequence.  Maybe a little

5    off, but I don't know.  I don't know whether I can qualify that

6    time sequence or not, but they are around the 2007 timeframe.

7    Q.   We will get into the precise sequence.

8    A.   Uh-huh.

9    Q.   It's -- but once the re-examination started, you had this

10   duty of candor to the Patent Office to tell them about material

11   prior art, right?

12   A.   Yes.

13   Q.   And you certainly knew about the '888 patent when it

14   started, right?

15   A.   Yes.

16   Q.   And you never told the Patent Office about it, right?

17   A.   Yes.

18   Q.   You never told the Patent Office Accolade, the owner of that

19   patent, had said you infringed it, correct?

20   A.   Yes.

21   Q.   You didn't tell them anything about it, right?

22   A.   Yes.

23   Q.   But there's more.  Let's fast forward a few months -- or

24   fast forward a few weeks.  You then signed an agreement with

25   Accolade, correct?

1    A.   Yes.

2    Q.   And the agreement with Accolade gives the '888 patent owner,

3    Accolade, a cut of the money you get from suing Citrix under the

4    '479 patent, right?

5    A.   Yes.  I think -- yeah, right.  Very immaterial.  That's why

6    I don't remember.  But, yeah, I think you are right.

7              MR. STONER:  Well, let's -- first, I would offer

8    Defendant's Exhibit 160.  Yes.

9              MR. SHUNK:  Your Honor, I would object.  The complaint,

10   it's hearsay.  It is from this other company, Accolade.  Counsel

11   has been able to use it for whatever other purpose, but the

12   complaint itself shouldn't go into evidence.

13             THE COURT:  I think objection sustained.

14             MR. STONER:  Your Honor, if I may.  It's not being

15   offered for the truth of the matter asserted.  It is offered to

16   prove notice to --

17             THE COURT:  I understand.  You have got the testimony

18   on that.

19             MR. STONER:  Okay.  Thank you.

20   BY MR. STONER:  (Continuing)

21   Q.   Now, in Accolade, this agreement -- which was written by

22   your lawyers here, correct?

23   A.   Yes.

24   Q.   It -- you signed it, correct?  If you would look at

25   Defendant's Exhibit 203.  Do you have that?

1    A.   Yes, I have it here.

2    Q.   This is the agreement with Accolade, correct?

3    A.   Can I -- because it is a few years ago, can I just browse

4    through it quickly?

5    Q.   Surely.

6    A.   Yes, it is.

7    Q.   You signed it, correct?

8    A.   Yes.

9    Q.   As the CEO, correct?

10   A.   Yes.

11   Q.   You initialed every page of this agreement, correct?

12   A.   Yes.

13   Q.   This is while the re-examination is going on, right?

14   A.   Yes.

15   Q.   In section 2.2 you say you are going to give additional

16   consideration to Accolade.  If you get money from Citrix in your

17   lawsuit against them, you are going to give some of that to

18   Accolade, correct?

19   A.   Yeah.  That's why I said the -- it was very immaterial,

20   $25,000.  So I -- I did not remember when you said that, yes.

21   Q.   You -- this was important enough to you that you initialed

22   every page of this agreement, right?

23   A.   Yes.

24   Q.   And the re-exam is going on, right?

25   A.   Yes.

1   Q.  In fact, it had started just a couple weeks earlier.  So,

2   you knew all about it, right?

3   A.  Yes.

4   Q.  And then -- Your Honor, I would offer Defendant's

5   Exhibit 203.

6          MR. SHUNK:  I would object again.  It is not relevant.

7   We would stipulate that the company had notice of this '888

8   patent at that time.  And so, I don't think there is any other

9   point to this document.  It's not a license of the '479 patent.

10         THE COURT:  Well, what is 203?

11         MR. STONER:  It is the agreement between 01 Communique

12  and Accolade where 01 agrees to give Accolade, the owner of the

13  '888 patent, some money if 01 gets money from Citrix suing on

14  the '479 patent.  It's notice not just of the patent, but of the

15  materiality of it.

16         MR. SHUNK:  Well, we have heard testimony about it,

17  Your Honor, and we stipulate that they had notice.  So, there is

18  no other point to this document.  And it's about another piece

19  of litigation in an unrelated patent.

20         THE COURT:  No, objection overruled.  It will be

21  admitted.

22         You know, it is time for us to quit for today.

23         MR. STONER:  Your Honor, I have about two more

24  minutes --

25         THE COURT:  All right.

1            MR. STONER:  -- if you want to finish up.

2            THE COURT:  Well, with you.  I don't know whether you

3    all have any more questions or not, but --

4            MR. SHUNK:  I have only a short, maybe ten minutes of

5    redirect, but I know Your Honor has to --

6            THE COURT:  Well, you can finish --

7            MR. SHUNK:  You're right.  I'm sorry, Your Honor.  I

8    know --

9            THE COURT:  I've got -- I will let you finish, but I'm

10   a little pressed tonight.  Ordinarily I would, if it would make

11   any difference, I would stay later, but tonight I'm a little

12   pressed.  Go ahead with your --

13           MR. STONER:  I am sorry, Your Honor.  I had forgotten

14   you had to leave.

15   BY MR. STONER:  (Continuing)

16   Q.  You never told the Patent Office about the '888 patent, did

17   you?

18   A.  Yes.

19   Q.  And your excuse is not withstanding signing this agreement,

20   it didn't even come up in your mind, right?

21   A.  It's not an excuse.

22   Q.  That's what reasoning you gave under oath why you didn't

23   disclose it, didn't even come up in your mind, right?

24   A.  Yes.

25           MR. STONER:  No further questions.

1          THE COURT:  All right.  Then we will adjourn until

2    tomorrow morning at 10 o'clock.

3          NOTE:  The March 18, 2013 portion of the case is

4    concluded.

5

6

7

8

9

10

11

12                      CERTIFICATION

13

14          I certify, this 18th day of March 2013, that the

15    foregoing is a correct transcript from the record of proceedings

16    in the above-entitled matter to the best of my ability.

17

18

19                         /s/
                  _____
20                  Norman B. Linnell, RPR, CM, FCRR

21                         /s/
                  _____
22                  Tracy Westfall, RPR, CMRS, CCR

23

24

25