1             UNITED STATES DISTRICT COURT
              EASTERN DISTRICT OF VIRGINIA
2                 ALEXANDRIA DIVISION

3    _____

     01 COMMUNIQUE LABORATORY,        )
4    INC.,                            )
                                      ) Docket No. 1:10-cv-1007
5           Plaintiff,                ) Alexandria, Virginia
                                      )
6           v.                        ) March 20, 2013
                                      ) 2:20 p.m.
7    LOGMEIN, INC.,                   )
                                      ) Volume III
8           Defendant.                ) (afternoon session)

9    _____

10

11                  TRANSCRIPT OF TRIAL

12         BEFORE THE HONORABLE CLAUDE M. HILTON

13              UNITED STATES DISTRICT JUDGE

14                     AND A JURY

15

16
     APPEARANCES:
17
       For the Plaintiff:      John P. Corrado, Esq.
18                             Marc A. Antonetti, Esq.
                               Thomas H. Shunk, Esq.
19                             Katherine Lea McKnight, Esq.
                               William T. DeVinney, Esq.
20                             Loura Alaverdi, Esq.
                               A. Neal Seth, Esq.
21
       For the Defendant:      Wayne L. Stoner, Esq.
22                             Charles B. Molster, III, Esq.
                               Vinita Ferrera, Esq.
23                             Rachel Gurvich, Esq.

24     Court Reporter:        Tracy L. Westfall, RPR, CMRS, CCR
     Proceedings reported by machine shorthand, transcript produced
25   by computer-aided transcription.

I N D E X

|                                | Direct | Cross | Redirect | Recross |
|--------------------------------|--------|-------|----------|---------|
| FOR THE PLAINTIFF:             |        |       |          |         |
| J. Kelliher (by deposition)    | 571    | --    | --       | --      |
| R. Brlas                       | 596    | 650   | --       | --      |

1                    P R O C E E D I N G S

2        (The jury enters at 2:20 p.m.)

3            THE COURT:  All right.  Who's next?

4            MR. SHUNK:  Your Honor, next we would like to read the

5    deposition -- excerpts from the deposition of the LogMeIn chief

6    financial officer, James Kelliher.  Again, Ms. McKnight will be

7    reading the questions.

8            MS. MCKNIGHT:  Good afternoon, Your Honor.  My

9    colleague, Chuck Carson, will be reading the deposition

10   testimony of Mr. Kelliher.

11           THE COURT:  All right.

12           MS. MCKNIGHT:  Rule 30(b)(6), deposition of LogMeIn

13   Inc., by James Kelliher, designee, January 14, 2011.

14       * * *

15       (Deposition of JAMES KELLIHER is record into the record as

16   follows.)

17                          EXAMINATION

18   BY MS. MCKNIGHT:

19   Q.  Can you state your full name for the record, please.

20   A.  James Kelliher.

21   Q.  By whom are you employed?

22   A.  LogMeIn.

23   Q.  What is your job?

24   A.  I'm the chief financial officer.

25   Q.  How long have you been the chief financial officer?

1   A.  Since July of 2006.

2   Q.  In a nutshell, can you describe for the record what your

3   duties as chief financial officer at LogMeIn are?

4   A.  I'm responsible for the finance and admin responsibilities

5   of the company.

6   Q.  What is the current price per unit for the LogMeIn Pro2 at

7   this time?

8   A.  $69.

9   Q.  Is that an annual subscription?

10  A.  It is.

11  Q.  How long has $69 annually been the price for LogMeIn Pro2?

12  A.  Since I've been with the company.

13  Q.  Do you remember when LogMeIn Pro2 was first introduced?  It

14  would be -- pardon me.

15  A.  It would be September of 2009.

16  Q.  Prior to that time, there was no LogMeIn Pro2, and so was

17  the $69 price the price for LogMeIn Pro?

18  A.  Yes.

19  Q.  And do the access products include LogMeIn Free, LogMeIn

20  Pro, LogMeIn Pro2, and Ignition?

21  A.  They do.

22  Q.  What is the current price for the LogMeIn Ignition per unit?

23  A.  $29.99.

24  Q.  Is that $29.99 for a perpetual license for the product or is

25  that annualized or monthly?

1    A.   That's a perpetually licensed product.

2    Q.   It may sound like a silly question, but I have to ask it

3    anyway.  What is the current price for LogMeIn Free?

4    A.   There is no price.  Zero.

5    Q.   Has there ever been a price charged for LogMeIn Free?

6    A.   Not to my knowledge.

7    Q.   In its financials, how does the company recognize revenue on

8    its access products?

9    A.   There's two sets of access products.  As you stated,

10   Ignition for mobile is the perpetual licensed product.  It's

11   recognized at the time of the transaction, which is reported by

12   Apple, to the company net of the Apple commissions.  And then

13   the access products, Pro and Pro2, are recognized on a

14   subscription basis over the period of the respective

15   subscription.

16   Q.   And what is the period of recognition?  In other words, is

17   there a daily recognition of the revenue associated to a monthly

18   recognition or some other time period used to recognize the

19   revenue?

20   A.   It's recognized on a daily basis.

21   Q.   Have you ever participated in meetings where there was a

22   discussion of the appropriate pricing for any of the access

23   products?

24   A.   A general discussion, not specific.

25   Q.   Are any of the access products that you've identified ever

1  offered to customers for a free trial period?

2  A.  Yes.

3  Q.  Currently what free trial periods, if any, are offered

4  regarding those products?

5  A.  Pro and Pro2 have a free trial period.

6  Q.  Does the company do any studies with regard to the extent to

7  which individual customers convert from LogMeIn Free to LogMeIn

8  Pro or Pro2?

9  A.  Studies, no.

10  Q.  Analyses?

11  A.  Conversion rates, yes, if you would call that analyses.

12  Q.  Who at the company is the person with the ultimate decision

13  power over the question of whether and to what extent free

14  trials should be offered on the access products?

15  A.  Andrew Burton is in charge of that product line.

16  Q.  From what source does LogMeIn get the conversion rates that

17  are reported externally to the public or to third parties?

18  A.  Our internal financial systems, internal sales reporting, or

19  sales financial systems.

20  Q.  As chief financial officer, are you responsible for the

21  generation of any of those reports?

22  A.  Yes, a summary report.

23  Q.  What's the name of that summary report?

24  A.  It's an investor relations report.

25  Q.  How often is the investor relations report generated?

1   A.   Quarterly.

2   Q.   What information is reported in the investor relations

3   report by category, not by specifics?

4   A.   Its various key statistics of the company.

5   Q.   Can you give some examples of the key statistics?

6   A.   Number of users, number of premium customers.

7   Q.   Does it also report conversion rates?

8   A.   Yes.

9   Q.   Does it report length of time to conversion?

10  A.   Yes.

11  Q.   Does it look at the conversion of LogMeIn Free users to

12  products other than access products?

13  A.   Yes.

14  Q.   Does it look at the conversion of free trial users to paying

15  customers?

16  A.   It's combined, yes.

17  Q.   Does it distinguish between the use of a free trial as

18  opposed to LogMeIn Free?

19  A.   No.

20       MS. MCKNIGHT:  PX 77A marked for identification.

21  BY MS. MCKNIGHT:

22  Q.   Mr. Kelliher, before the break we put in front of you PX

23  77A, which is a spreadsheet that was provided to us a day or two

24  ago.

25       Do you recognize this as the company's internal 2009 fiscal

1  year monthly financial report?

2  A.  Yes.

3          MS. FERRERA:  Your Honor, we'd like to read the next

4  question and answer starting at line 7 and continuing to

5  line 11.

6  BY MS. MCKNIGHT:

7  Q.  Looking at the spreadsheet, is this the format of the

8  spreadsheet as it is distributed internally within the company?

9  A.  No.

10 Q.  What changes, if any, have been made to it prior to its

11 appearance in this form?

12 A.  The bookings and revenue, I believe, are only the accused

13 products.

14 Q.  Okay.  But the operating expenses are expenses companywide?

15 A.  Yes.

16          MS. MCKNIGHT:  PX 63 marked for identification.

17 BY MS. MCKNIGHT:

18 Q.  Now, I've put PX 63 in front of you, sir.  What is PX 63?

19 A.  PX 63 was produced as part of this process by requests from

20 you.

21 Q.  It was created for the litigation for our purposes?

22 A.  Yes.

23 Q.  I was asking you whether the company ever allocates the

24 customer support or NOC lines to the access products for

25 purposes of computing a gross margin and cost of goods sold, and

1    I think that then caused you to refer to this document.

2    A.   Yes.   So the only time the company has, to my knowledge, is

3    with respect to the request as part of this process.   And the

4    allocation method which we have employed the methodology is on

5    page 5 of the document.

6    Q.   Turning back now to PX 77A, which is the 2009 spreadsheet.

7         Is it true then that this particular version of the monthly

8    financial report was prepared specifically for this litigation?

9    A.   That is true.

10   Q.   Looking on page 2 of the spreadsheet, I see one of the lines

11   is listed as acquired intangibles net.   To what intangibles does

12   that refer?

13   A.   That would refer to the intangibles related to an

14   acquisition the company did.

15   Q.   And which acquisition was that?

16   A.   The company was called Hamachi.

17   Q.   When was Hamachi acquired?

18   A.   I don't remember the exact date, but it would have been

19   approximately July of 2007.

20   Q.   What was acquired?   Assets or stocks?

21   A.   It was an asset acquisition.

22   Q.   How much was paid for that the acquisition of all assets?

23   A.   I don't remember the exact number, but it was approximately

24   $4 million.

25   Q.   The line after acquired intangibles net is goodwill.

1      Can you tell me how the company computes its goodwill?

2  A.   The goodwill is associated with acquisition of Hamachi.

3  Q.   And how was the goodwill number arrived at in terms of that

4  acquisition?

5  A.   It was done through a valuation, an external valuation of

6  the assets acquired versus the purchase price.

7  Q.   Who was it that allocated the purchase price to the various

8  assets?

9  A.   Ultimately the company is the decisionmaker in that, so

10  myself and Ed Herdiech.

11  Q.   Was a report prepared that summarizes the allocation of the

12  purchase price into the various assets?

13  A.   Yes.

14  Q.   Can you tell me what -- can you identify for me at least

15  some of the intangible assets that were acquired?

16  A.   It would have been the related software of Hamachi would be

17  in that acquired intangibles, so a valuation of the software

18  that we acquired.

19  Q.   If we can put PX 77A aside then and turn to what we marked

20  as PX 63.

21      I've asked you a couple of questions about this already, and

22  I think we've established that this was put together

23  specifically to respond to requests we have made in this

24  litigation; is that correct?

25  A.   That is correct.

J. Kelliher - Direct (By Deposition)                        579

1   Q.   In 2005, 90 percent of your customers were using LogMeIn

2   Free, LogMeIn Pro, or LogMeIn Pro2; is that correct?

3   A.   That is correct, approximately.

4   Q.   Now, has that 90 percent usage of the LogMeIn Free, Pro, and

5   Pro2 products, has that remained fairly constant from 2005

6   through 2010?

7   A.   Yes, approximately.

8   Q.   So even today, 90 percent of your customers utilize LogMeIn

9   Free, LogMeIn Pro, or LogMeIn Pro2?

10  A.   Approximately 90 percent, yes.

11  Q.   Looking at the first page now of PX 63.  This shows

12  month-by-month revenue worldwide from, among other things, the

13  Pro, Pro2, and Ignition products; is that correct?

14  A.   That is correct.

15  Q.   Was Pro2, LogMeIn Pro2 first commercially made available in

16  August of 2009?

17  A.   I believe it was September 2009.

18  Q.   And similarly, I see looking at the column for Ignition that

19  there's revenue first indicated in March of 2007.

20       Is March of 2007 when Ignition was first commercially

21  offered?

22  A.   I wouldn't be the best person to answer that question, but I

23  would surmise based on when revenue first did, that yes.

24       MS. MCKNIGHT:   PX 76A marked for identification.

25

1   BY MS. MCKNIGHT:

2   Q.  I've placed in front of you as PX 76A another spreadsheet

3   that was provided to us several days ago.

4       Tell me what this is.

5   A.  This is our consolidated income statement.  Well, this

6   report is our consolidated financial reports for the fiscal year

7   2005.

8   Q.  Does the revised version of PX 76A reflect all sales for all

9   products and all costs for all products?

10  A.  That's my understanding.

11          MS. MCKNIGHT:  PX 178 marked for identification.

12  BY MS. MCKNIGHT:

13  Q.  Showing you PX 178.  Do you recognize this document?

14  A.  I do, yes.

15  Q.  And what is it?

16  A.  It is a printout of a purchase associated with the product

17  Ignition.

18  Q.  And does this show the first individual to purchase the

19  Ignition product?  Was that the purpose?

20  A.  Yes, I believe that's the purpose of the document in

21  response to the request.

22  Q.  So this suggests that the first commercial purchase of the

23  Ignition product was in March of 2007; is that correct?

24  A.  That is correct.

25  Q.  Now, I also see that the booked amount was 49.95.  Can you

1    explain to me?

2    A.   That would be the amount charged for the product.

3    Q.   So there was a product where the price was 49.95, not 29.99?

4    A.   Ignition has two different products.  The Ignition product

5    line has what we'd call Ignition, a subscription product, and

6    then the Ignition for mobile, which is the iPad product or the

7    iPhone product.  Those are two different products.

8        So this is associated with our Ignition subscription

9    product.  The Ignition for iPhone product would not have been

10   released until at least one year later.

11   Q.   Does the data that we see in PX 237 come from the financial

12   and accounting system or from some other database at LogMeIn?

13   A.   From some other database at LogMeIn.

14   Q.   What database does it come from?

15   A.   It would be our order system database.

16   Q.   Order system -- system database?

17   A.   Yes.  That's an internally developed system.

18   Q.   Who is responsible for -- who has ultimate responsibility

19   for the operation of that internal database?

20   A.   My department would have responsibility for the data within

21   that internal database.

22            MS. MCKNIGHT:  PX 48 marked for identification.

23   BY MS. MCKNIGHT:

24   Q.   Let me move then to PX 83, which is now in front of you, the

25   10-K.  This is the 10-K filed on November 26, 2010, by LogMeIn

1    with the Securities and Exchange Commission for the period

2    ending December 31, 2009; is that correct?

3    A.   That is correct.

4    Q.   And if you look at the last page, that's the page that you

5    signed pursuant to statute?

6    A.   That is correct.

7    Q.   Is it true then that you believe the statements made in this

8    10-K are true and accurate as best you know?

9    A.   That is correct.

10   Q.   Do you agree that the availability of the LogMeIn Free

11   service increases awareness of your fee-based or premium

12   services?

13   A.   I agree that the free product increases the awareness of our

14   fee-based or premium services.

15   Q.   Sir, because you're one the certifying officers on this 10-K

16   and were undoubtedly as chief financial officer connected with

17   the creation of the document, you would agree, wouldn't you,

18   that there has to be analysis and backup to support any of the

19   statements made in a 10-K like this?

20   A.   I would agree with that.

21   Q.   And certainly LogMeIn did the appropriate analysis to be

22   sure that the statements that it made in its 10-K were accurate

23   because it wouldn't want an inaccuracy to appear in a 10-K

24   statement; isn't that correct?

25   A.   That's correct.

J. Kelliher - Direct (By Deposition)                              583

1    Q.  What analysis are you aware of that LogMeIn did to ascertain

2    the correctness of the statements made in the paragraphs that

3    we've just looked at, the one that begins in February '03 and

4    the one that begins in 2004?

5    A.  February '03 is a statement of fact.

6    Q.  Okay.  What about the statements about availability of the

7    LogMeIn Free service increasing awareness of the fee-based or

8    premium services?

9    A.  The sentence begins with the words "we believe."

10   Q.  And so what was the -- what was that belief based on?

11   A.  Our feelings and our beliefs.

12   Q.  Well, certainly isn't it true that someone must have done

13   some analytical analysis to be sure that it was fair to state

14   that belief in the 10-K?

15   A.  I don't believe that's true, necessarily true.

16   Q.  Do you in fact know whether or not there was any analysis

17   done to support the statements about the effect of LogMeIn Free

18   increasing awareness of the fee-based services?

