```
 1                    UNITED STATES DISTRICT COURT
                      EASTERN DISTRICT OF VIRGINIA
 2                         ALEXANDRIA DIVISION

 3   _____

     01 COMMUNIQUE LABORATORY,      )
 4   INC.,                          )
                                    )  Docket No. 1:10-cv-1007
 5           Plaintiff,             )  Alexandria, Virginia
                                    )
 6           v.                     )  March 21, 2013
                                    )  10:00 a.m.
 7   LOGMEIN, INC.,                 )
                                    )  Volume IV
 8           Defendant.             )  (morning session)

 9   _____

10

11                      TRANSCRIPT OF TRIAL

12             BEFORE THE HONORABLE CLAUDE M. HILTON

13                 UNITED STATES DISTRICT JUDGE

14                          AND A JURY

15

16
     APPEARANCES:
17
       For the Plaintiff:      John P. Corrado, Esq.
18                             Marc A. Antonetti, Esq.
                               Thomas H. Shunk, Esq.
19                             Katherine Lea McKnight, Esq.
                               William T. DeVinney, Esq.
20                             Loura Alaverdi, Esq.
                               A. Neal Seth, Esq.
21                             Christina Moser, Esq.

22     For the Defendant:      Wayne L. Stoner, Esq.
                               Charles B. Molster, III, Esq.
23                             Vinita Ferrera, Esq.
                               Rachel Gurvich, Esq.
24
       Court Reporter:      Tracy L. Westfall, RPR, CMRS, CCR
25   Proceedings reported by machine shorthand, transcript produced
     by computer-aided transcription.
```

1                          I N D E X

2                   Direct    Cross   Redirect   Recross

3    FOR THE PLAINTIFF:

4    R. Brlas              --       683       729       743

5

     FOR THE DEFENDANT:

6
     M. Anka             748       --        --        --
7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                         P R O C E E D I N G S

2            (The jury enters at 10:08 a.m.)

3                  THE COURT:  Good morning.

4                  MR. MOLSTER:  Good morning, Your Honor.

5                  MR. STONER:  Thank you, Your Honor.

6                      CROSS-EXAMINATION (Continued)

7     BY MR. STONER:

8     Q.  Mr. Brlas, we left off yesterday with your opinion that

9     LogMeIn supposedly would have agreed to pay 01 $2.50 for every

10    free product they gave away, correct?

11    A.  That's correct.

12    Q.  Which by now, according to your computation, would add up to

13    something like $66 million for giving away free products,

14    correct?

15    A.  Correct.

16    Q.  Let's look at where this $2.50 came from.  Okay?

17    A.  Okay.

18    Q.  Now, first of all, it has nothing to do with the value of

19    those free products to LogMeIn, does it?

20    A.  It has to do with the value that LogMeIn could derive from

21    those free products.

22    Q.  Well, Mr. Brlas, whatever value LogMeIn derives from its

23    free products is reflected in the actual revenue it receives

24    from its premium products, correct?

25    A.  Not at all.  That's only a portion of the benefit they

1  derived.  They also derive benefit from the standpoint of having

2  the free user base, which was a key component in the growth of

3  the business, obtaining a significant portion of the market,

4  probably about 17 percent, I believe, in the first couple of

5  years, which also was a big factor in allowing them to go public

6  and attract $107 million in new cash investment and a market

7  value of $432 million in the first day.

8      So the value of those free users went far, far beyond just

9  the revenue that was driven by their use.

10  Q.  Didn't you say something different under oath before this

11  trial?

12  A.  I don't believe so.

13  Q.  Do you have your deposition with you still?

14  A.  Sure.

15  Q.  Would you take at look at it, please, page 219?  Do you have

16  that before you?

17  A.  Yes.

18  Q.  At your deposition you were asked this question, Ms. Ferrera

19  asked you this question beginning at line 12:  My question,

20  Mr. Brlas, is simply, isn't it true that the revenues of

21  LogMeIn's paying products captures whatever monetary value that

22  LogMeIn derives from its free user base.

23      And your answer was?

24  A.  The answer was:  It captures the monetary value.  It doesn't

25  capture the rest of --

1  Q.  That's wasn't your answer --

2          MR. SHUNK:  I'm sorry, Your Honor.  May the witness

3  finish his answer?

4          THE COURT:  Yes.

5  BY MR. STONER:

6  Q.  Mr. Brlas, your answer was:  It captures the monetary value.

7      Correct?

8  A.  But --

9          MR. SHUNK:  Your Honor, Mr. Brlas didn't get to finish.

10          THE COURT:  Well, you can cross-examine him.  If he's

11  going through the deposition, he can -- all he can ask is what

12  he said at the deposition.

13          MR. SHUNK:  Yes, Your Honor.

14  BY MR. STONER:

15  Q.  Your answer in the deposition was:  It captures the monetary

16  value.  Correct?

17  A.  That's what I said.  That's correct.

18  Q.  And the next question was:  And that's what -- in terms of

19  the value to LogMeIn, that's what the reasonable royalty is

20  intended to consider, correct?

21  A.  And I said:  In terms of the royalty based upon revenue,

22  that's what it's supposed to capture.  That has nothing to do

23  with the free products.

24  Q.  Mr. Brlas, your answer was:  In terms of the royalty based

25  upon revenue, that's what it's supposed to capture.  Yes?

1  A.  Yes.

2  Q.  Correct?  And the reasonable royalty is what we're talking

3  about here, correct?

4  A.  As we said, there are two components to the reasonable

5  royalty.  You were initially asking me about the free product.

6  Now you've switched to the revenue side of the product.  So

7  there's two elements here, and you're focusing on one versus the

8  one you were asking me about.

9  Q.  Yes.  You were already charging, according to your opinion,

10 LogMeIn a royalty on the revenue it receives, correct, 18 to

11 20 percent?

12 A.  Right.  That's a royalty on the revenue that they would

13 generate, that's correct.

14 Q.  So you're charging LogMeIn both for its giving away free

15 products and then charging them again for the revenue those free

16 products lead to, correct?

17 A.  No.  I'm charging them for the use of the free product as it

18 was intended as a selling tool.  Just like if I gave away my

19 coffee mug, I have to pay for the coffee mug.  Then separate and

20 distinct from that, you sell the product.  There's a royalty

21 based upon the use of that product as a revenue-driving

22 mechanism for the business.

23 Q.  So, again, you were charging LogMeIn both for giving away

24 free products and also charging them again for the revenue that

25 comes from those free products, correct?

1   A.   I'm charging them for the value they're deriving from the

2   use of the free products in -- in helping to drive revenue,

3   helping to drive their market cap and increase their investment

4   and the impact it would have on 01 and its ability to go out and

5   use its technology through either selling its own products or --

6   or licensing it to others because this is having an impact on

7   the market.

8        So that's what I'm capturing with the free piece.   The

9   revenue piece is totally separate in terms of what it's using --

10  how it's being used to actually generate revenue for the

11  company.   It's like the coffee example I gave before.

12       You've got to pay for the coffee, you know, the 50 cents for

13  the coffee for the $2 that you sell it for.   That's the piece

14  there.   That's separate than the coffee mug that I gave away for

15  free hoping to get people to come into my shop.

16  Q.   It's double-dipping, isn't it, sir?

17  A.   Not at all.   Totally two separate and distinct uses of the

18  technology.

19  Q.   The free products get charged both when they're given away

20  and when they generate revenue, correct?

21  A.   No.   The free products are not charged when they're given

22  away.   The free products are only charged the first time they're

23  downloaded, because each and every incident of infringement is

24  something for which 01 has to be compensated, and each one of

25  those downloads is an active infringement.   And that's what I'm

1  capturing here because that's the value that is being provided

2  by 01 in terms of the free product just like the coffee cup.

3  Q.  This $2.50 also has nothing to do with any harm to 01, does

4  it?

5  A.  Oh, absolutely it does.

6  Q.  Well --

7  A.  You're taking value from 01.  01 is providing value.

8  Q.  Well, again, Mr. Brlas, we talked about this yesterday, but

9  there's no evidence that the users of LogMeIn's free products

10  would have bought 01's products instead if the free product

11  wasn't available, right?

12  A.  That's true.  I've not done any study for lost profits.

13  Q.  So there's no evidence 01 would have got $2.50 or anything

14  else from LogMeIn's free users, correct?

15  A.  Again, it's not -- that's not the purpose of this.  The

16  purpose of this is to capture the value that was provided by 01.

17  01 is entitled to a reasonable royalty for the value provided,

18  and that's what we're capturing here.

19  Q.  Please focus on my question.  There's no evidence that 01

20  would have got $2.50 or anything else from LogMeIn's free users,

21  correct?

22  A.  Would LogMeIn have gotten $2.50?  No.  The value would have

23  been in the free users ultimately being in the market from which

24  LogMeIn -- or 01 might have obtained sales or LogMeIn might have

25  obtained sales or Citrix might have obtained sales.  That's the

1   value, and that value can't be captured because the way that the

2   LogMeIn model is set up, those free users are now not forced to

3   make a decision.  So if, as Mr. Simon testified yesterday, the

4   14-year-old wanted to use the technology to do gaming, he can

5   use it.  But that -- and it's great if he wants to give it away,

6   but he's giving away something that doesn't belong to him.

7        And maybe if they would have charged for it, some portion of

8   those people would ultimately say, hey, I guess I do have to

9   make a buying decision.  And they would make a buying decision.

10  What they've done by taking that is -- and not making those

11  folks make that decision is they've removed that buying decision

12  and now that value of the free user, which we're trying to

13  capture part of this, that value is not being able to capitalize

14  on.  And that's what we're trying to capture here in terms of

15  the value of that free user with the $2.50.

16  Q.  There's no evidence that 01 would have got anything from

17  LogMeIn's free users, is there?

18  A.  I think I just explained that.

19  Q.  The answer is correct, right?

20  A.  The answer is there was some value that could have

21  potentially been obtained from those users.

22  Q.  But there's no evidence of that one way or the other, is

23  there?

24  A.  The evidence is there's free users out in the market now

25  that are not being forced to make a buying decision.  Those

1    users, everybody agrees, has value.  And all we're doing is

2    saying they do have value.  It's the -- and the value is driven

3    by the technology, the '479 technology.  And 01, as owner of

4    that technology, is entitled to a reasonable royalty for others'

5    use of that technology.

6    Q.  Sir, again, you don't know whether LogMeIn's using the '479

7    technology or not, do you?

8    A.  It's my assumption.

9    Q.  But you don't know if it's correct, do you?

10   A.  It's my assumption.  I'm not a computer scientist and I

11   cannot come to that conclusion.

12   Q.  Now, you computed this $2.50 from something to do with 01's

13   free trials of its I'm InTouch product and how much that led to

14   those people buying 01's product, right?

15   A.  Yes.

16   Q.  And it's something called a conversion rate, right?

17   A.  Yes.

18   Q.  It's the amount -- number of people you calculated who took

19   a free trial of the I'm InTouch product and then went on to buy

20   the I'm InTouch product, right?

21   A.  Yes.

22   Q.  01's conversion rate has no bearing on LogMeIn's free users,

23   does it?

24   A.  It doesn't because LogMeIn's model is different.  Again,

25   their conversion rate is different because they don't force

1    people to make a decision.  So that's why the value has to be

2    determined based upon the conversion rate that would be used by

3    01.

4    Q.  We can agree 01's free trial users of I'm InTouch never paid

5    01 $66 million or anything close to it, correct?

6    A.  I'm sorry.  Can you repeat that?

7    Q.  Sure.  We can agree that 01's free trial users never paid 01

8    $66 million or anything close to that?

9    A.  That would be correct.

10   Q.  How much have 01's free trial users ever paid 01?

11   A.  You'd have to -- I don't know their revenues as we sit here

12   right now.

13   Q.  If you take $66 million off your calculation that you're

14   charging LogMeIn for giving away free products, how much does

15   the number go down?

16   A.  It goes down by $66 million.  It goes down by $66 million.

17   Q.  The majority of your calculation, correct?

18   A.  Yes.

19   Q.  Now, let's turn to your opinion about a supposed 18 to

20   20 percent rate on the revenue LogMeIn received.

21       Do you have that in mind?

22   A.  Okay.

23   Q.  And what you say is hypothetically LogMeIn would have agreed

24   to pay 18 to 20 percent of all the revenue it received on its

25   products to 01, correct?

1   A.   On the accused products, correct.

2   Q.   So $1 out of every $5 coming in.  LogMeIn writes a check to

3   01, right?

4   A.   Correct.

5   Q.   Again, no one from LogMeIn ever told you they would agree to

6   such a thing, did they?

7   A.   That's correct.

8   Q.   They have never testified to that or anything like that?

9   A.   Correct.

10  Q.   It's not based upon anything LogMeIn ever said that you

11  reached this conclusion, right?

12  A.   That's correct.

13  Q.   Now, all of this is based upon a hypothetical license

14  negotiation that you say would have happened back in 2005,

15  right?

16  A.   Correct.

17  Q.   Based upon, you know, what you think people would have

18  agreed to back then, right?

19  A.   That's correct.

20  Q.   Now, I'm going to talk about some real world factors and how

21  they relate to the so-called *Georgia-Pacific* factors instead of

22  hypothetical facts.   Okay?

23  A.   Sure.

24  Q.   The first *Georgia-Pacific* factor is the royalties received

25  by 01 for licensing the '479 patent, correct?

1   A.   Correct.

2   Q.   It's the very first *Georgia-Pacific* factor, right?

3   A.   Correct.

4   Q.   01 has actually licensed the '479 patent, correct?

5   A.   Much later they did, yes.

6   Q.   And you didn't consider that relevant, did you?

7   A.   I would not consider a transaction six years later after all

8   of these infringements have -- or after the infringement has

9   occurred to be in any way indicative of what they would have

10   agreed to in 2005.  The horse, as I said, had left the barn at

11   that point in time.

12   Q.   Didn't you tell the jury yesterday that nothing changed

13   really between 2005 and 2009?

14   A.   Under the hypothetical, that's correct.

15   Q.   So things that happened after 2005 would be relevant, right?

16   A.   I'm sorry.  You lost me.

17   Q.   Things that happened after 2005 would be relevant, correct?

18   A.   I'm sorry.  I'm not following you.

19   Q.   Do you agree?

20   A.   I guess I didn't follow your line of questioning there.

21   Q.   If 01 agreed to a license after 2005, it still may be

22   relevant if nothing changed, right?

23   A.   Probably -- probably not given the -- the circumstances.

24   Q.   In any case, you didn't consider any license to the '479

25   patent that 01 entered into in the real world relevant to your

1  analysis, right?

2  A.  I did not.  The licenses that had been entered into were

3  five or six years later.  After all this occurred, to say that

4  the position 01 is in today versus what they would have been had

5  the hypothetical -- had the negotiation taken place and the

6  agreement -- and an agreement been in place for the royalties in

7  this matter, it would have been a different situation.

8  Q.  Now, you said something yesterday about how you didn't pay

9  attention to licenses people actually entered into because they

10  were litigation settlements, right?

11  A.  I think in regard to LogMeIn, that's correct.

12  Q.  Well, let's explore that.  You know, it is true that

13  sometimes when people are sued, they will pay money to settle a

14  lawsuit even if they don't think that they're guilty of

15  anything, correct?

16  A.  That's true.

17  Q.  Because the cost of litigation, win or lose, can be pretty

18  big, right?

19  A.  Yes, it can.

20  Q.  So people may pay to get rid of a lawsuit even if they don't

21  think they're infringing at all, right?

22  A.  Correct.

23  Q.  But it's different from the other side, isn't it?

24  A.  I'm not sure what you're talking about.

25  Q.  Let's take a concrete example.  01 sued and then settled

1  that lawsuit by granting a lawsuit to SingleClick, right?

2  A.  Yes.

3  Q.  Granting a license.  They granted a license to SingleClick,

4  right?

5  A.  Yes.

6  Q.  So 01, after filing a lawsuit, was willing to accept a

7  license from SingleClick, right?

