```
                    UNITED STATES DISTRICT COURT
                    EASTERN DISTRICT OF VIRGINIA
                        Alexandria Division




---------------------------------:
                                 :
01 COMMUNIQUE LABORATORY, INC.,  :
              Plaintiff,         :
                                 :
    -vs-                         :    Case No. 1:10-cv-1007
                                 :
                                 :
LOGMEIN, INC.,                   :
              Defendant.         :
                                 :
---------------------------------:
```

V O L U M E   2 (p.m.)


TRIAL TRANSCRIPT


March 19, 2013


Before:  Claude M. Hilton, USDC Judge


And a Jury

APPEARANCES:

Thomas H. Shunk, Marc A. Antonetti, A. Neal Seth,
John P. Corrado, Katherine L. McKnight, William T. DeVinney
and Loura Alaverdi, Counsel for the Plaintiff

Wayne L. Stoner, Charles B. Molster, III, Vinita Ferrera,
and Rachel Gurvich, Counsel for the Defendant

321

<u>INDEX</u>

| <u>WITNESS</u> | <u>EXAMINATION</u> | <u>PAGE</u> |
|---|---|---|
| ANDREW GRIMSHAW | | |
| | DIRECT | 322 |
| | CROSS | 327 |
| | REDIRECT | 397 |
| | RECROSS | 399 |
| BRIAN STRINGER | | |
| | DIRECT | 400 |
| | CROSS | 433 |

1              NOTE:  The afternoon portion of the proceedings on

2    March 19, 2013 begins in the presence of the jury as follows:

3    JURY IN

4              MR. SETH:  Your Honor, as a housekeeping matter, we'd

5    like to move into evidence the CV of Dr. Grimshaw.

6              MR. STONER:  No objection.

7              THE COURT:  It is admitted.

8              MR. SETH:  It hasn't been marked on either the

9    defendant or the plaintiff's exhibit list.  So, with your

10   permission, we would mark it as Court's Exhibit 1.

11             THE COURT:  I don't care how you mark it.  It doesn't

12   make any difference.

13             MR. SETH:  Okay.

14             MR. STONER:  It should be a plaintiff's exhibit.

15             THE COURT:  It is your exhibit.  So, why don't you

16   figure out what your last number is and put that on there.

17             MR. SETH:  Okay.  Thank you.  I would also like to move

18   into evidence PX 61.

19             MR. STONER:  No objection.

20             THE COURT:  Admitted.

21             ANDREW GRIMSHAW, called by counsel for the plaintiff,

22   having been duly sworn, continues to testify and state as

23   follows:

24        DIRECT EXAMINATION

25   BY MR. SETH:  (Continuing)

1   Q. Dr. Grimshaw, do you have your witness binder?

2   A.  I do.

3   Q.  Would you look at the '479 patent, please.

4   A.  '479 patent?

5   Q.  Yes.  PX 1.

6   A.  PX 1, okay.  Yes, I have it.

7   Q.  And claim 24, please.

8   A.  Yes, I am there.

9   Q.  Dr. Grimshaw, I'd like to direct your attention to the

10  preamble of claim 24.

11  A.  Yes.

12  Q.  Did you consider that language in your infringement analysis

13  of the LogMeIn remote access system?

14  A.  As I said earlier, I don't believe it's necessarily

15  limiting, but I did include that language in my analysis of

16  LogMeIn.

17  Q.  Okay.  Let's start with the first element of the preamble.

18  What is it?

19  A.  The first element in the preamble is a computer program

20  product --

21  Q.  Could you slow down for us, Dr. Grimshaw, please.  Thanks.

22  A.  I am sorry.  A computer program product for use on a server

23  computer linked to the Internet and having a static IP address.

24  Q.  Okay.  Where is that found in the LogMeIn remote access

25  system?

1   A.  So, that is found in the LogMeIn remote access system in at

2   least two places, in LogMeIn.com and in Secure.LogMeIn.com, they

3   both have IP addresses that haven't changed for some time.

4   Q.  Is there any difference between a static URL and a static IP

5   address in the context of the '479 patent to one of ordinary

6   skill in the art?

7   A.  To one of ordinary skill in the art in 2000, in fact, before

8   that, we would use static IP addresses and static URLs pretty

9   much interchangeably.  The static URLs being much easier to

10  remember than four, you know, sets of four numbers.

11  Q.  Now, what about the second element of the preamble, what is

12  it?

13  A.  The second element, again, is -- and I will try to read more

14  slowly -- the personal computer being linked to the Internet,

15  its location on the Internet being defined by either, 1, a

16  dynamic public IP address publicly addressable, or, 2, a dynamic

17  LAN IP address publicly un-addressable.

18  Q.  And where is that found in the LogMeIn remote access system?

19  A.  So, that's found in the LogMeIn remote access system by the

20  fact that it will work whether or not the -- the personal

21  computer or the host computer has a publicly dynamic -- a

22  publicly addressable dynamic IP or a publicly un-addressable

23  dynamic IP.  I know that because I have done it, because the

24  documentation says so.  In fact, we looked at that one thing

25  where they explicitly stated it.

1    And then, furthermore, the code, the way it is structured

2    and the way it works, it would work regardless of whether it was

3    static dynamic or publicly un-addressable or not.

4    Q.  Okay.  Dr. Grimshaw, is it your understanding that LogMeIn

5    has implemented a change to its architecture?

6    A.  It is my understanding that they did make a change from the

7    first round of stuff that we saw.

8    Q.  Can you explain to us what your understanding of that change

9    is.

10   A.  So, the essence of the change was one of the subcomponents

11   of the LogMeIn server is called the gateway.  And what they did

12   is they changed the way the gateway IP addresses are assigned.

13   Previous to the change, the IP addresses for the gateways were

14   manually assigned.  After the change, the IP addresses for the

15   gateway servers were assigned by a DHCP server.

16   Q.  And does this change your infringement analysis?

17   A.  Not at all, because, first off, I didn't depend on them

18   having static IP addresses.

19       Secondly, as Marton Anka said in his deposition, this is

20   sort of an under-the-hood or under-the-covers change.  It's just

21   a redirect around inside their own internal systems.

22   Q.  Does your opinion depend on whether or not the gateway IP

23   addresses of the LogMeIn system have a static or dynamic IP

24   address?

25   A.  No, it doesn't depend on that at all.

1  Q.  And did you rely on the fact that the gateway IP addresses

2  are either dynamic or static in your analysis?

3  A.  I didn't rely on the static or the dynamicness of the IP

4  address, of the gateways, or, for that matter, the database

5  servers either.  It just wasn't something I relied on.

6  Q.  Have you formed an opinion as to whether the changed LogMeIn

7  remote access system infringes claim 24 of the '479 patent?

8  A.  I believe that both before the changes and after the

9  changes, that the LogMeIn system infringes on claim 24.

10  Q.  Have you formed an opinion as to whether or not LogMeIn

11  copied 01's source code?

12  A.  I have come to know -- I don't have an opinion on that.  It

13  seems highly unlikely that they copied the source code, but it

14  is also not a requirement for infringement that they copy the

15  source code.

16  Q.  Does that matter to your opinion regarding infringement?

17  A.  No, it doesn't.

18  Q.  Why not?

19  A.  Well, first off, I haven't even seen the InTouch source

20  code, so I wouldn't be able to know whether they copied.  But my

21  understanding of patent law is infringement is what's -- I need

22  to show the claims.

23      And, in fact, when you look at how the LogMeIn system works

24  and you look at the claims, it in fact infringes on those

25  claims.

1    Q.  Dr. Grimshaw, do you find that each element of claim 24 can

2    be found in every version of the accused LogMeIn remote access

3    system?

4    A.  Yes, I do.  They all share a certain common infrastructure.

5    Q.  And so, is there infringement of claim 24 by LogMeIn Free?

6    A.  Yes, there is.

7    Q.  Is there infringement of claim 24 by LogMeIn Pro?

8    A.  In my opinion, yes.

9    Q.  Is there infringement of claim 24 by LogMeIn Pro2?

10   A.  In my opinion, yes.

11   Q.  Is there infringement of claim 24 by LogMeIn Ignition?

12   A.  Of 24?

13   Q.  Yes.

14   A.  24, I don't believe -- I am just thinking through -- yes, by

15   the use of Ignition, yes.

16   Q.  Is there infringement of claim 24 by LogMeIn IT Reach?

17   A.  Yes.

18   Q.  Is there infringement of claim 24 by LogMeIn Join.me Free?

19   A.  Yes, there is.

20   Q.  Is there infringement of claim 24 by LogMeIn Join.me Pro?

21   A.  Yes, there is, in my opinion.

22          MR. SETH:  Thank you, Dr. Grimshaw.

23          MR. STONER:  May I cross-examine, Your Honor?

24          THE COURT:  Yes.

25            CROSS-EXAMINATION

1  BY MR. STONER:

2  Q.  Good afternoon, Dr. Grimshaw.

3  A.  Good afternoon, Mr. Stoner.

4  Q.  I am going to go back to give the jury some context.  But

5  one thing you just said perplexed me.

6      Claim 24 says the server computer must be linked to the

7  Internet and have a static IP address.

8  A.  Yes.

9  Q.  You said you didn't rely upon that, right?

10  A.  I said I didn't rely on the gateway servers having a static

11  IP address.

12  Q.  Well, the database servers aren't on the Internet at all,

13  are they?

14  A.  Sir, the database servers have Internet IP addresses.  They

15  are non-routable IP addresses.

16  Q.  They are not on the Internet, are they?

17  A.  They have IP addresses.  They can make outcalls to the

18  Internet, so they can be clients on the Internet.

19  Q.  Do you ever -- maybe before we start, Your Honor, I would

20  like to pass out the exhibit binders and depositions to keep the

21  trial going.

22          THE COURT:  All right.

23  Q.  Do you have your deposition in front of you, Dr. Grimshaw?

24  A.  I am trying -- which binder is it in or is it this?

25  Q.  I believe it's what you had in your left hand.

1   A.  Yes, I do.

2   Q.  This was sworn testimony you gave before trial under oath

3   just the way you are doing today, right?

4   A.  That's correct.

5   Q.  Could you turn to page 80 of your deposition.

6        MR. SETH:  Excuse me.  Can I get a copy of the witness

7   binder, please?

8        MR. STONER:  Here is the deposition.

9        MR. SETH:  Thank you.

10  BY MR. STONER: (Continuing)

11  Q.  And in this proceeding called a deposition, where you gave

12  sworn testimony, I asked you this question:  Well, the database

13  servers do not have a location on the Internet at all as their

14  IP addresses are private and not viable and they cannot be

15  contacted directly?

16       Do you see that?

17  A.  I do see that.

18  Q.  Your answer was:  Yes, I do.

19       Correct?

20  A.  Yes, I see that.

21  Q.  And I asked you:  Do you agree?

22  A.  So, I qualified my statement.

23  Q.  Let's read the answer you gave under oath.

24  A.  Oh, okay.  Yes, I do.

25  Q.  You said:  That's what they have stated, and I have no

1   reason not to believe them --

2   A.   That's correct.

3   Q.   -- correct?

4        So, at your deposition you agreed that the database servers

5   in the LogMeIn system do not have a location on the Internet at

6   all, correct?

7   A.   Well, in my deposition that's what I said.  I qualified what

8   I said just now to say that they had non-routable IP addresses

9   and they may be able to send outward connections.

10  Q.   But they are not on the Internet, right?

11  A.   I am not sure that on the Internet has a formal definition.

12  They certainly have no routable -- they cannot be routed to, but

13  many machines that are routable, one can route to, are on the

14  Internet.

15  Q.   Now, Dr. Grimshaw, you've got done telling the jury here

16  that LogMeIn's technology in the '479 patent are similar in some

17  way, correct?

18  A.   No.  I believe I said that I believe that the LogMeIn

19  technology infringed on the '479 patent.

20  Q.   Well, the United States Patent Office doesn't agree they're

21  similar, does it?

22  A.   Can you give me the whole context for that question because

23  I don't think I understood something?

24  Q.   Certainly.  You know that LogMeIn has patents of its own,

25  don't you?

1   A.  I am aware of only one, but they may have more.  I don't

2   know.

3   Q.  In fact, you have relied upon one of LogMeIn's patents

4   earlier in this case as somehow relevant to infringement, right?

5   A.  It was something -- I don't recall whether I put that patent

6   in the set of things that I relied upon.  I certainly read one

7   of the LogMeIn patents while I was forming my opinion.

8   Q.  Take a look in your witness binder to Exhibit -- Defendant's

9   Exhibit 274.

10  A.  I see it.

11  Q.  Do you see that?

12  A.  I do.

13  Q.  It is a patent that issued to LogMeIn by the United States

14  Patent Office, correct?

15  A.  Yes, that's what it appears to be.

16  Q.  Has a diagram on the front page showing the system, correct?

17  A.  Yes, it does.

18  Q.  Shows host, client, Internet, firewalls, and routers,

19  correct?

20  A.  That's true, it certainly does.  Many diagrams like that

21  exist.

22  Q.  And do you see the section of the patent that is called

23  References Cited?  It's on the left-hand column of the first

24  page.

25  A.  On the left-hand column?  Yes, I see it.

A. Grimshaw - Cross                                                332

1   Q.  References Cited.

2   A.  Yes, I do.

3   Q.  You understand that what this is is a list of prior art that

4   the Patent Office looked at before it issued the LogMeIn patent,

5   right?

6   A.  I'm not an expert on how the Patent Office works internally,

7   but I would assume that's true.

8   Q.  One of the things listed there is the 01 '479 patent,

9   correct?

10  A.  Yes, that's true.

11  Q.  So, the Patent Office determined that LogMeIn's patented

12  technology in Defendant's Exhibit 274 was different from and not

13  even obvious from the '479 patent, correct?

14  A.  I am not an expert on patent law.  I don't know what that

15  means the Patent Office decided.  I really have no idea.

16  Q.  You don't know, correct?

17  A.  I don't know how the Patent Office makes its internal

18  decisions about things like that.

19          MR. STONER:  Your Honor, I offer Defendant's

20  Exhibit 274.

21          MR. SETH:  No objection.

22          THE COURT:  Admitted.

23  BY MR. STONER: (Continuing)

24  Q.  Did you consider this patent before you formed your

25  opinions?

1    A.  So, if by consider you mean did I look at it, yes, I did

2    read this patent.

3    Q.  You didn't mention it to the jury, correct?

4    A.  Well, I didn't mention it to the jury.  I didn't think that

5    it was necessarily relevant to the discussion at hand.

6    Q.  You don't know whether it is relevant, do you?

7    A.  I have a pretty good idea as to what this patent is and what

8    the other patent is, and they are different things.

9    Q.  You didn't mention this patent in any of your reports, did

10   you?

11   A.  Well, it's true I didn't mention this patent in any reports.

12   I didn't mention many other patents either.  This is solving a

13   different problem.

14   Q.  Well, Dr. Grimshaw, you don't have any patents of your own,

15   do you?

16   A.  No, I do not.

17   Q.  You have never applied for a patent, correct?

18   A.  I have never applied for a patent, that's correct.

19   Q.  You have never been involved in patent prosecution, correct?

20   A.  By -- once again, by prosecution, if you mean taking a

21   patent and pushing it through the system, no, I have not.

22   Q.  Patent prosecution is the process of filing an application

23   for a patent and having it examined by the Patent Office and

24   eventually issuing, correct?

25   A.  So, no, I have never been involved in that.

1   Q.  You know the '479 patent didn't just spring, you know,

2   full-formed out of some government agency, do you?

3   A.  Yes, I am aware of that.

4   Q.  It was a product of a process within the government agency

5   where things were said that determined what the patent would

6   eventually be, correct?

7   A.  I understand that's true, yes.

8   Q.  And you didn't tell the patent about any of that either, did

9   you?

10  A.  Well, I didn't.  I was asked to look at infringement.  So,

11  no, I didn't tell them that.  I didn't know that it was in the

12  scope of what I was supposed to be doing.

13  Q.  We will get into that.

14  A.  Okay.

15  Q.  That determines what the patent means and covers, doesn't

16  it?

17  A.  Yes, the patent file history certainly does.  But I didn't

18  realize that I was required in an infringement report to discuss

19  all of those things.

20  Q.  Let's make clear the jury knows what your reports are.

21      You are required by the rules to list all of your opinions

22  in a written report, correct?

23  A.  All of my opinions?

24  Q.  All of your opinions in this case must be listed in a

25  written report.

```
 1  A.  Yes.

 2  Q.  You are aware of that?

 3  A.  Yes, I am aware of that.

 4  Q.  It is a legal requirement, correct?

 5  A.  I am not a patent lawyer or a trial lawyer, but I believe

 6  that that's true.

 7  Q.  And you have to list in these reports everything you relied

 8  upon and reviewed, correct?

 9  A.  So, I listed all the documents that I relied upon

10  specifically.  I certainly have lots of experience going on

11  through the years and reading lots of other material than just

12  what was there.

13  Q.  Leaving aside your experience over the years, everything you

14  reviewed and relied upon specifically for this case is supposed

15  to be listed in your report?

16  A.  I believe that that's true.

17  Q.  And that's all you can testify about, leaving aside your

18  experience over the years, correct?

19  A.  I am not sure I know the answer to that, but I believe it's

20  true.

21  Q.  Did 01's lawyers every give you the LogMeIn patent that we

22  just looked at, Defendant's Exhibit 274?

23  A.  Yes, they did.

24  Q.  Now, I want to come back later to talk about your opinions,

25  but let's get some background.  You showed the jury a lot of
```

1   slides about the Internet and how the Internet works, correct?

2   A.  They are poster boards, but, yeah, we will call them slides.

3   Q.  I am sorry, poster boards.

4       You are certainly not suggesting that Mr. Cheung or 01

5   invented the Internet?

6   A.  I am absolutely not suggesting that he invented the

7   Internet.  I think Al Gore did.

8   Q.  They didn't invent the Internet, correct?

9   A.  No, they did not.

10  Q.  They didn't invent gateway proxies?

11  A.  No, they did not.

12  Q.  They did not invent dynamic IP addresses?

13  A.  No, they did not.

14  Q.  They did not invent publicly un-addressable IP addresses?

15  A.  No, they did not.

16  Q.  They didn't invent ping?

17  A.  No, they did not.

18  Q.  And they didn't invent remote computer access either, did

19  they?

20  A.  They did not invent remote computer access, no.

21  Q.  Now, you first heard of remote computer access back in the

22  1970s, didn't you?

23  A.  That's correct.

24  Q.  And you actually knew of a remote access product that would

25  access a computer with a dynamic IP address in the 1980s,

1   correct?

2   A.   Product that would -- so, was I aware in the 1980s of a

3   product that could access a computer with a dynamic IP address,

4   is that the question?

5   Q.   Well, whether it was a commercial product or not, you were

6   aware of a system that would do that, correct?

7   A.   So, if one was skilled, one could use existing things to

8   access things with dynamic but public IP addresses.

9   Q.   And you were aware of that in the 1980s, correct?

10   A.   I believe it was in 1984 to 1988, in that time period, yes.

11   Q.   Which was 15 years before 01 Communique filed for the '479

12   patent, right?

13   A.   I believe that that's true.

14   Q.   You know you cannot get a patent on things other people have

15   already invented, don't you?

16   A.   I believe that that's true, yes.

17   Q.   You know that if someone gets a patent on an invention that

18   someone else already made, the patent is invalid, correct?

19   A.   I believe that it also has to have been published and

20   documented somewhere.

