```
                    UNITED STATES DISTRICT COURT
                    EASTERN DISTRICT OF VIRGINIA
                         Alexandria Division




--------------------------------:
                                :
01 COMMUNIQUE LABORATORY, INC., :
               Plaintiff,       :
                                :
     -vs-                       :     Case No. 1:10-cv-1007
                                :
                                :
LOGMEIN, INC.,                  :
               Defendant.       :
                                :
--------------------------------:


                       V O L U M E   3 (a.m.)



                        TRIAL TRANSCRIPT


                         March 20, 2013


               Before:  Claude M. Hilton, USDC Judge


                          And a Jury
```

APPEARANCES:

Thomas H. Shunk, Marc A. Antonetti, John P. Corrado,
A. Neal Seth, Katherine L. McKnight, William T. DeVinney
and Loura Alaverdi, Counsel for the Plaintiff

Wayne L. Stoner, Charles B. Molster, III, Vinita Ferrera and
Rachel Gurvich, Counsel for the Defendant

460

INDEX

| WITNESS | EXAMINATION | PAGE |
|---|---|---|
| MICHAEL SIMON | | |
| | DIRECT | 470 |
| | CROSS | 518 |
| | REDIRECT | 548 |
| Michael J. Donahue (By Deposition) | | 555 |
| Kevin Bardos (By Deposition) | | 560 |
| Laura Pasquale (By Deposition) | | 562 |

1          NOTE:  The March 20, 2013 portion of the case begins in

2    the absence of the jury as follows:

3    JURY OUT

4          MR. SHUNK:  Good morning, Your Honor.  Thanks --

5          THE COURT:  Good morning.

6          MR. SHUNK:  Thanks for hearing us early.  We have two

7    housekeeping matters, and then a broader issue to raise with

8    you.

9          First of all, yesterday during the examination of

10   Mr. Stringer, Mr. Antonetti showed Mr. Stringer and he

11   identified Plaintiff's Exhibit 39.  As a result of the

12   discussions, it was agreed that part of it would be redacted and

13   then it would be admissible.  We have done that.  We now have

14   Plaintiff's Exhibit 39A, and we move its admission.

15         MR. MOLSTER:  No objection, Your Honor.

16         THE COURT:  All right.  It is admitted.

17         MR. SHUNK:  And then, secondly, Your Honor, during the

18   examination of Dr. Grimshaw Your Honor suggested that we simply

19   submit a CV instead of a lengthy questioning about his

20   background.  We have now created that exhibit as Plaintiff's

21   Exhibit 248.  We move its admission.

22         MR. MOLSTER:  Can we just get a copy?  I don't think we

23   have seen it.  If we can just get a copy of it?  We will look at

24   it.  We are very, very likely not to have an objection, but we

25   would just like to see it first.

1          MR. SHUNK:  We will get them one, Your Honor.  And I

2    guess we will decide between us whether they have any objection.

3          MR. MOLSTER:  We are going to conduct a very thorough

4    review, Your Honor, and get back to you as soon as we possibly

5    can.

6          MR. SHUNK:  A broader issue is this, Your Honor.  Your

7    Honor's scheduling order in this case says that any exhibit

8    which is not objected to in a timely fashion after the exhibits

9    are exchanged is admitted into evidence.

10         We have been looking for ways to speed this case up

11   because I know that's what Your Honor wants to do.  And what we

12   would like to do is to simply admit the rest of the exhibits

13   that we have that were not objected to rather than just throwing

14   them in front of witnesses and taking up the jury's time.

15         THE COURT:  That's a great idea.

16         MR. SHUNK:  We -- I am going to hand a list to

17   Mr. Molster.  I don't expect him to respond to quite a few

18   exhibits right now.  But if we understand that the Court

19   generally approves of the idea, then if we have a few issues to

20   discuss, we can raise it with Your Honor.

21         THE COURT:  The only thing you need to watch is if

22   there isn't going to be any testimony about the exhibits, you

23   wonder whether they ought to be in or not.  But they are

24   probably technically admitted anyway based on the order.  But I

25   don't know that they really add to anything to put them in if

1   there hasn't been any testimony on it.

2          MR. MOLSTER:  I think that's a fair point, Your Honor.

3   Also, some of these documents have some of the references to, as

4   Mr. Shunk called, the salty language we discussed yesterday, and

5   I'd like to at least redact --

6          THE COURT:  I will deal with some redactions in those

7   exhibits if they need to be.

8          MR. MOLSTER:  There are some.  We have redacted them.

9   We will try to work it out with the other side.  If not, we will

10  bring it to Your Honor's attention, if that is agreeable.

11         We have also have the product-by-product financial

12  information issue.  Now, we have an agreement and Judge Jones

13  ruled, and hopefully it is okay with Your Honor, that some of

14  this very competitively sensitive, in fact trade secret type

15  information, that the documents will go under seal.  And

16  everybody agrees to that.

17         And then, secondly, there may be testimony about those

18  documents today, but it's our understanding from 01 that they

19  are not going to seek live testimony on a product-by-product

20  basis, instead the buckets will basically be accused versus

21  non-accused.  We are fine with that.

22         So, I think that's our resolution of that issue, Your

23  Honor.

24         THE COURT:  That's fine.

25         MR. MOLSTER:  Anything else for you?

1              MR. SHUNK:  No, thank you, Your Honor.

2              MR. MOLSTER:  I've got a couple of issues.  I believe

3    the first witness they are going to call is our CEO, Michael

4    Simon, who they are going to call adversely in their case in

5    chief, which is fine.

6              I have not seen the exhibits yet, but I believe there

7    may be a few issues that -- or three issues that we should talk

8    about.  First of all, they may ask him about do you have

9    $200 million in the bank.  We believe that defendant's assets

10   are not relevant to this case.  Unless and until they get a

11   judgment, how much money Mr. Simon's company has in the bank is

12   not relevant, it is not a Georgia-Pacific factor.

13             And so, rather than object in front of the jury, we'd

14   like to have that resolved now.

15             MR. SHUNK:  Your Honor, it is our argument and our

16   expert witness, Mr. Brlas, will explain this in detail, that the

17   cash that the defendant has on hand is due to the sales of its

18   products.  That its profitability number, the bottom line on its

19   financials, is unnaturally low.  And that the profitability of

20   their product far exceeds what it actually says on their

21   financials.

22             So, I think it is appropriate for us to explain to the

23   jury, contrary to the defendant's theory that we are asking for

24   amounts that are well in excess of their profits, that, indeed,

25   we are asking for an amount that is less than the marginal

1   profit of these products.

2        THE COURT:  Well, what he has in the bank doesn't have

3   anything to do with that.

4        MR. SHUNK:  I am sorry?

5        THE COURT:  How much money they have on hand at the

6   moment or how much they have in the bank has nothing to do with

7   that theory.  You are welcome to put that theory on, but what

8   they have in the bank has nothing to do with that.

9        MR. SHUNK:  Actually -- well, what they have in the

10  bank, Your Honor, I'm sure Mr. Molster was using a more layman's

11  term for something very specific, and that is what in their --

12  in their Securities Exchange Commission filings they show as

13  being cash assets on hand.

14       Our expert is going to be able to say --

15       THE COURT:  The cash on hand has nothing to do with

16  what they are making off the product.

17       MR. SHUNK:  It does because they --

18       THE COURT:  A thrifty company will have a lot on hand,

19  a spendthrift company will have little on hand, and yet they

20  have made the same amount off the product.

21       MR. SHUNK:  Yes, but the cash that they have comes from

22  the sale of the products, and that shows that they are making

23  marginal profit from --

24       THE COURT:  You can disagree with me, but what they

25  have on hand I find is not relevant.

1          MR. SHUNK:  Very well.  We disagree, Your Honor, but we

2     hear your ruling.

3          MR. MOLSTER:  Your Honor, I don't know if they plan to

4     use -- there is one document, PX 192, it's a customer complaint

5     about LogMeIn two months after the company started in June 2004.

6          We don't think customer complaints about LogMeIn's

7     products are relevant.  We're not making a damages claim in this

8     case.  We don't see how it is relevant.  Under the 403 analysis,

9     clearly the prejudice outweighs the relevance.  And we ask that

10    that document not be used in front of the jury.

11         MR. SHUNK:  I find that is an interesting argument

12    since they spent yesterday trashing our products with these, you

13    know, hearsay customer complaints.

14         But, in fact, we are not going to offer that exhibit,

15    so it's not an issue, Your Honor.

16         THE COURT:  All right.

17         MR. MOLSTER:  Takes care of that issue.  We're going to

18    have a motion -- the plaintiff may well rest its case in chief

19    today.  We will have a Rule 50 motion.  We'd like to not make

20    that in front of the jury and just wanted to have a moment -- we

21    know we want to keep things moving, but we'd at least like to

22    have a moment to make that for the record.

23         And we'll be happy to give you any argument you are

24    interested in hearing about it.

25         THE COURT:  Well, I will hear your Rule 50 motion.  I

1    don't know whether we will do it at the side-bar or whether --

2            MR. MOLSTER:  However you want to do it, Judge.

3            THE COURT:  I never heard a Rule 50 motion in front the

4    jury.

5            MR. MOLSTER:  No, we don't want to do it in front of

6    the jury.

7            THE COURT:  I have never done it.

8            MR. MOLSTER:  Okay.  All right.  But we just want to

9    make sure --

10            THE COURT:  I don't think you can --

11            MR. MOLSTER:  I don't think we should.  All right.

12            THE COURT:  I have never done that.

13            MR. MOLSTER:  We are going to make the motion, just a

14    heads-up that we are going to make the motion.

15            THE COURT:  Well, you can be pretty sure that I have

16    never heard a Rule 50 motion in front of the jury.

17            MR. MOLSTER:  Thank you, Your Honor.  The last thing

18    is, the witness -- we are probably going to get to our case in

19    chief today.  Our second witness is Mr. Anka, who is in the

20    courtroom and who has a -- we would like to show a video that

21    shows sort of some animations as to how our system works, and

22    we'd like to do it on the screen.  But we didn't want to do that

23    without getting prior permission from the Court, and we didn't

24    want to ask in front of the jury.

25            THE COURT:  No, I thought I have said that you can show

1    the process.  If there is something that shows the process you

2    have and what this patent involves, you may do it.  How long is

3    it?

4         MR. MOLSTER:  I think it's five minutes, less than five

5    minutes.

6         THE COURT:  All right.

7         MR. MOLSTER:  I think that's it, Your Honor.  Thank

8    you.

9         MR. SHUNK:  It turns out, Your Honor, I misspoke.

10   Ms. McKnight has an issue to raise with Your Honor.

11        THE COURT:  All right.  I love this housekeeping.

12        MS. McKNIGHT:  Good morning, Your Honor.  I think if we

13   raise this one issue now, we may save a little time later.

14        This has to do with deposition designations of Michael

15   Donahue, which we are likely to read today.  There is an exhibit

16   in those designations that, if we are able to get a stipulation

17   from the other side on two points that Donahue testifies to, we

18   don't need to go into his deposition testimony establishing that

19   exhibit and even entering that exhibit.

20        So, we are happy to explain the stipulation to you,

21   just it would be easier now.  This is in the Donahue

22   declaration -- or deposition.  It is PX 238.  We are seeking a

23   stipulation that Tim Guest is still with the company and that he

24   is the product director.

25        MR. SIMON:  He is actually the project manager as

1    opposed to a director.

2         Should I speak to the Court, Your Honor?

3         So, the person in question, Tim Guest, is a project

4    manager, which means he is responsible for coordinating the

5    activities of engineers.  Which is different from being a

6    technical developer who would actually know what the activities

7    are.

8         So, I believe in both my deposition and others, that

9    the testimony is he's always been a project manager.

10        I don't know if that's a distinction that is important

11   to the Court.  But just in terms of what he is, I think he is a

12   project manager, which is different from a technical developer.

13        MS. McKNIGHT:  We have deposition testimony only that

14   he is the product director and that he is still with LogMeIn.

15   That's what we are seeking to have --

16        THE COURT:  Well, that's all they want.  He is a

17   project director?

18        MR. SIMON:  I think --

19        THE COURT:  And he is still with LogMeIn?

20        MR. SIMON:  No, sir, he is not.  He is actually no

21   longer with LogMeIn.  He may have been two years ago at the time

22   of the disposition.  He has subsequently left the company.  But

23   I believe he was a product director who was with LogMeIn up

24   until 2010, if that's --

25        MS. McKNIGHT:  Thank you, Your Honor.  We will just

 1    read the deposition.

 2              MR. SIMON:  I mean, is that --

 3              MS. McKNIGHT:  We will just read the deposition.

 4              MR. SHUNK:  It is very short.  We will just read it.

 5              THE COURT:  All right.

 6              MS. McKNIGHT:  Thank you, Your Honor.

 7              THE COURT:  Bring in the jury.

 8               NOTE:  At this point the jury returns to the

 9    courtroom; whereupon the case continues as follows:

10    JURY IN

11              THE COURT:  All right.  Good morning.

12              All right.  Who is next?

13              MR. SHUNK:  Your Honor, Plaintiff calls Michael Simon,

14    president of LogMeIn, as an adverse witness as if on

15    cross-examination.

16               NOTE:  The witness is sworn.

17               MICHAEL SIMON, called by counsel for the Plaintiff,

18    first being duly sworn, testifies and states:

19          DIRECT EXAMINATION

20    BY MR. SHUNK:

21    Q.  You are Michael Simon, is that correct?

22    A.  Yes, I am.

23    Q.  You are the chief executive officer of the Defendant in this

24    case, LogMeIn, correct?

25    A.  Yes, I am.

1    Q.   Now, from 1993 through 1994 you worked in Budapest at a

2    company called Ablaksoft, did you not?

3    A.   From 1993 to 1994, yes, I did work for a company called

4    Ablaksoft.

5    Q.   And it was during that time that you met Marton Anka, is

6    that correct?

7    A.   Yes, I did.  Marton was an intern for Ablaksoft.  At the

8    time -- he is actually in the courtroom today, but at the time

9    he was --

10   Q.   Thank you, sir.  I just wanted to confirm that you met

11   Marton Anka at that time.

12   A.   Yes, sir.

13   Q.   In 1995 you moved to a company in Hungary called Uproar, is

14   that correct?

15   A.   I did.  It was originally called ePub, but it renamed itself

16   Uproar.

17   Q.   And the business of Uproar was to build Web-based versions

18   of games like Family Feud and Bingo, is that correct?

19   A.   Among other things, yes, sir.

20   Q.   Now, during your time at Uproar, Marton Anka did consulting

21   work on software design for the company, did he not?

22   A.   From time to time he did.  He wasn't --

23   Q.   And Mr. Anka eventually formed a company called 3am Labs, is

24   that correct?

25   A.   I believe, to be specific, he formed a company with a

1    Hungarian name, it was 3am Laboratories Partnership.

2        LogMeIn, the company which I run right now and I work at, is

3    actually -- was originally called 3am Labs.

4        So, there is two different companies.  His was 3am

5    Laboratories in Hungarian.  LogMeIn was originally called 3am

6    Labs in English.  They are two different companies, though.

7    Q.  Your Honor, we are passing around the witness binders at

8    this point.  I believe the witness binders include the

9    deposition of Mr. Simon as well.

10       So, you began working with Mr. Anka and the 3am team in the

11   fall of 2002, is that correct?

12   A.  Approximately, we started discussing --

13   Q.  Sir, I just need to know that you started in the fall of

14   2002.  Is that correct?

15   A.  I think you used the word "working," which implies

16   employment.  But in terms collaborating or discussing, yes.

17   Q.  So, I was right, you did start working -- because

18   collaboration is work -- you started working in the fall of

19   2002?

20   A.  Fair enough, sure.

21   Q.  Okay.  And the product that Mr. Anka was selling

22   commercially at that time was a product called

23   RemotelyAnywhere, right?

24   A.  Yes, it was.

25   Q.  And in the fall of 2002, RemotelyAnywhere was not a remote

1   access service, it was software that the user paid for once,

2   correct?

3   A.   That is correct.

4   Q.   And it did not use a locator server in order to facilitate

5   one computer talking to another, correct?

