```
                    UNITED STATES DISTRICT COURT
                    EASTERN DISTRICT OF VIRGINIA
                         Alexandria Division




--------------------------------:
                                :
01 COMMUNIQUE LABORATORY, INC., :
              Plaintiff,        :
                                :
     -vs-                       :    Case No. 1:10-cv-1007
                                :
                                :
LOGMEIN, INC.,                  :
              Defendant.        :
                                :
--------------------------------:


                         V O L U M E   4 (p.m.)



                         TRIAL TRANSCRIPT


                         March 21, 2013


                Before:  Claude M. Hilton, USDC Judge


                         And a Jury




APPEARANCES:

Thomas H. Shunk, Marc A. Antonetti, John P. Corrado,
A. Neal Seth, Katherine L. McKnight, William T. DeVinney,
Loura Alaverdi and Christina Moser, Counsel for the Plaintiff

Wayne L. Stoner, Charles B. Molster, III, Vinita Ferrera and
Rachel Gurvich, Counsel for the Defendant
```

794

INDEX

| WITNESS | EXAMINATION | PAGE |
|---|---|---|
| MARTON ANKA | | |
| | DIRECT | 800 |
| | CROSS | 807 |
| PEDRO NASCIMENTO (By Deposition) | | |
| | | 845 |
| SAMRAT BHATTACHARJEE | | |
| | DIRECT | 857 |

1              NOTE:  The afternoon portion of the case on March 21,

2    2013, begins in the absence of the jury as follows:

3    JURY OUT

4              MR. MOLSTER:  Thanks for coming out early, Judge.  We

5    have just got a couple of quick issues.

6              First, on the exhibits that were discussed earlier this

7    morning, I had reserved on one, but we just for the record

8    wanted to make clear, Plaintiff's 64, 65, 66, 67, 68, the 206A

9    through F, all admitted without objection if they go under seal.

10   And there is an agreement that they go under seal.

11             MR. SHUNK:  179 as well.

12             MR. MOLSTER:  179, which I reserved on, we agreed

13   admitted and go under seal.

14             THE COURT:  All right.

15             MR. MOLSTER:  Thank you.  And I think there might be

16   some issue on the Nascimento deposition, which is the next one

17   to go up, but I'm not quite sure what the issue is.

18             THE COURT:  All right.

19             MR. MOLSTER:  We'll try to figure it out as we go.

20             MS. MOSER:  Your Honor, hi.  We have a some objections

21   to the portions of the Nascimento deposition that they plan to

22   read into evidence.

23             And, basically, these are portions that the jury

24   doesn't really need to hear because, first of all, the testimony

25   has been elicited elsewhere.

1              And, second, the issues that we're objecting to are the

2     facts that they're asking the witness questions about claim

3     construction.  And he's not a claim construction expert.  He is

4     not a technical expert.

5              And not only that, but what he is testifying is that,

6     you know, I don't know, I need some time to read the patent.

7     So, he is not actually giving any useful information.

8              And, finally, the witness testifies throughout the

9     deposition that his capacity was limited during the deposition.

10    He's not a native English speaker.  His first language is

11    Portuguese.  And he testifies that, you know, he can't really

12    read the document, it is difficult for him to translate.  He

13    had -- and he had a headache at that time.

14             And so, for these reasons, the portions of the

15    testimony that we have objected to dealing with claim

16    construction and infringement opinions, we would ask that the

17    Court strike.

18             THE COURT:  All right.

19             MR. MOLSTER:  He's an inventor.  He was one of the

20    inventors on the '479 patent at issue.  So, some of the

21    questions go to the patent.

22             Most of them go to whether or not he remembers what --

23    we have cut it way back.  Most of it goes to what he remembers

24    or, in fact, doesn't remember because it goes to evidentiary

25    prejudice.

1           And then whether or not he has got a headache or

2     doesn't speak English, we have got a lot of people in the case

3     who English is not their first language.  And I don't think

4     having a headache somehow excuses putting in the dep testimony,

5     Your Honor.  So --

6           MS. MOSER:  And --

7           THE COURT:  I think if he is the inventor, he can

8     testify about the claims.

9           MS. MOSER:  Yes, Your Honor.  The thing is he is not

10    actually providing testimony about the claims.  If I can

11    describe something to you.  For example, there is a document

12    that they --

13          THE COURT:  He can be asked about the claims.  Maybe

14    they want to put him on because he is avoiding the answer.  I

15    don't know.  I have no idea.  There could be a lot of reasons

16    they want to put him on, but --

17          MS. MOSER:  Yeah, there is one document that they are

18    questioning him about that he was not an author of and he

19    testified that he hadn't seen it.  They are asking him

20    essentially to read parts of the document.

21          And, so, they have already asked Mr. Cheung about that

22    document.  You know, they already have the testimony.  So, that

23    portion at least we would ask the Court not to allow.

24          THE COURT:  Well, I don't know in what context they are

25    doing it.  I mean, they can't cross-examine him about somebody

 1  else's document.

 2          MS. MOSER:  And that's what they are doing, Your Honor.

 3          MR. MOLSTER:  It's the Canadian -- the document they

 4  gave -- the official document they gave to the Canadian

 5  government in connection with their request for tax breaks or

 6  financial help, whatever it was, where it goes to the issue of

 7  non-enablement because -- which is a jury issue because they

 8  couldn't figure out how to make it work in a multiple or diverse

 9  distributed platform or server farms.

10          MS. MOSER:  And, Your Honor, if he were actually

11  providing them with information, that would be understandable.

12  But what he is stating is that, you know, I am seeing this for

13  the first time here.  And -- let's see.  And then they are just

14  having him read parts of the document.  And he is saying, okay,

15  yeah, I hear what you're saying.

16          And, you know, all he can say is that, you know, he

17  can't say anything about it because it wasn't written by me.

18  So, it's hard to say if I can -- if I can, you know, match the

19  particular dates in the document.

20          And, so, as far as for the content, Mr. Cheung is the

21  one who testified about that.  This testimony doesn't have any

22  content.  The witness didn't see the document.

23          THE COURT:  Yeah, but what does he know about this

24  document?  What is his relationship to the corporation?

25          MR. MOLSTER:  He was an inventor and employee of the

1   corporation.  He's an inventor of the patent and an employee of

2   the corporation.  The document directly relates to the patent.

3   And one of the points is if we had gotten sued five years

4   earlier, maybe he would remember more about what he is being

5   asked about.  That's evidentiary prejudice for laches.

6          THE COURT:  What does he have to do with this Canadian

7   document --

8          MS. MOSER:  He --

9          THE COURT:  I mean, just because the -- I'm talking to

10  your opposition --

11         MR. MOLSTER:  I'm sorry.  He's listed as the technology

12  guy on the document.  He is listed on the document as being the

13  contact point for technology questions.

14         THE COURT:  All right.  Objection overruled.

15         MR. MOLSTER:  Thank you, Your Honor.

16         THE COURT:  All right.  Let's bring in the jury.

17         NOTE:  At this point the jury returns to the courtroom;

18  whereupon the case continues as follows:

19  JURY IN

20         THE COURT:  All right.

21         MS. FERRERA:  And, Your Honor, before we proceed, I

22  would like to just offer DDX 2-1, which was the diagram that

23  Mr. Anka was talking about earlier.

24         Mr. CORRADO:  Your Honor, the witness has testified

25  about that.  It's a demonstrative exhibit.  We have no problem

1    with the fact the jury has seen it, but to send it back to the

2    jury would be improper.

3            MS. FERRERA:  Your Honor, it is a diagram of how the

4    product is working.  We have had other diagrams that have gone

5    back, I believe.

6            THE COURT:  Objection overruled.  It will be admitted.

7            NOTE:  The witness is sworn.

8            MARTON ANKA, called by counsel for the defendant,

9    having been previously sworn, continues to testify and state as

10   follows:

11       DIRECT EXAMINATION

12   BY MS. FERRERA:  (Continuing)

13   Q.  Good afternoon, Mr. Anka.

14   A.  Good afternoon.

15   Q.  Now, before the lunch break I think I had asked you whether

16   LogMeIn has patents or patent applications of its own relating

17   to the remote access products that it sells?

18   A.  Yes, yes, you did.  And the answer is that, yes, LogMeIn has

19   several patents on its own, some of them granted and many more

20   of them pending.

21   Q.  Do you know how many issued patents LogMeIn has?

22   A.  Four at this time.

23   Q.  Are you a named inventor on any of those patents?

24   A.  On the four that are issued, I am, yes.

25   Q.  Would you turn to DX 255 in the binder before you.

1    A.   Yes.

2    Q.   Is that one of LogMeIn's patents?

3    A.   Yes, it is.

4    Q.   What's the number of that patent, Mr. Anka?

5    A.   It's 7,558,862.

6    Q.   And when was this patent application or patent filed?

7    A.   It was filed in December of 2004.

8    Q.   Who are the inventors on this patent?

9    A.   The inventors are Gábor Tyukász, that's G-á-b-o-r,

10   T-y-u-k-á-s-z, he is one of our principal engineers and a

11   long-time friend of mine, works at LogMeIn, and myself.

12   Q.   And what does this patent relate to?

13   A.   This patent relates to controlling a computer from another

14   computer via a so-called peer-to-peer data transfer.  A data

15   transfer mechanism that does not go through -- that goes

16   directly between the two computers.

17   Q.   And does that invention have any significance for the

18   LogMeIn, the remote access products that your company sells?

19   A.   It does.  Essentially we -- we have put this invention to

20   use, and this allows us to be faster and much more responsive

21   than -- than our competitors' products are.

22   Q.   Would you turn then to DX 273.

23   A.   Yes.

24        MS. FERRERA:  And actually, Your Honor, if I could

25   offer DX 255.

1          Mr. CORRADO:  No objection subject to the conference we

2   had at the side-bar with respect to the use of that exhibit.

3          THE COURT:  All right, it will be admitted.

4   BY MS. FERRERA: (Continuing)

5   Q.  Mr. Anka, do you have DX 273 in front of you?

6   A.  I do, yes.

7   Q.  Is that another one of your patents?

8   A.  This is, yes.

9   Q.  What is the number on this patent?

10  A.  This is 7,734,799.

11  Q.  And when was this patent filed?

12  A.  November 15 of 2004.

13  Q.  Who are the inventors on this patent?

14  A.  I am.

15  Q.  Could you tell us briefly what this patent is about.

16  A.  Yeah.  This patent describes a system that allows a user to

17  send a file to another user over the Internet without that --

18  having to attach that file to an e-mail message, let's say.  It

19  allows you to create a link that you can send on to the other

20  user via e-mail or instant messaging.  They put that link into

21  the browser and download the file from your computer.

22  Q.  And is that one of the features of the LogMeIn products?

23  A.  Yeah, it's in LogMeIn Pro, yes.

24         MS. FERRERA:  I'd like to offer DX 273, Your Honor.

25         Mr. CORRADO:  The same position, Your Honor.  No

1    objection subject to its use.

2            THE COURT:  It will be admitted.

3    BY MS. FERRERA:  (Continuing)

4    Q.  Would you turn then to DX 274.

5    A.  Yes.

6    Q.  What is that document?

7    A.  This is another patent granted to LogMeIn.

8    Q.  What's the number on that patent?

9    A.  8,086,740.

10   Q.  When was that patent filed, Mr. Anka?

11   A.  It was filed in 2009, July of 2009.

12   Q.  And who are the inventors?

13   A.  It's again Gábor Tyukász and myself.

14   Q.  What is the subject matter of that patent?

15   A.  This is a continuation, improvement on the patent that I

16   described first, the remote control application.

17           MS. FERRERA:  I would like to offer DX 274.

18           Mr. CORRADO:  The same, Your Honor.

19           THE COURT:  It will be admitted.

20   BY MS. FERRERA:  (Continuing)

21   Q.  Now, Mr. Anka, if you could look at the front page of

22   DX 274, the bottom left-hand column, there is a reference to

23   References Cited, do you see that?

24   A.  I do, yes.

25   Q.  And then, U.S. Patent Documents?

1    A.   Yes.

2    Q.   Do you understand what that -- what the significance is of

3    the patents that are -- or the information that is listed

4    beneath that?

5    A.   Yes.  Yes, I do.

6    Q.   What is the significance?

7    A.   These are patent documents that the examiner who prosecuted

8    this particular patent application considered as prior art when

9    determining whether or not the invention described here is valid

10   and patentable.

11   Q.   Okay.  Would you go to the third line underneath:  U.S.

12   Patent Documents.

13   A.   Yes.

14   Q.   And do you see there is a reference to 6,928,479?

15   A.   Yes, I do.

16   Q.   What is that referring to?

17   A.   That is the patent at issue here, that's 01's patent.

18   Q.   Would you go then to DX 309.

19   A.   Yes.

20   Q.   Do you recognize that document?

21   A.   I do, yes.  This is U.S. patent 8,364,780.

22   Q.   And when was that patent filed?

23   A.   It was filed on September 23 of -- I'm sorry, it was filed

24   on June 3, 2010.

25   Q.   Who is the inventor on that patent?

 1   A.   I am.

 2   Q.   And what is this patent about, Mr. Anka?

 3   A.   This is a continuation, an improvement on the file transfer

 4   mechanism described earlier.

 5         MS. FERRERA:   I would like to offer DX 309.

 6         Mr. CORRADO:   Same, Your Honor.

 7         THE COURT:   Admitted.

 8   BY MS. FERRERA: (Continuing)

 9   Q.   If you look at the upper right-hand -- or the right-hand

10   column on the front page of that exhibit, Mr. Anka, about six

11   lines down, do you see there is a reference again to 6,928,479?

12   A.   Yes, I do.

13   Q.   What is that referring to?

14   A.   That, again, is the patent at issue here, it is 01's patent.

15   Q.   Mr. Anka, does LogMeIn invest in research and development

16   for its products?

17   A.   Yes.  Yes, we do, very heavily.

18   Q.   To date, how much has LogMeIn invested in research and

19   development?

20   A.   Over the course of the past ten years, we have spent over

21   $100 million on development.

22   Q.   Are you still conducting research and development today?

23   A.   Yes, we have more engineers than we ever had before.

24   Q.   Now, Mr. Anka, from your perspective, has LogMeIn and has

25   the LogMeIn product been a success?

1  A.  Yes, I -- I think very much so.

2  Q.  And how do you account for that success?

3  A.  Well, I think it's hard to give a very brief answer to that,

4  but I think it really comes down to us back in the early days

5  putting a great team together and creating our own -- using that

6  team to create our own extremely solid and reliable technology.

7  And this was a lot of hard work and, on the team's part, a lot

8  of ingenuity.

9      And if you couple that with, you know, our team's ability to

10  take this technology and build on top of the technology products

11  that are easy to use, are user-friendly, or, you know, users

12  like, and you find a way to -- to take these products to your

13  customers, then you can be successful.  And I think we've done

14  successfully all three of these.

15  Q.  Has LogMeIn won any awards for its products?

16  A.  Yes, many of them.

17  Q.  Would you turn to DX 300 in your binder.

18  A.  Yes.

19  Q.  Do you recognize that document?

20  A.  I do, yes.  This is a page from an internal company

21  presentation.

22  Q.  And what does that page show?

23  A.  It shows a number of -- it shows 12 awards that LogMeIn has

24  received over the course of the years.

25  Q.  Can you give us some examples of the awards that LogMeIn has

1  won?

2  A.  Yeah.  I see here a number of editor's choice awards from

3  magazines like PC Magazine, PCPlus, Laptop Magazine, PC World.

4  There's a best of year from PC Magazine, and so on and so on.

5          MS. FERRERA:  I would like to offer DX 300.

6          Mr. CORRADO:  No objection, Your Honor.

7          THE COURT:  It will be admitted.

8  BY MS. FERRERA: (Continuing)

9  Q.  Mr. Anka, did LogMeIn every copy 01's I'm InTouch product in

10  developing the LogMeIn system?

11  A.  No, we did not.

12  Q.  Mr. Anka, did LogMeIn ever copy any of 01's products in

13  developing the LogMeIn products?

14  A.  No.  No, we did not.

15  Q.  Did LogMeIn ever copy 01's '479 patent in developing any of

16  its products?

17  A.  No.  No, we did not.

18          MS. FERRERA:  Thank you.

19        CROSS-EXAMINATION

20  BY MR. CORRADO:

21  Q.  Good afternoon, Mr. Anka.

22  A.  Good afternoon, sir.

23  Q.  Your Honor, I have some exhibit binders for Mr. Anka.  I

24  also have some deposition transcripts I would like to pass up.

25      Mr. Anka, you're the chief technology officer of LogMeIn,

1    correct?

2    A.   I am, yes.

3    Q.   And you're one of the founders of LogMeIn?

4    A.   Yes, that's correct.

5    Q.   And your -- your role as chief technology officer is --

6    involves the development of new products, correct?

7    A.   Yes.

8    Q.   And it's your job to formulate the new products that LogMeIn

9    comes out with, correct?

10   A.   I play a very significant role in that, yes.

11   Q.   And, in fact, all the products in this litigation that have

12   been accused of infringement are products that you formulated in

13   your role as chief technology officer?

