```
                    UNITED STATES DISTRICT COURT
                    EASTERN DISTRICT OF VIRGINIA
                        Alexandria Division




--------------------------------:
                                :
01 COMMUNIQUE LABORATORY, INC., :
            Plaintiff,          :
                                :
    -vs-                        :   Case No. 1:10-cv-1007
                                :
                                :
LOGMEIN, INC.,                  :
            Defendant.          :
                                :
--------------------------------:


                            V O L U M E   5 (a.m.)



                        TRIAL TRANSCRIPT


                        March 25, 2013


            Before:  Claude M. Hilton, USDC Judge


                        And a Jury
```

APPEARANCES:

Thomas H. Shunk, Marc A. Antonetti, John P. Corrado,
A. Neal Seth, Katherine L. McKnight, William T. DeVinney and
Loura Alaverdi, Counsel for the Plaintiff

Wayne L. Stoner, Charles B. Molster, III, Vinita Ferrera and
Rachel Gurvich, Counsel for the Defendant

915

INDEX

| WITNESS | EXAMINATION | PAGE |
|---|---|---|
| SAMRAT BHATTACHARJEE | | |
| | DIRECT | 919 |
| | CROSS | 956 |
| | REDIRECT | 986 |
| | RECROSS | 990 |
| GREGORY GANGER | | |
| | DIRECT | 999 |

 1              NOTE:  The March 25, 2013 portion of the case begins

 2    in the absence of the jury as follows:

 3    JURY OUT

 4              MR. MOLSTER:  Good morning, Your Honor.  Charles

 5    Molster from Winston & Strawn on behalf of the defendant.

 6              Thank you for coming out early.  We just wanted to do a

 7    couple of exhibits for the record.  PX 46A and PX 92A are

 8    redacted versions of PX 46 and 92.  We have agreed to those

 9    redactions.  We have provided those to the clerk.

10              We have DX 174 that we want to move into evidence.  The

11    plaintiff wants to make some redactions.  They have not done

12    that yet, but we would like to get that resolved this morning,

13    so we will try to take care of that at the next break.

14              THE COURT:  All right.

15              MR. MOLSTER:  I wanted to give the Court a heads-up

16    that Dr. Bhattacharjee may well be our last witness.  We are

17    reserving the right to call other witnesses, but likely will

18    not.

19              THE COURT:  All right.

20              MR. MOLSTER:  We will probably have Dr. Bhattacharjee.

21    Then I understand there is one witness for 01, which is Gregory

22    Ganger.  And then we will have a motion, perhaps we should have

23    a charging conference and then closing arguments.

24              We would like, in terms of the amount of time for our

25    closing, given the fact that we are being sued for $113 million,

1   we would like to have up to an hour.  We may not use the full

2   hour, but at least we would like to have the right to an hour

3   for closing.

4          THE COURT:  Does the amount sued for have anything to

5   do with the length of the argument?

6          MR. MOLSTER:  It takes so long to say the number, Your

7   Honor, that it extends the closing argument.

8          THE COURT:  All right.  Well, I will consider your

9   request.

10         MR. MOLSTER:  Thank you.

11         THE COURT:  It sounds lengthy, but I will consider it.

12         MR. MOLSTER:  Thank you, Your Honor.

13         MR. SHUNK:  Your Honor, we --

14         THE COURT:  I will admit those exhibits.  Now, there is

15  still one you have got to redact, and I will admit that when you

16  get that redacted, but the other two are admitted.

17         MR. SHUNK:  We will work on that redaction this

18  morning, Your Honor.  I don't believe there is an objection to

19  46A and 92A, but --

20         MR. MOLSTER:  They are in.  We have agreed on the

21  redactions.  The clerk has them.  We are good to go on those.

22         MR. SHUNK:  In fact, Your Honor, I do believe that we

23  can finish this case today.  We do believe that we will have

24  only one witness.  We don't know exactly what more

25  Dr. Bhattacharjee will say.  But assuming that things go as

1   planned, we expect we will have a brief motion at the end after

2   Dr. Bhattacharjee, and then we will put Dr. Ganger on.  And that

3   should be the end of the evidence.

4          And we would reserve the right to call someone else if

5   something unexpected comes up, but that's what we think is going

6   to happen.

7          And in terms of the closing argument, Your Honor, I

8   think that in the Garmin case, the Verizon case, Your Honor, had

9   about 30 and 10 or something like that.  We are happy with that

10  same kind of limitation on the closing.

11         We would like some direction from the Court, if you

12  would, as to whether it would be okay once, of course, all the

13  evidence is admitted, to display some of the evidence to the

14  jury as part of the closing argument on the screens, or whether

15  Your Honor would prefer that we didn't.

16         THE COURT:  All right.  We will talk about that at the

17  time.

18         All right.  Are we ready for the jury?

19         MR. SHUNK:  We are, Your Honor.

20         MR. MOLSTER:  Yes, sir.

21         NOTE:  At this point the jury returns to the courtroom;

22  whereupon the case continues as follows:

23  JURY IN

24         THE COURT:  All right.  Good morning.  We need the

25  witness back on the stand.

1          SAMRAT BHATTACHARJEE, a witness called by counsel for

2   the plaintiff, having been first duly sworn, continues to

3   testify and state as follows:

4        DIRECT EXAMINATION

5   BY MS. FERRERA: (Continuing)

6   Q.  Good morning, Dr. Bhattacharjee.

7   A.  Good morning.

8   Q.  When we broke on Thursday, you had gone through the three

9   reasons for your opinion that the LogMeIn products don't

10  infringe.  And I believe that the last reason you gave was that

11  LogMeIn's system does not have a static IP address.

12       Do you recall that?

13  A.  Yes, I do.

14  Q.  And I believe that you explained -- you were talking about

15  the difference between the domain names www.logmein.com and

16  secure.logmein.com, and an IP address.

17       Do you recall that?

18  A.  Yes.

19  Q.  And I think you referred to representations that 01 made to

20  the Patent Office relating to that issue, is that correct?

21  A.  Yes, I did.

22  Q.  Would you turn in the binder in front of you to DX 172.

23  A.  Yes.

24  Q.  Do you have that document, Dr. Bhattacharjee?

25  A.  Yes, I do.

1   Q.  Is that the document that you were referring to in your

2   testimony?

3   A.  Yes, that was the document.

4   Q.  And can you explain to the jury how this document bears on

5   your opinion that www.logmein.com and secure.logmein.com are not

6   static IP addresses?

7   A.  Right.  So, first, recall that an IP address is a number,

8   often written four numbers with periods in between, but they

9   range from 0 to 4 billion, whatever it is, but it is just a

10  number.

11      A DNS name is exactly what it says.  It's a name.  It's a

12  string like www.google.com or logmein.com, which then gets

13  translated using the DNS system into a number.

14      And now, there was a prior art reference, which I believe

15  was called the Borsato reference.  And LogMeIn -- 01 was trying

16  to distinguish their patent from this Borsato reference.  And

17  this is talking about the distinction.

18      And in particular, the Borsato reference concerned dynamic

19  DNS, which is a form of DNS in which instead of just manually

20  typing in what the correspondence between the name and the

21  address is, you can also programmatically update this

22  correspondence.

23      So, understand this, dynamic DNS is a super set of just DNS.

24  So, anything you say about dynamic DNS applies to DNS as well,

25  but not necessarily the other way around.

1    And so, in describing the patent in the document itself, 01

2    says, talking about their own work:  This, of course -- this is,

3    of course, a completely different architecture from DNS and

4    provides a function that is also completely different from DNS

5    technology.  On this point alone, the claims are clearly

6    allowable.

7    And it goes on to say things like specific functions of the

8    invention that would clearly not be supported by DNS technology.

9    And there are obvious differences between the claimed invention

10   and dynamic DNS, as explained above.

11   So, there is a very clear separation here between what is

12   being claimed, that is, a server linked to the Internet and

13   having a static IP address, and DNS.  And that's plain and clear

14   in this document.

15   Q.  Thank you, Dr. Bhattacharjee.

16           Your Honor, we would like to offer DX 172.

17           MR. ANTONETTI:  No objection, Your Honor.

18           THE COURT:  It is admitted.

19   BY MS. FERRERA: (Continuing)

20   Q.  Now, Dr. Bhattacharjee, when we broke on Thursday, I think

21   you had started to go through the reasons for your opinion that

22   the claim 24 is invalid.

23   Do you recall that?

24   A.  Yes.

25   Q.  And would you just remind the jury what those four reasons

1   were, please.

2   A.   Yes.  First, claim 24 is invalid because it is anticipated

3   by the '888 patent, which I talked about.  It is also

4   anticipated by something called the '425 patent.  And it is

5   obvious in light of the '716 and '704 patents.  And, finally, it

6   is invalid because the invention itself is not enabled by the

7   '479 patent.

8   Q.   And with respect to the '888 patent, do you recall there was

9   one limitation where you were not able to recall where in the

10  '888 patent that requirement was disclosed?

11  A.   Yes.

12  Q.   If we could, if I could ask the Marshal just to briefly put

13  up DDX 3, which is, I think, the first board there which we were

14  looking at on Thursday.

15      And I think that we were looking at the third limitation

16  from the bottom that talked about in response to receipt of the

17  request for communication with the personal computer from the

18  remote computer, is that correct?

19  A.   Correct.

20  Q.   Have you since had a chance to recall which portion of the

21  '888 patent talks about that?

22  A.   This is like a redo for an exam.  I think it is in column 7,

23  if I am not wrong.

24  Q.   It is DX 27 in your binder, Dr. Bhattacharjee.

25  A.   Okay.  So, it's really in column 11, line 43 on.  I will

1    read it.  It says:  Next in step 358, the client selects the

2    connect option of the base page of the present invention, and in

3    a step 360 a Java Applet is downloaded to the client's system.

4        So, this is describing the client sending a request for

5    communication, and in receipt this applet comes in.  So, the

6    server receives a request for communication from the remote,

7    request for communication with the personal from the remote

8    computer.

9    Q.  Thank you.  Let's turn then to the second reason that you

10   gave for your opinion that the claim is invalid, and I believe

11   that was the '425 patent.  If you would turn to DX 4 in your

12   binder.

13       Is that the '425 patent that you were referring to?

14   A.  Yes, it is.

15   Q.  And could you read us the full number of that patent,

16   please, Dr. Bhattacharjee.

17   A.  Yes, it is U.S. Patent 6,546,425.

18   Q.  And when was that patent filed?

19   A.  It was filed June 11, 1999, about a year before the '479

20   patent was filed.

21           MS. FERRERA:  Your Honor, we would like to offer DX 4.

22           MR. ANTONETTI:  No objection, Your Honor.

23           THE COURT:  It is admitted.

24           MS. FERRERA:  If I could ask, Your Honor, if we could

25   put up a diagram of one of the figures from that patent to

1   assist Dr. Bhattacharjee's explanation, it is DDX 3-4.

2   BY MS. FERRERA: (Continuing)

3   Q.  Dr. Bhattacharjee, could you tell us what this diagram

4   represents.

5   A.  This is a schematic of the patent.  The patent, again, is

6   about remote access.  And what is being accessed are mobile

7   computers.  Here they are called mobile end systems in green.

8   And the computer that is doing the accessing is called the host

9   or a fixed end system.  And there is an intermediary called the

10  mobility management system, and also mobility management server

11  in the patent that intermediates this remote access from the

12  host to the mobile end systems.

13  Q.  And the green boxes and the blue box and then the red box,

14  are those in the original patent, Dr. Bhattacharjee?

15  A.  No, they're not.

16  Q.  Did you add them to assist in your testimony?

17  A.  I assisted in adding them to just help with the visual here.

18  Q.  And so, what do the green boxes represent?

19  A.  The green boxes are the mobile end systems or the mobile

20  computers that are being accessed during remote access.

21  Q.  And what is a mobile end system?

22  A.  A mobile end system is just a computer that is moving from

23  network to network.  Okay.  So, in particular, your cell phone,

24  if you have a data plan, acts just like a mobile end system.

25  Q.  And what is the blue box that's on this diagram?

1    A.   The blue box is a machine that's on the Internet that is

2    trying to talk to this mobile computer.

3    Q.   And how about the red box?

4    A.   The red box is the intermediary.   That's what is interposed.

5    That is the invention in this patent that allows a host on the

6    internet, unmodified host or machines on the Internet to just to

7    talk systems that are mobile, computers that are mobile.

8    Q.   So, how does the '425 patent relate to the '479 patent,

9    the -- 01's patent in this case?

10   A.   Okay.   So, the first thing to understand is that both

11   systems are about remote access.

12        Now, what's the hard problem that the '425 patent -- or

13   sorry -- the '479 patent is trying to go after?   The thing is, I

14   have these personal computers and their addresses are changing.

15   Okay.   And they may be behind a router or something, but their

16   addresses are changing.   And then I have somebody trying to

17   access this machine, but it may have a different address.   And

18   why is the address different here?   Because the ISP over time

19   may be assigning it new addresses.   Right.   That's the primary

20   problem.

21        And what's the problem here?   I have these mobile computers

22   whose addresses are changing.   Why are the addresses changing?

23   Well, they are changing because they are moving from network to

24   network.

25        So, the structure of the problem in both cases is exactly

1    the same.  So is the solution proposed, except this was proposed

2    a year ago.

3        And I will just point one thing out.  In the examples

4    describing this patent in the patent itself, the authors talk

5    about a businessman on the road trying to access the home

6    network or a router behind which the mobiles are and you don't

7    have enough addresses, the very same examples that were given

8    earlier to describe the '479 patent.

9    Q.  Now, let's talk about how the '425 patent compares with the

10   requirements of claim 24.  And did you go through each

11   limitation of claim 24 to match it up with what is disclosed in

12   the '425 patent?

13   A.  Yes, I did.

14   Q.  And did you help prepare a chart to assist in explaining

15   that to the jury?

16   A.  Yes.

17   Q.  Your Honor, we would like to show DDX 3-6, please.

18       So, Dr. Bhattacharjee, you have in front of you claim 24.

19   And once again, that claim starts with the requirement of a

20   computer program product for use on a server computer linked to

21   the Internet and having a static IP address.

22       Does the '425 patent disclose a computer program product for

23   use on a server computer?

24   A.  Yes, this is the software and hardware of the mobility

25   management server.

1   Q.  And is that server computer linked to the Internet?

2   A.  Yes, that's explicitly disclosed in the patent.

3   Q.  Is the server computer -- or does the server computer have a

4   static IP address?

5   A.  Yes.  Well, first, recall that the system is geared such

6   that the host or the fixed end system that's connecting to the

7   mobile does not have to be changed.  And the way the system

8   works is they actually create a connection to the server

9   computer.  And if the server computer's address were to change,

10  then these connections would keep breaking and the system

11  wouldn't be enabled.

12      Furthermore, in column 39, for instance, it explicitly says

13  that it has one address, the server does.

14  Q.  Would you please check off, then, the first box on that

15  chart.

16      And then if we look at the next limitation, it says that it

17  is for providing access to a personal computer for a -- from a

18  remote computer.

19      Is that met by the '425 patent?

20  A.  Yes.  The entire patent is about remote access to the mobile

21  computers, which are the personal computers, from the remote

22  computers, which are the fixed computers.

23  Q.  Would you check that box off, please.

24      And then the next limitation says:  The personal computer

25  being linked to the Internet.

1       Is that disclosed in the '425 patent?

2   A.  Yes.

3   Q.  Could you check that box off, please.

4       Now, does the '425 patent disclose remotely accessing a

5   personal computer that has a dynamic IP address?

6   A.  Yes.  In fact, the computers are mobile.  They have dynamic

7   IP addresses.  It talks in great length about the dynamic

8   address allocation protocols and problems of dynamic IP

9   addresses.

10  Q.  And does the '425 patent disclose remotely accessing a

11  personal computer that is behind a firewall or a router?

12  A.  Yes, it does, column 39.

13  Q.  And so, how does the '425 patent address that issue?

14  A.  The same way that the '479 patent does.  There is this

15  notion of an intermediate communication.  And the current

16  address called the point of presence address is sent from the

17  mobile computers to the server so that the server knows which --

18  what the current address of the mobile computer is.

19      And the mobile computers are accessed using something called

20  a virtual address, which you can think of as an identifier for

21  the mobile computer.