19   A.  Again, I would say the statement starts with "we believe."

20   Q.  Do I take it from your answer then you just don't know

21   whether there was any analysis done, you don't know either way?

22   A.  That's right.

23        MS. MCKNIGHT:  PX 238 marked for identification.

24   BY MS. MCKNIGHT:

25   Q.  Do you recognize PX 238, sir?

1    A.  I do.

2    Q.  What is it?

3    A.  It looks like an organization chart of the company.

4    Q.  What documents do the two sets of numbers we've just

5    discussed; that is, the registered users and the users as shown

6    on PX 114, come from?

7    A.  They would come from documents that would have come out of

8    our order administration system, sales system, database queries

9    into that system.

10   Q.  I take it then that the database contains information about

11   each user at least to the extent of tracking whether or not the

12   user has, A, a downloaded remote access product; and, B, has

13   actually conducted a remote access session with the product; is

14   that correct?

15   A.  That is correct.

16   Q.  And would that information be something also shown on the

17   investor relations report?

18   A.  Yes.  The total users are shown on the investors' relations

19   report.

20   Q.  What is the incremental expense of adding one additional

21   user to the LogMeIn Free service?

22   A.  Adding one incremental free user?

23   Q.  Yes.

24   A.  Minimal.  Zero.

25        MS. MCKNIGHT:  PX 183 marked for identification.

 1  BY MS. MCKNIGHT:

 2  Q.  We've placed in front of you a document that I'll represent

 3  to you I downloaded from LogMeIn's website entitled investor

 4  overview.

 5      Do you recognize to the document?

 6  A.  I do.

 7  Q.  Is it in fact an investor overview that was prepared for

 8  public distribution by LogMeIn?

 9  A.  We don't distribute it, but it's for public information,

10  yes.

11  Q.  It was public -- it was available publicly on the web?

12  A.  Yep.

13  Q.  When was it first made available on the web?

14  A.  It would have been sometime this quarter.

15      MS. FERRERA:  Your Honor, we would like to just read

16  the next question and answer, lines 19 through 22, on the same

17  page.

18      THE COURT:  All right.

19  BY MS. MCKNIGHT:

20  Q.  Sometime in January then of this year?

21  A.  No.  I would have -- sorry -- sometime in the previous

22  quarter.

23  Q.  Okay.  Did you prepare the investor overview?

24  A.  Sections of it I prepared.

25  Q.  Certainly free is lower than competitors who charge for the

J. Kelliher - Direct (By Deposition)                     586

1   product.

2       Are your premium products also lower than subscription

3   prices for your -- charged by your competitors?

4   A.  Again, it's not my area of expertise, but in general the

5   answer to that is yes.

6   Q.  Has, to your knowledge, any group at LogMeIn done any --

7   done an analysis of the marketplace and competition in terms of

8   their pricing, their total users, or their total revenue?

9   A.  Yes.

10  Q.  So turning to PX 63, page 5, and I apologize, you've already

11  testified to that, but tell me again why 90 percent of customer

12  support cost was allocated to Pro and Pro2.

13  A.  Because approximately 90 percent of the users are associated

14  with Pro, Pro2, or Free.

15  Q.  And when you said users in your last answer, you meant user

16  as that word is used on PX 114, that is to say an individual who

17  has downloaded and utilized with at least one communication

18  session a product?

19  A.  That is correct.

20  Q.  So if we then look at PX 114, the top line, total users, if

21  we looked at Q3 2010, there would be 10.4 roughly users for all

22  your products, and approximately 90 percent of those users would

23  be users associated with the accused products in this

24  litigation; is that correct?

25  A.  That is correct.

1    Q.  If you would turn to page 2838.  Page 2838 is in this

2    section of the 10-K identified as risks related to our business,

3    is it not?

4    A.  Yep.

5    Q.  And do you see in the middle of the page in this risk

6    section where the 10-K says, quote, certain of our competitors

7    offer or may in the future offer lower-priced or free products

8    or services that compete with our solutions.  This competition

9    may result in reduced prices and a substantial loss of customers

10   for our solution or a reduction in our revenue, end quote?

11   A.  Mm-hmm.

12   Q.  Can you explain to me how the offering by your competitors

13   of services that can compete with yours at a lower price or for

14   free would reduce your prices or subject you to a potential

15   substantial loss of customers?

16   A.  To the extent a competitor offers a free service that it

17   competes with our free service, that's obviously going to hurt

18   our business.

19       To the extent they have lower prices than us, that has

20   potential likewise to hurt our business.

21       If a competitor of yours would offer a product that was

22   substantially similar to one --

23   Q.  I think that's the question.

24       If a competitor of yours were to offer a product that was

25   substantially similar to one of your for-pay products but offer

1    that competitive product for free to customers, do you believe

2    that that would substantially and negatively impact on LogMeIn's

3    business?

4    A.   Potentially.

5    Q.   To your knowledge has LogMeIn ever been a potential

6    acquisition target by a third party?

7    A.   Yes.

8    Q.   On what occasions and who was the party?

9    A.   On occasions it was prior to -- it was prior to our IPO

10   process, and the parties that I can recollect in which there was

11   some discussions were Citrix, Cisco, and Hewlett Packard, to

12   which I was involved.

13   Q.   When were -- when did you learn that Citrix was considering

14   an acquisition of LogMeIn?

15   A.   I don't remember the exact date, but prior to our public

16   offering.

17   Q.   In 2009?

18   A.   No.  It would have been in 2008.

19          MS. MCKNIGHT:  PX 77B and PX 76B marked for

20   identification.

21   BY MS. MCKNIGHT:

22   Q.   Can you tell me what PX 77B is?

23   A.   77B would be the fiscal year 2009 monthly.

24   Q.   And how does it differ from, I believe, PX 77A, which was

25   the '09 spreadsheet that we looked at previously today?

1   A.  It includes both the accused and nonaccused products of

2   LogMeIn.

3   Q.  In both the revenue and the cost?

4   A.  The cost was always in there so you'll see the cost numbers

5   are the exact same between the two exhibits.  But in both the

6   bookings and the revenues, it includes the accused and

7   nonaccused products; whereas, the previous exhibit only included

8   the accused products.

9   Q.  Is PX 77B the way the spreadsheet appears as it is normally

10  produced and used as LogMeIn?

11  A.  Yes.

12  Q.  Okay.  Now, you also have PX 76B in front of you, sir.  Can

13  you tell me what PX 76B is?

14  A.  PX 76B is the same except for the year, 2005.

15  Q.  How does it differ from the earlier 2005 spreadsheet that we

16  looked at today?

17  A.  It would include the accused and nonaccused products.

18          MS. MCKNIGHT:  PX 75 marked for identification.

19  BY MS. MCKNIGHT:

20  Q.  Mr. Kelliher, can you please take a look at PX 75?

21  A.  Mm-hmm.

22  Q.  Do you have an understanding of what the spreadsheets

23  contained in PX 75 refer to?

24  A.  Some parts of it, yes.

25  Q.  Do you know what renewal rate refers to?

J. Kelliher - Direct (By Deposition)                        590

1  A.  That would be the effective renewal rate of the LogMeIn Pro

2  products.

3     It -- it represents the actual renewal -- it represents the

4  percentage of renewal revenue against prior year bookings.

5  Q.  So to go under Quarter 1 '09, does this 77 percent renewal

6  rate reflect the increase or the percentage compared to

7  Quarter 1 2008?

8  A.  It reflects the percentage of Quarter 1 2008 subscriptions

9  that were renewed in 2009 on a dollar basis.

10  Q.  And what is PX 181?

11  A.  It's the investor relations statistics report.

12  Q.  Okay.  And this is the report through Quarter 3 of 2010?

13  A.  It is.

14  Q.  Under Subscription Bookings Ratios, there's a reference to

15  New New.  What does New New mean?

16  A.  New subscriptions sold to a new customer.

17  Q.  And does New Premium Subscriber Add refer to a new

18  subscription or -- I'm -- why don't -- can you tell what -- what

19  New Premium Subscriber Add refers to?

20  A.  It's the number of new premium subscriptions, subscribers

21  added.

22  Q.  Further down there's a reference to 10 Year Customer

23  Lifetime Value.

24  A.  Mm-hmm.

25  Q.  What does that refer to?

1    A.   An estimated value of an average customer.

2    Q.   How is that determined?

3    A.   It's the subscription revenue per customer times an

4    effective analyzed renewal rate for a ten-year period of time.

5    Q.   How is the renewal rate determined?

6    A.   In this calculation it's at 80 percent.

7    Q.   Why is 80 percent used?

8    A.   It's an estimate of our -- of our actual renewal rates.

9    Q.   Is it based on past renewal rates?

10   A.   It is.

11   Q.   What period of time is it based on?

12   A.   Historically.

13   Q.   So since the inception of LogMeIn?

14   A.   No, not since the inception.  Over the -- over the last --

15   an average of over the last two years, approximately.

16   Q.   Underneath that there's a reference to Customer Lifetime

17   Profit Margin.

18   A.   Mm-hmm.

19   Q.   What does that refer to?

20   A.   The difference between that customer lifetime value minus

21   the cost to acquire a new customer.

22        MS. FERRERA:  We'd like to read the next question and

23   answer, 229, line 23, to 230, line 2.

24   BY MS. MCKNIGHT:

25   Q.   Will you please take a look at PX 73, Mr. Kelliher, and let

J. Kelliher - Direct (By Deposition)                    592

1   me know if you recognize it.

2   A.   I don't recognize the specific report.

3   Q.   Have you seen similar types of data before?

4   A.   I have seen this data.

5   Q.   Do you know when Citrix and LogMeIn first began discussions

6   about a potential acquisition?

7   A.   2006.  It would have been 2008.  Sorry.

8   Q.   Who at LogMeIn was involved in the discussions?

9   A.   Myself, Mike Simon.

10  Q.   Who at Citrix was involved in the discussion?

11  A.   The only person I remember is their vice president of

12  business development, Mike Cristinziano.

13  Q.   What kind of deal did the talks anticipate?

14  A.   Their discussions were regarding an acquisition of -- of

15  LogMeIn by Citrix.

16  Q.   Okay.  How long did the discussions go on for?

17  A.   Approximately two months, three months.

18  Q.   Did you provide documents to Citrix?

19  A.   I did.

20  Q.   What documents did you provide?

21  A.   We would have provided some financial reports, and we would

22  have provided a presentation of the company.

23  Q.   Citrix was a direct competitor of LogMeIn, correct?

24  A.   That is correct.

25  Q.   At some point did LogMeIn come to have an impression of what

1  Citrix might be willing to pay?

2  A.  Yes.

3  Q.  And what number did LogMeIn infer Citrix was looking for?

4  A.  That it would start with -- to my knowledge, that it would

5  start with a two.

6  Q.  Okay.  2 million, 200 million?

7  A.  200 million.

8  Q.  Did LogMeIn consider that amount to be too small?

9  A.  Yes.

10  Q.  What number did LogMeIn feel would be appropriate?

11  A.  To my knowledge, 400 to 500.

12  Q.  LogMeIn only recently -- what was the first year in which

13  LogMeIn recognized a net profit?

14  A.  That would have been 2009.

15        MS. MCKNIGHT:  Your Honor, that completes the testimony

16  of Mr. Kelliher.  I'd like to move in for admission of several

17  exhibits.

18        Move in for the admission a series of exhibits that

19  we've just discussed.  And Ms. Ferrera will stand up and let you

20  know which of those exhibits we don't object to being submitted

21  under seal.

22        Exhibit 77A.

23        MS. FERRERA:  Yes, Your Honor, we would like to have

24  that filed under seal, please.

25        THE COURT:  All right.  It will be admitted.

J. Kelliher - Direct (By Deposition)                    594

 1              MS. MCKNIGHT:  Exhibit 178.

 2              THE COURT:  Be admitted.

 3              MS. MCKNIGHT:  Plaintiff's Exhibit 83.

 4              THE COURT:  It's admitted.

 5              MS. MCKNIGHT:  Plaintiff's Exhibit 238.

 6              MS. FERRERA:  No objection.

 7              THE COURT:  It's admitted.

 8              MS. MCKNIGHT:  Plaintiff's Exhibit 114.

 9              MS. FERRERA:  No objection provided that it's filed

10  under seal, Your Honor.

11              THE COURT:  All right.  Admitted under seal.

12              MS. MCKNIGHT:  Plaintiff's Exhibit 183.

13              MS. FERRERA:  No objection.

14              THE COURT:  It's admitted.

15              MS. MCKNIGHT:  Plaintiff's Exhibit 77B.

16              MS. FERRERA:  No objection if it's filed under seal,

17  Your Honor.

18              THE COURT:  It's admitted under seal.

19              MS. MCKNIGHT:  Plaintiff's Exhibit 76B.

20              MS. FERRERA:  Again, no objection if it's filed under

21  seal.

22              THE COURT:  It's admitted.

23              MS. MCKNIGHT:  Plaintiff's Exhibit 75.

24              MS. FERRERA:  Same, Your Honor.  No objection if it's

25  filed under seal.

1          THE COURT:  All right.  It will be admitted.

2          MS. MCKNIGHT:  And the last one is Plaintiff's

3  Exhibit 73.

4          MS. FERRERA:  No objection if it's filed under seal.

5          THE COURT:  It's admitted.

6          MS. MCKNIGHT:  Thank you very much, Your Honor.

7                    (Witness stands down.)

8          MR. SHUNK:  Your Honor, before our next witness, to

9  clean up from the examination of Mr. Simon this morning, both --

10  we -- we showed Mr. Simon Plaintiff's Exhibit 78, the press

11  release.  Mr. Molster also questioned from it.  I move its

12  admission now.  I neglected to this morning.

13          MR. MOLSTER:  No objection, Your Honor.

14          THE COURT:  It's admitted.

15          MR. SHUNK:  Thank you, Your Honor.  I'm very pleased to

16  tell the Court and the jury that we are prepared to call our

17  final witness, Mr. Robert Brlas, a certified public accountant.

18          THE COURT:  All right.

19                    **ROBERT MICHAEL BRLAS**,

20            after having been duly sworn or affirmed,

21             took the stand and testified as follows:

22

23          MR. SHUNK:  As with the other witnesses, Your Honor, we

24  have witness binders for the Court, for the witness, and for

25  opposing counsel, and we'll pass them out with the help of the

1    marshal.

2              THE COURT:  Do you have a curriculum vitae filed for

3    him?

4              MR. SHUNK:  We do, Your Honor, and that's Plaintiff's

5    Exhibit 250.  We'd ask that it be admitted, assuming that the

6    defendant is not going to question his credentials.

7              MR. STONER:  That's fine, Your Honor.

8              THE COURT:  Be admitted.

9                         DIRECT EXAMINATION

10   BY MR. SHUNK:

11   Q.  Mr. Brlas, please tell the jury your full name.

12   A.  My name is Robert Michael Brlas.

13   Q.  By whom are you employed?

14   A.  I'm employed by BBP Partners.

15   Q.  What is BBP Partners?

16   A.  BBP Partners is a CPA and financial consulting firm.

17   Q.  Now, Mr. Brlas, your curriculum vitae, your list of

18   background and so forth, has already been admitted into evidence

19   so I won't ask you about that.

20       Let me turn directly to the question of why you are

21   testifying here today.  At some point were you asked to review

22   information and reach expert conclusions on certain subjects?

23   A.  Yes, I was.

24   Q.  Who asked you to do that?

25   A.  You did.

R. Brlas - Direct                                                  597

1  Q.  And what was it that I asked you to do?

2  A.  You asked me to assume that 01's '479 patent had been

3  infringed, at least one of the claims had been infringed by

4  LogMeIn, and to calculate damages associated with a reasonable

5  royalty as a result of that.

6  Q.  And did I offer to pay you for the hours that you would

7  spend doing that?

8  A.  Yes, you did.

9  Q.  And what was it that I agreed to pay you?

10  A.  My hourly rate is $375 an hour.

11  Q.  Did I stipulate to you at any time that you had to reach a

12  required result?