8  A.  I believe they came to an agreement on a license, yes.

9  Q.  And 01 has got zero from that license, correct?

10  A.  Again, I don't know -- specifically I don't believe if they

11  received anything it's much.

12  Q.  So what 01 was willing to accept in the real world for a

13  license to SingleClick was zero after starting a lawsuit,

14  correct?

15  A.  Well, again, you're mixing apples and oranges here too.

16  First of all, it was many years later.  I believe that license

17  has only been out there a short period of time.

18      The -- and the licenses that you're referring with LogMeIn

19  are different not only because they're settlements.  These

20  companies, I don't believe, are even competitors of LogMeIn.  So

21  to say that they're somehow comparable and appropriate, I don't

22  believe that's the case.

23  Q.  Just talking about the SingleClick license, sir.

24  A.  Okay.

25  Q.  01 started a lawsuit and was willing to accept a license to

1   settle it?

2   A.   Yes.

3   Q.   That paid them nothing, correct?

4   A.   Again, I don't know where that will ultimately end up.   I

5   know they haven't received much, if anything, yet.

6   Q.   All right.   Now, the license to Bomgar was similar, wasn't

7   it?

8   A.   I believe so.

9   Q.   01 started a lawsuit, correct?

10  A.   I don't recall if they started a lawsuit or not.

11  Q.   And they were willing to accept to settle that lawsuit

12  $240,000, right?

13  A.   Again, I don't know what they've received, and I don't -- I

14  couldn't answer that question.

15  Q.   Putting aside your hypothetical analysis, the most 01 has

16  ever received from anyone in the real world for license to the

17  '479 patent is $240,000; isn't that true?

18  A.   It's probably in that area, yes.

19  Q.   The *Georgia-Pacific* factor number 2 looks at the other side,

20  the rates paid by LogMeIn for the use of other patents, correct?

21  A.   Yes.

22  Q.   LogMeIn has licensed other patents, correct?

23  A.   They have licenses out there, yes.

24  Q.   In the real world, LogMeIn has actually licensed other

25  patents, correct?

1  A.  They do, yes.

2  Q.  And you didn't consider that relevant either, did you?

3  A.  As I said, I didn't consider it relevant because, again,

4  they weren't -- there were settlement of lawsuits.  These

5  companies were not even competitors.  It was a totally different

6  circumstance.  And no way were the licenses similar enough in

7  any way to say, as is required by that *Georgia-Pacific* factor,

8  that they establish some sort of precedent there as -- and as

9  far as what the -- what a royalty rate would be that they would

10 pay in a circumstance like this.

11 Q.  So in forming -- well, let's explore on this.  Just to put

12 some numbers on it, you know, one of the licenses LogMeIn

13 entered into, they paid $65,000 for a paid-up license forever to

14 a patent, right?

15 A.  Yes.

16 Q.  It's all they were willing to pay, right?

17 A.  To settle that lawsuit, yes.

18 Q.  And LogMeIn was never willing to pay anything more than

19 $1.6 million for a license to any patent, were they?

20 A.  That's all they paid.  Again, that -- what they paid was not

21 to a competitor.  It wasn't somebody in the market.  It was a

22 totally different circumstance and establishes nothing as far as

23 licensing in this sort of scenario.

24 Q.  So in forming your opinion about what 01 and LogMeIn would

25 supposedly have agreed to in a hypothetical negotiation, you

1   never considered relevant any licenses that 01, or if LogMeIn,

2   in fact, actually did agree to in the real world, right?

3   A.   Again, those licenses that were agreed to were many years

4   down the road, had different circumstances, were not at all

5   similar in any way and could not be considered in any way a

6   precedent in terms of saying this is how this negotiation would

7   have gone along.

8   Q.   So you didn't consider them relevant, right?

9   A.   Correct.

10  Q.   *Georgia-Pacific* factor number 3 is the nature and scope of

11  the licenses as exclusive or nonexclusive, correct?

12  A.   Correct.

13  Q.   You assume the license that 01 and LogMeIn would have

14  negotiated is a nonexclusive license to one patent, correct?

15  A.   Yes.   In a remote access services area.

16  Q.   And a nonexclusive license is one that means the person who

17  has the license has the right to use the technology, but lots of

18  other people can use it too, right?

19  A.   Correct.

20  Q.   As opposed to an exclusive license where only the person who

21  has the license can practice the technology, right?

22  A.   Correct.

23  Q.   You're assuming LogMeIn would have taken and 01 would have

24  granted a nonexclusive license, right?

25  A.   That's correct.

1   Q.   Where the rates tend to be lower than an exclusive license,

2   right?

3   A.   Depends on the circumstances.

4   Q.   Generally correct?

5   A.   Yeah, probably.

6   Q.   Now, I think you told the jury that you looked at a bunch of

7   abstracts of other license agreements that other people had

8   entered into for other patents and other technologies, right?

9   A.   Yes.

10  Q.   And if I remember your testimony correctly, you said these

11  were certainly not on target and it did not help you determine

12  anything, basically?

13  A.   I considered them.  I looked at them, but I didn't feel like

14  they were in any way spot on in terms being able to determine

15  what the royalty rate would have been agreed to between the

16  parties.

17  Q.   None of these abstracts was for a nonexclusive license to

18  one simple patent, was it?

19  A.   I don't believe so.

20  Q.   Some of them involved different numbers of patents, correct?

21  A.   Yes.

22  Q.   Some of them involved different technologies, right?

23  A.   Yes.

24  Q.   Some of them were exclusive licenses, right?

25  A.   Yes.

1   Q.  You did not rely on them to derive your royalty range, did

2   you?

3   A.  I looked at them in terms of what was out there, as I said,

4   just in terms of software, remote access, things like that, just

5   so that I could get a sense of -- again, this wasn't a spot on

6   type of analysis, just to give me a sense of what might be out

7   there in terms of software remote access.

8       But it was not -- it was not something that helped me

9   determine what the ultimate number was.  If anything, it sort of

10  helped inform the lower end of the range.  But that's -- that

11  would be it.

12  Q.  These abstracts were something from a source called

13  RoyaltySource, correct?

14  A.  Correct.

15  Q.  You're aware that 01 has represented to this Court that

16  Mr. Brlas did not rely on the RoyaltySource abstracts?  Are you

17  aware of that?

18  A.  Sounds right.

19  Q.  It's correct.

20  A.  Okay.

21  Q.  You didn't rely on them, right?

22  A.  Yeah.  They weren't really part of my analysis -- or they

23  didn't end up helping me make a determination of what the

24  royalty rate would be.

25  Q.  So in determining this 20 percent royalty, which is a pretty

1   big royalty, you didn't look at any actual licenses 01 or

2   LogMeIn entered into, correct?

3   A.   No, that's not true.  I looked at them.  I considered them,

4   but I didn't feel that they were indicative of what would have

5   happened given the circumstances of this negotiation.

6   Q.   And the RoyaltySource abstracts weren't indicative of

7   anything either, were they?

8   A.   They were not indicative of what the parties would have

9   agreed to in this circumstance.

10  Q.   So what you looked at next, and the only thing you looked at

11  next, were the acquisition of two companies, correct?

12  A.   That was the next part of my market approach, yes.

13  Q.   Now, an acquisition of an entire company is very different

14  from an nonexclusive license to one patent, isn't it?

15  A.   It is.

16  Q.   When you buy a company, you get many things besides a

17  nonexclusive license to one patent, right?

18  A.   That's true, yes.

19  Q.   You get personnel, you get goodwill, you get brand

20  recognition, whole bunch of other things, right?

21  A.   All those things are possible when you acquire a company,

22  yes.

23  Q.   And if you acquire the company, you actually get ownership

24  of the patents, not simply a nonexclusive license, right?

25  A.   That's true.

1  Q.  And, generally, you know, it costs more to buy something

2  than just to get a nonexclusive license to it --

3  A.  Yes.

4  Q.  -- right?  So you don't know in these acquisitions how many

5  patents were involved or what their scope was, do you?

6  A.  I know what the technology was in the -- I know that in the

7  LogMeIn acquisition of Applied Networking that they acquired

8  technology that they considered fundamental and core to the

9  success of the business.

10      And that amount that was attributed to that technology,

11  1.4 million, as we heard in the deposition testimony of

12  Mr. Kelliher yesterday, their CFO, he, along with other folks,

13  and outside consultants made a determination that $1.4 million

14  of that acquisition price was specifically directed at the

15  technology, the core technology that was acquired in that

16  transaction.

17      And that amount, that specific amount, not the whole

18  purchase price, the rest of the purchase price went to fixed

19  assets and people and software, all those other things you were

20  talking about, but that $1.4 million was specifically

21  attributable to the technology acquired.  And when you do the

22  calculations, that comes out to a 39 percent royalty rate on

23  only the technology, absent all those other pieces.

24  Q.  Well, let's look at that.  1.4 million is what LogMeIn paid

25  to buy the technology, right?

1   A.   No.   That was a specific amount of the purchase price that

2   they made a determination pertaining to that technology.

3   Q.   When LogMeIn bought Applied Networks, they bought the

4   company, right?

5   A.   Yes, they did.

6   Q.   So they owned the technology, right?

7   A.   Yes, they did.

8   Q.   They didn't just get a nonexclusive license to it, right?

9   A.   That's correct.

10  Q.   They owned it outright, correct?

11  A.   Correct.

12  Q.   And the technology included a lot of other things besides

13  patents, didn't it?

14  A.   It was -- it was core technology.   It was -- and that's why

15  it was core technology to, I believe, a VPN type of service,

16  which, again, is under that remote access solutions umbrella,

17  which, again, was very informative to me in being able to say,

18  all right, it's not spot on, but it's an indicator of what

19  somebody, especially LogMeIn, would be willing to pay for that

20  technology in the open market.

21  Q.   Mr. Brlas, if you could focus on my question, we can move

22  things along.

23       What LogMeIn acquired, when it acquired Applied Networks in

24  the technology, was a lot more than a nonexclusive license to

25  one patent, right?

1   A.  I don't know what all was included in that.  I know that

2   there was a patent application involved there, but I don't know

3   specifically what was in the -- all the technology that was

4   under that umbrella.

5   Q.  Did it include trade secrets?

6   A.  No.

7   Q.  Did it include copyrights?

8   A.  No.  That would be different.

9   Q.  Did it include trademarks?

10  A.  Again, that was not a value.  That would have been valued

11  separately.

12  Q.  That's part of the technology, isn't it?

13  A.  No.

14  Q.  How many patents were involved?

15  A.  I don't know.

16  Q.  What was the scope of the patents?

17  A.  I don't know.

18  Q.  From this 1.4 million you calculated that LogMeIn would have

19  agreed to pay 01 -- what? -- $50 million, something like that?

20  A.  Not at all.  Not at all.  Remember, all I was doing with

21  this was to get an indication of the value.  This was helping me

22  form the big box, the range within which my number needed to

23  be -- to fit.  So, no, it did not -- it did not help -- it

24  didn't come up with the rate using that particular methodology.

25  Q.  *Georgia-Pacific* number 4 was 01's policy regarding

1   licensing, correct?

2   A.   Yes.

3   Q.   You assumed 01 would not want to license its patent back in

4   2005, correct?

5   A.   They -- they were predominantly trying to market their own

6   products at that point in time, yes.

7   Q.   So you assumed that they did not want to license the patent,

8   correct?

9   A.   Yes.

10  Q.   That's the basis for your opinion, right?

11  A.   That's the basis for one of my -- my analysis and one of the

12  factors that helped me say, all right, I know they wanted to

13  maintain the -- their position in the market.  They certainly

14  want -- wouldn't want to be in a position where they're going to

15  give a license to a competitor who's going to give the

16  technology away for free.

17       And given those circumstances, it would make me think that

18  the -- they would be in a position where that would result in a

19  higher royalty rate.

20  Q.   That critical assumption on which you based your opinion is

21  not true, is it, sir?

22  A.   Yes, it is.

23  Q.   Well, did you look -- take a look in your exhibit book at

24  Defendant's Exhibit 48.

25       Do you have Exhibit 48?

 1   A.   Yes, I do.

 2   Q.   This is a 01 Communique press release, right?

 3   A.   Correct.

 4   Q.   Issued August 3, 2005, right?

 5   A.   Right.

 6   Q.   Talking about the issuance of 01 Communique's '479 patent,

 7   right?

 8   A.   Yes.

 9   Q.   Like the day the patent issued, '01 put out a press release

10   to the world, right?

11   A.   Yes.

12   Q.   Telling the world they got a patent and saying what this

13   means for the company, right?

14   A.   Yes.

15   Q.   And one of the things they say is, quote, this patent

16   provides 01 Communique with the opportunity to expand its

17   revenue model by licensing the patented technology in return for

18   royalty payments to other companies offering remote access and

19   control products that make use of the patented technology,

20   unquote.   Correct?

21   A.   Yes.

22   Q.   Have you seen this before?

23   A.   Yes, I have.

24   Q.   You considered this?

25   A.   Yes.

1  Q.  And when you told the jury 01 didn't want to license its

2  patent, you didn't tell them that 01 put out a press release

3  saying this patent provides 01 Communique with the opportunity

4  to expand its revenue model by licensing the patented

5  technology, right?

6  A.  What -- it says exactly what you said it says.  But the

7  licensing that they contemplated, was it an opportunity, yes.

8  And what they had planned on doing was licensing the technology,

9  if they could, to entities such as Hitachi in Japan and other

10 areas where they would not be licensing it to direct

11 competitors.

12     So it was not something where they were looking to

13 necessarily go out right away and do something in that area.

14 They were trying to maintain their -- and grow their business,

15 but they knew there were areas of the world where they couldn't

16 compete and they were considering doing something like that.

17 Q.  This press release says nothing about we're not going to

18 license competitors, does it?

19 A.  No, it does not.

20 Q.  Doesn't say what you just said, does it?

21 A.  It does not specifically say that, no.

22       MR. STONER:  Your Honor, I'd offer Defendant's

23 Exhibit 48, and I believe there's no objection.

24       MR. SHUNK:  No objection.

25       THE COURT:  It's admitted.

 1   BY MR. STONER:

 2   Q.   Back in 2005, 01 was struggling financially, weren't they?

 3   A.   Yeah.

 4   Q.   The company had never been profitable, right?

 5   A.   Correct.

 6   Q.   And so they wanted to try to get money, however, like any

 7   business, right?

 8   A.   I don't know that I would characterize it like that.

 9   Q.   Well, isn't it true that in 2005 trying to license its

10   patent was a big part of 01's strategy, right?

11   A.   Well, as we discussed here, that was certainly an option

12   that they had going forward.  And they were -- I believe they

13   were discussing that -- that option, yes.

14   Q.   It was a big part of that strategy, wasn't it, licensing?

15   A.   I don't know that I can say it's a big part, but it was a

16   part of it.

17   Q.   You have your deposition, sir?

18   A.   Sure.

19   Q.   Page 246.

20   A.   Okay.

21   Q.   Page 246 of your deposition you were asked the question:   In

22   fact, according to 01, as of the end of fiscal year 2005,

23   expanding its revenue model by licensing the patented technology

24   was a major part of its plan to maximize shareholder value, was

25   it not?

1        And your answer was:  That's what this says, yes.

2        Correct?

3    A.   That's true.

4    Q.   So in fact, 01 was willing to license its patent in 2005,

5    right?

6    A.   Yes, it was, as I -- as I said earlier.  It was willing to

7    license the technology of -- in certain areas.

8    Q.   I think you said before some -- at some point that LogMeIn

9    somehow denied 01 licensing opportunities, right?

10       Tell me if I'm wrong.

11   A.   I'm not -- I'm not sure what you're referring to.

12   Q.   Okay.  So LogMeIn did not deny 01 any licensing

13   opportunities, correct?

14   A.   I think what I said was that by providing the free product

15   in the market, it was -- it was harming 01's ability to not only

16   sell its products but also take advantage of licenses that it

17   could obtain with others because now these other free users were

18   in the marketplace which couldn't -- they couldn't derive value

19   from.