21   Q.   With that caveat, what I said is true?

22   A.   I believe that that's true, yes.

23   Q.   Take a look at Defendant's Exhibit 28 in your binder, which

24   is the Crichton patent.

25          MR. SETH:  Objection, Your Honor, beyond the scope of

1    the direct.

2              THE COURT:  What's beyond the scope?

3              MR. SETH:  The issue of this Crichton patent and,

4    frankly, the validity of it.

5              THE COURT:  What relevance does it have?

6              MR. STONER:  He was talking about what the technology

7    of the '479 patent was.  I am giving some context to the state

8    of the art to show what it was not.  I think it is completely

9    within the scope.

10             THE COURT:  Objection overruled.

11             THE WITNESS:  So, is there a question?  I am sorry.

12   BY MR. STONER: (Continuing)

13   Q.  Yes.  Do you have the Crichton patent?

14   A.  Yes, I have it in front of me, yes.

15   Q.  You never saw that before you formed your opinions in this

16   case, did you?

17   A.  I don't believe so.

18   Q.  It shows a remote access system, right?

19   A.  I am not sure exactly what it shows.  I mean, I see some

20   pictures.  I have looked at it a little bit since then, but I am

21   not sure exactly what's inside of this document.

22   Q.  01 and its lawyers did not give you the Crichton patent

23   before you formed your opinions, did they?

24   A.  Not that I recall.

25   Q.  Take a look now at Defendant's Exhibit 27, the '888 patent.

1          MR. SETH:  Objection, Your Honor.

2    A.  The one that says Hickman?

3    Q.  Yes.

4          MR. SETH:  Beyond the scope of the direct.

5          THE COURT:  Objection overruled.

6    BY MR. STONER: (Continuing)

7    Q.  You never saw this patent before you formed your opinions

8    either, did you?

9    A.  No, sir.

10   Q.  It shows a remote access system too, right?

11   A.  It appears to be about running VMS through the Internet.

12   Q.  01 and its lawyers never gave you this patent before you

13   formed your opinions either, did they?

14   A.  Not that I can recall.

15   Q.  In fact, the lawyers never asked you to look at the validity

16   of the '479 patent, did they?

17   A.  That's correct.  I was not engaged to examine the validity

18   argument.

19   Q.  You have worked in the computer field for 40 years or more,

20   correct?

21   A.  Yes, that's correct.

22   Q.  So, you are familiar with the state of the art, right?

23   A.  That's correct.

24   Q.  But the lawyers never asked you to look at validity,

25   correct?

1   A.  No.  They already had somebody engaged doing validity work.

2   Q.  You've testified in other cases that patents were invalid,

3   haven't you?

4   A.  That's true, I was -- I once testified that a patent was

5   invalid.

6   Q.  In other cases, you have looked at patents and even though

7   the Patent Office issued them, you concluded they were invalid,

8   right?

9   A.  In those cases I believe those patents were invalid.

10  Q.  And it is more than one case that you concluded that, right?

11  A.  I believe it was exactly two.

12  Q.  So, in those cases you concluded the Patent Office issued

13  invalid patents, right?

14  A.  That's correct.  After careful examination of the patents

15  and the priority, I was able to show they were invalid.

16  Q.  But the lawyers here for 01 never asked you to look at this

17  issue, correct?

18  A.  No, not at all.  I am not surprised.

19  Q.  And you have not -- you have no opinion on the matter,

20  right?

21  A.  I haven't formed an opinion on that, no.

22  Q.  As far as you know, the Crichton patent and the '888 patent

23  are the same as the '479 patent?

24  A.  When I see a patent, my presumption is that the patent is

25  valid until it is shown otherwise.

1    Q.  You concluded twice that patents are invalid, correct?

2    A.  That's because I showed otherwise.

3    Q.  Well, if an expert software engineer in this were to testify

4    that the '479 patent was invalid, you could not contradict him,

5    could you?

6    A.  I did not say that.  I said that I haven't examined the

7    patent for validity.  I haven't heard a hypothetical argument

8    about what someone may say is valid or invalid.  And so, no, I

9    couldn't categorical make a statement like that, not without

10   knowing exactly what it is they are talking about.

11   Q.  All right.  Now, let's examine what you did do in this case.

12   A.  Okay.

13   Q.  Before we get to your views on infringement, let's talk

14   about how you reached those views, if we could.  Is that all

15   right?

16   A.  Okay.

17   Q.  The first thing that happened is 01's lawyers called you and

18   you met with them, correct?

19   A.  I believe it was a telephone call, might have been an

20   e-mail, but most likely a telephone call.

21   Q.  It was 01's lawyers who called you, correct?

22   A.  That's correct.

23   Q.  And were you here for Mr. Shunk's opening statement when, if

24   my notes are correct, he told the jury something like the '479

25   patent was important technology that for the first time allowed

1    ordinary people to do remote access?

2    A.  I was in town, but I wasn't here for that particular

3    statement, no.

4    Q.  Well, the first time you heard about the '479 patent was

5    when 01's lawyers called you in connection with this lawsuit,

6    right?

7    A.  I believe that's true.  I don't recall anything before that.

8    Q.  You have been working in the computer field for 40 years,

9    correct?

10   A.  Approximately, yeah.

11   Q.  And you never heard of the '479 patent until the lawyers

12   called you, right?

13   A.  There are a lot of patents I haven't heard of.

14   Q.  Well, even after the '479 patent issued in 2005, it was out

15   there for five years and you never heard of it, right?

16   A.  No, I hadn't.  That's correct.

17   Q.  And I think Mr. Shunk and Mr. Cheung told the jury that the

18   01 I'm InTouch product was the first product on the market that

19   allowed people to do remote access, or words to that effect?

20   A.  So, I don't know what Mr. Shunk said.  So, I'm sorry, what's

21   the question?

22   Q.  Sure.  The first time you heard of the I'm InTouch product

23   is when the lawyers called you in connection with this lawsuit,

24   right?

25   A.  That's correct, yeah.  To the best of my knowledge, I had a

1  colleague tell me about some remote access products that would

2  go through NATs and firewalls, and I don't remember what the

3  names of them were.

4  Q.  Let's go back to after the lawyers called you.  They then

5  retained you to look at the question of infringement, correct?

6  A.  Infringement, yes.

7  Q.  Now, before they retained you, you had never written

8  anything on remote access systems like LogMeIn's, had you?

9  A.  I had never written anything -- so, if by remote access you

10  mean remote accessing files and resources and things like

11  that -- which, by the way, is one of the things that LogMeIn

12  does.  I had written tons of papers on remote access systems.

13      Had I specifically written about desktop emulators that

14  would do desktops through the system?  No.  But you have to keep

15  in mind the underlying technology and what you have to deal with

16  in terms of communication layers, and security is the same

17  whether you are accessing remote files or popping a desktop up.

18  Q.  My question was, you have never written on remote access

19  systems like LogMeIn's or 01 Communique's, correct?

20  A.  In terms of desktop emulation, no.  In terms of file access,

21  many, many times.

22  Q.  All right.  We already talked about that you have no patents

23  of your own, correct?

24  A.  Yes, we did already talk about that.

25  Q.  Were you here when Mr. Cheung said the question of

1   infringement is a legal issue?

2   A.  I don't remember if I was back then -- in here then, but

3   that sounds familiar.  So, I think I was, yes.

4   Q.  You are not a lawyer, correct?

5   A.  I am certainly not a lawyer.

6   Q.  You are not a patent agent?

7   A.  I am certainly not a patent agent.

8   Q.  The lawyers then sent you a packet of materials to read,

9   right?

10  A.  Yes, they did.

11  Q.  And it included some things from the prosecution history of

12  how the '479 patent got through the Patent Office, correct?

13  A.  Yes, it included the file wrapper, amongst other things.

14  Q.  Well, you never asked if it was complete, did you?

15  A.  I looked at the materials, I read the things that I needed

16  to read, and I didn't see anything missing.  So, I had no reason

17  to believe that it was incomplete.

18  Q.  You never asked whether it was complete or not, did you?

19  A.  Again, I didn't see anything missing, so I had no reason to

20  believe it would be incomplete.  So, I didn't ask.

21  Q.  Dr. Grimshaw --

22  A.  Yes.

23  Q.  Let's go turn to your deposition.

24  A.  Okay.

25  Q.  Page 19.

1   A.   Just a moment, please.  I have to go into my reading

2   glasses.  I am on page 19.

3   Q.   You were asked the question just last month:  Question:

4   Were you given the complete patent file history, including the

5   reexamination or parts of it?

6        Your answer was:  I cannot know whether I received the

7   complete one.

8        Correct?

9   A.   That's true, I said that.

10  Q.   On the next page, page 20:  Question:  Did you ask the

11  lawyers, is this the complete history or only parts of it?

12       Your answer was?

13  A.   Like I said, I had no reason to --

14  Q.   What was your answer, sir?

15  A.   Excuse me?

16  Q.   What was your answer under oath last month?

17  A.   Oh.  Are we talking about line 5?  The question on line 3?

18  Q.   The question was:  Did you ask the lawyers, is this the

19  complete history or only parts of it?

20       Your answer was?

21  A.   No, I didn't, no, sir.  Was:  No, sir.

22  Q.   Thank you.  Now, you certainly cared that you get the

23  complete file history, correct?

24  A.   Certainly I would care, yes.

25  Q.   But you never asked, correct?

1    A.  I had no reason to believe that they hadn't given me the

2    file history.  The things that I needed were there.  I didn't

3    see anything missing.  So, no, I didn't ask.

4    Q.  You didn't ask, correct?

5    A.  I had no reason to ask, no.

6    Q.  The lawyers are the ones who picked what they sent out of

7    the Patent Office record, right?

8    A.  So, the lawyers sent me a set of material, one of which was

9    a certified file wrapper.  And it was certified, I believe, with

10   a digital signature and so that, I know, was picked by somebody

11   else.  I don't believe it was actually from the lawyers.  They

12   sent me additional documents that I believe they selected, yes.

13   Q.  Other than what the lawyers gave you, you never asked for

14   more information, right?

15   A.  With respect to asking the lawyers for more information, I

16   did not ask them for additional information, no.

17   Q.  And the lawyers never told you anything unfavorable to 01's

18   position, did they?

19   A.  While it's true they never did, the fact is I still believe

20   that they -- LogMeIn infringes on the 01 patent.

21   Q.  Dr. Grimshaw, that wasn't my question.

22   A.  Okay.

23   Q.  The lawyers never told you anything unfavorable to their

24   position?

25   A.  Not that I can recall.

1    Q.  And then they paid you some money, didn't they?

2    A.  Absolutely.

3    Q.  You didn't mention this.  You are being paid for your

4    testimony today, aren't you?

5    A.  While it's true I am being paid, that's certainly not

6    unusual in this business.  The fact of the matter is --

7    Q.  No, whether there is -- sir, how much are you being paid?

8    A.  I am being paid 400 an hour.

9    Q.  $400 an hour?

10   A.  Uh-huh.

11   Q.  And you have been paid $400 an hour for all your work in

12   this case, correct?

13   A.  That's correct.

14   Q.  How much have you been paid so far?

15   A.  I don't know.

16   Q.  More than $10,000?

17   A.  Certainly.

18   Q.  More than $25,000?

19   A.  Certainly.  We discussed this at my deposition, yeah.

20   Q.  More than $50,000?

21   A.  Certainly.

22   Q.  More than $100,000?

23   A.  Over three years, I think we may be coming up.  I am not

24   certain, though.

25   Q.  Do you have bills outstanding?

1   A.   I have invoices outstanding.

2   Q.   You haven't been paid yet?

3   A.   Yes, I do have invoices outstanding that haven't been paid

4   yet.

5   Q.   How much are they?

6   A.   Approximately?  Boy, that's actually very difficult for me

7   to guess.  I can give you of a range.  I believe that for

8   January -- December, January, February, it's somewhere in the 30

9   to $50,000 range.  Beyond that, I can't provide more detail.  I

10  have worked quite hard on this.

11  Q.   That's your best estimate?

12  A.   Sitting right here now, yes.

13  Q.   Now, after you got the materials and you got paid by the

14  lawyers, you gave an opinion of infringement, correct?

15  A.   That happens to be the sequence in time.  There's --

16  causality is not necessarily there.

17  Q.   Well, the opinion of infringement is what the lawyers

18  wanted, right?

19  A.   So, the lawyers asked me to give my opinion as to whether it

20  infringed.  They told me and were very up front from day one

21  that if I found anything contrary to that, I should tell them.

22  And that if I ever had an opinion to the contrary or I was

23  uncomfortable with something, that I shouldn't do it.  And

24  that's the way that I like to behave.

25  Q.   Well, Dr. Grimshaw, after you were retained in this case,

1    you never challenged anything that 01 or its lawyers told you as

2    incorrect, isn't that true?

3    A.   That's a difficult question to answer.  Certainly on

4    anything substantive, that would be true.  I simply can't recall

5    every conversation I have had with any of them.

6    Q.   But as far as anything substantive, after you were retained

7    in this case, you never challenged anything the 01 lawyers told

8    you as incorrect?

9    A.   That's true, I had no reason to do so.  I didn't find

10   anything that was harmful in any way.

11   Q.   Let's be clear.  You told the jury earlier about some of the

12   things you reviewed before you formed your opinions, correct?

13   A.   If you are referring to today, yes, I told the jury some of

14   the things I reviewed and some of the things that I didn't

15   review.

16   Q.   Well, one of the things you never read before you formed

17   your opinions was a complete Patent Office prosecution history,

18   isn't that true?

19   A.   While it's true I didn't read the complete file history.  I

20   mean, I didn't every single receipt or memo or check box saying

21   that something had happened.  I read the substantive pieces that

22   I thought were important, and it got me the information I

23   needed.

24   Q.   Before you formed your opinions, you never even asked for

25   the complete file history, right?

1    A.  While it's true I never asked for it, they in fact sent me

2    the file history.  And I looked at the file history and I saw

3    nothing missing.

4    Q.  Before you formed your opinions, you never used 01's

5    patented I'm InTouch product, did you?

6    A.  In fact, I have still never used 01's patented I'm InTouch

7    product.

8    Q.  And before you formed your opinions, you never relied on any

9    information unfavorable to 01's position, correct?

10   A.  I am not sure that I can answer that one way or the other.

11   I mean, I read many things.  I don't recall ever seeing anything

12   or in any way, experiments or things that I did, that was

13   unfavorable to the infringement argument.

14   Q.  There is nothing that 01's lawyers told you that was not

15   favorable to 01's position that you relied upon, correct?

16   A.  If you are asking me, did they tell me that something was

17   fundamentally broken and I needed to ignore that, the answer is

18   no.  I don't recall them ever saying anything like that.

19   Q.  Now, I want to talk a bit about source code, okay?

20   A.  Okay.

21   Q.  This case obviously is about software, correct?

22   A.  It is about software.

23   Q.  Software is contained in source code, correct?

24   A.  No, not actually.  Software is defined -- the source code is

25   used to define what the software does.

1   Q.  That's a better term.  Source code defines the software,

2   correct?

3   A.  The source code that make files, the configuration files,

4   many, many things define how software executes.

5   Q.  Source code is what determines what software has in it and

6   what it does, correct?

7   A.  Source code and the runtime environment that is associated

8   with that source code, the libraries, the configuration

9   environment.

10  Q.  The source code is the proof of what the software has and

11  does, correct?

12  A.  The source code says what it is that the machine or the

13  software is doing at any given point in time.  How the pieces

14  interact, what their interfaces are, and how it is decomposed

15  into multiple modules that work together to solve the ultimate

16  problem.

17  Q.  Isn't it true that in your testimony today and in your --

18  all your reports in this case, you do not it cite any specific

19  file or line of LogMeIn source code, correct?

20  A.  Actually that's -- that's not true.  I cited the source code

21  many times in my initial report.  And I cited a specific file,

22  actually a set of files, the C file and the H file in the -- in

23  my -- the report after the update.

24  Q.  Well, your first report, all you say is:  I have reviewed

25  the pertinent source code which confirms my opinions.

1      Correct?

2  A.  Yes, that's correct.  I didn't feel a need to cite

3  individual lines of source code.

4  Q.  Well, whether you felt a need to -- for whatever reason, you

5  didn't do so, correct?

6  A.  I referred to the source code.  I did not cite individual

7  lines of source code.

8  Q.  You didn't identify what you thought the pertinent source

9  code was, correct?

10 A.  In the initial summary, is that what you are referring to?

11 Q.  Yes.

12 A.  While it's true I didn't say this function is contained in

13 this file and that function is contained in this file and you

14 need to look here on line 27 and then don't forgot this include

15 file that points somewhere else, no, I didn't do that.

16 Q.  You didn't do that and you didn't do that today in your

17 testimony for the jury, did you?

18 A.  No.  I don't really see any value in that in this particular

19 case in terms of describing it because it's one of the many

20 pieces of information that I used coming to my opinion.  And the

21 fact of the matter is, the source code is a fairly complex thing

22 to look at.

23 Q.  For whatever reason, you didn't provide it to the jury, did

24 you?

25 A.  It's true, I didn't provide it to the jury, I am not sure

1    that it would have been useful.  The odds that members of the

2    jury would know C# and SQL and all those things, I thought were

3    pretty, pretty slim.

4    Q.  Well, you didn't provide the proof to the jury so they could

5    evaluate it themselves, did you?

6    A.  So, with respect, sir, I think that's one of the reasons

7    that we have experts, is to interpret all of the evidence and

8    say how we believe that it works.

9        It's a challenge to understand that much source code and

10   figure out exactly what's happening, to look at the documents

11   that correspond to that, and to run the experiments.

12   Q.  You just tell the jury, believe me about this because I say

13   so, right?

14   A.  I don't believe that that's what I am doing.  I believe I am

15   giving them my opinion that in fact LogMeIn infringes on the

16   '479.

17   Q.  And you don't cite a single line of source code

18   demonstrating that, do you?

19   A.  While it's true I didn't cite a single line of source code,

20   I did experiments, I read the documentation, I looked at the

21   source code, I did many of those things that convinced myself.

22   I had multiple pieces of evidence that all were self-supporting

23   and led me to the same conclusion.

24   Q.  I want to turn now to your views on infringement, however

25   supported they are.

1      Let's see if we can agree on some ground rules, okay?  What

2  defines whether there is infringement or not is the claims of

3  the patent, right?

4  A.  That's my understanding, yes.

5  Q.  It's not the pictures, right?

6  A.  The pictures are a form of documentation, but I believe that

7  it's the claims that define, yes.

8  Q.  To determine infringement, you don't look at two pictures

9  and see if they look the same, right?

10  A.  I don't believe that the self-similarity of two pictures is

11  ipso facto by itself evidence that there is infringement, no.  I

12  think that if they behave the same and they have the same

13  schematic, that's one piece of evidence that suggests that there

14  might be infringement.  But, no, it's not conclusive.

15  Q.  To determine if there is infringement or not, you compare

16  the thing that is accused of infringement with the patent claim,

17  right?

18  A.  Exactly.

19  Q.  You don't compare it to a picture in the patent, right?

20  A.  Exactly.

21  Q.  And the claim has a long list of requirements in it,

22  correct?

23  A.  It has a list.  I wouldn't say it's necessarily long.

24  Q.  It has -- claim 24 has many requirements in it, right?

25  A.  We are splitting hairs over the word "many."  But, yes, it

1   has several.

2   Q.  And just so it is clear to everyone in case someone doesn't

3   know this already, that the claims are at the end of the patent

4   and they have numbers before them, right?