6   A.   No, it did not.

7   Q.   In 2003 3am Lab -- is that the year that 3am Laboratories

8   became 3am Labs?

9   A.   No.  It may be a little bit confusing for the jury.  But

10  essentially we created a new company called 3am Labs.  It was a

11  new company.  It is not the same body corporate or company that

12  changed its name.  We created a new company called 3am Labs.

13  And it, in turn, purchased the assets of 3am Laboratories.

14  Think of it like an, you know, an acquisition, if you will, with

15  the way you might think of that.

16  Q.   And in the very early days, you and Mr. Anka were 50/50

17  owners, correct?

18  A.   For a few days we were equal -- we were 50/50 owners, and

19  then within a few days we brought in teams, but we owned the

20  same amount, roughly a third of the company each.

21  Q.   And Mr. Anka contributed for his part the assets of his

22  company, 3am Laboratories, for example, the RemotelyAnywhere

23  product and its technology?

24  A.   That is correct.

25  Q.   Okay.  And you contributed money, right?

1    A.  Yes, I did.

2    Q.  How much money did you contribute in order to start up the

3    company?

4    A.  Well, we did -- I think the total investment I made early on

5    was $191,000.  And then additionally I extended what was known

6    as a loan, a credit facility or a loan, with my business partner

7    of $500,000 to the company.

8    Q.  Now, in 2003, sir, did the new company, the 3am Labs

9    company, did it show a profit?

10   A.  I don't remember, to be honest.  I don't believe so.

11   Q.  In 2004, sir, did 3am Labs make a profit?

12   A.  No, it did not.

13   Q.  Okay.  And 2004 was the year that LogMeIn Free was first

14   introduced to the public, is that correct?

15   A.  Yes, it was.

16   Q.  Now, in 2005, sir, did 3am Labs make a profit?

17   A.  No, sir.

18   Q.  And in 2006, I believe that was the year that the company

19   changed its name to LogMeIn, right?

20   A.  I don't have any reason to disagree with that.  I don't know

21   the year off the top of my head.

22   Q.  In 2006, though, 3am Labs did not make a profit, did it?

23   A.  No.  I believe the first year we were profitable wasn't

24   until 2007.

25   Q.  Well, are you sure about that?  Wasn't it 2009, the year you

1    went public that you first showed a profit?

2    A.  You may be right.  I actually don't have our financial

3    statements in front of me right now.

4    Q.  So, from 2003 through 2008, five years, even though LogMeIn,

5    the product, was available and you were giving away LogMeIn

6    Free, your company was not showing a profit during those years,

7    was it?

8    A.  No, it was not.

9    Q.  Well, sir, would you tell the jury how you kept the lights

10   on at your company if your company wasn't making any money?

11   A.  During that period we raised roughly $30 million of capital.

12   Q.  And you raised that $30 million of capital by telling

13   investors that you believed you had a great idea for marketing

14   the LogMeIn product, that is your freemium model, correct?

15   A.  Yes.  We had a business model that we often called freemium,

16   where we have both free and paid products.  And our investors

17   and ourselves continued to believe it was a good business model,

18   and we did attract investment capital.

19   Q.  Well, you certainly got a lot of free users, didn't you,

20   during that time?

21   A.  Yes, we did.

22   Q.  And the existence of those free users is what got the

23   investors to put money in the company and that's what kept the

24   lights on for your company during that time?

25   A.  Actually, not quite.  What really was more important to our

1   investors was the growth of sales, as you would imagine.  Our

2   free users we believe played a part in generating sales, but

3   like you would expect, our investors were looking for us to grow

4   revenue and earnings and actually generate financial performance

5   rather than just an audience of free users.

6   Q.  Well, now, in 2 -- let's think back to 2008.  In 2008 your

7   company still hadn't made any profit.  It had been in existence

8   for five years.  The freemium model didn't look so good at that

9   time, did it?

10  A.  Actually, it looked pretty good.  I mean, it is subjective,

11  but we believed that it was actually generating growth, sales

12  growth.  And it's not a perfect business model, the freemium

13  model, but it seemed promising for us, and it is the business

14  model we have continued to operate with.

15  Q.  Certainly it wasn't the RemotelyAnywhere profit that was

16  keeping the lights on at your company, was it?

17  A.  No, no.  We still do sell RemotelyAnywhere.  It is actually

18  built into sort of high-end storage network equipment.  But it's

19  a very small part of our business.  The majority of our business

20  is actually under our LogMeIn products.

21  Q.  And RemotelyAnywhere is a small part of your business

22  because its really a product for advanced technical users.  It's

23  not a product that everyday laypeople can easily make work, is

24  it?

25  A.  Yes, I would agree with that.

M. Simon - Direct                                                         477

1    Q.   Okay.  And in 2003, going back to that time period when you

2    first joined the team -- well, you joined the team in 2002.

3         In 2003 there were a fairly significant number of people

4    that downloaded a free trial of RemotelyAnywhere, but they were

5    unable to install, connect, or use it, right?

6    A.   That is right.

7    Q.   And, in particular, there were three areas that people would

8    get stuck when they used the RemotelyAnywhere product, dynamic

9    IP addresses, firewalls, and routers.  If people had those

10   obstacles to overcome, they had to have some pretty technical

11   sophistication to make RemotelyAnywhere work, isn't that

12   correct?

13   A.   Yes, this is correct.  Those are the normal obstacles that

14   one faces with remote access if you are not a technical person.

15   Q.   Unless, of course, you use the I'm InTouch product, then

16   they aren't a problem, are they?

17   A.   I believe, no, they aren't.

18   Q.   Okay.  Now, one of the employees of 3am Labs in 2003 was a

19   man named Tim Guest, is that correct?

20   A.   Yes, that is correct.

21   Q.   At that time what was Mr. Guest's job?  He was a project

22   manager, wasn't he?

23   A.   I believe -- yes, I know he was.

24   Q.   Now, Mr. Guest one of the people who was involved in

25   developing the LogMeIn service at your company, correct?

1    A.  Yes, sir, he was.

2    Q.  In fact, Tim Guest was the one who came up with the name

3    LogMeIn, right?

4    A.  I believe it was Tim and another employee together had to

5    come up with hundreds of names and try and find one that would

6    work.  And I believe we -- he was one who ultimately came up

7    with the name LogMeIn, which we now have named our company

8    after.

9    Q.  Sir, do you have the binder of exhibits in front of you that

10   we have given you for today?

11   A.  Yes, I do.

12   Q.  Would you turn in it, please, to Plaintiff's Exhibit 41.

13   A.  I have it in front of me.

14   Q.  Do you recognize Plaintiff's Exhibit 41?

15   A.  Yes, I do.

16   Q.  Tell the jury what it is.

17   A.  So, this is a product overview.  It's basically a planning

18   document that is dated from the 2nd of July in 2003.  It was

19   created by Tim Guest.  And it outlines the plans for building

20   what ultimately became our LogMeIn Pro and Free business.

21   Q.  But in 2003 that wasn't the working title for the project at

22   the company, was it?

23   A.  No.  Tim gave it an internal title, and the title of the

24   document is called GoToService-overview.  And that was his sort

25   of internal code name for it.

1  Q.  And GoToService, that was all run together, right?

2  A.  Yes, sir.  It is no spaces, GoToService, dash, overview.

3  Q.  And GoToService, that was actually kind of a play on words

4  because GoToMyPC was the product your company was attempting to

5  be like, right?

6  A.  I would only guess, but it seems reasonable.

7  Q.  Seems reasonable.  It sure does.  Now --

8          MR. MOLSTER:  Objection.  He doesn't need to comment,

9  Your Honor, after he gives his answer.

10         MR. SHUNK:  I apologize, Your Honor.  I'll try to not

11 be --

12         MR. MOLSTER:  It is inappropriate.  He should stop,

13 Your Honor.

14         THE COURT:  Objection overruled.

15 BY MR. SHUNK: (Continuing)

16 Q.  Now, Mr. Simon, do you agree with Mr. Guest's assessment in

17 Plaintiff's Exhibit 41 that by making a service which is easy to

18 understand and use, we hope to gain revenue from the individual

19 home users that is otherwise lost with the current product

20 offering?

21 A.  For the -- not quite.  I would -- just to clarify, it says

22 individual home users.  I think it would be more accurate to say

23 business users, but I think the underlying idea that we are

24 trying to serve a part of the market that isn't served by

25 RemotelyAnywhere, that isn't served, you know, isn't technical

1   people, if you will, is proper.

2   Q.  And when there was a reference to the current product

3   offering, that meant RemotelyAnywhere, right?

4   A.  Could you point me to it?

5   Q.  Sure.  That was the line I just read in the objective on the

6   first page.

7   A.  Oh, objective.  I am sorry, I don't see current offering.  I

8   am sure it was RemotelyAnywhere, though.  I just don't see it on

9   the fly.

10  Q.  Now, down at the bottom of the first page, Mr. Guest says,

11  and I want to know whether you agree with him about this:  The

12  service should be designed to be incredibly easy to set up and

13  use by the customer.  The initial target group are the people

14  that download the free trial of the current RemotelyAnywhere,

15  but are unable to install, connect or use it.

16  A.  Yes, that's what it says.

17  Q.  And you agree with that?

18  A.  I do.

19  Q.  Now, sir, on the second page, Mr. Guest says that there are

20  several areas where the user gets stuck in the current

21  RemotelyAnywhere.  We have to provide comprehensive help if the

22  user has trouble with any of the following.

23      Is that correct?

24  A.  Yes, it is.

25  Q.  And he identifies dynamic IP addresses, routers and

1  firewalls as the problem that RemotelyAnywhere had, right?

2  A.  Yes, those are the principal issues that really are

3  obstacles for remote access services and for non -- people that

4  aren't technologists.

5  Q.  So, those were the problems that your team was trying to

6  solve in 2003 that eventually led to LogMeIn, correct?

7  A.  Not to mince words, but the one difference, we weren't

8  trying to solve the problem, we were trying to address it.

9  Q.  Okay.

10  A.  There is a slight difference.  But, yes.  Those are the

11  problems we were trying to address.

12  Q.  Now, Mr. Guest made the suggestion that there be a periodic

13  pulse frequency, a ping, sent between the service and the host

14  about every 1.8 seconds, did he not?

15  A.  Yes, he did.

16  Q.  And he noted to the group that GoToMyPC sends a ping like

17  that every two seconds, didn't he?

18  A.  He did.

19  Q.  So, is there any doubt in your mind that Mr. Guest back in

20  2003 and your company generally were aware of GoToMyPC and how

21  GoToMyPC worked?

22  A.  We definitely were aware of GoToMyPC, and we were -- we

23  don't -- to this day we don't exactly now how GoToMyPC works,

24  but you can, I think you have heard much testimony this day, you

25  can readily observe communication between a service like

1   GoToMyPC or LogMeIn with a packet sniffer.  And so, they are

2   aware of this periodic communication, which is known as a ping.

3   Q.  And that eventually led to your company creating a service

4   instead of a product and creating a server computer for that

5   service, is that correct?

6   A.  It led us to create LogMeIn service.  I don't know about a

7   server computer, wouldn't necessarily be the right way.  We do

8   not have a server computer.

9   Q.  Well, help the jury understand how the LogMeIn service

10  works, sir.  If a user wants to use their service, use your

11  service, the user would download some software on to his, for

12  example, business computer that he wants to access, right?

13  A.  That would not be the first step.  I would be happy to

14  describe.

15  Q.  Well, bear with me and go my path, if you would, for just a

16  few minutes.  The first thing the user would have to do would be

17  to register, correct?

18  A.  Correct.

19  Q.  And then once the user registered, then the user would

20  download some software on to the business computer he wanted to

21  access?

22  A.  We have multiple products and they all work slightly

23  different, depends which product you are talking about.

24  Q.  I am asking about LogMeIn Free, just as an example.

25  A.  Okay.  So, yeah.

1  Q.  Now, once the user had done that, then --

2  A.  I am sorry.  Could you back up, I wasn't sure which product

3  you were talking about, if you could please clarify the first

4  step.  I just wanted to --

5  Q.  Let's start all over again.  I am talking about LogMeIn

6  Free, I want to know what a user does as the user uses it.  The

7  first thing that the user does is go to, for example, your Web

8  page and follow the clicks until the user has been able to

9  register for using LogMeIn Free?

10  A.  Yes.

11  Q.  Okay.  And then the next thing the user is invited to do is

12  to download software on to the computer that he wants to be able

13  to access, correct?

14  A.  Yes.

15  Q.  Okay.

16  A.  Some time may pass.  They are not required to do it

17  immediately, but at some point they would need to do that.

18  Q.  I didn't say immediately, did I?  If I did, I misspoke

19  myself.

20      Now, the next thing that happens is that if the remote, if

21  the user wants now to travel and to access the business

22  computer, he simply finds another computer that is connected to

23  the Internet.  That would be the next thing that he would do,

24  right?

25  A.  Could do, yes.

1   Q.  Okay.  And so, let's say the user is staying at the Westin

2   Hotel across the street, and the user has gone to the business

3   center and opened up a computer that is connected to the

4   Internet, the user now would again access the LogMeIn Web page?

5   A.  Yes.

6   Q.  And the LogMeIn Web page would invite the user to type in a

7   password and a user name, and that would allow then the user to

8   identify that business computer he had previously loaded the

9   software on to, right?

10  A.  Yes.

11  Q.  Okay.

12  A.  Yes.

13  Q.  And then the business user would click on the button, and

14  eventually they would see the desktop of the computer that they

15  had loaded the software on to previously, right?

16  A.  Eventually.  There is another password and things, but

17  eventually they would get to the point that they could actually

18  use their remote computer as LogMeIn is designed to do, yes.

19  Q.  And the thing that makes that happen is that your company

20  operates a locator server -- I am going to take that word out so

21  that we don't fight over semantics.

22      Your company operates computers that it maintains control

23  over, and those computers then allow the connection from the

24  remote to the business computer, right?

25  A.  Not quite.  So, those computers implement part of that, but

1    there is other things that also are doing that.  Our computer

2    system, which I think you have heard is quite extensive, is not

3    sufficient actually to enable that.

4    Q.  I would like now, sir, to change to Plaintiff's Exhibit 1,

5    please, in your book.

6        Do you recognize that, sir?

7    A.  Yes, I do.

8    Q.  That's our patent, isn't it?

9    A.  Yes, it is.  It's a copy of your patent.

10   Q.  The '479 patent.  Now, you first became aware of that patent

11   when 01 sued the company called Citrix that the jury has already

12   heard about, correct?

13   A.  Yes.  Yes, sir.

14   Q.  Now, you would agree with me, wouldn't you, that if your

15   competitors are sued, there is always a risk your company can be

16   sued, right?

17   A.  Yes, I would.

18   Q.  In fact, once your company learned about 01's lawsuit

19   against Citrix, that lawsuit was something that your company was

20   concerned about, right?

21   A.  I am an employee of the company, and I was concerned about

22   it.

23   Q.  Okay.  Very good.

24   A.  So, I think that's reasonable.

25   Q.  And yet, even though your company was concerned about the

1    '479 patent back in 2006, isn't it a fact that you had not

2    personally read the '479 patent by the time I took your

3    deposition in March of 2011?

4    A.   Yes.  Others in the company had read the patent, I had not.

5    Q.   Okay.  Well, you are the president, right?  You are the CEO?

6    A.   Yes, I am.

7    Q.   Okay.  And you hadn't bothered to read the patent?

8    A.   No.  I am -- to this day, for me reading the patents is -- I

9    have to pour over them.  I find them difficult to read and they

10   are very specific.

11        So, you know, I have read it multiple times now, but I am

12   not particularly expert in interpreting them.  So, we actually,

13   obviously, have a technical team, and they would both know the

14   details of how we implement things and what the patent means.

15   Q.   Well, maybe you are being a little bit too modest, sir.  You

16   have a computer software engineering background, don't you?

17   A.   I do.  I have a degree in electrical engineering, and I had

18   a concentration -- today, where I went to school, which is Notre

19   Dame, for what it's worth, has a computer engineering program --

20   we didn't back in the '80s.  So, I studied electrical

21   engineering, but I did actually study computer science.