14   A.   Yes.  Not alone, of course --

15   Q.   Of course not.

16   A.   -- but I -- I played a very integral role in that, yes.

17   Q.   And if there are problems with products, it's your job to

18   lead the effort to try to resolve those problems?

19   A.   Yes, you could say that.

20   Q.   And some of the most important problems to overcome in

21   software development are reliability and performance, right?

22   A.   Absolutely.

23   Q.   And I think on direct you talked about the soundness of the

24   products, that that was an important -- it was important for you

25   to have sound products?

1    A.   Yeah, absolutely.

2    Q.   And reliable products?

3    A.   Yeah.

4    Q.   And the list of products that have been accused by 01 in

5    this case are LogMeIn Pro2, LogMeIn Ignition, join.me, join me

6    Pro, join.me Free, LogMeIn Backup, all of those products have

7    been accused by 01 of infringement, correct?

8    A.   And LogMeIn Free as well, yes.

9    Q.   Okay.  You talked in your direct testimony about a product

10   called RemotelyAnywhere.  Remember that testimony?

11   A.   I do, yes.

12   Q.   Now, RemotelyAnywhere is a completely different product from

13   the products that 01 has accused of infringement, right?

14   A.   RemotelyAnywhere is not accused here, no.  It's -- it solves

15   the same problem.  The target audience, however, is very

16   different, and it goes about solving the problem in a different

17   way.

18   Q.   Right.  It solves the problem in a different way?

19   A.   Yeah.

20   Q.   Okay.  We don't want the jury to be confused between the

21   products that have been accused and the products that have not

22   been accused.  RemotelyAnywhere is a product that has not been

23   accused by 01 of infringement, right?

24   A.   That's right, yes.

25   Q.   All right.  Let's talk a little bit about that

1    RemotelyAnywhere product.  That was a product that I think you

2    introduced in 1998.  Do I have that date right?

3    A.  Yes.

4    Q.  And it was a remote access solution product?

5    A.  It was.

6    Q.  And it had certain software that ran on a host computer?

7    A.  That's correct.

8    Q.  And that software on that host computer was written in

9    different programming languages, right?

10   A.  That software was written in C++.

11   Q.  It was written in C and it was written in C++, correct?

12   A.  That's correct, yes.

13   Q.  Two different software programming languages?

14   A.  They are very closely related, but, yes.

15   Q.  But they're different.

16       Your Honor, can I ask to have Plaintiff's demonstrative

17   Exhibit Number 1 placed on a board?

18       Mr. Anka, you are familiar with this figure, aren't you?

19   A.  Yes.  Yes, I am.

20   Q.  Did you draw this figure?

21   A.  Well, I drew something like this on a napkin, and our

22   graphic artist turned it into something pretty, right.

23   Q.  And you testified about this on your direct testimony,

24   correct?

25   A.  I did, yes.

1    Q.  And it was a figure that was included in one of the exhibits

2    that was introduced?

3    A.  It was in the security white paper.

4    Q.  And it's intended to display the architecture of the LogMeIn

5    system from a high level, right?

6    A.  It's intended to show the entities that comprise the LogMeIn

7    system at a very high level, yes.

8    Q.  Okay.  Now, I want to talk about the differences between

9    RemotelyAnywhere, which is not accused, and LogMeIn, which is

10   accused.

11   A.  Okay.

12   Q.  RemotelyAnywhere had the ability to work behind a firewall,

13   right?

14   A.  Yes.  For technical people, that was not a challenge.  For

15   nontechnical users, it -- it was.

16   Q.  Right.  You had to do something to the firewall itself in

17   order to use this software with a computer behind a firewall,

18   correct?

19   A.  Yeah.

20   Q.  You had to reconfigure the firewall?

21   A.  Yes.

22   Q.  You had to essentially open a port in the firewall?

23   A.  That's the technical term for it, right.

24   Q.  Right.  You opened a path through that firewall, and then

25   they -- the remote computer and the host computer could then

1   communicate through that firewall?

2   A.   Yeah.

3   Q.   Now, with respect to RemotelyAnywhere, the part you see in

4   the middle of this diagram, LogMeIn, including www.logmein.com,

5   LogMeIn database, LogMeIn gateway, those weren't part of

6   RemotelyAnywhere, right?

7   A.   No, they were not.

8   Q.   That was something that was added to your LogMeIn software

9   product when you released it in 2004, right?

10  A.   Yes, that's correct.

11  Q.   Okay.  But the LogMeIn software was a successor to

12  RemotelyAnywhere, correct?

13  A.   I wouldn't necessarily characterize it that way.  In spirit,

14  yes.  But to this day, we actually sell RemotelyAnywhere.  It's

15  not a huge part of our business, but it is a product that still

16  exists.

17  Q.   But the source code for RemotelyAnywhere was the starting

18  point for the source code for LogMeIn, right?

19  A.   Yes, that is correct.  LogMeIn as it is today, and as it was

20  back then, used a very large portion of the RemotelyAnywhere

21  source code, yes.

22  Q.   Okay.  And unlike RemotelyAnywhere, LogMeIn had the ability

23  to traverse a firewall without opening a port in the firewall,

24  right?

25  A.   Yes.

1  Q.  And that was one of the main issues you identified that

2  customers wanted in remote access software, right?

3  A.  Yes, that's what makes it easy for customers to use a

4  product like this, yes.

5  Q.  And this reflects the basic architecture of all the LogMeIn

6  products that are accused in this case, the basic architecture,

7  this chart?

8  A.  I would not call this an architecture diagram, no.  But

9  this -- as I said earlier, it shows every -- shows an instance

10  of every entity that is at play during a remote control session.

11  Q.  Okay.  This allows the exchange of information with

12  computers that are behind firewalls, right?

13  A.  Yes.

14  Q.  Without opening a port in the firewall?

15  A.  Yeah, that's right.

16  Q.  And it allows access to host computers with a dynamic IP

17  address, right?

18  A.  Yes.

19  Q.  And at the time you introduced RemotelyAnywhere, this

20  configuration was essentially, in your testimony, the only real

21  way to communicate with a computer behind a firewall without

22  opening a port in the firewall?

23  A.  I believe what I said was that to get two computers to

24  communicate with one another, both or -- one or both of them

25  being behind a firewall, the only easy way to do that is -- and

1    I believe I used the term to bounce messages off of an

2    infrastructure that is accessible on the Internet.

3    Q.  Now, at the time you introduced LogMeIn in 2004, you were

4    aware of the Citrix remote access software, weren't you?

5    A.  Yes.  Yes, I was.

6    Q.  And you were aware that Citrix used a version of software

7    that embodied a gateway between the remote and the host?

8    A.  I did not know how their system worked exactly, I'm sorry.

9    Q.  But you knew that it used a periodic pulse between --

10   between the service and the host every few seconds, correct?

11   A.  Yes.  I was aware of something like that, yes.

12   Q.  All right.  And this was during the time you were

13   thinking -- you were trying to develop LogMeIn?  This was in the

14   2003-2004 time frame?

15   A.  Yeah, that's correct.

16   Q.  All right.  And in that development process, some of the

17   main problems you had were problems with respect to dynamic IP

18   addresses, routers, and firewalls, correct?

19   A.  I believe that's the problem our users had.  We -- as I said

20   earlier, the concept to solve this problem for our users was

21   quite clear to us.  I wouldn't characterize it as a problem that

22   we had.

23   Q.  Well, but those were problems you were trying to solve for

24   your users, right?

25   A.  We were trying to solve a problem for our users, yes.

1    Q.  Because with RemotelyAnywhere you needed to give your users

2    comprehensive help to solve those problems when they were on

3    your system, right?

4    A.  Yes.

5    Q.  All right.  Now, let's go back to the release of LogMeIn

6    Anywhere.  That was in April of 2004, correct?

7    A.  You mean LogMeIn?

8    Q.  I'm sorry, LogMeIn, right.

9    A.  Yes, yes, April 13 of 2004.

10   Q.  All right.  And you testified in your direct about a press

11   release that was issued on the day that LogMeIn was released,

12   right?

13   A.  Yes.

14   Q.  And that date was April 13, 2004, right?

15   A.  That's right.

16   Q.  Can you put the exhibit -- Defendant's Exhibit 297 in front

17   of you, Mr. Anka.

18   A.  297?

19   Q.  297.  I'm sorry, you may have a different binder.  It is the

20   black binder.

21   A.  Oh, yeah, I am sorry.  This is our binder.  Yes, I have it.

22   Q.  This is the press release that you issued on April 13 to

23   introduce your customers and potential customers to your new

24   product, LogMeIn, correct?

25   A.  Yes.

1   Q.  Now, in this product -- in this press release you describe

2   LogMeIn as a remote access software product, correct?

3   A.  Yes.

4   Q.  And you say in this press release that LogMeIn can allow

5   access to users with remote -- with host computers behind

6   firewalls, right?

7       Let me ask you to look at the top of the second page:  Ease

8   of use.  LogMeIn can be installed in minutes and work securely

9   behind corporate firewalls.

10      Right?

11  A.  Yes.  That's what it says, yes.

12  Q.  Now, RemotelyAnywhere worked behind corporate firewalls,

13  didn't it?

14  A.  It did, yes.

15  Q.  But you had to open a port?

16  A.  Yes, you did.

17  Q.  And this press release doesn't say anything about being able

18  to access computers behind firewalls without opening ports, did

19  it?

20  A.  It doesn't, no.

21  Q.  It doesn't say anything about not having to reconfigure a

22  firewall, does it?

23  A.  No, it doesn't.

24  Q.  It doesn't say anything about use of gateways, does it?

25  A.  No, it doesn't.

1   Q.   Doesn't say anything about dynamic IP addresses, does it?

2   A.   It doesn't, no.

3   Q.   It doesn't say anything about routers either, does it?

4   A.   No, it does not.

5   Q.   Now, you became aware of the 01 product I'm InTouch, you

6   say, also in April of 2004, right?

7   A.   Yes, that's correct.

8   Q.   And the way you became aware of that was that one of your

9   employees sent an e-mail that attached a review of I'm InTouch,

10  correct?

11  A.   Yes, that's correct.

12  Q.   All right.  And you testified about that on direct, right?

13  A.   I have, yes.

14  Q.   And that was Defendant's Exhibit 185.  Do you have that

15  exhibit in front of you?

16  A.   This is the e-mail I sent about my experiences with -- yeah.

17  Q.   That's right.

18  A.   I do, yes.

19  Q.   Do you have that?

20  A.   I do, yes.

21  Q.   All right.  So, just to orient the jury on this, this is

22  your response -- actually, it's a Kevin Bardos e-mail sent

23  Thursday April 22, 2004.  But it attaches your response to an

24  e-mail from Joe Eckert, which was sent to you on April 20, 2004,

25  correct?

1    A.  Yes, that's right.

2    Q.  All right.  And that e-mail from Joe Eckert -- well, first

3    of all, who is Mr. Eckert?

4    A.  Well, Mr. Eckert is no longer with the company.  He hasn't

5    been for a few years.  But while he was with us, and he was with

6    us for a number of years, he was our public relations manager.

7    Q.  All right.  And this e-mail sent to you on April 20 by

8    Mr. Eckert describes a product from 01 Communique, does it not?

9    A.  Yes, it does.

10   Q.  And it's the I'm InTouch product, right?

11   A.  It is, yes.

12   Q.  And Mr. Eckert refers to 01 as another competitor to

13   LogMeIn, right?

14   A.  Yes.  Yes, he does.

15   Q.  All right.  And in the review that Mr. Eckert attaches, the

16   review is titled -- and this is -- the review is dated April 19,

17   2004.  Do you see that?

18   A.  Yes, I do.

19   Q.  And it says:  App offers easy remote access, right?

20   A.  Correct.

21   Q.  And that's referring to 01's product, right?

22   A.  Yes.

23   Q.  And the first sentence says:  01 Communique's I'm InTouch

24   3.5 provides easy remote access to firewall-protected PCs via

25   secure Web communications.

1        Right?

2   A.   Yes.

3   Q.   I'm reading that right?

4        And giving access to data and applications without the

5   hassles of setting up a VPN or reconfiguring the firewall.

6        Do you see that?

7   A.   I do, yes.

8   Q.   So, you were aware when you read this e-mail that 01 had a

9   product which allowed access to a computer behind a firewall

10  without reconfiguring the firewall?

11  A.   After I had read this e-mail, I was aware, yes.

12  Q.   And the review talks about -- it says that the I'm InTouch

13  product is similar to the Citrix GoToMyPC product, right?

14  A.   Yes, yes, it says something along those lines.

15  Q.   All right.  And then in the fourth paragraph, the review

16  says:  Initial configuration of the host PC was a snap.  And it

17  goes on to say:  I simply picked a unique host name and selected

18  my e-mail application.  Remote users can then browse

19  www.locator.01com.com, enter the host name to initiate the

20  session, log directly into the host computer, and select the

21  desktop or handheld interface.

22       Do you see that?

23  A.   I do, yes.

24  Q.   So, the article tells you about the I'm InTouch product,

25  right?

1   A.  Yes, it does.

2   Q.  It tells you it provides access to firewall-protected PCs,

3   right?

4   A.  Yes.

5   Q.  Tells you that using the 01 product, you don't have to

6   reconfigure the firewall, right?

7   A.  That's right.

8   Q.  And even tells you what the subscription price is for the 01

9   product, right?

10  A.  Yes.  Yes, it does.

11  Q.  And that subscription is $99.95 per host computer per year,

12  right?

13  A.  That's correct, yes.

14  Q.  Now, when you got this e-mail from Mr. Eckert, you

15  immediately went to check out the 01 product, didn't you?

16  A.  I believe it was a couple of days later, but very shortly

17  after that, yes.

18  Q.  Well, the e-mail to you from Mr. Eckert is dated April 20,

19  2004.  And you sent an e-mail around to Michael Simon and others

20  at the company on April 22, 2004, correct?

21  A.  Yes, a couple of days after.

22  Q.  Two days later, right?

23  A.  Yes.

24  Q.  And you say in the e-mail to them:  I have put together a

25  brief walkthrough for whoever is interested (Y'all should be).

1        Do you see that?

2   A.  That is what I wrote, yes.

3   Q.  All right.  And after you got the e-mail from Eckert

4   describing the 01 product, you went on the 01 Web site, right?

5   A.  Yes, I did.

6   Q.  And you downloaded the 01 product, right?

7   A.  Yes.

8   Q.  And you used the 01 product at that time, right?

9   A.  I did.

10  Q.  And you took some screen shots of the 01 product?

11  A.  I took several screen shots, yes.

12  Q.  And you described what you saw in those screen shots, right?

13  A.  I described my experience, yes.

14  Q.  All right.  Let me ask you to look at page 8, Mr. Anka.  You

15  show on page 8 one of the screen shots of the I'm InTouch

16  product, right?

17  A.  Yes, I do.

18  Q.  All right.  Let me read the description you put at the

19  bottom of that screen shot:  This is what remote control looks

20  like.  It's basically a glorified VNC client with a mirror

21  driver in the back, a gateway in between, and a nice toolbar.

22      Right?

23  A.  Yes, that's what it says.

24  Q.  So, you understood when you saw this e-mail that 01 not only

25  allowed access to a computer behind a firewall without opening a

1   port in the firewall, it also used a gateway in order to

2   facilitate that remote access?

3   A.  Yes, that is correct.

4   Q.  Now, when you were developing the 01 product in early -- I'm

5   sorry -- the LogMeIn product in early 2004, there were problems

6   with the product that you weren't able to solve internally at

7   LogMeIn, correct?

8   A.  I can think of one particular issue, yes.

9   Q.  Mr. Anka, let me ask you to look at Plaintiff's Exhibit 146,

10  which is in your binder.

11  A.  Okay.

12  Q.  Do you have that in front of you?

13  A.  I do.

14  Q.  All right.  Plaintiff's Exhibit 146 is an Internet posting

15  by you, isn't it?

16  A.  Yes, it is.

17  Q.  And the date of that Internet posting is February 17, 2004,

18  at 12:03 p.m., right?

19  A.  That's correct.

20  Q.  And it says it's from Marton Anka, right?

21  A.  Yes.

22  Q.  And below that it has a box that talks about the subject and

23  then it says it's from Marton Anka and it gives an e-mail

24  address for you.  Do you see that?

25  A.  That's actually not my e-mail address.  I believe this was

1   posted through Google Groups, which -- yeah, it does have my

2   name on it, yes, and I wrote this.

3   Q.  All right.  Now, it does not show your e-mail address at 3am

4   Labs, which is where you were at the time, does it?

5   A.  No, it doesn't.  Like I said, I posted through this through

6   a Web interface that one can used to access news groups.

7   Q.  Okay.  And you describe certain problems you are having in

8   this posting, right?  And you are soliciting assistance in

9   solving those problems, right?

10  A.  Absolutely.

11  Q.  All right.  And you say:  I'm trying to solve a very

12  peculiar problem.  In my application there are three players.