22  Q.  So, does the '425 patent disclose that the personal computer

23  has its location on the Internet being defined by either a

24  dynamic public IP address or a dynamic LAN IP address?

25  A.  Yes.

1    Q.  Would you check that box off, please.

2        Now, if we look at the next line, it is a computer usable

3    medium.

4        Is that disclosed in the '425 patent?

5    A.  Yes, that's just the storage medium on which the program for

6    the server is stored.

7    Q.  Would you check that box off, please.

8        And then subsection (b) refers to a computer readable

9    program code recorded or storable in the computer usable medium,

10   the computer readable program code defining a server computer

11   program on the server computer wherein.

12       Is that met by the '425 patent?

13   A.  Yes, that is just the program for the mobility management

14   server.

15   Q.  Would you check that box off, please.

16       And if we look at the next line, (b)(i):  The server

17   computer program is operable to enable a connection between the

18   remote computer and the server computer.

19       Is that disclosed in the '425 patent?

20   A.  Yes, the server can talk to the remote.

21   Q.  Please check that one.

22       And then if we go to (b)(ii), it talks about the server

23   computer program includes a location facility.

24       Is that disclosed in the '425 patent?

25   A.  Yes.  As you know, the location facility has these four

1   requirements, and then there is a server program that includes

2   this location facility.

3   Q.  And it says that the server computer program is responsive

4   to a request from the remote computer to communicate with the

5   personal computer to act as an intermediary between the personal

6   computer and the remote computer.

7       Is that met by the '425 patent?

8   A.  Yes.  In -- pardon me.  In the '425 patent, the server

9   computer explicitly receives requests from the remote computer,

10  which are these fixed end systems, and then creates new channels

11  and whatnot as required.  And so, it does receive a request and

12  it definitely is an intermediary.  It -- all communication goes

13  through there.

14  Q.  And if you turn in DX 7 -- sorry, not DX 7 -- DX 4, which is

15  the '425 patent, to column 20, lines 15 to 23.

16      Could you explain what that portion of the patent is talking

17  about.

18  A.  Yes.  I will read it.  It is talking about a connect event.

19  It says:  Connect event.  This event occurs when the association

20  specific listening portal receives a transport layer connect

21  request, usually from the fixed end system 110.  When it wishes

22  to establish a transport layer end-to-end connection with a

23  mobile end system 104.  The proxy server 224 accepts the connect

24  request on behalf of the mobile end system, and then builds a

25  connect event RPC call and forwards it to the mobile end system.

1      So, here a lot of things are being disclosed, but, in

2  particular, it is explicitly talking about receiving a transport

3  layer connect request.  So, that's the response for a request,

4  and it also is acting as an intermediary.

5  Q.  Would you please check that box, Dr. Bhattacharjee.

6      And then the next limitation says:  By creating one or more

7  communication sessions there between, said one or more

8  communication sessions being created by the location facility.

9      Is that disclosed in the '425 patent?

10 A.  Yes.  Application layer data, whatever protocol that the end

11 systems are running, goes over the intermediary, thereby

12 creating these sessions.

13 Q.  And then if we look at the next -- sorry, if you will check

14 that one, please.

15     And then if you look at the next line:  In response to the

16 receipt of the request for communication with the personal

17 computer from the remote computer.

18     Is that disclosed in the '425 patent?

19 A.  Yes, that's what I just read.

20 Q.  If you would check that, please.

21     And how about:  By determining a then current location of

22 the personal computer.

23     Is that disclosed in the '425 patent?

24 A.  Yes.  In order for it -- for the server computer to actually

25 forward the request -- actually it doesn't forward, it creates a

1   new RPC.  But the destination of the RPC is the current point of

2   presence address of the mobile computer.  And so, it must

3   determine the then current location of the personal computer.

4   Q.  If you'll turn in DX 4 to column 3, lines 40 to 42.

5       Is that describing the point of presence address that you

6   mentioned?

7   A.  That's correct.

8   Q.  And then if we look at -- sorry.  If you would check that

9   box off, please, Dr. Bhattacharjee.

10      And then if we look at the last limitation:  Creating a

11  communication channel between the remote computer and the

12  personal computer, and then the rest of that clause.

13      Is that disclosed in the '425 patent?

14  A.  Yes, that very paragraph from column 20 that I read

15  describes exactly that.

16  Q.  So, does the '425 patent disclose all of the requirements of

17  claim 24 of the '479 patent?

18  A.  Yes, it does.

19  Q.  Let's turn to the third reason you gave -- you went ahead

20  and did it for me, you checked the last box.  Thank you.

21      Let's turn to the third reason you gave for your opinion

22  that the patent is invalid.  And can you remind us what that

23  was?

24  A.  Yes.  The '479 patent is invalid because it is obvious in

25  light of the '716 Crichton patent and the '704 Hutton patent.

1   Q.  Would you turn in your binder to DX 28.

2   A.  Yes.

3   Q.  Is that the '716 patent that you just referred to?

4   A.  Yes.

5   Q.  And would you read the full number of that patent, please.

6   A.  Yes, it's U.S. Patent 6,104,716.

7   Q.  And when was that patent filed at the Patent Office?

8   A.  March 28, 1997, about three years before the '479 patent was

9   filed.

10  Q.  And then if you also would turn to DX 7 in your binder.

11      Is that the '704 patent that you just mentioned?

12  A.  Yes.

13  Q.  And what is the full number of that patent?

14  A.  6,108,704.

15  Q.  When was that patent filed, Dr. Bhattacharjee?

16  A.  September 25, 1995, which is about five years before the

17  '479 patent was filed.

18          MS. FERRERA:  Your Honor, we would like to offer DX 7,

19  please.

20          MR. ANTONETTI:  No objection.

21          THE COURT:  It is admitted.

22          MS. FERRERA:  Your Honor, if I could ask the Marshal to

23  put up DDX 3-7, which is a figure from the '716 patent.

24  BY MS. FERRERA: (Continuing)

25  Q.   Now, Dr. Bhattacharjee, do you recognize this figure from

S. Bhattacharjee - Direct                                              934

1    the '716 patent.

2    A.   Without the colors, yes.

3    Q.   And the colors were added to assist in your testimony, is

4    that correct?

5    A.   That is correct.

6    Q.   Would you explain to us what the '716 patent in particular

7    this figure is talking about?

8    A.   Yes.   The '716 patent is, once again, about remote access.

9    There are these client computers that are trying to access a

10   server computer, but they are separated by two or more firewalls

11   that impede the connections.   And the '716 patent describes a

12   architecture, really, consisting of three proxies together that

13   act as a server that allow this remote access to proceed.

14   Q.   And is the '716 patent directed to any of the same problems

15   as the '479 patent?

16   A.   Yes.   In particular, the '716 patent is talking about

17   accessing machines, servers that are behind firewalls.

18   Q.   And how does the '716 patent's solution to that problem

19   compare to the '479 patent?

20   A.   Very similar.   It has this intermediary server that

21   intermediates access from the client to the server.

22   Q.   And could you tell us which of the components in Fig. 10

23   correspond to the personal computer in the '479 patent?

24   A.   That would be the server that is being accessed in green,

25   yes.

1   Q.   That's the one in the green box?

2   A.   Yes.

3   Q.   And then which of the components correspond to the server

4   computer in the '479 patent?

5   A.   Right.   The server computer or the intermediary is really in

6   three pieces here.   It is the client proxy, middle proxy, and

7   server proxy altogether called the SOCKS server in this

8   embodiment of the '716 patent.

9   Q.   And which of the components corresponds to the remote

10  computer in '479 patent?

11  A.   The blue box, the client, the SOCKS client.

12  Q.   And now, Your Honor, I would like to ask permission to show

13  DDX 3-10 next to the '716 patent figure, if we could.

14       Dr. Bhattacharjee, can you tell us what DDX 3-10 is?

15  A.   This is Fig. 1 from the '704 patent.

16  Q.   Are the blue, red, and green boxes added in order to assist

17  in your testimony?

18  A.   Yes.

19  Q.   Could you tell us what the '704 patent is discussing or

20  describing.

21  A.   '704 patent is also about remote access.   There is a first

22  processing unit, which is in blue, that is trying to access the

23  second processing unit, it's called the callee in green.   And

24  there is a connection server in the middle that helps in setting

25  up this access.   The '704 patent is explicitly about the problem

1    of dynamic IP addresses.

2        The second processing unit has an address that can change.

3    And the second processing unit tells the connection server what

4    the address is periodically.  So, when the first processing unit

5    wishes to access the second processing unit, it sends a request

6    to the server and obtains the current address.

7    Q.  And, Dr. Bhattacharjee, if it helps you at all, you have a

8    pointer in front of you, if you need to use that in order to

9    describe the figures.

10   A.  I will be careful with this.

11   Q.  Okay.  So, let's compare the '716 and '704 patent claims to

12   claim 24 of the '479 patent.

13       Did you help prepare a chart in order to assist with that

14   comparison?

15   A.  Yes.

16   Q.  And if we could show DDX 3-11, please.  Maybe on top, that

17   one.  Thank you.

18       Now, Dr. Bhattacharjee, again, looking at the first

19   limitation of claim 24:  Computer program product for use on a

20   server computer linked to the Internet and having a static IP

21   address.

22       Is that limitation disclosed in either the '716 patent or

23   the '704 patent?

24   A.  Yes.  The computer program product for use on a server

25   computer, that would be the hardware and software for what I

1   would call the combined server because you have to take

2   teachings from both in order to create an obviousness

3   combination here.  And the server in '704 has a static IP

4   address.

5   Q.  If we look at the next line:  For providing access to a

6   personal computer from a remote computer.

7       Is that requirement met by either the '716 patent or the

8   '704 patent?

9   A.  Both.

10  Q.  Could you check that one off, please, and also the first

11  one.

12      Do either the '716 patent or the '704 patent disclose a

13  personal computer being linked to the Internet?

14  A.  Yes, both.

15  Q.  Would you check that one off, please.

16      And do either the '716 patent or the '704 patent disclose

17  accessing a personal computer that has a dynamic IP address?

18  A.  Yes, the '704 patent is all about dynamic IP addresses.

19  Q.  And how about accessing a computer that is behind a firewall

20  or a router, does either the '716 or the '704 patent disclose

21  that?

22  A.  The '716 does, yes.

23  Q.  So, together do the '716 patent and the '704 patent meet the

24  fourth limitation there of a dynamic public IP address or a

25  dynamic LAN IP address?

1   A.   Yes.

2   Q.   Would you check that box off, please.

3        And the next line talks about a computer usable medium.

4        Is that met by either the '716 or '704 patent?

5   A.   Yes.

6   Q.   Would you check that box off, please.

7        And then limitation (b) talks about a computer readable

8   program code recorded or storable in the computer usable medium,

9   the computer readable program code defining a server computer

10  program on the server computer wherein.

11       Is that met by either the '716 or the '704 patent?

12  A.   Yes.  This would be the code for the combined server.

13  Q.   Would you check that one off, please.

14       And then turn to (b)(i):  The server computer program is

15  operable to enable a connection between the remote computer and

16  the server computer.

17       Is that met by either the '716 or '704 patent?

18  A.   Yes.  In both cases the server is able to talk to the caller

19  or the client computer.

20  Q.   Would you check that box off, please.

21       And then if we look at (b)(ii) it says:  The server computer

22  program includes a location facility.

23       Is that met by either the '716 or '704 patent?

24  A.   Yes.  The combined server would include a location facility.

25  Q.   And then the next portion of that says:  Is responsive to a

1   request from the remote computer to communicate with the

2   personal computer to act as an intermediary between the personal

3   computer and the remote computer.

4        Is that met by either the '716 or '704 patent?

5   A.   Both have -- is responsive to a request, and the '716 server

6   is explicitly an intermediary in the communication.  So, that is

7   met.

8   Q.   Would you check that box off please, Dr. Bhattacharjee.

9        Then if we go to the next line, it talks about:  By creating

10  one or more communication sessions there between, said one or

11  more communication sessions being created by the location

12  facility.

13       Is that met by either the '716 or the '704 patent?

14  A.   Yes.  The '716 Crichton patent talks about how application

15  level data goes through the locator server, thereby creating

16  these sessions.

17  Q.   Would you check that box off, please.

18       And then if we look at the next line:  In response to

19  receipt of the request for communication with the personal

20  computer from the remote computer?

21       Is that disclosed by either the '716 or '704 patent?

22  A.   Yes, both.

23  Q.   Would you check that box off, please.

24       And then if we go to the next to last one:  By determining a

25  then current location of the personal computer.

1      Is that met by either of the '716 or '704 patents?

2  A.  Yes, both.  And the '704 also determines the current

3  location when the address is dynamic.

4  Q.  Would you check that box off, please.

5      And then going to the very last one:  Creating a

6  communication channel between the remote computer and the

7  personal computer, and the rest of that clause.

8      Is that limitation met by the '716 or the '704 patent?

9  A.  Yes, the '716 Crichton patent.

10  Q.  Would you check that one off, please.

11      Now, Dr. Bhattacharjee, you have identified that certain of

12  the limitations are met in the '716 patent and certain are

13  described in the '704 patent.

14      Would a person of ordinary skill in the art at the time of

15  the invention of the '479 patent have been motivated to combine

16  these two references to achieve the combined teachings?

17  A.  Yes.  First, the problem of the dynamic addresses was

18  obvious by then, and the solutions are also obvious.

19      Okay.  We're taking another piece of art in the remote

20  access field that is solving exactly this problem of remote --

21  of dynamic IP addresses, and it would have been obvious to

22  combine the two.

23  Q.  Would it have been difficult to do that combination?

24  A.  No, it's -- there is no unexpected result here.  It's pretty

25  clear, in fact it is very clear what's going on.  And the

1    modification to the '716 server would be obvious, there is

2    nothing unexpected here --

3    Q.  And --

4    A.  -- nor difficult.

5    Q.  I am sorry.  I didn't mean to interrupt.

6        How would that combination work as a practical matter?

7    A.  Okay.  So, what the '704 patent is saying is the following.

8    I have these hosts and the hosts are periodically getting new

9    addresses.

10       So, what you do as a host is periodically when you get a new

11   address, send the address over to the connection server.

12       What will the connection server do?  It will maintain a big

13   table.  Right.  And in the table there is an identifier, and

14   then the current address.  Such that when a request comes in for

15   that identifier that identifies this host, it will just look up

16   the current address in the table.

17       This mechanism, which is relatively obvious, right -- I

18   mean, if it changes, will tell somebody.  And then there is a

19   fixed point, which is in the 1995 patent.  You would put that in

20   the '716 server, which talks about going through the server as

21   an intermediary.

22       So, what would happen is exactly what you would expect.  The

23   servers in the '716 patent as they get new addresses, they would

24   just update this table by sending the current address over to

25   the combined server.  The requests would have an identifier.

1    And when the request came in, it would look up what the mapping

2    was or what the correspondence was in the table that was created

3    as described explicitly in the '704 patent.

4    Q.  So, if you combined the teachings of the '716 patent and the

5    '704 patent as you described, would that combination meet all of

6    the requirements of claim 24 of the '479 patent?

7    A.  Yes, it would.

8    Q.  Now, Dr. Bhattacharjee, do you understand that in assessing

9    whether an invention is obvious, there are certain secondary

10   considerations or objective indicia that you may look at as well

11   in making that assessment?

12   A.  Yes.

13           MR. ANTONETTI:  Objection, leading.

14           THE COURT:  Objection overruled.

15   BY MS. FERRERA: (Continuing)

16   Q.  You can answer, Dr. Bhattacharjee.

17   A.  Yes.  I understand that.

18   Q.  And did you consider any of those factors in arriving at

19   your obviousness determination?

20   A.  Yes, I did.

21   Q.  Now, are you aware that one of those factors is whether

22   others invented the same invention at roughly the same time?

23   A.  Yes.

24   Q.  Did you consider that factor in reaching your opinions?

25   A.  Yes, I did.

1   Q.  How did that factor affect your opinion?

2   A.  Well, as I have explained, the '888, '425, '716 plus '704,

3   all of them show the same invention.  There are also other

4   inventions that are exactly contemporaneous with '479, including

5   the '721 Hind patent.