13  A.  No.  That's not the way I work.  I will go through the

14  information I have, evaluate it fairly, and come up with an

15  opinion.

16  Q.  Do you have any assistance in doing that work?

17  A.  Yes.  I had several accountants and financial professionals

18  that work with me at BBP that help me on projects like this, so

19  I had -- I had folks that were assisting me throughout the

20  process.

21  Q.  Tell the jury very briefly what kind of things they did for

22  you.

23  A.  There were a lot of -- there were a lot of documents

24  produced in this matter.  There were depositions that were

25  provided.  There were documents produced by LogMeIn regarding

1   their financial well-being, their statistics in terms of

2   operations.   There was research that needed to be done in terms

3   of the industry, royalties that might have been in place in the

4   market, a variety of things like that, data from O1.

5       So we needed to go through all this documentation to get an

6   understanding of what was -- what the -- the situation was with

7   the parties as we went about doing the analysis to determine

8   what a reasonable royalty would have been in this particular

9   situation.

10  Q.   Do you have any sense, sir, at least in general terms, of

11  how many hours you and your associates spent going through all

12  this information, doing the calculations, and reaching the

13  results?

14  A.   Yes.   Since 2010, we probably spent almost 2000 hours

15  working on this matter.

16  Q.   Have you been paid per your agreement with me?

17  A.   Yes, we have.

18  Q.   Now, sir, were you able -- after going through all those

19  documents and using your expertise to review them, were you able

20  to reach a conclusion as to what a reasonable royalty would be

21  for the assumption that there was an infringement by LogMeIn of

22  one of the claims of the '479 patent?

23  A.   Yes, I was.

24  Q.   I'm going to ask you a lot of questions about the work you

25  did in the background, but to set a frame for it, would you tell

1   the jury what the conclusion was with regard to that reasonable

2   royalty?

3   A.  My conclusion was that the royalty that would be owed to 01

4   by LogMeIn as a result of the rates that I derived and the bases

5   on which it was derived would be somewhere between 109 million

6   and $113.7 million.

7   Q.  How did that break down in terms of a per unit or per dollar

8   royalty?

9   A.  The way it broke down was for units that were sold by

10  LogMeIn, the Pro versions of these different products, if you

11  will, the accused products that were for sale, it was a royalty

12  rate of either somewhere between 18 and 20 percent.  Those are

13  the numbers I ended up with.

14      For the free products, the LogMeIn Free, for instance, it

15  was a flat rate of $2.50 per download.

16  Q.  Now, does that mean a one-time payment or $2.50 for each use

17  or what exactly does that $2.50 represent?

18  A.  The $2.50 is a one-time payment.  Once you download it, you

19  access the software -- or the service rather.  You now have that

20  service forever, and it's a one-time payment for that, the use

21  of that service.

22  Q.  With what degree of certainty did you reach these

23  conclusions, Mr. Brlas?

24  A.  I reached my conclusions to a reasonable degree of

25  accounting certainty.

1   Q.   Now, let's get into exactly what you did, how you did it,

2   and what the calculations mean.

3        First of all, in a summary way, let's go through the types

4   of documents that you reviewed, you and your associates, to

5   reach this conclusion.

6        For example, did you review the patent?

7   A.   Yes, I read the patent.  I read it from a layperson's

8   perspective.  I'm not qualified to evaluate the patent itself,

9   but I read it.

10  Q.   Are you a software engineer?

11  A.   I am not a software engineer.

12  Q.   Did you make any independent findings about whether the

13  patent was valid or about whether the patent was infringed,

14  even?

15  A.   No.  That would be beyond the scope of my capabilities.

16  Q.   Now, did you look at any of the court documents?

17  A.   Yes, I did.

18  Q.   What sort of court documents did you look at?

19  A.   I looked at the complaint, the answer, and there were a few

20  other pleadings I believe I reviewed, but that's basically what

21  I looked at.

22  Q.   Did you read any of the many, many depositions that were

23  taken in this case?

24  A.   Yes.  I read the deposition of Mr. Cheung, Mr. Stringer,

25  Mr. Kelliher.  I actually attended Mr. Kelliher's deposition.

1    So, yes, I read several of the depositions.

2    Q.   Where was that deposition that you attended?

3    A.   That one was in Boston.

4    Q.   Have you attended any of the proceedings in this case?

5    A.   I was here this morning to listen in.

6    Q.   Who did you hear?

7    A.   I heard Mr. Simon.

8    Q.   Okay.  Did you have any discussions with any individuals

9    that were helpful to your analysis?

10   A.   Yes.  I spoke to Mr. Stringer and I spoke to the experts

11   that were retained by 01, including Mr. Grimshaw.

12   Q.   Did you speak with the inventor, Andrew Cheung?

13   A.   I've spoken to him during the initial phases of my analysis.

14   I did not consult with him on that particular piece, no.

15   Q.   Did you review any financial documents?

16   A.   I reviewed a lot of financial documents.

17   Q.   What financial documents did you review, if any, that were

18   produced by LogMeIn?

19   A.   I reviewed a variety of information related to LogMeIn's

20   revenues and expenses and information related specifically to

21   the accused products in terms of their revenues.  I looked at

22   their public filings and other financial data.  So it was a

23   quite extensive amount of financial data that I looked at from

24   LogMeIn's perspective.

25   Q.   Of the roughly 2000 hours that you spent, do you have any

1  sense for how much of it was actually, I guess, what we would

2  call number crunching, looking at the financials and going

3  through the numbers?

4  A.  Wow.  It would be -- it would be at least a few hundred

5  hours.

6  Q.  Now, you spoke about public filings.  Did you look at any

7  analyst reports?

8  A.  Yes.  I looked at -- one of the things I typically do as I

9  go through these types of processes is I look at information in

10 the public domain and I looked at information produced by the

11 IDC on the marketplace, the random access solutions marketplace

12 and the competitors in that market.

13 Q.  What is IDC?

14 A.  IDC is International Data Corporation.  They're one of the

15 leading market intelligence providers in the IT consumer

16 technology and telecommunications industry.

17 Q.  What is a market analyst anyway?

18 A.  It's a person who goes and studies a particular industry,

19 gathers information on it, summarizes it, and provides it for

20 people who are interested in the market.

21 Q.  Is it typical for people who do what you do in an expert

22 capacity to rely on something like the IDC reports?

23 A.  Yes.  Because a lot of what we're doing is we're trying to

24 look at the situation as it existed at a particular period of

25 time, and those reports will give us a good idea of what

1    those -- what the industry looked like or what the competition

2    looked like at a particular point in time and maybe going

3    forward.

4    Q.  Did you look at any other market transactions or licenses,

5    not between these companies but between other companies, that

6    you thought might provide some information that was of use to

7    you?

8    A.  Yes.  I went out to a firm by the name of RoyaltySource who

9    tracks public -- publicly available data on licenses and

10   obtained information from them on different licensing

11   transactions that were out in the public domain.

12   Q.  Is it typical, again, for people who do what you do to rely

13   on that particular source for information?

14   A.  Yes.  That's a common source for folks that do what I do,

15   people are involved in licensing, absolutely.

16   Q.  Now, I'd like to understand, sir, what the methodology was

17   that you used to figure out what the reasonable royalty would

18   be.

19       Can you give us, from the 50,000-foot view, overall what was

20   it that you were trying to figure out?

21   A.  Well, what I was trying to figure out was at the time of the

22   infringement, what would 01 and LogMeIn have -- being willing

23   partners, no litigation going on, but they just know that

24   LogMeIn wants to use 01's '479 technology, if they'd sit down at

25   a table and talk about we need to come up with agreement, what

1   would it be that they would agree to.

2   Q.  Now, is that a typical way to determine patent infringement

3   damages?

4   A.  It is.  It's generally referred to as the *Georgia-Pacific*

5   method.

6   Q.  The *Georgia-Pacific* method.  Are you familiar with that

7   method being used in other cases?

8   A.  Yes.  It's actually based upon a court case, and this is the

9   methodology that's typically used by folks that do what I do to

10  be able to determine what damages would be in this sort of a

11  situation.

12  Q.  Now, I believe you said that you then -- you were thinking

13  about this hypothetical negotiation between the two companies.

14  What if it turns out that one of the two companies or both of

15  them just aren't interested in reaching a deal?  Doesn't that

16  break down somehow?

17  A.  Well, at the end of the day, what we have to do is make a

18  determination that an agreement would be reached.  I mean, it's

19  not uncommon to think that people don't want to license

20  technology, but in this sort of situation, the assumption is the

21  parties would come to an agreement.

22  Q.  Now, trying to imagine that hypothetical day where there

23  would be this negotiation, what method did you use in order to

24  figure out what the ultimate result at the end of the day of

25  negotiation would be?

1    A.  Well, the *Georgia-Pacific* case actually gives me 15 factors

2    that I should consider in coming up with the amount that I

3    ultimately determine the reasonable royalty rate should be.

4    Q.  Okay.  Do you start with a starting point or how does that

5    work?

6    A.  Yes.  I start with a starting point, and that's to figure

7    out some of the parameters within which my royalty rate would

8    fall, and then I would get to the point where I would then apply

9    those -- those different factors in order to determine

10   ultimately what the royalty rates would be.

11   Q.  Okay.  Well, let's think about the starting point from two

12   aspects; first of all, when would it be and then how would you

13   arrive at the starting point.

14       So first of all, when did you imagine -- or when did the

15   *Georgia-Pacific* method require that you imagine this

16   hypothetical negotiation would occur?

17   A.  The *Georgia-Pacific* methodology requires me to imagine that

18   the hypothetical negotiation would have taken place at the time

19   of first infringement, and that would have been August of 2005.

20   Q.  Okay.  So as of August -- now, was that for all the

21   products?

22   A.  This would have been for the remote access services

23   products.  That would be the LogMeIn products, not the

24   collaborative application products, which we dealt with later.

25   Q.  Let's make sure that we all understand what you mean by

1   that.  First of all, the remote access products, which specific

2   products were you looking at?

3   A.   The remote access products would be LogMeIn Free, LogMeIn

4   Pro, IT Reach, and Ignition.

5   Q.   Now, what about -- I think you called them the collaborative

6   application products.  Which ones would those be?

7   A.   The collaborative application products would be the join.me

8   products, join.me Free and join.me Pro.

9   Q.   Would there be a different day that you applied to the

10  collaborative application products?

11  A.   Yes, there was.

12  Q.   What date was that and why did you apply that date?

13  A.   The day I applied for that negotiation was the summer of

14  2005 -- or I'm sorry -- 2009.  That's because we had seen in the

15  2009 business plan of LogMeIn that they had an intention to

16  introduce a meeting -- a product sometime probably around 2010,

17  and then there were internal communications about an express

18  product around the summer of 2010, and a beta version of that

19  product which -- the express product -- which ultimately turned

20  into the join.me products came out in the fall of 2009.  So I

21  set it in the summer of 2009.

22  Q.   Okay.  So now that we know about the date, let's talk about

23  how it was that you -- you came up with or determined the

24  starting number.

25       Were there various methods that you used or looked at?

1   A.   Yes, there was.   There were --

2   Q.   What are the generally accepted methods first, if you could

3   list them, and then we'll talk about which ones you used and

4   what you came up with.

5   A.   In terms of putting a value on the technology?

6   Q.   Yes, sir.

7   A.   Well, there are -- there is basically three different

8   methods to put a value on something like this, an asset, an

9   intangible asset.   They're called the cost approach, the market

10  approach, and the income approach.

11  Q.   Let's take each one.   What generally is the cost approach to

12  doing the analysis?

13  A.   The cost approach is basically what would be considered a --

14  the cost of a design-around or work-around.   So, in other words,

15  I want you to license my technology and I want to charge you X

16  for it.

17       Well, you're going to look at that and say I don't -- do I

18  want to pay X or do -- or if I can do something else, rework my

19  product or service or whatever it is and it's only going to cost

20  me this amount, well, then I'm probably not going to want to pay

21  this amount.

22       So that's going to give you some guidance in terms of what

23  the amount would be that somebody would be willing to pay from

24  the standpoint of a reasonable royalty.

25  Q.   You mentioned something called the market approach.   What is

1    that?

2    A.   The market approach is just what it sounds like.  You go out

3    into the market, you look for licenses or transactions that

4    might mirror or be close to or have some of the characteristics

5    of the license that you're trying to negotiate in this

6    situation, and that becomes an indicator of what the parties in

7    this particular negotiation -- hypothetical negotiation might be

8    willing to agree to.

9    Q.   We'll come back to all of these, but I'm getting an overview

10   now.

11       What about the income approach, what's that?

12   A.   The income approach is where you look at the -- the

13   particular technology and its value to the parties involved in

14   the negotiations, sort of you look at what they're expecting to

15   derive in terms of value from that particular technology or

16   license, and that helps guide you as far as what the value might

17   be.

18   Q.   Let's go back to the first one now, the cost approach.  Did

19   you consider and use that approach at all?

20   A.   I considered the cost approach, but ultimately I did not

21   utilize the cost approach.

22   Q.   Tell the jury why.

23   A.   Because, as I said, the cost approach involves being able to

24   quantify what it would cost to prepare a work-around, and that

25   cost could be made up of a variety of things.  It's not only,

1    you know, I've got to buy this material and I got to hire this

2    guy and I got to do all these things to make the new product,

3    but there's also the impact of maybe a delay.

4        To come up with my rework, maybe I'm going to have to wait

5    another year to get into the marketplace.  Well, those lost

6    profits that I could have made during the course of that year,

7    that's a cost to me too so I've got to take that into account.

8    And if the work-around is not as efficient or costs more, that

9    would be something else that I would have to take into account.

10       In this particular situation though, based upon my

11   understanding of what the experts have shared with us, there is

12   no work-around for this technology.  So there's no way to do a

13   quantification of what it would be worth to -- or what the cost

14   would be to come up with the work-around.  So, therefore, in

15   this particular situation, the cost approach really didn't work

16   for us.

17   Q.  Now, did you actually look at an engineering standpoint and

18   reach some conclusion about whether a design-around would work

19   or not?

20   A.  No, I did not do that.  That's an assumption that I have as

21   part of my work.

22   Q.  Let's turn to the market approach.  Did you consider and did

23   you use, in any way, the market approach?

24   A.  Yes, I did.

25   Q.  Tell the jury how you did that, what you looked at, what you

1   determined.

2   A.   Okay.   Well, I started out with trying to understand the

3   licensing histories of both 01 and LogMeIn.   That would be the

4   natural point to start.   They are the parties that would be part

5   of the hypothetical negotiation.

6        Well, the first thing I looked at was 01.   The only licenses

7   that 01 had were with a company by the name of Hitachi in Japan.

8   Those were licenses to rebrand the 01 I'm InTouch product in

9   Japan, and it called for royalties of between 20 and 30 percent,

10  and there were some arrangements for development costs and such.

11       But -- and the license did call for the use of the

12  technology, the '479 technology, but it was -- it was a software

13  license, it was a little bit broader, so it was something that

14  ultimately didn't say that was a royalty rate that could be used

15  for purposes of this hypothetical analysis.   So that's what I

16  had from the standpoint of 01.

17       I also had some licenses produced by LogMeIn.   When I looked

18  at those licenses, they were technology licenses, but they

19  were -- they were agreed to in the context of litigations or

20  litigation settlements.   The patents at issue could have been

21  reexamined or were subject to reexamination.   And so it really

22  didn't -- it wasn't under the guise of an arm's-length

23  transaction where willing people sat down to talk about, what

24  would we agree to from a business standpoint.   These were --

25  these were more like business settlements.

1    So from the standpoint of saying that these had any value in

2  terms of determining the licensing history of LogMeIn, well,

3  first of all, they were actually subsequent to the data of the

4  hypothetical negotiation.  But to say they were indicative of

5  what licensing policy they would have, I didn't find that

6  particularly useful either.  So it -- it really didn't inform me

7  from that standpoint.