20   Q.   Well, if 01 didn't want to license its patent, then there

21   was no opportunity to lose, right?

22   A.   No.  That's -- that's not true.  Again, you're -- you have

23   to understand, the -- the licensing policy would have evolved --

24   we're assuming here that they would have done -- they had to do

25   the license, and they would have done the license just because

1   that's what's required as part of this analysis.  So they would

2   have been able to go out and license it under these

3   circumstances.

4   Q.  Well, whatever LogMeIn was doing, 01 had the ability to go

5   out and try to license its patent, did it not?

6   A.  Yes.

7   Q.  In fact, they tried, right?

8   A.  I don't know to the extent that they tried, but I believe

9   they did try.

10  Q.  Not many people were interested, right?

11  A.  Well, again, you had the two big companies in the

12  marketplace.  There weren't many other options out there.  01

13  has, as we can see, we're sitting here today, accused both

14  LogMeIn and Citrix of -- of infringing upon that patent, so the

15  value of the licenses to other people at that point in time was

16  hindered.

17  Q.  Not many people took a license and the couple that were

18  didn't pay much money, right?

19  A.  Again, the licenses that were obtained were many, many years

20  later after all this occurred.

21  Q.  Let's skip forward a few *Georgia-Pacific* factors to

22  number 8.

23      You'll agree not all of the *Georgia-Pacific* factors are

24  relevant or you said they're neutral, correct, some of them are?

25  A.  They're -- they're relevant.  You need to consider them, and

1    each one has a different impact.

2    Q.   Some of them are neutral though and have no impact, right?

3    A.   In my analysis of this situation, yes.

4    Q.   Let's look at number 8, which is the established

5    profitability of product made under the patent.   Right?

6    A.   Uh-huh.   Yes.

7    Q.   The I'm InTouch product 01 sells under the patent has never

8    been profitable, correct?

9    A.   01 has not made profits.   That is correct.

10   Q.   And generally this factor says the more profitable the

11   patented technology is the more people would be willing to pay

12   for it, correct?

13   A.   Yes.

14   Q.   And vice versa, right?

15   A.   Well, again, it depends on -- on the circumstances.   There

16   are technologies that people are willing to pay a lot for that

17   haven't made any money because they're in an early stage.   And

18   that's effectively what we're with -- where we are at with this.

19        The profitability of the product is -- as we talked about,

20   you can -- they're deriving at least 84 cents on every sales

21   dollar in terms of gross margins and 47 cents of incremental

22   margin on this product.

23        Now, at that point in time was -- were these companies

24   profitable?   No, because they were in an early stage.   But there

25   was certainly -- the value was there.   That's why people were in

1   the market.

2   Q.   The I'm InTouch product under the patent has never been

3   profitable, ever, correct?

4   A.   That's correct.

5   Q.   And, in fact, it was never more -- it was never more than a

6   very small part of the market, correct?

7   A.   They were -- they were -- they were one of the probably

8   second tier -- they were probably a second tier company in the

9   market around 2005, actually ahead of LogMeIn, I believe, or

10  maybe at the same level.  But they've never -- but they never

11  made money.

12  Q.   In fact, the I'm InTouch product was never profitable even

13  before LogMeIn was ever in the market, right?

14  A.   That's true.

15  Q.   The I'm InTouch product was introduced in 2001, correct?

16  A.   Yes.

17  Q.   And LogMeIn didn't come into the market until 2004, correct?

18  A.   Correct.

19  Q.   In those three years, I'm InTouch was never profitable,

20  right?

21  A.   That's correct.

22  Q.   Never gained market share, right?

23  A.   That's correct.

24  Q.   And what has 01's revenues as a whole company for the life

25  company been?

1    A.   I couldn't tell you as I sit here right now.

2    Q.   It's about $16 million, right?

3    A.   Again, I couldn't tell you as I sit here right now.

4    Q.   Do you have any idea?

5    A.   I haven't gone back and added up their revenues recently.

6    Q.   All of the thousands of hours you spent in this case, you

7    don't know how much money 01 received as a company?

8    A.   It wasn't really part of the -- I haven't had to look at the

9    revenues all through -- up to date for 01.

10   Q.   Let me ask you to assume that for the entire life of the

11   company, selling all of its products through its own efforts, 01

12   has made about 16 -- has not made -- has received $16 million in

13   revenues.

14   A.   Okay.

15   Q.   Now, of course that doesn't mean they were profitable

16   because you have costs of running a company, right?

17   A.   That's right.

18   Q.   They've got $16 million coming in the door.  Can you assume

19   that?

20   A.   Okay.  Yes.

21   Q.   Your $113 million damage claim is more than six times that,

22   right?

23   A.   It sounds ballpark right, yeah.

24   Q.   Your damage claim would give 01 more than six times the

25   amount of money they ever had coming in the door through their

1    own efforts, right?

2    A.   Through the sale of their product, that's correct.

3    Q.   You didn't consider the lack of success of the I'm InTouch

4    product in your analysis, did you?

5    A.   No, that's not true.  I definitely considered it.

6    Q.   Do you have your deposition, sir?

7    A.   Yes.

8    Q.   Turn to page 249.

9    A.   Okay.

10   Q.   The bottom of the page, line 23, Ms. Ferrera asked you the

11   question:  Is it your understanding that the I'm InTouch product

12   practices the '479 patent?

13       And your answer was:  Yes.

14       Correct?

15   A.   Correct.

16   Q.   And on the next page, question:  You didn't consider that in

17   determining whether or not the products made under the invention

18   were commercially successful, correct?

19       And your answer under oath was:  I did not specifically

20   mention that.  I was looking at the market in general.

21       Correct?

22   A.   Yes.

23   Q.   That's your testimony under oath before this trial, correct?

24   A.   Yes.

25   Q.   It was accurate and truthful testimony, right?

1   A.   Yes.  I didn't specifically mention it.  But for purposes of

2   when I was looking at all this, absolutely I looked at the

3   margins of this product.

4   Q.   You're aware that 01's not even trying very hard to sell its

5   product anymore, aren't you?

6   A.   I know they have not had a great success with selling the

7   product.  I don't believe they're -- they have an extensive

8   sales organization at this point.

9   Q.   If we could turn to Defendant's Exhibit 174 in your

10  notebook.

11  A.   Okay.

12  Q.   Do you have that?

13  A.   Yes.

14  Q.   These -- this is 01 Communique's financial projections for

15  the period ended February 28, 2013, correct?

16  A.   Yes.

17  Q.   It's dated September 5, 2012, right?

18  A.   Yes.

19  Q.   So what this is is 01 Communique is providing to its

20  investors and the public and shareholders projections for its

21  business over the coming months, right?

22  A.   I believe so, yes.

23  Q.   Let's take a look at the first page in the introduction.  At

24  the bottom of the page, there's some highlighted language.

25       Do you see that?

1   A.   Yes.

2   Q.   In the middle of that it says:  We will continue with our

3   product development efforts, and with respect to revenue

4   increases, we are limiting our marketing activities to focus our

5   attention and financial resources on protecting our intellectual

6   property rights.

7        Do you see that?

8   A.   Yes.

9   Q.   Protecting intellectual property rights is code for suing

10  people, right?

11  A.   Well, I -- I don't know if it's suing people, but certainly

12  that would be part of it I would expect, sure.

13  Q.   So they're limiting their marketing activities, right?

14  A.   Yes.  That's what this is saying.

15  Q.   That is business-speak for trying to sell product, right?

16  A.   Yes.

17            MR. STONER:  I'd offer Defendant's Exhibit 174.

18            MR. SHUNK:  Your Honor, we object.  And we object for

19  reasons that there are material in this document that was not

20  covered in the cross.  Mr. Stoner has elicited whatever

21  information he has from the cross.  We would object though to

22  the admission of the document itself because of the additional

23  information.

24        I can explain that further to the Court if the Court

25  wants that information, but we would -- we would object to the

R. Brlas - Cross                                              717

1    admission of the document itself.

2              THE COURT:  Why don't we admit it with the redaction?

3              MR. STONER:  I'm not sure what the basis of the

4    objection is or why.

5              THE COURT:  I'll deal with it later, but I'll admit the

6    portion that's been testified to, in any event, whether I admit

7    the whole document or not.

8              MR. SHUNK:  Thank you, Your Honor.  We'll submit our

9    proposed redactions to Mr. Stoner and see if we can negotiate

10   that.

11             THE COURT:  All right.

12             MR. STONER:  Thank you, Your Honor.

13   BY MR. STONER:

14   Q.  Now, let's move on to *Georgia-Pacific* factors 11, and I want

15   to deal with 11 and 13 together if that's okay with you.

16   A.  Sure.

17   Q.  Number 11 is the extent to which the alleged infringer has

18   made use of the invention, right?

19   A.  Yes.

20   Q.  And number 13 has to do with improvements added by the

21   alleged infringer, correct?

22   A.  Yes.

23   Q.  Now, even with your assumption of infringement by LogMeIn,

24   you know that LogMeIn has put a lot of value of its own into its

25   products that has nothing to do with the '479 patent, correct?

1    A.  Correct.

2    Q.  Millions of dollars in product development, sales,

3    marketing, correct?

4    A.  Yes.

5    Q.  In fact, you know, you think, even according to your

6    calculation, 80 percent of the value of LogMeIn's products is

7    from LogMeIn, correct?

8    A.  Yes.

9    Q.  Even assuming infringement, 80 percent of LogMeIn's

10   products' value is from LogMeIn, correct?

11   A.  Yes.

12   Q.  The '479 patent feature you assume LogMeIn is using was not

13   alone responsible for LogMeIn's sales, was it?

14   A.  No.

15   Q.  Not even close, right?

16   A.  Well, let's put it this way.  My understanding is that the

17   LogMeIn product would not work without the use of the '479

18   technology.  So it was certainly an important part.  So to that

19   extent, I believe it was responsible for -- for sales.

20   Q.  But certainly the '479 patent feature was not alone

21   responsible for the demand of consumers for LogMeIn's products,

22   was it?

23   A.  That's correct.

24   Q.  In fact, according to you, only 20 percent of the value of

25   LogMeIn's products, even assuming infringement, comes from the

1  '479 patent, right?

2  A.  Yes.

3  Q.  But you, in your calculation, took all of LogMeIn's revenues

4  and applied your 18 to 20 percent royalty to it?

5  A.  That's correct.

6  Q.  You didn't take 20 percent of LogMeIn's revenues and then

7  apply a royalty to that, correct?

8  A.  That's correct.  It's 20 percent of the value of the

9  product.

10  Q.  LogMeIn has spent over a hundred million dollars in research

11  and development on its products.  Did you know that?

12  A.  It sounds about right.

13  Q.  You've looked at LogMeIn's financial statements?

14  A.  Yes.

15  Q.  So your $113 million number would take all of LogMeIn's

16  research and development spending over the years away and give

17  it to 01, right?

18  A.  No, it wouldn't.

19  Q.  Well, 113 is more than a hundred, right?

20  A.  Yes.

21  Q.  Let's turn to the last *Georgia-Pacific* factor or at least

22  number 15.  That's the amount LogMeIn would have agreed to and

23  make -- to pay and make a reasonable profit, right?

24  A.  Yes.

25  Q.  Now, there was some discussion yesterday about GAAP.  GAAP?

1   A.   Yes.

2   Q.   That's spelled G-A-A-P, correct?

3   A.   Correct.

4   Q.   Stands for generally accepted accounting principles, right?

5   A.   Correct.

6   Q.   What have LogMeIn's profits been for the entire life of the

7   company under generally accepted accounting principles?

8   A.   Again, I haven't added up those numbers.  It's -- in the --

9   it's many millions.

10  Q.   16 million?

11  A.   Again, I -- I haven't added them up.

12  Q.   You don't remember?

13  A.   No, I haven't added them up.

14  Q.   In trying -- and you had to consider the amount LogMeIn

15  would have agreed to pay and make a reasonable profit, right?

16  A.   Yes.

17  Q.   You don't know what LogMeIn's profits have been?

18  A.   No.  I know what they've been.  I just haven't added them

19  up.

20  Q.   Does 16 million sound about right?

21  A.   It sounds like it could be, yes.

22  Q.   Now, so LogMeIn, under generally accepted accounting

23  principles, has made about $16 million in profit, correct?

24  A.   Again, I'll assume that's correct.

25  Q.   That's what you call bottom line profit, right?

1    A.   Yes.

2    Q.   So your damage calculation would result in LogMeIn paying,

3    again, over six times the actual profits its made to 01 as a

4    royalty, right?

5    A.   On that basis, yes.

6    Q.   That does not leave LogMeIn with a reasonable profit, does

7    it?

8    A.   I think that mischaracterizes what -- what the value is

9    here.  If you look at the company, even last year, I think the

10   profits were approximately $9 million.

11       And, again, you have to remember, the profits have been

12   going up because we've taken a company that started out losing

13   money.  And, if you look, the revenues and the profits are going

14   up, up, up.  After the last -- even though they only made, under

15   GAAP, 8 -- or around 8 or 9 million last year, the operations of

16   that company produced $30 million in cash, and it's been doing

17   about $30 million in cash each year for the last couple of years

18   at least.

19       So what you've done is you've -- you've got -- you've got

20   your GAAP reporting income, which takes into account all the --

21   all of the pieces that you have to report on that basis, but it

22   doesn't capture the value that a product like this provides to

23   this company.

24       And the value it's providing is it's generating $30 million

25   a year to this point.  And, again, the trend has been upwards

1   for the company.  So that's where you have to look at the value

2   that's being derived from a product like this.

3   Q.   $30 million in cash is money LogMeIn can spend on more

4   research and development, correct?

5   A.   Yes, they can.

6   Q.   Pay its employees?

7   A.   Well, they've already paid the employees with that,

8   including all the bonuses and everything else that's been taken

9   care of.

10  Q.   Goes into bonuses, correct?

11  A.   No.  This is after all that's been paid.  There's still

12  $30 million left on an annual basis.

13  Q.   It can be used to keep growing the company, right?

14  A.   Oh, absolutely, and that's what they're doing.  They're now

15  taking the join.me product and they're -- they're using the same

16  program now to build the join.me product, so that right now the

17  join.me product is very small in terms of revenue, but they

18  believe it's their biggest growth product.  They're hoping that

19  that will take off as well and augment that $30 million of

20  revenue so that it continues to increase.

21  Q.   Keep developing new products and improving products for

22  consumers, right?

23  A.   Well, yeah.  That's -- what they've been doing, in terms of

24  product development and all that, that's already taken care of

25  before you get to the $30 million a year they're producing.

1  Q.  Well, let's just take profits under generally accepted

2  accounting principles.  Your royalty says LogMeIn would have

3  paid 01 more than six times in royalties what its profits have

4  been under generally accepted accounting principles, right?

5  A.  Again, assuming your number is correct, that's true.

6  Q.  No one would agree to pay a royalty where they would lose

7  money by paying it, would they?

8  A.  Yes, they would, because they have a long-term view.

9      Again, this company has gone from -- for the products that

10  we're talking about, back when the license would have been

11  negotiated, they were -- the sales were maybe a little over a

12  million, two million, and last year they were well over 50

13  million, I believe.

14      So they know that what's going to happen is it takes time.

15  They look the license.  If they would have taken the license,

16  they were -- by the time they were in 2009, you heard in

17  Mr. Kelliher's deposition testimony that they believed the

18  company was already worth, by 2008, 4 to $500 million, so

19  there's value there.

20      Now, even at that point in time they were losing money, but

21  they believed the company was worth 4 to $500 million.  So you

22  have to understand the value piece of it.

23      Would you take a license so that -- you pay that amount so

24  that several years later you're going to be deriving $30 million

25  in operating cash?  You bet you would.

1  Q.  We are several years later, aren't we, sir?

2  A.  Yes.

3  Q.  And right now you're saying LogMeIn should have to pay

4  $113 million to 01 for the past several years.  If that had

5  actually happened, LogMeIn would have lost money every single

6  year big, right?