5   A.  Yes, they do.

6   Q.  And one of those is claim 24, right?

7   A.  That's correct.

8   Q.  It's the only one 01 is asserting in this lawsuit, right?

9   A.  That's -- to the best of my understanding, that's true.

10  Q.  All right.  And for there to be infringement, the LogMeIn

11  system, every one of LogMeIn's products has to have every single

12  limitation in the claim, right?

13  A.  I'm not sure that the infringement -- I don't know

14  personally whether every single one must infringe on everything.

15  I don't know whether it's an all-or-nothing thing.  I believe

16  that they all do, but I do not know the legal ramifications of

17  whether it's an all-or-nothing.

18  Q.  Well, if you take one LogMeIn product, in order for it to

19  infringe, it has to have every single requirement in that claim,

20  right?

21  A.  That's correct.

22  Q.  If there is even one missing, there is no infringement,

23  right?

24  A.  That's my understanding, yes.

25  Q.  Now, you never showed the jury claim 24, did you?

1   A.  No, actually, we didn't.  My recollection is that that came

2   up and we weren't supposed to show the claim language in detail

3   on a big chart, but I don't know that for certain.

4   Q.  Well, you put a lot of charts up in front of the jury about

5   pictures and diagrams and things like that, right?

6   A.  Yes.  And I read them the claim out loud.

7   Q.  But what they need to determine infringement is the claim

8   language, right?

9   A.  I am not sure I am qualified to say what they need to make a

10  decision.  I really don't.  I think that the claim language is

11  there.  I don't know whether they will have a copy of the patent

12  when they go back and retire.  I just don't know that.

13  Q.  One of the requirements in claim 24 is something called a

14  location facility, correct?

15  A.  Yes, that's true.

16      May I get the patent out before we continue?

17  Q.  Certainly.

18  A.  I have claim 24 now.

19  Q.  Do you have that before you?

20  A.  I do.

21  Q.  One of the things that claim 24 requires is a location

22  facility, correct?

23  A.  Just a moment.  I want to make sure I get my language

24  exactly right.  Yes, would be claim (b)(ii).

25  Q.  So, if there is no location facility in the LogMeIn system

1    as defined by the '479 patent, there is no infringement, right?

2    A.  So, the location -- a location facility can be many

3    different things and composed of many different things as a

4    standard software engineering practice.  But there would need to

5    be a location facility, yes.

6    Q.  In order for there to be a location facility that meets the

7    requirements of claim 24, it has to do all of the things the

8    claim says the location facility must do, correct?

9    A.  So, I actually think it's defined a little bit inversely to

10   that.  That something that does these things, that does that,

11   is, therefore, defined to be the location facility.

12   Q.  And if it doesn't do those things, it's not a location

13   facility?

14   A.  It needs to do each of the things that is in claim -- well,

15   it has to have all of the elements, yes.

16   Q.  So, if something doesn't do all the things a location

17   facility must do in the claim, it's not a location facility?

18   A.  Well, let me say that if it doesn't do the things that are

19   required in the claim language, then it doesn't infringe.

20   Q.  Correct.

21   A.  Yes.

22   Q.  And it is not a location facility and it doesn't infringe,

23   right?

24   A.  I am not sure that those can be directly coupled in English.

25   My mind is a little confused about that.

1      So, can I just say that it needs to infringe on each of the

2   elements of the claim.  And that the claim defines -- I am not

3   sure it defines it.  It describes the location facility that has

4   certain things that it has to do.

5   Q.  Well, I am trying to make this simple, Dr. Grimshaw.

6   A.  I know.

7   Q.  The claim says:  The server computer program includes a

8   location facility.

9   A.  Yes.

10  Q.  That's what it says, right?

11  A.  Yes.  That's correct.

12  Q.  If the LogMeIn server program does not include a location

13  facility, it does not infringe, right?

14  A.  If it didn't, that would be true, but I believe it does.

15  Q.  Well, I didn't ask you that.  If it doesn't include it, it

16  doesn't infringe, right?

17  A.  If it didn't include it, then it wouldn't.  But it does.

18  Q.  We will get into that.

19  A.  Okay.

20  Q.  Another requirement is that the location facility in the

21  server is what creates the communication channel between the

22  remote computer and the personal computer, right?

23  A.  That's correct.

24  Q.  And if the communication channel in the LogMeIn system is

25  not created by the location facility in the server, it doesn't

1   infringe, right?

2   A.  If the -- if the LogMeIn location facility did not create a

3   communication channel between the personal computer and the

4   remote computer, yes, it would not infringe.

5       Once again, I believe it does.

6   Q.  Well, Dr. Grimshaw, could you just please answer my

7   questions.  Okay?

8   A.  I am answering your questions as best I can.

9   Q.  It requires -- claim 24 requires a server computer be linked

10  to the Internet and have a static IP address, correct?

11  A.  That's in the preamble, and my understanding is that that's

12  not always a requirement.  But I'm not an attorney.  But I

13  didn't depend on that in any event.

14  Q.  But let's assume that is a requirement.  Can you do that?

15  A.  I am not sure that I am allowed to, but I will assume that

16  that's a requirement.

17  Q.  Okay.  Assume hypothetically, at least, that's a

18  requirement.  Can you do that?

19  A.  Yes, I can do that.

20  Q.  So, if the LogMeIn server computer is not linked to the

21  Internet and has a static IP address, it doesn't infringe,

22  correct?

23  A.  Under the assumptions that you just stated, that that

24  particular phrase of the preamble is a requirement of the

25  patent, then in fact if a server did not have a static IP

1   address, then it would not infringe.  That's if-then-else.

2   Q.  Now, Dr. Ganger -- I'm sorry, Dr. Grimshaw.  I want to talk

3   about the location facility requirement of the claims.

4   A.  Okay.

5   Q.  You know that was the subject of extensive discussion

6   between 01 Communique and the Patent Office?

7   A.  Yes, I do, actually.

8   Q.  And you didn't relate any of that discussion to the jury in

9   your testimony with Mr. Seth, did you?

10  A.  Let me switch glasses.  No, I didn't.  I was talking about

11  how things worked and about infringement, not about the

12  discussion about how they got there.

13  Q.  What 01 told the Patent Office about its patent, and what it

14  means and covers, is certainly important to whether there is

15  infringement, isn't there?

16  A.  Yes, as well as the arguments that Dr. Ganger made.

17  Q.  Yes, let's turn to Defendant's Exhibit 126 in your binder.

18      Do you have that?

19  A.  I do not yet, I am still trying to put this other one away.

20      26?

21  Q.  126.

22  A.  Oh, 126.  Yes, I have that in front of me.

23  Q.  This is in evidence, but let's make sure everyone

24  understands what it is.  It's a document that 01 submitted to

25  the Patent Office, correct?

1  A.  Yes, that's what it appears to be.

2  Q.  It is a sworn statement by a software expert, correct?

3  A.  It's -- just give me a moment.  I believe that is true, but

4  I want to verify that.  Yes, by Dr. Ganger.

5  Q.  Dr. Ganger is a software expert like you are, correct?

6  A.  Yes, he is.  He is at Carnegie Mellon University.

7  Q.  And he discusses what the '479 patent means and covers,

8  correct?

9  A.  So, I recall seeing this document, it has been some time,

10  but I believe that's true.

11  Q.  And one of the things he discusses is the location facility,

12  correct?

13  A.  There are things about the location facility described in

14  this document.

15  Q.  And Dr. Ganger on 01's behalf wanted the Patent Office to

16  understand what a location facility was and what it was not,

17  correct?

18  A.  He certainly discusses those things, yes.

19  Q.  Let's turn to paragraph 6 of that document.

20  A.  Yes, I am already there.

21  Q.  He says:  The location facility must create the

22  communication channel.

23      Correct?

24  A.  That's correct.

25  Q.  So -- and he says that one of ordinary skill in the art

1    would not view this language, and particularly its repeated use

2    of forms of "create" to be satisfied by an alleged location

3    facility that is simply used by some other component that

4    creates this communication channel.  Rather, one of ordinary

5    skill in the art would understand it to require that the

6    location facility itself creates the communication channel.

7         Do you see that?

8    A.   Yeah, I do.

9    Q.   I read that correctly?

10   A.   I wasn't reading along, but it sounded correct, yes.

11   Q.   All right.  So, let's be clear.  To be a location facility

12   within 01's '479 patent, it must locate the personal computer,

13   correct?

14   A.   It must determine the current location of the computer, yes.

15   Q.   And it also must create the communication channel?

16   A.   Must create the communication channel, yes.

17   Q.   So, the same component must do both things, correct?

18   A.   The location facility must do that.  The thing that is being

19   described here, the location facility needs to do that.

20   Q.   The same component must do both things, right?

21   A.   The location facility itself must do that.  Component is a

22   phrase -- a term of art that typically can be applied

23   recursively.  Which is to say, a component can have

24   subcomponents, can have subcomponents, et cetera.

25        The location facility must be the thing that creates it, not

1    the personal computer or the host computer.  That's what he is

2    trying to say here.

3    Q.  Well, you say that's what he's trying to say?

4    A.  I believe so, yes.

5    Q.  He doesn't mention anything about a personal computer, does

6    he?

7    A.  I believe he was contextualizing the component piece to be

8    the location facility as a component, as opposed to other

9    external components from the location facility.

10   Q.  He says that the location facility cannot simply be used by

11   some other component that creates the location channel?

12   A.  Yes, it says that.

13   Q.  Right.  So, the location facility and not some other

14   component must create the communication channel, right?

15   A.  That is what it says.

16   Q.  And if we turn to paragraph 8, he elaborates on that, right?

17   A.  Give me just a moment, please.

18   Q.  Sure.

19   A.  Okay.  Yes, I'm familiar with this.

20   Q.  Dr. Ganger says, quote:  One of ordinary skill in the art

21   would also not view these create requirements to be satisfied --

22   A.  Well, actually you forgot a word -- or you added a word.

23   You added "also."

24   Q.  In the middle of the paragraph --

25   A.  Oh, I thought the sentence:  One of ordinary skill in the

1   art would not view.  Are you looking at a different sentence?

2   Q.  Well, let's start with the sentence --

3   A.  Yeah, let's make sure we're talking about the same sentence.

4   Q.  One of ordinary skill in the art would not view the create

5   requirements of the '479 patent claims to be satisfied if the

6   location facility is only used by some other component that

7   itself creates the communication channel.

8   A.  That's correct.

9   Q.  You agree, right?

10  A.  I do, yes.

11  Q.  He then goes on to say:  One of ordinary skill in the art

12  would also not view these create requirements to be satisfied if

13  the location facility only enables or facilitates some other

14  component that creates the communication channel.

15      Correct?

16  A.  My belief is that that's correct, and what he was talking

17  about is directory-based systems.

18  Q.  You agree with what he said, right?

19  A.  Yes.

20  Q.  He goes on to say --

21  A.  And I use that definition.

22  Q.  He goes on to say:  These words; uses, enables, facilitates,

23  would have different meanings to one of ordinary skill in the

24  art than create.

25      Correct?

1   A.   He does use those words.

2   Q.   Assisting some other component that creates the

3   communication channel is not the same as creating the

4   communication channel.  The '479 patent claims require the

5   location facility to do the latter.

6        Correct?

7   A.   That's a correct quote.

8   Q.   These are very specific requirements, aren't they?

9   A.   Yes, they are.

10  Q.   He goes on to have an analogy in paragraph 9, which, if I

11  could I would paraphrase, he says, if he wants to make a phone

12  call and he looks up the number in a phone book, and he dials

13  the phone number, it's -- obviously, the phone book is not

14  creating the communication channel, right?

15  A.   Yes.  The phone book is a directory system.

16  Q.   He also says, if he calls the 411 service of the phone

17  company and asks them for a number, if he then hangs up and

18  dials the number himself, the 411 system is not creating the

19  communication channel, right?

20  A.   That's true.  The 411 system is just a directory service

21  used in that way.

22  Q.   And then he says:  It's only if I call the operator and the

23  operator dials my call, is the operator creating the

24  communication channel.

25       Right?

1   A.   Yes, that's correct with what he said.

2   Q.   That's what he said to the Patent Office.

3        Now, you did not have this document, consider it, before you

4   reached your opinions in this case, isn't that true?

5   A.   I don't recall, to tell you the truth.  I know I've seen

6   this documents many times and I've looked it over in the -- and

7   I know that in many of the subsequent documents from another

8   case I saw those as well.  I don't recall exactly where this

9   document that you gave me came from, but I know I've seen it.

10  Q.   Your first report was on infringement, right?

11  A.   That's correct.  The only reports I've done have been on

12  infringement.

13  Q.   You believe you first saw this -- this Ganger declaration

14  after you issued your report?

15  A.   I don't think I said that.  I think I said I don't recall

16  when I first saw this document.

17  Q.   So, you can't say whether you considered this document

18  before you reached your opinions or not, right?

19  A.   Well, it's true, I can't recall whether it was before or

20  after.  Certainly the heart of these discussions about what

21  exactly it -- the location facility does, is something I had

22  firmly in my mind from the very beginning, is that it was not,

23  in fact, a directory system and that directory systems would not

24  be infringing.

25       So, I don't recall if it was before or after, but certainly

1    the concepts contained in here I knew before.

2    Q.  Now, you know, you also referred in your testimony earlier

3    to the Court's claim construction, right?

4    A.  Yes, I did, the Aldrich court.

5    Q.  You didn't show that to the jury either, did you?

6    A.  Not that I can recall.  No, I didn't actually.  I know I

7    didn't do that.

8    Q.  And you didn't even say what it was, did you?

9    A.  It's true I didn't say what it was.  There was lots of

10   things I didn't bring up because there's just a lot of material

11   out there, hundreds and hundreds of pages.

12   Q.  The Court, His Honor, has determined what a location

13   facility is, right?

14   A.  Excuse me?  Are -- I thought you were talking of a different

15   one.  I thought you were talking about the definition from the

16   Aldrich case.

17       So, can you remind me, please?

18   Q.  Sure.  If you look, actually, in your notebook at DDX 1-20.

19   A.  My Sudafed is starting to run out.  DDX 1-20.  Ah, here it

20   is.

21   Q.  Do you see that?

22       MR. SETH:  Excuse me.  We need a copy of that one,

23   please.

24       Okay, thank you.

25   Q.  Do you have that?

1   A.   DDX 1-20?  I do.

2   Q.   This is the official definition of location facility for

3   this case, right?

4   A.   Give me a moment to read it, please.

5        Yes, I believe so.

6   Q.   And let's just focus on some aspects -- first of all, the

7   location facility is software on a locator server computer,

8   correct?

9   A.   The location facility is software.

10  Q.   That software must do four functions, right?

11  A.   The software collectively must do four functions.

12  Q.   It doesn't say collectively, does it?

13  A.   When you're talking about software, you're talking about the

14  collection of the various elements that make up the software.

15  Q.   Dr. Ganger, in anywhere in the Court's construction --

16  A.   I'm Grimshaw, sir.

17  Q.   Sorry, Dr. Grimshaw.  Anywhere in the Court's construction,

18  is the word "collectively"?

19  A.   That's what software is.  It's a collection of modules that

20  make it up.  So, when I see software, that's exactly what I

21  think, it's a collection of -- of things.

22  Q.   Dr. Grimshaw, anywhere in the Court's construction of

23  location facility, is the word "collectively" there?

24  A.   So, sir, I'm an expert on software, and I'm telling you

25  that's what software is.

1   Q.   Please answer the question.

2   A.   Does the word "collectively" occur in there?  No, it does

3   not.

4   Q.   Okay.  And the location facility software must perform four

5   functions, correct?

6   A.   The locator server software must perform four functions.

7   Q.   And one of those functions is that it determines the then

8   current location of the personal computer, correct?

9   A.   That's correct.

10  Q.   And it must create a communication channel between the

11  remote computer and the personal computer, correct?

12  A.   Yes.  That's what we just spent some time talking about.

13  Q.   Very similar to what Dr. Ganger told the Patent Office,

14  right?

15  A.   Yes.

16  Q.   So, the location facility software must do both in order to

17  be a location facility, correct?

18  A.   Yes.

19  Q.   All right, now let's see how this applies to the LogMeIn

20  system.  The LogMeIn server architecture has three different

21  components, correct?

22  A.   It has three different subcomponents, yes.

23  Q.   It has three different components?

24  A.   Subcomponents.

25  Q.   Do you have your rebuttal expert report in front of you?

1    A.  I don't know.  Did you give it to me?  Or would it be in

2    the -- yes, I do.

3    Q.  Turn to the first page.

4    A.  I'm there.

5    Q.  There's a discussion of location facility, correct?

6    A.  That's correct.

7    Q.  In the last sentence you refer to the LogMeIn locator server

8    components, correct?

9    A.  The last sentence of the page or the paragraph, last

10   paragraph?

11   Q.  The last sentence of the second paragraph on the page.

12   A.  Yes.  What about it?

13   Q.  You refer to the LogMeIn locator server components, correct?

14   A.  Right.  There's multiple components, there's subcomponents.

15   As I -- you might recall, a minute ago I said components are

16   defined recursively.

17   Q.  Dr. Grimshaw, on this page, your report, one of your

18   official reports in this case, you refer to the LogMeIn locator

19   server components, correct?

20   A.  Yes, in the way --

21   Q.  And you identify --

22   A.  -- one of ordinary skill in the art would use that phrase.

23   Q.  And you identify what they are, right?

24   A.  Identified the main components, yes.

25   Q.  Which are the gateway, database, and Web servers, correct?

1   A.  Yes, they are.

2   Q.  So, the LogMeIn server architecture has three different

3   components; the database, gateway, and Web server, correct?

4   A.  It has other minor pieces that aren't described.  Those are

5   the major ones.

6   Q.  And those are separate and different components, right?

7   A.  Yes, they're separate and different submodules,

8   subcomponents of a larger whole.

9   Q.  They are separate -- they are separate and distinct

10  components having different IP addresses, different software

11  code, different physical locations, and multiple data centers

12  across two continents, right?

13  A.  So, the LogMeIn system is decomposed into three types of

14  components, more precisely, if I can be clear.  And those are

15  designed and engineered to work together to perform a single

16  function.  This is classic software engineering.

17      So, yes, there are multiple components, they are in multiple

18  places.  That's what we do in our business.

19  Q.  Dr. Grimshaw, do you have your deposition under oath from

20  last month there?

21  A.  Yes, I do.

22  Q.  Page 78.

23  A.  Yes.

24  Q.  Question:  All right.  The next sentence on page 13 of

25  Exhibit 8 says:  LogMeIn's remote access system, separate and

1  distinct components having different IP addresses, different

2  software code, and different physical locations in multiple data

3  centers across two continents to allow its users to remotely

4  access computers, unquote.  Do you agree?

5       What is your answer?

6  A.  Do I agree that that's what I said?  Or do I agree --

7  Q.  Do you agree with that statement?

8  A.  It is perfectly consistent with what I just said now.

9  Components and subcomponents --

10 Q.  Your answer was yes, correct?

11 A.  Yes, it was.  At that point, if you'll recall, you were

12 having me answer single-sentence questions one at a time.

13 Q.  Now, the software in the different LogMeIn components --

14 A.  Uh-huh.

15 Q.  -- performs different functions, right?

16 A.  Yes, obviously, the different components are designed to do

17 different things and work together.

18 Q.  They're different -- they have different functions.  Each of

19 the software -- first of all, the software in each of the

20 components is different, right?

21 A.  So, that's -- that's practically a tautology.  If they're

22 different software components and they're going to have

23 different implementations, that's typically the case.  You can

24 have one big switch statement, but one doesn't usually do that.