22   Q.   Now, I believe I heard in your previous answer you tell the

23   jury that since I took your deposition in March of 2011, you

24   have bothered finally to read the patent, right?

25   A.   I have read it, yes.

1  Q.  Okay.  Well, by March of 2011 when I took your deposition,

2  this lawsuit had already been pending for some five or six

3  months, hadn't it?

4  A.  I believe so, yes.

5  Q.  And you still hadn't bothered to read the patent?

6  A.  No, sir, I hadn't.

7  Q.  And isn't it a fact, sir, that if Mr. Cheung, Andrew, had

8  spent the money for a 41-cent stamp, if that's what they still

9  cost today, and written you a letter and attached the patent to

10  it, you probably wouldn't have read it once you received it

11  because you just didn't seem interested?

12  A.  I wouldn't agree with that.  I would be very interested, but

13  I would obviously use our technical team to evaluate whether it

14  was a patent that we would find useful for our business.

15  Q.  Okay.  So, if Mr. Cheung --

16  A.  To this day, I rely on our technical team on that.

17  Q.  I am sorry, sir.  If Mr. Cheung had written you that letter

18  with a copy of the patent, you would have brought in the

19  lawyers, right?

20  A.  I don't know.  I mean, essentially to evaluate the

21  technology, we may have done it ourselves.

22  Q.  Take a look, sir, at Plaintiff's Exhibit 104.

23  A.  Not to be problematic, I -- oh, there it is.  I'm sorry, I

24  found it.

25  Q.  Do you have 104 in front of you?

1   A.  Yes, I do.

2   Q.  That's a price list for your products from back in I believe

3   2007, is that correct?

4   A.  Yes, it is.

5   Q.  And how have those prices changed?  I don't expect you to go

6   one by one and give me the dollars and cents, but have you

7   increased them, have you lowered them, have they stayed the same

8   over time?

9   A.  If you give me a second to kind of look at the prices.  They

10   may have changed some, but at least they are somewhat

11   consistent.

12   Q.  Take a look at the LogMeIn Pro, the Pro2 price.  There may

13   not be a Pro2 price.

14      Well, that's okay.  Neither you nor I have the current data,

15   so let's move on?

16      What is the price today for LogMeIn Free?  I know that is

17   kind a silly question, but I want to get it on the record.

18   A.  It is actually free.

19   Q.  Okay.  What is the price today for LogMeIn Pro2?

20   A.  We don't sell LogMeIn Pro2 anymore, it has been replaced by

21   a product simply called LogMeIn Pro.  And that price is $69 per

22   year.  It is a subscription, so you pay annually $69 per year,

23   typically.

24   Q.  So LogMeIn Pro2 was replaced by LogMeIn Pro, or did you

25   misspeak and mean LogMeIn Pro3?

1   A.  No, it is actually just LogMeIn Pro.  We originally had the

2   2 designator.  We have subsequently removed numbering.  So, we

3   just call it LogMeIn Pro, and as it is updated from time to time

4   it stays with one name.

5       You might think, there used to be a Windows 95 and then

6   there's a Windows 7, sometimes there's just a Windows, maybe

7   something similar in naming that way.  We don't use a number

8   anymore.

9   Q.  Well, just to be clear, there isn't any real substantive

10  difference between what you now just call LogMeIn Pro and what

11  you used to call LogMeIn Pro2, is that correct?

12  A.  There actually is a huge difference.  So, LogMeIn Pro

13  includes not just remote access to it.  So, LogMeIn Pro allows

14  you to print remotely, or synchronize folders, or conduct a

15  one-on-one meeting, or transfer a large file.  LogMeIn Pro has

16  always done that.

17      With LogMeIn Pro2, we actually added functionality that we

18  felt was really useful for our old core user base, which is IT

19  professionals.  We still, it's still a really important part of

20  our market, is IT professionals.

21      So, LogMeIn Pro2 took into one nice product functionality

22  that allowed, you know, you to work remotely or, for like your

23  IT department, to make sure your remote computer was healthy and

24  working well.

25      So, IT Pro2 actually has what we call an administer toolkit.

1    It allows you to actually -- it allows your IT department to go

2    in and make sure that your software is up-to-date.  It alerts

3    the IT department --

4    Q.  Sir, let me stop you because now that I hear your answer, I

5    think you misunderstood my question.  I think you were telling

6    the jury about the difference between the original LogMeIn Pro

7    and what later became LogMeIn Pro2.

8    A.  Yes, sir, I was.

9    Q.  My question was whether there was any substantive difference

10   between the newest LogMeIn Pro, which has no number, and the

11   LogMeIn Pro2 which preceded it?

12   A.  We think it is even better, but it's functionally somewhat

13   similar.

14   Q.  Well, it does the remote access fundamentally the same as

15   the previous product, correct?

16   A.  I believe so.  I have to admit, because I don't actually

17   work on the engineering, I am strictly a business employee, to

18   my knowledge it works functionally the same, but I don't know

19   that I know the exact answer to that.

20   Q.  Is it okay if this comes up again in our discussion,

21   Mr. Simon, that we call the newest LogMeIn Pro new LogMeIn Pro,

22   just so we don't confuse it as you did earlier with the original

23   LogMeIn Pro?

24   A.  Okay.

25   Q.  Okay.  Now, what's the price today for LogMeIn Ignition, if

1   you still sell it?

2   A.   It is, I believe, $39 per year.

3   Q.   What's the price for join.me Free?

4   A.   join.me Free is an online meeting product that is free.

5   Q.   And join.me Pro?

6   A.   Again, it's a subscription product, so it's $149 per year.

7   Q.   Were you in the courtroom, I believe it was yesterday, when

8   portions of Mr. Anka's testimony was read to the jury?

9   A.   Yes, I was.

10  Q.   Do you agree with him, sir, that the join.me products,

11  join.me Free and join.me Pro, do remote access using the same

12  fundamental technology as the LogMeIn products?

13  A.   You know, I certainly defer to his technical judgment.

14  Q.   Isn't it true LogMeIn Free is the engine that drives the

15  sales of all the other products of your company?

16  A.   Not quite.

17  Q.   Take a look at Plaintiff's Exhibit 62, sir.

18  A.   Yes, I have it in front of me.

19  Q.   Do you recognize Plaintiff's Exhibit 62?

20  A.   Yes, I do.

21  Q.   Okay.  It's a diagram that your company has used, at least

22  internally, in order to educate the employees of the company

23  about how the company develops its sales, correct?

24  A.   It's used internally.  It was used for a few months by a

25  person named Sean Ellis for his team.  We don't necessarily use

 1   it to educate the general employee base, but it was a document

 2   that was used internally.

 3   Q.  You agree with it, don't you?

 4   A.  Some of it, but not all of it.

 5   Q.  Well, one of the things the document has is a big circle in

 6   the middle that says free engine, and that seems to drive the

 7   entire -- what's call the LogMeIn economic engine, right?

 8   A.  It does.  If you look at the exhibit, it says free engine,

 9   but there is important thing what free means.  It is actually

10   part of a larger slide deck.  And free, and it's very clear in

11   the slide deck, is free trials.  The word "free," it's not the

12   Free product, and that's where this looks a little bit

13   confusing.

14       All of our products, from our most expensive product to our

15   least expensive product, actually has a free trial.

16       So, if you are we are to say free things are an important

17   part of driving all of our registrations, it is true.  But it is

18   not the LogMeIn Free product, which is a specific product that

19   is at the center of this engine.

20            MR. SHUNK:  Your Honor, I move the admission of

21   Plaintiff's Exhibit 104, the price list testified to earlier,

22   and Plaintiff's Exhibit 62 that the witness has just testified

23   to.

24            MR. MOLSTER:  No objection to the price list.  Object

25   to 62, it is an incomplete document, he just testified it is an

1    incomplete document, we don't believe it ought to be received

2    into evidence.

3            THE COURT:  All right.  Objection overruled, it will be

4    admitted.

5            MR. SHUNK:  Thank you, Your Honor.

6    BY MR. SHUNK:  (Continuing)

7    Q.  Now, isn't that true, Mr. Simon, that without LogMeIn's free

8    user base, your company, LogMeIn, would have zero growth and be

9    a pretty terrible business?

10   A.  Well, that requires speculation because we do have LogMeIn

11   Free, and one can only guess, and there is very different

12   opinions in our company, whether it does more harm than good.

13   But my personal belief is that it plays an important part of our

14   growth.

15   Q.  Well, the words that I just said, those are actually words

16   that you said, that you wrote in --

17   A.  Yes.  Yes, it is.  Those are words I wrote.

18   Q.  I show you Plaintiff's Exhibit 92, sir.  Would you flip to

19   that in the book.

20           And, Your Honor, so as to void any objections, we are

21   willing to redact the final paragraph in that document and

22   perhaps -- so, we will not discuss it with the jury.

23           THE COURT:  What was the number?

24           MR. SHUNK:  62.  92, Your Honor, I am sorry.

25   BY MR. SHUNK:  (Continuing)

 1   Q.  Let's turn, Mr. Simon, to the first paragraph.  Do you not

 2   say in the second sentence:  Make no mistake, without our free

 3   user base, we would have zero growth and be a pretty terrible

 4   business?

 5   A.  Yes.  This was written back in 2009 from me to our

 6   employees.  And in particular, the reason I had to write that is

 7   there are many people in the company that disagree with that

 8   premise.  But ultimately the company holds the position,

 9   particularly in 2009 when we were very much in an economic

10   recession, that we felt it was an important part of our growth

11   in that period.

12          MR. SHUNK:  Your Honor, I move the admission of

13   Plaintiff's Exhibit 92 with the final paragraph redacted, and we

14   will prepare a redaction.

15          MR. MOLSTER:  No objection as redacted.

16          THE COURT:  Admitted.

17   BY MR. SHUNK: (Continuing)

18   Q.  You bring up an interesting point, Mr. Simon.  There have

19   been quite a few people in your company that aren't fond of the

20   idea of the freemium model, isn't that correct?

21   A.  That is correct.

22   Q.  Okay.  And isn't it true that just because LogMeIn is

23   offering a product today for free, that's no assurance that that

24   product is going to be offered for free next year?

25   A.  I don't know that there is any guarantees that we will

1   always have free products.

2   Q.  Well, isn't it a fact that your company has plans to start

3   charging for its free products as soon as it has put its

4   competitors effectively out of business?

5   A.  No, that is not correct.

6   Q.  Don't you remember receiving an e-mail directly written to

7   you by Mr. Anka in which he is discussing TeamViewer and the

8   idea that TeamViewer could be put out of business using your

9   free model, and that's why he advocated not actually starting to

10  charge yet for the join.me product?

11  A.  Essentially, you know, our business is to take --

12  Q.  Well, wait a second, sir.  I want to give you a full chance

13  to answer, but answer my question first.

14  A.  I do remember an e-mail, yes.

15  Q.  And when he said that to you, did you say, well, no, Marton,

16  that's not the way our business works and, you know, we are

17  always going to keep this product for free?

18  A.  I don't remember what I said to him.  I know we didn't take

19  his advice.  First of all, we trying to win in, you know, what's

20  a competitive marketplace.  We are trying to get business from

21  our competitors, as you would expect.  They are trying to get

22  business from ourselves.

23      In particular, TeamViewer, you know, Marton suggested we

24  should only have a free meeting product.  We did not do that.

25  We have a paid one.

1      And in fact, TeamViewer during that period, when they

2   introduced their product after we did, you know they were not in

3   business until after we introduced LogMeIn Free and continuing

4   business, and they actually generate over a hundred million --

5   they actually just filed to go public a few months ago and

6   generated over a hundred million dollars in revenue.

7      So, this notion of, hey, we are going to put them out of

8   business is obviously hyperbole.  What we are really trying to

9   do is get business away from our competitors if possible,

10  drive -- grow our own business.  Sometimes from time to time

11  people within our company say, hey, we're going to put them out

12  of business, but obviously that's over-reaching and not our

13  actual strategy and plans.

14  Q.  Well, sir, let's take a look at Plaintiff's Exhibit 46.

15     You recognize Plaintiff's Exhibit 46, don't you?

16  A.  Yes, I do.

17  Q.  Well, let's start with the bottom half of the page, that is

18  actually the e-mail you sent to Mr. Anka that then generated his

19  response.

20         And, Your Honor, on this issue we discussed yesterday,

21  again, we are willing to do redactions so that we don't have to

22  deal with that issue.

23         Do you see that e-mail you wrote on June 11, 2009?

24  A.  Yes, I do.

25  Q.  You said to Mr. Anka, did you not, my bigger problem is that

1    a paying LogMeIn user thinks TeamViewer is "an awesome

2    application."  The price is listed first, but then there are 11

3    other bullet points of why their product is so great.

4         That's what you said, right?

5    A.  Yes, I did.

6    Q.  So, tell the jury now, what exactly the TeamViewer

7    application is?  It is a product like your join.me product,

8    right?

9    A.  It's a product both like -- because TeamViewer has both

10   remote access, desktop remote access and online meeting

11   products, they compete against multiple of our products.  And

12   they also have free products, like ourselves, different terms

13   and conditions in terms of when you can use them.  But I think

14   it's indicative of how competitive this marketplace is.  And for

15   people to be successful, it requires constant innovation and

16   improvement.

17        You know, we you don't just competent against TeamViewer, we

18   have dozens of both free and paid competitors in hosted remote

19   access.  There isn't just two or three of us in this space by

20   any means.

21   Q.  And Mr. Anka responding to you -- first of all, he agreed

22   with you, did he not?  The first sentence of what he said to you

23   is:  We have known for a while that TeamViewer was a very

24   compelling application.  Even if you set pricing aside, if you

25   don't need any of the advanced Rescue features, there's no

1    argument against TeamViewer being a more elegant solution.

2        So, he agreed it was a pretty good product, right?

3    A.   Just to clarify, you did misread that.  You left out

4    "compelling application for certain use cases."  I noticed

5    that --

6    Q.   I'm sorry.  I --

7    A.   That's not quite what he had said across the board

8    compelling.  But, yeah, it's -- we have to compete with

9    TeamViewer very -- we have to compete with Citrix and Microsoft

10   around Google and all kinds of other companies constantly trying

11   to innovate and make better products.

12   Q.   So, do you agree then with his next statement:  Users seem

13   to always find the path of least resistance, be that resistance

14   based on money, ease of use, aesthetics, et cetera.  We've been

15   taking advantage of this with LogMeIn Free for years now.  Now,

16   however, we've gotten to know how the GoToMyPC team felt a few

17   years back.

18       You see -- do you agree with that?

19   A.   I think it's indicative very much that, you know, it's about

20   the passion this team has for delighting the customers.  You've

21   got to make great products.  Even if they're free, it's hard to

22   make a great free product.

23       And so, Marton is saying, well, people are going to go to

24   the best product, whether it's based on price, whether it's

25   based on performance, whether it's based on ease of use.  So, I

1   do agree with him.

2   Q.  And then Mr. Anka says to -- he gives you a suggestion for

3   how he proposes to "reconquer the territory," right?  That's in

4   there?

5   A.  He does.  He does, yes.

6   Q.  And he says -- his proposal to you was:  That's why I'm not

7   enthusiastic, to say the least, about trying to turn Express

8   into a pay-for product on any level, at least not until it's

9   done its job and put our German friends out of business.

10      Right?

11  A.  That's what it says.  And as I did say, that's -- we did not

12  follow his advice --

13  Q.  Well --

14  A.  -- and they did very well.

15  Q.  -- certainly it was Mr. Anka's feeling that the way that the

16  join.me product should be used is keep it free until TeamViewer

17  is out of business, then start charging for it.  That's what he

18  suggested?

19  A.  Again, I would say that putting someone out of business is

20  hyperbole, as we discussed before.

21  Q.  Hyperbole or not, that's what he said, right?

22  A.  That's what he wrote.

23  Q.  Okay.  Now, LogMeIn Free, you're planning to start to

24  monetize that, aren't you, start to tighten the noose and

25  restrict the number of things you can do with LogMeIn Free in

1    order to get more people to convert to LogMeIn Pro?

2    A.  I don't think we're tightening the noose.  We're always

3    trying to figure out how to get our free customers to switch and

4    become paying customers.