13  One, client, runs on a Web browser; two, proxy, runs my proxy

14  application with open SSL 0.9.7c; and, three, host, runs my host

15  application with open SSL 0.9.7c.

16      Do you see that?

17  A.  Yes, I do.

18  Q.  Okay.  And then you describe how your system works.  You

19  say:  The host connects to proxy and waits, client connects to

20  proxy and wishes to talk to host.

21      Right?

22  A.  Well, I describe the problem from a cryptographic

23  perspective.  I did not describe how the LogMeIn system worked.

24  That's not the point of this e-mail.

25      Can I explain what the problem was that we were trying to

1   solve or --

2   Q.  Well, you do use the words "host connects to proxy and

3   waits."  Do you see that language?

4   A.  Yes.  Yes, I do.

5   Q.  And you use the word "client connects to proxy and wishes to

6   talk to host."  Do you see those words?

7   A.  Yes.

8   Q.  And then you say, you have a question.  And the second

9   question is:  Can this be improved?  For example, can we get rid

10  of the de-encryption/re-encryption phase?  Can I somehow manage

11  to get both host and client to negotiate the same cipher suite

12  and session key?  I have total control over the code that runs

13  on proxy and host, but client can be any Web browser.

14      Do you see that language?

15  A.  I do, yes.

16  Q.  All right.  And then you say:  Please note that I am just an

17  ordinary SSL user and do not understand its internal workings to

18  100 percent, so I apologize if the latter question is dumb.

19      Right?

20  A.  I do, yes.

21  Q.  You do.  And you even go so far as to offer to pay people if

22  they will help you solve that problem, right?

23  A.  I do, yes.

24  Q.  You say:  If someone were willing to consult me on this

25  matter, I would, of course, be willing to pay appropriate

1  compensation for their time.

2      Right?

3  A.  Yes, that's correct.

4  Q.  All right.  And you did get assistance in solving that

5  problem from that posting, didn't you?

6  A.  Yes.  So, this particular posting was sent to a list called

7  open SSL users, which is a mailing list and news group for

8  engineers who work on the -- work with the results of the open

9  SSL project.  The open SSL project is a cryptographic

10  implementation that is open source and maintained by a number of

11  engineers.

12      They read these postings.  This group is primarily for other

13  users to communicate with one another, but the developers

14  themselves are also present here.

15      So, I was actually contacted by one of the maintainers of

16  open SSL, a certain Dr. Steven Hanson from the United Kingdom,

17  offering help with this particular problem.

18  Q.  Okay.  And you don't know whether you had contact -- you

19  received that contact before or after you released LogMeIn in

20  April 13, 2004, do you?

21  A.  I actually don't know off the top of my head, no.

22  Q.  And when you made this posting, you didn't tell people that

23  you were designing a software program, correct?  You didn't tell

24  them that you were a developer of remote access software?  You

25  didn't say that in the posting?

1   A.  No, I did not.  It was not relevant.  What we are talking

2   about here -- or what I am talking about here, at least, is a

3   problem with cryptography.  It had nothing to do with the

4   context of the application.

5   Q.  But you went outside of LogMeIn to find the solution to this

6   problem, didn't you?

7   A.  Yes.  Yeah, that's -- I don't see any problem with that.  I

8   did.

9   Q.  Mr. Anka, would you take a look at Plaintiff's Exhibit 42.

10  A.  Okay.

11  Q.  Mr. Anka, you know what this exhibit is, don't you?  You've

12  seen it before?

13  A.  Yes.  It was shown to me during one of my depositions, yes.

14  Q.  And it's a log by 01 showing users of the 01 system, right?

15  A.  Showing some of the users, I imagine, yes.

16  Q.  That's right, some of the users, not all.  Okay.

17      And you see your name on this log, don't you?

18  A.  I do, yes.

19  Q.  All right.  If you could take a look at line 9, there is

20  a -- what appears to be a first name Marton, do you see that?

21  A.  I do, yes.

22  Q.  And then a second name Anka, do you see that?

23  A.  I do.

24  Q.  And then an e-mail address, which I will have a hard time

25  pronouncing, but it seems like it's katyushaq@freemail.hu,

 1  right?

 2  A.  Yes.

 3  Q.  All right.  And the date of this is April 21, 2004, right?

 4  A.  That is correct, yes.

 5  Q.  And this shows that you were downloading 01 software on

 6  April 21 of 2004, right?

 7  A.  Yes.  Yes, that's what it shows.

 8  Q.  All right.  Now, freemail -- katyushaq@freemail.hu, that's

 9  not your 3am Labs e-mail account, is it?

10  A.  No, it's not, but Marton Anka is -- is my name.

11  Q.  But you were using this e-mail account, correct?

12  A.  I don't use it anymore.  I believe from time to time I must

13  have if I -- if I gave it here, yes.

14  Q.  Okay.  And when it says freemail.hu, the hu refers to

15  Hungary, correct?

16  A.  Yeah, Freemail was -- you know, it's kind of like Hotmail,

17  Gmail, except it was specific to Hungary back in those days.

18  Q.  All right.  And if you would take a look at line 7,

19  Mr. Anka.  Do you see that?

20  A.  Yeah.  Yeah, I do.

21  Q.  Line 7, the first name is Marton, the second name is Anka.

22  Do you see that?

23  A.  Yes.

24  Q.  Now you do use your e-mail, don't you?  You say the e-mail

25  address is marton@03am.com, do you see that?

1   A.   Yes, that was one of the domains we used for e-mail.

2   Q.   And that shows you were on the 01 Web site on June 3, 2006,

3   right?

4   A.   Yes, it does.  I think this was shortly after we have

5   learned about 01 launching their lawsuit against Citrix.

6   Q.   All right.  Take a look at line 2, if you would, Mr. Anka.

7   The first name is 3am and the second name is Labs.

8        Do you see that?

9   A.   Yes.  Yes, I do.

10  Q.   And this e-mail address is andras.marton@3amlabs.com, do you

11  see that?

12  A.   Yes, yes, I do.

13  Q.   And that shows that the person using this e-mail address was

14  on the 01 Web site in August 10 of 2004, correct?

15  A.   That is correct, yes.

16  Q.   Mr. Anka, is that you on the Web site at that time?

17  A.   No.  Andras Marton was -- was a software engineer who worked

18  for us briefly at LogMeIn.

19  Q.   All right.  Mr. Anka, let me ask you to take a look at line

20  8.  Do you see the first name is mpenney, one word,

21  m-p-e-n-n-e-y.

22       Do you see that?

23  A.   Yes, I do.

24  Q.   And the second word -- the second name is the letter D,

25  right?

1   A.  I -- I do see that, yes.

2   Q.  And the e-mail account is mpenney@3amlabs.com, right?

3   A.  Yes.

4   Q.  And the date of that is -- and that's your company's e-mail

5   address at the time, right?

6   A.  It is, yes.

7   Q.  And that shows that whoever this was was on the 01 Web site

8   downloading software on August 10, 2007, correct?

9   A.  Yes, that's correct.

10  Q.  Mr. Anka, you had occasion to use what you call throwaway

11  e-mail addresses from time to time?

12  A.  Possibly, yes.

13  Q.  Do you know what a throwaway e-mail address is?

14  A.  Yeah, it's when you sign up for something but you don't want

15  to get spam, you put in something that you know you are not

16  going to be bothered at.

17  Q.  And sometimes when you do that, for the name you simply bang

18  on the keyboard, right?  Just any old random thing on the

19  keyboard, right?

20  A.  People might do that, yes.

21  Q.  All right.  Mr. Anka, look at, if you would, at line 12.

22  The first name here is Microsoft, second name is Windows, and

23  the e-mail address is, amarton@gmail.com, shows accessing the 01

24  site on January 16 of 2008.

25      Is that -- is that amarton related to you?

1    A.   That -- that is my Gmail address, yes.

2    Q.   So, you were also on the 01 Web site then, correct?

3    A.   Yes.

4    Q.   Mr. Anka, there -- if you look at line 45, there is an

5    e-mail address by someone -- the e-mail address is

6    abacsatnas@freemail.hu, you see that?

7    A.   Yes, I do.

8    Q.   And you were using the freemail.hu account, correct?  From

9    time to time?

10   A.   Yes.

11   Q.   And the first name here is XY and the last name is Z.   Do

12   you see that?

13   A.   Yes, I do.

14   Q.   And that shows that this person was on the 01 site on

15   February 28, 2004, do you see that?

16   A.   Yes, I do.

17   Q.   Was that you, Mr. Anka?

18   A.   I don't think so.

19   Q.   You're not sure?

20   A.   I am pretty sure I wasn't.  I wasn't trying to hide my

21   identity when I was -- when I was visiting one site.  I don't

22   know why I would have.

23   Q.   But you can't -- you can't testify for certain today that

24   you weren't on the Web site in February of 2004?

25   A.   Look, whenever I visited the Web site, I have either used

1    one of my e-mail addresses or gave my name.

2    Q.  Mr. Anka, I would like to ask you to take a look at

3    Defendant's Exhibit 255, which you testified about on direct.

4           MR. CORRADO:  Your Honor, I would like to move the

5    admission of -- I am sorry, Plaintiff's Exhibit 42 is in

6    evidence.  Plaintiff's Exhibit 146, I believe, is not in

7    evidence.  I would move its admission at this time.

8           Your Honor, Plaintiff's Exhibit 146, I believe it has

9    not been admitted, and I would move the admission of Plaintiff's

10   Exhibit 146 at this time.

11          MS. FERRERA:  No objection.

12          THE COURT:  It is admitted.

13   BY MR. CORRADO: (Continuing)

14   Q.  Mr. --

15   A.  I am sorry, Defense Exhibit -- Defense Exhibit --

16   Q.  Defense Exhibit 255.  Do you have that in front of you?

17   A.  Yes, I do.

18   Q.  This is one of the patents that you testified about earlier,

19   correct?

20   A.  That's correct.

21   Q.  And this is a patent that bears your name, Marton Anka?

22   A.  It does, yes.

23   Q.  And the date of the patent on its face shows that it was

24   applied for on December 9, 2004, right?

25   A.  That's correct, yes.

1   Q.  And it was finally issued on July 7, 2004, correct?

2   A.  I think 2009, but yes.

3   Q.  I am sorry.  I am sorry.

4   A.  Yes.  Yes, July 7, 2009.

5   Q.  I correct it, you are absolutely right.

6       July 7, 2009, right.  And this patent was in prosecution

7   with the Patent and Trademark Office from December 2004 to July

8   2009, right?

9   A.  It was, yes.

10  Q.  And in some of the patents you testified about, you referred

11  to the listing here at the bottom of the first column, top of

12  the second column:  U.S. Patent Documents.

13      Do you see that?

14  A.  Yes, I do.

15  Q.  It is a list of patents and other references that you

16  disclosed to the PTO when you applied for your patent, right?

17  A.  That's correct.

18  Q.  And you understand that when you apply for a patent, you

19  have duties of disclosure to tell the Patent and Trademark

20  Office of prior art that you're aware of, correct?

21          MS. FERRERA:  Objection, Your Honor, I don't think that

22  Mr. Anka is being charged with any kind of issue here, so I

23  don't think it's relevant to any of the issues in the case.

24          Mr. CORRADO:  Your Honor, she asked the witness about

25  the very same thing with respect to his patents, she asked the

1  witness to look at the documents that were submitted to the

2  PTO --

3          THE COURT:  Objection overruled.

4  BY MR. CORRADO: (Continuing)

5  Q.  So, this includes a list of documents that you disclosed

6  during the pendency of your application from December 2004 until

7  July 2009, do you see that list?

8  A.  Yes, I do.

9  Q.  All right.  Now, you have -- you were aware of the 01

10 product at that time, right?  Well, let me take that back.

11 A.  Yes.

12 Q.  In 2004 when you applied for this patent, on December 9,

13 2004, you were aware of the 01 product?

14 A.  The product I was, yes.

15 Q.  All right.  And you had downloaded some -- the Web site?

16 A.  I went to their Web site to download the product, yes.

17 Q.  All right.  And you sent around certain computer -- certain

18 screen shots of the 01 product at that time?

19 A.  Yes, that's correct.

20 Q.  But you didn't disclose the 01 product or any publications

21 about the 01 product in this list of patent prior art references

22 to the PTO, did you?

23 A.  There was no 01 patent that I was aware of at the time.

24 Q.  All right.  But you were aware of the product, correct?

25 A.  The product, yes, I was.

1   Q.   You had used the product?

2   A.   I had.

3   Q.   You had downloaded the product?

4   A.   Yeah.

5   Q.   Now, you became aware of the 01 patent in 2006, correct?

6   A.   That is correct, yes.

7   Q.   And that's when 01 initiated litigation against Citrix,

8   right?

9   A.   That's right.

10  Q.   And Citrix was a competitor of yours?

11  A.   Very much so.

12  Q.   And a competitor of 01, right?

13  A.   Probably.

14  Q.   All right.  And when you -- when you saw the Citrix, that 01

15  had sued Citrix on this patent, you immediately went and you

16  pulled a copy of the 01 patent, correct?

17  A.   Yes.  Yes, I did.  Right.

18  Q.   And you read the patent at that time, right?

19  A.   I have read it, yes.

20  Q.   And that was in 2006, that was three years before this

21  patent issued, right?

22  A.   That's correct.

23  Q.   All right.  But you didn't disclose that patent to the U.S.

24  Patent and Trademark Office in 2006, did you?

25  A.   No, no, I did not.

```
 1   Q.  The first line of this abstract of your patent describes,

 2   let me quote:  A remote access session is established between

 3   client and host computers with the assistance of a gateway.

 4       Right?  Do you see that?

 5   A.  Yes, I do.

 6   Q.  That's you describing your patent application?

 7   A.  Yes.

 8   Q.  All right.  And you were aware of the 01 patent at this

 9   time, but didn't disclose that to the PTO as relevant prior art

10   to your patent?

11   A.  No, we did not.  What we did, though, is the continuation of

12   this very patent application, when we filed that, we did

13   disclose the 01 patent.

14   Q.  And that was in 2011, wasn't it, Mr. Anka?

15   A.  It was much later, yes.

16   Q.  But in 2006 you didn't disclose the 01 patent?

17   A.  No, we did not.

18   Q.  In 2007 you didn't disclose the 01 patent?

19   A.  No, we did not.

20   Q.  In 2008 you didn't disclose the 01 patent?

21   A.  We did not disclose it in 2009.

22   Q.  2009 when the patent issued you hadn't disclosed the 01

23   patent?

24   A.  No.

25   Q.  Now, you became aware of the Accolade patent, the '888
```

1    patent, the Hickman patent we call it, you became aware of that

2    in 2006 as well, didn't you?

3    A.   That is correct, yes.

4    Q.   And that's because LogMeIn was sued for infringing the '888

5    patent, right?

6    A.   That's correct.

7    Q.   And 01 was sued for infringing the '888 patent in the very

8    same lawsuit, right?

9    A.   Yes, they were.

10   Q.   All right.  And you know -- you knew at that time that

11   Accolade was accusing both 01 and LogMeIn of infringing its '888

12   patent, right?

13   A.   That's correct, yes.

14   Q.   And that was 2006.  But you didn't disclose the Accolade

15   patent to the Patent and Trademark Office in 2006, did you?

16   A.   No, we did not.

17   Q.   You didn't disclose it in 2007 either?

18   A.   Not in 2008 either.

19   Q.   You didn't disclose it in 2008 or 2009?

20   A.   No.

21   Q.   In fact, this patent issued without your disclosing the

22   Accolade patent as material, as prior art to your application,

23   correct?

24   A.   That is correct.

25   Q.   Mr. Anka, do you consider the '888 patent to be material

1   prior art to your patent application?

2           MS. FERRERA:  Objection, relevance.

3           THE COURT:  What relevance does it have?

4           Mr. CORRADO:  Your Honor, I am happy to approach the

5   sidebar and talk about it.  It has relevance with respect to

6   whether it is material --

7           THE COURT:  All right.

8           NOTE:  A side-bar discussion is had between the Court

9   and counsel out of the hearing of the jury as follows:

10  AT SIDE BAR

11          Mr. CORRADO:  Your Honor, the inequitable conduct claim

12  in this case is based on the failure to disclose the '888 patent

13  to the Patent and Trademark Office in 01's application.  The

14  grounds for that inequitable conduct claim is that 01 knew about

15  that patent because they were sued on it and should have

16  disclosed it and didn't.

17          LogMeIn knew about the very same patent from the very

18  same lawsuit, they were sued, they were co-parties with 01.

19  They also didn't disclose that patent to the Patent and

20  Trademark Office in 2006, 2007, 2008, until the patent issued in

21  2009.

22          That's material to the issue of whether or not there

23  was an intent to deceive.  If there was no intent to deceive

24  that 01 had, then there is no intent to deceive -- if there is

25  no intent to deceive that LogMeIn had, there is no intent to

1    deceive that 01 had.  So, it's material to that point, what they

2    consider to be material prior art.