6   Q.  Would you turn in your binder to DX 9.

7       Is that the '721 Hind patent that you just referred to?

8   A.  Yes.

9   Q.  And what is the full number of that patent,

10  Dr. Bhattacharjee?

11  A.  It is U.S. patent 6,665,721.

12  Q.  When was this patent filed?

13  A.  It was filed April 6, 2000.

14  Q.  And how does that compare to the date of the '479 patent

15  filing?

16  A.  I think it's about the same time, yes.

17          MS. FERRERA:  Your Honor, we would offer DX 9.

18          MR. ANTONETTI:  No objection, Your Honor.

19          THE COURT:  It is admitted.

20          MS. FERRERA:  If I can ask the Marshal to show

21  DDX 3-13, please.

22  BY MS. FERRERA: (Continuing)

23  Q.  Dr. Bhattacharjee, do you recognize that figure?

24  A.  Yes, it's a figure from the '721 patent, but with some

25  colors added.

1   Q.   Could you tell us what the '721 patent is about.

2   A.   The '721 patent is about remote access.  There are users

3   that are trying to access a machine, and that machine runs a

4   piece of software that allows that machine to be accessed by

5   users even if they have dynamic addresses or they are behind a

6   firewall, and so on.

7   Q.   And what are the problems that the '721 patent is solving,

8   and how do those problems compare with the '479 patent?

9   A.   Exactly the same problems, dynamic addresses, machines being

10  behind firewalls, routers, and so on.

11  Q.   And how does the '721 patent solve those problems?

12  A.   By interposing this Internet hosting Web server.  There is a

13  piece of software called the Internet hosting Web server that

14  has some software that receives these addresses and maintains

15  connections open, just like the '479 patent describes.

16  Q.   So, how does the '721 patent affect your opinion concerning

17  the obviousness of the '479 patent?

18  A.   Well, this is yet another solution to the same problem at

19  the same time, showing that the '479 patent solution was also

20  obvious.

21  Q.   Do you understand that another one of the factors that you

22  may consider is whether there was a long-felt need for the

23  invention?

24  A.   Yes.

25  Q.   Did you consider that factor in arriving at your opinion in

1    this case?

2    A.   Yes.

3    Q.   And what was your analysis of that factor?

4    A.   Well, my analysis is that there was really no long-felt

5    need.  Okay.  The solutions that are being proposed were known.

6    And there wasn't a -- there wasn't a long-felt need.  The

7    solutions were known by then.

8    Q.   And are you aware that another factor is whether others had

9    tried and failed to make the invention of the '479 patent?

10   A.   Yes.

11   Q.   Did you consider that factor?

12   A.   Yes.

13   Q.   And how did that factor affect your opinion?

14   A.   Well, I don't know of anyone trying and failing.  In fact,

15   we have examples of others doing it at the same time or even

16   earlier.

17   Q.   Are you aware that another factor is whether the invention

18   achieved unexpected results?

19   A.   Right.

20   Q.   Did you consider that factor?

21   A.   Yes.

22   Q.   And what was your analysis of that factor?

23   A.   There were no unexpected results here.  It was the

24   application of known techniques, and it gave rise to a known

25   solution.

1    Q.  And another factor, Dr. Bhattacharjee, is whether people of

2    ordinary skill in the field expressed surprise or disbelief at

3    the invention.

4        Did you consider that factor in arriving at your opinion?

5    A.  Yes.

6    Q.  And how did that affect your analysis?

7    A.  Again, you know, I don't know of any surprise or disbelief.

8    I didn't know of this patent before the lawsuit.  And in

9    analyzing the solution, I don't see anything unexpected.

10   Q.  And then lastly, are you aware that another factor is

11   whether the inventor proceeded contrary to accepted wisdom in

12   the field?

13   A.  Yes.

14   Q.  And did you consider that factor?

15   A.  Yes.

16   Q.  How did it affect your opinion?

17   A.  As I have said, this is a known problem with a known

18   solution.  The solution does not proceed contrary to accepted

19   wisdom in the field.

20   Q.  Dr. Bhattacharjee, are you also aware that there is a

21   factor -- that one of the factors to consider is whether the

22   invention has been a commercial success?

23   A.  Yes.

24   Q.  Are you aware of any evidence that the invention has been a

25   commercial success?

1  A.  I am not aware of any evidence that the invention has been a

2  commercial success.

3  Q.  So, Dr. Bhattacharjee, how does your consideration of these

4  various secondary considerations affect your opinion concerning

5  whether or not the '479 patent is obvious?

6  A.  Well, it reinforces my opinion that the patented invention

7  is obvious.

8  Q.  Now, let's turn to your fourth invalidity opinion, which I

9  believe was that the claims were not enabled, is that correct?

10  A.  That's correct.

11  Q.  Before we go into the basis for your opinion, could you

12  explain to the jury what your understanding of the enablement

13  requirement is.

14  A.  Yes.  The patent specification has to teach one of ordinary

15  skill in the art how to make and use the invention without undue

16  experimentation.  If that doesn't happen, then the patent is not

17  enabled.

18  Q.  So, why do you say that the '479 patent was not enabled?

19  A.  Well, in my opinion, the '479 patent is not enabled because

20  it does not teach one of ordinary skill in the art how to make a

21  multi-server configuration or a multi-server implementation of

22  the locator server or the location facility.

23      And this is also further reinforced by the fact that 01

24  themselves were not able to make a multi-server version operable

25  as they represented in the 2003 SRED documents that you have

1   already heard about.

2   Q.  Would you turn to DX 173 in your binder, Dr. Bhattacharjee.

3   A.  Yes.

4   Q.  Do you have that document?

5   A.  Yes.

6   Q.  Is this the 2003 document that you were just referring to?

7   A.  Yes.

8   Q.  And would you turn to page 25 of the document.  And at the

9   top of that page there is a reference to Project Code iServer.

10      Do you see that?

11  A.  Yes.

12  Q.  Were you here last week for Mr. Cheung's testimony about

13  what the iServer project was?

14  A.  Yes.

15  Q.  And what do you understand that it was?

16  A.  I gather it is related to the I'm InTouch product and also

17  the '479 patent.

18  Q.  Now, beneath that in parentheses there is a reference to

19  server farming.

20      Do you see that?

21  A.  Yes.

22  Q.  Could you tell the jury what you understand server farming

23  to be.

24  A.  Well, it's trying to implement the invention over multiple

25  computers.  A farm of servers, so to speak.

1   Q.  And if we go to the first section on that page under

2   Technological Objectives.

3       Would you read that paragraph there to the jury, please.

4   A.  Yes.  Part 2A, Technological Objectives.  With the

5   completion of many different phases of the iServer project, we

6   are beginning to encounter a related problem, multi-servers

7   platform.  While there is a limited number of simultaneous

8   session a single locator server can handle, we need to

9   investigate and implement an efficient architecture to support

10  virtually an unlimited scalability of the server infrastructure

11  while not having any noticeable degrade on the performance of

12  the service we are providing.

13  Q.  What do you understand that paragraph to be talking about?

14  A.  I think it's saying that they can do a single server

15  implementation, and now they are trying to investigate how to

16  make a multi-server implementation.

17  Q.  And if we go to the next section under Technological

18  Advancement.  Could I ask you to read the second and third

19  sentences of that paragraph.

20  A.  The second sentence starts with:  On the single server

21  platform today we have combined the locator registration, the

22  e-commerce, the locator portal, the signup database together.

23  Among all, the locator registration as well as the locator

24  portal required to have the scalability.

25  Q.  And what does that tell you about the architecture of the 01

1  system at the time of this document?

2  A.  Well, this is saying what is -- what is written, which is

3  the registration and the portal functionality, are all on the

4  same machine.

5  Q.  Now when you go to the last section, Technological

6  Uncertainties.  And could you just read the first paragraph to

7  the jury, please.

8  A.  Okay.  The first paragraph of part 2C, Technological

9  Uncertainties.  First of all, the biggest uncertainty is that we

10  are not sure at all whether the farming can work without

11  affecting the efficiency of data delivery throughput.  This is

12  because of our unique architecture that the reverse http

13  mechanism requires the user's PC to be attaching to the locator

14  registration server with a live session.  Then through the

15  locator portal a remote browser would set up a live connection

16  with the user's PC.  Now, if the locator registration servers

17  and the locator portal servers are located in different

18  machines, we are not sure how the architecture can still

19  function.

20  Q.  What do you understand that paragraph to be saying?

21  A.  Once again as written, they can envision two computers where

22  certain things will do one thing, like registration, the other

23  thing will do the portal function.  But if they do that, then

24  they are not sure how the architecture can still function.

25  Q.  So, is there any indication, Dr. Bhattacharjee, in this

1    document that as of -- or whether as of 2003 01 had succeed in

2    subdividing the functions of the location facility across

3    different machines?

4    A.   No.

5    Q.   And how did these statements bear on your opinion regarding

6    enablement?

7    A.   Well, the specification does not provide any guidance as to

8    how to go about doing a multi-server implementation.  And again,

9    four years after the filing of that patent, the inventors are

10   writing that they are not sure how the architecture can still

11   function.

12       So, in my mind, the multi-server function is not enabled,

13   it's not in the specification.

14   Q.   Now, Dr. Bhattacharjee, are you named as an inventor on any

15   patents of your own?

16   A.   Yes, three.

17   Q.   And can you tell us, just generally, what do those patents

18   relate to?

19   A.   Yes.  The first one is about upload.  So, we are all

20   familiar with downloading a lot of data, large amounts of data,

21   but this patent is about efficiently uploading.

22       So, suppose some day you can do your taxes entirely online,

23   but then everybody will want to upload exactly at 11:59.59 on

24   April 15.  Right?  And then that would cause a big problem for

25   the servers that receiving the upload.

1      So, this patent is about scaling that or make that more

2  efficient and feasible in fact.

3  Q.  Then you said you had two other patents?

4  A.  Oh, right.  The second patent is about wireless

5  communications.  So, when you have wireless communications, what

6  can happen is if I am sending a packet, it will have bit errors.

7  You know, somebody opens a door somewhere, and that causes

8  electromagnetic problems and your bits get dropped.

9      Now, if you look at the bits that are dropped in a packet,

10  it turns out they are not dropped uniformly.  The probability

11  that a particular bit is dropped is not uniform over the length

12  of the packet.

13      So, what we can do is create a profile of which bits are

14  more likely to be dropped than others, and get more efficient

15  communication by understanding which bits are more likely to be

16  dropped.

17      And then, sorry, there is this last patent which just was

18  issued last week.  It's about detecting -- you have a large

19  network and you get to -- as a network administer you get to see

20  the traffic going in and out of your network.  And then this is

21  about some statistical analyses that's saying, hey, is somebody

22  mounting an attack on remote servers from inside my network,

23  just by looking at the packets that are coming and going.

24  Q.  As a result of having filed your own patents,

25  Dr. Bhattacharjee, are you familiar with the duty of candor that

1   an inventor owes to the Patent Office?

2   A.   Yes.

3   Q.   And can you tell the jury what your understanding is.

4   A.   Well, I think we have to as inventors disclose all known

5   prior art to the Patent Office so that they can make a correct

6   determination as to the inventiveness, let's say, of the

7   application.

8   Q.   Now, were you here last week, Dr. Bhattacharjee, when

9   Mr. Cheung testified that he became aware of the '888 patent

10   when 01 was sued on that patent in 2007?

11   A.   Yes.

12   Q.   And do you recall that Mr. Cheung testified that was before

13   the reexamination of his '479 patent?

14   A.   Yes.

15   Q.   Have you reviewed the communications back and forth between

16   the Patent Office in connection with the reexamination?

17   A.   Yes.

18   Q.   Based on your review, did 01 submit the '888 patent that you

19   testified about last week and today to the Patent Office during

20   the reexamination?

21   A.   No, they did not.

22   Q.   Now, were you here for Mr. Cheung's testimony about the

23   reason why he did not tell the Patent Office about the '888

24   patent?

25   A.   Yes, I was.

1   Q.  And do you recall that he testified that he didn't -- it had

2   nothing to do with the '479 patent technology?

3   A.  I heard him say that.

4   Q.  Do you agree with him?

5   A.  Absolutely not.

6   Q.  Can you tell the jury why?

7   A.  Well, as I have described the '888 patent to you, it's about

8   remote access, it's about intermediating through this Web

9   server, and it has the same solutions as the '479 patent.  So, I

10  don't see how it is not related.

11  Q.  Would you turn to DX 27, which is the '888 patent.

12      If you could turn in particular to column 3, line 65, and

13  going up to column 4, line 6.

14  A.  Okay.

15  Q.  Would you just read those lines to the jury, please.

16  A.  An advantage of the present invention is that much greater

17  computational power is accessible by users of the Internet and

18  the www, World Wide Web.  The present invention will, for

19  example, allow a client computer user to diagnose and fix

20  problems on a host computer, run application programs that are

21  available on the host computer, perform maintenance on the host

22  computer, et cetera.  Furthermore, users from multiple client

23  computers can access a single host machine to permit

24  collaborative or multiple individual efforts on that computer

25  system.

1   Q.   Is that describing remote access, Dr. Bhattacharjee?

2   A.   Yes.

3   Q.   And then just a little bit further down in column 4 starting

4   at line 48 to line 52.  Would you read those lines, please.

5   A.   By implementing the processes, apparatus and systems of the

6   present invention, one or more of the computer systems 14

7   through 18 can monitor and/or access virtually the entire

8   functionality of any other computers 14 through 18 connected to

9   the Internet 12.

10  Q.   Is that describing remote access?

11  A.   Yes.

12  Q.   Do you have an opinion, Dr. Bhattacharjee, as to whether or

13  not the '888 patent would have been material to the Patent

14  Office during its consideration of the '479 patent?

15  A.   Yes.

16  Q.   And what is your opinion?

17  A.   Well, the '888 patent would certainly be material to the

18  Patent Office.

19  Q.   Now, did you review any of the other prior art references

20  that were before the Patent Office during the reexamination?

21  A.   Yes.

22  Q.   And how does the '888 patent compare with those other

23  references?

24  A.   Well, the '888 patent is the closest compared to the others

25  in terms of the problems and solutions in the '479 patent.

1           MS. FERRERA:  Thank you.  No further questions, Your

2    Honor.

3           THE COURT:  All right.

4       CROSS-EXAMINATION

5    BY MR. ANTONETTI:

6    Q.  Good morning, Dr. Bhattacharjee.  I have a few housekeeping

7    items, related statements from your prior depositions and

8    reports and your testimony here today, that I wanted to confirm

9    whether or not they are still your view today.  Okay?

10          Dr. Bhattacharjee, assuming that there were no load issues,

11   could the LogMeIn remote access system be implemented on one

12   server computer?

13   A.  Probably, yes.

14   Q.  Now, Dr. Bhattacharjee, for purposes of my next question, I

15   want you to assume the following.  The locator server computer

16   and the location facility as claimed by the '479 patent do not

17   require that it be defined by a static IP address.

18          Can you assume that for me?

19   A.  Okay.

20   Q.  Now, if you make that assumption, it is your opinion, isn't

21   it, that a distributed locator server computer and a distributed

22   location facility would be enabled by the '479 patent?

23   A.  Yes.

24   Q.  Is it true that you said in paragraph 28 of your report of

25   February 2011 that the LogMeIn system, once a host is able to

1    authentic the gateway server, that the host maintains a standing

2    network connection with the gateway server and the host and

3    "periodically exchanges messages to ensure that the connection

4    is live"?

5    A.  Yes.

6    Q.  Is it also true that at your first deposition you gave just

7    about two years ago today on March 23, 2011, you were asked to

8    describe the process by which the host periodically exchanges

9    messages to ensure that the connection is live?

10   A.  I can't remember what was asked two years ago.  Sorry.

11   Q.  Okay.  Well, if you could, and if the Marshal could

12   distribute something from the binders and deposition testimony

13   we have for you.

14       And I promise not to ask you about all this paper.  But if

15   you could, turn to your first deposition, and that's the

16   March 23 deposition from 2011.  And turn to page 80, lines 12 to

17   25.

18       Are you there, Dr. Bhattacharjee?

19   A.  Yes.

20   Q.  Okay.  I'm going to read the questions and answers from

21   lines 12 to 25, and you can tell me if I read it correctly.

22       It says there:  Question:  Then it says, periodically

23   exchanges messages to ensure the connection is live.

24       And you answered:  Correct.

25       And then the next question was:  Can you describe that

S. Bhattacharjee - Cross                                      958

1   process to me?