8  Q.  Well, did you forge on and look at some other items?

9  A.  So I forged on.

10  Q.  Okay.

11  A.  And that's where we went to the RoyaltySource information.

12    Now, RoyaltySource, what I did was I -- I gave some -- gave

13  RoyaltySource some search terms about remote access software and

14  prepacked software and things like that, and they gave me a

15  group of licenses that I looked at and considered.  I ultimately

16  looked at a smaller subset of those licenses, none of which were

17  perfect in terms of the characteristics of what we were looking

18  at here.

19    They were informative from the standpoint of giving an idea

20  of what might be out there from the -- from the standpoint of

21  certain licensing related to software or remote access, but they

22  certainly weren't on target with what we were doing.  So I

23  looked at them and I considered them, but ultimately that didn't

24  help me determine what the royalty rate would be in this

25  particular situation.

1   Q.   Did you look anything else for the market approach?

2   A.   Yes.   The last piece of my market approach was two actual

3   transactions in the area of -- of the businesses that we're

4   talking about here.   One was an acquisition by -- by LogMeIn.

5   LogMeIn acquired a company by the name of Applied Networking.

6   Applied Networking had, according to the documents I saw,

7   some -- some very important technology that the LogMeIn folks

8   believed was key to the ongoing success of the company.

9        And what they did was -- and I think it was discussed by

10  Mr. Kelliher in his deposition.   He and his folks, along with

11  outside investment bankers that they had working with them on

12  that, determined the value of this technology, which was really

13  sort of a VPN technology, not exactly remote access solutions,

14  but in the remote access services umbrella, in that area.

15       They allocated $1,400,000 of that $4 million purchase price

16  to that particular technology.   And what I was able to do is

17  base -- take the information that they had in terms of how they

18  came up with the amount -- the amount they determined should be

19  assigned to that technology, and I was able to sort of reverse

20  engineer it and -- and using what accountants call the relief

21  from royalty methodology, and I was able to determine that that

22  $1.4 million determination of the value of that technology

23  equated to approximately a 39 percent royalty rate for the

24  technology that they acquired in that particular transaction.

25  Q.   Well, the -- there were a lot of complicated phrases in

1   there.  Let me ask you about one.

2   A.  All right.  Yeah.

3   Q.  Relief from royalty, what does that mean and what -- what

4   did that mean that you did?

5   A.  What that -- what that means is -- the relief from royalty

6   method assumes that when you buy technology like that as an

7   acquirer, you are going to get a value from it on an ongoing

8   basis.  So really what it's trying to do is measure the cost

9   savings that you as a company will enjoy as a result of buying

10  this technology instead of having to pay a license on a

11  perpetual basis to go out and acquire that technology to include

12  it in your products, if you will.

13      So that's the purpose.  It's sort of a -- it's looking at

14  what you're going to save over a period of time and assigning a

15  value to it.

16  Q.  Was there any other transaction like that that you looked

17  at?

18  A.  Yes.  The other transaction involved Citrix, the company

19  that owns GoToMeeting.  They bought a company by the name of

20  Expertcity.

21  Q.  And what documents did you look at in order to get

22  information about that transaction?

23  A.  It was Citrix's public filings.

24  Q.  Okay.

25  A.  And --

1    Q.   With -- public filings with who?  With what agency?

2    A.   With the Securities and Exchange Commission.

3    Q.   Okay.  Go ahead.

4    A.   And so what I did was I looked at the information that they

5    provided.  They indicated that they paid $240 million for -- for

6    Expertcity.  And they determined that, I believe, $25.3 million

7    of that purchase price belonged to core technologies for their

8    business.

9        So I went ahead and, again, using the same relief from

10   royalty methodologies, I was able to make a determination that

11   based upon the amount assigned, the 25.3 million, they were

12   making a determination that -- I made -- I was able to calculate

13   that the royalty rate for that implied -- implied in that

14   transaction was approximately 20 percent.

15   Q.   Okay.  What conclusions as to the market valuation did you

16   reach from all of that work that you've described so far?

17   A.   Well, both -- both the -- the last two, the Citrix

18   acquisition of Expertcity and LogMeIn's acquisition of Applied

19   Networking.  Again, I don't have all the specifics on the

20   technology that was acquired.  All I know is they were core

21   technologies that were important to the companies, and my

22   understanding is that the '479 technology is very important to

23   the functioning of the LogMeIn products.

24       So I couldn't say they were -- they were spot on in terms of

25   saying this is what they would agree to in this particular

1    situation, but what I could do is say, all right, that's giving

2    me some indication of how -- how the market might be looking at

3    the value of -- of technologies such as this.

4         So ultimately what I did was I looked at all my information

5    on the -- on my market research and my -- on the market

6    approach, and what I did was basically come up with what I would

7    term my big box.  Where should my ultimate royalty rate that I'm

8    going to make a determination of, in what box should that fit?

9         On the low end I had -- I assumed about 5 percent, based

10   upon looking at some of these transactions and everything,

11   saying that might be the low end from my standpoint from what I

12   could tell.

13        The -- and on the top end, I said 30 percent.  That would be

14   the big box based upon some of these rates I've seen out there.

15   And that's -- so that was sort of my working parameters as I

16   moved forward.

17   Q.  Now, did you try to narrow that down some more by going to

18   the income approach?

19   A.  Yes, that was my next step.

20   Q.  Tell the jury what you did there.

21   A.  Now that I looked at what was going in the market and I had

22   my -- my framework, I then went to look and see how the

23   companies would look at this technology and how they would value

24   it.

25        So I started out by looking again at the financial

1  information and -- of LogMeIn and understanding how they would

2  utilize it and how they would derive value from this technology,

3  and there were a couple of aspects to it.

4     They -- they had the paid-for products, the LogMeIn Pro, if

5  you will, for which they charge money, and they had the LogMeIn

6  Free, for which they didn't charge any money.  So I had to come

7  up with values for each of those in terms of making a

8  determination of what a royalty rate would be.

9  Q.  Let me stop you right there.  Why did you feel you had to

10  come up with a valuation for both the free products and for

11  the for-pay products?

12  A.  Well, that gets back to one of the other elements that

13  we'll -- we -- that I need to look at is the royalty base.  How

14  am I going to apply my royalties in terms of determining how

15  much LogMeIn would owe 01.

16     So there's -- there's typically three ways that you would

17  look at this, the first one being a lump sum where the parties

18  would just get together and say, all right, pay me this amount

19  and we've got a license and we're done.

20     Well, again, going back to the timeframe we're talking in

21  2005, LogMeIn was -- had already given away, I believe, around a

22  million copies of the free -- the free service.  And 01 would

23  see this and understand that that would have a potential impact

24  on -- on the market and on their abilities to go out and sell

25  their products.  So they're going to be a little reluctant to --

1  to agree to just a one-time fee because they don't know if -- if

2  they would get enough and -- because maybe LogMeIn is going to

3  just give -- get that many out or it's going to be this

4  successful.  They don't know.

5      And the fact that LogMeIn's in the market doing this,

6  that -- that causes them some consternation in terms of their

7  business and what it's going to mean to it.  So LogMeIn would

8  want a one-time payment that would be very, very high, too much

9  for LogMeIn to pay.  And LogMeIn, not knowing what the success

10 rates of this is going to be, they're going to be gambling with

11 going on with this freemium approach, they're not going to want

12 to pay a big amount.  They're going to only want to pay a little

13 amount.  So I didn't believe that that approach was appropriate.

14     The next approach then was a volume approach where you just

15 track the number of downloads.  So every time the product

16 containing the '479 patent in it, embodying the '479 patent is

17 downloaded, whether it's Free or Pro, you get a certain amount

18 of money.

19     And, again, it's one of those things where 01 will say,

20 well, if they're giving -- keep giving this away, you're having

21 an impact on me and my ability to not only sell my products, but

22 even license it to other parties, so they're going to want a

23 very big number.  And LogMeIn is saying, well, I don't know how

24 many I'm going to give away, but it could be a lot, I'm going to

25 be a little hesitant to necessarily agree to that.

1    And also from 01's standpoint, if -- if LogMeIn at some

2    point in time would make a determination that we're going to

3    take all of our free folks and we're going to convert them over

4    to a paid model, now all of a sudden that amount that they would

5    be getting for the one-time use, for the one-time download,

6    might -- might not totally capture the value of what they're

7    providing LogMeIn.

8    Q.   So how did you look at the parties' expectations sitting at

9    that hypothetical negotiating table from this income standpoint,

10   and specifically what kind of calculations did you do?

11   A.   Well, from a -- I should finish.  There's one other piece.

12   Q.   Absolutely.

13   A.   I'm sorry.  The last piece is a revenue approach, doing a

14   royalty based upon revenues where, just whatever they sell,

15   LogMeIn would get -- or LogMeIn would have to pay 01 a

16   percentage of that.

17     If that's what they agreed to, that could be problematic for

18   01 because they're going to say you're giving away literally

19   millions and millions and millions of copies of this software,

20   this service, and we're really not getting compensated for that.

21   And that, again, impacts our ability to not only sell our

22   product, but license it to others who would be willing to sell

23   it.

24     So ultimately what I decided then was the parties would

25   agree to sort of a hybrid approach.  The -- the free versions

 1   that -- for which 01 would -- or that LogMeIn would distribute

 2   for free, there would be a one-time payment associated with

 3   those.

 4       On the other hand, for the products that they're deriving

 5   revenue from, they would then get a percentage of the revenue

 6   associated with it.  So that's how I came up with the basis on

 7   which the rates we'll talk about now are assigned; part volume,

 8   part revenue.

 9   Q.  Okay.  And so having now created that structure, what did

10   you do to fill in the numbers?

11   A.  So to fill in the numbers, I had to see what the value of

12   the products were.  I want to understand it from the standpoint

13   of the values that would be derived from both parties and

14   what -- particularly from LogMeIn's standpoint, what they would

15   derive from a profitability on selling the product, and from

16   01's standpoint, what value they would be giving up in terms of

17   their -- their valuation of the free piece of the business.

18       So on the LogMeIn side, I looked at what sort of

19   profitability they could expect to achieve on those products

20   over -- over time.  So I looked at the financial data that was

21   provided by -- by LogMeIn and I was able to determine the --

22   what I call the incremental profitability, what they could

23   expect to derive from the sale of that software over time.

24   Q.  Well, let me stop you right there.  We've heard the word

25   profit in this case a lot.  The jury has heard it from many

1    different witnesses, and now you -- it sounded like you

2    qualified that as incremental profitability.

3        Isn't -- isn't profit just profit?

4    A.  If the world was that simple, I probably would be out of

5    business.

6    Q.  Okay.

7    A.  But, no.

8    Q.  Tell us what you mean by incremental profit.

9    A.  Incremental profit means that when -- when I sell something,

10   there are costs that I would incur -- I have a store.  I have to

11   pay -- I have to pay rent for the store.  I'm going to pay rent

12   for the store whether I sell a product or not.  So what I'm

13   interested in in this particular situation is, when I sell this

14   product, what cost do I have to take away from that product or

15   are associated with that product that will leave me dollars with

16   which to pay the rent, if you will.

17       So what I'm looking for is, if I'm going to sell you -- if

18   I'm going to sell you a cup of coffee, you know, the cup of

19   coffee I'm going to charge you $2 for, and the cup of coffee

20   itself and the labor and everything is going to cost me

21   $0.50.  So that leaves me 1.50 to pay me and pay the -- pay the

22   rent and all those sort of things.

23       So that's what I'm looking at is that -- that amount after

24   you pay for the coffee, if you will.  That you take the $0.50

25   from the $2 selling price and the 1.50.  And that's -- that's

1   what I'm trying to understand in terms of profitability.

2   Q.   Well, is that the same thing as sort of the bottom line

3   profit of the company for the year?

4   A.   It's not.   When you look at the bottom line profitability,

5   that's when you throw in the rest of this stuff.   At the end of

6   the year, I want to know, did I make money by selling enough

7   cups of coffee where I was generating $1.50 and the donuts that

8   went along with it and everything.   And at the end of the year,

9   hopefully I've got enough money from all these incremental

10  profit pieces to pay for the rent and pay for me and -- and make

11  my business successful.

12  Q.   Okay.   So tell the jury at -- let's start with LogMeIn's

13  side.   How did you calculate what they would think the -- you

14  know, the value that they would get would be?

15  A.   What I did was, LogMeIn had provided me some information

16  regarding the revenues and costs associated with -- with the

17  accused products.   They had come up with some information where

18  they really didn't keep profitability necessarily on a product

19  basis, but the information they gave me, they did some

20  allocations of expenses and such.

21       And those allocations really, again, don't get you to the

22  point, in my experience, where that gives you really the

23  incremental amount, that $1.50 that you would be looking at in

24  these kinds of situations.

25       So what I did was I took that information or actual

1   information in terms of the revenues and costs and such, and I

2   performed a statistical analysis called a regression analysis to

3   give me what that -- that incremental piece was, the cost --

4   that 50-cent cost of a cup of coffee, if you will.

5   Q.   Okay.  And do you recall what you determined from that

6   incremental analysis?

7   A.   Yes.  What -- what that analysis showed me was that for

8   every dollar that -- of revenue that LogMeIn generated by

9   selling these products, their cost of goods sold that they

10  charged to that was, I think, about $0.16.  So that meant they

11  had $0.84 of every dollar that they -- they generated to pay for

12  the further costs.

13     Now, there were other costs.  There were sales and marketing

14  costs associated with -- with this product, which came up to

15  another $0.37.  So that meant that on an incremental basis,

16  after looking at these costs, that LogMeIn was generating an

17  additional about $0.47 on every dollar that they could use to

18  pay these costs.

19  Q.   Okay.  Turn to Plaintiff's Exhibit 246, please.

20  A.   Okay.

21  Q.   That's already been admitted in evidence in this case.  So I

22  simply want to ask you, first of all, did you -- did you look at

23  this document to -- does this document help explain some aspect

24  of the incremental cost picture that you were just discussing?

25  A.   I have looked at this document.  This document would include

 1    the types of expenses that are included in that analysis.  It

 2    would also, I think, be more helpful in terms of just

 3    understanding that -- that -- not necessarily incremental profit

 4    versus operating profit, but sort of GAAP income versus non-GAAP

 5    income.  That's -- that's what this sort of shows.

 6    Q.  That's exactly what I -- I wanted you to comment on.  Could

 7    you -- the jury has heard testimony in this case about how

 8    profitable the company is or isn't at a particular time and what

 9    their overall profits might be.

10        And I've -- I've shown you this particular document from a

11    recent filing.  What can you tell the jury from that specific

12    instance that would help them understand this issue of the

13    connection between the reported profit and the incremental

14    profitability you've been talking about?  Does the bottom line

15    profitability -- is that -- is that what you're looking to to

16    estimate the value of the products to the company?

17    A.  It's not the bottom line that I'm looking at.  It's -- it's

18    something a little higher up.  It's taking into account all the

19    expenses associated with getting to the bottom line, but you're

20    going through and saying, of these expenses, only certain ones

21    of them apply to the revenue that you're generating.

22    Q.  Take a look at Plaintiff's Exhibit 48, and particularly

23    page 32 from that document.

24    A.  I'm sorry.  What page?

25    Q.  32.

1    A.   Okay.

2    Q.   Does that particular section -- well, first of all, what is

3    the document?

4    A.   This document is LogMeIn's Form 10-K, their annual report

5    filed with the Securities and Exchange Commission for the period

6    ended December 31, 2009.

7    Q.   Does it provide you any information about LogMeIn's cost

8    allocations, cost of revenue?

9    A.   Yes, it does.

10   Q.   Tell us about that.

11   A.   It tells us about the cost and -- and the cost of revenue

12   and how those are computed by the company.

13   Q.   Did you -- was that part of what you used in order to figure

14   out what this incremental profit margin would be?

15   A.   I looked at these costs and it helped inform me that there

16   were allocations involved, and that's why what I needed to do

17   was to just to step back and not look at -- at the public

18   filings in terms of calculating what the incremental profits are

19   here because the public filings and the public reporting are all

20   appropriate and -- and they're done correctly.  But that doesn't

21   tell the story in terms of specific elements within those

22   financial statements such as what we're talking about here with

23   the incremental profits associated with the infringing products.