7  A.  I don't know if they would have lost money big, but they

8  would have been, again, producing cash and generating cash, and

9  that's -- that's the key.

10  Q.  If you have to pay a royalty year after year that makes you

11  lose money, it's better just to go out of business, isn't it?

12  A.  Well, given the fact that in 2009 they were losing money and

13  they were able to take the company to market and generate a

14  $107 million of cash investment and achieve a market cap on the

15  opening day of $432 million, I don't think that that, looking at

16  losing money, is the appropriate measure here.  It's clearly

17  not.

18  Q.  That investment is not sales of product or profit, is it?

19  A.  The investment is not -- exactly my point.  The free product

20  or the free users was the value that was seen by the investors.

21  They understood that there was value there because the -- it

22  hadn't turned into -- the LogMeIn business had not turned into a

23  moneymaker there.

24      But they knew this freemium model, as LogMeIn was talking

25  about it, was the value, all of these free users.  And those

1   free users were the -- were the key pieces of letting them go

2   public at that point in time even though they were losing money

3   in deriving all this additional investment and -- and achieving

4   the market cap that we were talking about.

5   Q.   These investments, sir, are people investing money in the

6   company hoping to make a return on that investment, right?  It's

7   not just free money?

8   A.   Exactly.  They were taking a risk, but they were taking the

9   risk with the -- the -- using the technology that -- the '479

10  technology that 01 had developed, and 01 needs to be compensated

11  for that.  That's not -- that's not 01's risk.  That was the

12  risk of LogMeIn and the people who invested in LogMeIn.

13  Q.   Now, you would agree that officers of a publicly traded

14  company, if they agreed to a royalty arrangement that would make

15  them lose money year after year, would be violating their

16  fiduciary duty to their company and shareholders, right?

17  A.   Absolutely not.  If they could take a license to something

18  like this -- like I said, if you could agree to something like

19  this where you can -- you can get a license and have the

20  long-term view that these people do, understand the market,

21  knowing that this company is going to take off and be

22  profitable, they would be violating their fiduciary duty not to

23  take a license like this.

24  Q.   Have you ever done a computation and taken LogMeIn's balance

25  sheets and figured out what they would look like if they had

1   actually paid all this money to 01?

2   A.   It would look different.

3   Q.   It would look a lot different, wouldn't it?

4   A.   Sure.

5   Q.   They would have lost money every single year?

6   A.   They would have lost money.

7   Q.   Right.  You were talking yesterday to the jury about

8   something called incremental profit, right?

9   A.   Correct.

10  Q.   That's how you get to LogMeIn making 50, $60 million in

11  profit or something like that?

12  A.   That's -- that's on the products, yes.

13  Q.   Incremental profit is not generally accepted accounting

14  principle profit, is it?

15  A.   That's correct.

16  Q.   Finally, sir, I want to examine if you took into account one

17  final real life factor.  Okay?

18  A.   Okay.

19  Q.   01's patent issued in 2005.  You know that?

20  A.   Yes.

21  Q.   01 did not sue LogMeIn until 2010, correct?

22  A.   I believe that's correct.

23  Q.   Five years, correct?

24  A.   Yes.

25  Q.   Throughout that period 01 did not say anything to LogMeIn

1   about any patent, correct?

2   A.   I don't know the communication that went on between the

3   parties at that point.

4   Q.   Well, let me ask you to assume that in that five years, 01

5   did not say anything to LogMeIn about any patent, any

6   infringement, any harm, any problem whatsoever.

7        Can you assume that?

8   A.   Sure.

9   Q.   It's consistent with your understanding of the facts in this

10  case, is it not?

11  A.   Well, again, I don't know what communication took place, but

12  I'll accept that.

13  Q.   Assume it to be so.  Can you do that?

14  A.   Okay.

15  Q.   What that means either, or both, is that 01 was not hurt

16  that much to bother telling 01 -- to bother telling LogMeIn

17  about a patent or try to stop any alleged infringement or 01

18  didn't have a valid infringed patent to complain about.  Use one

19  of those things or both.

20       MR. SHUNK:  Objection.  That's argumentative, Your

21  Honor.

22       THE WITNESS:  I don't know what it means.  I don't know

23  what was going on at that point.

24  BY MR. STONER:

25  Q.   Well, you're here assuming infringement so let's look at

1   whether there's any harm.

2        Can we do that?

3   A.   Okay.

4   Q.   Isn't it true Mr. Cheung testified in those five years

5   LogMeIn was not hurting 01 enough to make it worthwhile even to

6   tell them about the patent?

7   A.   I -- I don't recall specifically.  I'll accept that.

8   Q.   You read his deposition, right?

9   A.   Yeah, but I don't specifically recall that.

10  Q.   So the alleged infringement, if there was any, was not even

11  worth 01 spending $0.40 on a postage stamp, right?

12  A.   I -- I don't know the circumstances around that.

13  Q.   Assume it to be so.  Can you do that?

14  A.   Okay.

15  Q.   Doesn't that real life fact tell you that your $113 million

16  is way off?

17  A.   Not at all.

18  Q.   No one has ever agreed to pay 01 a dime for this patent

19  outside of a lawsuit, have they?

20  A.   I don't believe -- I don't -- again, I don't know how much

21  has come out of these other licenses and all of the

22  circumstances, but I'll accept that.

23  Q.   Even after a lawsuit, no one has ever agreed to pay even a

24  tiny fraction of $113 million, right?

25  A.   That's true.

1    Q.   And, again, if there is no infringement of a valid patent in

2    this case, the damages are not even that high, are they, sir?

3    A.   That would be correct.

4    Q.   They are zero, right?

5    A.   I would believe so.

6             MR. STONER:   No further questions, Your Honor.

7                         REDIRECT EXAMINATION

8    BY MR. SHUNK:

9    Q.   Mr. Brlas, Mr. Stoner has asked you a lot of questions about

10   the various license agreements that 01 has entered into.

11        Do you recall those questions?

12   A.   Yes.

13   Q.   And even now in the last few questions and throughout his

14   cross-examination, do you recall him repeatedly asking you,

15   well, just how much money has 01 made from these license

16   agreements, right?

17   A.   Yes.

18   Q.   Would you tell the jury, Mr. Brlas, what the presence of

19   LogMeIn in the marketplace infringing on Andrew Cheung's patent

20   has done to 01's ability to get revenue from any of these

21   license agreements.

22   A.   Well, again, given the time frame of the infringement, at

23   that point in time 01 and LogMeIn, in looking at the IDS

24   studies, were pretty close.  LogMeIn might -- or, I'm sorry --

25   01 might have been actually a little bit ahead of them.

1    But because of this -- this infringement, especially with

2    the distribution of -- of the free product, of taking millions

3    and millions of potential customers out of the market for not --

4    again, not only 01, but for everybody, by not forcing them to

5    make buying decisions, it's had a devastating effect on their

6    ability to go and capture market and -- and become profitable.

7    Q.  What kind of company, Mr. Brlas, would be interested in

8    taking a license on the '479 patent if Citrix and LogMeIn were

9    already in the marketplace infringing the patent?

10   A.  There wouldn't be anybody who's going to be really

11   interested in it under those circumstances.

12   Q.  Is that why, Mr. Brlas, you've told the jury that you have

13   suspicions or you view suspiciously the use of license

14   agreements that are dated after the hypothetical negotiation

15   because they don't recognize that market impact?

16   A.  They totally don't recognize it.  You're talking about

17   circumstances that would not have existed.  01 would have been

18   in a position where they would have been able to negotiate more

19   favorable terms had this happened.

20   Q.  Mr. Brlas, you mentioned, I think, IDC analyses.  Would you

21   tell -- in your last -- last answer.

22      Would you tell the jury what that is, the IDC analysis?

23   A.  The IDC is International Data Corporation.  I think we

24   mentioned this yesterday.  They're a market intelligence firm

25   that looks at this industry.

1  Q.  Mr. Brlas, I'd like you to take a look at Plaintiff's

2  Exhibit 36.

3          MR. SHUNK:  Unfortunately, I have to ask the marshal to

4  dig that one out.  I can -- I can see he knows that.  Thank you.

5          THE WITNESS:  Yes, sir.

6  BY MR. SHUNK:

7  Q.  Is that one of the IDC analyses you relied on?

8  A.  Yes, it is.

9  Q.  And flip through it.  I know there are a number of these so

10 you have to figure out which one you're looking at.

11     Is this the one that you testified about for Mr. Stoner just

12 a few minutes ago that discussed the relative market share of

13 LogMeIn and 01 in 2005 at the time of the hypothetical

14 negotiation?

15     And you know what, Mr. Brlas, I may have the wrong one.

16 A.  I think you've got the wrong one.

17 Q.  That doesn't look right.  Would you take a look at 35

18 instead.  Exhibit 35.

19 A.  Yes, this is the one.

20 Q.  This is the one.  Okay.  These all look alike, don't they?

21 They have the same cover?

22 A.  They do.

23 Q.  Okay.  Will you forgive me for picking out the wrong number?

24 A.  Yes.

25 Q.  Okay.  So is this -- is this the IDC report that you say you

1  relied on and that was involved in your answer?

2  A.  That's correct.

3         MR. SHUNK:  Your Honor, I move the admission of

4  Plaintiff's Exhibit 35, but under seal in light of the fact that

5  IDC puts a value on these reports and wishes them not to be

6  generally publicly available.

7         MR. STONER:  No objection, Your Honor.

8         THE COURT:  It's admitted.

9         MR. SHUNK:  Thank you.

10 BY MR. SHUNK:

11 Q.  And now that you have the document in your hand, can you

12 confirm precisely what the relative market shares were back in

13 2005?

14 A.  Well, I was looking at one of the graphs in here, and it

15 just -- it demonstrates that 01 was -- in terms of the

16 leadership in the market and everything, was ahead of, at that

17 point in time, 3AM Labs.

18     It's on page 9.  That in terms of the view of the -- of 01,

19 in terms of the leadership position in the market, 01 was ahead

20 of 3AM Labs, which was the prior name of LogMeIn.

21 Q.  And what was the relative market share of Citrix Systems

22 back at that time?

23 A.  Citrix was the -- was the dominant player.  They were far

24 out ahead.  They probably had somewhere around 90 percent of the

25 market maybe, somewhere in that ballpark.

1    Q.  Does it surprise you, Mr. Brlas, that 01 chose to sue Citrix

2    rather than LogMeIn at that time given those facts?

3            MR. STONER:  Objection, Your Honor.

4            THE COURT:  Objection sustained.

5    BY MR. SHUNK:

6    Q.  Now, Mr. Brlas, you were asked a lot of questions about the

7    SingleClick license agreement.  Do you remember that?

8    A.  Yes.

9    Q.  I'm really going to test your memory now.  First of all, is

10   that -- did you review that license agreement?

11   A.  I reviewed it once.  I didn't spend a lot of time with it.

12   Q.  What was the reason that you didn't spend a lot of time with

13   it?

14   A.  Again, it was -- I believe it was 2011 when that license was

15   negotiated, many years after the -- after the hypothetical

16   negotiation took place.  And it really -- as such, it really

17   wasn't relevant to what would happened six or so years prior to

18   that.

19   Q.  Do you remember -- I know that you were asked what the

20   revenue that 01 has seen from that agreement was.

21       Do you remember by chance what the royalty was that

22   SingleClick agreed to in that license agreement?

23   A.  I thought it was somewheres close to what we had in the --

24   in our hypothetical negotiation.

25   Q.  Well, take a look at Defendant's Exhibit 129.

1          MR. SHUNK:  Unfortunately, I again have to ask the

2    marshal to find that one in the books.

3          THE MARSHAL:  Which exhibit was it?

4          MR. SHUNK:  Defendant's Exhibit 129.

5          THE WITNESS:  Okay.

6    BY MR. SHUNK:

7    Q.  If you would look at Section 4(a)(iii).

8    A.  Okay.

9    Q.  What is the royalty rate that you see set out there?

10   A.  Let's see.  It says licensee hereby agrees that it shall pay

11   royalties to licensor or licensed products at the rate of

12   20 percent of -- 20 percent.

13   Q.  Okay.  It's 20 percent of what?  Do you see --

14   A.  Of the imputed value for all such licensed products sold.

15   Q.  Okay.  Now, imputed value is capitalized there?

16   A.  Yes, it is.

17   Q.  Okay.  So does that suggest to you that it has -- it's

18   defined somewhere else?

19   A.  Yes.

20   Q.  Let me ask you to turn to page 2, section 1D --

21   A.  Yes.

22   Q.  -- definitions.

23   A.  Got it.

24   Q.  Okay.  If you would read that paragraph to yourself,

25   Mr. Brlas.  No reason to read it to the jury.  But then I want

1   to ask you a little bit about the imputed value.

2   A.   Okay.

3   Q.   Mr. Brlas, are -- and I know I'm asking you to do this kind

4   of on the fly.  Can you summarize to the jury what imputed value

5   means in this contract?

6   A.   It appears to me that the imputed value is basically the

7   receipts that they're going to get from the sale of the product.

8   If you have commissions and things like that, that comes off the

9   top, but basically that's what it amounts to.

10  Q.   So it's basically the money they make from selling the

11  product and then they're going to give 20 percent as their

12  royalty, right?

13  A.   Right.

14  Q.   Now, does that provision that you just read to yourself,

15  does it have a provision that takes care of the idea that maybe

16  SingleClick will offer the service for some period of time for

17  free?

18  A.   I believe it does.

19  Q.   Particularly the last sentence, sir, if you turn your

20  attention to that.

21  A.   Yeah.  It's 3.95 per user.

22  Q.   Yes.  Explain that to the jury.

23  A.   I believe that means that -- that for each -- again, I'm

24  just reading this on the fly.  I -- for each free user that just

25  has a free copy of the -- or free download of the product, they

 1    get -- they have to pay 3.95 for the product.

 2    Q.  Well, it says the imputed value.  It should be 3.95 a month.

 3    A.  Oh, I'm sorry.  3.95 per month.  You're right.  I'm sorry.

 4    Q.  Okay.  So what does that mean?  That means that if

 5    SingleClick chooses to give the product away for free, then it

 6    still has to pay a royalty on the free even though it's not

 7    receiving money, right?

 8         MR. STONER:  Your Honor, I object to the leading.

 9         THE COURT:  Objection sustained.

10         MR. SHUNK:  Your Honor --

11         THE WITNESS:  I believe that's the case, yes.

12    BY MR. SHUNK:

13    Q.  Okay.  Well --

14    A.  That's -- yeah, I believe that's the way it reads here, yes.

15    Q.  What -- what infor -- what do you draw then from looking at

16    these provisions of the SingleClick license?

17         What -- what conclusions do you draw about the willingness

18    of licensees, even today, to recognize the value of being able

19    to even just give away the '479 patent invention?

20    A.  Well, it certainly seems like they understand that there's

21    value associated with it.

22    Q.  Now, the provision that you just read, does that require a

23    one-time payment in the -- in the case of a free giveaway or --

24    or something else.

25    A.  It's a per month charge of 3.95, I believe.

1   Q.   Now, Mr. Brlas, do you remember Mr. Stoner asking you to

2   actually turn to your deposition at page 219, and he asked you

3   to give the answer that you gave back then, something about

4   royalty based on revenue being -- and then you said, quote, it

5   captures the monetary value, close quote?

6   A.   Correct.

7   Q.   Would you explain to the jury whether there's any other

8   value that a royalty based on revenue either captures or misses?

9   A.   Well, as -- as we've been talking about, the -- the royalty

10  based upon revenue is just that.   It's capturing that piece of

11  the value.

12       But there's the other piece, the value that's being derived

13  from the free users, the folks that they're effectively taking

14  out of the market by not making them make a purchasing decision.

15       So -- and they've been able to take those people and

16  they've -- they've now captured them.   They've used that to

17  drive their market value, help to drive investment, and -- and

18  it's harmed others in the market because of that.

19  Q.   What is the royalty that you've calculated in this case that

20  is based solely on the actual for-revenue products of LogMeIn?