25 Q.  It's written in different languages, right?

A. Grimshaw - Cross                                            373

1   A.  It might be.  It doesn't really matter.

2   Q.  Whether it matters to you or not, sir, the fact of the

3   matter is --

4   A.  Yes, they are written in different languages.  Some are in

5   C#, some bits are in SQL, some are in ASPX.  I mean, yes,

6   there's many different languages.

7   Q.  In the LogMeIn server architecture, it's not as if you have

8   the same software that's like split up and put on three

9   different computers, right?

10  A.  That's not their current deployment configuration, I don't

11  believe.

12  Q.  I want to take the software components one by one.

13  A.  Okay.

14  Q.  Let's talk about the database software.

15  A.  Okay.

16  Q.  It is one software component, correct?

17  A.  It's a part of the overall system, yes.

18  Q.  Well --

19  A.  It is a component that's part of the overall system, yes.

20  Q.  The whole world is an overall system, isn't it, sir?

21  A.  That's -- that's a very good way to think about it,

22  actually.  But, yes, it's part of one set of things that are

23  working together.  They're designed to work together.  It is a

24  component.

25  Q.  You don't think the '479 patent covers the whole world, do

1   you?

2   A.   Clearly I don't.

3   Q.   Good.

4   A.   It would be invalid.

5   Q.   The software in the database is written in SQL language?

6   A.   I believe that that's true.  Well, actually, the software

7   itself, as I said in the deposition, I don't know the database

8   engine, what language it's written in.  But the statements to it

9   are in SQL, yeah.

10  Q.   And SQL is usually written S-Q-L?

11  A.   S-Q-L, yes.

12  Q.   That software in the database does not perform all four

13  functions of a location facility claim construction, does it?

14  A.   By itself, that software does not perform all four

15  functions.  Collectively, they do.

16  Q.   It does not create a communication channel by itself, does

17  it?

18  A.   The database software, the database server, does not create

19  the channel alone, no, it does not.

20  Q.   So, that software is not a location facility, correct?

21  A.   The database server by itself is not a location facility.

22  Q.   Let's take the Web server software.  It's another software

23  component, correct?

24  A.   Yes, it is.

25  Q.   It has a different software and a different language from

1    the database software, correct?

2    A.   The Web server software is written in a different set of

3    languages.  I don't believe it's restricted to just one.  And,

4    yes, it's standalone.

5    Q.   And it does not perform all four functions of a location

6    facility claim construction by itself either, right?

7    A.   No, it doesn't.  And as with the other ones, it doesn't do

8    much all by itself in any event.  They're designed to work

9    together.

10   Q.   Well, we saw in Dr. Ganger's declaration 01 Communique told

11   the Patent Office the location facility software must by itself

12   create the communication channel, right?

13   A.   Yes.

14   Q.   And the Web server software in the LogMeIn system doesn't do

15   that, does it?

16   A.   This gets to the heart of the question of by itself.  The

17   LogMeIn services collectively implement the function.  That's

18   how one builds software in this day and age, is you decompose

19   the problem into multiple pieces.

20      With respect to Ganger's statement, Ganger, when he refers

21   to a component, was referring to, I believe, the location

22   facility.

23      And when he's referring to the other components, I believe

24   he was referring to the host computer or the personal computer.

25      So, the distinction that I think you're trying to make to

1    me, this is just how we do software, we have hierarchies of

2    composition.

3    Q.   You are not an inventor on the '479 patent?

4    A.   I am not an inventor on the '479 patent.

5    Q.   You didn't have anything to do with the '479 patent being

6    created, did you?

7    A.   No, I did not.

8    Q.   Or getting through the Patent Office, right?

9    A.   No, I did not.

10   Q.   So, whether -- however you design software, it has nothing

11   to do with the '479 patent, does it?

12   A.   It's not just the way I design software, sir.  That's the

13   way we do things in -- in the real world.  You go to any

14   software 101 class, that's what we're going to teach you.

15        If you go to the Software Engineering Institute, the

16   national place where they define what software architectures

17   are, and they will define that that's one of the first things

18   that you do, is you break it down into components that interact

19   and define the interaction patterns between them.

20   Q.   01 Communique told the Patent Office that the location

21   facility of software must locate -- determine the location of

22   the personal computer and create the communication channel

23   itself, correct?

24   A.   Yes, that's correct.

25   Q.   The LogMeIn Web server software does not do that, correct?

1   A.  Well, true, that by itself the LogMeIn Web server doesn't.

2   Collectively, the LogMeIn software writ large does.

3   Q.  Let's take the gateway server software.  That's another --

4   A.  Excuse me.  Gateway?

5   Q.  The gateway server software.

6   A.  Yes, sir.

7   Q.  It's another software component, correct?

8   A.  It is one another of the components in the LogMeIn system,

9   yes.

10  Q.  It's different software in different languages from the

11  Web -- Web server and database software?

12  A.  Yes, that's true.

13  Q.  It does not perform all four functions of a location

14  facility either, correct?

15  A.  By itself, it does not.

16  Q.  It uses other components to do so, according to you, right?

17  A.  It works with other components to.  They're all part of a

18  larger software system.

19  Q.  Well, using other components is exactly what Dr. Ganger told

20  the Patent Office was not allowed, right?

21  A.  Sir, if you'll recall, the way I defined components just a

22  few minutes ago is that they're defined recursively and,

23  therefore, hierarchically.  So, any component is going to be

24  subdivided into components.

25      The location facility has been subdivided into sublocation

 1    facilities.  Which, by the way, the patent in column 10

 2    explicitly called out it's something that it could do.

 3        This is common, known to everybody who writes software at

 4    any scale beyond hello world, and it's -- they know.

 5    Q.  I just want to summarize here.  Hopefully I'll move this

 6    along.

 7    A.  All right.  And I'm sorry.  Go ahead.

 8    Q.  All claim -- claim 24 requires a location facility, correct?

 9    A.  That's correct.

10    Q.  If there's no location facility, there's no infringement,

11    correct?

12    A.  Yes, if there's no location facility, there's no

13    infringement.

14    Q.  To be a location facility, the software must perform all

15    four functions, correct?

16    A.  Yes, that's correct.

17    Q.  The LogMeIn database software does not perform those

18    functions, correct?

19    A.  Individually it does not.

20    Q.  Gateway software doesn't either, correct?

21    A.  Individually by itself it does not.

22    Q.  The Web server software doesn't either, correct?

23    A.  The Web server software by itself does not.  Collectively,

24    they do.

25    Q.  You say you just put this all together and it will work and

1    they'll assist and use each other to perform all the functions,

2    right?

3    A.  You don't just jam them together.  It's not like putting

4    together pieces of software in PowerPoint.  They were designed

5    to work together and they integrate and work together.  They're

6    like -- they are the pieces of the larger machine and they're

7    designed to work together.  That's how we do software.

8    Q.  They work together and they use each other and they assist

9    each other and they facilitate each other, right?

10   A.  That's how you write software.

11   Q.  And Dr. Ganger said that's not the same thing as --

12   A.  He said they shouldn't use external components or use other

13   components.  And to -- all software uses -- that works, it uses

14   components internally.  My belief is that Dr. Ganger was

15   referring to external components because he was directly

16   addressing in that area directory-based systems and things like

17   directory-based systems.  When we refer to the phone company

18   example, it's pretty clear to me.

19   Q.  In the paragraphs 6 and 8 of his declaration we looked at,

20   the word "external component" never appears, does it?

21   A.  It -- I'm sorry.  The paper noise drowned you out.

22   Q.  Sure.  In the paragraphs 6 and 8 of Dr. Ganger's declaration

23   we looked at, there's no mention to -- of external components,

24   is there?

25   A.  He does not use the word "external."  When you read them,

1   that's what you gather.  I mean, certainly his example is

2   exemplary of that kind of behavior.

3   Q.  There is no component in the LogMeIn system that by itself

4   determines the location of the personal computer, is there?

5   A.  The LogMeIn server as a component does do the functions of a

6   location facility.

7   Q.  Well, you need multiple components to do so?

8   A.  It's decomposed into multiple components.  As I've said,

9   that's what you do.  You decompose components into

10  subcomponents.  All of those components are provided by LogMeIn,

11  they're all part of the LogMeIn software.

12  Q.  There's no one component in the LogMeIn system that itself

13  creates the communication channel without assistance from other

14  components?

15  A.  The LogMeIn software itself does create the communication

16  channel.  If you'll recall, earlier I said an abstraction at one

17  level or a primitive at one level is simply a data structure.

18  And when push comes to shove, that data structure gets created

19  in the LogMeIn software.

20  Q.  Let's just be very precise here.  There is no software

21  program in the LogMeIn system, written in a single language

22  resident on a server, or even on more than one server, that

23  performs all four functions of a location facility, isn't that

24  true?

25  A.  So, you're defining a software program to be restricted to

1   the case --

2   Q.   I'm not defining anything.

3   A.   Yes, you are, because you said there's no server program,

4   and then you add a bunch of clauses after that.  Which to me

5   means that I have to interpret those clauses with respect to the

6   first word.  Is that correct?

7   Q.   Dr. Grimshaw --

8   A.   And I'm sorry --

9   Q.   -- I asked the question.  If you could please just answer

10  it.

11      In the LogMeIn system, there is no software program written

12  in a single language resident on a server, or even on many

13  servers, that performs all four functions of a location

14  facility, is there?

15  A.   The LogMeIn software is written in multiple languages, yes.

16  I don't -- I disagree with your definition and the way you

17  claused software program, because that's not the way I would

18  have defined it.

19      But if what you're getting is, are they written in different

20  languages, then the answer is yes.

21  Q.   Let's move on to another requirement of the patent claims.

22  A.   Okay.

23  Q.   Even if the location facility -- if the location facility is

24  missing from the LogMeIn system, there's no infringement,

25  correct?

1  A.  If there's no location facility, there is no infringement,

2  yes.

3  Q.  Now, claim 24 also has --

4  A.  May I pause for just a second to get a drink?  I've been

5  talking for a while, I am getting kind of thirsty.

6  Q.  Sure.

7  A.  Yes, sir.

8  Q.  Claim 24 has other requirements too?

9  A.  Yes, it does.

10  Q.  One of those is that the communication channel from the

11  personal computer to the remote computer must be created by the

12  server, correct?

13  A.  Hang on.  Let me just -- can you repeat the question?

14  Because I'm busy trying to look something up while listening to

15  you at the same time, and it's not working very well.

16  Q.  One of the requirements of claim 24 is that the

17  communication channel must be created by the server?

18  A.  Yes, by the location facility.

19  Q.  Which is on the server, correct?

20  A.  Yes.

21  Q.  So, if something other than the location facility creates

22  the communication channel, there's no infringement, right?

23  A.  I believe that's what Dr. Ganger's point was, yes.

24  Q.  Also, it's true that the communication channel must be

25  created in response to the request for communication?

1   A.  Yes, sir, that's true.

2   Q.  And if that's not true, there's no infringement either,

3   right?

4   A.  Yes, that's true.

5   Q.  Now, in the LogMeIn system, there is a communication channel

6   always open, ideally, from the host to the server, correct?

7   A.  Under normal operating procedures, that's correct.

8   Q.  I mean, if you turn off the host or the network goes down or

9   something, there's no channel.  But ideally there's a standing

10  channel always open?

11  A.  If everything is working and it's been enabled and turned

12  on, yes.

13  Q.  And that standing channel is always there, right?

14  A.  That's along the discussion we just had, yes.

15  Q.  So, it's not created in response to anything, is it?

16  A.  But that's not the channel between the remote host and the

17  personal computer.  That's a channel between the personal

18  computer and the server computer.

19  Q.  It's one half of the channel?

20  A.  It's not one half.  It's one part.

21  Q.  One part of the channel.  And that part of the channel is

22  not created in response to anything, right?

23  A.  Sir, if you'll recall, a moment ago I said the channel is

24  essentially an abstraction or a data structure.  The data

25  structure -- that's true also for TCP sockets and -- which is

1   what the connection is that we're talking about.  And that TCP

2   socket is a set of data structures that -- where the data

3   structures exist in multiple places.

4   Q.  Well, with a standing channel that already exists, it's not

5   created in response to anything, correct?

6   A.  So, that first channel, the one between the host computer

7   and the server computer, that's the one we're talking about,

8   right?

9   Q.  Yes.

10  A.  That's initiated by the host computer as an outgoing TCP

11  connection.

12  Q.  But it's always there as long as the host computer is turned

13  on, right?

14  A.  Yeah, and all those other things.  It is there, yes.  It's a

15  standing channel.

16  Q.  It's certainly not initiated by a request for communication

17  from the remote defined computer?

18  A.  That channel is already there.

19  Q.  Already there, correct?

20  A.  That's correct.

21  Q.  And if you merely forward packets of information across that

22  channel, that doesn't create a communication channel, does it?

23  A.  If I'm -- if by that you mean forwarding packets simply over

24  that one piece of the channel from the personal computer to the

25  host computer, sending packets along that does not in and of

1    itself create a communication channel from the personal computer

2    to the host computer.

3    Q.  Let's talk about the rest of the communication channel from

4    the -- that ultimately connects up the client and the host

5    computer.

6    A.  Uh-huh.

7    Q.  Do you have that in mind?

8    A.  I do.

9    Q.  In the '479 patent, what must create that channel is the

10   server, correct?

11   A.  Yes, the -- yeah, the server computer must create the

12   communication channel.

13   Q.  That's not the way the LogMeIn system works, though, is it?

14   A.  I disagree with that statement.

15   Q.  Well, it's the -- it is the client computer, the laptop on

16   the road, or whatever --

17   A.  Uh-huh.

18   Q.  -- that creates that communication channel, isn't it?

19   A.  Which channel are you referring to now, the --

20   Q.  The channel that goes to the host.

21   A.  No, that's not true.

22   Q.  Well, without that request, there would be no channel

23   created?

24   A.  Sir, the request and the channel are two different things.

25        I'm not sure I'm understanding your question.  Can you ask

1    the question again.

2    Q.   Sure.  It's what creates the channel --

3    A.   Uh-huh.

4    Q.   -- running from the client computer to the host computer --

5    A.   Can we call that, for lack of a better term, the end-to-end

6    channel?

7    Q.   The end channel?

8    A.   End-to-end, because it's going from one end to the other

9    end.

10   Q.   What creates that end-to-end channel is the request from the

11   client computer, isn't it?

12   A.   Just as in the patent, it's the request that initiates the

13   creating of the channel.  The channel will not be created until

14   there's a request.  When the request comes -- assuming

15   authentication and security and all that stuff aside, when the

16   request comes, the location facility will create a channel

17   between -- the end-to-end channel between the host and the

18   personal computer.

19   Q.   Well, let's --

20   A.   I mean, excuse me, the personal computer and the remote

21   computer.

22   Q.   Let's be very clear.  Claim 24 requires that that end-to-end

23   channel be created by the server, correct?

24   A.   It does.

25   Q.   In the LogMeIn system, without a request from the client

1   computer, there's no such channel created, right?

2   A.   Until there is a request, there is no channel created.   Once

3   there's a request, it creates a channel.

4   Q.   So, it's that channel that creates the communication

5   channel?

6   A.   No, that's not what I said.   I said it's the request that

7   initiates the creation of the channel, end-to-end channel.

8   Q.   Would you agree that without a request from the client, no

9   communication channel is created by the LogMeIn system?

10  A.   So, it's conceivable that somewhere in the source code they

11  have one that does that.   I highly doubt it.   But, yes, I would

12  agree with that statement.   Until and unless there's a request

13  for -- for an end-to-end channel, the system isn't going to

14  create one.

15          MR. STONER:   Thank you, Dr. Grimshaw, I have no more

16  questions.

17          THE WITNESS:   Okay.   Thank you.

18          THE COURT:   Why don't we take a brief recess.

19          NOTE:   At this point a recess is taken; at the

20  conclusion of which the case continues in the absence of the

21  jury as follows:

22  JURY OUT

23          MR. MOLSTER:   Thank you, Your Honor.

24          There may be a couple of depositions that are going to

25  be up before we have another break and before the end of the day

1     where we have got some objections.  And couple of them are 403

2     objections that we didn't want to make in front of the jury.

3              And so, I wanted to pass up the exhibits, if I could,

4     and raise them with you so that we can have it clear as to

5     whether or not it's going.

6              THE COURT:  Okay.

7              MR. MOLSTER:  Thank you.

8              MR. SHUNK:  Do you have a copy of those exhibits?

9              MR. MOLSTER:  Yes, it's your Pasquale before you -- the

10    exhibits that you're using with Pasquale.

11             The first one I'd like to talk about is Pasquale.  I

12    put a little sticky on there on Pasquale.  The employee is Laura

13    Pasquale.  There are three exhibits that are used during the

14    course of the deposition.

15             The first one I want to talk about is on the front,

16    Judge.  It is PX 88.  It is an e-mail.  It has got a number of

17    people in it, including Ms. Pasquale.  It is not her statement.

18    It's not her e-mail.  There are a couple that are in there.

19             But this is a 403 issue -- first of all, it is not

20    relevant at all, but the only reason they want it in there is

21    because there is a use of an unfortunate term called "freetard"

22    as in a free customer, but it's obviously mixing free and

23    retard, and so it is called freetard.  And all they want to do

24    is put that in front of the jury so it will besmirch the company

25    and people will think we are bad people because we have

1    employees that use the unfortunate term "freetard."

2         Under 403, if you balance the probative value, which is

3    none because it is not relevant, to the prejudicial value, which

4    is lots, then we think that PX 88 should be excluded because it

5    is not relevant and because it's prejudicial.  And we made those

6    objections before.

7         The other two documents are also not her statements.

8    And so, we don't think those ought to come in because they are

9    being crossed on somebody else's statement.

10        So, it would be a great way to speed up the trial, Your

11   Honor, would be to eliminate Ms. Pasquale's deposition

12   testimony.

13        THE COURT:  All right.

14        MR. SHUNK:  Your Honor, I am glad we have an

15   opportunity to speak with the Court about this outside the

16   presence of the jury because I, too, am a little bit concerned

17   about the language not only in this e-mail, but in some of the

18   other e-mails.  It gets a little salty.  And I would love to

19   have the Court's direction so that we all behave the way the

20   Court wants us to in the courtroom.

21        Unfortunately, you've heard the premium business model

22   is at the essence of the defendant's claim to why they've been

23   so successful.  Their employees had the very unfortunate habit

24   of just talking about the premium model by calling their users

25   freetard -- freetards.  I don't like it, but it's in there.

1       It's in these e-mails.

2              And this particular e-mail that we with start off with,

3       PX 88, is all about a question of targeting all of their -- all

4       of their work and all of their marketing efforts towards the

5       900,000 total active -- and they mean active free users, but

6       they call them freetard bastards, Your Honor.

7              Now, I don't -- there isn't any way to talk about this

8       exhibit other than to look at those words, but, you know, I

9       certainly don't want to sling that word around this courtroom

10      all the time.  If --

11             THE COURT:  Well, there is no reason to put it in.  I

12      mean, that's not at issue.  They were doing it.  They were

13      giving these things away free.

14             So, just throwing in some of their --

15             MR. SHUNK:  Well, Your Honor, they --

16             THE COURT:  -- more exciting words, could have no

17      intent other than just to blacken them up a little bit.

18             MR. SHUNK:  Your Honor, I think that this -- these

19      e-mails that have this kind of language in it are an important

20      part of our case.  We need to be able to tell the jury --

21             THE COURT:  Do infringers curse more or use worse

22      language than non-infringers?