5    Q.  So, for example, a few months ago you told the public that

6    no longer can LogMeIn Free be used on as many computers as you

7    want.  You put a limit on the number of computers, right?

8    A.  That's right.  Historically you could use LogMeIn Free --

9    when you register and create an account, you could add as many

10   computers as you wanted.  And most of our competitors that have

11   free offerings only allow one.  And a few months ago we decided

12   that we would change our service so you get an infinite amount

13   of free computers just to 10.

14       And the rationale being if you have more than ten computers,

15   you're probably not an individual accessing your office or your

16   home.  You're probably an IT department.

17       And we actually sell other products that are really

18   complementary and useful for IT departments, and particularly we

19   have security and deployment solutions.

20       You can if you're an individual -- and many, many people do

21   this -- is, you're not -- there's nothing that prevents them

22   from saying, look, I'm going to have ten accounts each with ten

23   computers.  But for security reasons, you would have to have a

24   limit of ten computers as well.  You would have to have a

25   separate password for each set of ten computers.

1   Q.   Take a look at Plaintiff's Exhibit 79, please.

2   A.   I'm sorry.  I don't see one in my --

3   Q.   I apologize, sir.  Keeping track of the documents is not my

4   forte.  I'm going to have to ask the Marshal if he could hand

5   you a copy of Plaintiff's Exhibit 79.

6   A.   Thank you, Marshal.

7   Q.   Now that we've spent the time to dig it up, I hope you

8   recognize it.

9        Do you recognize it there?

10  A.   Yes, I do -- yes, I do recognize that.

11  Q.   What is it?

12  A.   This is a document entitled Understanding LogMeIn By the

13  Numbers.  It doesn't have an author on it, but I do recognize

14  it.

15  Q.   Well, it's a presentation that was created by your company,

16  isn't it?

17  A.   Yes, it was -- it's created -- it's an internal confidential

18  documentation.  At least it's labeled Company Confidential.

19  Q.   So, this would have been something that would have been

20  shown to company managers and directors and that sort of thing?

21  A.   I don't actually know who it would be shown to.

22  Q.   And the date is in 2006, is that right?

23  A.   Yes, it is.

24       MR. SHUNK:  Your Honor, there has been no objection to

25  this document.  I move its admission, Plaintiff's Exhibit 79.

1            MR. MOLSTER:  No objection, Your Honor.

2            THE COURT:  Admitted.

3   BY MR. SHUNK: (Continuing)

4   Q.  Turn, if you would, sir, to page 4 of the document.  You're

5   there already?

6   A.  I am.

7   Q.  Oh, my goodness, that's fast.  I was looking at the paper

8   still.

9       Do you agree with the document statement that at least back

10  in 2009 88 percent of the trials for your product, the top five

11  origins of those trials are associated with free?

12  A.  I think this is an important document because it actually

13  very much complements this free engine notion.  What it says is

14  88 percent of the trials are associated with free, but it

15  actually lists specifically what free is.  It -- you know, you

16  can actually see.

17      It explicitly said, this isn't our Free product.  These are

18  the sources of the word "free" trial.  For example, the number

19  one reason people try any of our products, if you go to our

20  website, there's a big green button most prominent that says,

21  try it for free.  When you click on that, it asks you, what

22  would you like to do?  Would you like LogMeIn Pro?  Would you

23  like IT Reach or, excuse me, Central, et cetera.

24      So, it's not -- there's been some confusion because we have

25  a product called Free, but then everything we do has free

1   trials.  And we use the word "free" as you do all over the

2   Internet.  I mean, there is no shortage of freemium businesses.

3   There's no shortage of free products.

4       So, I think it would be a big mistake if you were to say,

5   oh, any time I see free, that means the LogMeIn Free product.

6   You have to look and, you know, actually see what it says.

7   Q.  Right.  Well --

8           MR. MOLSTER:  Objection.

9   A.  This document says very clearly --

10          MR. MOLSTER:  I think the witness is entitled to finish

11  his answer.

12          THE COURT:  Objection sustained.

13  A.  This document very clearly lists free.  Like, for example,

14  LogMeIn Free nav bar, that's a button on our website.  You know,

15  it's a navigational thing you would see on our website.  It's

16  not our Free product.  And it's very clear and very explicit in

17  this document that we're not talking about the LogMeIn Free

18  product.

19  Q.  Well, I don't know.  Let's turn to page 43475 in that

20  document and see whether we get some more clarity.  43475.

21  A.  Yes, sir, I am there.

22  Q.  Now, on this particular slide, the first thing says that:

23  The free hook gets potential customers to our pages to register.

24      That's what you were saying, right?

25  A.  I am.  And, again, it defines what the free hook is.  It's

1    the word "free."

2    Q.   And then the registrations become trials, right?

3    A.   Yes.

4    Q.   And once the trials start, then the user gets hit with what

5    you call cross promos.  Cross promotions of other products,

6    right?

7    A.   It is.  It does.

8    Q.   And then trials of IT, Reach, and Pro become Rescue trials

9    and purchases, right?

10   A.   And --

11   Q.   So, what you're saying here is that the products that have

12   the free name associated with them actually lead to your

13   customers trying and purchasing related products in your family,

14   right?

15   A.   Well, the unfortunate thing about this document -- and,

16   again I think it's important -- is the previous page actually

17   shows how it works.  And there's -- there's been sort of this

18   notion that people start with free and then go and buy our

19   products later on, that somehow there's residual value.

20       And this document clearly shows when you try a LogMeIn

21   product -- when you first come and you register, you get a free

22   trial of one of our premium products.  You get to pick.  You

23   don't have to put in your credit card.  You don't have to -- you

24   register and you -- you don't start with LogMeIn Free.  You

25   actually start with LogMeIn Pro.  And you don't have to pay for

1   it.  You can you see whether, you know, the remote printing or

2   the remote administration tools are valuable for you.

3        And after a while, you're presented with, do you want to

4   keep using this?  Do you want to buy it?  If you do, yes, you

5   become a paying customer.

6        If not, at that point you become a free user.  And it's

7   not -- there is sort of this belief that, hey, we get a bunch of

8   free users and somehow they magically turn into paid users.  And

9   it is actually just the opposite.  Once someone becomes a free

10  user, they're typically a free user forever.

11       And this document, you know, outlines when you start, you

12  register and then you go into a Pro trial, or you're asked what

13  type of product is useful for you rather than the opposite.

14  Q.  Are you really testifying to this jury, sir, that it's your

15  belief that people who try -- who are -- who register as LogMeIn

16  Free users never upgrade to LogMeIn Pro?

17  A.  No, sir, I'm not.

18  Q.  I mean, that's the whole concept of your freemium model,

19  isn't it?

20  A.  It actually is not quite that way because, essentially,

21  you -- if you think about intuitively our users, we serve every

22  type of user under the sun.  Kids use -- if you've ever heard of

23  the game of Minecraft, people use our products to play Minecraft

24  with each other.  My kids do that.

25       People use our products to deliver remote support to their

1    friends and family.  You might -- if you have an elderly parent,

2    you might fix their printer at home.  We have students.  We have

3    teachers.  We have government employees.  We have CEOs of large

4    companies.  We have students.  We have all these types of users.

5        But in reality, there's two types of users that come to

6    LogMeIn, people that use it typically for work and it's mission

7    critical for them to actually work remotely, or people that are

8    IT professionals.  They either -- the vast majority of our

9    purchases start early on because they've tried it and, yeah, I

10   want to keep it.  And then others -- you know, a 14-year-old kid

11   really has no reason to ever buy LogMeIn Pro typically.  And

12   given the preponderance of other free alternatives, once someone

13   says, hey, look I'm just looking for the free one, it's just

14   very rare in our business for people to upgrade to -- from free

15   to a Pro product.

16   Q.  Turn to page 43477 in the document.

17   A.  Which -- same exhibit?

18   Q.  Yes.

19   A.  Yes.

20   Q.  Doesn't the second bullet point, Mr. Simon, say:  Each free

21   registration has some value to us.  It's averaged $5.88 in the

22   last four weeks?

23   A.  Yes, it does.  And this --

24   Q.  Then let's move on to --

25   A.  Well, I think there's something that is really important

1    that says in this document --

2    Q.  Well, Mr. Simon --

3          MR. MOLSTER:  Your Honor, I think he's entitled to

4    explain his answer.  He asked him the question.  Maybe he

5    doesn't like the answer, but I think he's entitled to give him

6    his answer.

7          THE COURT:  He can finish.

8          MR. SHUNK:  Your Honor, this is cross-examination.

9          THE COURT:  He can finish his answer.

10         MR. SHUNK:  Very well, sir.

11   A.  So, to make it simple, if 20 people show up for LogMeIn and

12   one person buys -- let's say they buy $100 worth of products.

13   We're going to get $100, 20 free registrations.  Exactly

14   what's -- $100 for 20 registrations.  The average value per user

15   per registration is $5, right?  It's $5 because we had 20 people

16   for $100 in sales.

17      What I feel is trying to be put on -- in front of you or

18   what this -- you know, this notion that -- they're saying that

19   because you get $5 per free registered user, you're actually 100

20   users would -- excuse me, your 20 -- let me get the math right.

21      Your 20 users would each generate $100, so it would be

22   getting 20 times as much value.  So, instead of you get $100

23   from one user on -- they're saying you get somehow $2,000.

24      That's -- and that's not at all true.  All the money we

25   generate from our free registrations comes from the products we

1    actually sell.  It averages out in this particular exhibit to

2    about $5.  But it's not $5 for the one that paid and then $5 for

3    everyone else so that we get $100 per user.  We only get the

4    $100 once, not 20 times.

5    BY MR. SHUNK: (Continuing)

6    Q.  Take a look at page -- at Plaintiff's Exhibit 68.  I would

7    like you to identify some documents for us now.

8              MR. MOLSTER:  I'm sorry.  That was 68?

9              MR. SHUNK:  Yes.

10             And while we're waiting for that, that Plaintiff's

11   Exhibit 79, I don't recall if I moved the admission of it, but I

12   do now.  It was not objected to, Your Honor.

13             MR. MOLSTER:  I think I already didn't object to that

14   one, Your Honor.  And I continue to not to object to that

15   document.

16             THE COURT:  It is admitted.

17             MR. SHUNK:  Thank you.

18   BY MR. SHUNK: (Continuing)

19   Q.  Do you have 68?

20   A.  Yes, sir, I do.

21   Q.  Do you recognize it?

22   A.  I don't know the origin of it.  I am familiar with the date

23   on it, I think.

24   Q.  Well, if you don't recognize it, I won't ask you about it.

25   Do you recognize it?

1    A.   I'm afraid I don't recall if I've seen this before.

2    Q.   Let me ask you this, sir.  How many -- how many users of

3    LogMeIn Free have there been over the years?

4    A.   I believe it's about 16 million.

5    Q.   16 million.  How many users of the join.me Free product have

6    there been over the years?

7    A.   I believe it's roughly 9 million, 8 or 9 million.

8    Q.   Take a look at Plaintiff's Exhibit 78.

9         Is Plaintiff's Exhibit 78 a press release that your company

10   issued?

11   A.   Yes, it is.

12   Q.   And doesn't it have as its headline, LogMeIn's meeting app,

13   join.me, hits 50 million participant milestone, now averaging

14   more than a million new users every month?

15   A.   Yes, it does.  The -- in the context of how we report a

16   user.  This is actually saying how many people have ever

17   participated in a meeting.  So, it includes the person that

18   hosts the meeting as well as the people that attend.

19   Q.   Well, and, of course --

20   A.   And -- and it also -- if you go to four meetings, you would

21   count four times rather than one person.

22        And when we talk about the numbers that we report for users,

23   it's actually the people that host a meeting.  If you do one or

24   ten or 100, you're one person.

25   Q.   Of course, everybody who is attending the meeting is using

1    the service, aren't they?

2    A.  Yes, they are.  Typically in our industry though, you never

3    sell for the people that use it.  It's actually the person --

4    that attend.  It's usually the host of a meeting that is counted

5    or licensed, whether it's free or paid.

6    Q.  On the other hand, isn't it true that if the join.me service

7    infringes, then each of those users would be -- would be

8    conducting an infringing use of the product, right?

9    A.  Well, first of all, we -- we vigorously believe join.me

10   doesn't infringe, obviously.  We know it doesn't infringe.  And

11   in terms of whether -- so, I actually -- in terms of whether the

12   participants would or wouldn't be covered by the patent, I can't

13   actually say whether it's the user or the participants.

14   Q.  Take a look Plaintiff's Exhibit 118.

15        Do you recognize Plaintiff's Exhibit --

16   A.  Okay.

17   Q.  I'm sorry, do you recognize Plaintiff's Exhibit 118?

18   A.  Yes, I do.

19   Q.  It is, in fact, a slideshow of a presentation that you

20   yourself have demonstrated to potential investors of the

21   company, is it not?

22   A.  I believe -- I believe it's been used with potential

23   investors.

24        MR. SHUNK:  I move the admission of Plaintiff's

25   Exhibit 118.  There's been no objection.

```
 1                MR. MOLSTER:  No objection, Your Honor.

 2                THE COURT:  It is admitted.

 3   BY MR. SHUNK:  (Continuing)

 4   Q.  Take a look at Plaintiff's Exhibit 48, please.

 5                MR. MOLSTER:  I don't think it's in the book.

 6                Do you have it, Mr. Witness?

 7                THE WITNESS:  I don't believe -- let me just

 8   double-check it.

 9                MR. MOLSTER:  The witness should have it in front of

10   him, please.

11                THE WITNESS:  I don't believe it's in my book.  Maybe

12   I'm --

13                MR. SHUNK:  I would ask the Marshal to present that to

14   the witness, please.

15                THE MARSHAL:  What's the number?

16                MR. SHUNK:  48, please.

17   A.  Yes, I'm looking at Exhibit 48 now.

18   BY MR. SHUNK:  (Continuing)

19   Q.  What is it?

20   A.  It's a LogMeIn Form 10-K.

21   Q.  That's a filing with the Securities and Exchange Commission,

22   is it not?

23   A.  Yes, it is.

24   Q.  And in your capacity as chief executive officer you signed

25   and verified that -- all of the statements that are made in that
```

 1  document, do you not?

 2  A.  Yes, I do.

 3          MR. SHUNK:  I move the admission of Plaintiff's

 4  Exhibit 246 -- Plaintiff's Exhibit 48, I'm sorry.

 5          MR. MOLSTER:  No objection, Your Honor.

 6          THE COURT:  It is admitted.

 7  BY MR. SHUNK: (Continuing)

 8  Q.  Take a look at Plaintiff's Exhibit 246.  And that,

 9  hopefully, will be in your original binder.

10          MR. MOLSTER:  If it helps, I don't object to 246

11  either, Your Honor.

12  A.  Okay, I am looking at Plaintiff's 246.

13  Q.  What is 246?

14  A.  So, it's a -- I would have to read it, but it's a form 8-K.

15  Q.  And what does that -- why do you file that form with the

16  Securities and Exchange Commission?

17  A.  This -- I would have to double-check and see which one this

18  is.  But it's to actually disclose -- so, this is disclosing

19  financial information to the Securities and Exchange Commission.

20  Q.  And on page 4 you -- you sign it and verify it, do you not?

21  A.  Yes, I do.  I -- yes, I do.

22          MR. SHUNK:  I move the admission of 246, Your Honor.

23          THE COURT:  It is admitted.

24          MR. MOLSTER:  Still don't object.

25  BY MR. SHUNK: (Continuing)

1    Q.  Would you turn to the sixth page of the document, Mr. Simon.

2    It's the page that says at the top:  LogMeIn announces fourth

3    quarter and fiscal year 2012 results.

4    A.  Yes, I do.

5    Q.  Now, do you agree that for the fourth quarter of 2012 --

6    that would be the last three months of 2012, is that correct?

7    A.  Yes, it is, the last quarter of the year.

8    Q.  You reported that the net income for your company, according

9    to generally accepted accounting principles, was 2.2 million,

10   correct?

11   A.  That is correct.

12   Q.  But you also reported that under non-generally accepted

13   accounting principles for the fourth quarter the net income was

14   $6 million, correct?