3           MS. FERRERA:  First of all, Your Honor, there's no

4    charge of inequitable conduct here with respect to LogMeIn or

5    that LogMeIn committed any kind of fraud on the Patent Office

6    with respect to its patents.

7           But beyond that, this witness is not an expert, he is

8    not giving an opinion about materiality, he hasn't been asked

9    these questions on direct.  To ask him now to form a legal

10   conclusion about whether something is material, is completely

11   inappropriate.

12          THE COURT:  I believe so.  Objection sustained.

13          NOTE:  The side-bar discussion is concluded; whereupon

14   the case continues before the jury as follows:

15   BEFORE THE JURY

16   BY Mr. CORRADO: (Continuing)

17   Q.  Mr. Anka, you were the one at LogMeIn who was responsible

18   for deciding to give LogMeIn away for free, were you not?

19   A.  No, that -- the idea is -- that was mine.  I wasn't running

20   the company, not -- definitely not alone.  So, it was a decision

21   that we made together.

22   Q.  Who made the decision?

23   A.  Michael Simon, myself, Sean Ellis, our VP of marketing at

24   the time.

25   Q.  Now, Mr. Anka, if you would take a look at Plaintiff's

1    Exhibit 46 in your binder.

2        Do you have that in front of you?

3    A.  Yes, I do.

4    Q.  Plaintiff's Exhibit 46 is an e-mail from you dated June 12,

5    2009, to Michael Simon, Kevin Harrison and Kevin Bardos, do you

6    see that?

7    A.  Yes.  Yes, I do.

8    Q.  And in this e-mail you tell Mr. Simon, Mr. Harrison and Mr.

9    Bardos that, and I quote the second paragraph:  Users always

10   seem to find the path of least resistance, be that resistance

11   based on, and then the dollar sign.

12       Right?

13   A.  Yes.

14   Q.  And that dollar sign refers to money, right?

15   A.  Yeah.  What I say here is:  Be that resistance based on

16   money, ease of use, aesthetics, et cetera.  That's -- that's the

17   sentence.

18   Q.  All right.  And you go on to say:  We've been taking

19   advantage of this with LMI Free for years now.

20       Right?

21   A.  Yes, that's correct.

22   Q.  That means that you were taking advantage of the free -- of

23   the giving away of LogMeIn to customers for years, right?

24   A.   I believe what I say here is that we've been taking

25   advantage of the fact that users always find the path of least

1    resistance, you know, be that based on money, ease of use or

2    aesthetics.  That's what we've been taking advantage of.  That's

3    what I say here.

4    Q.  Okay.  You see a reference in the last paragraph to Express,

5    do you see that?

6    A.  Yes.  Yes, I do.

7    Q.  Express is the join.me product, isn't it?

8    A.  It was the early name of the join.me product, yes.

9    Q.  And you say:  I think if we're not careful with decisions

10   regarding Express and lose sight of its number one goal, destroy

11   TeamViewer, we may be forced to retreat in shame.

12        Do you see that language?

13   A.  Yes, I do.

14   Q.  Who is TeamViewer?

15   A.  TeamViewer is a company originally based out of Germany.

16   They became a competitor of ours over the course of the past few

17   years.  Today I believe they have revenues over $100 million a

18   year.

19   Q.  Okay.  And they were a competitor of LogMeIn, right?

20   A.  They still are.

21   Q.  All right.  And you say with respect to TeamViewer:  That's

22   why I am not enthusiastic, (to say the least) about trying to

23   turn Express into a pay-for product on any level.

24        Do you see that?

25   A.  Yes.

1  Q.  And it goes on to say:  At least not until it's done its

2  job.

3      Right?

4  A.  Yes.

5  Q.  And what was that job, Mr. Anka?

6  A.  Well, to finish the sentence, what I wrote here:  It's done

7  its job and put our German friends out of business.

8  Q.  And put our German friends out of business.  That was the

9  real purpose behind giving away LogMeIn for free, right --

10  A.  This was --

11  Q.  -- was to destroy your competitors, wasn't it?

12  A.  No, it was not.  You don't make money by destroying your

13  competitors.  You make money by selling products to your

14  customers.

15  Q.  But you said:  That's why I'm not enthusiastic about trying

16  to turn Express into a pay-for product on any level, at least

17  not until it's done its job and put our German friends out of

18  business.

19      I read that right, didn't I?

20  A.  Yes.  Yes, you did, but --

21  Q.  And that's your language?

22  A.  That is my language.  However, the context for this e-mail

23  is that we've been competing with TeamViewer with a particular

24  product of ours.  It's actually a non-accused product here.

25  It's a support product.  And TeamViewer has taken a lot of

1   market share from us back in those days.  A lot of the low-end

2   market share has gone to TeamViewer.

3       We were, understandably, quite upset and concerned about

4   that.  And we -- well, I personally believed that we could do

5   the same harm with a completely free product that they have done

6   to us.  That's -- that's all there is to it.

7       You know, probably, needless to say, this did not happen.

8   join.me does have a pay-for product and TeamViewer is thriving.

9   Q.  Despite your efforts to put them out of business?

10  A.  If you want to put it that way, yes.

11  Q.  Mr. Anka, you changed the software for LogMeIn, didn't you,

12  recently?

13  A.  We change the software very regularly.  That's -- the great

14  thing about software, the service, is that, you know, you don't

15  go from one boxed version to another.  You are able to update it

16  regularly and frequently and make the product better.

17  Q.  But you made that change after this lawsuit was filed,

18  didn't you?

19  A.  Well, we have made changes before, after, and we make

20  changes every week.

21  Q.  All right.  But the change -- the change you made after this

22  lawsuit was filed, or at least one of them, was a source code

23  change affecting the gateway servers, right?

24  A.  Again, we have made many changes.  I am not sure which

25  change you are referring to here.

1    Q.  Well, you made a change with respect to the way the gateway

2    servers interact with the Web servers or the database servers,

3    didn't you?

4    A.  I am not aware of such a change, no.

5    Q.  But do you remember -- do you remember talking about a

6    change you made after the lawsuit was filed which you called an

7    under-the-hood change?

8    A.  Under-the-hood means low-level changes.  Again, I am still

9    not sure what you are referring to.

10   Q.  Well, Mr. Anka, would you take a look at your deposition.

11   It's the larger deposition.

12       I am sorry, it's not.

13       Mr. Anka, this is the January 23, 2013 transcript of your

14   deposition.

15   A.  Yes, I have it in my hands.

16   Q.  All right.  And you made a certain change to the software

17   which you called a workaround.  Do you recall that?

18   A.  A workaround?  Did I use that term?  I may have.  I --

19   Q.  Well, take a look at -- take a look at page 36 of that

20   deposition.  You see that you were asked this question and you

21   gave this answer.

22   A.  Oh, yeah, yeah, yeah.  Yes, I do.

23   Q.  The question was:  Why not?  And the answer was:  Well, this

24   was shortly after LogMeIn won the case on summary judgment, so I

25   believe that we no longer needed a workaround.

1       Do you see that language?

2   A.  Yeah.  Yeah, I do.

3   Q.  All right.  And you called that change an under-the-hood

4   change.  Do you see your deposition at page 114?  Take a look at

5   line 7 of 114, Mr. Anka.

6   A.  One moment.

7       Yes.

8   Q.  Mr. Anka, one -- one final question.  You -- as an officer

9   of LogMeIn, you have an obligation to file certain filings with

10  the Securities and Exchange Commission whenever you exercise

11  your stock options, right?

12  A.  That's correct, yes, sir.

13  Q.  And you made those filings on a consistent basis since 2009,

14  correct?

15  A.  That is correct, yes.

16  Q.  And in exercising the sale of those stock options, you

17  profited by at least $14.8 million, didn't you, Mr. Anka, on the

18  stock of LogMeIn?

19  A.  My recollection -- yeah.  I -- you know, if that is data you

20  have from -- from SEC filings, then -- then that must be

21  correct, even though my recollection is something more closer to

22  $10 million, but --

23  Q.  Somewhere between 10 and 14 or 15 million?

24  A.  No, I -- I actually think 10 is a -- is a more accurate

25  answer.  I am not sure.  So, are you talking about exercising

1   and selling options?

2   Q.  I'm talking about the net profit you made on the sale of

3   your options, actual profit on the sale.

4   A.  If you have that data, then I'm sure that is correct.

5           Mr. CORRADO:  No further questions, Your Honor.

6           MS. FERRERA:  No questions, Your Honor.

7           THE COURT:  All right.  Thank you.  You may step down.

8           NOTE:  The witness stood down.

9           THE COURT:  Who is next?

10          MR. MOLSTER:  Good afternoon, Your Honor.  We have some

11  deposition testimony from Pedro Nascimento from March 2 of 2011.

12  Mr. Nascimento is not here, so with your permission we're going

13  to have Andrew Liao play the part of Mr. Nascimento, and I'm

14  going to play the part of the questioner.

15          THE COURT:  Very good.

16          MR. MOLSTER:  Can I pass up the -- and, for the record,

17  Your Honor, Pedro Nascimento is one of the inventors of the '479

18  patent which -- that 01 is suing on in this case.

19          THE COURT:  All right.

20          MR. MOLSTER:  So we start on page 1, Your Honor -- I am

21  sorry, page 7.

22          NOTE:  The deposition of Pedro Nascimento is read into

23  the record as follows:

24  BY MR. MOLSTER:  (Reading)

25  Q.  Please state your full name for the record.

1  A.  My name is Pedro Paulo Nascimento.

2  Q.  You're currently an employee of 01, correct?

3  A.  Yes.

4  Q.  What's your current title at 01?

5  A.  I am VP of R&D.

6  Q.  You're a named inventor on the '479 patent, correct?

7  A.  Yes, it is.

8          MS. MOSER:  Your Honor, we would have read page 9, line

9  15 through page 10, line 10.

10          MR. MOLSTER:  Your Honor, I don't think that's

11  responsive.  It talks about the Citrix lawsuit and the -- it's

12  designated as a counterdesignation for pages of a Citrix

13  deposition, a completely different deposition, taken in February

14  of '07, which we were initially going to read some from, but

15  we've dropped it.

16          So, it's supposed to be countered to yet a completely

17  different deposition which we're not reading anyway.  So, we

18  don't think it's appropriate.

19          MS. MOSER:  Your Honor, it's directly related to the

20  next portion of the testimony that LogMeIn plans to read.

21          THE COURT:  All right.  Go ahead and read it.

22  BY MR. MOLSTER: (Reading)

23  Q.  Have you been involved in any way in the litigation between

24  01 Communique and Citrix?

25  A.  As litigation goes, I guess that I was consulted.  But in

1   terms of taking actions on myself, I don't remember.

2   Q.  So, without revealing any attorney/client communication, did

3   you review any expert reports in the 01 Communique versus Citrix

4   litigation?

5   A.  For that litigation, I remember giving all documentation

6   that I have in my possession to my attorneys, to my -- my boss,

7   Mr. Cheung.  And as far as I know, he forward all the documents

8   to our attorneys.

9   Q.  Okay.  What type of -- types of documents were collected in

10  your litigation with Citrix?

11  A.  It was meetings minutes, e-mails, and some product

12  reporting.  Whatever we had in hard copy and soft copy, we put

13  it out.

14  Q.  So, you produced literally everything in your possession?

15  A.  Everything that I had, yes.

16         MR. MOLSTER:  Then on page 11, Your Honor, line 2.

17  Q.  Do you regularly permanently delete old e-mails?

18  A.  What time?

19  Q.  Over any time.

20  A.  I remember that, you know, as an e-mail user you receive a

21  lot of spams.  So it was like kind of better, I think, to

22  delete, you know, spams about e-mails that you belong so list.

23  And also prior to -- we started having those litigations going

24  on.  So I was -- I used to get all my e-mails and compress them

25  in a zip format, leave on the network, and as year goes by we

1   would delete some of those compressed files, the very old ones.

2       MR. MOLSTER:  Now to page 14, Your Honor, lines 8

3   through 13.

4   Q.  Did you do anything to prepare for your deposition today?

5   A.  Like what.

6   Q.  Did you review documents?

7   A.  I just came here.  So, I had the conversation with my

8   attorney, that's all.

9       MR. MOLSTER:  Page 15, Your Honor, lines 3 through 8.

10  Q.  Did you review any documents?

11  A.  We -- we talk about some documents, yes.

12  Q.  Did any of those documents refresh your recollection of the

13  subject matter of this litigation?

14  A.  No.  Really, I was all the time apologizing because I

15  couldn't remember most of what was there.

16      MR. MOLSTER:  Next page 44, Your Honor, line 16.

17  Q.  Right.  Okay.  So, iServer was the name you used internally,

18  and then when you launched the product, you called it I'm

19  InTouch?

20  A.  Yes, I guess it was that, yes.

21      MS. MOSER:  And, Your Honor, I believe the next

22  testimony is going to be related to the '479 patent, and we have

23  a portion related to that at page 84, 4 through line 22, that we

24  would like to have read into the record.

25      MR. MOLSTER:  The next -- actually, the next thing

1   we're doing, Your Honor is at 65 -- no, I am sorry, Your Honor.

2   The next -- the next one we're doing is 128.

3              So, 128, line 16, through the end of the page.

4   BY MR. MOLSTER: (Reading)

5   Q.  Okay.  Let's look at the '479 patent.  It's in your pile

6   there.  I think it's Exhibit Number 3.  Do you have the '479

7   patent in front of you?

8   A.  Yes.

9   Q.  Do you see the title of the '479 patent?  It says:  System

10  computer product and method for providing a private

11  communication portal.

12  A.  Yes.

13             MS. MOSER:  And, Your Honor, this is where we would

14  like to have read page 84, line 4 through line 22.

15             MR. MOLSTER:  And I think we're backing up 40 pages,

16  Judge.  I don't even have it.  I don't think that's putting it

17  in context.  It's 40 pages before that.

18             MS. MOSER:  Your Honor --

19             MR. MOLSTER:  They can read it --

20             THE COURT:  That can't be in context.  I'll let you

21  read it.  Go ahead and read it now if you want to.

22             MS. MOSER:  Okay.

23             THE COURT:  Go ahead and read it.  It can't make a

24  whole lot of difference either whether it's in context or not.

25  Go ahead.

1            MS. MOSER:  Question:  Is there any word in the patent

2    that you don't understand?

3            Answer:  Not that I can remember now.  There are plenty

4    of them, trust me, principally being -- English not being my

5    first language.

6            Question:  Do you think that the patent is an accurate

7    reflection of your invention?

8            Answer:  If I think, I think so.

9            Question:  What was your role in drafting the patent

10   application that issued as the '479 patent?

11           Answer:  My role was outline some points, technical

12   points.  If I -- if didn't -- I didn't interact too many times

13   with our lawyers that was being -- writing the patent for us.

14   That was a comprehensive process.  But I participate in many

15   meetings, and when I had some discussion -- because, as you

16   know, there's many definitions that can be kind of confusing

17   here and there, so I provide some explanations to avoid -- for

18   the document to be kind of unique from the beginning to the end.

19           MR. MOLSTER:  At page 136, Your Honor, line 4 through

20   line 14.

21   BY MR. MOLSTER: (Reading)

22   Q.  Did you -- did you review the patent before it was submitted

23   to the Patent Office?

24   A.  Yes, I did.

25   Q.  Did you understand --

1   A.  But many, many years ago.

2   Q.  Did you understand what the term "portal" meant at that

3   time?

4   A.  I just don't remember.  I have to go through.  This thing

5   has been going on for --

6   Q.  Mr. Nascimento, you're aware that your company is --

7   A.  Can I finish my sentence?  I'm sorry.  When I say that, this

8   was written some years ago.  It has been read over, the lawyers

9   are helping us to write expressions to avoid ambiguity and

10  everything.  There are some special legal expressions that

11  honestly I cannot remember anymore what they meant.  And the

12  labeling, how we label things is being lost in my memory.  So, I

13  have to truly refresh.  And to do this right now under pressure

14  and be filmed and everything is nothing I can do to help out.

15  Q.  So, you don't know whether the term "portal" sitting here

16  today refers to the host computer or not?

17  A.  I said before I don't remember what that label exactly

18  means.

19  Q.  Do you know whether the term "portal" refers to the locator?

20  Sitting here today, do you know whether the term "portal" refers

21  to the locator server computer or not?

22  A.  I don't remember what the label "portal" is referring to.

23          MR. MOLSTER:  148, Your Honor, lines 14 through 17.

24  Q.  Before June of 2000, had you ever constructed a locator

25  server computer that was implemented as a server farm?

1   A.   I don't remember.  I don't remember.

2           MS. MOSER:  Your Honor, we would have read page 148,

3   line 18 through line 22.

4   A.   When you are developing, you go for the simple model first

5   and then you -- you look to the commercial opportunities.  And

6   then you know if I do succeed, I will need more power, I will

7   need more locations, and then -- but I don't remember when we

8   did that.

9           MR. MOLSTER:  Next, Your Honor, line 179 -- I am

10  sorry -- page 179, line 3 through the next page-and-a-half, to

11  page 181, line 7.