2       And your answer was:  I believe it's every 30 seconds or so,

3   and I think the exact timing might be in my report in the source

4   code section, the host sends a message which is within the code

5   called a ping to the gateway, and the gateway replies with a

6   message which is called a pong.

7       Do you see that there?

8   A.  Yes.

9   Q.  And I read that correctly?

10  A.  Yes, you did.

11  Q.  And you said that back in March of 2011, right?

12  A.  Correct.

13  Q.  And do you still believe that is how -- do you still believe

14  that is how the LogMeIn system worked at that time?

15  A.  Sorry, could you repeat the question.

16  Q.  Do you still believe that that is how the LogMeIn system

17  worked at that time?

18  A.  Yes.

19  Q.  Okay.  And that's how it works today too, isn't it?

20  A.  I haven't seen anything to contradict this.

21  Q.  Okay.  Now, a question -- you were asked about the '721

22  patent.  You can put the deposition away for now,

23  Dr. Bhattacharjee.

24      You're not contending here today that the '721, or Hind

25  patent, invalidates the '479 patent, are you?

1    A.  I don't know whether the priority date would allow it to

2    invalidate it.

3    Q.  Well, it was not one of the four reasons you stated for

4    invaliding the patent, right?

5    A.  Correct.

6    Q.  Now, Dr. Bhattacharjee, you understand that the claim

7    construction in this case says, "The locator server may comprise

8    one or more computers, and the location facility may be

9    distributed among one or more locator server computers,"

10   correct?

11   A.  I guess -- guess so, correct.

12   Q.  Now, in your first deposition in this case, you said you

13   read the '479 patent and that it did not disclose a decomposed

14   server embodiment, right?

15   A.  I believe you're talking about the very last paragraph of my

16   deposition from the first one.  Is that the context?

17   Q.  Well, I'm just asking, did you say at your deposition that

18   it did not disclose a decomposed server embodiment?

19   A.  I think out of context -- I would like to see what was

20   written, but I believe I have said consistently that it does not

21   disclose a decomposed server in the case of the location

22   facility.

23   Q.  Okay.  And so, you -- how you were reading the '479 patent

24   at the time of your first deposition was wrong in light of the

25   way the claims have been construed today, right?

1  A.  No.

2  Q.  Okay.  Now, on Thursday, Dr. Bhattacharjee, you testified

3  that you were extremely careful in taking these types of expert

4  witness assignments.  Do you remember that?

5  A.  Yes.

6  Q.  And you also testified that your primary job is being a

7  professor at the university, right?

8  A.  Correct.

9  Q.  And as you told the jury on Thursday, you want to make sure

10 that when you take on an assignment as an expert witness, that

11 it's clearly within your expertise with the research you do and

12 the education you have, right?

13 A.  Correct.

14 Q.  And so, your academic integrity, Dr. Bhattacharjee, is

15 important to you, right?

16 A.  Yes.

17 Q.  Now, as a professor of computer science, Dr. Bhattacharjee,

18 are you at all knowledgeable about the computer science programs

19 at other universities?

20 A.  Yes.

21 Q.  And as someone knowledgeable in the field of computer

22 science, you are, of course, aware of the computer science

23 program at Carnegie Mellon University in Pittsburgh,

24 Pennsylvania, right?

25 A.  Yes.

S. Bhattacharjee - Cross                                                    961

1   Q.  And Carnegie Mellon is a pretty good school for computer

2   science, isn't it?

3   A.  Yes, it is.

4   Q.  In fact, would you agree with the statement that Carnegie

5   Mellon has one of the top-ranked computer science programs, if

6   not the top-ranked computer science program in the country?

7   A.  Well, I think those are marketing statements.  You know, a

8   program is good or bad.  I mean, all programs are reasonable.

9   Carnegie Mellon is certainly a top program.

10  Q.  Now, have you also heard of the Parallel Data Lab at

11  Carnegie Mellon?

12  A.  Yeah, I'm familiar with it.

13  Q.  And you do know who Dr. Gregory Ganger is, right?

14  A.  Yes.

15  Q.  And you saw -- even saw Dr. Ganger here in the courtroom

16  while you were testifying on Thursday, right?

17  A.  Yes, I did see him.

18  Q.  And Dr. Ganger is here today as well, right?

19  A.  Yes, he is.

20  Q.  Now, you're aware that Dr. Ganger is the director of the

21  Parallel Data Lab at Carnegie Mellon University?

22  A.  Yes.

23  Q.  And in providing your expert testimony, Dr. Bhattacharjee,

24  you even relied on Dr. Ganger's declaration given in the Patent

25  Office's reexamination of the '479 patent to form your opinions

S. Bhattacharjee - Cross                                    962

1   offered in this case, right?

2   A.  I have referred to his statements, yes.

3   Q.  And you considered them?

4   A.  Yes, I have.

5   Q.  And you agreed with your belief as to what a number of those

6   meant, right?

7   A.  I agreed with my belief, yes.

8   Q.  And you also relied on your discussions with Marton Anka in

9   formulating your opinion in this case, correct?

10  A.  Well, let me clarify.  I have never really had discussions

11  with Marton Anka.  I've asked him specific questions and he's

12  given me answers.  And they were not extensive conversations, by

13  any means.

14  Q.  All right.  But you did see Marton Anka testify in court

15  here on Thursday, correct?

16  A.  Yes.

17  Q.  And you remember Mr. Anka's testimony, right?

18  A.  I mean, I don't remember it word by word, but I know the

19  gist of it, yes.

20  Q.  Would it be your testimony here today that you agree with

21  Mr. Anka's description of the LogMeIn system and its

22  architecture?

23  A.  Yes.

24  Q.  And, in fact, you had to rely in part on what Mr. Anka told

25  you to formulate your understanding of the operational details

1   of how LogMeIn worked, isn't that true?

2   A.  Sir, understand that I extensively considered the source

3   code.  But the source code doesn't include everything.  In

4   particular, it doesn't tell me how the machines themselves are

5   configured because that's not part of the source code.

6       And so, only the operations staff and Mr. Anka, by proxy,

7   can tell me how that works.  And that's what I relied upon him

8   for.

9   Q.  And if somebody -- if they told you something that was

10  incorrect, that could affect your opinion, right?

11  A.  Yes.

12  Q.  Now, Dr. Bhattacharjee, you also gave a deposition just last

13  month on February 5, 2013, right?

14  A.  Yes.

15  Q.  And when you testified at your deposition last month,

16  Dr. Bhattacharjee, you were under oath, correct?

17  A.  Yes.

18  Q.  And you were being truthful last month when you testified at

19  your deposition?

20  A.  Yes.

21  Q.  Now, Dr. Bhattacharjee, you provided at least three expert

22  reports in this matter, correct?

23  A.  Yes.

24  Q.  And each and every one of those expert reports was written

25  before you gave your deposition on February 5, 2013, right?

1   A.  Correct.

2   Q.  And in your report of December 12, 2012, you said that the

3   accused LogMeIn products do not infringe any of the asserted

4   claims, correct?

5   A.  Correct.

6   Q.  Now, Dr. Bhattacharjee, on February 5, 2013, just last

7   month, you testified, "I don't know the operational details of

8   LogMeIn," isn't that so?

9   A.  I said that, yes.

10  Q.  Is it your position, Dr. Bhattacharjee, that you could write

11  your reports and render an opinion that LogMeIn's accused

12  products do not infringe the '479 patent without knowing the

13  operational details of LogMeIn?

14  A.  Let me clarify that statement.  First, some of my

15  non-infringement positions do not depend on the operational

16  details.  They're clear from the source code.

17      Second, that statement was made, I believe, when I was

18  asked, do the Web servers have a dynamic IP address?  To which I

19  said, I don't know.  Because if they did, that would provide yet

20  more non-infringement positions.  Even assuming the worst case

21  of the detail I did not know, it still doesn't infringe.

22  Q.  So, it is your position then that you could provide reports

23  and render an opinion without knowing the operational details of

24  LogMeIn, right?

25  A.  As long as I look through the source code in detail and find

 1   sufficient evidence in the source code that refutes one of the

 2   claims, the claim elements, requirements, then yes.

 3   Q.  Now, Dr. Bhattacharjee, I think you started to allude to

 4   this.  At your deposition last month, you were asked whether

 5   LogMeIn's Web servers had a static or dynamic IP address, right?

 6   A.  Correct.

 7   Q.  And at least three times in your deposition you emphatically

 8   denied knowing whether the LogMeIn Web servers have a static or

 9   dynamic IP address, right?

10   A.  Correct.  And since then I have asked Mr. Anka about that.

11   Q.  Okay.  And at the time of your deposition just last month

12   you said you didn't remember even asking whether LogMeIn's Web

13   servers were static or dynamic, right?

14   A.  Correct.  But please understand that my non-infringement

15   position did not depend on whether the Web servers had static or

16   dynamic IP addresses.

17   Q.  But as of the time of your deposition, Dr. Bhattacharjee, no

18   one at LogMeIn had told you whether the Web servers had a

19   dynamic IP address or not, right?

20   A.  I -- let me just say that if they did, I had forgotten.  I

21   just didn't remember.

22   Q.  Now, on Thursday you were able to come to court and say that

23   in the LogMeIn system the Web servers are in fact linked to the

24   Internet and that they -- and, "they have static IP addresses,"

25   correct?

1  A.  Correct.

2  Q.  And when exactly was the first time you learned that

3  LogMeIn's Web servers had static IP addresses,

4  Dr. Bhattacharjee?

5  A.  It was sometime last week I asked Marton Anka.  I don't

6  remember which day it was, but it was certainly before Thursday.

7  Q.  Now, you gave two depositions and provided at least three

8  reports without knowing this basic element of LogMeIn's

9  architecture, right?

10  A.  See, the thing to understand is that the worst case

11  assumption, that they have static IP addresses, would still

12  not -- still not make the product infringing.

13      And so, that's probably why I didn't ask him.  Or if I did,

14  I didn't remember.  But since you had asked me at the

15  deposition -- not you, but I think

16  Mr. Carson did, and I asked Marton Anka specifically.

17  Q.  Okay.  Now, just last month when you gave your deposition,

18  you didn't know whether the LogMeIn database servers had dynamic

19  or static dynamic IP addresses either, did you?

20  A.  No.

21  Q.  Now, Dr. Bhattacharjee, will you agree today that the

22  LogMeIn database servers have static IP addresses?

23  A.  They have static and private addresses.  I knew back then

24  that they had private addresses.  Thus, they were not even on

25  the Internet, so to speak.  They were -- they were on a private

1  network.

2      So, that's all that really mattered to me.

3  Q.  But you didn't know that they had static IP addresses,

4  right?

5  A.  I did not, no.

6  Q.  Now, did you just learn about the static IP addresses on the

7  database servers recently from Marton Anka then?

8  A.  The same conversation with Marton Anka.

9  Q.  And you were here last week when Dr. Andrew Grimshaw

10  testified, right?

11  A.  Yes, I was.

12  Q.  And Dr. Grimshaw is here in the courtroom today too, right?

13  A.  I don't see him, but I think I saw him earlier this morning.

14  Q.  Okay.  You don't have any reason to question Dr. Grimshaw's

15  qualifications as an expert, do you?

16  A.  Not really, no.

17  Q.  But do you -- but you do disagree with his testimony about

18  the domain names www.logmein.com and secure.logmein.com,

19  correct?

20  A.  I disagree with his testimony that those represent static IP

21  addresses, absolutely.

22  Q.  Now, Dr. Bhattacharjee, though, when you enter a legitimate

23  domain name or URL, does it generally resolve to an IP

24  addresses?

25  A.  Does it generally?  Yes.  In this case, the -- not only is

1    not a static IP address, it doesn't even resolve to the IP

2    address of a Web server.

3    Q.  So, is it your statement then that you believe that the

4    www.logmein.com and secure.logmein.com do not resolve to IP

5    addresses?

6    A.  I did not say that.  I said it did not resolve to the IP

7    address of a Web server.

8    Q.  But they do resolve to an IP address, right?

9    A.  Yes.  If you give a legitimate DNS name, the DNS system will

10   give you back an IP address.  That's that mapping I've been

11   talking about.

12   Q.  And have the IP addresses for www.logmein.com and

13   secure.logmein.com changed at all recently?

14   A.  I don't know that they have changed.

15   Q.  So, you don't know?

16   A.  No.  I don't think they have, but I don't know that they

17   have changed.

18   Q.  And back in the year 2000 --

19   A.  Can I -- sorry.  Can I go back to that answer?

20   Q.  Sure.

21   A.  Understand that in the LogMeIn system, there are multiple

22   sites.  And so, depending upon where you are accessing from, you

23   may get back a different IP address.

24       So, inasmuch as from -- if you were to query twice from two

25   different places, you may in fact get back a different address

1    such that they are changing from the perspective of the querier.

2    Whether the set of addresses is changing or not, I don't know,

3    and I don't think they are.

4    Q.   But they do go to an IP address, right?

5    A.   The DNS names, if you do a type A or address type query,

6    will give you back an IP address, regardless, as long as there

7    is such a mapping and the DNS is functioning.

8    Q.   Okay.   Now -- and back in the year 2000 and before that,

9    would you agree that to someone with ordinary skill in the art,

10   static IP addresses and static URLs were -- were used pretty

11   much interchangeably?

12   A.   No.

13   Q.   Okay.   Now, in the year 2000, you had only just gotten your

14   Ph.D. in the summer before, right, in 1999?

15   A.   Yes.

16   Q.   And if Dr. Grimshaw got his Ph.D. in computer science in

17   1988, he would have had 11 more years of experience than you,

18   with much of that experience in the 1990s as a doctor of

19   computer science, correct?

20   A.   Yes.   I don't know that he was necessarily working in

21   networking, but he certainly has more experience.

22   Q.   Now, Dr. Bhattacharjee, critical to your conclusion that

23   the -- that LogMeIn's system does not infringe the '479 patent,

24   is your current opinion that the LogMeIn system is not a single

25   software program, right?

1   A.  It's not just my current opinion, it's always been my

2   opinion.

3   Q.  And for purposes of this patent and for patents generally,

4   however, you would agree, to use your words, the "commonly

5   accepted" meaning for the word "a" is one or more, correct.

6   A.  I think that is the usual construction of "a" in patent law,

7   yes.

8   Q.  And is the -- is the word "software" as a noun singular or

9   plural?

10  A.  I think software is its own plural.

11  Q.  Well, if one wanted to be clear, isn't the singular form of

12  software always referred to as a piece of software or as a

13  single software program?

14  A.  The -- you know, I don't know if it's always referred to

15  that way.  You can just say software.  I don't know that --

16  again, there are many uses of these terms.  These are not

17  technical terms.

18      All I know is that in the patent itself, you know, location

19  facility or just facility is referred to as a program.  There

20  are even sentences which says facility or program.

21  Q.  Well, the plural of software is not softwares with an s,

22  right?

23  A.  I believe I said software is its own plural.

24  Q.  And in your experience, Dr. Bhattacharjee, if you type

25  softwares with an s on your word processing program or on

1    Outlook or your BlackBerry, the spell check always identifies it

2    as a misspelled word, right?

3    A.   Well, I don't use any of those, but I suspect that the spell

4    checker will.

5    Q.   Now, I -- I would like to put up what was DDX 1-20,

6    Dr. Bhattacharjee.  It's defendant's demonstrative exhibit, but

7    I've had it blown up so we can all see it.  Can we have that

8    brought out?

9        And it's in your binder, too, Dr. Bhattacharjee, at DDX

10   1-20, if you want to look at it up close.

11       Now, you see that there in front of you, right?

12   A.   Yes.

13   Q.   Now, Dr. Bhattacharjee, do you remember back on Thursday

14   that LogMeIn's counsel asked you the following question:  "And I

15   am not going to ask you to read the whole definition,

16   Dr. Bhattacharjee, because it is quite long.  But is that

17   consistent with the explanation that you just gave of location

18   facility?"

19       Do you remember that?

20   A.   Yes.

21   Q.   And you said that it was consistent with your explanation,

22   right?

23   A.   Correct.

24   Q.   And that was because, in your view, the LogMeIn system

25   doesn't have a single software program that does all of the

1   things listed on DDX 1-20, right?