24   Q.   So you had to dig deeper?

25   A.   Yeah.

R. Brlas - Direct                                                     625

1   Q.  And what did you do to dig deeper?

2   A.  I looked at the internal financial statements of LogMeIn

3   and -- and found the information that was provided to us by

4   their management.  And using that information, I performed this

5   statistical analysis that I refer to, the regression analysis.

6   Q.  And is that regression analysis a standard tool that people

7   who do what you do rely on?

8   A.  Yes, it is.

9   Q.  What was the result of that regression analysis?

10  A.  That's where I came up with the 46 or 47 cents of

11  incremental margin that was generated by LogMeIn through the

12  sale of the accused products.

13  Q.  Now, did you look at the income approach, moving now from

14  LogMeIn to 01, to see what 01 would see in terms of the value of

15  the technology on an income basis?

16  A.  Sure.  01 understood the profitability of these products.

17  If you look at their financial statements, they will show that

18  their -- their cost of sales -- remember, I said that LogMeIn

19  said that theirs was -- you know, or my computation of theirs

20  was somewhere around $0.84, and it did ultimately around 2010, I

21  believe, get up to about $0.90.  Well, 01's was in the same

22  ballpark.  Theirs was actually $0.90 to $0.95.  So they

23  understood the sort of same profitability that LogMeIn would be

24  looking for through the sale of their products.

25      What LogMeIn would be most concerned about from my

R. Brlas - Direct                                                626

1    perspective is this free piece here because there's -- they have

2    a value associated with the free users.  And the fact that -- 01

3    would be concerned about the value associated with free users,

4    so what they would be concerned about is the fact that LogMeIn

5    was giving away millions and millions of copies of the LogMeIn

6    Free product using the '479 technology.  And by giving that

7    away, they're taking -- they're effectively taking value from --

8    from 01.

9         Now, it's not profits necessarily, some of that.  You know,

10   hopefully they would make some sales there.  But it also related

11   to the licensing, that they had licensing opportunities where

12   they can literally go out and take this technology out and

13   license it to other people.

14   Q.  What effect would the -- would free have on a licensing

15   strategy in your estimation?

16   A.  The free, the impact that it has and the way it's employed

17   by LogMeIn, it's -- it's literally excusing the free user, if

18   you will, from making a buying decision.  Mr. Simon testified

19   earlier this morning that it's -- you know, it's free

20   advertising.  And, you know, the free users, you know, we like

21   them and everything and they're great word-of-mouth advertisers

22   and everything.

23        Well, what -- what the LogMeIn model does is by giving -- I

24   think there's 16 million free users now.  You know, you talked

25   about people like to use it for gaming and everything like that,

1   that's great.  But those free users, after using -- whether they

2   use a -- the free or free trial and -- or take the free trial

3   off and ultimately go back to the free, they obviously had some

4   value associated with that.

5       They are now -- LogMeIn's model now takes that -- that

6   buying decision away.  I don't have to decide to buy.  I can

7   just continue to use the product for free.  And what that's

8   doing is effectively removing those as -- those folks as

9   purchasers from the market.  Again, not that all of them are

10  going to buy, but some of them could buy.  And so those free

11  users had a value, and that's what 01 would be concerned about

12  capturing, is that value, that -- go ahead.

13  Q.  I was going to say, how did you go about then putting a

14  number to that value?

15  A.  We used a methodology very similar to what Mr. Kelliher had

16  testified to and what 01 uses.  And that's looking at the value

17  of an annual subscription, taking that in terms of the dollars,

18  looking at the renewal rates that apply to the 01 customers,

19  and -- and applying that over a series of years.  I think in our

20  case, it was approximately five we used.  And then turning that

21  into a conversion rate.  How many of those people typically

22  would be converted from a free trial user, in their case, to a

23  paid user.

24      And with that, we came up with a dollar value per free user

25  on the low end of approximately $8 and a high end of

1    approximately $14.

2    Q.   What was the conversion rate that you used?  Do you recall?

3    A.   The conversion rate ranged on the low end of 8.8 percent to

4    the high end of 9.5 percent.

5    Q.   Where did you get that percentage rate?

6    A.   That information was based upon the subscription information

7    that was provided to us by LogMeIn in terms of their actual

8    subscriptions -- or, I'm sorry, not LogMeIn's, 01 -- of their

9    actual subscription history in terms of new -- new

10   subscriptions, cancellations, and the like.

11   Q.   What was the pricing number that you used in that

12   calculation?

13   A.   The pricing number was between, I think, 76 and $79.

14   Q.   What was -- how did you determine a renewal rate to apply?

15   A.   The renewal rate was based upon on the low -- I used an

16   average for the historical numbers for the low end of 2004,

17   2005, and then I used a longer term up to 2010 for the high end.

18   Q.   Now, how did your income analysis inform your starting

19   royalty rate?

20   A.   Well, based upon what I saw there in terms of the -- the

21   values that were being derived from both parties, certainly in

22   the value being -- the -- the incremental profits being derived

23   by LogMeIn, the value of the free users that were not being

24   captured by them in -- at a cost to 01 because of the value they

25   were providing, I believe that based upon those numbers that the

1  parties would have been negotiating for royalty rates somewhere

2  again between 15 and 25 percent based upon the values I saw

3  there.

4      So now taking my big box, if you will, the 5 to 30, and

5  based upon my looking at the value of that technology, I've now

6  narrowed it down to 15 to 25 percent.

7  Q.  Okay.  And so having narrowed it down to that smaller range,

8  did you then begin to apply the various factors that the

9  *Georgia-Pacific* techniques requires?

10 A.  Yes, I did.

11 Q.  Okay.  Let's go through those quickly and tell us how -- not

12 only how you applied it in terms of what effect did it have, but

13 also a brief statement of why you applied it in that fashion.

14     So let me ask you, first of all, if you considered the

15 royalties that were actually received by 01 for licensing the

16 patent-in-suit that might establish an established royalty?

17 A.  Well, that's a -- that's a factor that I certainly

18 considered.  And, as I mentioned, we had the Hitachi licenses

19 out there, but, again, they were for a different geography.

20 They were rebranding even though they included the '479 patent

21 in it.  It just wasn't compelling enough.  It wasn't spot on, if

22 you will, to say that that was the value that was going to be

23 derived and -- from this licensing thing.  It didn't -- it

24 didn't establish a precedent to say this is a history of

25 licensing that you could rely upon.

1     Therefore, I said that particular factor was neutral.  It

2 had no impact in terms of increasing or decreasing the rates

3 because -- excuse me -- that's what I'm trying to do with the

4 *Georgia-Pacific* factors is after I look at them and weigh them,

5 I'll make a determination as to whether or not they tend to

6 increase or decrease that rate.

7 Q.  Did you consider the rates that were paid by the licensee

8 for the use of other patents?

9 A.  Yes, I did.  Again, I -- as we -- excuse me -- discussed

10 earlier, I looked at the licenses of LogMeIn.  Those licenses

11 were, again, in settlement of -- of litigation.  There was

12 nothing there to indicate that those would be indicative of a

13 set licensing history, particularly for this technology.  So

14 once again, I said this particular factor was neutral.  It

15 really didn't impact where that licensing, what rate should

16 ultimately end up.

17 Q.  Did you consider the nature and scope of the hypothetical

18 license being exclusive or not exclusive, restricted or

19 nonrestricted?

20 A.  Yes.  I assumed that this license was going to be

21 nonrestricted in terms of the remote access services industry

22 and wouldn't be exclusive.  Therefore, I didn't feel like it

23 would have any real impact on the ultimate decision about the

24 royalty rate.  So, again, it was a neutral impact.

25 Q.  Did you consider 01's established policies and marketing

1    programs with regard to patents in terms of licensing or not

2    licensing others?

3    A.  Yes, I did.  Excuse me.  I did consider their -- consider

4    that.  And, again, 01 really didn't do any licensing outside of

5    the -- outside of the Hitachi licenses in Japan.  I didn't --

6    they wanted to preserve their monopoly, if you will.  They

7    wanted to continue to develop their -- their products and sell

8    those and be successful.  They weren't looking to license to

9    competitors.  So I felt that would tend to increase the value of

10   the license a bit.

11   Q.  Did you --

12          THE COURT:  Why don't we take a brief recess at this

13   time.

14      (Recess taken at 3:51 p.m.; the jury enters at 4:09 p.m.)

15   BY MR. SHUNK:

16   Q.  Mr. Brlas, we were on the sixth *Georgia-Pacific* factor.

17      Did you consider the effect of selling the patented

18   specialty in promoting sales of other products of the licensee

19   or the existing value of the invention to the licensor as a

20   generator of sales of nonpatented items and the extent of those

21   sales?

22   A.  Yes, I did consider that.  Certainly the -- the embodiment

23   of the '479 patent by LogMeIn and its products was very valuable

24   to them.  They were generating the dollars and everything, but

25   it was also driving people to their other products.

1    The -- the company commented on how when people came and

2    bought product from LogMeIn, they followed up with another

3    40 percent of purchases in the following year.  So it certainly

4    was a compelling case that it did add some value there.

5        So it was a factor, not as strong as some of the factors,

6    but it helped a little bit in terms of a little higher rate.

7    Q.  Did you consider the duration of the '479 patent and the

8    term that would be applicable for the license?

9    A.  Yes.  The '479 patent, I believe, would have had about

10   another 17 years on it at the time of the hypothetical

11   negotiation, which from 01's standpoint is good.  That gives

12   them a longer period.

13       However, what they want to do is sort of temper that a bit.

14   You don't want to -- you don't want to do something where you

15   have people that have the license, then all of a sudden they

16   feel like they would rather pay less, and so they're -- they're

17   encouraged to do something else.  So that factor was sort of a

18   neutral factor in my mind.

19   Q.  Did you consider the established profitability of the

20   product made under the patent's commercial success and current

21   popularity?

22   A.  Yes.  Well, as I said earlier, the -- the LogMeIn Free

23   products at that time were generating incremental margins of

24   probably 46, 47 cents on the dollar for LogMeIn, and certainly

25   there had been a great deal of acceptance of the -- not only

 1  that product, but the free product.

 2     And that free product ultimately ended up helping derive

 3  value for the company in terms of their IPO a few years later.

 4  So there was certainly an embodiment -- or there was certainly

 5  value from that perspective.  So this one, again, tended to take

 6  it a little bit higher.

 7  Q.  Did you consider the utility and advantages of the patented

 8  property over old modes or devices, if any?

 9  A.  I did.  And I -- and if you -- if you go to the next one,

10  because usually we take these two together --

11  Q.  Okay.  Well, then did you consider that in addition to the

12  nature of the patented invention, the character of the

13  commercial embodiment, and the benefits to those who have used

14  the invention?

15  A.  Yes.

16  Q.  And what did that mean in terms of your analysis?

17  A.  What that meant to me was that the embodiment of this

18  technology was -- was used in all the -- all the downloads of

19  the product, all the products -- all the accused infringing

20  products.  And the technology solved a lot of technical

21  problems, from my understanding, and is used by LogMeIn.  And my

22  understanding is Citrix is also accused of using this

23  technology.

24     So it was used by the vast majority of the market and it

25  solved a lot of these technical problems.  So it had value in

1   terms of the way it was to be utilized.  That too tended to

2   increase the rate a bit.

3   Q.  Did you consider the extent to which LogMeIn had made use of

4   the invention and any evidence of the value of that use?

5   A.  I did.  And, again, this is one where LogMeIn had

6   incorporated this technology in virtually all of its remote

7   access services products, in every one of them, every -- all of

8   the millions of downloads of the free product, all the -- I

9   think they had several hundred thousand pages at that point in

10  time.  So it was certainly in there and it was creating value

11  for the company not only from the standpoint of profitability

12  and such.  Again, this tended to increase the value.

13  Q.  Did you consider the portion of the profit or the selling

14  price that may be customary in a particular -- in this

15  particular business area to allow the -- for the use of the

16  invention?

17  A.  Yes, I did.  And, again, this is one where there was no

18  established amount necessarily where you could go to -- to prior

19  transactions or prior licenses necessarily and say this is an

20  established amount.

21      But, as I mentioned, when we look at the Expertcity

22  acquisition by Citrix and the LogMeIn acquisition of Applied

23  Networking, they saw some value there, which was fairly -- they

24  paid a substantial effective royalty rate for technology that

25  was somewhat similar.  So this one, I believe, tended to

1   increase the value a bit.

2   Q.  Did you consider the portion of the realizable profits that

3   should be credited to the '479 patent's invention as

4   distinguished from other elements of the accused service that --

5   or the manufacturing process and business risks and so forth

6   that are related to the accused product or process?

7   A.  I did.  And in this particular case, my understanding is

8   that LogMeIn's product without the '479 technology wouldn't be

9   the same product.  It would not function.  So it was certainly

10  key to the functioning of the product and their being able to

11  sell it.

12      Now, that said, LogMeIn had also invested a lot of money in

13  developing its products and taking it to market and all the

14  other business risks associated with it.  So I believe that this

15  particular element argued for a lower royalty rate.

16  Q.  Now, did you consider the opinion and testimony of any other

17  qualified experts with regard to this particular product?

18  A.  In this particular case, I know there are other opinions out

19  there, technical experts and such.  I'm just going under the

20  assumption for my purposes that there's infringement going on.

21  But for purposes of this factor, I determined it to be neutral

22  in terms of weighing how the royalty would be determined.

23  Q.  And, finally, sir, in your analysis, did you give

24  consideration to the amount that LogMeIn and 01 would have

25  agreed upon at the time that the infringement began if both had

1   been reasonably and voluntarily trying to reach an agreement?

2   A.   I did.

3   Q.   And how did that factor into your ultimate consideration?

4   A.   So what I've done now is I've said -- I've had this big box,

5   5 to 30 percent.  After going through the income approach, I've

6   now narrowed it down to 15 to 25 percent, and I've gone through

7   all these *Georgia-Pacific* factors that are helping me weigh

8   where does this go, where do I ultimately end up in terms of the

9   royalty rate.

10       And after looking at those, there were -- the

11  *Georgia-Pacific* factors led me to conclude that it should tend

12  to go a little bit higher than the average, if you will.  So

13  where I ended up was the 18 to 20 percent royalty rate that we

14  discussed earlier on.

15  Q.   And did you weigh each of these factors in reaching that 18

16  to 20 percent?

17  A.   Yes, I did.  Yes, I did.  I went through -- as I said, I

18  went through those.  Some of them played -- some of them were

19  neutral and some of them were weighted in terms of -- in my

20  mind, in terms of their value, in terms of the -- increasing the

21  rate or decreasing the rate.  But I did consider them that way,

22  yes.

23  Q.   Now, how did you apply the royalty?  Did you apply it the

24  same way for each product?

25  A.   Well, again, what I had to do then was now that I had the

1    rate, I had to come up with the amounts that I would apply.  So

2    for the revenue piece, it was fairly straightforward.  I would

3    take the revenue generated by the accused products and multiply

4    that revenue by 18 percent and 20 percent to come up with the

5    amounts for that.

6        And then for the free product, the products that were just

7    given away, I applied a rate to the volume there.  And what I

8    did was I took the -- when we were talking earlier about the

9    value of the free user to 01, I took that -- those royalty rates

10   and applied those, and it gave me a range of between about $1.50

11   and 2.90 in terms of low/high end, in terms of what a free user

12   would be -- I'm sorry -- let me step back.

13       The value of the free users I computed was between about 8

14   and $14.  What I did then was I applied the -- that royalty rate

15   of 18 to 20 percent on those numbers.  And what I ended up

16   getting was a range of value for a free user based upon those

17   royalty rates of between a $1.40 -- about $1.42 and $2.89.  What

18   I ended up with then is I determined, given all my analysis of

19   the Georgia-Pacific factors, that they would agree to $2.50 as

20   the amount that would be charged for each free download.

21   Q.  That was then separately applied to the for-pay and the free

22   products; is that --

23   A.  So the percentage, the 18, 20 percent, was applied to the

24   revenues, the revenue base for the sold products.  And then the

25   $2.50 was applied to the -- the free product that was just

R. Brlas - Direct                                        638

1   distributed free of charge by LogMeIn.