21  A.   In terms of the amount?

22  Q.   Yes, uh-huh, the total.

23  A.   Let's see.   Ballparking it, approximately 45 million,

24  something like that.

25  Q.   Okay.   You know, I do want you to turn to Plaintiff's

1   Exhibit 36 -- yes, Plaintiff's Exhibit 36, as I had asked you to

2   do earlier by mistake because I got my numbers mixed up.

3        Probably in that big binder.

4   A.  Okay.

5   Q.  I simply want to ask you, Mr. Brlas, if this is one of the

6   other IDC reports from 2005 that you reviewed and on which your

7   analysis is in part based?

8   A.  Yes, it is.

9        MR. SHUNK:  I would move the admission of Plaintiff's

10  Exhibit 36 as well, Your Honor, with the same provision that it

11  would be under seal because of IDC's requirements.

12       MR. STONER:  No objection.

13       THE COURT:  It's admitted.

14  BY MR. SHUNK:

15  Q.  Now, you remember Mr. Stoner asking you a lot of questions

16  about whether you have calculated the profits that 01 may have

17  lost because it wasn't able to sell its products.

18       Do you remember that?

19  A.  Yes.

20  Q.  Did you do a lost profits analysis in this case?

21  A.  I did not.

22  Q.  Would you tell the jury why you didn't do a lost profits

23  analysis?

24  A.  I didn't do a lost profits analysis because I was looking at

25  the -- the reasonable royalty analysis which says that's the

1    minimum amount that a party whose patent has been infringed

2    should receive as a result of that infringement.

3    Q.   By minimum amount, do you mean that -- or what do you mean

4    by that?

5    A.   Just that.  They should be -- they should be able to derive

6    the value that was -- that was obtained from that particular

7    technology.  It has -- it's totally separate from whatever

8    profits they would have or would not have made.

9    Q.   Does the reasonable royalty analysis that you did require

10   you to evaluate the profit -- the potential lost profits of 01?

11   A.   No, it does not.

12   Q.   Do you understand in that -- in the traditional way in which

13   the reasonable royalty analysis is done by experts such as

14   yourself, do you understand there to be any particular limit to

15   the reasonable royalty based on the bottom line operating profit

16   of the defendant?

17   A.   No, there is no limit imposed in that regard.

18   Q.   Explain then to the jury, sir, why even though from a bottom

19   line perspective LogMeIn had many years that it didn't make

20   money, you believe it still would have made sense for them to

21   enter into the license agreement that you've described.

22   A.   Well, as -- as I said, if you have an agreement such as this

23   which gives you up front an opportunity to gain technology that

24   is important for your products, and you can obtain it in such a

25   way that you're paying as you go, you know you're going to be

R. Brlas - Redirect                                                    740

1  investing because there's a lot of companies out there that

2  spend a lot of years trying to get to the point where they can

3  make money.  This company actually did quite well in a fairly

4  short period of time.

5      But if you can get that, you know you're going to eventually

6  get to the point where the business turns and you're making

7  money and everything.  And -- and if -- if I give you the

8  opportunity to buy a piece of technology from me or license a

9  piece of technology from me that allows you to go out and make

10 even more money, you'd be -- it wouldn't make sense to not do it

11 if that's -- you know, if that's your business.

12 Q.  Let's put bottom line profitability to the side just for a

13 second and let me ask you this.

14     Over the course of the years from your study of the

15 financial facts, would LogMeIn have had the resources to pay the

16 royalty that you've described in your report?

17 A.  Oh, yes.  I mean, the company, I think even at the end of

18 2005, had in excess of $10 million in the bank.  I -- and it's

19 only continued to go up.  I think at the end of last year,

20 the --

21          MR. STONER:  Your Honor, you excluded this yesterday.

22 I object.

23          MR. SHUNK:  I believe they opened the door by asking

24 questions -- suggesting to the jury that because some bottom

25 line number is low that that precludes the award of the

1    reasonably royalty.  I think the jury should hear the full

2    story.

3              THE COURT:  Objection sustained.

4    BY MR. SHUNK:

5    Q.  Mr. Brlas, you remember the question about the $16 million

6    of total revenue that 01, according to Mr. Stoner at least, has

7    seen over the years?

8    A.  Yes.

9    Q.  And he asked you to assume that and then answer various

10   questions about it?

11   A.  Yes.

12   Q.  Were you aware that Mr. Stringer testified that the amount

13   of money that the company has seen in revenue has been

14   substantially greater than that?

15   A.  I don't recall specifically.

16   Q.  Okay.  Well, let's just assume that 01 has seen about

17   $40 million of revenue since its inception in 1992.  Just assume

18   that for me for a second.

19   A.  Okay.

20   Q.  How could a young company have $40 million in revenue and

21   yet not show an accounting profit?

22   A.  It's -- it's very easy.  I mean, companies -- it takes a

23   long time sometimes for people to get into a market and be able

24   to penetrate it and become successful.  It's just the way

25   business works.

1  Q.  Well, how many years did LogMeIn fail to show a profit?

2  A.  LogMeIn I don't believe showed a profit for -- I think until

3  2009, if I'm not mistaken.

4  Q.  How did they manage to keep the lights on if you know?

5           THE COURT:  Does this get us anywhere with the royalty?

6           MR. SHUNK:  I think so, Your Honor.  I think it's

7  responding to this question of whether the royalty is

8  unreasonable or not.

9           THE COURT:  All right.  Well, we'll take a brief

10  recess.

11     (Recess taken at 11:33 a.m.; back on the record at

12  11:49 a.m.)

13           THE COURT:  Let's try to finish up.  We've spent far

14  too long with this witness.

15           MR. SHUNK:  I have only one more question, Your Honor.

16     (The jury enters at 11:50 a.m.)

17           THE COURT:  All right.

18  BY MR. SHUNK:

19  Q.  One more question for you, Mr. Brlas.

20     In the hypothetical negotiation scenario that you evaluated

21  for purposes of your opinion, in 2005 at the time of that

22  negotiation, would LogMeIn have had the ability to invest in a

23  license to the '479 patent along the lines that you suggest?

24  A.  Yes, it would.  Absolutely.

25           MR. SHUNK:  No other questions, Your Honor.

1          THE COURT:  Do you have anything else?

2          MR. STONER:  Could I ask one question, Your Honor,

3    please?

4          THE COURT:  Sure.

5                      RECROSS EXAMINATION

6    BY MR. STONER:

7    Q.  You keep telling the jury what companies would have agreed

8    to or would not have agreed to in a licensing negotiation,

9    right?

10   A.  Yes.

11   Q.  You've never negotiated a license, have you?

12   A.  That's correct.

13         MR. STONER:  Thank you.

14         THE COURT:  Thank you.  You may step down and may be

15   excused.

16         (Witness stands down.)

17         MR. SHUNK:  Your Honor, the plaintiff is prepared to

18   rest subject to the admission of a few additional exhibits,

19   exhibits that have not been objected to, and which we would move

20   into admission at this time.

21         They are Exhibits -- Plaintiff's Exhibit 64, 65, 66,

22   67, 68, and Exhibits 206A, B, C, D, and F.

23         MR. MOLSTER:  No objection.

24         MR. SHUNK:  Also, I'm sorry, one more.  Plaintiff's

25   Exhibit 179.

1           MR. MOLSTER:  I need to see 179, Your Honor.  Can we

2    talk about that at a break?

3           THE COURT:  All right.  The others are admitted.

4           MR. SHUNK:  Okay.  Your Honor, subject to the

5    admission -- to discussion about Plaintiff's Exhibit 179, and

6    also the substitution of some of these exhibits where we're

7    going to redact some things, the plaintiff has no further

8    witnesses in this case.

9           THE COURT:  All right.

10           MR. STONER:  We have a motion, Your Honor.

11           THE COURT:  All right.  Do you-all want to approach the

12    bench?

13       (Conference at the bench, as follows:)

14           MR. STONER:  She wanted this changed, but this is okay.

15           Your Honor, defendant moves for a judgment as a matter

16    of law on all issues in the case.  Rather than reciting them, we

17    have a written motion that we can file with the Court.

18           Two, I wanted to emphasize particularly the issue

19    should not go to the jury.  The doctrine of equivalents has not

20    even been argued in this case or even suggested.  Their

21    infringement expert didn't mention the words, didn't even

22    pretend to prove infringement --

23           Did not even mention it, did not present any proof on

24    it, so it shouldn't go to the jury.

25           The other issue is until the first day of trial, the

plaintiff was asserting a variety of claims of this patent.
They elected in their opening statement to say that they're only
asserting claim 24 and presented no proof of infringement of any
other claims.  So only claim 24 should go to the jury.

I raise these, in particular, because it reflects on
what instructions the jury should get and what should go in the
verdict form.  If those issues are not in the case, as they
should not be, then it should not go in the verdict form.

But other than that, we move for judgment as a matter
of law, if not infringement, of invalidity based on obviousness,
anticipation, of nonenablement, of estoppel, of laches, and of
no damages.

MR. SHUNK:  Your Honor, we believe that we have proved
every single element necessary, at least as a matter of prima
facie evidence.  And we will happy to respond to the brief that
Mr. Stoner is going to file.

There is one possible area of agreement between us, and
that is, we do wish only claim 24 to go to the jury.  We don't
expect the jury form to have anything on it other than claim 24.
And so that may obviate at least a small portion of what
Mr. Stoner has raised.

As to the matter of validity and the other defenses,
there's been no evidence put on by them about it so that would
be inappropriate at this time.  And as to the matter of
infringement, we have clearly had Dr. Grimshaw express an

1   opinion on that issue and we've carried our burden at this

2   point.

3         THE COURT:  What about the doctrine of equivalents?

4         MR. SHUNK:  Your Honor, Dr. Grimshaw has testified

5   about the similarity of the operation of the LogMeIn product to

6   the -- to the activities that are described in the claims.  Now,

7   our issue with the doctrine of equivalents is that most of the

8   claim terms in this case, Your Honor, is going to tell the jury

9   that they should simply apply normal English meaning to it, as

10  we believe is appropriate.

11        We think that the jury should be able -- since they're

12  going to be doing that analysis of the normal English meaning,

13  they should be able to consider the possibility of the doctrine

14  of equivalents as they're doing that analysis.

15        And Dr. Grimshaw's testimony is what it is.  We think

16  it's appropriate to send even the doctrine of equivalents.

17        THE COURT:  But there wouldn't be any evidence for the

18  doctrine of equivalents, would there, in the case?

19        MR. SHUNK:  Well, there would be -- he has described

20  specifically how each of the LogMeIn components work.  And the

21  jury could conclude that that component is equivalent to, if not

22  directly, meeting the necessary aspects of the limitation of the

23  claim.

24        MR. ANTONETTI:  If I may, Your Honor, on page 324 of

25  the transcript, the question was asked whether there's a

1    difference between a static URL and a static IP address in the

2    context of the '479 patent to one of ordinary skill in the art.

3    And he did respond to that and said that, yes, they were and

4    that they could be used interchangeably with respect to that

5    static URL.  So that would address --

6              THE COURT:  Well, I'll think about that a little bit.

7    There's no controversy about only claim 24 going forward.  I'll

8    consider the doctrine of equivalents.  Otherwise, your motion

9    will be denied.  I find there's ample evidence to go forward.

10             MR. SHUNK:  Thank you.

11             MR. STONER:  Your Honor, just for completeness here.  I

12   forget to say we also move for JMOL, judgment as a matter of

13   law, of no willfulness and inequitable conduct, although that

14   certainly -- if I could respond briefly on doctrine of

15   equivalents.

16             As Your Honor is aware, the law is that they have to

17   provide particularized argument to the linking testimony on a

18   limitation-by-limitation basis of no substantial differences, no

19   function way result analysis.  They never asked Dr. Grimshaw an

20   opinion on that, never provided that particularized testimony

21   whatsoever.

22             MR. SHUNK:  May I briefly suggest, Your Honor, that at

23   least the Court should permit the doctrine of equivalents on the

24   limited issue of the static IP address based on the portion of

25   the testimony that Mr. Antonetti has read.  And I assume that I

 1  don't need to respond on the willfulness issue that was just

 2  raised.  If Your Honor wants me to argue something about that --

 3          THE COURT:  No.

 4          MR. STONER:  Thank you.

 5          MR. SHUNK:  Thank you, Your Honor.

 6      (Thereupon, the following proceedings continued in open

 7  court:)

 8          MS. FERRERA:  May we proceed, Your Honor?

 9          MR. CORRADO:  May we have a minute, Your Honor?

10          MR. SHUNK:  We have -- we have to switch lawyers, Your

11  Honor.

12          MS. FERRERA:  Thank you, Your Honor.  LogMeIn calls

13  Marton Anka.

14                          **MARTON ANKA**,

15          after having been duly sworn or affirmed,

16          took the stand and testified as follows:

17

18          MS. FERRERA:  Your Honor, I'd like to speed things

19  along.  I'd ask the marshal if he could hand Mr. Anka a binder,

20  and we have one for opposing counsel and for Your Honor.

21          THE COURT:  All right.  Go ahead.

22                      DIRECT EXAMINATION

23  BY MS. FERRERA:

24  Q.  Good morning, Mr. Anka.  Would you please introduce yourself

25  to the jury.

1   A.   Yeah.  Good morning.  My name is Marton Anka.

2   Q.   And where do you work?

3   A.   I work for LogMeIn.

4   Q.   How long have you worked for LogMeIn, sir?

5   A.   Since its inception in 2003.

6   Q.   And were you involved in the inception of the company in

7   2003?

8   A.   Yes.  I was the founder of LogMeIn.

9   Q.   What position do you currently hold at LogMeIn?

10  A.   Chief technology officer.

11  Q.   And maybe you could move the microphone a little bit closer

12  to you, Mr. Anka.  I'm not sure the jury can hear you.

13  A.   Chief technology officer.

14  Q.   Okay.  What are your responsibilities in that position?

15  A.   Well, I help formulate new product and new features in

16  existing products.  First and foremost, my responsibility is to

17  make sure that the technology we use to create those products is

18  sound, it's scalable, it's reliable, it's solid.

19       In addition to this, there is a research and development

20  team, a team of engineers that reports directly to me, as well

21  as our network operations group.  The people who operate our

22  servers and datacenters, they also report to me.

23  Q.   Mr. Anka, do you currently do any software development?

24  A.   No, I don't.  Not anymore.

25  Q.   Have you in the past?

1  A.  Yes.  Yes, I have.

2  Q.  How long have you been doing software development?

3  A.  Well, commercially since I was about 14.

4  Q.  Tell us about that.

5  A.  Well, really my first commercial project was when I was

6  actually 14.  And it -- I'm going to be very brief.  My dad, my

7  father, used to own what you here in the United States you call

8  a credit union.  And he asked me to help with -- him with

9  payroll.  He gave me the formulas and I created -- on our home

10  Commodore computer a small software for him -- for him to use,

11  but he said that he really preferred to do that at the bank.

12      So I visited him a few times and actually created it for the

13  IBM PC that they had.  And they didn't actually pay me for this.

14  What I asked for in return was a list of all the credit unions

15  in Hungary, which he gave me.

16      And I also asked him to loan me money for postage, which he

17  also did.  So I sent over 300 letters to the credit unions

18  trying to sell my software, which I actually did.  I sold about

19  20 copies.

20      I did not strike it rich with that, but it was a nice -- it

21  was a lot of money for a 14-year-old kid in Communist Hungary.

22  So, you know, I bought a nice bicycle and a Walkman.

23  Q.  And how long have you been doing remote access, Mr. Anka?

24  A.  Well, that I've been doing as a business since 1998.

25  Q.  Now, where do you live currently?

1   A.   I live in Windham, New Hampshire.

2   Q.   And how long have you lived there?

3   A.   Since the fall of 2007.

4   Q.   Do you have any family there?

5   A.   I live there with my wife, yes.

6   Q.   Where did you live before moving to New Hampshire?

7   A.   I lived in Budapest, Hungary.

8   Q.   Would you briefly summarize your education to the jury?

9   A.   Yes.  I graduated from a school called the -- I should spell

10  it -- S-Z-A-M-A-L-K Institute in Budapest with a degree in

11  information systems programming in 1993.