23             MR. SHUNK:  I've got to tell you, I was a little bit

24      surprised when I read this stuff.

25             THE COURT:  Okay.

1          MR. SHUNK:  You know, I mean, I would be --

2          THE COURT:  What relevance -- the first one -- I will

3    sustain the objection to this first one, PX 88.

4          I haven't gone through all the rest of them.  What

5    relevance do the rest of them have?

6          MR. SHUNK:  Well, the next one that I have got, Your

7    Honor, PX 62, this is a key document.  Free engine in the middle

8    of the diagram, that is showing that these free products really

9    are the lifeblood of the company.  Without selling the Free

10   products, the company wouldn't have its other revenue.

11         I think we are entitled to show the jury that, indeed,

12   Mr. Cheung's invention really is the source of all the defendant

13   company's revenue.

14         MR. MOLSTER:  It is not her document.  She said in the

15   deposition she didn't create the document.

16         MR. SHUNK:  Well, this -- Your Honor, this was a --

17   that's not the test for whether the document should be admitted.

18   This was a PowerPoint presentation.

19         THE COURT:  You have got to have somebody that will

20   authenticate it.

21         MR. SHUNK:  Well, she was at the meeting where this was

22   displayed.  It was a PowerPoint presentation, Your Honor.

23         Now, we don't have to have the maker of the

24   presentation authenticate it.  Anybody that can say, yeah, I was

25   there and that was up on the screen, I -- or I remember this

1   being circulated.  It is an admission of a party opponent.  It

2   is right out of their documents.  The authenticity isn't in

3   question.  I think -- I don't see how this doesn't get in.

4         Now, this one does not have the problem of bad words in

5   it.

6         Yeah, authenticity objections have been withdrawn.

7         MR. MOLSTER:  I am not making an authenticity

8   objection.  He wants to cross her on a document that is not hers

9   in the deposition.  That's the measure of the objection with

10  respect to the last two documents.

11        MR. SHUNK:  With respect, Your Honor, it is her

12  company's.  She was at -- she received this document.  She

13  remembers it.  If we have to track down the author of each

14  document, that puts an unusual burden on us.

15        We should be able to ask company employees --

16        THE COURT:  Your purpose of calling her is the fact of

17  what?  That they had a meeting and that these items were passed

18  out?  What's the thrust of her testimony?

19        MR. SHUNK:  She is -- Your Honor, Ms. Pasquale is the

20  chief marketing person at this company.  The purpose of the

21  testimony in her deposition is to confirm that the Free engine

22  is what drives the entire focus of the company's marketing.

23        THE COURT:  That doesn't seem to be in dispute, does

24  it?

25        MR. MOLSTER:  No, sir.

1                MR. SHUNK:  It isn't to me, but I hear it from the

2    other side.

3                THE COURT:  I think we have heard evidence from others

4    that that has been testified to already.  How long does she

5    testify?

6                MR. SHUNK:  This one --

7                THE COURT:  What is the length of her testimony?

8                MR. SHUNK:  This one takes like ten minutes to read,

9    something like that.  I mean, this is a short one, Your Honor.

10               THE COURT:  All right.  Well, I will let you call her.

11   What is it, 62, 118 -- are there any of these others that have

12   the language in them?

13               MR. MOLSTER:  No, the next one, Judge, is for Boyer.

14   And my objection on that one is kind -- can I have just a little

15   bit of room here?

16               MR. SHUNK:  I am sorry, Chip.

17               MR. MOLSTER:  Boyer, here, Your Honor --

18               THE COURT:  Now, Boyer is in a separate pile.  You gave

19   me a whole pile of --

20               MR. MOLSTER:  I gave two piles, Judge.  One is Pasquale

21   and one is Boyer.

22               THE COURT:  All right.  So, if I knock out the PX 88,

23   you don't care about the rest of them?

24               MR. MOLSTER:  No, you just ruled against me on the rest

25   of them.  I accepted that and moved on to the next file.

1            THE COURT:  Very good.

2            MR. MOLSTER:  Boyer, two documents for Boyer.  Okay.

3    One of them is PX -- let me get the right number here --

4            PX 91.  Okay.  This is -- it's an e-mail that is not to

5    Boyer or from Boyer.  He is nowhere on it.  And it attaches a

6    slide deck created by a woman named Michelle Rabideau on

7    August 22nd of 2008.  She is a summer temp that worked for the

8    company.

9            So, Boyer is being crossed with this document, in their

10   deposition transcript, that he didn't create.

11           And the 403 nature of this is that she is a summer

12   intern who took upon herself to take a look at what the value of

13   a free user was to LogMeIn.  And she comes up with a calculation

14   of over $6 per free user.  It is completely unreliable.  Nobody

15   has ever relied on it in the company.

16           They want to put it in front of the jury.  We don't get

17   six -- we don't get any money from free users.  That's the whole

18   point of free users.  And you have seen some of the briefing

19   we've had of what the value of free is.  But this a completely

20   unreliable document done by a summer temp, and under 403 it

21   shouldn't go in.

22           THE COURT:  You still want to cross-examine him about

23   this.  It's not that he received this at some meeting or that

24   this is a company policy that was passed around, they are

25   bringing up some report they have received to cross-examine him

1    during this deposition?

2           MR. MOLSTER:  That's what they do, is they try to talk

3    to him about a document that he didn't create.  Right.

4           THE COURT:  Okay.

5           MR. SHUNK:  Your Honor, Mr. Molster's argumentation

6    just proves our point.  First of all, notice that he still is in

7    denial about whether the free users are of value to the company.

8    He keeps telling you they aren't.  And that's -- and I'm sure

9    they're going to argue that --

10          MR. MOLSTER:  Not true.  That's not true.

11          THE COURT:  He didn't -- he didn't say that at all.

12          MR. MOLSTER:  Quantification is the issue.

13          THE COURT:  All right.  Don't tell me too much now,

14   Mr. Molster.

15          MR. SHUNK:  But, Your Honor --

16          THE COURT:  Are you using this to cross-examine Boyer?

17          MR. SHUNK:  I am, because Mr. Boyer can authentic it.

18   He can say he received it.  This is -- you see, Michelle

19   Rabideau, she worked for the company for a small period of time.

20   She did this work.

21          Mr. Boyer, himself, did his own analysis looking at

22   what Ms. Rabideau did.  That deposition is about Mr. Boyer's own

23   work.  And if you don't understand the Rabideau calculation, you

24   don't understand what Mr. Boyer did.

25          THE COURT:  All right.  Objection sustained as to

1    cross-examining him about somebody else's work.

2          MR. MOLSTER:  The only other document in his deposition

3    is his evaluation, his employee evaluation.  I don't think

4    that's relevant.  And the poor guy's evaluation shouldn't be in

5    federal court.

6          MR. SHUNK:  I agree with that, Your Honor.  We don't

7    need to admit the evaluation.  I don't have a clear recollection

8    of what the question is connected with it, but the evaluation

9    itself doesn't need to go in.  We will withdraw that exhibit.

10          Your Honor, I am sorry --

11          THE COURT:  I am confused.  I sustained the objection.

12          MR. MOLSTER:  Right.

13          THE COURT:  You cannot cross-examine Boyer on somebody

14    else's report.  Now, if there is something in here in addition

15    to the report --

16          MR. MOLSTER:  There is one other document he has

17    withdrawn.  So, we are set on Boyer, Your Honor.

18          THE COURT:  Are you going to call Boyer?

19          MR. MOLSTER:  I don't think there is any left on Boyer.

20          MR. SHUNK:  It is only a five- or ten-minute

21    deposition, Your Honor.  And, again, Mr. Boyer is the one --

22          THE COURT:  Is he going to repeat the fact that they

23    give away some service?

24          MR. SHUNK:  No.  He is going to talk about what the

25    value of the free giveaway is.  Ms. Rabideau -- Ms. Rabideau did

1   the initial calculation.  Then Mr. Boyer was asked to take a

2   second look at it.  And Mr. Boyer is going to talk about what

3   his second look meant to him.

4           THE COURT:  You cannot cross-examine him based on this

5   report.

6           MR. MOLSTER:  Understood.

7           MR. SHUNK:  Even though he received it and even though

8   he is an employee of the company and it's a company document?

9           THE COURT:  Yes.

10          MR. SHUNK:  All right.  I understand the Court's

11  ruling.

12          THE COURT:  You can only cross-examine somebody on

13  their own report, their own work.  Not somebody else's.

14          MR. SHUNK:  I understand the Court's ruling.

15          MR. MOLSTER:  Thank you, Your Honor.

16          THE COURT:  All right.

17           NOTE:  At this point the jury returns to the

18  courtroom; whereupon the case continues as follows:

19  JURY IN

20          THE COURT:  All right, counsel.

21           REDIRECT EXAMINATION

22  BY MR. SETH:

23  Q.  Dr. Grimshaw, could you turn in the defendant's witness

24  binder to tab PX 1-20, the claim construction.

25  A.  Plaintiff's?

1   Q.  Defendant's.

2   A.  Defendant's.

3   Q.  The black binder.

4   A.  Sorry.  1-20?  Yes.  The Court's construction of --

5   Q.  That's the Court's construction of location facility there,

6   right?

7   A.  That's correct.

8   Q.  And Mr. Stoner spent a lot of time with you talking about

9   the Court's construction of the location facility.  Do you

10  recall that?

11  A.  Yes, I do.

12  Q.  He didn't point you to the last sentence of the -- of the

13  definition?

14  A.  No, he did not.

15  Q.  And could you read that for the jury, please.

16  A.  Yes, I can.  It says, and I quote:  The locator server

17  computer may comprise one or more computers, and the location

18  facility may be distributed among one or more locator server

19  computers.

20  Q.  And can you tell us what that means.

21  A.  Well, to somebody like me, what that means is -- and these

22  were common things to do and have been for some time -- A, that

23  we can have multiple computers that make up the server computer.

24  And that the location facility, that is the software, can be

25  decomposed and distributed amongst those computers.

1    Q.  All right.  Dr. Grimshaw, Mr. Stoner had a lot of questions

2    for you.  Have any of those questions changed your opinions in

3    any way?

4    A.  No, they have not.  I still feel as I did before.

5            MR. SHUNK:  No further questions.

6            MR. STONER:  Very briefly, Your Honor.

7            THE COURT:  He only asked three questions.

8              RECROSS-EXAMINATION

9    BY MR. STONER:

10   Q.  I think we covered this before, but I want to be clear.

11       In the LogMeIn system, the software is not all the same

12   software split among different computers.  It is different

13   software, right?

14   A.  It's not the same software replicated between them.  I don't

15   believe that it's a simple replication, no.

16           MR. STONER:  Thank you.

17           THE COURT:  All right.  Thank you.  You may step down.

18   You may be excused.

19           NOTE:  The witness stood down.

20           THE COURT:  Who is next?

21           MR. ANTONETTI:  Your Honor, Plaintiff 01 calls Brian

22   Stringer.

23           NOTE:  The witness is sworn.

24           MR. ANTONETTI:  If we could distribute the witness

25   binders to the witness.

1          THE COURT:  Go ahead.

2          BRIAN STRINGER, called by counsel for the Plaintiff,

3   first being duly sworn, testifies and states:

4          DIRECT EXAMINATION

5   BY MR. ANTONETTI:

6   Q.  Could you please state your name for the record.

7   A.  Brian Stringer.

8   Q.  Mr. Stringer, do you have a job?

9   A.  I do.

10  Q.  With whom are you employed?

11  A.  01 Communique.

12  Q.  And what is your position with 01?

13  A.  I'm chief financial officer.

14  Q.  When did you become the chief financial officer of 01?

15  A.  I started with 01 in 1998.

16  Q.  Have you held other positions with 01?

17  A.  No.

18  Q.  And prior to joining 01, did you hold other employment

19  positions?

20  A.  Yes, I did.

21  Q.  What other positions have you held?

22  A.  Well, since I graduated university in 1975, after that I

23  spent four years working at Clarks & Gordon, which later became

24  Ernst & Young, a large accounting firm.

25  Q.  You stated you graduated from university.  Do you hold any

1   degrees, sir?

2   A.  Yes, I do.  I hold an Honors BA in business administration.

3   Q.  And how long did you hold the position with Clarks & Gordon?

4   A.  I spent four years at Clarks & Gordon, which is where I

5   articled to become a chartered accountant.

6   Q.  Mr. Stringer, what do you mean by a chartered accountant?

7   A.  A chartered accountant is the same as -- similar to a CPA

8   here in the United States.  As a matter of fact, I hold the

9   designation in Canada of a CPA as well.

10  Q.  And what did you have to do to article to become a CA?

11  A.  Well, what I did is -- articling is your practical

12  experience.  After you get your education, you need the

13  practical experience, which I did, and then you write a series

14  of exams.

15  Q.  And who administers those exams?

16  A.  They are administered by the national body, the Canadian

17  Institute of Chartered Accountants.

18  Q.  I take it you passed your exams?

19  A.  Yes, I did.

20  Q.  Now, just very briefly, after working for Clarks & Gordon,

21  who else did you work for?

22  A.  I spent a number of years working in insurance companies.  I

23  worked as the controller for the Personal Insurance Corporation

24  of Canada.

25      I then worked for -- as vice-president of finance for

1    Northumberland General Insurance Company.

2        Followed by working as controller for the Insurance

3    Corporation of Ireland, the Canadian branch.

4        And after that, I then switched into technology.  And I

5    worked for MICOS Computer Systems, which was a service company.

6    Also sold systems software.

7        And then I worked for a number of years at a company called

8    PureData, which was a network manufacturer.

9        And after that I started with 01.

10   Q.  And, Mr. Stringer, were you ever discharged from any of your

11   positions?

12   A.  No, I wasn't.

13   Q.  Now, as a chartered accountant, are you required to do

14   anything to maintain your professional license?

15   A.  Yes.  We have continuing education requirements.  We are

16   required to have 20 hours per year of continuing education, or

17   120 hours in any three-year stretch.

18       So, it's 20 per year, but you have got to have at least 120

19   in any three-year period.

20   Q.  And is your license in good standing today?

21   A.  Yes, it is.

22   Q.  Now, why did you join 01, Mr. Stringer?

23           THE COURT:  Are you trying to qualify this witness as

24   an expert?

25           MR. ANTONETTI:  No, I'm not, Your Honor.  I am giving

1    background so that you can understand what it is that he does

2    and how he does it.

3              THE COURT:  Let's move along.

4              MR. ANTONETTI:  I'll move right along.

5    BY MR. ANTONETTI: (Continuing)

6    Q.  Now, Mr. Stringer, you said you are the chief financial

7    officer.  Just briefly, what are your duties as the CFO?

8    A.  Well, as the CFO of the company, I am responsible for

9    financial reporting of the company.  I am responsible for

10   investor relations and raising capital.

11       I am a member of the management team of the company.  I am

12   not a member of the board of directors, but I do attend most of

13   the board meetings and I provide advice as required.

14       In addition to that, I have assumed the role -- I manage the

15   direct sales force and have done so since around 2003.

16       And not being that large of a company, if there is anything

17   else, any other duties you need, then you pitch in and help.

18   Q.  And are you familiar with the products and services that 01

19   offers?

20   A.  Yes, I am.

21   Q.  What are these products?

22   A.  Well, we make a suite of online products.  We have got our

23   I'm InTouch products as a service in the server edition, our

24   online collaboration product, which is I'm InTouch Meeting.  And

25   we have our remote support product, I'm OnCall.

1   Q.  And what kind of company is 01?

2   A.  It is a public company.

3   Q.  When did it first become publicly traded?

4   A.  We became first publicly traded in 1998.

5   Q.  And on what market was --

6   A.  That was on the over the counter, the CVNX market in Canada.

7   And we have since moved to the Toronto Stock Exchange, which is

8   the senior exchange in Canada.

9   Q.  Mr. Stringer, are you an investor in 01?

10  A.  Yes, I am.  I own 150,000 shares, which today is worth about

11  $200,000.

12  Q.  Okay.  And as CFO and a shareholder of 01, do you follow

13  01's stock price?

14  A.  Yes, I do.

15  Q.  Now, you mentioned the term "investors relations"

16  previously.  Now, what do you mean by the term "investor

17  relations"?

18  A.  Well, that is communicating with our shareholders,

19  disseminating information, keeping in touch with them.  And we

20  would put on presentations and press conferences from time to

21  time.

22  Q.  And when have you held such presentations?

23  A.  Well, we have held them on and off fairly routinely since

24  around 1999-2000 time frame.

25  Q.  And why do you hold such presentations?

1    A.  Well, we hold them generally around important events,

2    significant events that are going on in the company, you know,

3    such as new product launches.

4    Q.  And did you ever hold any investor relations presentations

5    related to the I'm InTouch product?

6    A.  Yes, we have.

7    Q.  And when did you participate in your first presentation

8    related to the I'm InTouch product?

9    A.  That would have been in January 2000 at the Royal York

10   Fairmont Hotel in Toronto.

11   Q.  And were you present at that gathering?

12   A.  Yes, I was.

13   Q.  What was 01 presenting at that time?

14   A.  We were presenting the concept, which later became our I'm

15   InTouch product offering.  There was a presentation put on by

16   Andrew Cheung, our president.  In that he talked about our

17   Communicate! line of products and what we were doing with that,

18   as well as the future.  And the future concept he talked about

19   later, as I said, became our I'm InTouch product line.

20   Q.  And what happened at that presentation?

21   A.  Well, during the presentation there was a big oak doors like

22   here that were at the back.  It was about 150 people, so it was

23   quite a sizeable presentation.  And they kept opening and

24   closing and making a big thud.  And I couldn't figure out, you

25   know, why people were leaving because I thought it was a pretty

1    good presentation.  But after the presentation, I certainly

2    figured out why.

3    Q.  And why is it that you figured out why?

4    A.  Well, during that day we opened, our stock opened at $3.85.

5    And by the time I got back after the presentation, back to the

6    office in Mississauga, the stock had risen over 17 percent.  And

7    it continued rising right the way through until we ended up on

8    the Toronto Stock Exchange, which we got listed in March.  And

9    by that time we had reached about -- just over $14, 14.50, which

10   is, you know, over a 250 percent increase.

11   Q.  And as CFO, to what did you attribute the company's stock

12   increase?

13   A.  Well, I attributed it to the enthusiasm that was witnessed

14   by Andrew's presentation and the follow-on interest that we

15   received after it.

16   Q.  And when did 01 become listed on the Toronto Stock Exchange?

17   A.  That would have been March of 2000.

18   Q.  And why did 01 look to become listed on the Toronto Stock

19   Exchange?

20   A.  That was the senior exchange.  We could attract additional

21   investors, additional shareholders.

22   Q.  And what happened after the January 2000 presentation with

23   respect to 01's remote access technology?

24   A.  Well, Andrew continued developing it, and later on we

25   applied for the patent.

1   Q.  And when was this -- well, where did you apply for the

2   patent, sir?

3   A.  We applied for a patent here in the United States, and we

4   applied for one in Canada as well.

5   Q.  And when did you apply for the United States patent?

6   A.  That would be June 2000.

7   Q.  Did you do anything when the patent application was filed?

8   A.  Yes.  We are a public company.  We have a process in place

9   to put press releases out to inform our shareholders and the

10  public at large about significant events.  And that was a

11  significant event, and we put out a press release.

12  Q.  I'd ask that you look at Plaintiff's Exhibit 27.  It's in

13  your witness binder.

14      Mr. Stringer, I'd ask --

15  A.  Give me a second, please.

16  Q.  I'm sorry.

17  A.  You know what -- okay.  I have it.

18  Q.  I ask, Mr. Stringer, do you know what that is?

19  A.  Yes.  This is the -- sorry -- this is the press release we

20  made.