15   A.  We did.

16   Q.  Now, the difference between those two calculations of profit

17   had to do with reporting $4.4 million in stock compensation

18   expense, did it not?

19   A.  Among -- yes, that was part of it.  There's multiple reasons

20   that are different that is required.  But there's four million

21   in stock compensation and then other -- other costs as well.

22   Q.  So, if the stock compensation expense had not been deducted,

23   your actual net income for your company would have risen from

24   $2.2 million instead to $6.6 million, correct?

25   A.  I believe so, but I'm just trying -- there's two other

 1   components.  I want to make sure that -- that's -- I'm sorry,

 2   I'm just trying to look to make sure I get the math right.

 3        But I am certainly comfortable with the idea that under a

 4   non-GAAP basis, which excludes other costs that are typically

 5   noncash costs, that our -- our net -- non-GAAP net income in

 6   fourth quarter would have been $6 million.

 7   Q.  Now, those stock compensation expenses, those are -- that is

 8   a line that indicates to the reader that the company -- that

 9   insiders at the company have exercised stock options and have

10   seen a gain by exercising the stock option, correct?

11   A.  I'm afraid that's totally incorrect.  That's not how that

12   works under both GAAP and non-GAAP in financial reporting.

13   That's not what that means at all.

14   Q.  Let me ask you this, sir.  In 2012, for the year, what was

15   the -- what was the bottom-line profit shown by your company?

16   A.  You know, I would have to look to make sure I get the

17   numbers right, but -- because it's actually part of this.  It's

18   what we disclose every quarter.

19        So, our net income for 2012 was $3.5 million.

20   Q.  3.5 million.  Now, in that same year, isn't it true that you

21   personally made a profit of $1.7 million on the sale of LogMeIn

22   stock?

23   A.  Can I ask where you think you got that number?

24   Q.  Well, I got it from looking through the SEC filings.  Does

25   that sound right to you?

1    A.   Yeah, I think -- I assumed that's where you got that number.

2    That's actually not what that says.  I think you misunderstand

3    how stock compensation and its reporting in SEC filings works.

4    It has nothing to do with exercise or actually making any money.

5    That's just not fundamentally what it means.  The cost is

6    incurred at the time the grants are made.  It has -- you can

7    actually incur stock -- we have 575 employees, 575 employees.

8    If we give them options, then you get a situation where we have

9    to take a charge even if they never make a penny on them.

10   Q.   Take a look at Plaintiff's Exhibit 63.

11   A.   Yes, I'm looking at Exhibit 63.

12   Q.   What is 63?

13   A.   It was a schedule, I believe, that was prepared for this

14   litigation that talks about our revenue broken out from just

15   U.S. and worldwide and -- and then foreign revenue by product.

16   Q.   Is it accurate?

17   A.   I believe so, yes.

18        MR. SHUNK:   I move the admission of Plaintiff's

19   Exhibit 63.

20        MR. MOLSTER:   This is one of the documents that we

21   discussed, Your Honor.  We don't have an objection to its

22   admission, but under seal.

23        MR. SHUNK:   No problem, Your Honor.

24        THE COURT:   Admitted.

25   BY MR. SHUNK: (Continuing)

1   Q.   Take a look at Plaintiff's Exhibit 181.

2   A.   Yes, I am looking at 181.

3   Q.   What is it?

4   A.   This is a document entitled Investor Relations Statistics.

5   Q.   And that's something that is prepared, among other things,

6   for your use in communicating with your investors if the need

7   arises, correct?

8   A.   It is, yes.

9   Q.   Is it accurate?

10  A.   I believe so, yes.

11          MR. SHUNK:  I move its admission, Plaintiff's Exhibit

12  181.

13          MR. MOLSTER:  Same situation.  No objection if it's

14  filed under seal.

15          MR. SHUNK:  No problem with the seal.

16          THE COURT:  It's admitted.

17  BY MR. SHUNK: (Continuing)

18  Q.   Is there is a Plaintiff's Exhibit 76A in your book,

19  Mr. Simon?

20          MR. MOLSTER:  I don't have 76A.

21  Q.   If I could hand the Marshal those items, the witness could

22  just look at it that way.

23  A.   Yes, I am looking at 76A right now.

24  Q.   Do you recognize 76A?

25  A.   They're financial information, LogMeIn's income statement.

1   I don't know if I've seen it in this form.  Was it something we

2   prepared for you?

3   Q.  Well, this is something that was provided to us by your

4   company, so --

5   A.  I would believe it's accurate then.

6           MR. SHUNK:  I move its admission.

7           MR. MOLSTER:  Subject to the same treatment,

8   Your Honor, under seal, we don't have any objection to 76A.

9           THE COURT:  It is admitted under seal.

10  BY MR. SHUNK: (Continuing)

11  Q.  Take a look at 76B.  Same question.

12  A.  I'm sorry.  I'm just trying to understand what exactly I'm

13  looking at.  But it's financial information, I believe, prepared

14  by our company.

15          MR. SHUNK:  I move its admission, with the same

16  agreement to put it under seal.

17          MR. MOLSTER:  No objection.

18          THE COURT:  It's admitted.

19  BY MR. SHUNK: (Continuing)

20  Q.  Finally, Mr. Simon, would you look at Plaintiff's

21  Exhibit 247.

22  A.  Yes, I have it in front of me right now.

23  Q.  What is Plaintiff's Exhibit 247?

24  A.  It's a document entitled Purchase Price Allocation.  It

25  relates to an acquisition of a small company we did called

1   Applied Networking.

2   Q.  Was that an analysis that you commissioned to have done to

3   analyze certain financial aspects of your acquisition of the

4   company that had the Hamachi technology?

5   A.  Yes, it is.

6   Q.  And did your company utilize this document for its own

7   financial analysis purposes?

8   A.  Yes, we did.

9         MR. SHUNK:  I move the admission of Plaintiff's

10  Exhibit 247.

11        MR. MOLSTER:  The same, no objection if we can file it

12  under seal.

13        MR. SHUNK:  Agreed.

14        THE COURT:  It's admitted under seal.

15        MR. SHUNK:  Thank you, Mr. Simon.

16        THE COURT:  All right, why don't we take a brief recess

17  at this time.

18        NOTE:  At this point the morning recess is taken; at

19  the conclusion of which the case continues as follows:

20        MR. MOLSTER:  May I proceed, Your Honor?

21        THE COURT:  Yes.

22        MR. MOLSTER:  Thank you.

23      CROSS-EXAMINATION

24  BY MR. MOLSTER:

25  Q.  Still good morning, Mr. Simon.

1    A.  Good morning.

2    Q.  I would like to follow up on a few of the things that you

3    were asked in your examination by 01.

4        First of all, with respect to the patent, they showed you

5    their patent, PX 1.  Do you remember that?

6    A.  Yes, sir.

7    Q.  And they asked you if you looked at it yourself?

8    A.  Yes.

9    Q.  Did you rely on your technical team for looking at the

10   patent back previous -- just before this lawsuit?

11   A.  Yes.  I continue to rely on our technical team for all

12   technology issues, including patent.

13   Q.  Can you turn to Exhibit 78 that you were shown.  I'm sorry,

14   yes, 78.  Do you see that?

15   A.  Yes, I do see that.

16   Q.  Do you remember that was -- I believe you had testified that

17   there were about 9 million join.me Free registered users.  Do

18   you remember that?

19   A.  Yes, it's actually we track them without a registration, but

20   tracked users, yes.

21   Q.  Tracked users?

22   A.  Yes.

23   Q.  And then Mr. Shunk showed you this document and said, well,

24   isn't it really 50 million.  Do you remember this article?

25   A.  I do remember that.

1   Q.  And I just wanted to -- I believe your response was that it

2   is really 50 million participants, not actually join.me users,

3   is that correct?

4   A.  Correct.  So, it is actually a press release from LogMeIn.

5   It's our own press release.  And it said that out of all the

6   meetings we've ever held, the total number of people that have

7   ever attended, whether it be once, a hundred times, a thousand

8   times, you know, the people that have ever -- the number of

9   participants in all the meetings, not the number of people,

10  participants -- and that's actually in the headline -- the

11  number of participants is 50 million.

12      So, if you use join.me once a week to meet with ten people,

13  that would be ten every week for 52 weeks, so 520 of those, not

14  just ten people.  That's why it is a much larger number.

15  Q.  Is the word "participants" actually in the title of the

16  press release?

17  A.  Yes, it is.

18  Q.  Could you just read the title of the press release for the

19  jury.

20  A.  LogMeIn meeting app, join.me -- LogMeIn meeting app,

21  join.me, hits 50 million participants milestone, now averaging

22  more than a million new users every month.

23  Q.  Thank you, sir.  How about page -- Plaintiff's Exhibit 46,

24  could you look at that.

25  A.  Yes, sir, I am looking at it.

1   Q.  And do you remember -- I think Mr. Shunk was asking you

2   about the first paragraph, and I think that you had pointed out

3   to him that he left out a few words, but I am not sure that I

4   got that and I am not sure the jury got it.

5       So, could you just read that first sentence and indicate

6   where the words are that Mr. Shunk left out when he was

7   examining you about Plaintiff's Exhibit 46.

8   A.  Yes.  So, part of it says:  TeamViewer was a very compelling

9   application.  The actual e-mail says:  A very compelling

10  application for certain use cases.

11      And Mr. Shunk had left out the "for certain use cases."  He

12  just said it was a very compelling application.

13  Q.  And so, is it fair to say that Mr. Anka in his e-mail was

14  limiting his comments on TeamViewer to certain use cases?

15  A.  Yes, he was.

16  Q.  Thank you.  Let's take a look at Exhibit 79, because I think

17  this is one that Mr. Shunk asked you about and you said it was

18  an interesting document and an important document.  And I think

19  you were trying to sort of explain the difference between Free

20  products and free trials.  And I just want to make sure that the

21  jury is clear on that.

22      So, when you get to 79, please let me know.

23  A.  Yes, I am looking at that.

24  Q.  Okay.  And maybe the easiest thing to start off with is,

25  could you just explain that us -- you have something called free

1   products, is that correct?

2   A.  We have free -- a product called LogMeIn Free.

3   Q.  Okay.  And that doesn't cost money for users to use,

4   correct?

5   A.  That doesn't cost.

6   Q.  And do you have a free product called join.me Free?

7   A.  Yes, I do.  Yes, we do.

8   Q.  And you have paid -- and you have paid products as well, is

9   that correct?

10  A.  We do.

11  Q.  And for the paid products, is there a free trial period?  Is

12  that what you were saying?

13  A.  Yes, there is free trials for all of our paid products.

14  Q.  Is that common in your industry?

15  A.  Extraordinarily common.

16  Q.  Did you hear, in fact, Mr. Cheung say that his company

17  offers a free trial period for its I'm InTouch product?

18  A.  Yes, I did.  I was here.

19  Q.  Okay.  So, you have free trials, and then after a certain

20  amount of time you either convert -- hopefully they convert to

21  the paying product, is that correct?

22  A.  That is without a doubt our goal, to get people to buy

23  products.

24  Q.  About how long is that free trial period?

25  A.  Can typically last anywhere from 14 to 30 days, depending on

1    the product.

2    Q.   Okay.  And did you -- as I recall, you were indicating this

3    document is important because it, in fact, is addressing free

4    trials as opposed to your Free products, is that correct?

5    A.   Correct.  It is both together.

6    Q.   Okay.  Is there any particular part of the document that

7    would be most helpful for us and the jury to understand the

8    document?

9    A.   So, essentially through the document, it very clearly goes

10   through product by product and identifies trials by products.

11   And, in particular, on page 9 of this exhibit, it shows what

12   happens.  And if it's okay, I will walk you through it again.

13   Q.   Sure.

14   A.   You register.  And the registration and trying, it's free.

15   You start with free.  Then you pick which type of product you

16   are going to use.  It could be LogMeIn Pro, it could be join.me

17   if you are registering.  And you start a trial.

18        And I should say, before you even start a trial, you pick a

19   product.  And so, we are cross-promoting.  You may have heard, I

20   heard about LogMeIn, I think they have a free remote control, I

21   need to fix a server or something.

22        So, you go there.  And then we say, well, you know, we

23   actually have products just for IT professionals or we have

24   products just for accountants.

25        And we try and direct you -- you heard about LogMeIn Free,

1    but we try and direct you to one of our paid products.  And,

2    typically, you don't have to pay anything, you don't have to put

3    it on a credit card, you don't have -- it is just a user name

4    and password.  Just like literally in today's world hundreds of

5    thousands of other freemium business.  It is perhaps the most

6    popular business model in all tech now.

7        If you go to -- if you're an iPhone user, you go to App

8    Store -- I don't know if there hundreds -- there are at least

9    tens of thousands, but I would guess at least hundreds of

10   thousands of free apps.  You can use the free.  They encourage

11   you to buy them, but most likely you're going to use the free.

12   Free is often good enough, very much the case.  Only a small

13   percentage of our users ever pay.

14       But you start with a paid product or you get a free trial of

15   a paid product.  And then after your trial is up, there is sort

16   of a decision, do I want to stay and actually continue using all

17   the extra features and pay for them, or do I just want to revert

18   to free.

19       For the vast, vast, vast, vast majority of our users, free

20   is good enough, and so they become free users.

21       Do they ever go from free back to pay?  Yeah, sometimes.

22   But typically the majority of our purchases actually happen in

23   the beginning rather than the tail-end.

24       And I did a poor job, I think, in direct of trying to do the

25   math.  I was kind of trying to give an example --

1    Q.  I am not saying that, Mr. Simon.  Go ahead.

2    A.  Okay.  But if I could just clarify.  Again, if we sell $100

3    worth of products to 20 users, the average revenue we get is $5

4    per user.

5        There is not another $5 per user elsewhere so that we are

6    magically getting another $100 that that would imply.

7    Q.  Could I just clarify --

8    A.  And that would be double-dipping, I think.

9    Q.  Okay.  So, if you got -- the $5 that you are talking about

10   is for both free users and paid users, is that correct?

11   A.  Correct.

12   Q.  All right.  So, with respect specifically back to PX 79,

13   Plaintiff's Exhibit 79, I believe Mr. Shunk asked you about a

14   line that said:  Each free registration has some value to us, it

15   averaged $5.88 in the last four weeks.

16       Do you remember he asked you about that?

17   A.  He did.

18   Q.  Does that 5.88 include both free users and paid users?

19   A.  And paid users.  If you just try and say how much do we

20   generate from our free users, the math is very easy.  I wouldn't

21   mess it up.  It is zero.  You know, our free users never pay us

22   anything.  That's why it is called -- they are free products.

23   Q.  Even I can do that math, Mr. Simon.

24       Let me ask you this.  With respect to your company's

25   revenues, you get revenues from paid users, for paid products,

1    right?

2    A.  Correct.

3    Q.  And just to clarify, how many -- what revenues do you get

4    from customers that only use your free products?

5    A.  Zero.  And just for the avoidance of doubt, we don't put

6    advertisements or add words.  They are genuinely free products.

7    We are not trying to use them as, you know, a way of hitting our

8    users with spam and e-mail and promoting third-party products or

9    credit cards like so often with free products.  They are free

10   products.  They are used by all kinds of people and they are

11   genuinely free.

12   Q.  What kinds of people -- what kind of users use your product?

13   A.  Without a doubt, it spans the entire universe.  When we went

14   public in 2009, I realized that -- we did some research.  I

15   realized there's 243 countries and territories in the world, at

16   least there were in 2009.  We actually had free users in all

17   243.  I mean, it is all over.

18       And the types of users -- you know, one of the most common

19   use cases is -- interestingly enough, it's to what we internally

20   in our company call friends and family support.  It is where a

21   person is trying to give technical assistance to an elderly

22   parent.

23       How often -- you know, for the situations where like, oh, my

24   e-mail isn't working or I can't print, that is very common use.

25   That covers all kinds of people.

1    But if you kind of dig it into a little bit more, students,

2    teachers, government workers, defense contractors, Department of

3    Defense, Department of State.  We have Fortune 500 company

4    users, military, police, you name it.  You know, essentially it

5    is a free product.  It is genuinely free and people tend to like

6    it.