12  Q.   So, is it true that -- in starting November 19, 2002, you

13  began working on implementing a multiple server platform for the

14  iServer product?

15  A.   For the product, could be -- could be true.  I'm seeing this

16  for the first time here.  I don't remember exactly if it's

17  matching the real project schedule that we had.

18  Q.   But it doesn't strike you as grossly off?

19  A.   No, it's -- you have to -- to put it in perspective --

20  Q.   Sure, okay --

21  A.   - is nine years passing by from this date, they --

22  Q.   I understand it's a long time ago, okay?

23      All right.  And then -- and, again, this document is dated,

24  again, on the bottom of this page, June 30, 2003, correct?

25  A.   Yes, I see that.

1  Q.  Now if you go down to part IIc?

2  A.  IIc, okay.

3  Q.  It says:  Technical -- it says "technological

4  uncertainties," correct?

5  A.  Yes.

6  Q.  And it says, "first of all, the biggest uncertainty is that

7  we are not sure at all whether the farming can work without

8  affecting the efficiency of the data delivery throughput,"

9  correct?

10  A.  Yes.

11  Q.  Then it says, "this is because of our unique architecture

12  that the reverse HTT -- reverse the -- that the reverse HTTP

13  mechanism -- HTTP mechanism requires the user's PC to be

14  attaching to the locator registration server with a live

15  session," correct?

16  A.  Okay, yes.

17  Q.  And the next sentence is, "then through the locator portal,

18  a remote browser could set up a live connection with the user's

19  PC," correct?

20  A.  Yes.

21  Q.  "Now, if the locator registration servers and the locator

22  portal servers are located in different machines, we are not

23  sure how the architecture can still function," correct?

24  A.  Yes.

25  Q.  So, is this a true statement as of June 30, 2003, to the

1   best of your recollection?

2   A.  I presume to be true because this come from my company, but

3   I cannot -- it wasn't written by me, so it is hard to say if I

4   can match exactly dates and things like that.  The only way

5   for -- in order to see if it is really, really true is to have

6   some -- you know, to see how the project was evolving and see if

7   it matches what is being written here.

8   Q.  And this document was written three years after you filed

9   your application for the '479 patent in June of 2000, correct?

10      Is June 30, 2003, three years to the month after June 2000

11  when you filed the '479 patent?

12  A.  I guess it is.

13          MR. MOLSTER:  Page 208, line 17, Your Honor.

14  Q.  You understand the terms that are used in claim 1?

15  A.  When we transform our invention into application for patent,

16  at the time I had a total understanding every single label,

17  reference, drawing, and -- during that time.  But that was a

18  long time ago.  I just don't remember anymore.

19          MR. MOLSTER:  Page 212, line 1, Your Honor, through the

20  bottom of the page.

21  Q.  And is it your testimony today that you've forgotten the

22  meaning of the words in claim 1 since that time?

23  A.  I said to you that there are labeling names, convention, and

24  that has been too long for me to make a quick reference.  So --

25  Q.  So, does the term "remote computer" not have a commonly

1  understood meaning in the --

2  A.  I have to see.

3  Q.  -- in the field of remote access?

4  A.  I have to read and see for the remote computer is like what

5  we decided that the legal job that we did before, if it is the

6  computer being used as a means to access host machine, but I

7  need to see in the context of this document.  So, here I have

8  more meaning, so here can have meaning differently.  To be

9  precise, I just have to go through.

10  Q.  Do you think that the lawyers used the term -- the lawyer

11  who drafted this patent used the term "remote computer"

12  different than the way you understood it?

13  A.  When I think -- I don't know.  I don't remember?  It has

14  been too long ago.

15         MR. MOLSTER:  Page 213, Your Honor, line 23 through the

16  bottom of the page, and then to 214 at line 8.

17  Q.  What's the difference between creating a communication

18  session and creating a communication channel?

19  A.  I have to see through.

20  Q.  You don't know the answer?

21  A.  I don't have the answer right now.  I don't remember what

22  the difference is.

23  Q.  Can you tell me what the meaning of communication channel

24  is?

25  A.  Only reading in the context of this document because I

1   don't -- don't remember.

2           MR. MOLSTER:  Line 18 also on page 214, Your Honor.

3   Q.  How would you use the word "communication channel" in your

4   own use?

5   A.  Well, there are many different ways it can be used.  So the

6   context can be changed, it is likely -- because at the first

7   view you can think that the communication channel --

8   communication channel and session are the same thing, and I want

9   to see if they are or are not the same thing, reading the -- the

10  description again.  I just don't remember.

11          MR. MOLSTER:  Next, Your Honor, page 224, line 22.

12  Q.  Okay.  Mr. Nascimento, do you know whether any of the

13  LogMeIn products infringed the '479 patent?

14  A.  Pardon me?

15  Q.  Do you know whether any of the LogMeIn products infringed

16  the '479 patent?

17  A.  I really don't.

18          MR. MOLSTER:  That's the end of Mr. Nascimento's

19  testimony, Your Honor.  Thank you.

20          THE COURT:  All right.  Why don't we take a brief

21  recess.

22           NOTE:  At this point the afternoon recess is taken;

23  at the conclusion of which the case continues as follows:

24          MS. FERRERA:  May we proceed, Your Honor?

25          THE COURT:  Please.

1          MS. FERRERA:  Your Honor, LogMeIn calls Dr. Samrat

2    Bhattacharjee.

3          NOTE:  The witness is sworn.

4          SAMRAT BHATTACHARJEE, called by counsel for the

5    defendant, first being duly sworn, testifies and states:

6        DIRECT EXAMINATION

7    BY MS. FERRERA:

8    Q.  Good afternoon.  Could you please introduce yourself to the

9    jury.

10   A.  Good afternoon.  My name is Samrat Bhattacharjee.  I'm a

11   professor of computer science at the University of Maryland.

12   Q.  And, Dr. Bhattacharjee, maybe I could just ask you to pull

13   the microphone a little bit closer to you.  Thank you.

14       Would you turn to DX 313 in -- you don't have any binders.

15   I think we have them actually for the other side and for Your

16   Honor.

17       If you would turn to DX 313, Dr. Bhattacharjee.

18          MS. FERRERA:  Marshal, is there a binder perhaps for

19   opposing counsel?

20          THE MARSHAL:  I put it on his table.

21   BY MS. FERRERA:  (Continuing)

22   Q.  Do you have DX 313, Dr. Bhattacharjee?

23   A.  Yes, I do.

24   Q.  Can you tell us what that document is?

25   A.  It is a copy of my CV.

1   Q.  As far as you know, is it true and accurate as of today?

2   A.  Yes, it is.

3           MS. FERRERA:  Your Honor, we would offer DX 313.

4           Mr. CORRADO:  No objection.

5           THE COURT:  Admitted.

6   BY MS. FERRERA: (Continuing)

7   Q.  Dr. Bhattacharjee, could you tell us who retained you in

8   this case?

9   A.  LogMeIn.

10  Q.  And prior to being retained in this case, had you ever

11  served as an expert witness?

12  A.  Yes, I had.

13  Q.  Have you ever testified at trial before?

14  A.  No, I have not.

15  Q.  Do you have a practice with respect to how many and what

16  type of expert engagements you take on?

17  A.  Yes.  I am extremely careful in taking on these type of

18  expert witness assignments.  I am a professor at the university,

19  and that is my primary job.  So, I can only work at most one of

20  these at any one time.  And I just want to make sure that when I

21  take one on, it's clearly within my expertise with the research

22  I do and the education that I have.

23  Q.  Are you being compensated for your time in this case?

24  A.  Yes, I am.

25  Q.  How are you being compensated?

1   A.   I am being paid $550 per hour.

2   Q.   To date, approximately how many hours have you spent on your

3   work analyzing the issues in this case?

4   A.   Approximately 700 hours.

5   Q.   How have you spent that time?

6   A.   A large amount of that time I spent looking through,

7   reading, and analyzing LogMeIn's source code.  And then I also

8   read and analyzed a large number of prior art references.  I

9   went and read a large number of LogMeIn technical papers and

10  white papers.  I wrote at least three reports for this case.  I

11  was deposed, so I had to prepare for deposition and prepare for

12  trial.  And I also discussed aspects of the case, especially how

13  LogMeIn worked, with Marton Anka.

14  Q.   You mentioned source code, Dr. Bhattacharjee.  Can you tell

15  us what that is.

16  A.   Yes.  Source code is the actual lines of program text that

17  comprise a program.

18  Q.   And what source code did you review in this case?

19  A.   I reviewed the source code for the LogMeIn system.

20  Q.   Were there particular programs for which you reviewed source

21  code?

22  A.   Yes.  I reviewed the source code for the LogMeIn Web

23  servers, the LogMeIn database servers.  And I also reviewed

24  source code for the LogMeIn gateway servers.  And I reviewed

25  source code for some of the LogMeIn host programs.

1    Q.  And can you please tell the jury for what purpose did you

2    review the source code?

3    A.  Well, I reviewed the source code to understand exactly how

4    it was that the LogMeIn system worked.  I went through and

5    focussed primarily on what happens when the LogMeIn -- in

6    LogMeIn, a remote computer tries to connect to the host.

7        So, I went through and read through and understood that

8    source code very carefully.

9    Q.  And why was it necessary for you to review source code in

10   order for you to perform that analysis?

11   A.  Well, I think you have to understand that if you have a

12   computer program, the source code is the one thing that actually

13   tells you what's happening with that program.  Okay.

14       It's like if you have a car and you want to understand how

15   it works, you can read the owner's manual as much as you want.

16   But if you really want to understand what is going on, you have

17   to pop the hood, look at the engine, the transmission and

18   everything else.  And nowadays in a car, you have to look at the

19   source code of the engine computer.

20       But the point is, when you have a program, right, and you

21   want to understand what it is that it's doing, you really just

22   have to look at how it's written, what the code is, how the

23   different pieces are talking, and so on.

24   Q.  And how much source code did you review?

25   A.  Tens of thousands of lines of source code, if not more.

1   Q.  How long did it take you to review that source code?

2   A.  It took me well close to two months.

3   Q.  Approximately how much have you billed LogMeIn to date for

4   reviewing all that source code and looking at the other

5   documents and information you described?

6   A.  Approximately $300,000.

7   Q.  Now, Dr. Bhattacharjee, what were you asked to do in this

8   case?

9   A.  I was asked to analyze the '479 patent both for infringement

10  to see whether the LogMeIn system infringed the '479 patent, and

11  also to analyze whether the '479 patent is valid in light of

12  prior art.

13  Q.  Have you formed any opinions regarding those issues?

14  A.  Yes, I have.

15  Q.  Can you tell us what your opinion is with respect to

16  infringement.

17  A.  In my opinion, the LogMeIn system does not infringe the '479

18  patent.

19  Q.  Did you focus on a particular claim with respect to that

20  opinion?

21  A.  Yes.

22  Q.  Which one?

23  A.  I analyzed claim 24.

24  Q.  And what's your opinion with respect to infringement of

25  claim 24?

1   A.  Specifically, my opinion is that the LogMeIn system does not

2   infringe claim 24 of the '479 patent.

3   Q.  And how about with respect to validity, what is your opinion

4   on that issue?

5   A.  It is my opinion that claim 24 of the LogMeIn -- of the '479

6   patent is invalid.

7   Q.  Now, we'll talk more about those opinions very shortly, but

8   I would just like to ask you a few questions about the

9   background of remote access technology to put your opinions in

10  context.

11      When did remote access technology first start to be used?

12  A.  Well, remote access or remotely accessing a computer is sort

13  of the reason computer networks were developed to begin with.

14  So, even as late -- or as early as the late 1960s, we had a

15  protocol -- think of a protocol as an agreement for

16  communication between computers.

17      So, we had this protocol called Telnet that would allow

18  remote access.  And, frankly, even today some versions of Telnet

19  are used, but it was certainly standardized by the late 1960s.

20  Q.  And just briefly, what was Telnet?

21  A.  So, Telnet, as I said, is this protocol that defines how to

22  talk to a computer.  And using Telnet, you would get a

23  text-based access.  You would get this little -- you could type

24  commands and then those commands would run on that other

25  computer.  It's just text-based access to a remote computer.

1    Q.  After Telnet, did other remote access solutions or products

2    become available?

3    A.  Yes.  As the technology progressed and over the years, we

4    got graphical terminals, you had mice and Windows and whatnot.

5    So, we had, for instance, the V-system followed by the X11

6    system in the mid-'80s that allowed graphical access to remote

7    computers.

8         And then moving on in the '90s, after the Internet became

9    popular for commercial purposes, we had, for instance, VPNs that

10   we have heard about, virtual private networks.  And then, of

11   course, there were other programs that have also become popular

12   since.

13   Q.  Can you provide us some examples of other programs that you

14   said have -- which have become popular since then?

15   A.  Yes.  And I should say that, you know, these types of

16   programs for remote access were not just for scientists or

17   something.  Even for the personal computer, there was a very

18   famous program that some of you might have used called

19   pcAnywhere, which would allow you to access your PC remotely.

20   Q.  Dr. Bhattacharjee, did 01 Communique invent remote access

21   technology?

22   A.  No, they did not.

23   Q.  Had you heard of 01 Communique prior to this lawsuit?

24   A.  No, I had not.

25   Q.  Had you heard of a product called I'm InTouch?

1   A.   No, I had not.

2   Q.   Were you aware of 01's '479 patent?

3   A.   No, I was not.

4   Q.   Did you have an opportunity to analyze 01's '479 patent as

5   part of your work on this case?

6   A.   Yes, I did.

7   Q.   Would you turn in your binder to PX 1.

8        Is that the '479 patent that you reviewed?

9   A.   Yes, it is.

10  Q.   Now, Dr. Bhattacharjee, were you here earlier this week when

11  Mr. Cheung testified about the problems that he was aiming to

12  solve in coming up with his '479 patent?

13  A.   Yes, I was here.

14  Q.   And do you recall that he identified three things, dynamic

15  IP addresses, firewalls, and routers?

16  A.   Yes, I recall that.

17  Q.   When did dynamic IP addresses first come into use?

18  A.   Well, they were in use by the mid-'80s.  There was a

19  protocol called BOOTP that could be used to assign IP addresses

20  dynamically.  And now the protocol that we all use today, it is

21  called DHCP, dynamic host configuration protocol.  That one

22  was -- that protocol was standardized in '93, I think.

23  Q.   And so, by the late 1990s, how prevalent were dynamic IP

24  addresses?

25  A.   Oh, they were common.

1   Q.  And in what context were dynamic IP addresses being used as

2   of that time?

3   A.  One of the most common ways dynamic IP addresses were being

4   used were when you dialed up using your modem to your Internet

5   service provider, or ISP, they would give you a dynamic IP

6   address.

7   Q.  Can you give us some examples of Internet service providers,

8   or ISPs, that were using dynamic IP addresses as of the late

9   1990s?

10  A.  Yes, I think all of us remember the AOL disks, so America

11  Online was a big one.  MindSpring, Prodigy, all of these were

12  other ISPs that were -- that people would dial into and then get

13  dynamic IP addresses.

14  Q.  And then we also -- Mr. Cheung also mentioned firewalls.

15      When did firewalls come into use?

16  A.  So, as I said, you know, in the early '90s, that's when the

17  Internet started getting commercially popular.  And once things

18  got commercially popular, businesses started coming onto the

19  Internet.  And then it became necessary to isolate the corporate

20  networks from the public network.  The Internet wasn't just an

21  innocent place for scientists anymore.  There were actual profit

22  and miscreants also.

23      So, we had to separate real business networks.  And that's

24  when devices like firewalls were put up.  And I think there is a

25  very famous book on firewalls again from the mid-'90s.

S. Bhattacharjee - Direct                              866

1   Q.   So, by the late 1990s, how prevalent were firewalls?

2   A.   Oh, they were very common.

3   Q.   And how about routers, when did they first come into use?

4   A.   Well, first, let me just say that the term "router" as we

5   are using it here isn't the way I would teach it to my

6   undergrads.   Routers are devices on the middle of the network

7   that connect other devices and, let's say, other networks.

8       But the term -- the way we are using router here is really

9   what one would colloquially call a router, is a home router.   It

10  is something that sits inside your house and then might give you

11  a wireless access, a wireless router would, and then connects to

12  your upstream provider.

13      So, I've used that term, but note that that's not the

14  technical use of that term.

15      Those kind of routers were common in the mid-'90s.

16  Q.   And so, by the late 1990s, how prevalent were they?

17  A.   Oh, by the late 1990s we were getting wireless routers, and

18  they were really common.

19  Q.   Now, as of the late 1990s, were there options available to

20  remotely access a computer that was using a dynamic IP address?

21  A.   Yes.

22  Q.   What options were available?

23  A.   Dynamic DNS -- for instance, there was a protocol called

24  dynamic DNS.   You could use that to access a machine with a

25  dynamic IP address.

1  Q.  And can you tell the jury briefly what dynamic DNS is?

2  A.  Certainly.  So, DNS stands for Domain Name System.  It's --

3  think of it as an Internet directory.  You have these names like

4  www.google.com that you type into your browser and that gets

5  translated using DNS into a number that actually goes on the

6  communication packet.