2   A.   Correct.

3   Q.   And, Dr. Bhattacharjee, do you still have your red pen from

4   last Thursday and this morning on the stand?

5   A.   I don't know if it's the same pen, but I have a red pen.

6   Q.   I want you to take your time now, though, and read the whole

7   definition very carefully.  Can you do that for me now?

8   A.   Yes.

9   Q.   Now, please circle for the jury so they can see it every

10  time the word "program" appears on LogMeIn's Exhibit DDX 1-20.

11  A.   There is no program in this definition, as I have said.

12  Q.   That's right, there is no program in that definition,

13  correct?

14  A.   That's right.

15  Q.   Now, Dr. Bhattacharjee, nowhere in the Court's construction

16  of location facility is the word "software" limited by other

17  words such as "single software program" or "a piece of

18  software," is it?

19  A.   As I've said, the quote itself recognized in -- in giving

20  this construction that the patent uses "facility"

21  interchangeably with "program."  And I think the Court was

22  clarifying that facility is software, not hardware, and it's a

23  software program.

24       In fact, as I said --

25  Q.   But the word "program" does not appear in that definition

1  there, does it?

2  A.  No, it does not.

3  Q.  Now, would you agree that the definition of software that

4  you're using in this case is narrower than its ordinary meaning?

5  A.  It is narrow explicitly because of what the patent says and

6  what the inventors said to the Patent Office.  So, yes.

7  Q.  So, it is narrower than the ordinary meaning, right?

8  A.  Correct.

9  Q.  Now, would you also agree that you're effectively inserting

10  a limitation of the word "software" in the Court's construction

11  of the term "location facility" by using the word "program"

12  which does not actually appear in the Court's construction of

13  the term "location facility"?

14  A.  No, I think it's there simply because it's in the

15  specification.  And the Court itself said that "facility" is

16  used interchangeably with "program."  And so, that's why it is

17  software.

18  Q.  But the word "program" doesn't appear there?

19  A.  No, it does not.

20  Q.  Dr. Bhattacharjee, in support of your non-infringement --

21      You can take that away now, Mr. Marshal.  Thank you.

22      In support of your non-infringement opinion, you testified

23  on Thursday that the software on the LogMeIn Web server is

24  written by Microsoft, didn't you?

25  A.  Yes, and it's customized by LogMeIn.

1   Q.   Okay.  Now, you also told the jury that the software in the

2   LogMeIn database server is written by Microsoft as well, right?

3   A.   And, once again, customized by LogMeIn.

4   Q.   So, you're not suggesting, are you, that all of the software

5   on the LogMeIn Web server is written by Microsoft, are you?

6   A.   No.  In fact, the excerpt that I read from was written by

7   LogMeIn.

8   Q.   And that was Defendant's Exhibit 314, one of them, right?

9   That was some of the source code you displayed?

10  A.   I wasn't able to display it, but I did --

11  Q.   That you looked at?

12  A.   That's right, yes.

13  Q.   And that was also Defendant's Exhibit 315, right?

14  A.   I don't recall the numbers, sir.  I'm sorry.

15  Q.   And I believe your binder should still be up there.

16  A.   Yes.  I will take your word for it that it's 314 and 315.

17  Q.   Now, would you agree then, it would be misleading if anyone

18  were to suggest that only source -- that the only source code on

19  the LogMeIn Web servers and database servers only came from

20  Microsoft, right?

21  A.   That would be misleading, yes.

22  Q.   Now, do you profess to have carefully read the language on

23  the '479 patent, Dr. Bhattacharjee?

24  A.   Yes.

25  Q.   And the '479 patent is 01 's patent, right?

1   A.   Yes.

2   Q.   Dr. Bhattacharjee, do you recall testifying about the

3   '888 patent on Thursday?

4   A.   Yes.

5   Q.   And you testified about it again here today, right?

6   A.   Yes.

7   Q.   Do you profess to having carefully studied the language in

8   the '888 patent?

9   A.   Yes.

10  Q.   And the '888 patent has also been referred to, I think, in

11  this case as the Accolade patent or the Hickman patent, right?

12  A.   Correct.

13  Q.   Now, do you remember that you said on Thursday that the

14  words "dynamic IP address" do not appear anywhere in the '888

15  patent?

16  A.   It doesn't have exactly those words, yes.

17  Q.   And those words do not appear anywhere in the '888 patent,

18  right?

19  A.   And in the '479 patent, that's right.

20  Q.   Now, Dr. Bhattacharjee, I would ask that you turn to the

21  trial transcript then.  And you just said that they do not

22  appear in the '479 patent either, right?

23  A.   Those words, I don't believe, are in the '479 patent.

24  Q.   Okay.  And you were asked about that on Thursday, right?

25  A.   Correct.

1    Q.  And your testimony hasn't changed in that regard from

2    Thursday to today, right?

3    A.  I don't think those words are in the '479 patent.

4    Q.  And so, it would still be your answer today,

5    Dr. Bhattacharjee, that dynamic IP address does not appear in

6    the '479 patent, right?

7    A.  I can't recall a place where it is --

8    Q.  Now --

9    A.  -- in the specification.

10   Q.  Well, let's -- let's go through this carefully then,

11   Dr. Bhattacharjee.  You testified that you prepared a chart that

12   you looked at and it had the '888 patent on it, right?

13       And I would ask the Marshal if we could have ours for a

14   second.  And I've had that chart copied again so we can look at

15   it here with the jury.

16       Now, on Thursday on page 912 of the trial transcript,

17   counsel for LogMeIn asked you this question, and maybe you

18   remember it:  And then let's go to the last limitation, creating

19   a communication channel between the remote computer and the

20   personal computer.  And I won't read the rest of it.  I think

21   you described that earlier.  But is that limitation in the '888

22   patent?

23       And you answered no to that, right -- or yes?

24   A.  Yes.

25   Q.  Okay.  Now, I read -- I have had the exhibit blown up.  If

1   you would carefully read to yourself the rest of the words in

2   the last box on the bottom that did not get read on Thursday and

3   did not get read either today in context with the '425 patent or

4   the other patent that was displayed, from the words "personal

5   computer" on.

6   A.   The location facility being operable to create such

7   communication channel whether the personal computer is linked to

8   the Internet directly with a publicly addressable dynamic IP

9   address or indirectly via an Internet gateway/proxy with a

10  publicly un-addressable LAN dynamic IP address.

11  Q.   So, the words "dynamic IP address" do appear in the '479

12  patent, don't they?

13  A.   In the claims, not in the specification.

14  Q.   But that's not what you said on Thursday, and it's not what

15  you said earlier today, is it?

16  A.   I made a mistake.  It is in the claims.  It's not in the

17  specification or the teachings of the patent, yes.

18  Q.   And so, you would at least agree today that the '479 patent

19  is different from the '888 patent in that the '479 patent has

20  the words "dynamic IP address" in it while the '888 patent does

21  not have the words "dynamic IP address" in it, correct?

22  A.   The claims have the word "dynamic IP address."  The

23  specifications of neither do.  And in -- in that way, they are

24  different, yes.

25  Q.   Now, talking about the specifications, Dr. Bhattacharjee,

1  would you agree with the term -- that the term "dynamic IP

2  address" involves a situation in which a user's Internet

3  protocol addresses generally changes -- or, I am sorry.

4      Would you agree that the term "dynamic IP address" involves

5  the situation in which "a user's Internet protocol address

6  generally changes from time to time for system resource

7  management reasons"?

8  A.  Yes.

9  Q.  I would ask that you turn to Plaintiff's Exhibit 1.  And

10  that's in your binder from Thursday.

11  A.  Okay.

12  Q.  Do you have it there in front of you?

13  A.  Yes.

14  Q.  And I would ask that you look at column 3 in Plaintiff's

15  Exhibit 1.  That's the '479 patent, right?

16  A.  Yes.

17  Q.  And in column 3 there are the specifications of the '479

18  patent, right, Dr. Bhattacharjee?

19  A.  Yes.

20  Q.  Now, let me read you the sentence that begins on line 15 and

21  ends on line 18 for you.  And you can tell me if I read it

22  correctly.  It reads, "this is because the user's Internet

23  protocol address generally changes from time to time for system

24  resource management reasons."

25      Did I read that correctly?

1    A.   Yes.

2    Q.   And that is describing a dynamic IP address in the

3    specifications of the '479 patent, isn't that true?

4    A.   Very much like the '888 patent also describes scenarios

5    where a user would necessarily have a dynamic IP address,

6    correct.

7        All I said was -- and I believe you have pointed out that it

8    was -- I was incorrect.  I said that the patent doesn't talk

9    about the words "dynamic IP address" and the specification

10   doesn't use those words.  It has the concept, definitely.  The

11   claims do even have the words "dynamic IP address."

12   Q.   Thank you, Dr. Bhattacharjee.

13       I don't need this chart any longer.

14            THE COURT:  All right.  Why don't we take a brief

15   recess.

16            MR. ANTONETTI:  Yes, Your Honor.

17            NOTE:  At this point the morning recess is taken; at

18   the conclusion of which the case continues as follows:

19            THE COURT:  All right.

20            MR. ANTONETTI:  May I proceed, Your Honor?

21            THE COURT:  Yes.

22   BY MR. ANTONETTI: (Continuing)

23   Q.   Dr. Bhattacharjee, I am now going to ask you a question

24   about the Crichton patent standing alone.

25       You would agree that the locator server in the Crichton

1    patent does not necessarily look up a current address because

2    the Crichton patent is not designed to work with dynamic

3    addresses?

4    A.  It does not necessarily, that's correct.

5    Q.  And when you testified at your deposition just last month

6    that you would have to add the functionality that is described

7    in the Hutton patent to the Crichton patent to enable it to work

8    with a server that had a dynamically allocated IP address,

9    that's the same as what you're saying here today, is that right?

10   A.  That's correct.

11   Q.  Now, the Crichton patent then, without the Hutton patent,

12   does not do exactly what the 01 patent does, right?

13   A.  It does not do what is claimed in claim 24.

14   Q.  And the Crichton patent standing alone does not invalidate

15   the '479 patent, does it?

16   A.  It doesn't invalidate claim 24.

17   Q.  Okay.  And the Crichton patent does not disclose a dynamic

18   IP address, right?

19   A.  Not explicitly, no.

20   Q.  Okay.  Let's talk a little bit about commercial success.

21       Has Citrix been a commercial success with their GoToMyPC

22   product?

23   A.  I think so.

24   Q.  Has LogMeIn been a commercial success with its tens of

25   millions of users?

1   A.  I suppose so.

2   Q.  So, if you assume that LogMeIn infringes the '479 patent,

3   you would say that the '479 patent has been a commercial

4   success, wouldn't you?

5   A.  Well, I don't know what defines commercial success.  As I

6   have said, the so-called invention in the '479 patent is --

7   would have been obvious to one of ordinary skill in the late

8   1990s.

9       And if you look at the LogMeIn software, I think there are

10  lots of other pieces, the user friendliness, the GUI, and how

11  fast it is, and so on, which I expect also contributed to their

12  commercial success.

13  Q.  But you testified for the jury just a few minutes ago that

14  01's patent, the '479 patent, was not a commercial success.  But

15  you just said you don't know how to define commercial success,

16  do you?

17  A.  Well, what I mean is I don't know how to attribute

18  commercial success to one specific piece.  Even if I assume that

19  the '479 patent is being infringed, it's not clear to me that

20  any implementation of the '479 patent automatically gives it

21  commercial success.  And I think we have examples to that.

22  Q.  Well, if LogMeIn implemented the '479 patent, they were

23  commercially successful in doing it, weren't they?

24  A.  Well, this is what I am trying to tell you.  Even if I

25  presume that the LogMeIn system implements the '479 patent,

1    there is a whole bunch of other stuff if you use the program,

2    which you will see, which I expect also contributed to its

3    commercial success.  It's not just an implementation of '479.

4    Q.  Okay.  Now, Dr. Bhattacharjee, you said your rate in this

5    case was $550 an hour, right?

6    A.  Correct.

7    Q.  And you also testified that you spent approximately

8    700 hours working on this case as of your testimony on Thursday,

9    correct?

10   A.  Correct.

11   Q.  Now, Dr. Bhattacharjee, you were asked on Thursday by

12   LogMeIn's counsel how much you billed to LogMeIn to date for

13   reviewing all that source code and looking at the other

14   documents and information you described.

15       And you answered to that question, approximately $300,000,

16   right?

17   A.  Correct.

18   Q.  So, just so the record is clear, Dr. Bhattacharjee, you

19   would agree with me though, that when you multiple 700 hours

20   times $550 an hour, you get a number that is a lot bigger than

21   $300,000, right?

22   A.  I think if you look in my reports, you will see that

23   originally when I started working in this case I was charging

24   $425 an hour.  And I've -- only when we restarted, after two

25   years or whenever the hiatus was, so only for this year is my

1    rate 550.  So, that is my current rate.

2        But basically everything, the bulk of the 700 hours,

3    probably more than 650, was at $425 an hour.

4    Q.  So, approximately how much then have you incurred to date in

5    fees?  Is it more than $300,000?

6    A.  I haven't sent an invoice for the work that I have done in

7    the last month or so.  So, it would be more than 300,000 because

8    that is what I had invoiced before then.

9    Q.  And you do intend to invoice for that additional work, you

10   are not just going to give it away for free to LogMeIn, right?

11   A.  I am not giving it away for free.

12   Q.  Now, are you also going to charge LogMeIn for your work

13   preparing for trial and testifying then on Thursday and today,

14   right?

15   A.  Yes, that's the part that I am talking about.

16   Q.  Okay.  And you said you prepared at least three reports in

17   this case, right?

18   A.  Yes.

19   Q.  Exactly how many reports did you prepare, Dr. Bhattacharjee?

20   A.  I prepared the infringement report.  I did the invalidity.

21   There was, I think, a reply to the invalidity.  And then there

22   was a supplemental report.

23   Q.  So, there are more than three reports, right?

24   A.  Right.

25   Q.  And you talked to LogMeIn's lawyers as part of preparing

1    those reports, right?

2    A.  Yes, I did.

3    Q.  And did LogMeIn's lawyers ever ask you to change any part of

4    your reports?

5    A.  No.

6    Q.  Did Marton Anka review your reports before you finalized

7    them?

8    A.  The LogMeIn lawyers had copies or drafts of my reports.  I

9    don't know who reviewed them.

10   Q.  Do you know if anyone at LogMeIn reviewed your reports

11   before you finalized them?

12   A.  I don't know.

13   Q.  Now --

14   A.  And let me just put it this way.  I don't know what review

15   means.  If I were to write something and they say, change it,

16   it's not going to happen.  The opinions are my own.

17   Q.  And you do plan to charge for any preparation you did on

18   Friday, Saturday, and Sunday and this morning, right,

19   Dr. Bhattacharjee?

20   A.  I didn't do anything on this case Friday and Saturday, but

21   certainly this morning, yes.

22   Q.  Now, you do realize your testimony here today is under oath,

23   Dr. Bhattacharjee, right?

24   A.  Yes.

25   Q.  From the time you were testifying here on Thursday to the

1   time you took the stand to continue your testimony here today,

2   did you in the intervening three days talk at all with LogMeIn's

3   counsel?

4   A.   I asked them for two documents.  And I asked -- and I told

5   them, I'm going home, on Thursday.

6   Q.   And did you talk to them about anything else, about the

7   substance of your testimony?

8   A.   No, absolutely not.

9   Q.   And that's your sworn testimony here today?

10  A.   Absolutely.

11  Q.   Did you talk to LogMeIn's lawyers at all during the break in

12  these proceedings this morning?

13  A.   Just now?

14  Q.   Yes.

15  A.   I was in the restroom, and I don't think I even exchanged a

16  word.  And that's about the only time I got close to one of

17  them.

18          MR. ANTONETTI:  Okay.  I have no further questions for

19  this witness, Your Honor, although I would like to approach the

20  bench briefly.

21          THE COURT:  All right.

22          NOTE:  A side-bar discussion is had between the Court

23  and counsel out of the hearing of the jury as follows:

24  AT SIDE BAR

25          MR. ANTONETTI:  Your Honor, it is improper for them to

1   have talked to the witness in the break in the proceedings.  I

2   would move to strike his testimony.  Or in the alternative, for

3   an instruction to be given to the jury to say that he was talked

4   to by the lawyers during the break in the proceedings.