2   Q.  Now, all of our discussions so far have related to the

3   LogMeIn or the -- I think you called them the remote access

4   accused products.  You said that you -- I believe you said you

5   used a different date with regard to the join.me and Free and

6   Pro products.

7       How did that change the type of analysis you went through

8   for the LogMeIn style products?

9   A.  It really didn't change the type of analysis I did.  It

10  basically all -- what I did was I went through the same process

11  again now in the summer of 2009 for the collaborative

12  application products, the join.me Free and the join.me Pro, and

13  then went through the entire process, looked at -- looked at

14  what had been out there before and came up with the rates for

15  that particular product.

16      The primary difference with this one was -- with the

17  downloads was the base for the free products.  With the remote

18  access products, it was pretty easy.  They maintained a log of

19  -- or they tracked all the downloads of the free product.

20      With the join.me Free, they didn't maintain a record of each

21  particular user, but they did track unique IP addresses.  So

22  what we were able to do is we applied the rate that we arrived

23  at based upon the unique IP addresses as opposed to the free

24  users for the remote access products.

25  Q.  Well, now, how exactly did that work?  Did you just assume

1  that every unique IP address was a new user and apply it that

2  way?

3  A.   What I did was we had -- they had provided us with

4  information on the number of hosted sessions that they did for

5  everybody on a monthly basis, and they also provided us with

6  information on the total number of users.

7       So what we did -- and that's on a monthly basis.  So we were

8  able to compute that on average.  It was each user used -- had

9  two -- actually, it was 1.8 hosted sessions a month.  So using

10  that we said, all right, based upon what they charge for the

11  product, they charge for the join.me Pro, it comes out to an

12  annual rate of about $25 per month.

13       So what I did was I looked at the $25 a month.  I applied

14  the royalty rates that we used here, which was, again, the 18 to

15  20 percent, which gave me a value of 4.50 to $5 a month based

16  upon that royalty rate.

17       But what we're going to do is we're only going to charge for

18  the first usage.  So they said -- we figured out it was 1.8 uses

19  per month.  We rounded it up to two uses a month.  So we

20  basically took that amount of 4.50 to 5 and said that's for two

21  uses.  So -- on average.  So we took the two uses, just charged

22  for the first.  So we're giving each IP address credit for using

23  it on the first case and -- or charging them only for that and

24  not for the second one.  And based upon that, that's how we did

25  the charge for the -- for the free distribution of the join.me

1    product.

2    Q.  Was there any difference in your analysis based on the fact

3    that the second one was in the fall of 2009, but the first one

4    was based on a hypothetical negotiation in 2005?  Certainly

5    things may have changed during that period of time.

6    A.  They might have changed.  But as we looked at the

7    information from LogMeIn, their margins were pretty consistent.

8    We looked at -- there was only a small amount of data that we

9    had on the join.me products.  But the profitability, the

10   incremental profitability on those products looked to be fairly

11   consistent with what we saw for the remote access products.

12        So what we did was we used the margins that we had seen for

13   the other products and applied those to join.me and came up with

14   the same ratio.  But -- and then we went through the process

15   again of looking at the market.  We saw no other transactions or

16   no other royalty rates out there that impacted the analysis.

17        So ultimately we came back to doing the *Georgia-Pacific*

18   factors again in looking at how they would play out.  The

19   primary difference in this particular situation was, I believe,

20   the fact that the parties would have already agreed to a license

21   in 2005 that contained these rates, and financially they were

22   performing as I would have expected.  I think the parties would

23   have agreed basically to the same terms.

24        LogMeIn would have been successful under that model, and 01

25   would have been successful as well in terms of deriving revenues

1    and such.  And they would have needed -- I believe 01 would have

2    needed to maintain that kind of rate because if they changed it

3    at all, they would probably have had -- if all the hypothetical

4    negotiations would have been successful in 2005, they would have

5    other agreements out there.  And if you start favoring one party

6    versus another, it creates issues.

7         So I think this would have been the same -- they would have

8    effectively ended up in the same place in terms of the royalty

9    rates on the join.me product as they did -- or on the

10   collaborative application products as they did on the remote

11   access products.

12   Q.   And so did you apply ultimately the same royalty rates to

13   both classes of products?

14   A.   Ultimately I did, yes.

15   Q.   Now, sir, did you obtain specific data from LogMeIn with

16   regard to the number of units used or the number of users and to

17   the actual revenue for each product?

18   A.   Yes, I did.

19   Q.   And from that have you computed a chart to show to the jury

20   that shows the bottom line for each product of what the

21   revenue -- of what the reasonable royalty would be, applying the

22   revenues or the royalties that you've just set out, to the

23   actual units sold and dollars received?

24   A.   Yes.

25        MR. SHUNK:  At this time, Your Honor, we'd like to

1   display that chart to the jury, but there may be some issues.

2           MR. MOLSTER:  We have an agreement upon this, I

3   believe, consistent with Judge Jones' ruling on Friday, which is

4   we could turn the chart this way.  Whatever the testimony is --

5   it won't -- it's a demonstrative so it won't go back.  And then

6   whatever the testimony is going to be, we agree to put that

7   small portion, maybe a page or two, under seal.

8           THE COURT:  All right, sir.

9           MR. MOLSTER:  Thank you, Your Honor.

10          MR. SHUNK:  Mr. Molster, I'm going to let you adjust

11  the appropriate angle as you see fit.  Thank you.

12          MR. MOLSTER:  Agreeable?

13          MR. SHUNK:  Yes.

14  BY MR. SHUNK:

15  Q.  Tell the jury what this chart shows.

16  A.  This chart shows my calculation of the reasonable royalty

17  amount that I've computed on a product-by-product basis.  And

18  this would include the timeframe from the summer of 2005, or

19  August of 2005, up through March 15th.  We have taken some data

20  from -- the last month of data we had, I believe, was October

21  for revenues for some of these products and carried it forward

22  to March 15th of this year, so effectively last Friday.

23      And what we've done then is compute the royalties on each of

24  these products from that time frame forward for the remote

25  access piece.  And that would be the first four products here --

1    I'm sorry -- the first five items here.  So that would be the

2    first hypothetical negotiation.

3        The last two are the collaborative application piece, and

4    that ends up with the total damage amounts that you see there of

5    109 million to 113.7 million.

6    Q.  Now, sir, the first column -- that's just a listing of the

7    product that's being referred to, correct?

8    A.  That's correct.

9    Q.  What -- what do you mean by low and high in the second and

10   third columns?

11   A.  The low and high means I've applied the 18 or 20 percent

12   royalty rates to those particular products.  So if you look at,

13   for instance, the first product here, the IT Reach, you can see

14   a low number of 5,035,000, that's at 18 percent, a high of

15   5,000,594, that's at 20 percent.

16       The LogMeIn Free and the join.me -- actually, that's a typo

17   there.  Those numbers are the same because in both cases we're

18   using the $2.50 per item amount.  So it's just the volume times

19   that flat amount.  So there's no difference between low and high

20   in those particular products.

21   Q.  For the purpose of the record now, Mr. Brlas, because we're

22   not going to admit the chart, I'm going to ask about each line

23   and simply have you read the low and the high number.

24           MR. SHUNK:  Is that acceptable as to the way we're

25   going to do it?

1              MR. MOLSTER:  And this is the portion where we would

2     like the court reporter to keep it under seal, Your Honor.

3              MR. SHUNK:  That's fine with us.

4              MR. MOLSTER:  Thank you.

5              THE COURT:  If you're going to write up something for

6     the jury, that I understand that, why not just put that in the

7     record?

8              MR. SHUNK:  I would be happy, Your Honor --

9              THE COURT:  You're going to have to take the time to

10    read this again.  We've spent a lot time with this witness.

11             MR. SHUNK:  I agree.  And I'd be happy, Your Honor, to

12    reduce this board to an 8-and-a-half by 11 document --

13             THE COURT:  Well, do that.

14             MR. SHUNK:  Okay.  I'm agreeable to putting that under

15    seal as well.

16             MR. MOLSTER:  We'd actually prefer the testimony, Your

17    Honor.  It won't take very long.

18             THE COURT:  Why would you prefer the testimony?

19             MR. MOLSTER:  Under 403, we think it would be -- we

20    would prefer the testimony.

21             MR. SHUNK:  I leave it in Your Honor's hands.  We'd

22    actually prefer to just send this back with the jury, but I'll

23    leave it in Your Honor's hands.

24             THE COURT:  Well, I thought you said you're going to

25    reduce that to writing.

1            MR. MOLSTER:  No, not this.  Just the testimony.  It's

2     not -- the demonstrative --

3            THE COURT:  Well, if you reduce that, that's the

4     testimony.  He doesn't have to testify.

5            MR. MOLSTER:  Well, this is a demonstrative exhibit so

6     it would not be going back to the jury.  That's what I was

7     saying in the beginning, Your Honor.

8            There are other documents that they've already used

9     that have some of this information.  This document -- this is

10    not a document, it's not an exhibit in the case.  It's only a

11    demonstrative.

12           THE COURT:  What's wrong with putting this in the

13    record under seal?

14           MR. MOLSTER:  We're fine to have the testimony go under

15    seal, Your Honor.  But we don't think there should be a separate

16    document that goes back because it's not an exhibit.  It's a

17    demonstrative.

18           THE COURT:  What if we have an exhibit and he doesn't

19    testify and then it stays under seal and it doesn't go to the

20    jury.

21           MR. MOLSTER:  Because it's not an exhibit in the case,

22    Your Honor.  We prefer to have just the testimony.

23           THE COURT:  I cannot see how it can possibly make any

24    difference.

25           MR. MOLSTER:  The issue is whether it goes back to the

1   jury, Your Honor.

2          THE COURT:  Well, we'll not send it to the jury.  It

3   will remain here --

4          MR. MOLSTER:  If it doesn't go to the jury, I'm

5   completely fine --

6          THE COURT:  -- and the record under seal is the record

7   of what he would have read.

8          MR. MOLSTER:  That's fine.  I misunderstood, Your

9   Honor.  If it doesn't go to the jury, we are completely fine.

10         THE COURT:  All right.

11         MR. SHUNK:  Okay, Your Honor.  We'll -- we will then

12  put a plaintiff's exhibit number on it.  We'll move it into

13  evidence with the understanding that it remains in the Court's

14  possession.

15         THE COURT:  Remains under seal as part of the record.

16         MR. SHUNK:  And it's part of -- it would be what he

17  would have testified to.

18         THE COURT:  That's right.

19         MR. SHUNK:  Okay.

20         MR. MOLSTER:  That's fine, Your Honor.  Thank you.

21         THE COURT:  All right.  So we can finish up with this

22  witness.

23         MR. SHUNK:  Yes.  We're very near the end.

24  BY MR. SHUNK:

25  Q.  And so, once again, just the bottom numbers, the total

1   amounts, would you state that for the record, please?

2   A.   Sure.   On the low end, it's $109,082,682.   And with the high

3   rate of 20 percent, it's $113,713,266.

4            MR. SHUNK:   And I would ask the marshal to put the

5   board back facing forwards the wall again, if you would, please.

6   Thank you.

7   BY MR. SHUNK:

8   Q.   Now, just a couple of questions to finish up, Mr. Brlas.

9        First of all, you're aware, aren't you, that LogMeIn has

10  argued in its opening that the numbers that you have arrived at

11  are simply way out of proportion with the actual profit received

12  by the company, and they've argued that it would not be possible

13  to imagine that that -- that LogMeIn would have agreed to

14  numbers that high given the profitability they've seen.

15       How do you respond to that challenge, sir?

16  A.   Well, I can certainly understand the challenge, but I

17  believe that that's not accurate.

18       If you look at these products over -- through March 15th of

19  this year, we've estimated the sales of these products to be

20  over approximately $228 million.   They've generated incremental

21  margins of approximately something around probably about

22  $106 million on these products.

23       And it's created beyond -- and that's just on the revenue

24  side.   It doesn't even include the value that's been attributed

25  to the free products.   The free products -- when the company

1   went public in 2009, they had revenues of approximately

2   $63 million and were not making any money.  But they did have

3   this free user base of -- I think it was 5.8 million at that

4   point in time.  And they were able to take the company public

5   with that little sales and no profitability but these free users

6   and generate a market cap the first day of $432 million and

7   generate cash for the business of approximately $107 million

8   through that transaction.  So there was value associated with

9   that.

10      And what -- what LogMeIn has -- has failed to do is failed

11  to understand that they need to pay for the piece that was

12  related to the revenue, but there's also the value associated

13  with the royalty -- with the free product.

14      Now, I think Mr. Simon even said it was a gamble doing the

15  free business model, and that's the case.  It was a gamble, but

16  it was their gamble, and what they were gambling with

17  effectively was the asset of 01.  01 had that asset and had the

18  ability to take it to market, either sell their products or

19  license it to other folks.

20      And what this did was that impacted 01's ability to be able

21  to go out and do that.  So it not only impacted them, but it

22  impacted others in terms of their ability to get into the market

23  potentially to compete and make the profits they would have

24  expected.

25      So there were a variety of values that LogMeIn achieved as a

1    result of using this technology and not paying for it.  And

2    it's -- it's -- the purpose of this calculation then is to

3    provide -- provide 01 with a reasonable royalty for the amount

4    of value that was extracted from them as used by LogMeIn.

5    Q.  Mr. Brlas, another criticism that the jury has heard is that

6    if you give away a product for nothing, then the royalty on that

7    is something times zero.

8        How do you respond to that?

9    A.  I would respond to it as -- as -- as was discussed earlier

10   this morning.  It's great to give stuff away for free.  You

11   know, if -- we do it.  You know, we might give away coffee mugs

12   to people that we want to have buy our services.  And if I

13   decided to give away a thousand coffee mugs and they cost me $5

14   apiece, that's $5000.

15       If I bought them from you, you're not going to sit there and

16   say, well, pay me if you're successful.  No.  You expect to be

17   paid, and whether I'm successful or not, that's on me.  That's

18   my gamble.  That's a separate piece, and that value has to be

19   recognized and paid for.

20   Q.  One final question.  And that is there was also an

21   allegation in this case from LogMeIn that your calculation was

22   somehow double-dipping because you were trying to get value from

23   the revenue products as well as from the free products.

24       How do you respond to that?

25   A.  That's -- that's absolutely not the case.  As I was saying,

1    there's the value of the technology as -- or in the free

2    product.

3        What they did was they went out and used it as a sales and

4    marketing tool, and that's fine.  They can use that as a sales

5    and marketing tool, but there's value associated with that and

6    you have to pay for it.  Just like my coffee mug, you have to

7    pay for it if you want to use it.  That's one use and that's one

8    value.

9        Then there's the second value, which is the value that they

10   derived from actually selling the product.

11       So it's not double-dipping.  It's two different pieces, two

12   different components, and two different values.

13            MR. SHUNK:  Thank you, Mr. Brlas, Your Honor.

14            MR. STONER:  May I proceed, Your Honor?

15            THE COURT:  Indeed.

16            MR. STONER:  As we have with witnesses before, we have

17   binders and materials to assist in the examination moving along,

18   and if we could pass those out, please.

19            THE COURT:  All right, sir.

20            We need a weight limit on these things.

21            MR. STONER:  Just want to be prepared, Your Honor.  I

22   don't think we'll use all those.  Depends on the witness.

23                          CROSS-EXAMINATION

24   BY MR. STONER:

25   Q.  Mr. Brlas, let's see if we can agree on a few things right

1    up front.

2    A.   Okay.

3    Q.   If there's no infringement, the damages are zero, right?

4    A.   I would assume that to be the case.

5    Q.   If this patent is invalid, the damages are zero?

6    A.   I would say that's true.

7    Q.   The patent is unenforceable if the damages are zero,

8    correct?

9    A.   I don't know what you mean by unenforceable.

10   Q.   You don't know what --

11   A.   I -- if it's unenforceable, I -- I assume that would be the

12   case.

13   Q.   You just assumed there was infringement of a valid patent,

14   correct?

15   A.   That's correct.

16   Q.   01's lawyers asked to you make that assumption, correct?

17   A.   Yes.

18   Q.   You don't know whether it's true or not, right?

19   A.   Again, as I said earlier, I'm not a computer scientist and

20   that's beyond my capabilities to make that evaluation.