12  Q.   And what did you do after receiving your degree?

13  A.   I joined a small software company in Budapest as an intern

14  in -- that was right after -- after school in 1993.

15  Q.   What was the name of that company?

16  A.   It's called Ablakszoft.  Yeah.  A-B-L-A-K-S-Z-O-F-T.

17  Q.   What did you do for that company?

18  A.   I was a junior software engineer there initially.

19  Q.   What types of products were you developing?

20  A.   We worked on a complicated -- what you would call an

21  enterprise resource planning software, ERP system, that

22  businesses use to manage things like general ledger, inventory,

23  billing, invoicing.  I worked on that while at the company.

24  Q.   Did you write software code?

25  A.   Yeah.  Absolutely, I did.  Yes.  That's most of what I did

 1   there.

 2   Q.   And how long did you work there?

 3   A.   I left Ablakszoft at the end of 1995.

 4   Q.   At some point, Mr. Anka, did you start your own company?

 5   A.   Yes.  Yes.  In 1998 I did.

 6   Q.   What was that the name of that company?

 7   A.   It was a company called 3AM Laboratories Partnership.

 8   Q.   Why did you call the company that?

 9   A.   It's just a fun name.  Essentially I like to work late at

10   night, and 3 a.m. was a time I was fairly productive at.  And

11   laboratory gives it a bit of mystique.  And, frankly, I didn't

12   think it was really going to be something very visible, very

13   successful.  So I thought I would give it a fun name I was happy

14   with, and that's about it.

15   Q.   Why did you decide to start that company?

16   A.   Well, I had this concept, this idea, for a simple but very

17   effective remote access product that I wanted to market.

18   Q.   What was the nature of that product?

19   A.   So the product called RemotelyAnywhere, and it actually went

20   on the market in September of 1998.  It was essentially a tool

21   that I marketed at systems administrators.  It was a product

22   that you would install on the computer, typically a server.  And

23   then you would go to a different computer, open a web browser.

24   And that's what was really unique about the product back in

25   those days.

1        You would open a web browser and you would point the browser

2   at the other computer, the computer that you have installed my

3   software on.   And after signing in, you were able to do

4   administrative tasks as well as control the keyboard and the

5   mouse remotely.

6   Q.   So this was a remote access product; is that correct?

7   A.   Yes.   Yes, it was.

8   Q.   And when did you begin to develop that product?

9   A.   That would have been -- when I actually started working on

10  it, it would have been end of '96, maybe early '97, but it

11  actually -- the first version that went on sale, that was in

12  September of 1998.

13  Q.   So approximately how long did it take you to develop the

14  product?

15  A.   Approximately two years.

16  Q.   Who wrote the code for that product?

17  A.   I did.

18  Q.   Now, we've heard in this case about firewalls and routers.

19       Was RemotelyAnywhere able to provide remote access to a

20  computer that was located behind a firewall or a router?

21  A.   Well, yes, it was, but you really had to be a technical

22  person to make that -- make that work.

23  Q.   And we've also heard about dynamic IP addresses.

24       Was RemotelyAnywhere able to work if a personal computer had

25  a dynamic IP address?

1   A.   Yes.   Again, if you were a technical person, you had no

2   problems getting that to work, yes.

3   Q.   Was RemotelyAnywhere a successful product for your company?

4   A.   Well, it was a very small company.   It was just myself for

5   the first couple of years.   And then at the end, I had two

6   and -- and one part-time employee.   So it was a small company,

7   but it was a very successful product, yes.

8   Q.   How much in annual revenues did it generate?

9   A.   So near the end, it was north of a million dollars --

10  Q.   How long --

11  A.   -- annually.

12  Q.   And how long did that company operate?

13  A.   We operated from 1998 until the beginning of 2003.

14  Q.   What happened at that time?

15  A.   Well, at that time we founded LogMeIn.

16  Q.   When you say we, who's we?

17  A.   Essentially I approached my boss at a previous job and the

18  person I've known well and had a lot of respect for, both as a

19  person and as a businessman, and I knew he was available,

20  Michael Simon.   You've seen him testify yesterday.

21       I knew he was in Budapest at the time.   I knew he was

22  between companies.   And what frustrated me with my -- you know,

23  as I said, we have been a successful company, but sales weren't

24  growing.   I am first and foremost a technologist.   I don't know

25  and don't really want to know much about the business side of

1   things.

2       What I did know, however, that market for a software,

3   essentially market for Internet-related software, was growing

4   exponentially, especially back in those days, the early 2000s.

5       And our revenues were solid, but they weren't growing at

6   all.  So I seek out first just Michael's advice, then his actual

7   involvement in taking this to the next level.

8   Q.  When did you first approach Mr. Simon?

9   A.  I think that would have been the summer of 2002.

10  Q.  What became of your original company, 3AM Laboratories

11  Partnership, at that time?

12  A.  Well, so we found a new company that we called 3AM Labs,

13  Incorporated, and the assets of my old company were sold to the

14  new entity, 3AM Labs.

15  Q.  And that -- did that include the RemotelyAnywhere product?

16  A.  It included the primary -- the RemotelyAnywhere product or

17  the source code or the intellectual property rights, yes.

18  Q.  What was your position at the new company?

19  A.  I became chief technology officer.

20  Q.  And what was Mr. Simon's position?

21  A.  He was CEO.

22  Q.  At some point did 3AM Labs change its name?

23  A.  Yes.  I don't know the exact year, but maybe 2005, 2006, we

24  changed the name of the company to that of our flagship product,

25  LogMeIn.

1    Q.   What was your goal in founding LogMeIn, Mr. Anka?

2    A.   Well, we've looked at the RemotelyAnywhere business.   And

3    what we saw was that we were getting a lot of interest from

4    people, in fact, an increasing amount of interest while sales

5    were somewhat flat.

6         And what we found was that there was a tremendous amount of

7    interest from people -- an increasing amount of interest from

8    people who weren't technically savvy and wanted remote access.

9    Remember, again, early 2000, that's when broadband really became

10   prevalent.   Everybody was getting, you know, all these

11   connections to the Internet, connections that were faster, much

12   faster than ever before.

13        And the concept of being able to work remotely, access a

14   computer that's afar, that was very appealing to many people.

15   RemotelyAnywhere had -- we always had good press, but it was a

16   niche product.   People found us.   They wanted to use the product

17   for -- for paying remote access, but they weren't really

18   technologically savvy.   They may have been extremely bright

19   professionals, but -- you know, dentists, lawyers maybe, common

20   people -- not technical people, and that was beyond their

21   capability to use the RemotelyAnywhere product.

22        So what we thought we would be able to do -- we actually had

23   a plan for it -- is to create a service based on the

24   RemotelyAnywhere source code that would allow people to purchase

25   and use a powerful but easy remote access product.

1    Q.   In developing this new remote access product, what

2    challenges were you having to overcome?

3    A.   Well, so to get two computers to communicate with one

4    another, one computer being, let's say, in an office

5    environment, the other computer being at home, you need to

6    get -- you needed to be able to get the two to talk together.

7         Now, getting these two computers to exchange information

8    with one another was not something that was an insurmountable

9    problem.  You know, the concept is pretty obvious.  These days

10   if somebody chats with a friend on Facebook, for example, the

11   same thing happens.

12        The two computers being very far from each other, they

13   bounce messages off of a server or multiple servers on the

14   Internet and the messages go through a cloud infrastructure.  We

15   didn't call it a cloud infrastructure back then.

16        But the concept was well-known even back in those days, even

17   going back to as early as 1988.  That was when a product called

18   Internet-related chat was created.  It allowed people to do the

19   exact same thing as Facebook chat does today in a very, very

20   similar manner.

21        So we knew of the concept and we knew how to tackle that

22   problem at high level.  What was hard to solve and what we

23   really spent a lot of engineering time on was to solve this in a

24   way that would really work for a large number of users and work

25   in a cost-effective way.

1          Essentially we were planning on success.  We were hoping for

2    success, and we knew that we needed a system that was

3    cost-effective to run.  And it was able to support -- initially,

4    it worked well for a small number of users, but then later on it

5    was able to scale to millions of users.  And even in that

6    infrastructure, that's what we spent a lot of time on.

7    Q.  Now, at the time of LogMeIn's founding, were there other

8    companies offering remote access?

9    A.  There were many, yes.

10   Q.  Can you give some examples?

11   A.  Well, GoToMyPC was a clear market leader back in those days,

12   but there was Laplink everywhere; WebEx, who was a

13   billion-dollar company back then, mostly well known for their

14   web conferencing solutions.  They had my WebEX PC.  I understand

15   01 was around, even though we did not know of them at that time,

16   and I'm sure there have been many others.

17   Q.  Mr. Anka, did you know of 01 Communique as of 2003?

18   A.  We did not.  I did not.

19   Q.  How, if at all, did you intend your remote access product to

20   differ from the other products that were out there?

21   A.  Well, we wanted to build something that's easier to use,

22   faster and cheaper.  We -- we wanted to build a better

23   mousetrap, essentially.

24   Q.  Did LogMeIn ultimately develop a better, faster, cheaper

25   product?

1   A.   Yes.  Yes, we did.

2   Q.   What was that product called?

3   A.   Well, we called it LogMeIn.

4   Q.   How long did it take you to develop the LogMeIn product?

5   A.   Well, so 3AM Labs -- the new 3AM Labs, later known as

6   LogMeIn, was started in 2003, February of 2003.  And we started

7   working first on the concept and then the actual code pretty

8   much immediately.

9        It took us a little over a year.  The product actually

10   launched -- the LogMeIn product launched in April of 2004.

11   Q.   Mr. Anka, could you tell the jury, to what extent did your

12   development of the LogMeIn product build upon the work you had

13   previously done on RemotelyAnywhere?

14   A.   To a fairly large degree.  Essentially, the RemotelyAnywhere

15   product itself, as I mentioned earlier, it was able to provide

16   access to one computer from another using a web browser.  So all

17   the code that we had for RemotelyAnywhere, we were actually able

18   to use for LogMeIn.

19        Hence, the maybe unusually short development time back --

20   back in those days of just, you know, about a year.  What we had

21   to build and then what we really had to put a lot of effort

22   into, as I mentioned, is the infrastructure to support the

23   service which makes it easy for our users to -- to use a remote

24   access product.

25   Q.   When did you first launch the LogMeIn product?

1    A.   It came out exactly on April 13th of 2004.

2    Q.   Would you turn in the binder in front of you to DX 297.

3    A.   Yes.

4    Q.   Can you tell us what that document is, please?

5    A.   Yes.   This is a press release that we issued on April 13,

6    2004, announcing the availability of LogMeIn.

7    Q.   And the press release refers to RemotelyAnywhere announcing

8    the availability of LogMeIn.   Why does it refer to

9    RemotelyAnywhere?

10   A.   We were a small company back then and not very formal about

11   these things.

12        I believe we did not refer to us as 3AM Labs but instead

13   used RemotelyAnywhere because RemotelyAnywhere had some brand

14   recognition.   It had some really nice reviews and -- and

15   customers that knew of us.   So we thought that if -- if we used

16   the better known name, it would get better recognition this way.

17             MS. FERRERA:   And, Your Honor, we would offer Exhibit

18   DX 297.

19             MR. CORRADO:   No objection.

20             THE COURT:   It's admitted.

21   BY MS. FERRERA:

22   Q.   Does LogMeIn still sell the LogMeIn product, Mr. Anka?

23   A.   The LogMeIn product?   Yes.   Yes, we do.

24   Q.   How many versions of that product are there?

25   A.   We actually have two versions of it now.   There is LogMeIn

1  Free, which as the name implies is free of charge, and there's

2  LogMeIn Pro that -- that requires a subscription fee for.

3  Q.  The product that was launched in April 2004, which of those

4  two products was that?

5  A.  So that would have been the LogMeIn -- what we call the

6  LogMeIn Pro product at this -- at this time, except it was only

7  one version so it was just LogMeIn.

8  Q.  And when did you launch the free version of the product?

9  A.  That came in in September of the same year, September of

10  2004.  I don't recall the exact date.

11  Q.  Whose idea was it to offer a free version of the product?

12  A.  I believe it was my idea.

13  Q.  Where are LogMeIn's headquarters today, Mr. Anka?

14  A.  It's in -- it's in Woburn, Massachusetts.

15  Q.  Does LogMeIn have offices or facilities in other places?

16  A.  Yes.  Yes.  We -- we actually do have quite a few of

17  offices.  Other than Woburn, we have a location in Hungary and

18  worldwide sales offices in London, Dublin, Sydney, and

19  Bangalore.

20  Q.  Do you have any locations here in Virginia?

21  A.  Yes.  We also operate datacenters throughout the world so --

22  actually one of our biggest datacenters is here in Ashburn,

23  Virginia.

24     Our large -- our other large datacenter is located in Los

25  Angeles, and we also have smaller datacenters in Dallas, Texas;

1    Chicago, Illinois; London in the United Kingdom; Sydney; and

2    Singapore.

3    Q.   How many employees does LogMeIn have today?

4    A.   I actually don't how many we have today.  I know that at the

5    end of last -- it changes every day, but at the end of last

6    year, we had 575 employees.

7    Q.   How many did it have when it started?

8    A.   We started, I think, with -- with ten people.

9    Q.   And, Mr. Anka, I'm going to ask you to explain the LogMeIn

10   system and how it works, and this is fairly complicated stuff.

11   I'd like to ask you to just slow down a little bit when we --

12   when we go through it so that everyone can understand what

13   you're -- what you're --

14   A.   Okay.

15   Q.   -- describing.  And I'd like to ask you to turn to DDX2-6 in

16   the binder in front of you.

17   A.   Yes.

18   Q.   Can you tell us what DDX2-6 is?

19   A.   Yes.  This is a screen shot of one of the web pages on

20   LogMeIn.com.

21   Q.   And is it actually a series of screen shots?

22   A.   Yes.  As you -- yes.  There are several pages, and they are

23   all screen shots of either the LogMeIn.com website or the

24   product that you download off of LogMeIn.com.

25   Q.   Who prepared these screen shots?

1   A.   I have.

2   Q.   And how did you prepare them?

3   A.   Well, I went to LogMeIn.com as -- as any new user of ours

4   would and went through the process of registering for an

5   account, downloading the software, installing it, and then

6   accessing a computer with the help of our software.

7   Q.   When did you prepare them?

8   A.   This was early last week.

9   Q.   And are these a true and accurate representation of what a

10  user would see when they're using the LogMeIn product?

11  A.   Yes.  Absolutely.

12          MS. FERRERA:  If we could put DDX2-6 up on the screen,

13  please.

14          And, Mr. Anka, I have a laser pointer here, if I could

15  ask the marshal to ...

16  BY MS. FERRERA:

17  Q.   Mr. Anka, could you just walk us through these screen shots

18  and explain to the jury what they show?

19  A.   Yes.  Absolutely.  So the first -- the first screen shows

20  the user signing up for an account.  You specify your e-mail

21  address, you create a password, you select the country that

22  you -- that you live in, and you also tell us if you're willing

23  to use LogMeIn for personal business reasons, and then you

24  simply click continue.

25  Q.   And if we go to the next slide, what does that show?

1    A.  Well, the next slide shows the screen that the user sees

2    next, which is -- this is a prompt for -- for them to install

3    our software on the computer that they are in front of at -- at

4    that time.  This is what enables that computer to be accessible

5    later on.

6    Q.  And then let's turn to the next slide.  What does that show?

7    A.  It shows that the user click the big green button on the

8    previous page, and this is our installer being downloaded.

9    It -- there are a few help screens here for the user, but -- few

10   help screens here for the user.  And as we go through the

11   process, the next slide shows the installer -- the installer

12   itself being downloaded and run.