21          MR. ANTONETTI:  And I now move that into evidence, Your

22  Honor, Plaintiff's Exhibit 27.

23          MR. STONER:  I don't see the relevance, but no

24  objection.

25          THE COURT:  It is admitted.

1           MR. ANTONETTI:  Thank you.

2     BY MR. ANTONETTI: (Continuing)

3     Q.  Were there any other presentations in 2000 regarding the

4     remote access capability 01 was developing?

5     A.  Yes, there was, in September of 2000.

6     Q.  And did the company make an announcement regarding that

7     presentation?

8     A.  Yes, we did.

9     Q.  What sort of announcement did the company make?

10    A.  Well, we made a press release announcing the --

11    announcing -- well, it was a press release announcing an

12    upcoming press conference in respect of a live demonstration of

13    the remote access capabilities.

14    Q.  I ask you to turn in your binder to Plaintiff's Exhibit 15.

15    A.  Okay.

16    Q.  Mr. Stringer, do you know what that is?

17    A.  This is the press release we made at that time announcing

18    that press conference.

19          MR. ANTONETTI:  I would also move that into evidence,

20    Your Honor.

21          MR. STONER:  I object, Your Honor.  This is irrelevant.

22    It is wasting time.

23          MR. ANTONETTI:  I don't believe so, Your Honor, because

24    it demonstrates that an announcement regarding the technology

25    was, in fact, made to the public at large at that point --

1          THE COURT:  Objection overruled.

2          MR. ANTONETTI:  Thank you, Your Honor.

3   BY MR. ANTONETTI: (Continuing)

4   Q.  Who participated in the presentation in September of 2000?

5   A.  I did, as well as Andrew Cheung, our president.

6   Q.  What was presented at the September 2000 gathering?

7   A.  Well, we presented a live demonstration of our -- of the I'm

8   InTouch product.  And that was presented to a very large

9   audience, I would say about 150 people, downtown Sheraton.

10      And during that presentation, Andrew Cheung displayed it on

11  a screen in front of everybody.  And it was a demonstration

12  where he showed the capabilities, where he could get back to his

13  office computer, and he showed that.  And he then accessed his

14  computer and he sent an e-mail.

15      And in the audience was a senior executive from Research in

16  Motion.  That's the company that makes the BlackBerry, Mark

17  Guilbert.  And Mark stood up and he showed he received the

18  e-mail from Andrew.  And then he responded to that e-mail.  And

19  you could see it all on the screen.

20      So, it was a live demonstration of our product at that time.

21  Q.  And what happened after that demonstration occurred?

22  A.  Well, there was a lot of clapping and cheering.  People were

23  quite impressed.

24  Q.  And following that September 2000 presentation, what

25  happened?

1    A.  We were able to do a financing.  About two days later we did

2    a financing of about $10.5 million net proceeds.

3    Q.  And when did the I'm InTouch product first become

4    commercially available?

5    A.  It was made first commercially available at COMDEX to our

6    business partners, that would have been November 2000, and to

7    consumers in March 2001.

8    Q.  And what was COMDEX?

9    A.  COMDEX is -- was the preeminent, the largest trade show for

10   technology companies at that time.

11   Q.  And I would ask you take a look in your binder at

12   Plaintiff's Exhibit 16, Mr. Stringer.

13   A.  I have got it.

14   Q.  Did you do anything in connection with the COMDEX show?

15   A.  We made a press release announcing I'm InTouch.  That's what

16   this is.

17   Q.  And is that what Plaintiff's Exhibit 16 is?

18   A.  Yes, it is.

19          MR. ANTONETTI:  I move that into evidence, Your Honor.

20          MR. STONER:  Again, I don't see the relevance, but no

21   objection.

22          THE COURT:  Well, I am beginning to question it.

23          MR. ANTONETTI:  I don't have anything else --

24          THE COURT:  What they did to advertise their

25   products -- I thought we were getting to some kind of dollar

1   testimony here --

2          MR. ANTONETTI:  Yes, we are, Your Honor.

3          THE COURT:  Well, I think you ought to do the dollar

4   testimony first, and then go back and I can determine the

5   relevance of what you are trying to lead into --

6          MR. ANTONETTI:  Sure.

7          THE COURT:  -- because their advertising program has no

8   significance.

9          MR. ANTONETTI:  It does go to the knowledge that the

10  public has of the company, Your Honor, and others may have of

11  the company.  So, I will move on.  I hear you.

12  BY MR. ANTONETTI: (Continuing)

13  Q.  How did 01 plan to bring the I'm InTouch product to market,

14  Mr. Stringer?

15  A.  We planned to bring that to market two ways.  One, direct to

16  consumers, and the other through business partners.

17  Q.  And what type of business partnerships did 01 look to enter

18  into?

19  A.  Well, we looked to enter into partnerships with companies

20  that would either resell our products or, you know, would

21  partner with us and make it available to their customers on a

22  revenue sharing arrangement.

23  Q.  Now, as the CFO of 01, did you pay attention to what 01's

24  competitors were doing?

25  A.  Yes.  I did.

1    Q.  And who were the competitors in the market in 2000 for the

2    I'm InTouch service?

3    A.  There weren't any.

4    Q.  Now, did 01 enter into any business partnerships of the type

5    you described?

6    A.  Yes, we did.  We entered into one with Hitachi.

7    Q.  And did you enter into any other business partnerships with

8    other companies?

9    A.  Yes.  We entered into a number with other companies as well.

10   Q.  And can you identify any of those companies?

11   A.  Yes, I can.  We entered into a relationship with Research in

12   Motion.  We made an added feature functionality, I'm InTouch

13   Messenger, for their product.

14       We also worked with three of the largest Taiwanese

15   motherboard manufacturers where they would bundle our product

16   with a CD they were shipping with their motherboards, trial use.

17   And that would have been MicroStar, ECS and ASUSTeK.

18       As well as that we worked with Chello, a Dutch ISP cable

19   provider.  And Motorola Homesight.  They had a -- they had a

20   home monitoring system.  We provided the remote access

21   capabilities to that.

22       And there were others, but they were the better, the major

23   ones.

24   Q.  Can you tell me a little bit about what the arrangement was

25   with Hitachi?

1   A.  Yes.  I can.  Hitachi, we met at COMDEX 2000, and over the

2   next couple years developed a working relationship.  And we

3   signed an agreement with them whereby -- and this would have

4   been in 2002 -- where we would custom make our product, localize

5   it for the Japanese market in Japanese, and it would be a

6   look-and-feel product, look like a Hitachi product that was

7   called name -- it was called DoMobile.

8       And in return for that, they paid the engineering fees up

9   front and got exclusivity in Japan.  And in return, we received

10  30 percent of the revenue from customers.

11  Q.  And is the Hitachi arrangement in effect today?

12  A.  That particular one isn't, no.  There is another one in

13  place that is very similar.

14  Q.  Is the -- so the other arrangement is in effect today then?

15  A.  It is, that's for our corporate server edition.

16  Q.  Now, did there come a time when other competitors entered

17  the marketplace?

18  A.  Yes, there was.

19  Q.  When did that happen?

20  A.  That would have been in 2001 with GoToMyPC from Expertcity

21  at that time.

22  Q.  And apart from Hitachi, were there other relationships with

23  business partners similar to the Hitachi arrangement that you

24  attempted to enter into?

25  A.  Well, we had -- we attempted to enter into other

1    partnerships, yes.  One was with Verizon.

2    Q.  What was involved with the Verizon relationship?

3    A.  Well, the Verizon was a little more than just discussions,

4    it was fairly lengthy.  We spent about nine months working with

5    them.  And what it was, we were going to produce a product

6    customized for Verizon, it was going to be -- it was called the

7    Verizon Telecommute.  And it was our product, completely looked

8    like theirs.  We had to integrate it with their billing system,

9    their billing.  So, we talked to their billing people, we were

10   working there.

11       Working with their call center because they were going to

12   support it.  As well as working with the people, the graphics

13   people to make sure it looked the way they wanted to.  And then

14   they were going to set up the servers, so we had to work with

15   their data centers as well.

16   Q.  And were there competitors for the Verizon account?

17   A.  Yes, there was.  Expertcity.  So, GoToMyPC was a competitor.

18   Q.  And did 01 ultimately obtain the Verizon account?

19   A.  No, we didn't.

20   Q.  Why not?

21   A.  It is my understanding that while Verizon was more

22   comfortable working with us, they stated they were more -- they

23   preferred to go with Citrix who had just purchased Expertcity at

24   the time, or actually a few weeks earlier, and they were more

25   comfortable working with a larger company the size of Citrix.

1  Q.  Now, apart from the business partnerships you mentioned

2  earlier, direct sales to consumers, what did 01 intend to do at

3  that time with respect to sales to consumers?

4  A.  Well, our sales to consumers at that time was online.  We

5  were also selling through retail stores.  We had rejuvenated our

6  retail, which we had going very well with the Communicate! line.

7  And we were selling through CompUSA, Office Depot, and Staples,

8  three of the larger retail chains.

9  Q.  And when did 01 begin selling the I'm InTouch product to

10  consumers?

11  A.  Well, we made it available in March, as I said, 2001; but

12  through the retail chains, it would have been around in 2003.

13  Q.  Now, is the I'm InTouch product still sold to consumers

14  today?

15  A.  Yes, it is.

16  Q.  And how much does 01 sell the I'm InTouch product for today?

17  A.  Our list price for I'm InTouch is 99.95 U.S. and 99.95

18  Canadian.

19  Q.  And have you ever changed that list price?

20  A.  Only the Canadian.  At one time it was $135, it is now down

21  to the same price as the U.S. price.

22  Q.  And what other I'm InTouch products and services does the

23  company offer?

24  A.  Well, we have the I'm InTouch Server Edition, and then we

25  also have the I'm InTouch Meeting.

1  Q.  And what kind of product is I'm InTouch Meeting?

2  A.  I'm InTouch Meeting is online collaboration, that's the

3  ability to hold meetings online with a multiple of people.

4  Q.  And is that different from the other services you offer?

5  A.  Yes.  I'm InTouch is more of an access to your desktop

6  application.

7  Q.  And what does I'm InTouch Meeting do then?

8  A.  Well, I'm InTouch Meeting is online collaboration.  So, I'm

9  InTouch, you are accessing your PC to work as if you were there.

10 With the I'm InTouch Meeting, you're holding meetings where

11 maybe half dozen people could be online, on an online meeting.

12 Q.  And when was I'm InTouch Meeting first offered?

13 A.  That would have been in 2011.

14 Q.  And what is the list price for a subscription to I'm InTouch

15 Meeting?

16 A.  Just under $300.  299.95.

17 Q.  Has there ever been a different list price for I'm InTouch

18 Meeting?

19 A.  No, there hasn't.

20 Q.  And what is the list price for I'm InTouch Server Edition?

21 A.  Server Edition comes with five licenses and the

22 administration software, and that's -- the suggested list price

23 is $1,995.

24 Q.  And when did 01 first offer the I'm InTouch Server Edition?

25 A.  That would have been in 2005.

1    Q.  Now, Mr. Stringer, do you have any roles in addition to

2    being CFO of the company?

3    A.  Yes.  As I said, I also look after the direct sales force.

4    Q.  And when did you start supervising the direct sales force?

5    A.  That would have been in 2003.

6    Q.  And as the person responsible for the 01 sales force, do you

7    analyze data related to 01's sales?

8    A.  Yes, I do.

9    Q.  What sort of data do you analyze?

10   A.  Well, I analyze any sales that relate -- any data that

11   relates to sales, and that would include things like number of

12   subscribers, subscriber renewal rates, cancellations, trials,

13   and pay counts.

14   Q.  Do you do any analysis with respect to the price of your

15   products?

16   A.  Yes.  Yes, we do.  We look at average sales price.

17   Q.  And what do you mean by the term "peg count"?

18   A.  Peg count refers to the number of times -- it's the term we

19   use to determine the number of times you access the system,

20   access your computer.  If you have a peg count of five, it means

21   you have accessed the system five times.

22   Q.  How does peg count affect your analyses of the company?

23   A.  Well, first, if you look at conversion, conversion of a free

24   trial to a pay subscriber, the more you use the system or the

25   higher your peg count is, the higher likelihood is that you are

1   going to be a paying subscriber.

2       So, we use it to monitor usage, if you will.  And when I say

3   usage, I mean we just know that you're on.  We can't see what

4   you're doing, just that you have accessed the system.

5       And that's to, you know, determine the more you use it, the

6   more likelihood is that you will become a paying subscriber.

7       And we also look at it when you are a paying subscriber for

8   renewals, just to keep in touch with our customers.

9   Q.  And when did you first begin monitoring the peg count?

10  A.  That would have been around the time that I started with

11  looking after the sales force.  So 2003, 2004 time frame.

12  Q.  And is tracking the peg count important to 01?

13  A.  Yes, it is, as it's tracking the usage by your customers.

14  Q.  And do you also track the renewal of your customers'

15  subscriptions?

16  A.  Yes, we do.

17  Q.  Does the peg count relate at all to the renewal of your

18  customers?

19  A.  Well, the peg count helps with the conversion rate,

20  obviously, the conversion rate from a trial user to an active

21  trial user.  So, it helps there.

22      And with the peg count, I guess that -- that's your question

23  there, I think.

24  Q.  Yes.  Now, how does the system at 01 track the peg count for

25  trial users?

1  A.  Well, to do that, first I'll just give you a brief example

2  as to how it comes about.  When you request the download, you

3  know, you go to the Web site, you request a product and it -- at

4  that point you get a -- you are given a certificate number or

5  serial number, you click, and it downloads the software.

6      Then you are asked for your personal information, login

7  information, and that is unique to you.  And one of the things

8  you would look for would be a computer name.  So, that's a

9  unique identifier, your login.  So, you might use Brian's PC.

10 So, that stays with you.

11     That computer name is stored in a database along with the

12 peg count.  Okay.  So, they are stored together in a database.

13 And we only keep that for 90 days.  And the reason we keep it

14 for 90 days is real simple.  Well, I should say it is 90 days

15 after you cease to be a subscriber or on trial.  And the reason

16 being is the computer name is unique.

17     So, if you had Brian's PC locked up, nobody else could use

18 it.  So, you free it up, refresh the database, and we do that

19 every 90 days for people that are no longer registered on the

20 system.

21 Q.  And do you personally regularly monitor the peg count?

22 A.  Yes, I do.

23 Q.  Now, in your historical experience from 2003 to the present,

24 do you have an understanding of what percentage of users have a

25 positive peg count?

1    A.   Yes, I do.

2    Q.   What is that percentage?

3    A.   That would be 50 percent.

4    Q.   And what does that mean?

5    A.   That 50 percent represents the percentage of people that are

6    a trial user, the percentage that convert to be what we consider

7    to be an active user.  In other words, they have got a positive

8    peg count, they have used the system at least once.

9    Q.   Now, I'd ask that you take a look at what we have marked as

10   Plaintiff's Exhibit 38.

11   A.   Okay.

12   Q.   Have you ever seen the document that has been marked as

13   Plaintiff's Exhibit 38 before?

14   A.   Yes.  I have.

15   Q.   And what is Plaintiff's Exhibit 38?

16   A.   Well, Plaintiff's Exhibit 38, that was prepared in

17   conjunction with this litigation.  And it shows down the

18   left-hand side, excuse me, by year from 2004 up to 2010, it

19   shows our average selling price, our revenue or billings -- and

20   that's for our I'm InTouch product -- and the transactions, the

21   number of transactions.

22   Q.   And how did you compile the information contained in

23   Plaintiff's Exhibit 38?

24   A.   Okay.  Well, that's in the first -- that's the top part.

25   The second part is a hypothetical situation given the above

1   information.

2       And I would have compiled that from information, I would

3   have looked at our deferred revenue I'm InTouch sheets.  And for

4   the hypothetical, I would have used the historical 50 percent

5   rate that we just talked about.

6   Q.  Now, when are the deferred I'm InTouch revenue spreadsheet

7   documents generated?

8   A.  They are generated on a regular basis as part of our

9   business processes.

10  Q.  And when are the I'm InTouch channel performance documents

11  generated?

12  A.  The I'm InTouch channel performance documents, which were

13  also used there, they are generated, again, on a weekly basis.

14  And that's as part of our ongoing business processes.

15  Q.  And who is ultimately responsible for the I'm InTouch

16  revenue spreadsheets and the channel performance documents?

17  A.  That would be me, I am ultimately responsible as the CFO.

18  Q.  Now, are the I'm InTouch revenue spreadsheets, the channel

19  performance documents, the monthly sales sheets, regularly made

20  by the company?

21  A.  Yes, they are.

22  Q.  And did you use those records to prepare this chart?

23  A.  Yes.

24  Q.  And for what years did you review information for this

25  particular chart?

1   A.   That would be 2004 through 2010.

2   Q.   And are those records that you reviewed voluminous?

3   A.   Yes, I would say they are fairly volu- -- there is lots of

4   them.

5          MR. ANTONETTI:   Okay.   Your Honor, I intend to offer

6   Plaintiff's Exhibit 38.   I only am relying on the top portion of

7   the document.   I assume there may be an objection.   I am

8   prepared to offer the whole document, but if there is an

9   objection to any portion of it, I am prepared to offer only the

10  top segment of that document if that would satisfy any

11  objection.

12         MR. STONER:   Your Honor, I think it's irrelevant, but

13  if he wants to put in the top half of the document, no

14  objection.

15         THE COURT:   All right.

16         MR. ANTONETTI:   Thank you, Your Honor.

17         THE COURT:   The top part will be admitted.

18         MR. ANTONETTI:   If you could distribute Plaintiff's

19  Exhibit 38 A.

20  BY MR. ANTONETTI:   (Continuing)

21  Q.   Now, Mr. Stringer, could you explain what the top column ASP

22  means?

23  A.   ASP stands for average selling price.

24  Q.   And the column that begins with the words "transactions"?

25  A.   Transactions, that's the number of transactions.

1    Q.  And the column called Revenue?

2    A.  That's our revenue or billings, the amount that was received

3    from customers.

4    Q.  And are the dollars referred to in the average sales price

5    U.S. or Canadian dollars?

6    A.  They are U.S. dollars.

7    Q.  And why is that?

8    A.  The majority of our revenue is in U.S. dollars.

9    Q.  Okay.  Thank you.  We can set that one aside.

10        Now, Mr. Stringer, I would ask that you take now a look at

11   what has been marked as Plaintiff's Exhibit 39.

12   A.  I have it in front of me.

13   Q.  What is Plaintiff's Exhibit 39?

14   A.  Again, that's a sheet that was prepared in conjunction with

15   this litigation, and it's a summary by year from 2003 to 2010.

16   And it gives information that is relevant to our customers.  It

17   gives our subscribers, our trials.  And it also makes -- that's

18   on the left-hand side of the column.  And then it makes use of

19   the historical conversion rate from active trials to -- or,

20   sorry, from trials to active trials.

21   Q.  Now, Mr. Stringer, how did you compile the information

22   contained in Plaintiff's Exhibit 39?

23   A.  Well, the information in Exhibit 39, that was compiled from,

24   if you take a look before, there is several pages on this

25   spreadsheet, and that comes -- that summarized data from our I'm

1    InTouch daily or weekly channel performance sheets, which are

2    basically our weekly sales reports.

3        And in addition to that, I would have looked at one of

4    the -- one of the sheets on the peg count conversion, historical

5    conversion.