7    Q.  Do you have a 15-year-old boy like my kid who is a gamer?

8    A.  If you have anyone that wants to play Minecraft with their

9    friends, we have a free product for them.

10   Q.  Is this concept of -- I heard it referred to as the freemium

11   model.  Are you familiar with that?

12   A.  Yes, I am.

13   Q.  Is that common in the Internet industry?

14   A.  It is very common.  I think anyone who has been on the

15   Internet knows that there's a large number of free things, not

16   just Facebook and Google, but actual applications and utilities.

17       If you actually search for remote access in Google, you'll

18   get dozens and dozens of solutions, including an enormous number

19   of free ones from people like Microsoft, from -- gosh, you have

20   Google has a free remote access, Microsoft has a free.  There is

21   not just GoToMyPC, there is ShowMyPC, and all kinds of variants.

22       I mean, there are many, many free solutions in this space,

23   including some of our important competitors like TeamViewer.

24   Q.  TeamViewer?

25   A.  TeamViewer has a free solution.

1   Q.   Let me ask you, I think you said you first offered your

2   products in April of 2004, is that right?

3   A.   Correct, April 13 of 2004.

4   Q.   And when did you first start offering free products?

5   A.   A little bit later, September of 2004.

6   Q.   So, how was it that you were able to offer free products

7   so -- in such a short time after you started your company?

8   A.   Well, a lot of technical innovation went into reducing

9   our -- in our industry we call service delivery costs.  How much

10  does it cost to actually support a free user because, as you can

11  imagine, we run servers, have bandwidth costs.

12       So, what we were able to do is come up with technology that

13  is now patented.  We have five patents on our technology that is

14  largely -- those particular patents address to cost efficiency

15  and how we can make it very low cost.  And then --

16  Q.   Is that low cost for remote access?

17  A.   Low cost for hosted remote access.  So, essentially, there

18  was a desire early on to come up with a freemium business.

19  Again, as I said, it's one of the most common, if not the most

20  common business model in tech right now, and the technology --

21  Q.   You have been in this courtroom the whole time, is that

22  correct?

23  A.   Yes.

24  Q.   As the corporate representative of LogMeIn?

25  A.   Yes.

M. Simon - Cross                                                529

1    Q.   Did you hear Mr. Stringer testify yesterday?

2    A.   Yes, I did.

3    Q.   Did you hear Mr. Stringer testify that his company, 01, had

4    a choice whether or not to offer a freemium model or not,

5    correct?

6    A.   I did.

7    Q.   And he indicated that he did not -- that his company decided

8    not to offer the freemium model, correct?

9    A.   Yes, I do.

10   Q.   And your company decided to offer the freemium model,

11   correct?

12   A.   Yes, we did.

13   Q.   Did you have a lot of money back in 2004 when you rolled out

14   your -- took the risk and rolled out your freemium product?

15   A.   Well, not for a company.  We had about $800,000 in the bank

16   when we started, not particularly a lot of money.

17   Q.   Would you turn to Exhibit 41, Plaintiff's Exhibit 41, that

18   Mr. Shunk asked you about.

19        Do you have that document in front of you, sir?

20   A.   Yes, I do.

21   Q.   And I think just to recap, one of the things -- he asked you

22   some specifics about this document.  But I think that -- let

23   me -- before I get to that, let me ask you one more question.

24        Why did your company decide to offer Free?

25   A.   We just thought it was a good business model.  Essentially

1    the free products are a form of advertising for us.  The free

2    products attract other users.  It helps with word of mouth, as

3    you imagine.  It is not the only marketing.  We aggressively

4    have sales and marketing.  But we feel that free users attract

5    other free users and sometimes they attract other paid users.

6        So, it is strictly something to build awareness of LogMeIn,

7    hopefully a good brand equity, and awareness of all our

8    products, not just our free products, but all of our products.

9    Q.  And is your company pretty successful?

10   A.  Pretty successful.  We could be more successful, but we are

11   making some progress.

12   Q.  Very good.  Exhibit 41, if you would, please.

13   A.  Yes, this is -- I have it in front of me.

14   Q.  Okay.  And this was a document from July 2 of 2003 and there

15   was some discussion about a Mr. Tim Guest.  Do you remember

16   that?

17   A.  Yes, I do.

18   Q.  And I think Mr. Shunk asked you a little bit about your

19   background.  You indicated you have an electrical engineering

20   degree from Notre Dame, is that right?

21   A.  Yes, I do.

22   Q.  When did you obtain that degree?

23   A.  So, I graduated from Notre Dame in 1987.

24   Q.  Did you ever work as software programmer?

25   A.  I did.  I started right after I finished university, I spent

1    five years working for McDonnell Douglas, the aircraft

2    manufacturer.  I was actually a software -- originally an

3    associate, then regular engineer, then senior engineer doing

4    software systems for aircraft.  Worked on number of ones, but an

5    airplane some of you might recognize is like an F-18.  It's a

6    Navy and Marine airplane that I worked on.

7    Q.  What kind of work were you doing when you were working on

8    the F-18 for McDonnell Douglas?

9    A.  It's called avionics, but it's the embedded control systems

10   of an airplane.

11   Q.  While you were working with McDonnell Douglas, did you go to

12   night school?

13   A.  I did.  I went to Washington University of St. Louis.

14   McDonnell Douglas is in St. Louis.  And I studied for an MBA or

15   Master's of Business Administration at night.

16   Q.  Did you obtain that degree?

17   A.  I did.  I graduated in 1992.

18          MR. SHUNK:  Pardon me, Your Honor.  This is beyond the

19   scope.

20          THE COURT:  Objection sustained.

21          MR. MOLSTER:  Your Honor, I think he opened the door

22   when he asked him about his background, but very well, Your

23   Honor.

24   BY MR. MOLSTER: (Continuing)

25   Q.  Let's turn back to PX 41, please.

1       Now, on PX 41 there is a reference to the

2  GoToService-overview.  Do you see that?

3  A.  Yes, I do.

4  Q.  Was that the project name within your company for that

5  product?

6  A.  There was -- well, it was at least Tim Guest's code name.  I

7  can't remember if we used that name for very long.

8  Q.  And Mr. Shunk kept asking you questions about GoToMyPC and

9  whether this was going to be like the GoToMyPC and lots of

10  questions about that.  Do you recall that?

11  A.  I do recall that.

12  Q.  GoToMyPC, that's not an 01 product, right?

13  A.  No, it's not.

14  Q.  01's product is called I'm InTouch, is that right?

15  A.  Yes, sir.

16  Q.  What is the name -- whose product is GoToMyPC?

17  A.  It is a product now of Citrix, the Citrix corporation.

18  Q.  And they are not a party to this litigation, right?

19  A.  No, sir, they are not.

20  Q.  Okay.  All right.  So, let's go -- I think on the third page

21  he made a reference to ping.  Do you remember his reference to

22  ping?

23  A.  Yes, I do.

24  Q.  Every two seconds?

25  A.  Yes.

1   Q.   Was -- when did you start working on the Internet space?

2   A.   So, I really got into the Internet space in 1995.  I was --

3   Q.   When you first got into the Internet space in 1995, was ping

4   well-known?

5   A.   Yes, it was.  The actual ping protocol dates back to 1983.

6   It's a command that allows you to test communication between two

7   devices on the Internet.

8   Q.   Dates back to when, I'm sorry?

9   A.   1983, at least according to Wikipedia, 1983.

10  Q.   Did Mr. Cheung invent ping?

11  A.   I don't believe.  Not according to Wikipedia, no.

12  Q.   How about Mr. Shunk asked you about page 2, some references

13  with respect to the RemotelyAnywhere project concerning dynamic

14  IP addresses, routers, and firewalls.  Do you remember that?

15  A.   Yes.

16  Q.   And you have been sitting here the whole time and you heard

17  Mr. Cheung and other people talk about dynamic IP addresses,

18  routers, and firewalls, is that right?

19  A.   Yes, I have.

20  Q.   Okay.  So, here is a reference to dynamic IP addresses,

21  routers, and firewalls in 2003.  Is that the date of this

22  document?

23  A.   Yes, it is.

24  Q.   And do you know that to be two years before the patent ever

25  issued to 01?

1    A.  Yes, it is.

2    Q.  Okay.  So, you all were dealing with this issue long before

3    the patent issued, right?

4    A.  In fact, very long before.

5    Q.  Okay.  Well, let's talk about that.  Had you worked with

6    Mr. Guest prior to 3am Labs or LogMeIn?

7    A.  Yes.  We actually worked together an awful long time ago,

8    almost 18 years.

9    Q.  Okay.

10   A.  He was an employee of ePub and then Uproar.

11   Q.  All right.  I want to talk about ePub and Uproar.  Mr. Shunk

12   asked you some questions about them.  Before I do, let's just

13   confirm.

14       There was a company called 3am Labs, Limited Partnership,

15   was a Hungarian company that Mr. Anka owned, is that right?

16   A.  Yes.

17   Q.  Then you and he hooked up and created a new company called

18   3am Labs?

19   A.  Yes.

20   Q.  And then did you change the name of 3am Labs to something?

21   A.  LogMeIn.

22   Q.  And when did you do that?

23   A.  I believe it was 2006.

24   Q.  Okay.  Where did 3am Labs start off?

25   A.  Actually it was founded in Marton's apartment in Budapest,

1   Hungary.

2   Q.   Did at some point you move it to the United States?

3   A.   Yes, we did.   Our headquarters is now just north of Boston,

4   in Woburn, Massachusetts, a little suburb of Boston.

5   Q.   When did you move the headquarters to the United States?

6   A.   2004.

7   Q.   Okay.   Let's go back to Mr. Guest and these three issues,

8   dynamic IP address, routers and firewalls.   You referenced a

9   company called ePub?

10  A.   Yes.

11  Q.   Did ePub deal with remote access?

12  A.   We did, very much.

13  Q.   At what period of time did ePub deal with remote access?

14  A.   Well, we had to get into and solve remote access problems

15  starting in 1995 when we started developing services for the

16  Internet.

17  Q.   Did that include issues relating to dynamic IP addresses?

18  A.   It did.

19  Q.   Did it include issues relating to routers?

20  A.   Yes, it did.

21  Q.   Did it include issues relating to firewalls?

22  A.   Yes, it did.

23  Q.   How far before -- the patent issued in 2005 -- and you are

24  talking about 1995?

25  A.   Yes, I am.

1   Q.  All right.  Tell us about ePub and what it was doing to

2   develop Internet products.

3   A.  Well, ePub stands for electronic publishing.  That's ePub,

4   it's not a bar something like that.

5       So, ePub was contacted -- I was the founder and CEO of ePub.

6   And in 1995 the Microsoft Corporation contacted ePub and myself

7   and asked for help with the launch of Windows 95, Windows 1995

8   or in 1995.  And specifically they needed to create content for

9   their new online services.

10      And they -- essentially, Microsoft was just getting into the

11  space with Microsoft Network, which you might remember.  And

12  Microsoft in general, and Bill Gates in particular, needed to

13  demonstrate that Microsoft was going to be a player in online

14  space.

15      So, we actually worked with Microsoft, actually went to a

16  bunch of presentations for engineers, but ultimately in

17  September of 1995 when Windows was launched in Europe, I

18  actually spent a day with Bill Gates where we were actually

19  showing, hey, this is what the Internet could be.  This is what

20  Microsoft Network could be.

21      So, we got involved in what back then were two very new

22  technologies --

23  Q.  I just want to stop you.  When was it -- what year did you

24  spend the day with Bill Gates?

25  A.  1995.

1    Q.   Where were you?

2    A.   Budapest, Hungary.

3    Q.   Go ahead.

4    A.   So, what was interesting about that at least is he actually

5    did the announcement in the Parliament of Hungary.  He was

6    treated like a state representative, even though it was a

7    commercial product.

8    Q.   He should be.  Go ahead.

9    A.   So, essentially things that we take for granted 18 years

10   later were brand new.  Java was just released in 1995.  And what

11   is now known as ActiveX, the plug-ins, if you ever come across

12   that, were -- the predecessor of that was developed, and that's

13   particularly what we were, you know, exposed to.

14        And those fundamentally changed what you could do on the

15   Internet at that time.  Up until that point, you could basically

16   download a document.  But suddenly with those two technologies,

17   you could create much better, much more sophisticated type

18   things.  Multiuser games, chat systems, remote access, and all

19   kinds of things, just to put a point on it.

20   Q.   Did you create a product called ePub Information Exchange?

21   A.   We did.

22   Q.   Who created that product?

23   A.   It was myself and the engineering team.  Again, I led, if

24   you will, as the CEO.  But our engineers, we together at ePub

25   created something called the ePub Information Exchange.

1    Q.  Was Mr. Guest one of those engineers?

2    A.  For part of the time.

3    Q.  Did the ePub Information Exchange product allow remote

4    access?

5    A.  Very much so.  It's the reason it was created.  So,

6    essentially at that time local area networks, computers behind a

7    firewall, were common.  If you were behind -- you know, two

8    computers that were on one network, could readily print, could

9    readily share files, was -- you could use PC anywhere to do a

10   remote control.  That was pretty well-known.

11       However, the reason we created ePub Information Exchange is

12   as soon as we wanted to create anything more sophisticated,

13   anything fun, anything useful, for the Internet, we had to solve

14   this problem, how do you get access between any two computers

15   that are not connected to the Internet, including the computers

16   that are connected behind the firewall or behind a router with

17   dynamic IP addresses.

18       So, the reason we created the ePub Information Exchange is

19   literally, as the name says, which is to exchange information.

20   And we used it for multiple purposes.

21   Q.  Did the ePub system permit access to a computer that was

22   located behind a firewall?

23   A.  Yes, sir.

24   Q.  In 1995 and 1996?

25   A.  It was launched in 1996.  It was -- started development in

1  1995.

2  Q.  Did the ePub system permit access to a computer with a

3  dynamic IP address?

4  A.  Yes, sir, it did.

5  Q.  Did the ePub system permit access to a computer behind a

6  router?

7  A.  Yes, it did.

8  Q.  Did the ePub system include a ping?

9  A.  Yes, it did.

10  Q.  Did the ePub system have a location facility?

11  A.  No, it did not.

12  Q.  You heard the testimony in this court about the '479 patent

13  and its requirement that it have a locator server computer with

14  a location facility, did you?

15  A.  I did hear that.

16  Q.  Okay.  Did the ePub system use a locator server computer

17  with a location facility back in the mid-'90s?

18  A.  No, you didn't need one.

19  Q.  Why not?

20  A.  Well, because any Web server -- as you know, when you log

21  onto a Web site, it can send you information.  Web servers can

22  always send information, they know how to find computers.

23      So, by simply exploiting or working in conjunction with an

24  off-the-shelf Web server in 1995 and 1996, you could instantly

25  solve that problem, essentially by piggybacking on the sessions

1  between computers and -- it's a technical term, but a session is

2  a durable connection, if you will, a connection between a

3  computer and a Web server.

4      If you use a ping or a keep-alive pulse or heartbeat, those

5  sessions stay alive.  And as long as those sessions are alive,

6  you can send information between any two computers that are

7  connected to the Internet.

8      It's a problem that we ran into and all of our people that

9  were developing products back in 1995 and 1996, if they wanted

10 to do anything sophisticated, they ran into immediately.  And we

11 did as well, and we were able to solve it simply using a

12 solution that was readily available on the market.

13 Q.  Did you sell the ePub Information Exchange system

14 commercially, sir?

15 A.  What we did, we really had four different uses for the ePub

16 Information Exchange.

17 Q.  When did you first sell the ePub system commercially?

18 A.  Well, if I could explain the four uses, maybe that will give

19 you a sense.  So, it was used for chat, for multiuser games, for

20 online meetings and remote access.

21     We started in 1996 originally with multiuser games in August

22 of '96.  But then in December of 1996, December of 1996 we

23 started selling the ePub Information Exchange products not as a

24 game online, but actually for business use and other use.

25 Q.  Can you think of any significant customers of any of the

1    services offered by the ePub Information Exchange in the

2    early -- in early 1997?