7      Now, usually what happens is that the mapping or the

8  correspondence between www.google.com and the number is set

9  manually by some administrator for some name server that this is

10  stored in.  Okay?  So, that's regular DNS, manually typing in

11  the correspondence.

12      What dynamic DNS did was, it defined a protocol, once again

13  a method, a communication agreement, by which machines that were

14  getting dynamic addresses could send a message and

15  programatically update this mapping as their address was

16  changing.

17      So, you could have this name that didn't change, but then

18  when you got a new address, it would just send this new address

19  on.  And if you had the proper credentials, the mapping would be

20  updated.  And so, whoever wanted to contact you with that name

21  would get the correct address because you were automatically

22  updating the address.  Someone didn't have to log in and

23  manually change the entry in a database.

24      So, that is dynamic DNS.

25  Q.  And how did dynamic DNS deal with the problem of dynamic IP

1  addresses and remote access?

2  A.   Well, as I said, the host, let's say the machine that you

3  wanted to access, would have a name.  And even though the

4  address for the machine was changing, always you need the

5  address to eventually talk to the machine.  Even though the

6  address itself was changing, if you knew the name and the

7  machine itself using the dynamic DNS protocols could update the

8  name to address mapping, then each time you use the name, you

9  would get the current address.  And that is how you would get to

10 the host even if it had a dynamic IP address.

11 Q.   And how about firewalls, Dr. Bhattacharjee, as of the late

12 1990s, were there options available to remotely access a

13 computer that was behind a firewall?

14 A.   Yes, there were.

15 Q.   Can you give us some examples?

16 A.   Certainly.  So, first understand what a firewall is.  A

17 firewall is a device that's, let's say, protecting a network.

18 And the way it does so is that it has a set of rules and it

19 says, things called packets, messages coming in, if they conform

20 to the rule, they can get in.  If they don't conform to the

21 rule, most likely I will throw it out because I don't know what

22 this is.  Right?

23     So, one of the first things one could do to access a machine

24 behind a firewall is manually just change the rule set so that

25 wherever you were coming from, there was a rule for it, so you

1  could get through.

2      Now, there were other types of protocols, again, programs

3  called -- something called SOCKS that one could run.  And what

4  that would do is explicitly define a mechanism by which it could

5  get through a firewall.

6      Now, there was something else that was also kind of common.

7  It has an interesting name.  So, the firewall is here.  It's not

8  letting things coming in.  And there is other machines here and

9  it can't actually go out.  Okay?  The firewall is isolating two

10  networks.  But there would be this other machine here,

11  interestingly named the DMZ host, demilitarized zone.  Okay.

12  That's just the name.  The DMZ machine was allowed to be

13  accessed both ways.

14      So, if you wanted to get out, it would talk to the DMZ and

15  the DMZ would get through the firewall.  And if you wanted to

16  get in, you would talk to the DMZ and the DMZ would let you get

17  in.

18      So, that was yet another mechanism by using these

19  demilitarized zone machines you could get in.

20  Q.  And then the third issue that Mr. Cheung identified was

21  routers.  As of the late 1990s, were there options available to

22  remotely access a computer that is behind a router?

23  A.  Absolutely.

24  Q.  And can you give us some examples of that?

25  A.  Certainly.  So, what the router is doing is something -- you

1    can think of it -- it is doing firewall-like functionality, but

2    the router might be doing something slightly different as well.

3        So, what's happening here is here is the global Internet

4    that we all know about, then here is this router or the NAT

5    device, but let's just call it a router.  And inside you have

6    private addresses.  Okay.

7        So, the addresses here don't mean anything over there, and

8    the addresses here don't mean anything in here.  They are

9    different address realms.  The router is separating what is

10   called address realms.  Okay?

11       So, now what you can do to get across -- well, for one

12   thing, if you only had one machine behind a router and another

13   one on the global Internet, you could always just talk to it by

14   directly sending packets from here onto there.

15       But if you wanted to come from the outside into this address

16   realm, then one of the easier things to do would be to have a

17   relay server.  Okay?  This guy from the inside network could

18   connect to the relay server, maybe somebody else maybe behind

19   yet another router could connect to the relay server, and the

20   relay server can relay packets between them.

21       And what is interesting is this solution is described in the

22   original description of these kind of routers in the mid-1990s

23   when this type of addressing and address realms became popular

24   almost by necessity because we were running out of addresses on

25   the Internet.

1   Q.   Now, Mr. Bhattacharjee, you understand that 01 is asserting

2   that LogMeIn infringes claim 24 of the '479 patent?

3   A.   Yes.

4   Q.   Let's turn to that claim.  And if you would look in PX 1

5   that I think you had already opened up, it's at column 13.

6   Would you turn to that, please.

7        And could you tell the jury briefly what the requirements

8   are of claim 24?

9   A.   Yes.  So, claim 24 claims a computer program product for use

10  on a server computer.  And what it does is it describes -- it

11  has a bunch of requirements.  So, for one thing, if you have a

12  patent claim, and if you infringe it, you have to do all of

13  these things.

14       And so, it has a bunch of requirements.  But at a very high

15  level, it is describing a host computer that is being accessed

16  from a remote computer.  And interposed in the middle is a

17  server computer.  And it describes a bunch of things that must

18  happen in order for this communication to occur, and also a lot

19  of requirements for it to be infringed.

20  Q.   And you mentioned that it requires a server computer.

21       Can you tell us what a server computer is in the context of

22  the '479 patent?

23  A.   Right.  The server computer here is an intermediary that

24  will facilitate access to the host computer.

25  Q.   Is the server computer referred to by any other term in the

1    '479 patent?

2    A.   Yes, it's also been called the locator server computer.

3    Q.   Now, if you look at lines 49 through 50 of claim 24, it

4    refers to the server computer being, quote, linked to the

5    Internet and having a static IP address.

6        Do you see that?

7    A.   Yes, I do.

8    Q.   What do you understand that to mean?

9    A.   Well, what it is saying is that the server computer can be

10   accessed by other computers on the Internet, and it can also

11   talk to other computers on the Internet, and that the server

12   computer has a permanent fixed address.

13       This is sort of important because if the server computer's

14   address itself was changing, then you wouldn't know how to get

15   to the server and then you couldn't locate anything, including

16   the server computer.

17   Q.   And then a little bit further down at lines 64 to 65, there

18   is a reference to something called a location facility.  Do you

19   see that?

20   A.   Yes, I do.

21   Q.   And what is -- first of all, what is a facility?

22   A.   Well, a facility in this patent is used interchangeably with

23   program.

24   Q.   And then the claim talks about a location facility.  What is

25   that?

1   A.  Well, the location facility is a software program that is

2   running on the server computer.

3   Q.  And is that location facility required to do anything in

4   particular?

5   A.  Yes.  The patent has specific restrictions -- requirements

6   from this location facility program that is running on the

7   server computer.  It has four specific requirements.

8   Q.  Can you tell us what those four specific requirements are.

9   A.  Yes.  They are in the document here, and I will read them.

10  So, what it says here is, this is claim element (b)(ii) or

11  (b)(ii), starting on lines 64 of column 13 of the '479 patent.

12      It says that the server computer program includes a location

13  facility, which is this software program that is running, and is

14  responsive to a request from the remote computer to communicate

15  with the personal computer to act as an intermediary between the

16  personal computer and the remote computer.

17      So, the idea is the remote computer will send a request,

18  okay, and the program has to be responsive to this request and

19  eventually the server computer will act as an intermediary.  And

20  there is a bit more here.

21      By creating one or more communication sessions there

22  between.  Okay.  So, that's said one or more communication

23  sessions being created by the location facility.

24      So, that's a requirement number 1.  This location facility

25  program has to create one or more communication sessions between

1    the remote and the host.  Okay.  That's number 1.

2        In response to receipt of the request for communication with

3    the personal computer from the remote computer.

4        Okay.  So that's requirement number 2.  This facility has to

5    be able to receive -- it's operable to receive a request to

6    communicate from the remote to the host.

7        Okay.  By determining a then current location of the

8    personal computer.

9        Okay.  That's requirement number 3.  So, once a request

10   comes in, the location facility has to be able to determine a

11   then current location of the host computer.

12       And creating a communication channel between the remote

13   computer and the personal computer.

14       That's the fourth requirement.  It has to be able to create

15   a communication channel between the remote computer and the host

16   computer.

17       Okay.  The location facility being operable to create such

18   communication channel, whether the personal computer is linked

19   to the Internet directly with a publicly addressable dynamic IP

20   address.  So, it is saying it's got to be able to do this, all

21   of these things, whether the host is on the public Internet here

22   with a public but dynamic IP address.  Okay.

23       Or indirectly via an Internet gateway/proxy with -- so, it's

24   not -- it's got to be also able to do this if the host is linked

25   to the Internet directly and there is this Internet gateway

1  proxy in the middle.  Okay.

2      And now the claim here says with percent, but there's errata

3  which says that percent should be an "a."  So, with a publicly

4  un-addressable LAN IP address.

5      So the last thing here is that the host is in a private

6  address realm.  Okay.  It has a dynamic address.  And the

7  location facility has got to be able to create a channel even

8  under that circumstance.

9      So, there are four requirements in the location facility.

10  First is that it has got to be able to create communication

11  sessions between the host and the remote.  It has got to be able

12  to receive a request for communication.  It has got to be able

13  to determine a then current location for the host.  Okay.  And

14  finally, it has got to be able to create communication channels.

15  Okay.

16      In order to infringe, you have got to do all of these

17  things.

18  Q.  Now, Dr. Bhattacharjee, were you here for the testimony of

19  Mr. Anka earlier today?

20  A.  Yes, I was.

21  Q.  And did you hear his description of the LogMeIn architecture

22  and how that architecture works to provide remote access?

23  A.  Yes.

24  Q.  Have you yourself reviewed information about the LogMeIn

25  system and architecture?

1   A.   Yes.  As I said, I have spent a huge amount of time looking

2   at the source code, and also I have read their white papers,

3   technical papers, including papers that describe their security

4   solution, and so on.

5       I have also spoken to Mr. Anka about the configuration of

6   the data centers.

7   Q.   Based on your review of those materials, do you agree or

8   disagree with Mr. Anka's description of the system and its

9   architecture?

10  A.   I agree.

11  Q.   Were you also here for the testimony of 01's expert,

12  Dr. Grimshaw?

13  A.   Yes, I was.

14  Q.   And did you hear his opinion concerning infringement of

15  claim 24?

16  A.   Yes, I did.

17  Q.   Do you agree or disagree with him?

18  A.   I disagree.

19  Q.   And why do you disagree?

20  A.   Well, I disagree primarily -- well, number one, because the

21  LogMeIn system does not practice this claim.  In particular,

22  there are specific elements in this claim that is not true, is

23  not practiced by the LogMeIn system.

24  Q.   What elements are those?

25  A.   There are three elements.  First, the LogMeIn system does

1    not have a location facility of the type required by the claim.

2    I am not going to go through and read it for you again.

3        Okay.  Second, it does not create channels between the host

4    and the remote as is required by the claim.  Nor does it create

5    sessions between the remote and the host as is required by the

6    claim.

7        And third, the LogMeIn system does not have a server

8    computer linked to the Internet having a static IP address, once

9    again as is required by the claim.

10   Q.  Let's take each of those reasons one at a time, and starting

11   with the first one that you mentioned, about the lack of a

12   location facility.

13       Now, are you aware that there has been a definition given to

14   the term "location facility" in this case?

15   A.  Yes, I am.

16   Q.  And if you would turn to DDX 1-20 in your binder.

17       Do you have that in front of you?

18   A.  Yes, I do.

19   Q.  And do you understand that that is the definition of

20   "location facility" that has been provided by the Court in this

21   case?

22   A.  Yes.

23   Q.  And I am not going to ask you to read the whole definition,

24   Dr. Bhattacharjee, because it is quite long.  But is that

25   consistent with the explanation that you just gave of the

1   location facility?

2   A.  Yes, it is.

3   Q.  Did you consider this definition in forming your opinions in

4   this case?

5   A.  Yes, I did.

6   Q.  And based on your examination of the LogMeIn system, does it

7   have a location facility that meets this definition?

8   A.  No, it does not.

9   Q.  Why not?

10  A.  Because it does not have a software program that does all of

11  these things.

12  Q.  Okay.  Now, did you hear Mr. Anka testify earlier today

13  about the different components of the LogMeIn system?

14  A.  Yes, I did.

15  Q.  And he talked about a Web server and a database server and a

16  gateway server, do you recall that?

17  A.  Yes.

18  Q.  And he also testified about the different software programs

19  on those servers, do you recall that?

20  A.  Yes.

21  Q.  Did you do anything to determine whether or not the software

22  that is on the Web server performs the four functions of the

23  location facility that you just identified?

24  A.  Yes, I did.

25  Q.  What did you do?

1  A.  I went through the Web server code in excruciating detail.

2  In particular, when the remote computer is initiating a

3  communication or wants to talk to the host computer, that part

4  of the code.

5  Q.  Would you turn to DX 314 in your binder.

6      Can you tell us what DX 314 is?

7  A.  Yes, it is a excerpt of source code from the Web server.

8  Q.  And do you know how this excerpt came to be?

9  A.  Yes, I helped prepare it.

10 Q.  How did you prepare it?

11 A.  This is a screen shot of a laptop screen showing the source

12 code.

13 Q.  Now, Dr. Bhattacharjee, would it be possible for you to

14 bring in the entire source code for the Web server software and

15 show it to the jury here today?

16 A.  Well, I mean, if we printed it, it would probably reach the

17 ceiling.  So, technically possible, practically no.

18 Q.  Is that why you prepared a -- you took an excerpt, a screen

19 shot of a portion of the source code?

20 A.  Yes.

21      MS. FERRERA:  Your Honor, we would like to offer

22 DX 314, but we would like to have it submitted under seal

23 because it is confidential source code for LogMeIn.

24      MR. CORRADO:  No objection.

25      THE COURT:  It is admitted.

1   BY MS. FERRERA: (Continuing)

2   Q.  Dr. Bhattacharjee, can you tell us -- well, first of all,

3   when you prepared your report in this case, you mentioned

4   preparing three reports.  Did you look at the source code at

5   that time?

6   A.  Comprehensively, yes.

7   Q.  And when you did that, did you make an effort to cite

8   portions of the source code pertinent to different aspects of

9   your opinions?

10  A.  Yes, my report contains thorough citations with function

11  names, file names, you know, describing how the system works in

12  a lot of detail.

13  Q.  And did you cite the file that contains DX 314 in your

14  report?

15  A.  Yes, I did.

16  Q.  Now, could you tell the jury what this portion of the source

17  code shows.

18  A.  Yes.  I'm sorry that you can't see this, but perhaps you

19  will later.  What this is is a piece of code that runs in the

20  Web server.  And what this code is doing is kind of interesting,

21  it's actually preparing another piece of code that will go and

22  run on your browser.  Okay.

23      So, when this code goes to your browser, it will in fact

24  render the page that shows which hosts you are allowed to click

25  on and log into.

1     And so, what this is showing then is, look, it's explicitly

2  constructing the links, okay, and the images for the hosts and

3  such that when your browser runs this code, it will show those

4  images and construct the links internally.  And once a user

5  clicks on one of those links, a request for communication will

6  come from the browser to the Web server.

7  Q.  And then if you would turn to DX 315 in your binder.

8  A.  Yes.

9  Q.  Is that another excerpt of the source code that you

10  prepared?

11  A.  Yes.

12          MS. FERRERA:  Your Honor, we would like to offer

13  DX 315, again under seal.

14          MR. CORRADO:  No objection, Your Honor.

15          THE COURT:  It is admitted.

16  BY MS. FERRERA: (Continuing)

17  Q.  What does this portion of the source code show,

18  Dr. Bhattacharjee?

19  A.  This is again source code that I cited in my report, and

20  it's source code that is run at the Web server.  And this is the

21  source code that is run once the user has clicked on that host.

22  Okay.

23     So, the request for communication has come in, and what this

24  is showing is the Web browser constructing a query to the

25  database.

1      Okay.  And as part of this query, the database will do

2   certain actions, at the end of it, what we will get back is a

3   URL that will contain the gateway that this host is connected to

4   using a standing channel.  If you recall, the host for -- in, I

5   think, the example was in Miami, was already connected.  And so,

6   I will get back -- here, it will get back the identity of the

7   gateway and also an authenticator called a ticket, which the

8   ticket will eventually allow communication.

9      So, that is what -- the Web server is now querying the

10   database to get all of the data back.

11   Q.  So, now focusing on the four functions that the location

12   facility in claim 24 is required to perform, does the LogMeIn

13   Web server software receive a request for communication with the

14   personal computer from the remote computer?

15   A.  Yes.

16   Q.  Does the Web server software determine a then current

17   location of the personal computer?

18   A.  No, it does not.

19   Q.  Does the Web server software create a communication channel

20   between the personal computer and the host computer?