5           MS. FERRERA:  Your Honor --

6           THE COURT:  He said he didn't talk to them, didn't he?

7           MR. ANTONETTI:  I think he did testify that he did ask

8   for documents to see and review from them.

9           THE COURT:  Well, would there be anything improper

10  about that?

11          MR. ANTONETTI:  All right, Your Honor.

12          THE COURT:  I don't see any --

13          MR. ANTONETTI:  Okay.  Thank you, Your Honor.

14          NOTE:  The side-bar discussion is concluded; whereupon

15  the case continues before the jury as follows:

16  BEFORE THE JURY

17          REDIRECT EXAMINATION

18  BY MS. FERRERA:

19  Q.  Dr. Bhattacharjee, would you please turn to DX 1 in the --

20  sorry.  PX 1, I guess it is, in the binder that we gave you.

21  A.  Yes.

22  Q.  And do you see that's the '479 patent?

23  A.  Yes.

24  Q.  And if you would turn to column 13, claim 24.

25  A.  13, 24?

1    Q.   Yeah, claim 24.

2    A.   Oh, claim 24.   Okay.

3    Q.   And you see if you look down to line 64 and 65, it says:

4    The server computer program includes a location facility.

5         Do you see that?

6    A.   Yes.

7    Q.   And I think you said earlier today that the Court's opinion

8    referred to a facility and program interchangeably, is that

9    correct?

10   A.   Correct.

11   Q.   Would you turn now in the binder that 01's counsel,

12   Mr. Antonetti, gave you.

13   A.   Yes.

14   Q.   If you look at the very last document in that binder --

15   A.   Yes.

16   Q.   -- you see it's United States Court of Appeals for the

17   Federal Circuit.   Do you see that?

18   A.   Yes.

19   Q.   Is that the opinion that you were talking about?

20   A.   Yes.

21   Q.   Would you turn to page 6.

22   A.   Yes.

23   Q.   And under Roman numeral III, about six lines down, it says:

24   The terms "facility" and "program" are used interchangeably in

25   the specification, suggesting that the facilities referenced

1    throughout the patent are software rather than hardware

2    components.

3        Do you see that?

4    A.  Yes.

5            MR. ANTONETTI:  Your Honor, I would object to the line

6    of questioning going into the prior proceeding of the matter.  I

7    don't know what purpose that serves.

8            THE COURT:  What relevance does that have?

9            MS. FERRERA:  Your Honor, this is just to reference the

10   fact that, as Dr. Bhattacharjee said, the Court already has --

11   or the Federal Circuit gave -- made a statement that facilities

12   and programs are interchangeable, as Dr. Bhattacharjee relied

13   upon.

14           THE COURT:  All right.  Objection overruled.

15   BY MS. FERRERA: (Continuing)

16   Q.  Is that the statement that you were referring to,

17   Dr. Bhattacharjee?

18   A.  Yes.

19   Q.  And did Mr. Antonetti read that statement to you or show you

20   that statement?

21   A.  No.  I referred to it.

22   Q.  Do you agree with what the Court said in that statement?

23   A.  Yes.  In fact, as I said, there are places in the patent

24   which explicitly says facility or program.

25   Q.  Would you turn now to the binder that we gave you, I think

1    it's the black binder in front of you, DX 27.

2         Do you see that's the '888 patent?

3    A.   Yes.

4    Q.   Now, you were asked some questions during your

5    cross-examination about whether or not the '479 patent refers to

6    dynamic IP addresses in the specification versus the claims.

7         Do you recall that?

8    A.   Yes.

9    Q.   Does it make any difference to you whether it appears in the

10   claims but not the specification?

11   A.   Well, the specification -- it depends in what context, of

12   course.  But in the '479 patent versus the '888 or --

13   Q.   Right.  You were shown some language in the '479 patent

14   claims referring to dynamic IP addresses.  Do you recall that?

15   A.   Yes.  The claims have dynamic IP address.  I actually don't

16   know if the claims were in the original filing or not because

17   there have been many claims.  The specification doesn't use the

18   term "dynamic IP address" in the '479 patent, neither does the

19   '888 patent.

20        The '479 patent specification does describe IP addresses,

21   and the text in the '888 patent necessarily implies that there

22   were dynamic IP addresses.

23   Q.   And would you turn in DX 27, which is the '888 patent, to --

24   I believe it is column 5.

25        Let's look at column 2, lines 6 through 9.

1   A.   Yes.

2   Q.   Is that the text that you are referring to?

3   A.   Yes.

4   Q.   And how does that necessarily imply dynamic IP addresses?

5   A.   Well, the text says:  A computer user can "cruise," i.e,

6   navigate around, the www, World Wide Web, by utilizing a

7   suitable Web browser and an Internet service provider.  For

8   example, UUNet, America Online and Global Village all provide

9   Internet access.

10       And one of ordinary skill in the art would know that in the

11  late '90s America Online gave out these dynamic IP addresses.

12  Q.   Dr. Bhattacharjee, you were asked about commercial success.

13  Do you recall that?

14  A.   Yes.

15  Q.   Does the -- do the LogMeIn products infringe the '479

16  patent, Dr. Bhattacharjee?

17  A.   No, they do not.

18            MS. FERRERA:   Thank you.

19            MR. ANTONETTI:   Just one question, Dr. Bhattacharjee.

20         RECROSS-EXAMINATION

21  BY MR. ANTONETTI:

22  Q.   I would ask that you look at what LogMeIn's counsel directed

23  you to on page 6 of the last attachment in the witness binder,

24  and that's the Federal Circuit's opinion.

25  A.   Okay.

1   Q.  If you go halfway down in the paragraph under Roman

2   numeral III, the sentence beginning with the word "the terms."

3       Do you see that there?

4   A.  Yes.

5   Q.  And I will read it for you:  The terms "facility" and

6   "program" are used interchangeably in the specification,

7   suggesting that the facilities referenced throughout the patent

8   are software.

9       There is no limitation on a single piece of software, is

10  there, rather than hardware components plural?

11  A.  I think if you just keeping reading, it says --

12  Q.  That's the end of that sentence, is it not?

13  A.  Right.  I am just going to read you the next sentence.

14  Q.  But I am asking you this question.  It does not in that

15  sentence say the word "single piece of software," right?

16  A.  No, it does not.

17          MR. ANTONETTI:  Okay.  I have no further questions.

18          MS. FERRERA:  Nothing further, Your Honor.

19          THE COURT:  All right.  Thank you.  You may step down.

20  You may be excused.

21          NOTE:  The witness stood down.

22          THE COURT:  Who is next?

23          MR. STONER:  Your Honor, LogMeIn rests.

24          MR. SHUNK:  Your Honor, we have a brief motion which

25  Your Honor may want to take up at the side-bar.

1          THE COURT:  All right.

2          NOTE:  A side-bar discussion is had between the Court

3     and counsel out of the hearing of the jury as follows:

4     AT SIDE BAR

5          MR. CORRADO:  Your Honor, motion pursuant to Rule 52,

6     they failed to prove their equitable defenses, inequitable

7     conduct, laches, unenforceability -- I'm sorry, equitable

8     estoppel.

9          Your Honor, the standard for inequitable conduct is

10    that they must show evidence that 01 knew that the '888 patent

11    was material, but-for material, and that they had an intent to

12    deceive the PTO.

13         There is absolutely no evidence in the record at this

14    point -- the Court has heard all of the evidence that there will

15    be on the issue of inequitable conduct.  And the only thing the

16    Court has heard is that Mr. Cheung did not submit the '888

17    patent because it was completely different, it did not solve the

18    problems that his patent solved.  It did not deal with routers,

19    firewalls, or dynamic IP addresses.

20         The evidence is clear that there is no direct evidence

21    of an intent to deceive.  And in addition, there is no

22    circumstance from which you can infer an intent to deceive.

23         The '888 patent was known by 01 when they were

24    prosecuting their own patent.  They did not submit the '888

25    patent in the prosecution of their own patent.  That shows that

1   the single most reasonable inference is not that the '888 is a

2   material patent that should have been disclosed to the PTO.

3          So, for those reasons, the inequitable conduct case is

4   now concluded, and we would move that that should be stricken

5   from the case, certainly that it should not be argued to the

6   jury at this point.

7          In addition, their claim of laches is insufficient as a

8   matter of law.  There is no presumption of laches.  There has

9   only been a five-and-a-half or so year delay in asserting the

10  claim against LogMeIn.  Three of those years the patent was in

11  reexamination, which is not only an excuse for failure to assert

12  a patent, but the PTO suggests that the patent should not be

13  asserted -- the Federal Circuit, I am sorry, suggests patents

14  should not be asserted when they are in reexamination.

15         In addition, there has been absolutely no testimony of

16  reliance.  In fact, there has been contrary testimony that

17  LogMeIn did not rely in any way on the fact that the patent had

18  not been asserted.

19         And, finally, with respect to inequitable conduct,

20  there needs to be an affirmative act leading LogMeIn to take

21  some action.  There has been no misrepresentation of an intent

22  to bring this action against LogMeIn.  There has been no

23  affirmative conduct.  In fact, the evidence is just the

24  opposite, that 01 did not do anything to lead LogMeIn to believe

25  that there was a claim for patent infringement.

1          So, for those reasons, we believe those three claims,

2    which are matters for the Court to decide, not the jury, those

3    three claims are insufficient as a matter of law and should be

4    dismissed.

5          THE COURT:  All right.

6          MR. STONER:  Your Honor, the evidence is far more than

7    that.  Their inequitable conduct, we just had an opinion this

8    patent was invalidating that they withheld from the Patent

9    Office, invalidating and withheld; therefore necessarily but-for

10   material.  It is undisputed Mr. Cheung knew about it.  It is

11   undisputed he made a decision not to withhold it.

12         He told contradictory stories how.  He said in his

13   deposition it never even came to mind.  He then said, oh, it did

14   come to mind, but then I thought it was not relevant.  Or, it

15   did come to mind, but I didn't disclose it because Citrix didn't

16   disclose it.  Those are inherently contradictory explanations

17   under oath of why he did what he did.

18         He made a deliberate decision to withhold.  The only

19   question is, did he know the patent was material, did he know it

20   was material?  He knew it was material in three ways.  He was

21   told it was material.  He was told it was material by Accolade

22   who sued him and his product under his own patent for

23   infringing, saying, your patented technology is the same as to

24   the prior art technology.  He was told that.  Even if he

25   disagreed, he was told that.

1        He was told that again in this lawsuit by Dr.

2   Bhattacharjee submitting reports saying, this patent is

3   invalidating prior art.  It is invaliding prior art, it's

4   material prior art.

5        They could have gone back to the Patent Office, even in

6   this lawsuit, even today, and tried to disclose it.  They would

7   have to withdraw it from issue.  It would interfere with their

8   litigation plans, but they could have done it.  So, he was told

9   twice.

10       He also agreed that -- he equated the two technologies

11  together, his patented technology and the prior art technology

12  he equated together.  First of all, he signed an agreement with

13  Accolade saying, I'm getting a covenant not to sue under your

14  '888 patent for my patented technology, exchanging money for

15  that.  It is essentially a license for three years.  So, he

16  treated the two as the same.

17       He also had an agreement that he would pay Accolade

18  money from suing on his own '479 patent.  If he got any money

19  from suing Citrix, he would pay them to settle their claims

20  under the '888 patent.

21       So, the idea that this never came to mind, that he

22  didn't know about it -- he knew they were terribly related.  It

23  is clear from the face of the patent, Your Honor, this language,

24  this patent says, this is remote access, it is doing exactly

25  what you are doing.

1          And that he fully appreciated that, he read it.  And

2    his testimony in this case when asked, if you knew all about it

3    and you never told the Patent Office about it, he said yes.

4          As far as the other issues -- that issue, we understand

5    here, it's going to be argued to Your Honor anyway, it's not

6    being decided by the jury.

7          On the other issues, there is clearly delay, a

8    misleading action.  They delayed for five-and-a-half years after

9    they had a patent.  They delayed for even before that, they

10   didn't say they had a patent -- that they had a patent

11   application.  They continued, there was delay, there was no

12   notice at all during five years of any problem, any patent, any

13   infringement.

14         The question is, was there prejudice?  There was

15   absolutely evidentiary prejudice to us.  You heard that in the

16   deposition testimony of Mr. Nascimento who said, during that

17   time, I cannot remember anything anymore.  I used to know.  He

18   was one of the inventors.  He is one of the inventors.  I

19   destroyed my e-mail, I destroyed my documents.  I don't have any

20   memory anymore of what my patent is about.  I used to know.

21         Evidentiary prejudice like that is exactly what the law

22   contemplates as prejudice in this situation.

23         Similar for estoppel.  Misleading action, or inaction.

24   Silence can be misleading action if it is coupled with other --

25   other actions by the patent holder.  Where they represent --

1   where they sued Citrix, they put out press releases saying, we

2   have a patent and we are going to enforce it.  And at he same

3   time they say nothing to us as they are chasing their

4   competitors.  That is misleading inaction.  And again, the

5   prejudice was we lost evidence in the interim.

6           THE COURT:  All right.  I believe there is enough

7   evidence to go forward on all these issues.  Your motion will be

8   denied.

9           MR. CORRADO:  May we ask that LogMeIn be prevented from

10  arguing inequitable conduct to the jury by counsel of the

11  prejudicial nature -- inequitable conduct to the jury by virtue

12  of the fact that the prejudicial nature of those kinds of

13  comments in closing argument to the jury, that 01 intended to

14  defraud the PTO?  There is really no evidence that they intended

15  to defraud the PTO.  It is a legal issue for the Court, not for

16  the jury, and there shouldn't be any discussion in closing

17  statement about any intent to defraud the PTO.

18          MR. STONER:  Well, Your Honor, you didn't permit us to

19  open on the issue, we don't intend to close on the issue.  The

20  fact that the Patent Office did not have the prior art, even

21  though 01 knew about it, is relevant to the validity.  And

22  that's all I intend to say.

23          THE COURT:  All right, that's fair enough.

24          MR. CORRADO:  Your Honor, sorry, but we also have a

25  motion with respect to Rule 50 with respect to the invalidity

1    and infringement issues.  We will be filing a brief on this.

2          For the record, we would like to make a motion with

3    respect to Rule 50, that those defenses are insufficient as a

4    matter of law.

5          THE COURT:  All right.  I don't know if you want to

6    respond to that.  I deny that motion.

7          MR. STONER:  Yeah.  I think there is plenty of evidence

8    of invalidity and noninfringement.

9          THE COURT:  All right.

10         NOTE:  The side-bar discussion is concluded; whereupon

11   the case continues before the jury as follows:

12   BEFORE THE JURY

13         THE COURT:  Do you have any further evidence?

14         MR. SHUNK:  We do, Your Honor.  We have one rebuttal

15   witness, Dr. Gregory Ganger.  We would call him to the stand.

16         Your Honor, we have witness binders that we would ask

17   the Marshal to assist us in passing out.

18           DIRECT EXAMINATION

19   BY MR. SHUNK:

20   Q.  Dr. Ganger, please introduce yourself to the jury.

21   A.  Thank you.  My name is Dr. Gregory Ganger.  I am a professor

22   of electrical and computer engineering at --

23         THE CLERK:  He has not been sworn.

24         MR. SHUNK:  I am sorry, that was my fault, Your Honor.

25   I jumped the gun.

1           NOTE:  The witness is sworn.

2           GREGORY GANGER, called by counsel for the plaintiff,

3    first being duly sworn, testifies and states:

4        DIRECT EXAMINATION

5    BY MR. SHUNK:

6    Q.  Okay, Dr. Ganger.  Now please introduce yourself to the

7    jury.

8    A.  All right.  I am still Dr. Greg Ganger, a professor of

9    electrical and computer engineering at Carnegie Mellon

10   University from Pittsburgh, Pennsylvania.

11   Q.  Dr. Ganger, were you retained by 01 in order to give expert

12   analysis and testimony in this case?

13   A.  I was.

14   Q.  Would you tell the jury what you were asked to do.

15   A.  So, I was asked to look at a variety of prior art references

16   and arguments made by LogMeIn and Dr. Bhattacharjee, and

17   consider whether or not the '479 patent is valid generally and

18   specifically in light of those arguments.

19   Q.  Were you instructed how you should come out with that expert

20   analysis?