21   Q.   The lawyers paid you a lot of money to make that assumption,

22   didn't they?

23   A.   What they paid me had nothing to do with the assumption.

24   That's just the assumption I worked under.

25   Q.   And you made the assumption, correct?

1    A.   Yes.

2    Q.   But if that assumption is incorrect so is your damage

3    calculation, right?

4    A.   That would be true.

5    Q.   In fact, there are no damages whatsoever, correct?

6    A.   I would assume that to be the case.

7    Q.   Now, you have an opinion that the jury here should take

8    $113 million from LogMeIn and give it to 01 Communique, correct?

9    A.   Yes.

10   Q.   We'll get into this more later.  But that is far more money

11   than 01 ever made itself using the patented technology; isn't

12   that true?

13   A.   That's true.

14   Q.   Actually, the patented technology practiced by 01 lost money

15   every year since it was introduced, correct?

16   A.   The company was not profitable.  That's right.

17   Q.   And the patented product was not profitable either, right?

18   A.   I'm sure there were some incremental profits, but at the

19   bottom line, you're correct, it was not.

20   Q.   You now want 01 to profit in this courtroom, right?

21   A.   All I'm looking to do is -- not say profit, but to provide

22   them with the value that was taken from them.

23   Q.   You're not suggesting to the jury here that 01 was actually

24   hurt by LogMeIn by losing 109 million or $113 million in profits

25   or anything like that, are you?

1   A.   I'm sorry.  Could you repeat that?

2   Q.   Sure.  You're not suggesting that 01 was actually hurt by

3   LogMeIn by 109 million or 113 million in lost profits or

4   anything like that, correct?

5   A.   Oh, I'm definitely not saying lost profits.  I'm saying this

6   is the value that was provided by 01 to LogMeIn for the

7   technology and the amount they should be compensated for.

8   Q.   You don't have any opinion at all that 01 lost profits to

9   LogMeIn, do you?

10  A.   Lost profits.  I'm not making a lost profit calculation,

11  correct.

12  Q.   You don't have any opinion that 01 lost any profits to

13  LogMeIn, are you?

14  A.   My computation is a reasonable royalty computation.  It is

15  not a lost profit computation.

16  Q.   You didn't do any such lost profits analysis, right?

17  A.   I did not do a lost profits analysis, correct.

18  Q.   So you don't have an opinion whatsoever that 01 -- that

19  LogMeIn caused 01 to lose any profits, do you?

20  A.   01 losing profits.  My opinion is that they're entitled to a

21  royalty.  I'm not saying they're entitled to lost profits.  I'm

22  saying under the law they're entitled to, my understanding, a

23  royalty for the use of the technology.

24  Q.   Mr. Brlas, I know we're going to talk about a reasonable

25  royalty in a bit.  But right now I just want to be clear.  You

1   don't have an opinion that 01 lost any profits to LogMeIn,

2   correct?

3   A.   I've not done any studies to say that they have a lost

4   profit damage, no.

5   Q.   But what you have done is come up with this hypothetical

6   $118 million number, a license that supposedly 01 and LogMeIn

7   would have agreed to, right?

8   A.   Correct.

9   Q.   This is -- so it's clear, this is a negotiation that you

10  have hypothesized occurred back in 2005 with 01 and LogMeIn

11  talking to each other and agreeing on a deal, right?

12  A.   Right.   That's -- that's parameters of the *Georgia-Pacific*

13  method, and that's what I used.

14  Q.   The deal that you hypothesize they would agree on is a

15  license to the '479 patent, right?

16  A.   Correct.

17  Q.   And it's based upon what supposedly LogMeIn would have been

18  willing to pay, correct?

19  A.   Correct.

20  Q.   So your opinion is that LogMeIn supposedly would have been

21  willing to pay 01 $113 million for a license, correct?

22  A.   Over an extended period of time, yes.

23  Q.   Of course, no one at LogMeIn ever told you that, did they?

24  A.   No, they didn't.

25  Q.   No one at LogMeIn's ever testified to that as far as you

1  know, right?

2  A.   That's correct.

3  Q.   No one at LogMeIn's ever said anything like that as far as

4  you know, right?

5  A.   That would be accurate.

6  Q.   You never asked them, right?

7  A.   Correct.

8  Q.   You just hypothesized it's true, correct?

9  A.   Yes.

10  Q.   Now, it's also your opinion that 01 would have been willing

11  take $113 million, right?

12  A.   No.  Of course, they would take 113 million.  What they

13  would have agreed to are the rates that I talked about.

14      At that point in time, they would not have known how that

15  turned out.  That's the key.  What they would have agreed to is

16  not the numbers.  What they would have agreed to was the rates.

17  Q.   They would have been very happy to get $113 million,

18  wouldn't they?

19  A.   I assume they would, but that, again, was not known at that

20  point in time.  All that would have been known would have been

21  the rates.

22  Q.   Let's talk about this hypothetical negotiation and how you

23  got there.  You've never even negotiated a license to a patent,

24  have you?

25  A.   That's correct.

1   Q.  You're telling the jury here about people licensing patents

2   and supposedly what they would have agreed to, but you've never

3   done it yourself, right?

4   A.  That's correct.

5   Q.  You never negotiated a license to a patent or anything else,

6   have you?

7   A.  That's correct.

8   Q.  You're basically just a professional expert witness; isn't

9   that true, sir?

10  A.  Well, I wouldn't say a professional expert witness.  I do

11  provide expert testimony.  What I do do though is damage

12  analysis and financial analysis.  That's the basis of the

13  opinions that I provide in this kind of a situation.

14  Q.  Let's regive the jury the facts so they can reach a

15  conclusion.  75 percent of your work is as -- is as an expert

16  witness in lawsuits, right?

17  A.  No, that's mischaracterizing what I do.  What I said was

18  75 percent of my work is associated with this.

19      So in other words, yeah, we spend about 2,000 hours of time

20  analyzing information.  You know, I spend a small part of my

21  time as the expert witness.  Most of my time is spent as an

22  analyst, to look through everything to figure out what -- what

23  happened in particular scenarios and situations, and then I

24  render an opinion.

25  Q.  Mr. Brlas, you gave a deposition in this case?

1   A.   Yes.

2   Q.   Under oath?

3   A.   Absolutely.

4   Q.   You were asked the question:  Approximately what percentage

5   of your time today is spent serving as an expert in litigation

6   matters?

7        Do you recall that question?

8   A.   Yes.

9   Q.   You recall your answer was:  Greater than 75 percent?

10  A.   I said the projects I work on, I believe, were litigated --

11  litigation or legally related.

12  Q.   75 percent, correct?

13  A.   Yeah.  Absolutely.

14  Q.   You have hired yourself out to testify 40 times or more,

15  correct?

16  A.   Yes.

17  Q.   That means that 40 times someone put you on the stand to

18  testify because they liked what you had to say for them after

19  they paid you money, right?

20  A.   Well, those were the ones that put me on.  There were also

21  people who, after I finished my analysis, said thanks but no

22  thanks.

23  Q.   01's lawyers here have hired you 10 to 15 times, right?

24  A.   They've hired my firm that many times.  I haven't worked for

25  them that many myself.

1    Q.   They keep coming back to you, right?

2    A.   I work with their firm and many other firms.

3    Q.   You like the business, don't you?

4    A.   It depends on the day.

5    Q.   And you want to keep it coming, don't you?

6    A.   Well, I would certainly like to keep it coming, absolutely.

7    I want to keep continuing my business.  I think as long as I can

8    continue to provide analysis that's -- that's fair and credible,

9    that's -- that's the key to my business.

10   Q.   We'll see how credible it is.  Let's see.  When the lawyers

11   hired you in this case, before you formed your opinions, you had

12   no technical education, correct?

13   A.   Well, I would consider accounting technical.  But if you're

14   talking about something like engineering, I don't have that kind

15   of a background.

16   Q.   You don't have any software programming experience, correct?

17   A.   No.

18   Q.   No engineering experience?

19   A.   That's correct.

20   Q.   You're certainly not an expert in remote access technology?

21   A.   No, I'm not.

22   Q.   You're not an expert in the remote access industry?

23   A.   No, I'm not.

24   Q.   You're not an expert in the software industry, right?

25   A.   Nope.

 1  Q.  You never negotiated a license, right?

 2  A.  Correct.

 3  Q.  You've never valued a patent or a patent license except as

 4  hired for a lawsuit, right?

 5  A.  Correct.

 6  Q.  You've never even used any remote access product, right?

 7  A.  That's not true.

 8  Q.  Before you formed your opinions, you had never used any

 9  remote access product; isn't that true?

10  A.  No, it's not.

11  Q.  Do you have your deposition there, sir?

12  A.  I assume so.  Okay.

13  Q.  Could you turn to page 92, please?  Do you have that before

14  you?

15  A.  Yes, I do.

16  Q.  The date of your testimony was March 11, 2011, correct?

17  A.  Correct.

18  Q.  That was after you formed your opinions in this case,

19  correct?

20  A.  Right.

21  Q.  You were asked the question at line 22:  Have you ever used

22  any remote access services?

23      Your answer was?  What was it?

24  A.  I have not.

25  Q.  Question:  So you haven't used the I'm InTouch product?

1        What was your answer?

2   A.   I have not.

3   Q.   Question:  You haven't used any of the LogMeIn products?

4        Answer?

5   A.   Correct.

6   Q.   You haven't used Citrix GoToMyPC product?

7   A.   Correct.

8   Q.   The lawyers paid you a lot of money, haven't they?

9   A.   They paid my firm.

10  Q.   You said you charged $375 an hour, correct?

11  A.   Correct.

12  Q.   And your firm has spent 2,000 hours --

13  A.   Yes.

14  Q.   -- on this matter, 2,000 hours, correct?

15  A.   Yes.

16  Q.   So what has your total bill been to 01 or its lawyers for

17  your work?

18  A.   Probably around a half million dollars.

19  Q.   Half million dollars.  How much of that bill has not yet

20  been paid?

21  A.   Maybe -- maybe 20,000.

22  Q.   In other words, so you have been paid almost a half million

23  dollars --

24  A.   That's correct.

25  Q.   -- in this lawsuit?

1    A.   My firm has.

2    Q.   To come up with an opinion of $113 million, correct?

3    A.   No.   I was paid to do my analysis and come up with a

4    conclusion.

5         It wasn't contingent upon my payment, my compensation, none

6    of that was contingent upon my opinions.

7    Q.   Before you formed your opinions, you did not speak to

8    Mr. Cheung, the named inventor of the '479 patent; isn't that

9    true?

10   A.   That's correct.

11   Q.   Before you formed your opinions, you did not speak with the

12   technical experts, did you?

13   A.   That's correct.

14   Q.   In fact, before you formed your opinions, you did not speak

15   to anyone who was familiar with the '479 patent technology, did

16   you?

17   A.   Well, I spoke to Mr. Stringer.   I spoke to the attorneys.   I

18   believe they all had some familiarity with it.

19   Q.   Mr. Brlas, Mr. Stringer is an accountant like you, right?

20   A.   You said familiarity.   I didn't say somebody who was expert

21   in use -- you asked if I spoke to somebody that was familiar

22   with it, and my understanding is those folks are familiar with

23   it.

24   Q.   Before you formed your opinions, you didn't read any report

25   of the technical experts in this case?

1   A.   Correct.

2   Q.   And you didn't use any remote access product, correct?

3   A.   Again, you're -- you're -- you're confusing things.  You

4   asked if I used any remote access products.  Yes, I have.  I

5   used a VPN all the time.  That's a remote access product.

6       Have I used any of the remote access services that we've

7   referred to here?  I have not.

8   Q.   Okay.  And you've never used any remote access services,

9   correct?

10  A.   That's correct.

11  Q.   And one thing is that you never actually considered any

12  actual licenses that 01 or LogMeIn had actually entered into in

13  the real world; isn't that true?

14  A.   No, that's not.

15  Q.   Well, it's -- 01 has actually licensed the '479 patent,

16  hasn't it?

17  A.   Yes, it has.

18  Q.   Hitachi is not a licensee, correct?

19  A.   They -- they have a different type of an agreement, correct.

20  Q.   It's not a license of the '479 patent, is it?

21  A.   The -- the use of it is included, but it's not a license of

22  the technology directly.

23  Q.   And you didn't consider it important, did you?

24  A.   Didn't consider what important?

25  Q.   Did not consider the Hitachi deal or agreement to be

1  relevant to your analysis, right?

2  A.  I considered it, but, again, I -- I said that that

3  particular agreement was not close enough to what I thought the

4  parties would agree to here even though it had some heavy

5  royalty rates in it.

6      I -- I didn't believe it was close enough in terms of what

7  the parties would agree to here to say that's -- that was

8  compelling to -- to the royalty rate that would be agreed to.

9  Q.  01 has actually licensed the '479 patent to other companies,

10 hasn't it?

11 A.  In subsequent years it has, yes.

12 Q.  You didn't mention that to the jury, did you?

13 A.  No, I didn't.

14 Q.  They licensed a company called SingleClick, right?

15 A.  Yes.

16 Q.  How much money has 01 gotten from that SingleClick license

17 for the '479 patent?

18         MR. SHUNK:  Objection, Your Honor.  May we see the

19 Court on a sidebar on this particular item?

20         THE COURT:  All right.

21         MR. SHUNK:  Thank you.

22     (Conference at the bench, as follows:)

23         MR. SHUNK:  Your Honor, the license agreements that it

24 appears we're getting into are license agreements that were

25 entered into after this case was filed, and that means, by

1    definition, they're irrelevant to the calculation of damages.

2           They were the subject of one of our motions in limine.

3    And I don't think it's appropriate to go into them because the

4    negotiation date was either '05 or '09.  These licenses were

5    much later.

6           MR. STONER:  Your Honor, they're not irrelevant.  Even

7    this sole transaction that the witness says he relied upon, the

8    purchase transaction, was years after the date of the

9    hypothetical negotiation.  These are actual licenses to the

10   patent-in-suit.  We're entitled to explore what the terms were.

11          I don't intend to go into the terms in great detail.

12   The fact that they got zero money from licensing this patent to

13   a company is certainly relevant to what a reasonable royalty

14   would be.

15          MR. SHUNK:  It's just not relevant.  The time isn't

16   right, and the -- the patent that -- the license that Mr. Stoner

17   is referring to is roughly contemporaneous within the same year.

18          THE COURT:  Well, there wouldn't be any requirement

19   that they be before this negotiation.

20          MR. SHUNK:  Well, in the sense, yes, Your Honor, the

21   parties would only know in the hypothetical negotiation what had

22   happened that day.  So they would only -- they wouldn't know

23   what might happen at some future time.

24          THE COURT:  Yeah, but I don't believe that -- I don't

25   believe that follows.  We're doing a hypothetical negotiation

1    here.

2              MR. SHUNK:  Yes.

3              THE COURT:  But something that happened later would be

4    indicative of what they would think about at the time, and

5    that's what we're tying to figure out here.

6              This witness says they're going to think one thing.

7    He's going to try to say -- and I'm sure there's going to be

8    another witness to say -- they're going to say something else.

9    And I think anything that would be reasonably related in time

10   would be -- would be relevant.

11             MR. SHUNK:  If that's your ruling, Your Honor.  Thank

12   you.

13        (Thereupon, the following proceedings continued in open

14   court:)

15   BY MR. STONER:

16   Q.  Mr. Brlas, 01 Communique has actually licensed the '479

17   patent to other companies, hasn't it?

18   A.  Yes, it has.

19   Q.  Licensed it to a company called SingleClick, right?

20   A.  Correct.

21   Q.  And how much money has 01 received from that license?

22   A.  I don't know if they've received much at all.

23   Q.  They haven't received anything, correct?

24   A.  I couldn't say for sure, but I wouldn't be surprised.

25   Q.  Received zero, right?

1   A.   It's possible, yes.

2   Q.   They also licensed the patent to a company called Bomgar,

3   correct?