13       The next slide shows the installer finishing his job.  And

14   at this point the software has been installed and the computer

15   ready for -- computer is ready for remote access.

16   Q.  Then if we turn to the next slide, can you tell the jury

17   what this shows?

18   A.  Excuse me.  Yes.  So here we have jumped a bit.  We have

19   finished the work on the -- on the computer that we were working

20   on earlier and now we are at a different computer.  It could be

21   in the same room, it could be in the same country, or it could

22   be somewhere else.

23       But we open a web browser and visit LogMeIn.com again.  And

24   what I'm doing here is in the upper right corner, I put in my

25   e-mail address that I specified earlier, and I also typed in the

1    password that I -- that I created.

2        All I need to do now is click the login button.

3    Q.  So just to be clear.  This is a screen shot from a computer

4    different than the one that you loaded -- that you originally

5    loaded the LogMeIn software onto.  Is that correct?

6    A.  Yes.  Yes, that's right.

7    Q.  Let's turn to the next slide.  And can you tell the jury

8    what this shows?

9    A.  Yes.  This -- this is a page that a user of us -- user of

10   ours would see when -- when they log into the system.

11       Here, we see the computer that I have installed the software

12   in the previous -- previous steps on.  There's just one computer

13   here.  There could be more, but I just installed it on a single

14   one.  It's shown in blue, it says it's online so that tells me

15   that I can actually connect to it if I want to.

16   Q.  And so what would happen if you selected that computer?

17   A.  Well, if I click on the computer, then a brief connecting

18   message shows up as -- as shown in the next slide.  This is only

19   up for a -- for a couple of seconds before.  This is just to

20   tell the user that things are happening and -- and we are

21   actually connecting them to their computer at this point.

22       After this, like I said, after a second or two, you are

23   prompted to log in -- the user is prompted to log in to the

24   computer in question.  There is a password for -- for the

25   computer itself as well.

1      So here I am typing in the password for -- for the computer.

2   And once I log in, I'm presented with a screen where essentially

3   on the left-hand side there's a menu bar where you can perform

4   various tasks such as, you know, probably most importantly is

5   ending the session and getting back to LogMeIn.com.

6      On the right-hand side, however, that's -- that's where

7   really things are happening.  You can see that there's a game of

8   FreeCell running, but that's actually running on a remote

9   computer.  It's a solitaire game included in Windows.

10     Essentially, this is a screen shot of -- of a browser that's

11  displaying the screen of another computer.

12     On the right-hand side -- well, in the -- really in the

13  middle of the screen, you can see a task bar, the background,

14  the recycle bin, software running on that computer.  This is --

15  this is really the desktop of -- of the computer that we have

16  installed the software on previously.

17     If I move my mouse over it and click on things, it -- the

18  clicks are actually happening on the other computer and I see

19  the results here.

20  Q.  And so just to be clear.  The desktop that you're looking at

21  there, is that the desktop of the remote computer or the

22  personal computer back home or in the office or --

23  A.  It's the desktop of the computer that we installed the

24  LogMeIn software on.  It's the computer I'm away from.

25  Q.  Now, Mr. Anka, this is what a user would see from -- a user

1   would see when they're using the LogMeIn --

2   A.  Yes.

3   Q.  -- product.  I'd like to ask you some questions now about

4   how the product -- the technical aspects of the product work

5   from behind the scenes.

6       Would you turn to PX 168.  Do you recognize that document?

7   A.  I do, yes.

8   Q.  What is it?

9   A.  This is a so-called white paper.  It's a security white

10  paper that we -- that we created and we maintain it for -- for

11  our customers or would-be customers.

12  Q.  What is the purpose of this document?

13  A.  Well, as you can imagine, remote access has -- it brings up

14  a lot of questions around security.  And most of the users that,

15  you know, that want to take advantage of remote access in a

16  mission critical environment, they -- they have a lot of

17  questions that we -- that we often have to answer.  So this --

18  this document is really a collection of -- of answers to those

19  questions.

20      It describes the security mechanisms that are in play and

21  the various entities that interact with each other when a remote

22  access session takes place.

23  Q.  Is it the purpose of this document to describe how the

24  LogMeIn system works?

25  A.  No, it's not.

1   Q.  Would you turn to page 5 of the document.

2   A.  Yes.

3   Q.  And do you see there's a figure on that page?

4   A.  Yes.  There's a diagram here, yes.

5   Q.  Is this an accurate depiction of how the LogMeIn system

6   works or the LogMeIn system itself?

7   A.  Well, it's a very high-level depiction of -- of the various

8   entities and the entities interacting with each another.

9   It's -- I would not call this blueprint for the LogMeIn service,

10  no.

11  Q.  Now, in the middle of that figure, there are three -- there

12  is a reference to LogMeIn and then there are three blue boxes

13  beneath that.  Do you see that?

14  A.  Yes, I do.

15  Q.  The first one says www.LogMeIn.com.  Do you see that?

16  A.  Yes.

17  Q.  What does that figure or that box represent?

18  A.  It represents a web server or, I should say, a collection of

19  web servers in our case.

20  Q.  And then beneath that, there's a reference to LogMeIn

21  Database.  Do you see that?

22  A.  Yes.

23  Q.  What does that represent?

24  A.  That's a representation of the database servers that we

25  operate.

1   Q.  And then beneath that there's the LogMeIn Gateway.  Do you

2   see that?

3   A.  I do, yes.

4   Q.  What does that represent?

5   A.  It's a representation of the gateway servers that we

6   operate.

7   Q.  And you said that this diagram only depicts the system at a

8   high level.  Did you help prepare a diagram that shows the

9   LogMeIn system in more detail?

10  A.  I certainly have, yes.

11        MS. FERRERA:  And, Your Honor, I'd like to just offer

12  in evidence DDX2-6 that Mr. Anka previously described.

13        MR. CORRADO:  No objection, Your Honor.

14        THE COURT:  It's admitted.

15        MS. FERRERA:  Could we put up on the screen DDX2-1?

16  BY MS. FERRERA:

17  Q.  And can you tell us -- first of all, what is this picture

18  that's up on the screen right now?

19  A.  So this is a map of -- a map showing all of the datacenters

20  where we operate web servers.

21  Q.  And did you help to prepare this diagram and the -- the ones

22  that we're going to look at in a moment?

23  A.  Yes.  Yes, I have.

24  Q.  And when did you prepare it?

25  A.  Early last week.

1  Q.  You said this is a map of where all the datacenters are, and

2  there are some pins on the -- on the map.

3     Can you tell us what those pins represent?

4  A.  Well, I said that these are the -- the -- we actually have

5  more datacenters, and I think that will come up later.  This is

6  just the datacenters where we have web servers.  And these pins

7  represent web servers, a collection of web servers.

8  Q.  And what is a web server in the LogMeIn system?

9  A.  A web server is -- is essentially a server that -- a web

10 browser, you know, Firefox, Chrome, Internet Explorer interacts

11 with.  And the web server serves web pages, contents, text, even

12 code, images, essentially a user interface that is ultimately

13 displayed by the -- by the web browser.

14 Q.  Where are those web servers located?

15 A.  So they are located in -- in the locations shown on the map.

16 London, Chicago, Ashburn, Dallas, and Los Angeles.

17 Q.  How many web servers does LogMeIn have?

18 A.  Well, as of right now we have 110 of them in operation.

19 Q.  And you also mentioned a moment ago something called the

20 gateway server.  Do you recall that?

21 A.  Yes.  Yes, I do.

22 Q.  What is a gateway server in the LogMeIn system?

23 A.  Well, a gateway server is really the server that facilitates

24 communication between -- between various computers, such as, you

25 know, the host computer that you're accessing and the client

1    computer that's doing the accessing.

2    Q.  And does this map show where the LogMeIn gateway servers are

3    located?

4    A.  Yes, now it does.

5    Q.  And where are they located?

6    A.  So in addition to the aforementioned locations, London

7    Ashburn, Chicago, Los Angeles, and Dallas, we also have servers

8    in Singapore and Sydney.

9    Q.  How many gateway servers does LogMeIn have?

10   A.  I believe that number adds up 103.

11   Q.  Then you also mentioned something called a database server.

12   Can you --

13   A.  Yes.

14   Q.  Can you tell the jury what that is in the LogMeIn system?

15   A.  Well, the database server is really where -- as the name

16   implies, it stores data, but it's also where all of business

17   logic is implemented.  That's -- that's where rules are enforced

18   on -- on what may or may not occur within the system.  And we

19   also store a lot of data in those places, yes.

20   Q.  Where are those database servers located?

21   A.  Ashburn and Los Angeles.

22   Q.  And how many database servers does LogMeIn have?

23   A.  Twenty in total, ten in -- ten in each location.

24   Q.  Why does LogMeIn have these different types of servers?

25   A.  Well, it's -- it's really one of the key innovations that

1    we -- that we spent a lot of time on early on.  It's -- this is

2    what enables us to deliver the service cost effectively to a

3    really, really large audience.

4         Essentially, it allows to us to put servers where they are

5    needed and have those servers do exactly what it needs to be

6    done.

7    Q.  What role, if any, did this system, this collection of

8    servers that you described, play in LogMeIn's ability to offer a

9    free product?

10   A.  It was extremely important.  We wouldn't have been able to

11   offer LogMeIn Free without this -- this architecture.

12   Q.  Now, does LogMeIn use any software to provide remote access?

13   A.  We use a lot of software, yes.

14   Q.  How many different pieces of software does LogMeIn use?

15   A.  Well, so in this example here, we have three very distinct

16   types of servers running three very distinct types of software.

17   Q.  So is there software on the web servers?

18   A.  Yes.  Yes, there is.

19   Q.  What kind of software is that?

20   A.  It's Microsoft's Internet Information server.

21   Q.  Did LogMeIn develop that software?

22   A.  No, we did not.

23   Q.  Did LogMeIn have to do anything with that software in order

24   to make it work on its web servers?

25   A.  Yes.  Yes, of course.  I mean, even in addition to

1    installing the server and configuring it, we created the

2    content.   And if that content is dynamic, that required

3    additional programming.

4        So, yes, there was a fair amount of involvement with -- with

5    the websites.   Yes.

6    Q.   Is there also software on the database servers?

7    A.   Yes, there is.

8    Q.   What kind of software is that?

9    A.   It's Microsoft's SQL server.

10   Q.   Did LogMeIn develop that software?

11   A.   No.   We -- we purchased it -- we licensed it from Microsoft.

12   Q.   And then in terms of the gateway servers, do they run any

13   kind of software?

14   A.   Yes.   Yes, they do.

15   Q.   And what kind of software do they run?

16   A.   That is our proprietary software.

17   Q.   Did LogMeIn develop that?

18   A.   Absolutely we did, yes.

19   Q.   Now, Dr. Anka -- Mr. Anka, are you familiar with the phrase

20   programming language?

21   A.   I am, yes.

22   Q.   Can you tell us, tell the jury, what a programming language

23   is?

24   A.   Well, to be very short.   Essentially, this is -- a

25   programming language is a way for an engineer to express ideas

1   in a way that a machine would understand them and -- and be able

2   to execute those ideas that ultimately, you know, we call

3   programs.

4   Q.   The various software programs that you just described, are

5   those written in the same programming language or different

6   programming languages?

7   A.   There have -- we use many program languages at LogMeIn.

8   Q.   What language are the -- is the web server software written

9   in?

10   A.   So that I actually don't know because I don't know what

11   Microsoft -- I could guess, but I wouldn't hazard.   Microsoft

12   used a programming language to create the software.   We license

13   it from them.   I don't -- I don't know.

14   Q.   And how about the database service software, what kind of

15   language is that written in?

16   A.   Same -- same goes for that.   It's -- it's Microsoft

17   software.   I -- I wouldn't be privy to that information.

18   Q.   In terms of the work that LogMeIn did with respect to the

19   web server software or the database sever software, what

20   language is the -- is the web server part of that written in?

21   A.   Yes.   So the code we have written on the web server side,

22   it's C# HTML, JavaScript, and that's it.

23   Q.   And how about the database server software?

24   A.   That's -- that's Microsoft's version of SQL, S-Q-L.   It's

25   Transact-SQL so you can abbreviate it T-SQL.

1   Q.  And then in terms of the gateway server software, what

2   language is that written in?

3   A.  It's written in C++.

4   Q.  Do any of LogMeIn's products, other than those that we've

5   talked about in this case, run on -- or use any of the software

6   that you've just described?

7   A.  I'm sorry.  Could you repeat the question?

8   Q.  Sure.  Other than the products, the LogMeIn products that

9   we've talked about here, does LogMeIn have products besides

10  those?

11  A.  Oh, yeah, absolutely.

12  Q.  And do any of those other products use the gateway server

13  software, for example?

14  A.  Yes, many of them do.

15  Q.  And how about the web server software?

16  A.  Yes.  With a couple of exceptions, many of them do, yes.

17  Q.  And how about the database server software, do any of the

18  other LogMeIn products use that?

19  A.  And by other, you mean the nonaccused products?

20  Q.  Right.

21  A.  Yes.  Yes, absolutely.

22  Q.  In developing the LogMeIn system, Mr. Anka, did you simply

23  chop up one piece of software into different subcomponents?

24  A.  No, not at all.  We set out to design the system in a way

25  that is comprised of different entities, each performing one

1   particular task, but doing that extremely well.

2        And these entities, you know, they have to communicate with

3   one another, but -- but they all have very distinct chores.  And

4   they are really good at that particular role, but not at

5   anything else.

6   Q.  Now, turning back to the diagram, I'd like to ask you to

7   walk the jury through on a step-by-step basis how the system

8   works from behind the scenes in terms of providing remote

9   access.  So --

10  A.  Sure.

11  Q.  And I -- if it helps to use the pointer, please feel free to

12  do that.

13       So what's the first step in the process, Mr. Anka?

14  A.  I don't know if I actually need this.  I think the animation

15  will take care of that.  But the first step is, as we ran

16  through the screen shots, essentially a user needs to register,

17  download, and install our software on a computer.

18       We call this computer the host computer, the computer that's

19  being accessed.  And that's actually shown here labeled Miami,

20  conveying the fact that the host computer is actually in fact

21  located in Miami.  So what we need to do now is download and

22  install the software.

23  Q.  What happens once the software has been downloaded?

24  A.  Well, once you download and install the software, the

25  software seeks out the nearest datacenter that we operate and

1   connects to one of the gateway servers within that datacenter.

2   Q.  And what does that pink line that just appeared between the

3   host computer and the gateway server represent?

4   A.  So that represents a connection that we -- that we call the

5   standing connection, the standing channel.  Essentially, this

6   connection is present whenever a computer is powered on and

7   connected to the Internet, and it always seeks out one of the

8   nearest gateway servers that -- that -- that we have.

9   Q.  And which component creates that standing connection?

10  A.  The host computer does.

11  Q.  The point that that standing connection has been created, is

12  there -- has there been any request for remote access

13  communication from another computer?

14  A.  No, not at this point.

15  Q.  So what happens after that standing connection is created?

16  A.  Well, the gateway server at this point needs to connect to

17  one of the database servers.  And, you know, in this example, we

18  don't have database servers in Dallas so the gateway actually

19  needs to go all the way to Ashburn, connect to one of the

20  servers that we operate there, and register the fact that this

21  computer is in Miami and is now available for access.

22  Q.  So the host computer is now -- that's -- that can be

23  accessed remotely.  Is that --

24  A.  At this point the computer is ready for access, yes.

25  Q.  Now, let's say the person has left their host computer in

1   Miami and has traveled somewhere.  What happens next in terms of

2   being able to remotely access that computer?

3   A.  Well, we are showing a client computer in -- in Budapest, a

4   person with a laptop.  The next step would be for a person to

5   open a computer, connect it to the Internet, fire up a web

6   browser and visit the LogMeIn.com website.

7   Q.  And what happens once they've gone to the LogMeIn website?

8   A.  Well, if they happen to be Europe, which -- which is the

9   case on the diagram, they would be very likely to be connected

10  to our datacenter in London.  So they connect to one of their

11  web servers in London and they sign into the LogMeIn system.