6    Q.  And just if you can very briefly walk us through the chart.

7    On the upper left-hand portion of that chart, what information

8    is there?

9    A.  Okay.  I will go quickly on this.  You get new

10   subscribers -- it is by year.  And you have got across the top,

11   you can envision that, there is new subscribers.  There is

12   trials that have expired.  The next is the rate, that's of new

13   subscribers to trials that have expired.  Okay.  Then you have

14   new trials for the period.  Subscribers cancelled.  And the rate

15   of subscribers cancelled to new subs.  Total subscribers as of

16   the end of each year.  The trials, new trials that took place

17   during the year.  And then the last column is the expired trials

18   as of the end of each year.

19   Q.  And then looking at the middle and far right on the first

20   page, Mr. Stringer, what does that information show?

21   A.  Then I show the historical 50 percent rate we just talked

22   about, and active trials expired then become the to date

23   expired, times the 50 percent, to give -- compared to our new

24   subscribers.  To give a rate of conversion of active trials to

25   new subscribers.  And that rate over that period of time is

B. Stringer - Direct                                              425

1    approximately 10 percent.

2    Q.  And then looking in the chart immediately below that, what

3    data is displayed there over the next few pages?

4    A.  That data comes from our I'm InTouch channel performance

5    sheets and shows new trials, expired trials, new subscribers,

6    subscribers cancelled, total subscribers, the trials, and then

7    there is three columns that are calculated on the spreadsheet.

8    Q.  Okay.  And just once more, I guess, where did the underlying

9    information you used to create Plaintiff's Exhibit 39 come from?

10   A.  As I say, these come from our I'm InTouch channel

11   performance sheets, our weekly sales sheets.

12   Q.  And I assume these documents, again, would be voluminous?

13   A.  They would be voluminous, yes, they would.

14           MR. ANTONETTI:  I now move Plaintiff's Exhibit 39 into

15   evidence, Your Honor.

16           THE COURT:  Any objection?

17           MR. STONER:  Your Honor, I, again, don't see the

18   relevance, and this document seems to include some of the same

19   sort of improper subject matter that Mr. Antonetti removed from

20   the prior document.  If he removes it from this one, I have no

21   objection.

22           MR. ANTONETTI:  If you let me know what you object to

23   specifically.  That right side of the page?

24           Your Honor, we are prepared to remove that part of it

25   from the document as well, and we will do so.

1          THE COURT:  All right.  It will be admitted with that

2    redaction.

3          MR. ANTONETTI:  Thank you, Your Honor.

4    BY MR. ANTONETTI: (Continuing)

5    Q.  Okay.  Now, just a few more questions, Mr. Stringer.  As

6    CFO, do you track what the remote access market is doing?

7    A.  Yes, I do.

8    Q.  And what sort of things do you track in the remote access

9    market?

10   A.  Well, I take a look at who is in the remote access market.

11   And then I would talk to our salespeople and get information

12   about the market in general.

13   Q.  Do you review any market research reports?

14   A.  Well, yes.  As I say, take a look at what's -- I take a look

15   at trade publications, I talk to our salespeople on a regular

16   basis, and I look at analyst reports like the ones we have used

17   in the past which come from IDC, International Data Corporation.

18   Q.  And have your competitors appeared in such reports?

19   A.  Yes, they have.

20   Q.  I would like to mark for identification only -- or it is

21   premarked already -- Plaintiff's Exhibit 35.

22       Mr. Stringer, have you ever seen what has been marked for

23   identification as Plaintiff's Exhibit 35 before?

24   A.  Yes, I have.

25   Q.  What is it?

1    A.   It is a Vendor Needs and Strategies Report published by IDC,

2    and they are a data research company.  And it has got -- well,

3    just that, vendor needs and strategies.  It's an overview of the

4    remote access services market analysis and the different

5    companies in it.

6    Q.   Did you review this IDC report as part of your duties for

7    01?

8    A.   Yes, I have looked at this report before.

9    Q.   Okay.  Now, you also mentioned, I think, that you were

10   responsible for raising money for the company.  What is involved

11   in raising money for the company?

12            THE COURT:  What does this have to do with

13   infringement?

14            MR. ANTONETTI:  It does not have to do with

15   infringement, Your Honor.  It has do to with the laches defense

16   that LogMeIn has asserted.

17            THE COURT:  Raising money has nothing to do with it.

18   If you want to ask him about the financial condition of the

19   corporation, there has been someone who has testified that there

20   wasn't money available.

21            MR. ANTONETTI:  That's fine, Your Honor.

22            THE COURT:  If that's what you want to go at, fine.

23   But how they raised money and what fund raisers they had is

24   irrelevant.

25            MR. ANTONETTI:  Okay.

1   BY MR. ANTONETTI: (Continuing)

2   Q.  Now, if I could move ahead then, Brian.  Now, has the

3   company spent money in your time as the CFO?

4   A.  Yes, we've spent lots of money.

5   Q.  What have you spent money on as a company?

6          THE COURT:  Now, we are going through the same thing.

7   I don't want to know all the expenses of the company nor does

8   the jury.

9          MR. ANTONETTI:  Okay.

10         THE COURT:  If they have a money problem that has

11  something to do with infringement, let's talk about that, but

12  nothing else.

13         MR. ANTONETTI:  Okay, Your Honor.

14  BY MR. ANTONETTI: (Continuing)

15  Q.  Mr. Stringer, when was the patent received?

16  A.  We received the patent in August of 2005.

17  Q.  And when did 01 learn it would receive the patent?

18  A.  That would have been a few months earlier.

19  Q.  Now, what did you believe that the patent would allow 01 to

20  do?

21  A.  Well, we believed the patent would give us exclusivity in

22  the jurisdiction, which is the United States, for a period of

23  time.  We also figured that we could use leverage on the patent

24  to attract business partners.

25  Q.  Okay.  And what did you mean by leveraging your product?

1   A.  Well, by leveraging our patent, we felt we could engage in

2   discussions with business partners to get them, you know -- two

3   aspects.  Resell our product.  The other side would be, you

4   know, we wanted to protect our intellectual property, to license

5   it in conditions where it made sense.

6       We also thought at the time about there is -- you know,

7   business partners include possible acquisitions of the company.

8   Q.  And did you talk to any companies about a possible

9   acquisition?

10  A.  Yes, we did.  We talked to Citrix, for one.

11  Q.  And did you also -- what did you mean about protect -- well,

12  wait a minute.  Let me back up one step.

13      Did anything come of the discussions with Citrix?

14  A.  No, it didn't, nothing became of them.

15  Q.  And what steps did 01 take after that?

16  A.  With respect to --

17  Q.  Citrix.

18  A.  Citrix?  Well, we sued them for patent infringement in 2006,

19  February 2006.

20  Q.  When did 01 institute the suit against -- oh, you said

21  February of 2006.  Is that case over?

22  A.  No, it's not.

23  Q.  At what stage is that case?

24  A.  That case was stayed in 2008.

25  Q.  And why was it stayed?

1    A.   It was stayed pending completion of the reexam of the patent

2    by the U.S. Patent Office.

3    Q.   And what was the result of that reexamination?

4    A.   The confirmation of the validity of the patent.

5    Q.   And were you able to do anything as a result of that patent

6    being confirmed?

7    A.   Yes.   That patent was confirmed in July of 2010, and we were

8    able to raise five-and-a-half million dollars within a month

9    following receipt of that.

10   Q.   Now, let's talk very briefly, who are 01's competitors?

11   A.   Our main competitors are LogMeIn and Citrix.

12   Q.   Have you studied how LogMeIn sells its products?

13   A.   I am somewhat familiar with it.

14   Q.   Okay.   And are you aware of what products LogMeIn sells?

15   A.   Yes.

16   Q.   And what are those products?

17   A.   Well --

18            MR. STONER:   Object, Your Honor.   We have already heard

19   what products LogMeIn sells.

20            THE COURT:   Yeah.   Is there something specific that

21   adds --

22            MR. ANTONETTI:   It is more of a foundational question,

23   I can move on, Your Honor.

24            THE COURT:   All right.   Objection sustained.

25   BY MR. ANTONETTI: (Continuing)

1  Q.  Do you have an awareness of what prices LogMeIn charges for

2  its products?

3  A.  Yes, I do.

4  Q.  Do you know what it charges for LogMeIn Pro?

5  A.  The last time I checked, I believe it was 69.95.

6  Q.  And what about the Join.me product?

7  A.  That is 149, I believe.

8  Q.  And what do they charge for LogMeIn Free?

9  A.  Nothing.

10  Q.  And does that impact your business?

11  A.  Yes, it does.

12  Q.  How does it impact your business?

13  A.  Well, it is very hard to compete with free, it is very

14  difficult.

15  Q.  Now, Mr. Stringer, when did 01 first learn about LogMeIn?

16  A.  That would have been shortly after they started, sometime in

17  2004.

18  Q.  And we are here today because 01 has sued LogMeIn.  When did

19  01 file suit against LogMeIn?

20  A.  September 2010.

21  Q.  Now, if 01 knew about LogMeIn in 2004, why didn't you sue

22  LogMeIn then?

23  A.  Well, first you need the patent, and we didn't get the

24  patent until 2005.

25  Q.  Okay.  Well, why didn't 01 sue LogMeIn between 2005 and

1   2010?

2   A.  Well, there is a couple of reasons.  First, at the time we

3   didn't have -- you've asked this, but we didn't have a lot of

4   money, and it takes money and it takes a patent.  You need them

5   both at the same time.

6       In essence, it wasn't until September of 2010 that we had

7   both, that we had a patent and we had the money.

8       In addition, in August of 2005 when we did receive it,

9   Citrix was by far the largest player in the market.  They

10  represented over -- about 85 percent of the market, probably

11  more.  LogMeIn had started with their freemium model, yes, and

12  we acknowledged that and we knew they were there.  But we didn't

13  have the finances to take on both parties at the same time, we

14  just didn't.

15  Q.  And did something change in 2010?

16  A.  Yes, that's what I say, when we raised the money, we now had

17  sufficient funds to initiate the lawsuit against LogMeIn, which

18  we did as quick as we could.

19  Q.  And how much money did you raise then again?

20  A.  That was five-and-a-half, $5.5 million.

21  Q.  Now, two final questions for you, Mr. Stringer.  Did you

22  ever consider giving away the I'm InTouch product for free?

23  A.  No.

24  Q.  And why not?

25  A.  Well, our business model is different than that.  And if

1    you -- you know, first off, if you are using the freemium model

2    or anything like it, you need lots of money.  And we didn't have

3    it.  I mean, you need money.  You have got to keep the lights

4    on, you have got to keep paying your bills while you are waiting

5    for the potential for something to happen.  Okay.

6        And we just -- you know, we just didn't have it.  We believe

7    in a business model that is different, and that's that.

8             MR. ANTONETTI:  I am prepared to pass the witness, Your

9    Honor.  Thank you.

10            THE COURT:  All right.  Cross-examine.

11            MR. STONER:  May I proceed, Your Honor?

12            THE COURT:  Yes.

13            MR. STONER:  Thank you.

14        CROSS-EXAMINATION

15   BY MR. STONER:

16   Q.  Mr. Stringer, that Ohio lawsuit against Citrix is still

17   stayed, right?

18   A.  That's correct.

19   Q.  Because the reexamination is not over, is it?

20   A.  We received the -- I think it's called a right to appeal

21   notice?  Is that what it's called?  We received that in 2010.

22   And Citrix has appealed that decision, yes.

23   Q.  And the Ohio court is still keeping the lawsuit stayed,

24   right?

25   A.  We have requested that be lifted, but we've not heard back.

1  Q.  And the Patent Office still does not have the '888 patent,

2  does it?

3          MR. ANTONETTI:  Objection, Your Honor, scope.

4          THE COURT:  What does that have to do what we're --

5  this witness?

6          MR. STONER:  Well, he's talking about the

7  reexamination.  I just want the record to be clear about the

8  status of proceedings.

9          THE COURT:  All right.

10 A.  Not that I am aware of.

11 BY MR. STONER: (Continuing)

12 Q.  Okay.  Now, Mr. Stringer, let's go back to talk about the

13 history of your I'm InTouch product.  You talked about some of

14 that before, correct?

15 A.  Yes.

16 Q.  There are some things you did not mention, true?

17 A.  I answered the questions, but go ahead.

18 Q.  Well, the I'm InTouch product was introduced commercially in

19 2001, March 2001, right?

20 A.  It was made available to consumers then, yes.

21 Q.  And it was not effective in capturing market share, correct?

22 A.  Not in capturing.  No, we didn't capture the market share

23 that we would have looked, that's correct.

24 Q.  You didn't capture market share in 2001, correct?

25 A.  Well, that's correct.

1    Q.  Or in 2002, right?

2    A.  The same.

3    Q.  Or in 2003?

4    A.  We didn't capture the market share we would have liked.

5    Q.  Or in 2004?

6    A.  That's correct.

7    Q.  In all of that time, LogMeIn wasn't even in the market,

8    right?

9    A.  That's correct.

10   Q.  There was no free product in the market, right?

11   A.  Our competition at that time was Expertcity GoToMyPC, and

12   the market was in its infancy stage.

13   Q.  And no free product in the market, right?

14   A.  LogMeIn wasn't there, that's correct.

15   Q.  You could have offered a free product, but chose not to,

16   correct?

17   A.  I think as I testified, we didn't have the money and

18   wherewithal and it's not our business model.

19   Q.  Mr. Stringer, you as well as other people, have given a

20   sworn deposition in this case, have you not?

21   A.  Yes, I believe so.

22   Q.  And if I could, Your Honor, I would pass out the witness

23   binder and the deposition binder of the witness.

24       Do you have your deposition, sir?

25   A.  Yes.

1   Q.  Dated February 2011, correct?

2   A.  Yes.

3   Q.  It was under oath, correct?

4   A.  Yes.

5   Q.  You told the truth?

6   A.  Yes.

7   Q.  Turn to page 161.

8   A.  Okay.

9   Q.  Do you have it?

10  A.  Yep.

11  Q.  You were asked this question:  Is there any reason that 01

12  could not offer a free product?

13      Do you see that?

14  A.  No, just a second.

15  Q.  Line 8.

16  A.  Yep, I see it.

17  Q.  Your answer was:  I can't say why anybody can't offer --

18  give away something for free.

19      Do you see that?

20  A.  Yep, that's true.

21  Q.  That's true.  The next question:  So, if I understand what

22  you're saying, 01 could have offered a free product, but just

23  hasn't done so?

24      Do you see that?

25  A.  Yes, I do.

1   Q.   What was your answer?

2   A.   My answer there is:  That's correct.

3   Q.   And it is correct, right?

4   A.   You can always give something away if you want.

5   Q.   01 could have offered a free product, but just hasn't done

6   so, correct?

7   A.   You can always give something away if you want.  But there's

8   other -- there's other -- there's always a choice.  That's

9   what -- that's what this society is about.  But, you know, you

10  have to have certain conditions, that you need -- you need the

11  finances in place to do so.

12  Q.   You chose not to do so?

13  A.   That's correct.

14  Q.   Now, in 2001 your company had a retail business, and then

15  you had your new I'm InTouch product, right?

16  A.   That's correct.

17  Q.   And the retail business was not doing so well, correct?

18  A.   That's correct.  It was coming down, yes.

19  Q.   So, you had decided, as a consequence, to focus your entire

20  business on the I'm InTouch product, right?

21  A.   I believe in our public statements we've -- we've stated

22  that our strategic direction was to invest in the I'm InTouch

23  product offering, yes.

24  Q.   And it didn't do very well, right?

25  A.   I don't know about that.  I mean, when you say didn't do

1    very well, what do you mean?

2    Q.  Your company has not been profitable in a single year since

3    2001 when you focussed on the I'm InTouch product, right?

4    A.  That's correct.

5    Q.  And there are many competitors out there, right?

6    A.  The two main competitors we have are LogMeIn and Citrix.

7    Q.  You believe in competition, don't you, sir?

8    A.  I believe in fair competition.

9    Q.  Fair competition is what provides consumers choice about

10   what to buy, right?

11   A.  That's correct.

12   Q.  You said you wanted exclusivity.  You wanted to be a

13   monopoly, right?

14   A.  No.

15   Q.  You don't have a problem with people competing with you,

16   right?

17   A.  Well, of course not.

18   Q.  All right.

19   A.  But if you remember what I said is I wanted exclusivity.

20   Isn't that what the patent system is about, to provide

21   exclusivity for the technology that you've invented for a given

22   time in its jurisdiction?

23   Q.  There are ways of doing remote access without using the '479

24   patent, aren't there?

25   A.  The '479 patent is one way of doing remote access.

1   Q.  And there are other ways of doing it, right?

2   A.  Well, obviously.

3   Q.  In the 12 years since you've focussed your business on your

4   I'm InTouch product, you've lost customers to many companies,

5   haven't you?

6           MR. ANTONETTI:  Objection, relevance.

7           THE COURT:  Objection overruled.

8   A.  I am sorry, I didn't --

9   BY MR. STONER: (Continuing)

10  Q.  In the 12 years since you've focussed your business on the

11  I'm InTouch product, you've lost customers to many different

12  companies, right?

13  A.  We've lost business to our competitors, yes.

14  Q.  GoToMyPC is one of them, correct?

15  A.  Yes, we've lost some business to them.  Not much, but we

16  have lost some business to them, yes.

17  Q.  VPN?

18  A.  Yes, some of our customers have gone to a VPN.

19  Q.  pcAnywhere?

20  A.  Yes, we've -- some of our customers have gone to pcAnywhere,

21  as antiquated as it is, but they have, yes.

22  Q.  Microsoft Remote Access?

23  A.  Well, I think it's Remote Desktop, but, anyways, okay.

24  Q.  And today 01 Communique has about 2,000 subscribers for all

25  of your remote access products, is that true?

1    A.   That would be a good ballpark number, I guess.

2    Q.   2,000.  LogMeIn has about 45 million, correct?

3    A.   I don't know.  Subscribers?

4    Q.   Yes.

5    A.   Okay.

6    Q.   20,000 times more, correct?

7    A.   Well, it's a lot more.

8    Q.   How many subscribers does Citrix have?

9    A.   That I don't know.

10   Q.   Do you monitor the market?

11   A.   I do.

12   Q.   How many subscribers does Web X have?

13   A.   I don't know.

14   Q.   Millions, right?

15   A.   Well, you know, you're -- you're now getting into using

16   large numbers.  If you're asking me to be specific, I can't.  I

17   know that Citrix has a lot.  I know they've got more revenue

18   than LogMeIn.  And I -- Web X, I'm not sure, but they've got

19   quite a bit of revenue as well.

20   Q.   Now, let's talk about LogMeIn.  Okay?  You were notified --

21   you supervised the sales force, correct?

22   A.   Yeah, that's correct.

23   Q.   So, you got constant reports from the sales force about what

24   LogMeIn was doing in the market, right?

25   A.   Yes.

1   Q.  And you made business decisions based upon that, those

2   notifications, right?

3   A.  Well, yes.

4   Q.  If you could look in your binder at Defendant's Exhibit 64.

5   A.  Okay.  Hang on a sec, please.

6       Okay, I see that.

7   Q.  Do you have that before you?

8   A.  I do.

9   Q.  It's a memo you received from Rupinder Saini May 31, 2004,

10  correct?

11  A.  That's correct.

12  Q.  He's telling you about LogMeIn.com right?

13  A.  Actually it's her.  It's a she.  But, anyways, go ahead.

14  Q.  She was telling you about LogMeIn.com, right?

15  A.  Correct.

16  Q.  May 31, 2004, is right after LogMeIn came on the market,

17  right?