3    A.  Yes, in --

4            MR. SHUNK:  Pardon me, counsel.  I want to object and I

5    wonder if we could approach the bench with regard to this

6    objection?

7            THE COURT:  All right.

8            NOTE:  A side-bar discussion is had between the Court

9    and counsel out of the hearing of the jury as follows:

10   AT SIDE BAR

11           MR. SHUNK:  Your Honor, it sounds as though the

12   defendant is trying to argue that this ePub thing was prior art.

13           It has never been disclosed to us in an expert report,

14   it was not, more importantly, in the notice of prior art that's

15   statutorily required 30 days before trial.  And there has been

16   no production of any details of this ePub thing to us.

17           So, we would object to them putting up -- we have heard

18   a little bit about what he was doing as a company, but now it

19   seems like they are going to argue that this somehow invalidates

20   our patent.

21           This is complete surprise.  And we would ask that they

22   not be permitted to try to insinuate to the jury that somehow

23   this ePub, whatever it is, is invaliding prior art to our

24   patent.  They simply have never given us notice as required by

25   this Court's orders as well as by the statute in advance of

1    trial.

2              MR. MOLSTER:  I'm not arguing it is prior art.  We

3    haven't asserted -- there is no patent on it.  But he did open

4    the door.  He put in a document where Mr. Guest talked about

5    remote access, he talked about firewalls, he talked about ping,

6    he talked about IP addresses.

7              He tries to make it look like we stole the idea.  This

8    fellow has been doing it along with Mr. Guest since 1995.  He

9    completely opened the door to it.

10             MR. SHUNK:  Your Honor, that sounds like he is trying

11   to argue it's prior art to me.  I don't understand why they

12   didn't give us this.

13             THE COURT:  Objection overruled.

14             MR. MOLSTER:  Thank you, Your Honor.

15             NOTE:  The side-bar discussion is concluded; whereupon

16   the case continues before the jury as follows:

17   BEFORE THE JURY

18   BY MR. MOLSTER: (Continuing)

19   Q.  Let's go back to where we were, Mr. Simon.  Can you think of

20   any significant customers of any of the services offered by the

21   ePub Information Exchange in 1997?

22   A.  I believe the biggest customer was Nortel.  Nortel paid

23   $40,000 to actually purchase the ePub Information Exchange

24   product.

25   Q.  Was Nortel in 1997 a telecom company?

1   A.  Yes, it's the company -- it's a Canadian-based company that

2   actually makes telephone equipment.  Many people have used their

3   the -- desktop phones and other things --

4   Q.  You took my question from me.

5   A.  Nortel is -- it's a world.  I think I said Nortel is a

6   Canadian-based telecom company that makes telephone equipment.

7   Q.  You stole my thunder.  You took my question from me.  Where

8   is Nortel located?

9   A.  It is headquartered in Canada to my knowledge.

10  Q.  Thank you.  Did you present to any other customers, your

11  ePub Information Exchange product to any other customers?

12  A.  We did.  We marketed it worldwide.  And we also presented it

13  at Internet World at the Javits Center in New York City in 1997.

14  Q.  Your Honor, I would like to hand up, if I may, the trial

15  exhibit binder for Mr. Simon.  One for the Court and one for the

16  witness.

17      Sir, did you present to a company called Centris?

18  A.  Yes, sir, I did.

19  Q.  When?

20  A.  In 1997.

21  Q.  Did that presentation relate to remote access?

22  A.  Yes, sir, it did.

23  Q.  How did it relate to remote access?

24  A.  They wanted to resell an online meeting and remote access

25  solution built on the ePub Information Exchange.

1    Q.   Would you please turn to DX 294 in your binder.

2    A.   Yes, sir, I am looking at it.

3    Q.   Is that a copy of the presentation to Centris Management on

4    September 4 of 1997 regarding the ePub product?

5    A.   Yes, sir, it is.

6    Q.   Did you present to a company called Scala?

7    A.   Yes, I did.

8    Q.   Was this a remote access product that you presented to

9    Scala?

10   A.   Yes, we did, it was a desktop remote control solution.

11   Q.   Could you please look at Exhibit DX 296 and tell the jury

12   what that document is.

13   A.   So, this document is the marketing presentation we did to

14   Scala.  It is dated -- excuse me, which one are we looking at?

15   Q.   296.

16   A.   296.  It's dated January 29, 1997, and it outlines what we

17   were trying to sell to them.

18   Q.   Were you at all involved in authoring each of these

19   documents and making those presentations?

20   A.   Yes, sir, it has my initials, Michael Kelly Simon, M.K.S.

21   '97 on it.

22        MR. MOLSTER:  Your Honor, I move for admission DX 294

23   and 296.

24        MR. SHUNK:  Objection to both as hearsay.  These are

25   just statements from this company.  They are not admissions.

```
 1            THE COURT:  Objection overruled.

 2   BY MR. MOLSTER: (Continuing)

 3   Q.  Could you please turn to the -- page 8 of the Centris

 4   presentation.

 5   A.  Yes.

 6   Q.  Are you on page 8?

 7   A.  Yes, I am.

 8   Q.  Are where it says:  Front Line Product Rollout?

 9   A.  Yes, sir.

10   Q.  Is there a chart there?

11   A.  Yes, there is.

12            MR. MOLSTER:  Your Honor, may I have permission to put

13   on the board the chart so the jury may see it and Mr. Simon can

14   point out the relevant portion?

15            MR. SHUNK:  I would object, Your Honor, it is not a

16   diagram.  It is just --

17            MR. MOLSTER:  It's in evidence, Your Honor.

18            THE COURT:  What is it?

19            MR. MOLSTER:  Its just a chart out of the document.

20            MR. SHUNK:  It is just words, Your Honor.

21            MR. MOLSTER:  That was part of the presentation.

22            THE COURT:  All right, put it up.

23   BY MR. MOLSTER: (Continuing)

24   Q.  Is this page 8 of the presentation to Centris in August

25   of -- September of 1997?
```

1  A.  Yes, sir, it is.

2  Q.  Just, if you would, for the jury, just read Stage 1, what do

3  those words say?

4  A.  Stage 1 was conferencing or online collaboration, online

5  meetings.

6  Q.  And how about the next paragraph?

7  A.  I am sorry, that was part one.  So, the Stage 1 was online

8  meeting, online conferencing and online collaboration and online

9  customer support with remote computer access.

10  Q.  Could you please -- may the witness have permission to

11  approach the chart and underline in red "remote computer

12  access"?

13          MR. SHUNK:  Objection, Your Honor.

14          THE COURT:  We have seen it.

15          MR. MOLSTER:  You think its good enough?

16          THE COURT:  I think its good enough.

17          MR. MOLSTER:  Thanks, Your Honor.  Can I have the next

18  chart, please.  This is from the Scala.  One more, we're done.

19          MR. SHUNK:  The same objection, Your Honor.

20          THE WITNESS:  Marshal, I think it is upside-down.

21          THE COURT:  Objection overruled.

22  BY MR. MOLSTER: (Continued)

23  Q.  Turn to page 7310 in the Scala presentation, which is DX

24  296, if you would, please.

25  A.  Yes, sir, I am looking at it.

1    Q.  Is that a screen shot there?

2    A.  Yes, this is an enlarged version of this particular slide

3    that we presented to Scala.

4    Q.  What does it show?

5    A.  So -- may I use the pointer?

6    Q.  Sure.

7    A.  So, what it shows is actually bidirectional remote access to

8    any two computers on the Internet.  It's a little -- gives you

9    an idea of how old it is, this is actually a DOS screen being

10   delivered into an Internet Explorer window.

11   Q.  What year -- what month and what year did you make that

12   presentation, sir?

13   A.  This was presented in January of 1997.

14   Q.  Thank you.  I don't need those charts up anymore, Marshal

15   Williams, thank you very much.

16       I think you indicated you started -- you released LogMeIn's

17   first product on April 13 of 2004, is that right?

18   A.  That is correct.

19   Q.  When did you first start developing the product?

20   A.  At LogMeIn?

21   Q.  Yes, sir.

22   A.  In 2003.

23   Q.  About how long did it take you to develop the product before

24   you ultimately launched it?

25   A.  13 months or so.  13, 14 months.

1  Q.  Did you first hear of 01 Communique before or after you

2  developed and introduced your first product in April of 2004?

3  A.  After.

4        MR. MOLSTER:  I don't have any further questions at

5  this time.  I do reserve to call him in my case in chief given

6  some of the scope objections, Your Honor.

7        THE COURT:  All right.

8        MR. MOLSTER:  Thank you.

9        MR. SHUNK:  Very briefly, Your Honor.

10       REDIRECT EXAMINATION

11  BY MR. SHUNK: (Continuing)

12  Q.  Mr. Simon, do you recall testifying in response to

13  Mr. Molster's question that free is a form of advertising for

14  us?

15  A.  Yes, I do.

16  Q.  And just so that we are not confused about free now, we are

17  talking about --

18  A.  Can I clarify?

19  Q.  Well, I was about to ask you for the clarification.

20       MR. MOLSTER:  Let's let him finish answering his

21  question, if we may, please.

22       THE COURT:  Well, I thought he had finished and we are

23  going on to another area.  Ask your next question and let's move

24  along.

25       MR. SHUNK:  Thank you, Your Honor.

1    BY MR. SHUNK: (Continuing)

2    Q.  By free, you mean the LogMeIn Free and the join.me Free

3    products, correct?

4    A.  In context of that question, it is LogMeIn Free product.

5    Q.  LogMeIn Free, okay.  Okay.  Now, wouldn't you agree with me,

6    Mr. Simon, that there are a lot of different free giveaways that

7    are used as advertising, by a lot of different companies?

8    A.  Yes, I would.

9    Q.  So, for example, if I am a plumber and I want to make

10   sure -- I want to try to get my name out there, I might give

11   away refrigerator magnets with the name of my company on it for

12   free, right?

13   A.  Okay.

14   Q.  And that's a kind of marketing?

15   A.  Yes.

16   Q.  So, but I would still have to buy those refrigerator magnets

17   that I am giving out for free because the person who actually

18   makes the magnets is going to expect to get paid, right?

19   A.  Okay.

20   Q.  Okay.  So, the risk of that kind of free advertising is that

21   I might buy boxes of magnets, but I don't get any additional

22   customers, and so I'm out the money that I spent to buy the

23   magnets, right?

24   A.  Okay, fair enough.

25   Q.  And in the same way, sir, isn't it true that when you give

 1   away LogMeIn Free for free, you are taking the risk that maybe

 2   no one will convert from being a LogMeIn Free user to a LogMeIn

 3   Pro user, for example?

 4   A.  Yes, we believe that, you know, it was, you know, a gamble,

 5   a risk, that LogMeIn took because we bore the cost.  We were the

 6   magnet manufacturer in your analogy.

 7   Q.  But in the same way that the magnets have a value, your

 8   LogMeIn Free still has a value whether it works as advertising

 9   for you or not, right?

10   A.  Fair enough.  But the magnets' value would not exceed how

11   much you charge for your plumbing.

12   Q.  I don't know.  That depends on the product and the free

13   giveaway, right?

14   A.  I don't think so.

15   Q.  Well, let's go on to the next question.

16       You were asked several times about whether this or that

17   event happened before the patent that Andrew Cheung was awarded

18   issued in 2005, you remember those questions from Mr. Molster?

19   A.  I believe so, yes.

20   Q.  Now, that's not the important question.  The real question

21   is whether they happened before 2000 when the patent was applied

22   for or before 1997 when Mr. Cheung had his invention, right?

23   A.  Some of those questions, yes.

24   Q.  Yeah.  So, it was a bit misleading to ask about whether they

25   occurred before 2005, right?

1    A.  No, I don't believe so.  I don't --

2          MR. MOLSTER:  Objection.  I think he's asking for legal

3    conclusions.  This is clearly not a patent lawyer.  I think his

4    question is -- embedded in his question are legal conclusions as

5    to what --

6          THE COURT:  Well, it's certainly argumentative anyway.

7    The objection is sustained.

8          MR. MOLSTER:  I object.  Thank you, Your Honor.

9    BY MR. SHUNK: (Continuing)

10   Q.  Well, let me ask you this, sir.  2000, the year that the

11   patent application was filed by Mr. Cheung with the U.S.

12   government, that was a long time before 3am Labs even existed,

13   right?

14   A.  Just a couple years, two years.

15   Q.  And it was a long time before the LogMeIn product was even

16   developed, right?

17   A.  It was a couple years, yeah, three years.

18   Q.  Now, you testified to the jury about ePub Information

19   Exchange.  That product did not use a server computer in order

20   to have the remote access, correct?

21   A.  It used servers, but not -- it used, you know, server --

22   computer servers were part of the solution.

23   Q.  Yes, I know.  But it didn't -- it was not a service

24   providing a server to allow the communication the same way that

25   LogMeIn is today?

1   A.  No, sir, it was.

2   Q.  And so, let's be real clear for the jury.  LogMeIn does not

3   use this ePub technology you testified about today?

4   A.  Actually, we use the underlying approach that was developed

5   at ePub.  LogMeIn was founded by roughly 12 engineers, the vast

6   majority of which actually came directly from Uproar and ePub.

7   Q.  And yet in the document that we looked at and that

8   Mr. Molster asked you questions about that's dated in 2003, the

9   company still defines obstacles for remote access that include

10  dynamic addresses, firewalls, and routers, right?

11  A.  Actually, I don't think it --

12  Q.  Well, hold on a second.

13  A.  I don't think that's the word.

14          MR. MOLSTER:  I'm sorry, Your Honor.  I think it's only

15  fair that the witness be allowed to finish his answer.

16          THE COURT:  You did interrupt him very quickly in this

17  answer.  Objection is sustained.

18          MR. MOLSTER:  Thank you, Your Honor.

19  A.  Just to be very, very clear, it doesn't say obstacles.  It

20  does not use that word.  There are several areas where people

21  get stuck.  Not obstacles.

22      Tim -- you know, Tim Guest absolutely was familiar with

23  these areas.  They weren't presented as obstacles.  That's not

24  the word.  It's like RA doesn't do these things, let's add --

25  solve these things.  It's not listed as obstacles at all.

1   BY MR. SHUNK: (Continuing)

2   Q.  Well, but they were problems that needed to be overcome in

3   the development of the LogMeIn product, right?

4   A.  No, they were not.

5   Q.  Well, RemotelyAnywhere didn't do these things, did it?

6   A.  No, it didn't.  But that didn't mean they were problems that

7   couldn't be solved that weren't readily understood by Tim Guest

8   and all of his people from the mid-'90s how to solve them.

9   Q.  Now, your lawyers have never asserted in this case, have

10  they, that ePub is somehow invaliding prior art?

11          MR. MOLSTER:  Objection.

12  A.  Not at all.

13          MR. MOLSTER:  Please.  Objection, Your Honor.  He's

14  getting into legal issues that are completely irrelevant to the

15  questions or are inappropriate for Mr. Simon.

16          MR. SHUNK:  Well, Your Honor, I think the jury -- I

17  think there should be some clarity as to the reason why this

18  testimony was offered.  I think we should be able to make it --

19          THE COURT:  Objection sustained.

20  BY MR. SHUNK: (Continuing)

21  Q.  And you have an expert witness, Dr. Bhattacharjee, right?

22  A.  Yes, we do.

23  Q.  And Dr. Bhattacharjee is going to come in and talk about the

24  arguments that he has about the validity of Mr. Cheung's patent?

25          MR. MOLSTER:  The same objection, Your Honor.  We're

1   just wasting time.

2           THE COURT:  Well, objection sustained to have him

3   comment on some other witness' testimony we haven't even heard.

4           MR. SHUNK:  I was just going to ask, Your Honor,

5   whether or not --

6           MR. MOLSTER:  He just sustained the objection.  Go

7   ahead.

8           MR. SHUNK:  Oh, I see.  You're standing there waiting

9   for it.

10          No other questions, Your Honor.

11          MR. MOLSTER:  Thank you, Your Honor, I don't have any

12  further questions for Mr. Simon at this time.