21   A.  No, it does not.

22   Q.  Does the Web server software create one or more

23   communication sessions between the personal computer and the

24   host computer?

25   A.  No, it does not.

 1   Q.  So, does the Web server software in the LogMeIn system

 2   perform all four functions of the location facility in claim 24?

 3   A.  No, it does not because, again, the location facility has

 4   got to do all four things and if -- it does one thing, but not

 5   the other three.

 6   Q.  Now, let's talk about the database server software that

 7   Mr. Anka described earlier today.  Did you do anything to

 8   determine whether that software program performs the four

 9   functions of the location facility?

10   A.  Yes, I did.  I looked at the source code, again line by

11   line.

12   Q.  And if you would turn to DX 316, can you tell us what that

13   is.

14   A.  Yes.  This is an excerpt of source code that runs at the

15   database.  And once again, I am sorry that you can't see it, but

16   perhaps you will later.

17   Q.  And again, is this a screen shot that you prepared of that

18   source code?

19   A.  Yes, I helped prepare it, that's right.

20          MS. FERRERA:  Your Honor, I would like to offer DX 316

21   under seal again.

22          MR. CORRADO:  No objection, Your Honor.

23          THE COURT:  It is admitted.

24   BY MS. FERRERA: (Continuing)

25   Q.  And is this, again, a portion of source code that you cited

1    in your report, Dr. Bhattacharjee?

2    A.   Yes, it is.

3    Q.   Could you tell the jury briefly what Exhibit DX 316 shows.

4    A.   Yes.  So, this is interesting.  This is written in a

5    completely different language, it's a language for programming

6    and extracting data from databases.  That's why it's running at

7    the database server.

8         And really if you think about it, or the way these types of

9    databases are structured, is that it's a big table of

10   information.  There are columns which say what attribute the

11   data has.  Okay.  Like it might have an ID, might have some time

12   when it was entered, you know, name, whatever.  There are

13   columns.  And then the rows are the individual data items.

14        That's how a database is structured.  And database languages

15   are geared, optimized for extracting data from these types of

16   tables.

17        So, here what is happening is that the database code is

18   querying a table called session tickets.  Okay.  It's looking

19   for the table that contains the tickets, and it's trying to

20   match certain things on these columns.

21        In particular, it says, well, is there a row in this big

22   table that has ticket ID equals to the one I am giving you, is

23   there -- and if there is, then give me the host ID, give me the

24   type of product, subscription ID, give me all the information

25   you know corresponding to this ticket.

1      And now what will happen is if the query succeeds and I can

2    extract a row containing that ticket, then it will -- this code

3    will return a positive result.  Otherwise it will return some

4    kind of an error indicating why it was that the query failed.

5    Q.  So again, focusing on the four functions that the location

6    facility in claim 24 is required to perform, does the database

7    server software receive a request for communication?

8    A.  No, it does not.

9    Q.  Does it determine a then current location of the personal

10    computer?

11    A.  Yes, it does.

12    Q.  Does it create a communication channel between the personal

13    computer and the remote computer?

14    A.  No, it does not.

15    Q.  And does it create any communication sessions between the

16    personal computer and the remote computer?

17    A.  No, it does not.

18    Q.  So, does the database server software in the LogMeIn system

19    perform all four functions of the location facility?

20    A.  No.  The database server software is not a location

21    facility, it does not perform all four functions at all.

22    Q.  And then let's move on to the gateway servers that Mr. Anka

23    described.

24      Did you do anything to determine whether or not the software

25    that runs on the gateway servers performs all four functions of

1    the location facility?

2    A.   I know it is going to get repetitive, but, you know, I went

3    through the source code of the gateway in very much line-by-line

4    detail, almost the whole thing.

5    Q.   Would you turn to DX 317.

6    A.   Yes.

7    Q.   Is that another -- is that an excerpt of the source code

8    from the gateway server software?

9    A.   Yes, it is.

10   Q.   And did you help prepare this excerpt?

11   A.   Yes, I did.

12        MS. FERRERA:  Your Honor, we would like to offer DX 317

13   under seal.

14        MR. CORRADO:  No objection, Your Honor.

15        THE COURT:  It is admitted.

16   BY MS. FERRERA: (Continuing)

17   Q.   And did you cite this portion of the source code in your

18   report, Dr. Bhattacharjee?

19   A.   Yes, I did.

20   Q.   And could you tell us again briefly, what does DX 317 show?

21   A.   Yes.  What it's showing is an excerpt from the gateway.  And

22   you can see that the gateway is written in a language called

23   C++.  This gateway is a very, very high performance piece of

24   code, okay, it has got to be able to relay packets between

25   remotes and hosts very fast.

1       So, C++ is a language that you write in when you want high

2   performance.  It's really difficult to do, but sometimes you've

3   got to do it.  Okay.

4       So, basically what this is showing is a little bit of -- of

5   a code snippet of what the gateway does when the standing

6   channel is being created by the host into the gateway.  It's

7   authenticating to see, hey, is it -- should I allow this

8   standing channel to occur.  If it's okay, then it will then say,

9   okay, I am going to let that standing channel come in.

10      That's the little snippet that I have shown here.

11  Q.  Based on your review of the source code for the gateway

12  server software, again focusing on the four functions of the

13  location facility, does the gateway server software receive a

14  request for communication?

15  A.  No, it does not.

16  Q.  Does it determine a then current location of the personal

17  computer?

18  A.  No, it does not.

19  Q.  Does it create a communication channel between the personal

20  computer and the remote computer?

21  A.  No, it does not.

22  Q.  Does it create one or more communication sessions between

23  the personal computer and the remote computer?

24  A.  No, it does not.

25  Q.  So, does the gateway server software perform all four

1   functions of the location facility?

2   A.  The gateway software performs none of the functions required

3   of the location facility.

4   Q.  So, what does the gateway server do, Dr. Bhattacharjee?

5   A.  Well, the gateway server has two primary roles.  First is

6   that it maintains the standing connections which are created by

7   the host, and then it relays packets between remote computers

8   and the host computer.

9   Q.  And how does that differ from creating a communication

10  channel or a communication session?

11  A.  Well, relaying packets is not creating a communication

12  channel or a communication session.  In the LogMeIn system, all

13  channels and sessions are always created either by the host or

14  by the remote.

15      Okay.  If anything, the gateway may facilitate creating some

16  of these channels or sessions, but it by itself does not create

17  a channel or a session.

18  Q.  Now, in his testimony earlier in this case Dr. Grimshaw

19  looked at all of the software programs, all three of the

20  software programs that you just talked about, and said that they

21  operate together as a location facility, do you recall that?

22  A.  Yes.

23  Q.  In your view is it appropriate to look at these three

24  software programs together and say that they are the location

25  facility?

1    A.   No, it is not.

2    Q.   Why not?

3    A.   Well, because they're three different programs.  You know,

4    they had different births.  The programmers who wrote these,

5    wrote these independently.  Okay.  They -- one of them is the

6    Web server written by Microsoft.  One them is the database

7    engine, again written by Microsoft.  One of them is the gateway,

8    that is written proprietary by LogMeIn without consultation or

9    assistance from Microsoft.

10        They are written in very specific languages for doing one

11   thing and one thing well.  Right?  They are -- they are really

12   standalone execution units.  They are not together.  They can be

13   started independently, they can be ended independently.

14   Microsoft could upgrade their Web browser or Web -- sorry, their

15   Web server, and that would still be fine because these other

16   things are not the same program.

17        They talk to each other, but using a bog-standard interface,

18   okay.  The Web server talks to the database using what anybody

19   always talks through a database with.

20        Similarly, the gateway talks to the database using a

21   completely standard interface that was not LogMeIn proprietary

22   or anything.  The web server and the gateways don't even talk.

23        So, they are just three different programs.

24   Q.   Were the Web server software, database server software,

25   gateway server software just one software program that's been

1    chopped up into subcomponents?

2    A.  Absolutely not.

3    Q.  Now, in forming your opinion regarding the lack of a

4    location facility, did you consider any statements made by 01's

5    experts concerning the '479 patent?

6    A.  Yes, I did.

7    Q.  What did you consider?

8    A.  I considered statements by Dr. Ganger made to the Patent

9    Office which said that the location facility had to itself do

10   certain functions.

11   Q.  And would you turn in your binder to DX 126.

12       Do you have DX 126?

13   A.  Yes, I do.

14   Q.  Is that the statement by Dr. Ganger that you just referred

15   to?

16   A.  DX 126 is a declaration and it contains statements that I

17   referred to.

18   Q.  Would you turn to page 2 of that document, and in particular

19   to paragraph 6.  Which has the heading:  Location facility must

20   create the communication channel.

21       Do you see that?

22   A.  Yes, I do.

23   Q.  And I'm going to ask you, if you would, to read the last

24   sentence of that paragraph to the jury.

25   A.  The last sentence says:  One of ordinary skill in the art

1    would not view this language, and particularly its repeated use

2    of forms of "create," to be satisfied by an alleged location

3    facility that is simply used by some other component that

4    creates the communication channel.  Rather, one of ordinary

5    skill in the art would understand that it is required that the

6    location facility itself create the communication channel.

7    Q.  What do you understand Dr. Ganger to be saying in that

8    statement?

9    A.  Well, so what Dr. Ganger is saying -- I understand him to be

10   saying is that there is this program, software program, the

11   location facility; and as a -- I agree with him.  What he is

12   saying is that it, itself, must create the communication

13   channel.  This program has got to create the channel, just like

14   it says in the claim.

15   Q.  And then if you would look at, in the same exhibit,

16   paragraph 8 which appears on page 3.  And if you'd look at the

17   second sentence of that paragraph that starts:  One of ordinary

18   skill in the art.

19   A.  Yes.

20   Q.  Would you read that sentence and the next sentence to the

21   jury, please.

22   A.  Yes.  That sentence says:  One of ordinary skill in the art

23   would also not view these "create" requirements to be satisfied

24   if the location facility only "enables" or "facilitates" some

25   other component that creates the communication channel, as

1   asserted in the ACP with respect to some references.  These

2   words "uses," "enables," "facilitates," would have different

3   meanings to one of ordinary skill in the art than "create."

4   Assisting some other component that creates the communication

5   channel is not the same as creating the communication channel.

6   The '479 patent claims require the location facility to do the

7   latter.

8   Q.  Dr. Bhattacharjee, how did these statements by Dr. Ganger

9   affect your opinion concerning whether or not there is a

10  location facility in the LogMeIn system?

11  A.  Well, first let me say I agree with him, that's what the

12  '479 patent says.  And there is no location facility in the '479

13  patent that does this.

14  Q.  Now --

15  A.  I'm sorry, there is no location facility in the LogMeIn

16  system that does this.  I apologize.

17  Q.  Dr. Bhattacharjee, would you turn to PX 1, which is the '479

18  patent again.

19      If you would look at column 10, lines 11 to 16.  And do you

20  see there is some language there about facilities that can be

21  subdivided into separate facilities?

22  A.  Yes.

23  Q.  What do you understand that language to mean?

24  A.  Shall I read it?

25  Q.  Sure.

S. Bhattacharjee - Direct                                    893

1   A.  Okay.  The line -- it says that:  In particular a number of

2   computer program facilities are described in this invention as

3   separate facilities for the sake of describing the invention.

4   However, it should be understood that such facilities can be

5   combined with other facilities comprising the present invention,

6   or such facilities can be subdivided into separate facilities.

7   Q.  And so, what do you understand that language to mean?

8   A.  Well, what this says is that there can be a software program

9   that does the job of the location facility, all those four

10  things, and that program can be broken up into subprograms or

11  sub-facilities.

12  Q.  And how does that compare to what LogMeIn is doing?

13  A.  Well, LogMeIn doesn't have either a logical or a physical

14  software program that is broken up.  It's got three different

15  programs.

16  Q.  So, in your opinion, Dr. Bhattacharjee, are the Web server

17  software, database server software, and gateway server software

18  in the LogMeIn system a location facility?

19  A.  No, it is not.  No, they are not.

20  Q.  Now, let's turn to the second reason that you gave for your

21  opinion that the LogMeIn products don't infringe.  And could you

22  just remind us what that reason was?

23  A.  There is no location facility in the LogMeIn system that

24  creates a communication channel from the remote to the host, or

25  one or more communication sessions between the remote and the

S. Bhattacharjee - Direct                                      894

1   host.

2   Q.  And how do you know that?

3   A.  Well, once again, I went through the code, and there just

4   isn't anything that creates such a channel.  And, in fact, it's

5   not possible for it to create such a channel.

6   Q.  Now, in claim 24 of the '479 patent, which component is it

7   that is required to create the communication channel?

8   A.  It's the location facility.

9   Q.  And which component is it that's required to create the

10  communication session?

11  A.  Once again, the location facility.

12  Q.  And can you tell us, what do you understand the term

13  "create" to mean in claim 24?

14  A.  Well, the plain meaning of create, as in bring into

15  existence.

16  Q.  And what do you base that on?

17  A.  Well, my understanding of English, and also Dr. Ganger has

18  made the same representation to the Patent Office.

19  Q.  And were those the statements that you just referred us

20  to --

21  A.  Yes.

22  Q.  -- in his declaration?

23      Does the Web server software in the LogMeIn system create

24  communication channels or communication sessions?

25  A.  No, it does not.

1   Q.  Does the database server software create communication

2   channels or communication sessions?

3   A.  No, it does not.

4   Q.  Does the gateway server software create communication

5   channels or communication sessions?

6   A.  No, it does not.

7   Q.  If none of the LogMeIn servers are creating's communication

8   channels or communication sessions, how are those created in the

9   LogMeIn -- when you're doing remote access with the LogMeIn

10  product?

11  A.  Well, the answer is simple.  In LogMeIn it's always the host

12  or the remote that are creating the channels and the sessions.

13  And the reason is also something that we know about.  Recall

14  that we said, look, the host may be in this private address

15  realm and it's not addressable from the Internet.  Right?

16  That's the primary reason we have all of these solutions anyway.

17  If somebody could create a channel from the outside to the host,

18  the remote might as well do it.

19      So, in the LogMeIn system, it's always the remote or the

20  host that creates the channels, and they create channels through

21  the gateway.

22  Q.  And when the host computer or the remote computer is

23  creating the channels, is it appropriate to say that the

24  communication channel or the communication session was created

25  by the LogMeIn servers?

1   A.   Absolutely not.   This is, again, a representation made by

2   Dr. Ganger to the Patent Office in order to get the patent

3   through and issued.

4   Q.   And even if you look at these servers or the software

5   together as a location facility, as Dr. Grimshaw does, in that

6   case did the LogMeIn servers create a communication channel or a

7   communication session?

8   A.   No, it's -- no, they don't.   It's physically impossible for

9   it to do so.

10   Q.   Now, Dr. Bhattacharjee, let's look at the third reason that

11   you gave for your non-infringement opinion.   Could you tell us

12   again what that was?

13   A.   Yes.   The claim requires that the server computer in the

14   claim is linked to the Internet -- well, it says:   A computer

15   program product for use on a server computer linked to the

16   Internet and having a static IP address.

17   Q.   So, why do you say that that requirement is not met in the

18   LogMeIn system?

19   A.   The LogMeIn system does not have a server computer linked to

20   the Internet and having a static IP addresses as is required by

21   the claim in order for it to be infringed.

22   Q.   Have you helped prepare a diagram showing how the LogMeIn

23   servers function in this regard?

24   A.   Yes.

25   Q.   And if I could ask the Marshal to put up DDX 4-6.

1      Can you tell us what that demonstrative shows?

2  A.  Yes.  So, what we are looking at here is one instance of

3  each type of server in the LogMeIn system.  There's a selected

4  Web server which is sitting in some data center, and that has

5  that address as you can see.

6      And then there is a selected gateway server which has a

7  different address, obviously.

8  Q.  And, Dr. Bhattacharjee, do you have a pointer?  Did I give

9  you that earlier?  It might just be easier when you're

10 explaining to use that.

11 A.  All right.  So, there's the selected Web server with one

12 address here.  IP address is the version of -- IP stands for

13 Internet protocol.  The version of IP that we use today has

14 32 bits, and the addresses for humans are written with four

15 numbers like that.  They go from 0 to 255, each with dots in the

16 middle.

17     So, that's the IP address.  Those are the addresses we are

18 concerned about.  Okay.  That's the IP address for the server.

19     Down here is a gateway.  That also is part of the LogMeIn

20 system.  This gateway has an address.  Notice this is the IP

21 address for the gateway, and that address is different from that

22 address.  Okay?

23     Similarly, there are these database servers.  Now, these

24 guys, these database servers are not even on the Internet.  They

25 have what are called private addresses.  Private addresses, they

1    look like this, but they have specific beginnings.  They might

2    start with a 10 or a 192.168, and so on.

3        And there's a convention which says you can use these

4    addresses locally, but just don't use them out on the Internet.

5    And so, everybody can reuse these addresses.  That's what a

6    private address really is.

7    Q.  And so, in the LogMeIn system, are the Web servers linked to

8    the Internet?