21   A.  You mean was I told what the answer was supposed to?

22   Q.  Right.  Right.

23   A.  Certainly not.

24   Q.  Okay.  What did you do in order to conduct this expert

25   analysis?

1   A.  Well, I read a large number of materials, many references

2   that were identified.  All of Dr. Bhattacharjee's reports

3   related to these validity questions.  The '479 patent and its

4   entire prosecution history, including the reexam process

5   history.

6       And generally looking at everything I could find that would

7   -- that would relate to this question of whether or not the '479

8   patent was valid.

9   Q.  Now, we're going to get into the details, Dr. Ganger, in

10  your testimony.  But could you begin by telling the jury what

11  you concluded after reviewing all of those materials.

12  A.  Yeah.  After looking at all of that stuff, it is my opinion

13  that the '479 patent is indeed valid.

14  Q.  Would you tell the jury in a general way why you believe the

15  '479 patent is novel and is not obvious.

16  A.  Sure.  So, the '479 patent is a technology for allowing

17  remote access between one computer and another computer using an

18  Internet service that allows the requesting computer, the remote

19  computer, to get to the personal computer and have communication

20  sessions created by that Internet service regardless of --

21  essentially regardless of how that personal computer is

22  connected to the Internet and whether it has got a dynamic IP

23  address or it's behind a firewall or it's behind one of these

24  network address translating routers.

25      Sometimes in understanding why a thing is novel though, it's

1   useful to step back and think about what's not the reason why

2   it's novel.  It's not the case that it's novel because it's the

3   first thing that ever allowed remote access between two

4   computers or allowed one computer to talk to another computer.

5       Dr. Bhattacharjee was accurate when he talked about there

6   having been such technologies before.  He described to you the

7   Telnet program that would let a power user sit at one computer

8   and connect into another computer.

9       He even talked about individual technologies that might

10  solve one of those problems, like setting up dynamic DNS and

11  being able to get to a computer with a dynamic IP address.  Or

12  using a firewall that has been extended with that SOCKS

13  functionality that we'll talk more about to allow a computer to

14  get through the firewall.

15      But what wasn't there was a system that could be provided as

16  an Internet service that would allow a user's personal computer

17  to be made available without them having to concern themselves

18  with which one of those issues they have.

19      So, whether it's the dynamic IP address or it's the network

20  address translating router, they just put it in place, use the

21  Internet service, and it just works because the single

22  technology of the '479 patent addresses all of those issues at

23  once in such a way that you can provide it as an Internet

24  service.  And that's what's novel about it.

25  Q.  And did you see that same ability to overcome all of those

1   obstacles in a simple and easy way in any of these other

2   references that you heard Dr. Bhattacharjee talk about?

3   A.  No.  And I assume we are going to talk about them in more

4   detail.

5   Q.  I am sure we will.

6   A.  Yeah.

7   Q.  After hearing -- well, first of all, you did hear

8   Dr. Bhattacharjee testify this morning and also on Thursday, did

9   you not?

10  A.  Yes, I did.

11  Q.  Has his testimony changed any of your opinions about the

12  validity or obviousness of the '479 patent?

13  A.  No, not at all.  I still believe it's valid.

14  Q.  Let's take a look at each one of the issues that

15  Dr. Bhattacharjee has raised regarding validity.  Let's start,

16  for example, with the Accolade patent.  The jury may have heard

17  it as the Hickman patent or the '888 patent.

18      That is a patent that you have looked at, isn't it?

19  A.  Yes, it is.

20  Q.  I would like you to begin by just telling the jury kind of

21  in layman's terms, what is this '888 patent about?

22  A.  Okay.  So, the '888 patent is about allowing a computer to

23  essentially advertise itself on the Web so that another computer

24  can access it remotely.  Okay.  And we'll talk some about how

25  that works.

1       But that's the nutshell notion.  That you have a computer

2   you want to -- that wants to allow itself to be accessed, and it

3   advertises itself on a Web server so that another computer can

4   find it and connect to it.

5   Q.  Have you put together a few diagrams that explain this and

6   that will help your testimony?

7   A.  I have.

8   Q.  I would ask the Marshal to put up the board that says

9   Hickman board, beginning with the number 5 on it.  Thank you,

10  sir.

11      And if you could flip over the first four pages so that we

12  are looking at number 5.

13      Does this diagram help explain how that Hickman patent

14  works, the '888 patent?

15  A.  Yes.  Yes.  So, can I go for it?

16  Q.  Well, I am not sure go for it is the right word, but can you

17  explain it to the jury, please.

18  A.  Sure.  So, what I have done here is I have taken Fig. 10

19  from -- or, sorry, Fig. 1 from the '888 patent that

20  Dr. Bhattacharjee showed you, but I have simplified it by

21  removing some of the pieces we don't need to talk about how it

22  works, in a nutshell, and added a few pieces to help us

23  understand and see the progression.  Okay.

24      So, here on the left we have a computer called the host.

25  And you can see it sort of looks like a computer, it has got a

1   keyboard and a monitor and the things that we think of as a

2   computer that might sit on your desktop.  Right.  And that's the

3   computer that's going to advertise itself on the Web server.

4   We'll talk about how that works in a bit.

5       Over here we have got another computer called the client,

6   and it is another sort of desktop computer.

7       And in the middle we have got our sort of amorphous cloud

8   that we have seen a lot of times representing the Internet.  And

9   in the Internet, somewhere out there on the Internet is a Web

10  server and that's the Web server, that is going to be used in

11  the '888 technology to advertise this host.  Okay.

12      The host, in fact, all three of them, will have an IP

13  address.  All right.  And for the host, I have gone ahead and

14  shown it here, just underneath there is an IP address listed.

15  It is a number.  As you have heard, for IP addresses, a number

16  of times, happens to be 67.73, and it goes on.  But I know that

17  is going to be hard to see from over there, so I painted it

18  yellow.  So, you can think of it as the yellow IP address.

19      And that's the IP address for this host.  And what the host

20  is going to do in order to advertise itself, is it's going to

21  construct a Java Applet.

22      Now, we heard Dr. Bhattacharjee talk about Java Applet.  And

23  he correctly described it as a piece of code that can be run.

24  In the case of the '888 patent, it's a piece of code that can be

25  run in order to connect to the host.

1      The host itself constructs that Java Applet.  And the key

2    part of how it works for us understanding how it is so different

3    from the '479 patent is that in order to construct that Java

4    Applet, the host puts its IP address inside of the Java Applet.

5    That's described in some detail in the '888 patent, that it

6    takes its own IP address and puts it inside the Java Applet.

7      Okay.  Once it's done doing that -- that's what it talks

8    about as generating the Java Applet or completing the Java

9    Applet.  Once it's done doing that, it uploads it to the Web

10   server.  Makes it available.  This is how it's advertising

11   itself.  It takes that Java Applet it has put together and puts

12   it out there on the Web so another computer can find it.

13     Maybe the other computer user is surfing around the Web

14   looking for the computer they want to access.  They find the

15   computer advertised at this Web server.  Okay.  And they say, I

16   want to access that computer.  And they say that to the Web

17   server.  And the Web server gives them back the Java Applet.

18   Okay.

19     And the client, the thing that wanted to access the host,

20   gets that Java Applet from the Web server -- the Web server got

21   it from the host -- downloads it, and runs it.

22     Now, remember, the Java Applet has the yellow IP address in

23   it, the IP address that the host put in, its IP address.  And

24   with that, it connects to the host.  Okay.  That's why the IP

25   address was put in there, so that it would know how to find the

1    host and connect to it.

2        Okay.  So, the '888 patent is about having the host generate

3    a Java Applet with its own IP address, upload it to a Web server

4    so a client can download it, run it to connect.

5        That's in a nutshell how the '888 patent works.

6    Q.  Well now, how is this different, if it is, from what's

7    described in claim 24 of the '479 patent, Andrew's patent?

8    A.  So, it is different in a number of ways.  It will help to

9    see the first two of -- the first two big ones.  First, if we

10   can flip to the next --

11   Q.  Yes, if the Marshal would flip the page to the next slide.

12   A.  The next slide, we can talk about the first one.  We flipped

13   two there, sorry.  I promise we will get to that one, too.

14       Okay.  So, here is our first one.  It does not deal with

15   dynamic IP addresses.

16       Let's remember the scenario here.  The host constructs the

17   Java Applet, putting its IP address into the Java Applet and

18   uploads it to the Web server.  Okay.

19       The client downloads it from the Web server and then runs it

20   to connect.  The IP address is in there so that the Java Applet

21   can find the host.

22       If you have a dynamic IP address, it might change.  And if

23   it changes after you have uploaded that Java Applet up there,

24   the Java Applet has the wrong IP address in it.  It has the

25   yellow IP address.  But let's say that the IP address -- it's

1   dynamic, so it might have changed.  It has changed to the red IP

2   address.

3        I have a different number in there also, but I realize it is

4   probably impossible to see from that far, at least it would be

5   for me.

6        And if this host has the red IP address, and this Java

7   Applet running on the client is connecting to the yellow IP

8   address, it's not going to work.  It can't work.  This computer

9   is located at this IP address, not this IP address.

10       So, it's not going to work if the IP address changes.  It's

11  sort of the definition, if it is not going to work with a

12  dynamic IP address.  Okay.

13  BY MR. SHUNK: (Continuing)

14  Q.  Are there other differences?

15  A.  There are.  So --

16  Q.  If the Marshal would flip the page for us.

17  A.  If we could flip to that next one.

18       Okay.  It's also not going to work if you have got a

19  publicly un-addressable IP address.  And you might have this

20  because you are behind a firewall, or you might have this

21  because you are behind one of those network address translating

22  router things that we have heard about.

23       Okay.  But the fundamental issue is that if the IP address

24  for this host computer is something that cannot be used over the

25  Internet -- and that's what publicly un-addressable means --

1    then the system can't work.

2        So, let's remember how it works again.  We have got an IP

3    address.  This time I've given it and orange IP address.  This

4    will be a publicly un-addressable IP address.  Okay.  And again

5    it's a number, but I am just showing it as the orange IP

6    address.

7        And the host does what's described in the '888 patent, it

8    puts its IP address, this time the orange one, into the Java

9    Applet.  Okay.  Uploads the Java Applet to the Web server.  You

10   can sort of see it there, maybe, if you maybe see a little bit

11   of orange there.  The client downloads it, runs it in order to

12   connect.

13       And when the Java Applet tries to connect to that orange IP

14   address, it can't work.  It can't work because it's publicly

15   un-addressable.  That's what the publicly un-addressable problem

16   is all about.  You can't use it over the Internet to connect to

17   that computer.

18       The technology of the '888 patent cannot be used to allow

19   for that connection over the Internet in the case of a publicly

20   un-addressable IP address.

21   Q.  In light of these differences, Dr. Ganger, have you put

22   together a chart that would summarize the elements of claim 24

23   that are not met by the '888 patent reference?

24   A.  Yes.  If we could flip to the next one of the tabs.  Thank

25   you very much.

1    Q.   What are those elements?

2    A.   So, so this is a list of several major elements that are

3    missing, claim 24 elements that are missing.

4        And I would like to start with one that we haven't talked

5    about yet, and that is the issue of determining the then current

6    location.   Remember that the location facility is supposed to,

7    as one of the things it is supposed to do, determine a then

8    current location for the personal computer.

9        Let's contrast that with how the '888 technology works.   The

10   '888 technology, when the client says, I want to connect to that

11   computer, what the Web server does is it gives it a Java Applet.

12   At no time does the Web server determine a location for the

13   personal computer.   It gives it a Java Applet.   Okay.   The Java

14   Applet is not a location.

15       The computer then runs the Java Applet and ends up

16   connected, as long as it's not a dynamic IP address and it's not

17   publicly un-addressable.   But at no time does the Web server

18   determine a then current location in response to a request for

19   communication.   Okay.   But that's a requirement of claim 24.

20       Now, the next item I've listed is no location facility.

21   Let's remember how the Court has explained to us the location

22   facility is defined.   There's those four things that it's

23   supposed to do.   One of them is determining the then current

24   location.

25       In this system, there is no software on the server that is

1   determining a then current location in response to a request for

2   communication.  So, there cannot be something that is defined as

3   the location facility.  And, indeed, there's not.  There's no

4   location facility in the '888 patent by definition from the

5   Court.  Okay.

6       As we've already talked about, there's no support for

7   dynamic IP addresses.  There is no support for publicly

8   un-addressable dynamic IP addresses.

9       And, indeed, if you put together some of those things,

10  there's no creating a communication channel in the case where

11  the personal computer is behind an Internet gateway/proxy with a

12  publicly un-addressable IP address.  It doesn't deal with those

13  problems of, for example, the firewall and the network address

14  translating router.

15  Q.  Well, Dr. Ganger, both you and Dr. Bhattacharjee are

16  professors of computer science, both of you seem smart.  Do you

17  have a sense for why the two of you disagree about this '888

18  patent?

19  A.  Well, there -- there is -- there is a fundamental starting

20  point disagreement that we have.  What I've described to you is

21  what's actually described in the patent itself.

22      What Dr. Bhattacharjee did is, he told you that it can't be

23  what's described in the '888 patent because there was a

24  restriction on -- on Java Applets.  He basically started with a

25  faulty assumption about a restriction on Java Applets that would

1  make it so that it couldn't do what the '888 patent describes,

2  what I described to you, but it has to do something else.

3       And so, since it has to do something else, based on his

4  assumption, he decided that what it would do would be what the

5  '479 patent does, even though that's not described in the

6  patent -- in the '888 patent itself.

7       And I just don't think that's a reasonable way of doing

8  this.

9  Q.  Dr. Ganger, have you taken a look back in the -- in the

10 literature of computer science to see whether you were right or

11 Dr. Bhattacharjee was right about what exactly a Java Applet

12 could do back in 2000?

13      I'm sorry, not in 2000, but at the time that the Hickman

14 patent, the '888 patent, was filed.

15 A.  Yeah.  So, in his deposition testimony and in his -- his

16 description of the '888 patent, what he told everybody was

17 that at the February 12, 1997 date that is listed on the '888

18 patent, that there were no Java Applets available that could

19 make a connection to any computer other than the computer from

20 which they were downloaded.  This is the restriction, the

21 assumed restriction that I was talking about.

22      You remember Dr. Bhattacharjee made -- you know, talked some

23 about you didn't want it to connect anywhere else because it

24 might do something nefarious.  If you downloaded it off the Web

25 and it started connected places, bad things might happen.

1    Right.

2        And it is the case that the very first version of Java did

3    now allow Java Applets to make those connections.  It allowed

4    Java generally to do that, but it put in a restriction that --

5    that Applets that were downloaded off the Web couldn't connect

6    to other places, but -- and this is really important.  It was

7    always understood that that was a temporary restriction.  And it

8    was understood that they were already working on the security

9    functionality implemented in the Java execution system to make

10   it so that the restriction wasn't needed.  And the reason they

11   were going to do that is that interesting applications, like the

12   one in the '888 patent, couldn't be done with that restriction.

13   Okay.

14       So, everybody knew it was going to lifted.  And,

15   importantly, it turns out that in fact it was the -- the

16   versions of Java -- a version of Java that would allow you to

17   not face that restriction was available before the February 12,

18   1997 date.

19   Q.  How did you confirm that to yourself?

20   A.  Well, we found documentation, papers, that had been

21   published by people at Sun.  Sun was the company that provided

22   Java to us at that time that -- that confirmed that the beta

23   version of what's called JDK, Java Developer's Kit, 1.1 was

24   available originally in early December.

25   Q.  Turn to page --

1   A.   I'm sorry, early December of 1996 --

2   Q.   Turn to Plaintiff's --

3   A.   -- which is before that February 1997 date.

4   Q.   I'm sorry.  I keep cutting you off.

5   A.   Sorry.

6   Q.   Turn to Plaintiff's Exhibit 198, Dr. Ganger, if you would.

7   It's in your book.

8        Tell the jury what Exhibit 198 is.

9   A.   So, this exhibit is a paper that was published in a

10  meeting -- published in a conference proceedings called COMPCON

11  in the spring of 1997.  And, in particular, it's a paper by one

12  of the engineers at Sun Computer Systems that worked on the Java

13  team describing, well, as the title says, New Security

14  Architectural Directions For Java.

15       And right in the introduction of it, it states that:

16  Starting from JDK 1.1, beta version released in early December

17  of 1996, available on the Web at httt -- http://java.sun.com, a

18  series of security features meeting customer requirements will

19  be made available to general Java users and developers.