4   A.   Yes.

5   Q.   And how much money does 01 receive from that?

6   A.   I don't know how much they've received from that.

7   Q.   $240,000; isn't that true?

8   A.   I don't know how much.

9   Q.   You didn't look at it?

10  A.   Again, these license agreements are now -- that you're

11  talking about are several years after the hypothetical

12  negotiation when 01 is in a totally different situation.  The

13  horse has left the barn when all of these negotiations and all

14  of these alleged infringements had -- those have occurred.

15       So now to look at licenses that were entered into several

16  years later, five, six years later, to say somehow that's

17  indicative of what would have happened before all the

18  infringements and LogMeIn and Citrix ended up with 90-plus

19  percent of the market, it's not indicative of what could be

20  expected at the time of the hypothetical negotiation.

21  Q.   Mr. Brlas, you relied upon the LogMeIn acquisition of

22  Applied Networking, correct?

23  A.   I did.

24  Q.   That was in 2006, right?

25  A.   Yes, less than a year after --

1   Q.  After -- it was after the time you say there was a

2   hypothetical negotiation, right?

3   A.  It was, yes.

4   Q.  So you relied upon information after the date of the

5   hypothetical negotiation?

6   A.  There's a difference here though because that is putting

7   a frame --

8   Q.  Mr. Brlas --

9   A.  I --

10          MR. SHUNK:  He's trying to answer.

11          MR. STONER:  He didn't answer the question.

12          THE WITNESS:  I am answering the question.  It's a

13  different situation.  You're talking about transactions that

14  happened in the time frame generally of when the hypothetical

15  negotiation would have occurred.  It was an arm's-length

16  transaction between LogMeIn and another party, and it was absent

17  of this -- this issue with the infringement.

18          We're now talking about what -- these agreements

19  with -- with 01.  They're there.  And they were entered into, I

20  believe, 2011, long after the infringement occurred and long

21  after the hypothetical negotiation would have taken place.  So

22  they're two totally separate situations.

23  BY MR. STONER:

24  Q.  So just to be clear, Mr. Brlas.  01 Communique has actually

25  licensed the '479 patent, right?

1    A.   Correct.

2    Q.   They've not received anywhere close to $113 million from

3    that, have they?

4    A.   No, they have not.

5    Q.   Ever from anyone?

6    A.   That's correct.

7    Q.   And in fact, one license they entered into voluntarily

8    they've received zero from, correct?

9    A.   I don't know if it's zero, but, as I said, I wouldn't be

10   surprised.

11   Q.   And the other they received $240,000, right?

12   A.   I'll accept that.  I don't know.

13   Q.   They also licensed a company called WiLAN.  Did you know

14   that?

15   A.   I don't recall that particular agreement.

16   Q.   You don't know that?

17   A.   I don't recall that one, no.

18   Q.   We'll get into that later.  01 Communique licensed a company

19   called WiLAN to license and sue other people on this patent.

20        Did you know that?

21             MR. SHUNK:  Objection, Your Honor.  This was in our

22   various motions.  This has really nothing to do with this

23   lawsuit or with this damages calculation.

24             THE COURT:  That would be correct, wouldn't it?

25             MR. STONER:  I don't believe so, Your Honor.  This is a

1    license to the patent, and what 01 received for that license is

2    relevant to what a reasonable royalty would be.

3         MR. SHUNK:  Your Honor, it's not even a license.  It is

4    an agreement in which WiLAN has certain abilities to negotiate

5    with other parties about the -- about getting revenue for the

6    patent.

7         THE COURT:  Well, does it have something to do with the

8    revenue that's received?

9         MR. SHUNK:  No, Your Honor.  It doesn't -- it's not

10   requiring WiLAN to pay royalties to 01.  The details of it are

11   set out in our motion.  I don't know whether it would be more

12   appropriate for us to relate that to you at the sidebar.

13        THE COURT:  Well, maybe you should.

14      (Conference at the bench, as follows:)

15        MR. SHUNK:  Your Honor, WiLAN is a company that agreed

16   to put money into 01 in return for the ability to take the '479

17   patent and attempt to negotiate with people who would actually

18   use it to have them reach a royalty agreement on the patent.

19   So WiLAN is effectively acting as if it were a licensing manager

20   or something like that.

21         WiLAN is not paying royalties for the sales of products

22   to 01.  So regardless of what the document may be titled,

23   this -- that document doesn't have anything to do with selling

24   products and getting money for them.  It's really an effort by

25   the defendant, once again, to suggest that there's something

1    peculiar about 01, that it wants to sue people instead of

2    selling product.  And, of course, it was after the -- it's 2011.

3    It's after the --

4               THE COURT:  What does it have to do with the royalty?

5               MR. STONER:  Your Honor, it is called a licensing

6    agreement.  The idea that this is not a license agreement is

7    incorrect.

8               MR. CORRADO:  Is there a license agreement --

9               MR. STONER:  Yes, there is.  Owner hereby grants to

10   WiLAN the irrevocable exclusive right to license --

11              MR. CORRADO:  Right to license.

12              MR. MOLSTER:  Let him finish.

13              THE COURT:  Come on now.  You've got to quit talking to

14   each other.  Just talk to me.

15              MR. STONER:  Owner hereby grants to WiLAN the

16   irrevocable exclusive right to license the patents solely to the

17   subject companies and to commence litigation or other

18   proceedings concerning the patents against the subject

19   companies.

20              There is a revenue payments and reports section as a

21   result of that.  There are gross revenues that were obtained

22   by -- if it's obtained, they're split between the companies.  So

23   it certainly has to do with money that's being paid for rights

24   to this patent and is relevant to what a reasonable royalty

25   would be.

1            THE COURT:  But it wouldn't have anything to do with

2    the valuation of the patent.

3            MR. SHUNK:  Well, that's exactly right.

4            MR. STONER:  No, it has a lot to do with it because

5    WiLAN is paying money, agreeing to pay a certain amount of money

6    if they receive anything from this patent.  So it goes exactly

7    to what the patent is worth.

8            MR. SHUNK:  This document --

9            THE COURT:  But it doesn't -- it isn't helpful for the

10   jury to determine what a royalty would be.  This agreement here,

11   they just want money.  They don't care what it is.  They're just

12   going to get half the money or whatever percentage they've

13   worked out.  It's like a lawyer's contingency fee, which is not

14   going to help evaluate the case.

15           I think objection sustained.

16           MR. SHUNK:  Okay.  Thank you, Your Honor.

17           MR. STONER:  Thank you, Your Honor.

18       (Thereupon, the following proceedings continued in open

19   court:)

20   BY MR. STONER:

21   Q.  Mr. Brlas, again, you never considered any actual license of

22   the '479 patent that 01 entered into, correct?

23   A.  Well, again, I considered them, but they were not

24   appropriate for use because they were much, much later down the

25   road after the hypothetical negotiation would have taken place.

1    So it would have been inappropriate and were not indicative of

2    what would have been --

3    Q.   Mr. Brlas --

4    A.   -- expected at the time of the hypothetical --

5    Q.   Mr. Brlas --

6    A.   -- negotiation.

7    Q.   -- whether you considered it appropriate or not, you never

8    considered relevant any actual license in the real world that 01

9    has granted to the '479 patent, correct?

10   A.   For the reasons I stated earlier, they weren't relevant, and

11   so, no, they weren't part of what I did.

12   Q.   And LogMeIn has actually licensed other patents in the real

13   world too, correct?

14   A.   I believe so, yes.

15   Q.   You didn't consider any of that relevant either, did you?

16   A.   Again, we were talking about licenses that were down the

17   road.  They were in settlement of litigation -- or threatened

18   litigation, I believe.  And a lot of those patents were, I

19   believe, they -- under -- potentially under reexam.  They

20   weren't to direct competitors.  There was nothing there that

21   was -- would say that they were in any way similar to what would

22   have been agreed to in this particular situation or subject to

23   this hypothetical.

24   Q.   Mr. Brlas, we'll get into this more later, but LogMeIn has

25   actually licensed other patents in the software field, correct?

1    A.   Yes.

2    Q.   In the real world, correct?

3    A.   Yes.

4    Q.   Not hypothetically, but in the real world, correct?

5    A.   They have settlement agreements and licenses, yes.

6    Q.   And in none of those did LogMeIn pay anything close to

7    $113 million, did it?

8    A.   That's true.

9    Q.   Now, one thing you did for your opinions is to talk to 01's

10   chief financial officer, Mr. Stringer, right?

11   A.   Correct.

12   Q.   He is not on the patent, correct?

13   A.   That's correct.

14   Q.   He's sitting right back there, right?

15   A.   Yes.

16   Q.   He testified in this trial, correct?

17   A.   I understand he did, yes.

18   Q.   Were you here when he testified?

19   A.   I was not.

20   Q.   He's not an engineer, right?

21   A.   Correct.

22   Q.   He's an accountant like you, right?

23   A.   He's an accountant, yes.

24   Q.   He told you that there was no alternative to infringing the

25   '479 patent if you wanted to have a remote access product.

1    Didn't he tell you that?

2    A.  I believe he did.

3    Q.  No technical expert told you that, correct?

4    A.  That's correct.  It's an assumption as part of my analysis.

5    Q.  This assumption that there are no noninfringing alternatives

6    to the '479 patent was an important premise in which you based

7    your opinions, isn't it?

8    A.  Yes, it was an important factor.

9    Q.  In fact, it was your working assumption in all of the

10   analysis you did, correct?

11   A.  That's correct.

12   Q.  It's not true, is it?

13   A.  I don't know that -- no, I don't know that it is.  No.  I

14   haven't seen any evidence that indicates that it's not true.

15   Q.  Did you read Mr. Stringer's deposition in this case?

16   A.  I did.

17   Q.  Did you hear him give the following testimony:

18       Question:  So what you're saying is that there are other

19   ways to remotely access a PC behind a firewall other than

20   practicing the invention disclosed to the '479 patent?

21       Answer:  Yes.  As I understand it, there's a variety of ways

22   of doing remote access.

23       Do you recall that testimony?

24   A.  Yes.

25   Q.  So he's saying there are other ways to do remote access

1   without using the '479 patent, correct?

2   A.  My understanding is that there are other ways.  But if you

3   do it other ways, not practicing the '479 technology, then it's

4   effectively a different type of product.

5       Therefore, it would -- it either -- either you use the '479

6   technology such as, my understanding, LogMeIn does and Citrix

7   does, or you -- if you use something else it's not the same type

8   of product.

9   Q.  But there are alternatives to doing remote access besides

10  the '479 patent, correct?

11  A.  There are other types of products out there with which you

12  can get remote access, yes.

13  Q.  So the assumption that there were no noninfringing

14  alternatives that you made is incorrect, right?

15  A.  Not at all.  My assumption relates to this particular

16  product and service.  The remote access solutions market is very

17  big and includes a lot of different things.  This relates to

18  this particular niche.

19  Q.  Mr. Cheung, did you read his deposition in this case?

20  A.  I believe I did.

21  Q.  Did you read his testimony where he said:  Question:  There

22  are remote access products out there that don't infringe the

23  '479 patent, correct?

24      His answer was:  Yeah.  Remote access is -- is a very wide

25  field.  Yeah, there is something out there that won't infringe

1   on the '479 patent.

2      Do you recall that testimony?

3   A.   That's exactly what I just said.   There are products out

4   there under the umbrella of remote access solutions that are

5   different and -- and those don't infringe.

6      But within this particular niche of the market, it's my

7   understanding that there are -- there are no alternatives

8   that -- to the '479 technology.

9   Q.   That's based upon what Mr. Springer told you, correct?

10  A.   That's based upon the assumption that I have in this matter

11  and my understanding from my discussions with -- with

12  Mr. Stringer and counsel and subsequently with -- with

13  Mr. Cheung and with the -- with the technical expert,

14  Mr. Grimshaw.   That's my understanding.

15  Q.   You don't know whether it's true or not, right?

16  A.   I'm not a technical expert.

17  Q.   And if it's not true, your analysis is way off, isn't it?

18  A.   I would say it could be.

19  Q.   Let's talk about your 113 million or whatever it is.

20     Most of that number is for free products that LogMeIn gave

21  away, right?

22  A.   So far, yes.

23  Q.   How much of that $113 million is charging LogMeIn for giving

24  away free products?

25  A.   It's probably north of 60 million.

1   Q.   I counted $66 million, right?

2   A.   Okay.

3   Q.   So because LogMeIn gave away free products, you say they

4   should give 01 $66 million?

5   A.   No.   I'm saying because they used 01's '479 technology in

6   the products they gave away, they improperly used it without

7   paying for it.   Therefore, they need to pay 01 for the use of

8   their technology in the product they gave away.

9   Q.   Well, let's get to this -- how you got it to this $2.50

10  number that you say every time LogMeIn gave away free product it

11  would send to 01 -- would agree to send to 01.   Right?

12       Your -- your opinion is LogMeIn would have agreed to give

13  $65 million to 01 for the right to give away free products,

14  right?

15  A.   No.   My conclusion is that 01 would have -- or I'm sorry --

16  LogMeIn would have agreed to pay $2.50 per -- per download to

17  give the product away.   Now, over the course of -- what is it

18  now, seven years or so -- that amount totals approximately

19  $66 million.

20  Q.   Again, no one from LogMeIn ever told you that they would

21  have agreed to pay -- agreed to that, right?

22  A.   Agreed to the $2.50 per download?

23  Q.   Yes.

24  A.   That's correct.

25  Q.   No one ever testified to that, correct?

1   A.   That's correct.

2   Q.   No one has ever -- from LogMeIn has ever suggested that in

3   any form whatsoever as far as you know, right?

4   A.   That's true.

5   Q.   So you're -- you're just saying LogMeIn would have agreed to

6   something when you didn't talk to LogMeIn about it and saw no

7   evidence of that from them, correct?

8   A.   The evidence I saw was the analysis I performed of the

9   financial results they achieved with the -- through the

10  utilization of the '479 technology.

11  Q.   Now, you're not saying all of the people who used LogMeIn

12  Free products would have bought 01's products instead if they

13  could not get the LogMeIn Free product, are you?

14  A.   No, I'm not.

15  Q.   There's no evidence of that, right?

16  A.   No.

17  Q.   I want you to tell the jury very clearly here.  There is no

18  evidence that LogMeIn's free users would have bought a 01

19  product if they couldn't get the LogMeIn Free product, correct?

20  A.   There is no evidence that says that they would have gotten

21  those sales.  They might have gotten some of those sales, or

22  potentially Citrix might have gotten some of those sales, or

23  potentially LogMeIn might have gotten some of those sales.  The

24  issue is not who got the sales.  It's the fact that they were

25  provided the downloads --

1  Q.  I can -- Mr. --

2  A.  -- so that they can make the buying decisions.

3  Q.  Mr. Brlas?

4  A.  Yes.

5  Q.  Some people --

6         MR. SHUNK:  Your Honor, may the witness finish his

7  sentence at least in responding to questions?

8         THE COURT:  Well, it was getting a little long in the

9  answer.  Maybe we can shorten the answers up just a little bit.

10         THE WITNESS:  Yes, Your Honor.

11  BY MR. STONER:

12  Q.  Mr. Brlas, some people who bought a free product wouldn't

13  have bought -- or got a free product, a LogMeIn product,

14  wouldn't have bought any other product, right?

15  A.  That's true.

16  Q.  So, again, just to be clear.  My answer {sic} is very

17  simple.  There is no evidence that you see that LogMeIn's free

18  users would have bought 01's products instead if they couldn't

19  get the LogMeIn Free product, correct?

20  A.  I have not performed any sort of analysis to determine that.

21  It's all based upon royalties.

22         THE COURT:  I assume you're not going to finish up in

23  the next five minutes?

24         MR. STONER:  That is correct, Your Honor.

25         THE COURT:  All right.  I think we ought to adjourn

1    until tomorrow morning at 10 o'clock.

2        * * *

3        (Proceedings concluded at 5:16 p.m.)

4

5

6

7

8

9

10

11

12

13

14

15

16                          CERTIFICATION

17

18        I certify, this 20th day of March 2013, that the

19   foregoing is a correct transcript from the record of proceedings

20   in the above-entitled matter to the best of my ability.

21

22                       /s/
     _____

23                 Tracy Westfall, RPR, CMRS, CCR

24

25