12  Q.  And what happens once they've signed in?

13  A.  Well, they see that list that we have displayed earlier, a

14  list of computers available for them to access remotely.

15  Q.  And they select one of the computers; is that correct?

16  A.  Yes.  Yes.  So they click on one of the computers to -- to

17  access it.  At that point the web server initiates a connection

18  to the database server and it requests that -- well, makes a

19  request that -- that signifies that this user wants to access

20  this particular computer.

21      The database server, as I said, the business logic is

22  implemented there so it needs to approve this.  And when it

23  does, it returns two very important pieces of information to the

24  web server.

25      One piece of information is the name of the gateway server

1   that the host computer is connected to.  And the other piece of

2   information is a so-called ticket, which is really what we allow

3   the client computer to ultimately access, the host computer.

4       So this information is sent to the -- to the web server and

5   the web server sends it further down to the client computer.

6   And once --

7   Q.  Sorry.  Go ahead.

8   A.  Okay.  Once the client computer receives this information,

9   it now has the address of the gateway server, the name -- name

10  or address of the gateway server, and the ticket that it needs.

11      What it does then is it goes and connects directly to the

12  gateway server, the gateway server that our computer in Miami

13  has previously connected to, and sends that gateway server the

14  ticket mentioned earlier.

15  Q.  Okay.  And once the ticket has been sent to the gateway

16  server, what happens?

17  A.  Well, the gateway server takes the ticket and -- and sends

18  it to the database server for verification.  The gateway server

19  sends this information to the database.  The database, in this

20  case and in the vast majority of cases, approves and responds

21  back to the gateway server that, yes, this remote access session

22  in fact allowed.

23  Q.  What happens next?

24  A.  So as the next step the gateway server will use the standing

25  connection that we -- that we mentioned earlier, the connection

1    that it permanently has with -- with the host computer to

2    request that the host create a new connection to it.

3        It's happening on the diagram so the host computer creates

4    an outbound connection that connects to the gateway server, and

5    this is really it.

6        At this point the host computer is connected to the gateway

7    server, the client computer is connected to the gateway server,

8    and they are able to exchange information with one another

9    through these two connections.

10   Q.  And what component in that diagram created the connection

11   from the host computer to the gateway server?

12   A.  The host computer did.

13   Q.  And what component on the diagram created the connection

14   from the remote client to the gateway server?

15   A.  The client computer did.

16   Q.  During this process that you've just described, do any of

17   the servers in the LogMeIn system receive a request from the

18   remote computer to communicate with the host computer?

19   A.  Yes, I believe the web servers do.

20   Q.  And that's the -- in this diagram -- the server in London;

21   is that correct?

22   A.  That is correct, yes.

23   Q.  And during this process do any of the servers determine the

24   location of the host computer?

25   A.  Yes, the database servers do.

1    Q.   And that's the one that in this diagram is in Ashburn?

2    A.   Yes, that's right.

3    Q.   And during this process do any of the servers create a

4    connection between the host computer and the client computer?

5    A.   No, none of the servers do that.

6    Q.   Do the LogMeIn servers together create a connection between

7    the host computer and the client computer?

8    A.   No.  It's impossible to create a connection to a computer

9    that's behind a firewall or -- or, you know, has a dynamic IP

10   address or is otherwise, you know, not itself visible on the

11   Internet.

12   Q.   So which entity in this -- which component in this system is

13   creating the connections?

14   A.   Well, it's the endpoints themselves, the client computer and

15   the host computer.

16   Q.   Now, Mr. Anka, it's taken us a few minutes to walk through

17   this diagram, but in reality, how long does this process take

18   from when the client logs into the LogMeIn website and initiates

19   a session?

20   A.   A second or two.  It -- it happens, you know, millions of

21   times every week.  It's -- it's extremely quick.

22   Q.   And before we take this diagram down, I'd like to ask you a

23   couple of questions about IP addresses.  We've heard about

24   dynamic IP addresses and static IP addresses.

25   A.   Sure.

1   Q.   Do any of the LogMeIn servers that are -- that's shown on

2   this diagram communicate through the Internet using IP

3   addresses?

4   A.   Yes.   Several of them do.

5   Q.   Do the web servers communicate through the Internet?

6   A.   Absolutely.

7   Q.   And what kind of IP address do they use?

8   A.   They use a static IP address.

9   Q.   Do the gateway servers communicate through the Internet?

10  A.   Yes.   Yes, they do.

11  Q.   What kind of an IP address do they use?

12  A.   They use dynamic IP addresses.

13  Q.   And have they always used dynamic IP addresses?

14  A.   No.   For a fair amount of time, they -- they used static IP

15  addresses.   We changed that fairly recently.

16  Q.   The -- are the addresses that the gateway server uses and

17  the web server uses the same or different?

18  A.   They are different.

19  Q.   And how about the database servers, do they communicate

20  through the Internet?

21  A.   They do not, no.

22  Q.   Okay.   We can take that diagram down.   Thank you, Mr. Anka.

23       Let's now talk a little bit about 01 Communique.   At any

24  time prior to the launch of the LogMeIn product, did LogMeIn or

25  did you know about 01 or its I'm InTouch product?

1   A.  Well, I did not, and I don't know if anyone at LogMeIn did.

2   Q.  And when did you first become aware of 01 or its product,

3   its I'm InTouch product?

4   A.  It was on April 19th of 2004.

5   Q.  How did you become aware of them at that time?

6   A.  Well, our PR person at the time, a person named Joe Eckert,

7   sent around an article that appeared in one of the online

8   publications about 01's product.

9   Q.  And just to be clear.  Was this before or after you launched

10  the LogMeIn product?

11  A.  This was six days after we launched our product, but it was

12  more than a year after we started developing our product.

13  Q.  And when you received this e-mail from Mr. Eckert, what did

14  you do?

15  A.  Well, I was naturally curious so I went and downloaded the

16  product.

17  Q.  And when you say downloaded it, what does that mean?

18  A.  Well, I went to their website, as any one of their users

19  would, and I took a trial of the product.

20  Q.  Why did you do that?

21  A.  Well, I wanted to see how the product worked for -- what the

22  product looked like for myself.

23  Q.  And have you ever downloaded other companies' remote access

24  products?

25  A.  Yes, absolutely.

1    Q.   Why?

2    A.   It's -- it's very common practice.  It's -- you know, I -- I

3    look at our competitors or, you know, companies' products that

4    are trying to solve the same problem.  I need to see exactly

5    what they present to their users so we can -- maybe we can be

6    sure that whatever we do is -- is better.  You know, it's easier

7    to use, it's faster.

8        But not only do I do these sort of things.  I mean, we

9    actually have records of both 01 or, for that matter, the market

10   leader, Citrix, downloading our own products in 2004.

11   Q.   Now, in the ordinary course of LogMeIn's business, do you

12   evaluate and review competitors' products?

13   A.   Yes.  Yes, I do.

14   Q.   And when you do so, do you have any kind of a practice in

15   terms of reporting the results of your evaluation to others at

16   LogMeIn?

17   A.   Yes.

18   Q.   And what is your practice?

19   A.   I send them an e-mail.

20   Q.   Did you prepare any kind of a summary of your evaluation of

21   01's product in 2004?

22   A.   Yes.  Yes, I did.

23   Q.   What did you -- what was that summary?  What --

24   A.   Well, I -- I put together a rather long e-mail that I sent

25   to my colleagues.  And I hope that -- I hope they read it.  You

M. Anka - Direct                                                    785

1  know, it was long.

2  Q.  Would you turn to DX 185 in your binder.

3  A.  Yes.

4  Q.  Is -- is that the e-mail that you sent to your colleagues?

5  A.  This is the e-mail, yes.

6  Q.  And when did you send this?

7  A.  So the date of this e-mail is April 22nd of 2004.

8  Q.  And was this e-mail subsequently maintained by LogMeIn in

9  the course of its business?

10 A.  Yes.

11       MS. FERRERA:  Your Honor, I offer DX 185.

12       MR. CORRADO:  No objection.

13       THE COURT:  It's admitted.

14 BY MS. FERRERA:

15 Q.  So, Mr. Anka, what did you think of 01's product once you

16 tried it out?

17 A.  Well, I -- I did not think much of it to be perfectly

18 honest.

19 Q.  Would you turn to page 14 of DX 185.

20 A.  Yes.

21 Q.  And do you see towards the bottom of that page there's a PS?

22 A.  Yes, there is.

23 Q.  And in that PS, the second sentence you talk about a leading

24 provider, quote, unquote.  Do you see that?

25 A.  I do, yes.

1   Q.   And what -- what leading provider, quote, unquote, were you

2   referring to?

3   A.   I'm referring to 01 because that's how they refer to

4   themselves in, I believe, a press release they put out.

5   Q.   And then at the end of that sentence, you say their product

6   does not work properly, presented --

7             MR. CORRADO:   Your Honor, I'm going to object to the

8   next sentence because there's no foundation for him to read this

9   to the jury.

10             MS. FERRERA:   I'm not going to read the last part of

11   the sentence, Your Honor.   I think -- I believe that's what

12   counsel is concerned about.

13   BY MS. FERRERA:

14   Q.   It says that their product does not work properly and it's

15   presented very poorly.   Do you see that?

16   A.   I do, yes.

17   Q.   What did you mean by that?

18   A.   Well, I learned that I -- I -- you know, I was comparing it

19   to, you know, the user experience with -- with our own product,

20   and I thought we did a much better job.

21        I, frankly, had problems getting 01's product to work, but

22   even when it did work, it was not -- it was hard to use.   It

23   wasn't intuitive.

24   Q.   Can you give us an example of the -- of what you're

25   describing?

1   A.   Yeah, I actually can.  If you go back to -- in this very

2   e-mail there is a screen shot on page 4, which, you know, it's

3   really the start of a remote access session with -- with their

4   I'm InTouch product.

5        As we have shown earlier, we've shown a few screen shots.

6   And I believe 01 also demonstrated their own product sort of a

7   standard.  And how LogMeIn has always done this was to --

8   this -- after the user logs into a website, you see a list of

9   computers that are available for -- for you to access.  You

10  click on it and then you get connected to it.  I couldn't think

11  of a simpler way, nor could anyone at LogMeIn, so that's how we

12  implemented it.

13       01 had a different approach, which I thought was very

14  peculiar, was that you -- you got to this web page where you had

15  to type in the name of the computer you were accessing, which

16  could be fine if you're -- I mean, it's a bit of a chore if you

17  have a single computer but could be a good approach.

18       But if you have five over ten computers that you're trying

19  to access, I thought it was something that -- that -- you know,

20  it's just a really bad design decision.

21       And you asked for an example and this is one example which I

22  thought was -- was particularly bad about I'm InTouch.  But, you

23  know, in general, I did not have a very favorable impression of

24  them.

25  Q.   And what, if anything, were you able to tell how about

1    the -- how 01's product worked from your using the software?

2    A.  Nothing.

3    Q.  What, if anything, were you able to tell about the

4    architecture of 01's system from using the product?

5    A.  I could not tell anything about their architecture, no.

6    Q.  And why not?

7    A.  Well, really, the only way to understand how a software

8    product actually works is if you look at the source code, if you

9    study the source code for the product.  And I did not have

10   access to their source code, nor -- nor did I seek it out.

11   Q.  Based on your review of 01's product in 2004, did you make

12   any changes to the LogMeIn product?

13   A.  No.  We -- we felt our product was -- was clearly superior.

14   I did not feel the need to change anything.

15   Q.  At the time that you reviewed 01's product in 2004, were you

16   aware of any 01 patents?

17   A.  No.  No, I wasn't.

18   Q.  When did you first become aware of the fact that 01 had a

19   patent relating to its I'm InTouch product?

20   A.  That was in 2006 when -- when they -- when they sued Citrix.

21   Q.  And how did you become aware?

22   A.  Our PR person, Joe Eckert, the person I mentioned earlier.

23   He was very diligent in -- in monitoring news and notifying us

24   of noteworthy events in the remote access space.  He sent around

25   an e-mail with an article that -- that talked about 01 suing

1    Citrix.

2    Q.  What did you do when you got that e-mail?

3    A.  Well, I was curious again.  So I went to the U.S. Patent

4    Office's website where you can download all patents.  They are

5    in the public domain.  So I went and downloaded the patent.

6    Q.  And did you read the patent?

7    A.  I did, yes.

8    Q.  Did you understand it at that time?

9    A.  No, I did not.

10   Q.  Have you since gained an understanding of the '479 patent?

11   A.  Well, you know, I'm still not a patent expert.  I think I

12   have a much better understanding of what -- what they -- they

13   are saying in the document, yes.

14   Q.  And based on your current understanding, does any LogMeIn

15   product in your view do what the '479 patent describes?

16   A.  No.  Absolutely not.

17   Q.  Mr. Anka, does LogMeIn have any patents of its own relating

18   to its products?

19   A.  Yes, we certainly do.

20        MR. CORRADO:  Your Honor, may we be heard at sidebar?

21        THE COURT:  Yes.

22     (Conference at the bench, as follows:)

23        MR. CORRADO:  Your Honor, the next line of testimony is

24   going to be a series, I think, of questions about patents that

25   Mr. Anka has.  Now, in Mr. Grimshaw's testimony they put in a --

 1    one of Mr. Anka's patents.  One of the oldest principles of

 2    patent law is that the fact that you are practicing your own

 3    patent isn't a defense to patent infringement of a patent.

 4          And there are Supreme Court cases going back to the

 5    1860s that say that it's improper to have testimony about the

 6    fact that you are practicing your own patent because it tends to

 7    confuse the jury.  They will think that practicing your patent

 8    is somehow a defense to a patent that -- of someone else's

 9    patent.

10          So we would object to any questions about Mr. Anka's

11    patent if they are going -- attempting to go to the point that

12    because they have a patent and they are practicing their own

13    patent, they're not infringing 01's patent.  That would be

14    misleading to the jury and confusing.

15          We would object to any testimony that tries to draw a

16    conclusion that there's no infringement because he's practicing

17    his own patent.

18          MS. FERRERA:  Your Honor, I think this is about the

19    third or fourth time 01 has made this argument.  Your Honor's

20    already allowed in evidence and testimony concerning at least

21    one of these patents, and they are relevant to this case.

22          Right now the issue of doctrine of equivalents is still

23    in the case, although we obviously are asking for a judgment

24    that it should not be.  But the existence of other patents that

25    LogMeIn has is relevant to the issue of doctrine of equivalents.

1    It's also relevant to the damages calculation to the extent that

2    it shows that LogMeIn has other technology that is at the heart

3    of the patent, which is why consumers are interested in their

4    technology.  It's not just based on the inventions of the '479.

5                MR. CORRADO:  Your Honor, it was the subject of a

6    motion in limine which we brought before Your Honor, and it was

7    deferred to see how it would arise in context.  Our concern

8    about this is the way in which this arises in context, and it is

9    about to arise in the context of suggesting to the jury that

10   there isn't infringement of the 01 patent because they're

11   practicing their own patent.  And that, again, is the misleading

12   inference the jury will draw unless there is an instruction to

13   the jury not -- not to read that patent, that somehow the

14   practicing of their own patent is a defense to claim that they

15   are infringing 01's patent.

16               THE COURT:  I believe your opponent's right.  It goes

17   to other issues as well.  And it's not -- really there's not --

18   if you object to making an argument, this is the time to get

19   facts out, not make any arguments.  So there should be no

20   argument made during his testimony at all, and we can deal with

21   the arguments later.  But I think there are some relevant issues

22   for the other patents so that will be overruled.

23               I guess now it's time to go to lunch.

24          (Bench conference concludes; lunch recess taken at

25   1:00 p.m.)

1

2                             CERTIFICATION

3

4          I certify, this 21st day of March 2013, that the

5     foregoing is a correct transcript from the record of proceedings

6     in the above-entitled matter to the best of my ability.

7

8                              /s/
                       _____
9                        Tracy Westfall, RPR, CMRS, CCR

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25