18  A.  Yeah, it's in that timeframe.

19  Q.  And she says:  I have attached comparison between

20  LogMeIn.com and IIT.

21      Do you see that?

22  A.  Yes, I do.

23  Q.  IIT is I'm InTouch?

24  A.  Yes.

25  Q.  And she says:  LogMeIn has three advanced features which we

1    do not have.

2        Correct?

3    A.   That's correct.

4    Q.   So, you knew that as of --

5            MR. ANTONETTI:  Your Honor, I object if he's going to

6    simply be reading this document in as it constitutes hearsay.

7            MR. STONER:  It's a party admission, Your Honor.

8            THE COURT:  Objection overruled.

9            MR. STONER:  I offer Defendant's Exhibit 64.

10           MR. ANTONETTI:  I'm sorry, 64.  Also, Your Honor, as

11   per the Court's ruling, he is crossing him on a document that

12   Mr. Stringer did not write.

13           MR. STONER:  I'm not cross-examining him on what the

14   document means.  I'm asking -- this is simply for notice, Your

15   Honor, that he was well aware of what LogMeIn was doing and

16   never sent any notice to LogMeIn of a problem, which is highly

17   relevant.

18           THE COURT:  Well, that's probably relevant, but if

19   you're using this document to do it, I'm not sure that that's

20   proper.  Why don't you just ask your question instead of trying

21   to use a document that he didn't author.

22           MR. STONER:  Okay.

23           THE COURT:  Unless you could some other way show that

24   he has received it or it is relevant.

25   BY MR. STONER: (Continuing)

Case 1:10-cv-01007-CMH-TRJ   Document 500   Filed 03/27/13   Page 124 of 139 PageID# 10073
B. Stringer - Cross                                                    443

```
 1   Q.  Well, you did receive Defendant's Exhibit 64, did you not?

 2   A.  Well, it says I did, it is marked from Rupinder to me.

 3   Q.  It was addressed to you, correct?

 4   A.  It's an e-mail to me.

 5   Q.  In your capacity as supervisor of the sales force, right?

 6   A.  I don't know what capacity she sent it to me.  I mean,

 7   that's not a fair question.

 8   Q.  You were the supervisor of the sales force back in May of

 9   2004?

10   A.  Yes.

11   Q.  And you relied upon these notices from your sales force to

12   make decisions for the company, correct?

13   A.  This would be an internal e-mail that I received.  It was

14   also sent to Brian Howden, who was VP of marketing at the time.

15   And I probably would have deferred something like this to him

16   because this is a marketing e-mail.  It talks about features, et

17   cetera.  So, it's something our marketing people would have

18   looked at.

19   Q.  Did you read the memo at the time?

20   A.  Yeah, I probably would have at the time, yeah.  I am not

21   debating that.

22        MR. STONER:  Your Honor, I would offer Defendant's

23   Exhibit 64.

24        THE COURT:  All right, any objection?

25        MR. ANTONETTI:  I assert my previous objection, Your
```

1   Honor.

2            THE COURT:  Objection overruled.  It will be admitted.

3   BY MR. STONER: (Continuing)

4   Q.  So, May 2004 you knew LogMeIn was competing with you, right?

5   A.  That's correct.

6   Q.  And they continued to compete with you, right?

7   A.  They still do.

8   Q.  And by 2008, LogMeIn was one of your biggest competitors, if

9   not the biggest in the market, right?

10  A.  That's correct.

11  Q.  And you continued to receive repeated notices from your

12  sales force and customers that you were losing customers to

13  LogMeIn, did you not?

14  A.  I received some -- I received lost business reports that we

15  had lost business to LogMeIn, yes.

16  Q.  Could you look at Defendant's Exhibit 60.

17           MR. ANTONETTI:  Your Honor, I object to this document

18  on the grounds of double hearsay.

19           MR. STONER:  Your Honor, I don't know what he means by

20  that.  It's a party admission sent to Mr. Stringer by another 01

21  employee.

22           MR. ANTONETTI:  It relates to a communication given to

23  another -- but from someone on the outside to a 01 employee and

24  then given to Mr. Stringer.  I believe he's going to offer the

25  entire document into evidence, and that would constitute double

1    hearsay, or at least hearsay with respect to the outside party.

2              MR. STONER:  Your Honor, again, it's offered for notice

3    to Mr. Stringer.

4              MR. ANTONETTI:  And, Your Honor --

5              THE COURT:  Well, you can ask him about notice, but

6    this is not addressed to him.  Unless he knows something about

7    this note -- you can ask him if he's seen it, knows about it.

8              MR. STONER:  Surely.

9    BY MR. STONER: (Continuing)

10   Q.  Mr. Stringer, Defendant's Exhibit 60 is addressed to you, is

11   it not?

12   A.  Yes, it is.

13   Q.  You and no one else, correct?

14   A.  That's correct.

15             THE COURT:  It is, I'm sorry.

16   BY MR. STONER: (Continuing)

17   Q.  Mr. Camara was an account manager for 01 Communique?

18   A.  That's correct.

19   Q.  And he's reporting to you about a lost customer, correct?

20   A.  That's correct.

21   Q.  And he reports to you what happened, right?

22   A.  Well, yeah, he said that the customer is on trial for I'm

23   InTouch, but it went with LogMeIn.  But I note that, you know,

24   one --

25   Q.  What else did he say?

B. Stringer - Cross                                                       446

1  A.  Well, hang on.  It -- I also note here that this guy is from

2  the UK.  And it doesn't surprise me because we don't -- we don't

3  have any servers in the UK, so our speed would be slower.  That

4  doesn't surprise me.

5  Q.  Well, he says:  Was on trial for I'm InTouch, went with

6  LogMeIn.  He found the speed faster, the resolution better, and

7  overall easier to use?

8  A.  Yeah.  And I would say -- and I would say exactly what I

9  just said before.  That doesn't surprise me because this guy is

10 in the UK.  We don't have servers there, so you would expect to

11 have better performance with somebody who's got servers in the

12 UK.

13         THE COURT:  All right, objection overruled, and I will

14 admit that.  I misread the top of that.

15 BY MR. STONER:  (Continuing)

16 Q.  You got other notices like this too from people who were not

17 in the UK, correct?

18 A.  Well, I get lots of notices.  And here's one of the things I

19 asked all our sales reps, is to inform me every time they get --

20 every time they lose a customer, I meet with them because I want

21 to know why.

22     I also talked to all our sales reps, any bad e-mails they

23 get, we want to know why.  That's -- we care about our

24 customers.  We want to do what we can to improve customer

25 relations.

1   Q.  Look at Defendant's Exhibit 63.

2   A.  Sure.

3         MR. ANTONETTI:  Your Honor, I would renew my objection

4   both on relevance and cumulative grounds.

5         MR. STONER:  Your Honor --

6         THE COURT:  No, he's -- he's testified about the

7   business that's been lost and why it was lost.

8         MR. ANTONETTI:  Very well, Your Honor.

9         THE COURT:  They have a different view of why they lost

10  it than you all do.

11        MR. ANTONETTI:  Very well.

12  BY MR. STONER: (Continuing)

13  Q.  Mr. Stringer, Defendant's Exhibit 63 is another report you

14  got from Mr. Camara?

15  A.  That's correct, yep.

16  Q.  About a lost customer, correct?

17  A.  Correct.

18  Q.  In June 2008, correct?

19  A.  That's correct.

20  Q.  About someone who was, quote, on trial for I'm InTouch, went

21  with LogMeIn Pro, found it easier to use, unquote, correct?

22  A.  That's correct.

23  Q.  So, Pro is a paying product, correct?

24  A.  As I understand it.

25  Q.  You didn't lose out to a free product, here you lost to a

1    paying product, right?

2    A.  Well, that's what Derek is saying or that George Stepanenko

3    said.  I don't know.  I have no reason to believe or disbelieve

4    it.

5            MR. STONER:  Your Honor, I would offer Defendant's

6    Exhibit 63.

7            THE COURT:  All right, it is admitted.

8            MR. ANTONETTI:  Subject to my objection.

9    BY MR. STONER: (Continuing)

10   Q.  Turn to Defendant's Exhibit 197.

11       This is another report to you, Mr. Stringer, from Mustafa

12   Jaffer, correct?

13   A.  That's correct.

14   Q.  Is it Mr. Jaffer or Ms.?

15   A.  No, it's Mr.

16   Q.  Mr. Jaffer was an 01 employee, correct?

17   A.  Correct.

18   Q.  He's reporting to you about another lost customer, correct?

19   A.  Correct.

20   Q.  He says:  I've just lost a customer, Lyden Security Systems,

21   who has been using I'm InTouch for three years, paying 99.95

22   annually.  He just moved to LogMeIn because he had problems with

23   remote printing.

24       Correct?

25   A.  Yeah, I can read it.

B. Stringer - Cross                                                  449

1   Q.  This was in December 2008, correct?

2   A.  Correct.

3           MR. STONER:  I would offer Defendant's Exhibit 197.

4           MR. ANTONETTI:  Your Honor, I renew my objection, also

5   on the grounds of Rule 403 as well, and cumulative.

6           THE COURT:  All right, it is admitted.

7   BY MR. STONER: (Continuing)

8   Q.  Turn to Defendant's Exhibit 198.

9       Do you have that?

10  A.  Okay, I do.

11  Q.  This is an e-mail your customer service department received,

12  correct?

13  A.  That's what it says.

14  Q.  You saw it at the time, did you not?

15  A.  I don't know.  Am I on here somewhere?  This doesn't look

16  familiar to me, so I can't tell you that, I don't know.

17  Q.  Your company received it?

18  A.  Well, it's Dear Customer Service.  It's sent to

19  marketing@01.com.  That's where it's sent.  So, I would assume

20  it went to our company.

21  Q.  It says they couldn't install your --

22  A.  Your question was had I received it, and I said I don't

23  know.

24          MR. ANTONETTI:  For that reason, Your Honor, I would

25  object.  Again, this is a document --

1              THE COURT:  Objection sustained.

2              MR. ANTONETTI:  Thank you, Your Honor.

3    BY MR. STONER: (Continuing)

4    Q.  One more, Mr. Stringer.  This one was sent to you,

5    Defendant's Exhibit 196.

6    A.  Okay.  Hang on, let me get there, please.

7         196.  Okay.  What have we got here?  Okay.

8         Yeah, I know this guy, We Care Computers.  He's got a --

9    he's one of our best customers.

10        Go ahead, please.

11   Q.  That's -- we have another -- another super frustrated

12   client?

13   A.  Oh, yeah, that's right.  And I hear about from We Care.  I'm

14   glad you picked this one.  He's one of our best customers.

15   Q.  Mr. Jaffer reports to you:  Fortunately, I had installed

16   LogMeIn, which ended up saving us more embarrassment.

17        You got that report, right?

18   A.  Yeah, I don't necessarily buy that issue though with this

19   guy because We Care Computers is a long-standing customer.  He's

20   constantly back and forth to try to get discounts on the

21   premium.

22   Q.  Well, Mr. Stringer, the point is, after getting all of these

23   reports and seeing LogMeIn competing with you in the business,

24   from 2004 until you filed a lawsuit you never complained to

25   LogMeIn whatsoever about any patent, any infringement, any

1   unfair competition, anything at all, right?

2   A.  Well, actually I do also get a lot of pretty good e-mails

3   from customers too, but that's a side.  But on your -- the

4   question you just asked, that's right.  We -- we did not contact

5   them until -- and I think I already testified to that.  We did

6   not contact them about the infringement until September 2010.

7   Q.  And there's a reason for that, isn't there?

8   A.  I think I gave that reason, didn't I?

9   Q.  It's because they don't infringe?

10  A.  I never said that.

11  Q.  Well --

12  A.  You woke me up there.

13  Q.  Well, Mr. Stringer --

14  A.  Sorry.

15  Q.  Mr. Stringer, you said you're the chief financial officer of

16  01, right?

17  A.  I am.

18  Q.  Correct?

19  A.  That's correct.

20  Q.  It's a publicly traded company?

21  A.  It's a publicly traded company.

22  Q.  You have fiduciary duties to the company, correct?

23  A.  I certainly do.

24  Q.  You have fiduciary duties to your shareholders, right?

25  A.  I certainly do.

1   Q.  And you -- one of those duties is to protect your company

2   against unfair competition, right?

3   A.  Where did you read that?

4   Q.  What that's?

5   A.  Are you quoting securities law now?

6   Q.  Do you agree you have that duty?

7   A.  To protect my -- to protect what?

8   Q.  To protect your company from unfair competition.

9   A.  No.  I have a duty to -- as the CFO of the company, I report

10  to the president, and also I work with the board of directors.

11  And our duty is to our shareholders, to make sure we maximize

12  shareholder value.

13  Q.  And protect -- and maximizing shareholder value means

14  protecting your company from unfair competition, right?

15  A.  That's your interpretation.

16  Q.  Well --

17  A.  My job is to look after -- our job is to grow our company as

18  we -- as best we can.

19  Q.  But you didn't think, even though LogMeIn was hurting your

20  business, you had any duty to try to stop it, did you?

21  A.  I didn't say that.

22  Q.  Well --

23  A.  You said I had a fiduciary duty to do so.  That's what you

24  said.

25  Q.  You had a reason --

1    A.  And I am telling you I disagree with you.

2    Q.  Did you have a -- did you have a fiduciary duty to protect

3    your business?

4    A.  We have a duty to grow our business.

5    Q.  And you never said word one to LogMeIn about any problem

6    until you filed a lawsuit, right?

7    A.  Well, that's correct.

8    Q.  Now, let's see what happens next.  In September 2010 you

9    sued LogMeIn, right?

10   A.  That's correct.

11   Q.  At that time LogMeIn was doing pretty well in the market,

12   right?

13   A.  They were -- well, they had gone public.  They seemed to be

14   doing well from what I could see.

15   Q.  I'm InTouch was not doing so well, correct?

16   A.  Well, as I say, I'm InTouch, we at -- well, excuse me.  I'm

17   InTouch, you know, we were doing as well as we could.

18   Q.  You wanted to take some of LogMeIn's success, isn't that

19   true?

20   A.  No.  We felt that with the patent we had and the money we

21   had spent to get the patent, to continue on with our business,

22   we felt we deserved, we had earned the patent and what goes with

23   it.

24   Q.  Turn to Defendant's Exhibit 157, which is already in

25   evidence.

B. Stringer - Cross                                         454

```
 1   A.   Okay.  Just give me one sec, please.

 2        Okay, I've got it.

 3   Q.   This is a press release you put out?

 4   A.   Okay.

 5   Q.   Correct?

 6   A.   That's correct.

 7   Q.   The day that LogMeIn -- that you sued LogMeIn, correct?

 8   A.   That's correct.

 9   Q.   You're listed as the company contact, correct?

10   A.   That's correct.

11   Q.   You announced to the world you've sued LogMeIn, correct?

12   A.   That's correct.

13   Q.   And you say why, right?

14   A.   I'm sorry?

15   Q.   You say why?

16   A.   Why we sued them?

17   Q.   Yes.

18   A.   I think that's here, the company is seeking past, back to

19   the issue date of the patent, and future damages, as well as the

20   trebling of damages for willful infringement and injunctive

21   release.

22   Q.   Injunctive relief?

23   A.   Injunctive --

24   Q.   Trying to get LogMeIn out of the market, right?

25   A.   We are trying -- we are looking for injunctive relief, yes,
```

B. Stringer - Cross                                                    455

1   as part of --

2   Q.  You are looking for an injunction to stop LogMeIn from

3   selling any products or giving any products away, aren't you?

4   A.   That's what an injunction is, yes.

5   Q.  All the people who paid for LogMeIn, 45 million people, all

6   the free people, you want to shut it all down, right?

7   A.   We're looking for injunctive relief.  If you're asking me

8   does LogMeIn infringe, we believe they do.  And we're looking --

9   we're looking for -- we believe we're entitled to be paid for

10  what they're giving away.  It's our technology and they're

11  giving it away.  They've made a significant amount of money out

12  of this.

13  Q.  And you want to take that all off the market so the only

14  choice people have is 01, right?

15          MR. ANTONETTI:  Objection, Your Honor, argumentive.

16          THE COURT:  That is asked and answered.  Objection

17  sustained.

18  BY MR. STONER: (Continuing)

19  Q.  The next --

20  A.   I didn't hear, I am sorry.

21  Q.  Looking again at Defendant's Exhibit 157, you say why you

22  sued.  It's quoting Mr. Cheung saying:  Our plan is to

23  participate in the growth of the remote access and

24  communications industry by leveraging our patents, right?

25  A.   That's correct.

B. Stringer - Cross                                               456

1   Q.  Leveraging your patents means suing people, right?

2   A.  No, not necessarily.  Leveraging our patents means this.  We

3   have a product, we spent a lot of money, we put a lot of effort

4   into it.  By the time this had gone out, we had spent close to

5   $25 million on developing our product and commercializing it,

6   running our business.  Okay?

7        In addition, we had a patent.  With that comes certain

8   rights.  We felt, and we still do, we feel that fair competition

9   is respecting other people's intellectual property rights.

10  Q.  Mr. Stringer, you did say you spent a lot of -- lots of

11  money on things at your company, didn't you?

12  A.  Yeah.

13  Q.  One of those is stock options and salary for you, right?

14  A.  Well, salaries.  You don't spent money for stock options.

15  Q.  Well --

16  A.  There's no money that exchanges hands for that.

17  Q.  Let's see, in 2011, how much money did your company lose?

18  A.  If you've got it in front of you, why don't you just say and

19  I'll agree with it because I can't remember off the top of my

20  head.

21  Q.  You don't remember?

22  A.  It was a couple million.  You tell me.

23  Q.  It was over $3 million, right?

24  A.  Okay.

25  Q.  And in 2011 you basically doubled your salary, right?

1  A.  The board gave me an increase in salary, yes.

2  Q.  Even though your company is losing $3 million a year, right?

3  A.  Even though the company had lost money.

4  Q.  And they also -- you know, you gave yourself $425,800 in

5  stock options in 2011, right?

6  A.  I don't give myself anything, by the way.  I'm an employee.

7  That was given to me by the board or our compensation committee.

8  Q.  You're an officer of the company, right?

9  A.  I'm an officer of the company.

10  Q.  Even though your company is losing money, your salary

11  doubled and you got a bunch of stock options, right?

12  A.  Well, I can remember in 2001 when the company wasn't doing

13  as well, taking a cut in pay quite substantially, about

14  35 percent.

15  Q.  So, when the company is now losing money in -- $3 million a

16  year, you get a -- you get a pay increase?

17  A.  No, this was the compensation committee gave me this.

18  Q.  You didn't turn it down, did you, sir?

19  A.  Not at that time, I didn't.

20          MR. STONER:  No further questions.

21          THE COURT:  Anything further?

22          MR. ANTONETTI:  Your Honor, I think we've had a long

23  enough day, and I have no further questions at this time.

24          THE COURT:  Thank you.  You may step down.

25          NOTE:  The witness stood down.

1          THE COURT:  And we will adjourn until tomorrow morning

2    at 10 o'clock.

3          NOTE:  The March 19, 2013 portion of the case is

4    concluded.

5          --------------------------------------------------

6

7

8

9

10

11

12

13

14

15

16

17

18          I certify that the foregoing is a true and

19     accurate transcription of my stenographic notes.

20

21

22                    /s/  Norman B. Linnell
                   _____
23                 Norman B. Linnell, RPR, CM, VCE, FCRR

24

25