13          THE COURT:  You may step down.

14          NOTE:  The witness stood down.

15          Who's next?

16          MR. SHUNK:  Your Honor, we're going to read some very

17  short snippets from some depositions.  The first deponent from

18  whose deposition we're going to read is Mr. Donahue, who's the

19  internal company attorney, and was also the 30(b)(6) witness on

20  the issues of that deposition.

21          THE COURT:  All right.

22          MR. SHUNK:  Ms. McKnight is going to do the questions.

23          MS. McKNIGHT:  Yes, Your Honor.  And a colleague of

24  ours, Will Hellmuth, will read the deposition testimony of

25  Mr. Donahue.

1                THE COURT:  All right.

2                NOTE:  The deposition of Michael J. Donahue is read

3    into the evidence as follows:

4    BY MS. McKNIGHT: (Reading)

5    Q.  Could you please state your full name for the record.

6    A.  Michael Joseph Donahue.

7    Q.  And what's your current position?

8    A.  Vice-president and general counsel.

9    Q.  So, what is Exhibit PX 238?

10   A.  It seems to be an organizational chart for LogMeIn.

11   Q.  Is this the current organizational chart for LogMeIn?

12   A.  It was current -- I believe it was current at the time it

13   was produced.

14   Q.  What e-mail system does LogMeIn use?

15   A.  I don't know the answer to that.

16   Q.  Do you use e-mail?

17   A.  I do.

18   Q.  What software do you use?

19   A.  The interface itself is Microsoft.

20   Q.  Outlook?

21   A.  Outlook.

22   Q.  Topic 13 to Exhibit 3 states, "all matters pertaining to

23   LogMeIn's third affirmative defense that 01's claims are barred

24   in whole or in part by laches, estoppel, and/or other

25   doctrines."

1      Are you prepared to testify as to topic 13?

2  A.  Yes, I believe I am.

3          MS. FERRERA:  Your Honor, we would like to read just

4  the previous question and answer to the next designation, which

5  is page 56, line 6 through line 21.

6          MS. McKNIGHT:  Your Honor, we have no objection to that

7  except for line 6 through 12 are not directly before.  We would

8  be happy to read 15 through 21 which lead into our designated

9  portion.

10         MS. FERRERA:  That's all, Your Honor.

11  BY MS. McKNIGHT: (Reading)

12  Q.  What's the factual basis for LogMeIn's defense that 01's

13  claims are barred by estoppel?

14  A.  Again, that 01 failed to notify LogMeIn of any claims and

15  LogMeIn continued to sell its products, invest in its products,

16  develop its products.

17  Q.  Does LogMeIn claim that 01 made any affirmative

18  representation to LogMeIn that support LogMeIn's defense that

19  01's claims are barred by estoppel?

20  A.  Not that I'm aware of.

21  Q.  Does LogMeIn claim that 01 made any affirmative

22  representations to LogMeIn that LogMeIn contends support its

23  defense of laches?

24  A.  No, not that I'm aware of.

25  Q.  Does LogMeIn contend that 01 made any public statements that

1  support LogMeIn's defense that 01's claims are barred by

2  estoppel?

3  A.  I'm not sure of the answer to that.

4  Q.  Does LogMeIn contend that 01 made any public statements that

5  LogMeIn believes supports its defense that 01's claims are

6  barred by laches?

7  A.  Again, I'm -- I don't know the answer to that question.

8  Q.  Well, I'm just looking to find out if LogMeIn believes that

9  there's anything 01 did or said that LogMeIn relied upon.

10  A.  They didn't -- they didn't inform us of any claims.

11  Q.  Okay.  If 01 had informed LogMeIn that 01 believed LogMeIn

12  infringed, say back in 2006, what actions would LogMeIn have

13  done differently?

14        MS. FERRERA:  Objection, speculative, hypothetical,

15  Your Honor.

16        MS. McKNIGHT:  Your Honor, he has -- LogMeIn has

17  identified Mr. Donahue as the corporate representative to

18  testify to these legal issues.

19        MS. FERRERA:  The question still calls for speculation.

20        THE COURT:  Objection overruled.

21  A.  I can't speculate as to that.

22  BY MS. McKNIGHT: (Reading)

23  Q.  Is there a specific investment that LogMeIn would have

24  decided not to make if it had known that it was accused of

25  infringement by 01?

1            MS. FERRERA:  The same objection, Your Honor.

2            THE COURT:  Objection overruled.

3   A.  I don't know the answer.  I would have to speculate to give

4   that.

5   BY MS. McKNIGHT: (Reading)

6   Q.  Is there any particular business opportunity that LogMeIn

7   would have passed up if it had been accused of -- if it knew

8   that it had been accused of infringement by 01?

9   A.  Again, that -- I can't make that speculation.

10  Q.  When did LogMeIn first believe that it might be infringe --

11  that it might sued for infringement of the '479 patent?

12  A.  Well, when we learned that Citrix was sued, obviously Citrix

13  being a large player in the market, you know, one could -- one

14  could believe that the possibility that we could be next.

15  Q.  If 01 had sued LogMeIn for infringement of the patent in or

16  around February 2006, would LogMeIn have stopped manufacturing

17  the accused products?

18  A.  I can't speculate as to that.

19  Q.  Are there any defenses that LogMeIn would have asserted in

20  this litigation that it is unable to because records have been

21  lost due to the passage of time?

22  A.  I don't know the answer to that.

23  Q.  Are there any defenses that LogMeIn would have asserted in

24  this litigation that it is unable to assert because witness

25  memories have faded?

1   A.  Again, I can't speculate as to that.

2   Q.  Are there any defenses that LogMeIn would have asserted in

3   this litigation that it is unable to do so because witnesses are

4   no longer available?

5   A.  The same answer, I can't speculate.

6           MS. FERRERA:  And, Your Honor, with respect to that

7   designation, we would like to read page 84, line 1 to 5, and 21

8   through 25 and the first line of the next page, which are the

9   immediately proceeding question and answer.

10          THE COURT:  All right.  Go ahead.

11  BY MS. McKNIGHT:

12  Q.  What harm has LogMeIn suffered as a result of 01's alleged

13  delay in bringing suit against LogMeIn for infringement of the

14  '479 patent?

15  A.  So as I mentioned in one of my earlier answers, LogMeIn

16  continued to obviously sell its products, invest in its

17  products, the development of its products, continued to grow its

18  business.

19  Q.  Had 01 sued LogMeIn earlier than it did, would LogMeIn have

20  stopped selling its products?

21  A.  I can't speculate as to that.

22  Q.  What development would LogMeIn not have undertook if it had

23  been sued earlier by 01?

24  A.  Same answer, I can't speculate as to what might have

25  happened.

1   Q.  If 01 had sued LogMeIn earlier than it did, would LogMeIn

2   still have grown its business?

3   A.  I don't know what would have happened.

4          MS. McKNIGHT:  Thank you, Your Honor.  We have no

5   further testimony from Mr. Donahue.

6          THE COURT:  All right.

7          MR. SHUNK:  Your Honor, next we would read a similarly

8   brief designation from Mr. Bardos' testimony.  He's another

9   employee of LogMeIn.

10          I believe Ms. McKnight is going to read that as well.

11          THE COURT:  All right.

12          MS. FERRERA:  And, Your Honor, our colleague, Andres

13   Arrubla, will read the part of Mr. Bardos.

14          NOTE:  The deposition of Kevin Bardos is read into the

15   record as follows:

16   By MS. McKNIGHT:  (Reading)

17   Q.  Good morning, Mr. Bardos.  Can you state your full name for

18   the record, please?

19   A.  Kevin Albert Bardos.

20   Q.  By whom are you currently employed?

21   A.  LogMeIn, Incorporated.

22   Q.  How long have you been employed by any LogMeIn entity?

23   A.  Since January of 2004.

24   Q.  What has your title or titles -- what have your title or

25   titles been during that period?

1    A.  Yes, there was partner manager, and then I believe there was

2    product development manager and then director of product

3    development and then vice-president product development and now

4    vice-president collaboration products.

5    Q.  First of all, there is a Free version of join.me, is there

6    not?

7    A.  There is.

8    Q.  And there is a Pro version of join.me?

9    A.  Correct.

10         MR. MOLSTER:  I would like to read the next question

11   and answer and the next question and answer after that, please.

12         THE COURT:  All right.

13   BY MS. McKNIGHT: (Reading)

14   Q.  Explain to me what the feature differential is between those

15   two products.

16   A.  There are some additional features in the Pro version.

17   Q.  And what are those additional features?

18   A.  Such as the scheduler and the ability to have a personal

19   link.  There are some other small things.

20   Q.  Is it referred to as join.me and Free, or is there some

21   other name used to describe that product within the LogMeIn

22   corporate entity?

23   A.  join.me Free and join.me Pro are the two variants.

24   Q.  And when were the products commercially launched?

25   A.  In October.

1    Q.  Of 2010?

2    A.  Correct.

3           MS. McKNIGHT:  Thank you, Your Honor.  There's no

4    further testimony by Mr. Bardos.

5           MR. MOLSTER:  None from us.  Thank you, Your Honor.

6           THE COURT:  All right.  Thank you.

7           MR. SHUNK:  Your Honor, we will next, with the Court's

8    permission, read a similarly brief designation from the

9    testimony of Laura Pasquale, another employee of LogMeIn.

10          Ms. McKnight will read the questions.

11          MS. McKNIGHT:  Yes, Your Honor.  A colleague of ours,

12   Amy Tolbert, will read the testimony by Laura Pasquale.

13          NOTE:  The deposition of Laura Pasquale is read into

14   the record as follows:

15   BY MS. McKNIGHT:  (Reading)

16   Q.  Can you state your full name for the record, please.

17   A.  Laura Pasquale.

18   Q.  Who is your employer?

19   A.  LogMeIn.

20   Q.  When you began at LogMeIn in December of 2004, what was your

21   title?

22   A.  Brand marketing manager.

23   Q.  Is that what you are today, marketing manager?

24   A.  VP marketing communications.

25   Q.  If you could take a look at Deposition Exhibit 2 from

1  Mr. Burton's deposition this morning, PX 62.

2      Have you seen this document before?

3  A.  Yes.

4  Q.  Do you know who created the document?

5  A.  Yes.

6  Q.  Who?

7  A.  Sean Ellis.

8  Q.  Who is Sean Ellis?

9  A.  He used to run marketing at LogMeIn.

10  Q.  Did you work for him?

11  A.  Yes.

12  Q.  Did Mr. Ellis talk about the document when he gave it to

13  you?  Did he explain it to you?

14  A.  Yes.

15  Q.  What did you understand the phrase "free engine" inside the

16  big circle in the middle to mean?

17  A.  People using LogMeIn Free.

18  Q.  Showing you what's been marked as Plaintiff's Exhibit 118.

19  Let me ask whether you've ever seen that document before?

20  A.  Yes, at least in part.

21  Q.  Moving ahead two pages to page 5247.  Do you see the caption

22  Seed Market With Free Products?

23  A.  Um-hmm.

24  Q.  What does that mean to you?

25  A.  It means marketing with Free.

1    Q.   Using LogMeIn Free as a marketing tool to obtain paying

2    customers?

3    A.   It's actually two products cited here, but, yes.

4    Q.   Free and Hamachi?

5    A.   Yes.

6    Q.   Turn three more pages over, please, to page 5251.  Do you

7    see the conclusion on that page, lifetime value of user greater

8    than $5?

9    A.   Yes.

10    Q.   What does that mean to you?

11    A.   Of all our users, that there's a greater than $5 value put

12    there.

13            MR. MOLSTER:   Your Honor, I would like to read -- or

14    have read, a few lines down on page 35, line -- one question and

15    one answer, lines 9 through 17.

16            MS. McKNIGHT:   Your Honor, it's on the other page,

17    quite a few lines past.

18            MR. MOLSTER:   It's completely relevant to what she just

19    read.

20            THE COURT:   I believe it is.

21            MS. McKNIGHT:   We would be happy to read it.

22    BY MS. McKNIGHT: (Reading)

23    Q.   You would agree with me, though, wouldn't you, that there is

24    some monetary value that is associated with LogMeIn Free users

25    because the company gets benefit from having people using their

1  Free product?

2  A.  I would not agree with you.  I would agree that there's a

3  value, not a monetary value.

4  Q.  You're the vice-president of marketing and communications.

5  Does your group have a budget that it gets each year or each

6  quarter?

7  A.  Yes.

8  Q.  What is your group's budget currently?

9  A.  Currently it is approximate five million a quarter.

10  Q.  Give me some examples of the online marketing -- online

11  advertising that you do.

12  A.  Search marketing, banners, e-mail, newsletter sponsorships.

13  Q.  Search marketing, for example, would be Google Adwords?

14  A.  Correct.

15  Q.  Have you ever purchased search words or a search terms that

16  included the names of competitors or competitor products?

17  A.  Yes.

18  Q.  When you make a purchase of search terms, how does that

19  work?  You pay -- you bid a certain amount?

20  A.  Yes.

21  Q.  And if you are the successful bidder, then if someone types

22  those search words into a search engine, your paid ad will pop

23  up -- well, it will not pop up, it will appear?

24  A.  Yes.

25          MR. MOLSTER:  So, two lines down, Your Honor, we would

 1   like to start on page 79, 19, through 80, line 6.

 2            THE COURT:  All right.

 3            MS. McKNIGHT:  That's fine, Your Honor.

 4   BY MS. McKNIGHT: (Reading)

 5   Q.  So your advertising will appear on the page along with

 6   whoever else has also purchased that search term?

 7   A.  Correct.

 8   Q.  Again, focusing on today, can you think of the names of any

 9   other competitors or competitive products for which you have

10   purchased the search terms?

11   A.  We have roughly 3,000 of them out of 20,000 search terms.

12   So, yes.

13   Q.  Have you purchased 01 Communique or Communique as part of a

14   search term?

15   A.  Yes.

16   Q.  And on what date did you begin purchasing 01 Communique?

17   A.  It was in '04.

18   Q.  Okay.

19   A.  Or maybe it was '05.  I'm sorry.  Early years.

20   Q.  Has LogMeIn continuously purchased the Communique name since

21   2004 as part of all of the search terms that it bids on?

22   A.  Yes.

23            MR. MOLSTER:  And then we would just like the next

24   question and answer, Your Honor.

25            MS. McKNIGHT:  We would be happy to read it.

1  BY MS. McKNIGHT: (Reading)

2  Q.  Can you tell me the names of some of the other competitors

3  whose names you have purchased?

4  A.  Sure.  GoToAssist, Laplink, VNC, Remote Desktop, Web X.

5  Those are some I can think of.

6          MS. McKNIGHT:  Thank you, Your Honor.  That's all the

7  testimony we would like to have from Ms. Pasquale.

8          MR. MOLSTER:  Fine with us, Your Honor.  We don't need

9  anything more.

10          THE COURT:  All right.

11          MS. McKNIGHT:  At this point, Your Honor, I would like

12  to move into admission evidence Plaintiff's Exhibits 118 and

13  238.

14          MR. MOLSTER:  I'm sorry.  I thought it was 118 and 62?

15          MS. McKNIGHT:  That's already admitted.

16          MR. MOLSTER:  We just need to see 238.  Or we can do it

17  and admit it later, whatever you want.

18          MS. McKNIGHT:  Your Honor, we'll address this later.

19  We don't want to hold up the Court.  We'll get them a copy and

20  we can address it later.

21          MR. MOLSTER:  All right.  Thank you, Your Honor.

22          MS. McKNIGHT:  Thank you.

23          MR. SHUNK:  Your Honor, our final deposition

24  designation to read is Mr. James Kelliher, chief financial

25  officer of LogMeIn.  We're happy to start immediately.  It's

1    about a 30-minute reading or so.  At the Court's pleasure.

2          THE COURT:  It will take you 30 minutes?  Well, why

3    don't we recess now for lunch until 2:15.

4          NOTE:  The morning portion of the proceedings on

5    March 20, 2013, are concluded.

6          --------------------------------------------------

7

8

9

10

11

12

13

14

15

16

17          I certify that the foregoing is a true and

18      accurate transcription of my stenographic notes.

19

20

21

22          /s/  Norman B. Linnell
         Norman B. Linnell, RPR, CM, VCE, FCRR

23

24

25