9    A.  Yes, they are.

10   Q.  And what kind of IP address do they have?

11   A.  They have static IP addresses.

12   Q.  How about the gateway servers, are they linked to the

13   Internet?

14   A.  Yes, they are.

15   Q.  And what kind of IP address do they have?

16   A.  They have dynamic IP addresses.

17   Q.  And how long have they had dynamic IP addresses?

18   A.  I gather since April of 2012.

19   Q.  And are the addresses of the gateway server and the Web

20   server the same or different?

21   A.  Well, they're different.  In fact, you know, the address is

22   how -- when you send a message, you get to a specific machine.

23   If -- it's not possible for two different machines to have the

24   same address.

25   Q.  And how about the database servers, Dr. Bhattacharjee, are

1    they linked to the Internet?

2    A.  Not directly.  They are, in fact, behind a commercial

3    implementation of one of these what we call routers, okay, but

4    they are being protected from the Internet and they have a

5    separate addressing realm, like I said, and they have private

6    addresses.

7    Q.  What kind of IP address do they have?

8    A.  Well, they, I believe, have static, but private, IP

9    addresses.

10   Q.  Is the address of the database server the same or different

11   from Web servers and the gateway servers?

12   A.  They are different both in number and in type.

13   Q.  And why does it matter that the LogMeIn servers have

14   different IP addresses?

15   A.  Well, it matters because the patent requires a fixed static

16   IP address.  It says so.

17       And, further, understand that if I could just have a server

18   with many, many addresses, you would then have to go around

19   locating the server.  You wouldn't have solved the problem.

20   Right?  The way the patent is trying to solve the problem of

21   locating things with dynamic addresses is by providing you with

22   this fixed point, a reference, which should have a static

23   address so I could get to it, and then it will let me get to the

24   other things.  Right.

25   Q.  And you said that the patent refers to the addresses as

1   being fixed.

2       Would you turn to PX 1?

3   A.   Yes.

4   Q.   And if you look at column 7 of -- that's the '479 patent,

5   correct, Dr. Bhattacharjee?

6   A.   Yes.  And line 34?

7   Q.   Thank you.  Column 7, line 34.

8   A.   Yes.  It says:  The Internet protocol, that is the IP,

9   address of server computer 12, however, is fixed and known to

10   the system described herein.

11   Q.   Now, did you hear Dr. Grimshaw talk about the domain names

12   www.logmein.com and secure.logmein.com?

13   A.   Yes, I did.

14   Q.   And did you hear him say that those satisfy the requirement

15   of a static -- a server computer that's linked to the Internet

16   and has a static IP address?

17   A.   I did hear him say that.

18   Q.   Do you agree or disagree with him?

19   A.   I disagree with him.

20   Q.   Why?

21   A.   Well, as he himself said, you know, www.logmein.com is a

22   text stream.  It's a domain name.  It's not an IP address.  IP

23   addresses are numbers.  They go from zero to 4 billion minus 1.

24   That's just the number of hosts you can have on the Internet.

25   Okay?

1        Domain names are text strings meant for humans to remember,

2    and they're translated to IP addresses using DNS.  But what's

3    interesting is during the patent prosecution, in order to get

4    their patent through, 01 made specific representations saying,

5    look, our system uses a static IP address and this is different

6    from DNS.  Okay.

7    Q.  So, Dr. Bhattacharjee, do the LogMeIn products meet all the

8    requirements of claim 24?

9    A.  No, they do not.

10   Q.  Now, you also indicated earlier that in your opinion the

11   '479 patent is invalid.  Do you recall that?

12   A.  Yes.

13   Q.  And can you tell us why you believe the '479 patent is

14   invalid?

15   A.  I believe the '479 patent is invalid because it is, one,

16   anticipated by the '888 patent.  It is anticipated by what I'll

17   call the '425 patent.  It is rendered obvious by the '716 and

18   '704 patent in combination.  And also because it is not enabled,

19   the '479 patent is not enabled.

20   Q.  Now, you said that the claim is anticipated by two pieces of

21   prior art, is that correct?

22   A.  That's correct.

23   Q.  Can you tell the jury what you mean by anticipated?

24   A.  Right.  A patent is anticipated if there is prior art, some

25   prior publication, that describes the claims of the invention in

1    their entirety.  Okay.  Every limitation of the claim is found

2    in the prior art and, thus, the prior art anticipates the claim

3    of the patent.

4    Q.  And then you also mentioned something called obviousness, is

5    that correct?

6    A.  Yes.

7    Q.  Can you tell the jury what you mean by obviousness?

8    A.  Yes.  So, what obviousness means is that I have one or more

9    prior art references, so these things have to have come earlier,

10   and there may be differences between what these things teach and

11   what the claims of the patent are teaching.  However, the

12   difference between what's being taught by the combination that

13   came earlier and what's taught by the claims of the patent would

14   have been obvious to one of ordinary skill in the art when this

15   patent was filed.

16   Q.  And you mentioned a person of ordinary skill in the art.

17   Can you tell us what you mean by that.

18   A.  Yes.  The person of ordinary skill in the art in this case

19   would be someone who had a degree in computer science or

20   computer engineering and should have taken a computer networking

21   course, or perhaps they had worked in industry for two years in

22   this field of remote access and computer networking.  I think

23   that would be a person of ordinary skill in the art.

24   Q.  And on what do you base that definition?

25   A.  Basically my experience reading the patent and also teaching

1  people computer networking.

2  Q.  Now, I think you said the first patent that you identified

3  as anticipating the '479 patent was the '888 patent, is that

4  right?

5  A.  That's correct.

6  Q.  And would you turn to DX 27 in your binder.

7      Is that the '888 patent that you're talking about?

8  A.  Yes, it is.

9  Q.  And has that been referred to as the Accolade patent from

10 time to time in this case?

11 A.  Yes, it has been referred to as both the Accolade and

12 Hickman patent.

13 Q.  When -- what's the full number of that patent,

14 Dr. Bhattacharjee?

15 A.  This is U.S. patent 7,130,888.

16 Q.  And when was that patent filed with the Patent Office?

17 A.  This was filed on February 12, 1997, which, I believe, is

18 about three years before the '479 patent was filed.

19      MS. FERRERA:  And, Your Honor, I would like to show

20 Fig. 1 from the '888 patent so that Dr. Bhattacharjee can

21 explain what that patent is describing.

22      THE COURT:  All right.

23      MS. FERRERA:  Thank you.  Could we have, Marshal, DDX

24 3-2?

25 BY MS. FERRERA: (Continuing)

1    Q.  And, Dr. Bhattacharjee, is this a figure from the '888

2    patent that you were just describing?

3    A.  Yes, this is Fig. 1.

4    Q.  And we've got some -- a green box, a red box, and a blue box

5    on that diagram.  Do those actually appear in the patent?

6    A.  The colored, the rounded rectangles do not appear on the

7    patent.

8    Q.  Have you put them on there to help explain your testimony?

9    A.  I helped put them on there, yes.

10   Q.  Would you tell the jury what the '888 patent is about.

11   A.  Yes.  The '888 patent is exactly what the '479 patent is

12   about.  It is to allow a client computer to remotely access a

13   host computer.

14       So, here's the client.  It is trying to remotely access this

15   host.

16   Q.  And is the '888 patent directed to any of the same problems

17   as the '479 patent?

18   A.  Absolutely.  The '888 patent, when practiced, will allow the

19   client to communicate and have remote access to the host even

20   when the host has dynamic IP addresses or is behind a firewall.

21   Q.  And so, how does the '888 patent solve the problem of

22   dynamic IP addresses and firewalls?

23   A.  Basically the same way the '479 patent does, except it did

24   it three years earlier.  It interposes this server in the

25   middle.  You see there's the network, the Internet, and then

1    there's a Web server.  And the '888 patent describes a process

2    by which using this intermediary the client can then get to the

3    host.

4    Q.  And, Dr. Bhattacharjee, did you go through each and every

5    limitation of claim 24 of the '479 patent and compare it to the

6    '888 patent and what it discloses?

7    A.  Yes.  In order to anticipate it, I would have to.  And I

8    did.

9    Q.  And did you help prepare a chart that enables your or

10   assists you in doing that?

11   A.  Yes.

12        MS. FERRERA:  Your Honor, I would like to show that

13   chart, if you will.  The claim is very long, and I think it will

14   speed things up for Dr. Bhattacharjee to be able to go through

15   that.

16        THE COURT:  All right.

17        MS. FERRERA:  Your Honor, could we have -- Marshal,

18   could we have DDX 3-3?

19   BY MS. FERRERA:  (Continuing)

20   Q.  Is this the board that you helped prepare,

21   Dr. Bhattacharjee?

22   A.  Yes.

23   Q.  All right.  So, could you just walk us through each of the

24   limitations of claim 24 and tell us whether or not the '888

25   patent discloses those limitations.

1    And so, if we start with the first one, a computer program

2    product for use on a server computer linked to the Internet and

3    having a static IP address.

4    A.  Yes.  The computer program product in the '888 patent is the

5    hardware and software for the Web server that it describes.  And

6    the Web server is linked to the Internet.  This is described

7    explicitly in the patent.  And it also has a static IP address,

8    and that's described, for instance, in the abstract and I

9    believe column 3 of the patent as well.

10   Q.  And does the '888 patent disclose a computer program for use

11   on a server computer for providing remote access to a personal

12   computer from a remote computer, which I think is the second

13   line there?

14   A.  Right.  So, the very first line of the abstract says:  The

15   present invention permits virtually the entire functionality of

16   a computer system to be made accessible over a network such as

17   the Internet or an intranet.  So, that that's claim on it.

18        MS. FERRERA:  And, Your Honor, could I ask

19   Dr. Bhattacharjee to indicate which of the limitations are met?

20   I think he has a red pen in front of him.

21        THE COURT:  All right.

22        MS. FERRERA:  Thank you.

23   A.  So, we are done with that.  Done with that.  Done with that.

24   BY MS. FERRERA: (Continuing)

25   Q.  And then, how about the next limitation?  Is that met in the

1  '888 patent, Dr. Bhattacharjee?

2  A.   Yes.  The '888 patent talks about computers with dynamic

3  public IP addresses and also computers -- the intranet reference

4  that I said was for computers behind firewalls, so they have

5  private addresses.

6  Q.   Now, do the words "dynamic IP address" actually appear

7  anywhere in the '888 patent?

8  A.   No, not in those words.  But, for instance, in, I believe,

9  column 5 you will see that the '888 patent talks about users

10 that are accessing the Internet using a modem.   Okay?

11      And column 2 talks about users using ISPs, such as AOL.  And

12 as we have heard, modems -- so, what happened back then, of

13 course, was you logged in for a few hours and then surfed the

14 Internet and logged off.  And ISPs have these large modem banks,

15 and when you logged in, they gave you a dynamic IP address.  And

16 then when you were done, they took the address back and gave it

17 to somebody else.

18      In fact, I believe Mr. Cheung himself identified this as one

19 of the motivations for his work.

20      And so, even though the words "dynamic IP address" don't

21 appear in this patent, it is necessarily present.

22 Q.   In fact, Dr. Bhattacharjee, do the words "dynamic IP

23 address" appear on the '479 patent, to your knowledge?

24 A.   Not to my knowledge, no.

25 Q.   So, that fourth limitation of claim 24, is that found in the

1    '888 patent?

2    A.   Yes.

3    Q.   Okay.  Could you please check that one off then.

4         Now, if we go to the next one, subsection (a), a computer

5    usable medium, do you see that?

6    A.   Yes.

7    Q.   Is that in the '888 patent?

8    A.   Yes.  That is simply, once again, the hard disk or other

9    floppy disk, but perhaps a hard disk, on which the Web server

10   program code is stored in the '888 patent.

11   Q.   So, would you check that off, please.

12        How about the next one, 2 -- I guess it's not 2, but section

13   (b) that says:  Computer readable program code recorded or

14   storable in the computer usable medium, the computer readable

15   program code defining a server computer program on the server

16   computer wherein.

17        Is that in the '888 patent?

18   A.   Yes, there is a server computer program that's recorded or

19   stored on the hard disk.

20   Q.   Could you check that off, please.

21        And then the next section talks about:  The server computer

22   program is operable to enable a connection between the remote

23   computer and the server computer.

24        Is that right?

25   A.   Yes.

1    Q.  Is that in the '888 patent?

2    A.  Yes.  The server computer can talk to the remote computer.

3    Q.  Let's check that off, please.

4        And then we get to:  The server computer program includes a

5    location facility and is responsive to a request from the remote

6    computer to communicate with the personal computer to act as an

7    intermediary between the personal computer and the remote

8    computer.

9        Is that -- did I read that correctly?

10   A.  Yes.

11   Q.  Does the '888 patent meet that limitation?

12   A.  Yes.  The '888 patent explicitly talks about a request from

13   the remote computer to the Web server.  Okay?  And then the way

14   the '888 patent is described, the server is necessarily an

15   intermediary to the communication.

16   Q.  Why do you say that?

17   A.  Okay.  So, this is important and this is something that you

18   have to understand about the '888 patent.  Okay?  The '888

19   patent is describing the following.  The remote computer

20   downloads a Java Applet from the Web server.  Okay?  And the way

21   Java Applets work for security reasons -- and I'll tell you --

22   give you one example in just a second -- Java Applets are

23   programs that come from Web server and they're running in your

24   browser.  They can do a lot of things, but they can only make

25   network connections back from whence they came.  In this case

1    the Web server.  They cannot talk to anything else, especially

2    the Java Applets that were available when this patent was filed.

3    It was just not possible.

4        So, the Web server is necessarily an intermediary in this

5    case.  Okay.

6        And I did say that I will tell you one of the security

7    problems, so I'll keep my promise.  What would happen is if you

8    got a program that came from somewhere and it could then make

9    arbitrary connections over the Internet, somebody could use your

10   computer to go attack third-party computers.  Okay?  That's one

11   of the big reasons why these things were constrained and were

12   not simply allowed to go make arbitrary connections.

13   Q.  So, is limitation (b)(ii) found in the '888 patent,

14   Dr. Bhattacharjee?

15   A.  Yes, it is.

16   Q.  Could you please check that off.

17       And then the next limitation talks about:  By creating one

18   or more communication sessions there between and those one or

19   more communication sessions being created by the location

20   facility.

21       Is that right?

22   A.  Yes.

23   Q.  Is that in the '888 patent?

24   A.  Yes.

25   Q.  And can you tell us how?

1    A.  Yes.  The communication goes through the Web server.  And

2    the '888 patent in column, I believe 14, talks about that

3    limitation, the sessions.

4    Q.  And then -- so would you check that one off, please.

5    A.  Okay.

6    Q.  And then the last -- the next one is:  In response to the

7    receipt of the request for communications with the personal

8    computer from the remote computer.

9        Is that in the '888 patent, Dr. Bhattacharjee?

10   A.  Yes, it is.  As I said, there was an explicit request for

11   communication, and the Web server receives the request for

12   communication.  And for the life of me, I can't remember the

13   column that it's in.

14   Q.  Let me see if I can help you.  Would you look at -- is it

15   column --

16   A.  7 or --

17   Q.  Okay.

18   A.  No, it's actually --

19   Q.  Is it column 10, Dr. Bhattacharjee?

20   A.  Yeah, 43 to 45 on 10, right?

21   Q.  Okay.

22   A.  No.  Sorry.

23   Q.  In any event, is that limitation disclosed in the '888

24   patent?

25   A.  It is.  It is disclosed, yes.

1   Q.  All right.  And would you check that one off, please.

2   A.  Yes.  There definitely is a request from the remote to the

3   Web server.  That's what the system is about.

4   Q.  And then how about:  By determining a then current location

5   of the personal computer.

6        Is that in the '888 patent?

7   A.  Absolutely.  The Web server is an intermediary.  It allows

8   sessions between the remote and the host.  It must determine the

9   current location of the personal computer, which is the host.

10  Q.  Would you check that one off, please.

11       And then let's go to the last limitation:  Creating a

12  communication channel between the remote computer and the

13  personal computer.  And I won't read the rest of it.  I think

14  you described that earlier.

15       But is that limitation met in the '888 patent?

16  A.  Yes.  That is in column 14.

17  Q.  And so -- would you check that one off, please,

18  Dr. Bhattacharjee.

19  A.  Yes.

20  Q.  So, does the '888 patent disclose all the requirements of

21  claim 24 of the '479 patent?

22  A.  Yes, it does.

23            MS. FERRERA:  Marshal, I think we can take that board

24  down.

25            THE COURT:  All right, counsel, I think it's time for

1    us to recess for the day.

2            I have motions tomorrow, so we're going to have to

3    recess this case until Monday morning at 10 o'clock.

4            And I'll recess until tomorrow morning at 9.

5            NOTE:  The March 21, 2013 portion of the case is

6    concluded.

7            --------------------------------------------------

8

9

10

11

12

13

14

15

16

17

18            I certify that the foregoing is a true and

19        accurate transcription of my stenographic notes.

20

21

22                    /s/   Norman B. Linnell
                  _____
23                Norman B. Linnell, RPR, CM, VCE, FCRR

24

25