20       This JDK 1.1, that's where they -- that was the sort of next

21  version after the very initial version, and that's where they

22  removed those restrictions.

23       But it's also important still to remember that everybody

24  knew the restrictions were temporary.  So, somebody reading the

25  '888 patent wouldn't say to themselves, well, I might not be

1    able to find a version that lets me do this right now, so it

2    can't possibly do what it says.  They would know that it's

3    describing what Java's intended -- the Java Applets were

4    intended to be able to do.

5    Q.  Dr. Ganger, is this Plaintiff's Exhibit 198 the kind of

6    paper or reference that a person like yourself, an expert in the

7    field, would normally go to in order to find out details of

8    things like the release date of a Java Applet version -- I'm

9    sorry, of a Java version?

10   A.  Well, certainly if I had a paper like this from the people

11   that were on that team that -- that told me when the -- when it

12   was available and where I could go and find it, I would find

13   that compelling.

14          MR. SHUNK:  Your Honor, we move the admission of

15   Plaintiff's Exhibit 198.

16          MR. STONER:  Your Honor, I don't have an objection, but

17   I think the record was unclear about the date of this document,

18   which is actually dated after the '888 patent.

19          THE COURT:  Well, the document, if it's dated, it

20   speaks for itself.

21          MR. STONER:  Okay.

22          THE COURT:  It is admitted.

23   BY MR. SHUNK: (Continuing)

24   Q.  Dr. Ganger, can you clear that up about the date?

25   A.  Sure.  So, counsel was correct that the date that appears

1    for the conference was February 23 to 26, 1997.  The date that

2    appears on the paper is December 19, 1996.  And that difference

3    is probably explained by when the person finished the paper and

4    sent it off to the publisher and when it -- when it was sort

5    of -- when the meeting happened.  Right.

6        And, importantly, the information in the paper is the piece

7    that I pointed to, not when the paper was published.  The

8    information in the paper says that JDK 1.1 was available in

9    early December 1996 on the Web.  In fact, on the Web at Sun,

10   which is where people would know to go and get Java.

11   Q.  Dr. Ganger, are you the same Dr. Gregory Ganger that wrote

12   the declaration that the jury has heard about from a number of

13   witnesses in this case?

14   A.  Yes.  Yes, I am.

15   Q.  You participated in the reexamination that was filed by

16   Citrix against the '479 patent, did you not?

17   A.  I participated in the sense that I provided declarations

18   like that one that's been referred to.

19   Q.  In the course of doing that work, did you become familiar

20   with the various references that were cited in the

21   reexamination?

22   A.  Yes, I did.

23   Q.  Would the '888 patent, in your opinion, either alone or in

24   combination with any of the other references from that

25   reexamination, invalidate any claim of the '479 patent?

1   A.  No, not at all.  As I've described to you, what's actually

2   described in the '888 patent is very different from the '479

3   patent.  It doesn't provide a starting point for creating some

4   kind of a combination and it doesn't fill a hole for one of the

5   other references.

6   Q.  Does the '888 patent teach anything that would be

7   inconsistent or contradictory with the position that 01 took

8   during the reexamination?

9   A.  No, I don't think so.

10  Q.  Do you believe that a -- an examiner would find what is

11  taught in the '888 patent to be useful or important to know in

12  terms of evaluating the '479 patent in that reexamination?

13  A.  No, I don't think so.

14  Q.  Mr. Marshal, if you could take that board down, we're going

15  to move on to the next reference.

16      Can I ask you, Dr. Ganger, to now turn your attention to the

17  combination, the obviousness argument that Dr. Bhattacharjee

18  made combining the so-called Crichton patent and the Hutton

19  patent.

20      Did you look at that?

21  A.  Yes, I did.

22  Q.  Could you tell the jury generally -- first of all, what does

23  that Hutton patent describe?

24  A.  Yeah.  So, the Hutton patent, I would think of it as an

25  Internet phone book.  The concept is that you could go to it and

1    say, I want to talk to the user with the e-mail address

2    something, right, an e-mail address, and could you tell me what

3    IP address they're currently connected at if they're around.

4    Okay.

5        And that's -- that's sort of the concept.  It provides a

6    phone book where you can go and ask it, is a user online?  And,

7    if so, where?

8    Q.  What about the Crichton reference?  Can you give the jury

9    kind of a layman's overview of what the Crichton reference is

10   about?

11   A.  Yeah.  So, the Crichton reference was about allowing a

12   computer on one side of one firewall to be able to talk to a

13   computer on the other side of another firewall by creating sort

14   of a tunnel between them.  Okay.  And that's sort of the

15   high-level description of what Crichton was about.

16   Q.  When did you first learn about the Crichton reference,

17   Dr. Ganger?

18   A.  It was a long time ago.  This was a reference that Citrix

19   had brought in a case before the reexamination.

20   Q.  Did you study it as part of your work of writing a

21   declaration or two in the reexamination proceeding?

22   A.  I did.  The Patent Office was considering that reference

23   extensively and multiple views on what it disclosed as well.

24   Q.  Well, Dr. Ganger, what I would like you to do now is -- I've

25   got to ask you though, have you prepared some diagrams that

1   would help the jury understand the Crichton reference in its

2   combination with the Hutton --

3   A.   I have.   I'm a big picture guy.   If we can use that, that

4   would be great.

5   Q.   In order to get into this, let me ask you, first of all,

6   does the Crichton reference just teach sort of one way of doing

7   things, or does it have several different versions of the

8   invention set out?

9   A.   It has several different, what are often called embodiments

10  that are -- that are laid out and described.

11  Q.   When you heard Dr. Bhattacharjee testify about this patent

12  this morning, was he talking about all of the different

13  embodiments or just one?   What do you recall his testimony

14  being?

15  A.   As I recall, he talked just about one embodiment --

16  Q.   Okay.

17  A.   -- which -- the so-called -- well, as I call it, the SOCKS

18  server embodiment.

19  Q.   Now, I assume it's not going to be easy on us.   SOCKS don't

20  refer to the thing that you wear with shoes, right?

21  A.   No.   No.

22  Q.   Okay.

23  A.   I'm sorry about that.

24  Q.   Would you tell the jury what exactly the SOCKS server

25  embodiment is.

1   A.   Yeah.  So, this is the same Fig. 10 that you saw before

2   except I don't have the colors on this version of it.

3   Q.   Okay.  If we could flip over --

4   A.   I wanted to show you the original.

5   Q.   -- to the third page, so flip the first two off.  There we

6   go.

7   A.   Thank you.  So, here now I do have some color, but I also

8   have a couple of extra pieces.  But let's start with the -- the

9   three components that Dr. Bhattacharjee identified.

10       So, here we have a computer that's running a piece of

11  software called the SOCKS client.  Okay.  And what that's doing

12  is describing a -- SOCKS client, it's describing a piece of

13  software that understands this SOCKS protocol.  SOCKS is a --

14  it's a protocol for talking to a firewall and asking it to let

15  you through.  Okay.  And we'll talk a little bit more about how

16  it does that in a second, but I just wanted to give you

17  that feel for it.  Okay.

18       So, this is the computer that he said was going to be the

19  remote computer, the one that's going to ask to talk to

20  somebody.  All right.

21       On this side we have another computer, and this one is

22  running a piece of software called the server -- that's

23  called -- just called server.  And that was the computer that he

24  said you're going to connect to.  Okay.  He said that's the

25  personal computer.

1      And then in the middle we have a set of three programs,

2   proxy programs that Dr. Bhattacharjee drew a circle around and

3   said that they would collectively be the location facility.  And

4   in particular, they would be -- collectively be the location

5   facility if you also added the Hutton connection server.  Which,

6   as we'll see, doesn't really make any sense.

7      But we're going to take these four programs and we're going

8   to -- going to call them the location facility.

9   Q.  Well, let me stop you right there, Dr. Ganger.  Was that

10  testimony from Dr. Bhattacharjee consistent with this definition

11  of location facility that he was cross-examined about by my

12  partner Mark Antonetti?

13          MR. STONER:  I object, Your Honor.

14          THE COURT:  What's the objection?

15          MR. STONER:  He's asking the witness to comment on

16  whether someone else's testimony was consistent with some other

17  witness' testimony.

18          THE COURT:  Well, objection sustained.

19  BY MR. SHUNK:  (Continuing)

20  Q.  Well, let me ask you this, Dr. Ganger.  In this particular

21  version of the way Dr. Bhattacharjee has put together his

22  analysis of the SOCKS server, has he combined different computer

23  programs on different machines in order to identify one

24  particular thing that he calls the location facility?

25  A.  Yes, he has.  So, as I said, there's these three programs

1    called proxy programs.  There's one that's called the client

2    proxy that sits -- sits on the side with the computer running

3    the SOCKS client.

4         There's one called the server proxy that sits on the side by

5    the computer running the server.

6         And in the middle between the two firewalls, there's a proxy

7    called the middle proxy.  Okay.

8         So, there's these three different programs.  They run on

9    three different pieces of computer hardware.  They have to

10   because they're each on different sides of a firewall.  Okay.

11   And they do different things.

12        Now --

13   Q.  Let me ask you right there, do you think that that

14   particular decision of Dr. Bhattacharjee's to try to identify

15   different computer programs on different computers all as a

16   location facility, was there anything improper about that?

17        MR. STONER:  Your Honor, I object.  I mean, asking him

18   whether another witness' testimony --

19        THE COURT:  Objection sustained.

20   BY MR. SHUNK: (Continuing)

21   Q.  Do you believe that Dr. Bhattacharjee's opinion is incorrect

22   based on the fact that he has in fact combined those different

23   computer programs?

24   A.  No.  I think that his opinion is incorrect for a variety of

25   other reasons.  But simply because he has identified multiple

1    programs that might construct a location facility, or that those

2    programs might be distributed across multiple computers, that by

3    itself is not an issue with respect to the claims of the '479

4    patent.  That is, in fact, consistent with the claims of the

5    '479 patent.

6    Q.  Well, let me ask you about your opinion.  As you have been

7    analyzing these references, Dr. Ganger, what have you assumed to

8    be the definition of location facility?

9    A.  I have always assumed the definition provided by the Court.

10   I've been -- that was -- when that was provided, that was

11   consistent with the definition I was applying before the Court's

12   construction.

13   Q.  And have you understood the Court's construction to restrict

14   location facility to just one computer program?

15   A.  No.  It's well understood in the field that when you

16   construct a server, a piece of server software, that it's common

17   to have multiple pieces of software that are a part of that.  In

18   fact, it's common to take software and break it up into pieces

19   to spread it across machines.

20       It's also very common in developing such software to use

21   this program and that program and specialize them or configure

22   them in order to be your server as opposed to someone else's

23   server in building up an Internet service.  It's a very common

24   thing to do.

25   Q.  Was that common back in the year 2000?

1   A.  Yes, it was.

2   Q.  Now, these different proxies, client, middle server, is

3   there any requirement in the '716 patent that they be located

4   physically next to each other, like in the same room, or within

5   the same network, or something like that?

6   A.  Sorry.  Which patent?

7   Q.  I'm sorry.  We're talking -- yeah, in the Crichton patent,

8   sir, these proxy servers, is there any requirement that they be

9   located near each other?

10  A.  No.  No, not at all.  In fact, in some ways that wouldn't --

11  that wouldn't make sense in what's going on here.

12      So, we've got a firewall in between each of these.  The

13  notion being that this one is behind a firewall at one place on

14  the Internet and this one is on a fire -- behind a firewall on

15  some other place on the Internet, and then this one is somewhere

16  out there to serve as a bridge between those two.  Okay.

17  Q.  Yes.

18  A.  And there's nothing in Crichton or in how one of ordinary

19  skill in the art would read Crichton that suggests that these

20  couldn't be geographically distributed.  In fact, it's sort of

21  the nature of distributed systems, that you would

22  geographically -- you may geographically -- ahh.  You may

23  geographically distribute these things.

24  Q.  Now, I sort of interrupted you, I think, as you were giving

25  an explanation of how the Crichton patent worked because I

1   wanted to ask you about those proxies.  Did you have something

2   more to say about the functioning, as you understand it, of the

3   Crichton reference?

4   A.   Yeah.  So, let's see, where did I leave off?  So, we had

5   our computer here with the SOCKS client.  That's the one that

6   wants to connect.  We have our computer here with the software

7   labeled server.  That's the one that it's trying to connect to.

8   We have our set of three proxies in the middle, which are

9   collectively referred -- can be collectively referred to as the

10  SOCKS server.  Okay.

11       And that's where Dr. Bhattacharjee is finding the location

12  facility when he combines in some functionality from Hutton.

13       Let's understood how the SOCKS protocol works.  It is a very

14  clear, very specific specification for how it works.  And it's

15  important to understand at least a part of it in order to see

16  how it's very, very different.  Okay.

17       What SOCKS says -- what the SOCKS protocol says is, a client

18  that wants to connect through a firewall somewhere else says to

19  the SOCKS server or SOCKS proxy, please connect me to this IP

20  address.  And it tells it the IP address it wants to connect to.

21       So, I've shown that up here.  Connect me to -- this is the

22  little mockup of a request that I've constructed for the SOCKS

23  client to send to the client proxy.  Connect me to IP address,

24  and then a yellow IP address.  There's a number in there, but we

25  can think of it as the yellow IP address for this.  It tells it

1   the IP address.  Okay.

2       It doesn't say, connect me to Dr. Ganger's computer or

3   something vague like that.  It says, connect me to this IP

4   address.  Okay.

5       And then a well-implemented SOCKS system will in fact do

6   that connecting.  So, the client says, connect me to this IP

7   address.  And the server -- the SOCKS system does that.  Okay.

8       That IP address happens to be over here because this SOCKS

9   client is trying to connect to this machine.  There is the IP

10  address, the yellow IP address.  Right.

11      The client tells it the IP address.  It says, connect me to

12  that IP address.  There's no figuring out where to go that

13  happens in the SOCKS server.  The SOCKS server is about getting

14  through the firewall.  It's not about figuring out where to go.

15  There is no figuring out where to go because there doesn't need

16  to be.

17      The where to go is told to it right in the request.

18  According to the specification -- this is what computer people

19  call the sort of definition of the protocol.  The specification

20  of the protocol says that it gives it an IP address.  Dr.

21  Bhattacharjee has even agreed to that in his deposition

22  testimony.

23  Q.  In light of this functionality that you've explained, have

24  you put together a list of all of the -- or at least some of the

25  limitations that are not met by the combination of Crichton and

1  Hutton in terms of claim 24 of the '479 patent?

2  A.  Yeah, I have.  Can I -- can I just say one more thing

3  regarding the other issue though?

4  Q.  Sure.

5  A.  So, remember that one of the things he suggested is you take

6  the Hutton connection server, that Internet phone book that we

7  talked about, and combine it in there somewhere.  That Internet

8  phone book is about looking up an IP address.

9      If you're already told the IP address, there's no value in

10  having a phone book for looking up an IP address.

11      So, when I said that the combination didn't make a whole lot

12  of sense, this is what I was referring to.  The specification

13  says the client is going to tell you where to go.  You don't

14  need to look it up by having some additional functionality in

15  there because the client tells you, that's what the

16  specification says.

17      Okay.  So, the client tells you where to go.  You go.  Okay.

18  Sorry.

19  Q.  And now, have you put together a list of at least some of

20  the elements of claim 24 that are not met by this combination?

21  A.  Yes.  Yes, I have.

22  Q.  If the Marshal would flip over the page.  Thank you.

23      Now, Dr. Ganger --

24          THE COURT:  Actually, it's time for us to recess for

25  lunch now.

1          MR. SHUNK:  Okay.  Thank you, Your Honor.

2          THE COURT:  We will recess until 2:15.

3          NOTE:  The morning portion of the proceedings on

4    March 25, 2013 is concluded.

5          --------------------------------------------------

6

7

8

9

10

11

12

13

14

15

16

17

18

19          I certify that the foregoing is a true and

20      accurate transcription of my stenographic notes.

21

22

23
                   /s/  Norman B. Linnell
24                 Norman B. Linnell, RPR, CM, VCE, FCRR

25